IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § § | |
| Plaintiff, | § § | Case No. 3:10-cv-527 |
| v. | § § | |
| BEN BARNES AND BEN BARNES GROUP, L.P., | § § § | |
| Defendants. | § § | |

## RECEIVER'S ORIGINAL COMPLAINT AGAINST BEN BARNES AND BEN BARNES GROUP, L.P.

### SUMMARY

1. The Court has ordered Receiver Ralph S. Janvey ("Receiver") to take control of all assets of the Receivership Estate in order to make an equitable distribution to claimants injured by a massive fraud orchestrated by Allen Stanford, James Davis, and others.

2. The Receiver's investigation to date reveals that revenue from the sale of fraudulent certificates of deposit ("CD Proceeds") generated substantially all of the income for the Stanford Defendants and the many related Stanford entities (collectively, the "Stanford Parties").

3. The Receiver has identified substantial payments from the Stanford Parties to Ben Barnes and Ben Barnes Group, L.P., a business consulting and lobbying group founded by Ben Barnes (collectively, the "Barnes Defendants"). The payments from the Stanford Parties to the Barnes Defendants totaled over $5 million. Payments to the Barnes Defendants were funded in part by Stanford entities, and in part by Allen Stanford personally, using investor funds drawn

from bank accounts in Houston and Antigua. Through this Original Complaint, the Receiver seeks the return of these funds in order to make an equitable distribution to claimants.

4. At least as early as 2005, the Stanford Parties began a business relationship with the Barnes Defendants, with the Barnes Defendants ostensibly providing various consulting, lobbying, and related services in exchange for the above-referenced payments.

5. The Barnes Defendants' work for the Stanford Parties included (a) consulting and lobbying in connection with United States Virgin Islands ("USVI") tax incentive laws to assist Allen Stanford's efforts to reduce his personal federal income tax liability; (b) consulting and lobbying in connection with the annual "20/20" cricket tournament held in Antigua, a marketing tool for Stanford International Bank and other Stanford companies; (c) consulting regarding political contributions; and (d) advice regarding various investments the Stanford Parties made using investor funds, including Caribbean airlines, alternative energy investments, and the proposed development of an island near Antigua.

6. The Barnes Defendants' work for the Stanford Parties (such as marketing the cricket tournament) had the unfortunate effect of attracting new victims to the Stanford Parties' fraudulent investment scheme. The Barnes Defendants' services provided no reasonably equivalent value to the creditors and victims of the Stanford Parties' Ponzi scheme.

7. At all times relevant to this complaint, the Stanford Parties were insolvent, and Allen Stanford operated the Stanford entities in furtherance of his fraudulent scheme. Each payment from the Stanford Parties to the Barnes Defendants was made with actual intent to hinder, delay, and defraud the Stanford Parties' creditors.

8. The Receiver was only able to discover the fraudulent nature of the above-referenced transfers after Allen Stanford and his accomplices were removed from control of the Stanford entities.

9. The Receiver seeks an order that: (a) the payments from the Stanford Parties to the Barnes Defendants constitute fraudulent transfers under applicable law; (b) the payments from the Stanford Parties to the Barnes Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Barnes Defendants are liable to the Receivership Estate for an amount equaling the payments they received from the Stanford Parties; and (d) the Receiver is entitled to an award of reasonable attorneys' fees, costs, and interest.

## JURISDICTION & VENUE

10. This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

11. Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

12. Further, within 10 days of his appointment, the Receiver filed the original Complaint and Order Appointing the Receiver in 26 United States district courts pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in each district where the Complaint and Order have been filed, including the Western District of Texas.

13. This Court has personal jurisdiction over Ben Barnes and Ben Barnes Group, L.P. pursuant to FED. R. CIV. P. 4(k)(1)(C) and 15 U.S.C. §§ 754 and 1692.

## THE PARTIES

14. Plaintiff Ralph S. Janvey has been appointed by this Court as the Receiver for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities the foregoing persons and entities own or control, including, but not limited to Stanford Financial Group Global Management, LLC ("SFGGM") and Stanford Financial Group Company ("SFGC") (the "Receivership Assets"). Plaintiff Janvey is asserting the claims outlined herein in his capacity as Court-appointed Receiver.

15. Defendant Ben Barnes Group, L.P. is a Texas limited partnership with its principal office in Austin, Texas.

16. Defendant Ben Barnes is a U.S. citizen and resident of Austin, Texas.

17. Each Defendant will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

## STATEMENT OF FACTS

18. On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd. ("SIB" or "the Bank"), Stanford Group Company, and Stanford Capital Management, LLC (collectively "Stanford Defendants"). On the same date, the Court signed an Order appointing a

Receiver, Ralph S. Janvey, over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

## I.   Stanford Defendants Operated a Ponzi Scheme

19.   As alleged by the SEC, the Stanford Defendants marketed fraudulent SIB CDs to investors exclusively through SGC Financial Advisors pursuant to a Regulation D private placement.  First Amended Complaint (Doc. 48), ¶ 23.[1]  The CDs were sold by Stanford International Bank, Ltd.  *Id*.

20.   The Stanford Defendants orchestrated and operated a wide-ranging Ponzi scheme. Stanford Defendant James M. Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning.  Doc. 771 (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); Doc. 807 (Davis Tr. of Rearraignment) at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme ab initio").

21.   In marketing, selling, and issuing CDs to investors, the Stanford Defendants repeatedly touted the CDs' safety and security and SIB's consistent, double-digit returns on its investment portfolio.  *Id*. ¶ 31.

22.   In its brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit."  SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers."  *Id*. ¶ 32.  Further, SIB stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."  *Id*. ¶ 45.

---

[1]   Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Stanford Int'l Bank, Ltd., et al.,* Civil Action No. 3-09-CV-0298-N.

23. In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." *Id.* ¶ 44. More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments. *Id.*

24. Consistent with its Annual Reports and brochures, SIB trained SGC Financial Advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients." *Id.* ¶ 46. In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). *Id.* ¶ 24.

25. Contrary to the Stanford Defendants' representations regarding the liquidity of SIB's portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the Bank's portfolio were misappropriated by the Stanford Defendants and were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" – *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit cards, etc.). In fact, at year-end 2008, the largest segments of the Bank's portfolio were: (i) at least $1.6 billion in undocumented "loans" to Allen Stanford; (ii) private equity; and (iii) grossly over-valued real estate. *Id.* ¶¶ 24, 48.

26. In an effort to conceal their fraud and ensure that investors continued to purchase the CD, the Stanford Defendants fabricated the performance of SIB's investment portfolio. *Id.* ¶ 5.

27.     SIB's financial statements, including its investment income, were fictional. *Id*. ¶ 37. In calculating SIB's investment income, Stanford Defendants Allen Stanford and James Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio. *Id*. Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn. *Id*.

28.     For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing CDs. *See id*. ¶ 1. However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses. As the depletion of liquid assets accelerated, this fraudulent scheme collapsed.

29.     Most of the above facts discovered from Stanford records have since been confirmed by Stanford's Chief Financial Officer, James Davis, who has pleaded guilty to his role in running the Stanford Ponzi scheme.

## II.     *Stanford Transferred Funds from the Ponzi Scheme to the Barnes Defendants.*

30.     Funds from the Ponzi scheme described above were transferred by or at the direction of the Stanford Parties to the Barnes Defendants. The Barnes Defendants did not perform services of reasonably equivalent value in exchange for those payments, and in many instances performed services that simply furthered the Ponzi scheme. Any services provided by the Barnes Defendants were of no utility from the perspective of the Stanford Parties' creditors.

31.     The Barnes Defendants' work for the Stanford Parties included (a) consulting and lobbying in connection with United States Virgin Islands ("USVI") tax incentive laws in order to assist Allen Stanford's efforts to reduce his personal federal income tax liability; (b) consulting and lobbying in connection with the annual "20/20" cricket tournament held in Antigua, a marketing tool for Stanford International Bank and other Stanford companies; (c) consulting

regarding political contributions; and (d) advice regarding various investments the Stanford Parties made using investor funds, including Caribbean airlines, alternative energy investments, and the proposed development of an island near Antigua.

## REQUESTED RELIEF

32. This Court appointed Ralph S. Janvey as Receiver for the Receivership Assets. Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2. The Receiver seeks the relief described herein in this capacity.

33. Paragraph 4 of the Order Appointing Receiver, signed by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing Receiver (Doc. 157) at ¶ 4. Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order Appointing Receiver (Doc. 157) at ¶ 5(c).

34. One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants. *See* Amended Order Appointing Receiver (Doc. 157) at ¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.*, 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660,

669 (D. Kan. 2004). But before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Estate or assets traceable to the Estate. Doc. 157 ¶ 5(b).

### I. The Receiver is Entitled to Disgorgement of Assets Fraudulently Transferred to the Barnes Defendants.

35. The Receiver is entitled to disgorgement of the funds transferred from the Stanford Parties to the Barnes Defendants because such payments constitute fraudulent transfers under applicable law. The Stanford Parties made the payments to the Barnes Defendants with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, the Receiver is entitled to the disgorgement of those payments. Additionally, the Stanford Parties transferred the funds to the Barnes Defendants at a time when the Stanford Parties were insolvent, and the Stanford Parties did not receive reasonably equivalent value in exchange for the transfers.

36. The Receiver may avoid transfers made with the actual intent to hinder, delay, or defraud creditors. "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception. . . . The Receiver's proof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").

37. The Stanford Parties were running a Ponzi scheme, which included SFGC and SFGGM, and paid Barnes with funds taken from unwitting CD investors. The Receiver is, therefore, entitled to disgorgement of the funds the Stanford Parties fraudulently transferred to the Barnes Defendants.

38. Consequently, the burden is on the Barnes Defendants to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value. *See, e.g., Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly."). Consideration which has no utility from the creditor's perspective does not satisfy the statutory definition of "value." *SEC v. Resources Dev. Intern., LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000).

39. The Barnes Defendants cannot meet their burden to establish that they provided reasonably equivalent value for the payments received from the Stanford Parties and did so in good faith. Accordingly, the Receiver is entitled to the disgorgement of those funds.

40. The Receiver was only able to discover the fraudulent nature of the above-referenced transfers after Allen Stanford and his accomplices were removed from control of the Stanford entities. Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period. *See, e.g., Wing v. Kendrick*, No. 08-CV-01002, 2009 WL 1362383, at *3 (D. Utah May 14, 2009); *Quilling v. Cristell*, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 29, 2006); *see also* TEX. BUS. & COMM. CODE § 24.010(a)(1) (claims may be brought either within four years of the transfer *or* "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

41. The Receiver therefore seeks an order that (a) the payments from the Stanford Parties to the Barnes Defendants constitute fraudulent transfers under applicable law; (b) the funds transferred from the Stanford Parties to the Barnes Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Barnes Defendants are liable to the Receivership Estate for an amount equaling

the amount of funds transferred from the Stanford Parties to the Barnes Defendants; and (d) the Receiver is entitled to an award of reasonable attorneys' fees, costs, and interest.

## PRAYER

42. The Receiver respectfully requests an Order providing that:

    (a) the payments from the Stanford Parties to the Barnes Defendants constitute fraudulent transfers under applicable law;

    (b) the funds transferred from the Stanford Parties to the Barnes Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate;

    (c) the Barnes Defendants are liable to the Receivership Estate for an amount equaling the amount of funds transferred from the Stanford Parties to the Barnes Defendants; and

    (d) the Receiver is entitled to an award of reasonable attorneys' fees, costs, and interest.

Dated:  March 15, 2010						Respectfully submitted,

                                                   **BAKER BOTTS L.L.P.**

                                                   By:  /s/ Kevin M. Sadler
                                                         Kevin M. Sadler
                                                         Texas Bar No. 17512450
                                                         kevin.sadler@bakerbotts.com
                                                         Scott D. Powers
                                                         Texas Bar No. 24027746
                                                         scott.powers@bakerbotts.com
                                                         1500 San Jacinto Center
                                                         98 San Jacinto Blvd.
                                                         Austin, Texas 78701-4039
                                                         (512) 322-2500
                                                         (512) 322-2501 (Facsimile)

                                                         Timothy S. Durst
                                                         Texas Bar No. 00786924
                                                         tim.durst@bakerbotts.com
                                                         2001 Ross Avenue
                                                         Dallas, Texas 75201
                                                         (214) 953-6500
                                                         (214) 953-6503 (Facsimile)

                                         **ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

      On March 15, 2010, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve Ben Barnes and Ben Barnes Group, L.P. individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

                                                  /s/ Kevin M. Sadler
                                                  Kevin M. Sadler