# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. and THE OFFICIAL STANFORD INVESTORS COMMITTEE <br><br> Plaintiffs, <br><br> v. <br><br> BEN BARNES AND BEN BARNES GROUP, L.P., <br><br> Defendants. | § § § § § § § § § § § § § | Case No. 3:10-cv-0527-N |

---

**PROPOSED FIRST AMENDED COMPLAINT AGAINST
BEN BARNES AND BEN BARNES GROUP, L.P.**

---

**SUMMARY**

1. The Court has ordered Receiver Ralph S. Janvey ("Receiver") to take control of all assets of the Receivership Estate in order to make an equitable distribution to claimants injured by a massive fraud orchestrated by Allen Stanford, James Davis, and others. The Court recognizes the Official Stanford Investors Committee (the "Committee"), which is working with the Receiver to investigate and prosecute certain claims, including the claims asserted in this action. Under the terms of an agreement approved by this Court, the Committee has primary responsibility for litigating the claims asserted in this action for the benefit of the Receivership Estate.

2. The Receiver's and the Committee's investigation to date reveals that revenue from the sale of fraudulent certificates of deposit ("CD Proceeds") generated substantially all of

the income for the Stanford Defendants and the many related Stanford entities (collectively, the "Stanford Parties").

3. The Receiver and the Committee (collectively, "Plaintiffs") have identified substantial payments from the Stanford Parties to Ben Barnes and Ben Barnes Group, L.P., a business consulting and lobbying group founded by Ben Barnes (collectively, the "Barnes Defendants"). The payments from the Stanford Parties to the Barnes Defendants totaled over $5 million. Payments to the Barnes Defendants were funded in part by Stanford entities, and in part by Allen Stanford personally, using investor funds drawn from bank accounts in Houston and Antigua. Through this First Amended Complaint, Plaintiffs seek the return of these funds in order to make an equitable distribution to claimants. The investigation is continuing, and should more payments of CD proceeds to the Barnes Defendants be discovered, Plaintiffs will amend this First Amended Complaint to assert claims regarding such additional payments.

4. At least as early as 2005, the Stanford Parties began a business relationship with the Barnes Defendants, with the Barnes Defendants ostensibly providing various consulting, lobbying, and related services in exchange for the above-referenced payments.

5. The Barnes Defendants' work for the Stanford Parties included (a) consulting and lobbying in connection with United States Virgin Islands ("USVI") tax incentive laws to assist Allen Stanford's efforts to reduce his personal federal income tax liability; (b) consulting and lobbying in connection with the annual "20/20" cricket tournament held in Antigua, a marketing tool for Stanford International Bank and other Stanford companies; (c) consulting regarding political contributions; and (d) advice regarding various investments the Stanford Parties made using investor funds, including Caribbean airlines, alternative energy investments, and the proposed development of an island near Antigua.

6. The Barnes Defendants' work for the Stanford Parties (such as marketing the cricket tournament) had the unfortunate effect of attracting new victims to the Stanford Parties' fraudulent investment scheme. The Barnes Defendants' services provided no reasonably equivalent value to the creditors and victims of the Stanford Parties' Ponzi scheme.

7. At all times relevant to this First Amended Complaint, the Stanford Parties were insolvent, and Allen Stanford operated the Stanford entities in furtherance of his fraudulent scheme. Each payment from the Stanford Parties to the Barnes Defendants was made with actual intent to hinder, delay, Plaintiffs were only able to discover the fraudulent nature of the above-referenced transfers after Allen Stanford and his accomplices were removed from control of the Stanford entities.

8. Plaintiffs seek an order that: (a) the payments from the Stanford Parties to the Barnes Defendants constitute fraudulent transfers under applicable law; (b) the payments from the Stanford Parties to the Barnes Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Barnes Defendants are liable to the Receivership Estate for an amount equaling the payments they received from the Stanford Parties; and (d) the Receiver is entitled to an award of reasonable attorneys' fees, costs, and interest.

## JURISDICTION & VENUE

9. This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

10. Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

11. Further, within 10 days of his appointment, the Receiver filed the original Complaint and Order Appointing the Receiver in 26 United States district courts pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in each district where the Complaint and Order have been filed, including the Western District of Texas.

12. This Court has personal jurisdiction over Ben Barnes and Ben Barnes Group, L.P. pursuant to FED. R. CIV. P. 4(k)(1)(C) and 15 U.S.C. §§ 754 and 1692.

## THE PARTIES

13. Plaintiff Ralph S. Janvey has been appointed by this Court as the Receiver for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities the foregoing persons and entities own or control, including, but not limited to Stanford Financial Group Global Management, LLC ("SFGGM") and Stanford Financial Group Company ("SFGC") (the "Receivership Assets"). Plaintiff Janvey is asserting the claims outlined herein in his capacity as Court-appointed Receiver.

14. The Committee was formed and recognized by this Court on August 10, 2010. *See SEC v. Stanford Int'l Bank, Ltd., et al*, Civil Action No. 3-09-CV-0298-N [ Docket No. 1149] (the "Committee Order"). As stated in the terms of the Committee Order, the Committee is cooperating with the Receiver in the prosecution and identification of actions and proceedings for the benefit of the Receivership Estate and the Stanford Investors. See id. at ¶¶ 7, 8. The Receiver and the Committee reached an agreement regarding the prosecution of certain claims,

including the claims asserted in this First Amended Complaint. By the terms of that agreement, which has been approved by this Court, the Committee has primary responsibility for litigating the claims asserted in this First Amended Complaint. *See* Order, Docket No. 1267.

15. Defendant Ben Barnes Group, L.P. is a Texas limited partnership with its principal office in Austin, Texas.

16. Defendant Ben Barnes is a U.S. citizen and resident of Austin, Texas.

17. Each Defendant has been served pursuant to the Federal Rules of Civil Procedure and has appeared in this action.

## STATEMENT OF FACTS

18. On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd. ("SIB" or "the Bank"), Stanford Group Company, and Stanford Capital Management, LLC (collectively "Stanford Defendants"). On the same date, the Court signed an Order appointing a Receiver, Ralph S. Janvey, over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

### I.   *Stanford Defendants Operated a Ponzi Scheme*

19. As alleged by the SEC, the Stanford Defendants marketed fraudulent SIB CDs to investors through SGC financial advisors pursuant to a Regulation D private placement. SEC's Second Amended Complaint (Doc. 952), ¶ 27. The CDs were sold by Stanford International Bank, Ltd. *Id*.

20. The Stanford Defendants orchestrated and operated a wide-ranging Ponzi scheme. Stanford Defendant James M. Davis has admitted that the Stanford fraud was a Ponzi scheme

from the beginning. Doc. 771 (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a *"massive Ponzi scheme"*); Doc. 807 (Davis Tr. of Rearraignment) at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a *"massive Ponzi scheme ab initio"*). In fact, this Court recently found that the Stanford fraud was indeed a Ponzi scheme. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 (*"The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."*), at 11. (*"[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."*), and at 13 (*"The Court finds that the Stanford enterprise operated as a Ponzi scheme . ... ."*); Doc. 1315 at 10-11 (*"The Court previously determined that the Stanford Defendants operated a massive Ponzi scheme that stole approximately $8 billion from an estimated 50,000 investors scattered over more than 100 countries."*) and at 14 (*"The Stanford Defendants' Ponzi scheme dissipated billions of dollars over its long existence."*).

21. In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's findings that the Stanford fraud was a Ponzi scheme. *See Janvey v. Alguire*, 628 F.3d 164, 168-69, 185 (5th Cir. 2010) (motion for reh'g *en banc* pending) (upholding this Court's Order). In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows: We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.

\*   \*   \*

> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme ab initio.

\*   \*   \*

> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed ....
>
> *      *      *
>
> Here, the Receiver provided evidence of a massive Ponzi scheme ... . The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized.

*Id.* at 176-78, 180.

22. In marketing, selling, and issuing CDs to investors, the Stanford Defendants repeatedly touted the CDs' safety and security and SIB's consistent, double-digit returns on its investment portfolio. SEC's Second Amended Complaint (Doc. 952), ¶¶ 32-33.

23. In its brochure, SIB told investors, under the heading *"*Depositor Security,*"* that its investment philosophy is *"*anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit.*"* SIB also emphasized that its *"*prudent approach and methodology translate into deposit security for our customers.*"* *Id.* ¶ 34. Further, SIB stressed the importance of investing in *"*marketable*"* securities, saying that *"*maintaining the highest degree of liquidity*"* was a *"*protective factor for our depositors.*"* *Id.*

24. In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a *"*well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements.*"* *Id.* ¶ 35. More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments. *Id.*

25. Consistent with its Annual Reports and brochures, SIB trained SGC financial advisors, in February 2008, that *"*liquidity/marketability of SIB's invested assets*"* was the *"*most important factor to provide security to SIB clients.*"* *Id.* ¶ 36. In training materials, the Stanford

Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). *Id.* ¶ 49.

26.  Contrary to the Stanford Defendants' representations regarding the liquidity of SIB's portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the Bank's portfolio were misappropriated by the Stanford Defendants and were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" - *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit cards, etc.). In fact, at year-end 2008, the largest segments of the Bank's portfolio were private equity; over-valued real estate; and at least $1.6 billion in undocumented "loans" to Defendant R. Allen Stanford. *See Id.* ¶¶ 39-40.

27.  In an effort to conceal their fraud and ensure that investors continued to purchase the CDs, the Stanford Defendants fabricated the performance of SIB's investment portfolio. *Id.* ¶ 4.

28.  SIB's financial statements, including its investment income, were fictional. *Id.* ¶¶ 4, 53. In calculating SIB's investment income, Stanford Defendants R. Allen Stanford and James Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio. *Id.* Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn. *Id.*

29.  For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing

CDs. *See id*. ¶ 1. However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses. As the depletion of liquid assets accelerated, this fraudulent Ponzi scheme collapsed.

30. Most of the above facts discovered from Stanford's records have since been confirmed by Stanford's Chief Financial Officer, James Davis, who has pleaded guilty to his role in running the Stanford Ponzi scheme.

## II.     *Stanford Transferred CD Proceeds from the Ponzi Scheme to the Barnes Defendants.*

31. CD Proceeds from the Ponzi scheme described above were transferred by or at the direction of the Stanford Parties to the Barnes Defendants. The Barnes Defendants did not perform services of reasonably equivalent value in exchange for those payments, and in many instances performed services that simply furthered the Ponzi scheme. Any services provided by the Barnes Defendants were of no utility from the perspective of the Stanford Parties' creditors.

32. The Barnes Defendants' work for the Stanford Parties included (a) consulting and lobbying in connection with United States Virgin Islands ("USVI") tax incentive laws in order to assist Allen Stanford's efforts to reduce his personal federal income tax liability; (b) consulting and lobbying in connection with the annual "20/20" cricket tournament held in Antigua, a marketing tool for Stanford International Bank and other Stanford companies; (c) consulting regarding political contributions; and (d) advice regarding various investments the Stanford Parties made using investor funds, including Caribbean airlines, alternative energy investments, and the proposed development of an island near Antigua.

## REQUESTED RELIEF

This Court appointed Ralph S. Janvey as Receiver for the Receivership Assets. Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2; Second Amended Order Appointing Receiver (Doc. 1130) at ¶¶ 1-2. The Committee was

formed and recognized by this Court on August 10, 2010, *see* Committee Order [Docket No. 1149], and under the terms of a Court-approved agreement between the Receiver and the Committee, the Committee has primary responsibility for litigating the claims asserted in this First Amended Complaint. *See* Order, Docket No. 1267. Plaintiffs seek the relief described herein in these respective capacities.

33.  Paragraph 4 of the Order Appointing Receiver, signed by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing Receiver (Doc. 157) at ¶ 4; Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 4. Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order Appointing Receiver (Doc. 157) at ¶ 5(c); Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(c); *see also Alguire*, 628 F.3d at 183-84 ("[R]eceivers are legal hybrids, imbued with rights and obligations analogous to the various actors required to effectively manage an estate in the absence of the 'true' owner. . . . [R]eceivers have long held the power to assert creditor claims.").

34.  One of Plaintiffs' key duties is to maximize distributions to defrauded investors and other claimants. *See* Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants"); *Scholes v. Lehmann*, 56

F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.*, 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660, 669 (D. Kan. 2004). But before Plaintiffs can attempt to make victims whole, they must locate and take exclusive control and possession of assets of the Receivership Estate or assets traceable to the Receivership Estate. *See* Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(b).

35. The Committee Order, signed by the Court on August 10, 2010, states that "[t]he Committee shall have rights and responsibilities similar to those of a committee appointed to serve in a bankruptcy case under title 11 of the United States Code" and that the Committee may bring actions for the benefit of the Receivership Estate jointly with the Receiver. *See* Doc. 1149 at ¶¶ 2, 7-8.

## I. *Plaintiffs are Entitled to Disgorgement of Assets Fraudulently Transferred to the Barnes Defendants.*

36. Plaintiffs are entitled to disgorgement of the funds transferred from the Stanford Parties to the Barnes Defendants because such payments constitute fraudulent transfers under applicable law. The Stanford Parties made the payments to the Barnes Defendants with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, Plaintiffs are entitled to the disgorgement of those payments. Additionally, the Stanford Parties transferred the funds to the Barnes Defendants at a time when the Stanford Parties were insolvent, and the Stanford Parties did not receive reasonably equivalent value in exchange for the transfers.

37. Plaintiffs may avoid transfers made with the actual intent to hinder, delay, or defraud creditors. "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v.*

*Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Alguire*, 628 F.3d at 176 ("[A] Ponzi scheme 'is, as a matter of law, insolvent from inception.'"); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception. . . . The Receiver's proof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").

38. The Stanford Parties were running a Ponzi scheme and paid the Barnes Defendants with funds taken from unwitting CD investors. Plaintiffs are, therefore, entitled to disgorgement of the funds the Stanford Parties fraudulently transferred to the Barnes Defendants.

39. Consequently, the burden is on the Barnes Defendants to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 13 ("A defendant invoking this defense has the burden to show both objective good faith and reasonable equivalence of consideration.") (emphasis in original); s*ee also Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly."). Plaintiffs are, therefore, entitled to recover the full amount of the payments that Suarez received — either directly or indirectly — unless she proves both objective good faith and reasonably equivalent value.

40. The good-faith element of this affirmative defense requires that the Barnes Defendants prove objective, rather than subjective, good faith. *See Warfield*, 436 F.3d at 559-560 (good faith is determined under an "objectively knew or should have known" standard); *In re IFS Fin. Corp.*, Bankr. No. 02-39553, 2009 WL 2986928, at *15 (Bankr. S.D. Tex. Sept. 9, 2009) (objective standard is applied to determine good faith); *Quilling v. Stark*, No. 3-05-CV-

1976-BD, 2007 WL 415351, at *3 (N.D. Tex. Feb. 7, 2007) (good faith "must be analyzed under an objective, rather than a subjective, standard. The relevant inquiry is what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.") (internal citations and quotation marks omitted).

41. There is no evidence that the Barnes Defendants provided any value — much less reasonably equivalent value — in exchange for the fraudulent transfers they received. Moreover, both this Court and the Fifth Circuit have held that providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value. *Warfield*, 436 F.3d at 555, 560; Case No. 3:09-CV-0724-N, Doc. 456 at 13-14 ("[A]s a matter of law, services provided in the context of a Ponzi scheme do not constitute 'reasonably equivalent value.'"). Furthermore, consideration which has no utility from the creditor's perspective does not satisfy the statutory definition of "value." *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000). The Barnes Defendants cannot now claim that, in return for furthering the Ponzi scheme and helping it endure, they should be entitled to keep the over $5 million in CD Proceeds they received from the Stanford Parties. The Barnes Defendants cannot meet their burden to establish that they provided reasonably equivalent value for the CD Proceeds they directly or indirectly received from the Stanford Parties and that they received such payments in good faith. Accordingly, Plaintiffs are entitled to the disgorgement of those funds.

42. Moreover, under applicable fraudulent-transfer law, Plaintiffs are entitled to attorneys' fees and costs for their claims against the Barnes Defendants. *See*, *e.g*., TEX. BUS. & COM. CODE ANN. § 24.013 ("[T]he court may award costs and reasonable attorney's fees as are equitable and just."). As a result, the Plaintiffs request reasonable attorneys' fees and costs for prosecuting their fraudulent-transfer claims against the Barnes Defendants.

43. In order to carry out the duties delegated to them by this Court, Plaintiffs seek complete and exclusive control, possession, and custody of the CD Proceeds received by the Barnes Defendants.

44. Plaintiffs were only able to discover the fraudulent nature of the above-referenced transfers after R. Allen Stanford and his accomplices were removed from control of the Stanford entities, and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Stanford entities. The Court has recognized the necessarily complex nature of such investigations. *See*, e.g., Doc. 1315 at 11, 14 ("This Court has charged the Receiver with the responsibility of tracking down and collecting ill-gotten funds that properly belong to the Receivership Estate and, ultimately, defrauded investors. That task has been complicated by the Ponzi scheme's complexity. . . . The Stanford Defendants' Ponzi scheme collected and dissipated billions of dollars over its long existence. Coupled with the scheme's Byzantine structure, the process of recouping any fraudulently obtained funds necessarily includes weeding through a massive number of individual transactions and any documents and information related to those transactions."). Moreover, the Committee could not have been aware of any of the transactions involving CD Proceeds paid to Suarez until after its formation on August 10, 2010, at the earliest. Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period. *See*, *e.g.*, *Wing v. Kendrick*, No. 08-CV-01002, 2009 WL 1362383, at *3 (D. Utah May 14, 2009); *Quilling v. Cristell*, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 29, 2006); *See also* TEX. BUS. & COMM. CODE ANN. § 24.010(a)(1) (claims may be brought either within four years of the transfer or "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

45.     The Stanford Parties, who orchestrated the Ponzi scheme, transferred the CD Proceeds to the Barnes Defendants with actual intent to hinder, delay, or defraud their creditors. Plaintiffs are, therefore, entitled to disgorgement of all CD Proceeds fraudulently transferred to the Barnes Defendants.  Pursuant to the equity powers of this Court, Plaintiffs seek an order that: (a) CD Proceeds received directly or indirectly by the Barnes Defendants were fraudulent transfers under applicable law; (b) CD Proceeds received directly or indirectly by the Barnes Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Barnes Defendants are liable to the Plaintiffs for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Plaintiffs.

## PRAYER

46.     The Receiver respectfully requests an Order providing that:

(a) CD Proceeds received directly or indirectly by the Barnes Defendants were fraudulent transfers under applicable law;

(b) CD Proceeds received directly or indirectly by the Barnes Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate;

(c) The Barnes Defendants are liable to the Plaintiffs for an amount equaling the amount of CD Proceeds they directly or indirectly received; and

(d) The Receiver is entitled to an award of reasonable attorneys' fees, costs, and prejudgment and post-judgment interest.

(e) The Court grants such other and further relief as the Court deems proper under the circumstances.

Dated: _____                             Respectfully submitted,

                                                                                         By: _____

**BUTZEL LONG, PC**
Peter D. Morgenstern (*admitted pro hac vice*)
morgenstern@butzel.com
380 Madison Avenue, 22nd Floor
New York, New York 100217
(212) 818-1110
(212) 818-0494 (Facsimile)

**ATTORNEYS FOR THE OFFICIAL STANFORD INVESTORS COMMITTEE**


**STRASBURGER & PRICE, LLP**
Edward F. Valdespino
Texas Bar No. 20424700
Edward.valdespino@strasburger.com
300 Convent St., Suite 900
San Antonio, Texas 78205
(210) 250-6061
(210) 258-2703 (Facsimile)

**ATTORNEYS FOR THE OFFICIAL STANFORD INVESTORS COMMITTEE**


**CASTILLO SNYDER, P.C.**
Edward C. Snyder
Texas Bar No. 00791699
esnyder@casnlaw.com
Bank of America Plaza, Suite 1020
300 Convent Street
San Antonio, Texas 78205
(210) 630-4200
(210) 630-4210 (Facsimile)

**ATTORNEYS FOR THE OFFICIAL STANFORD INVESTORS COMMITTEE**


**NELIGAN FOLEY, LLP**
Nicholas A. Foley
Texas State Bar No. 07208620

nfloey@neliganlaw.com
Douglas J. Buncher
Texas State Bar No. 03342700
dbuncher@neliganlaw.com
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
(214) 840-5320
(214) 840-5301 (Facsimile)

**ATTORNEYS FOR THE OFFICIAL STANFORD INVESTORS COMMITTEE**

**BAKER BOTTS L.L.P.**

Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On _____, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve Ben Barnes and Ben Barnes Group, L.P. individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Peter D. Morgenstern
Peter D. Morgenstern