**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH JANVEY, IN HIS CAPACITY AS | § | |
| COURT-APPOINTED RECEIVER FOR THE | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| ET AL. and the OFFICIAL STANFORD | § | |
| INVESTORS COMMITTEE, | § | |
| | § | Case No.: 3:10-CV-0527-N-BG |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| BEN BARNES and BEN BARNES GROUP, L.P., | § | |
| | | |
| Defendants. | | |

---

## APPENDIX

---

**Exhibit "1"**   Declaration of Karyl Van Tassel, dated December 12, 2014.  *See* APP0001 – APP001292.

**Exhibit "2"**   Deposition of Ben Barnes.   *See* APP001293 – APP001326.

**Exhibit "3"**   Deposition of Karl Caperton. *See* APP001327-APP001364.

# EXHIBIT "1"

APP000001

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., and the OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § § § § | |
| Plaintiffs, | § § | Case No. 3:10-cv-0527-N-BG |
| v. | § § | |
| BEN BARNES and. BEN BARNES GROUP, L.P., | § § § | |
| Defendants. | § § § | |

_____

**DECLARATION OF KARYL VAN TASSEL**

_____

I, Karyl Van Tassel, of 1201 Louisiana, Suite 2600, Houston, Texas 77002, state as follows:

1.      I am over the age of 21 years and am legally competent to make this declaration. The statements made in this declaration are true and correct based on the knowledge I have gained from the evidence and many documents I have reviewed and other work I and my team have performed in the course of our investigation on behalf of the Receiver.   A copy of my résumé is attached as exhibit **KVT-1**.

2.      On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey as the Receiver for all entities owned or controlled by R. Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, and the other defendants in the case styled *Securities & Exchange Commission v. Stanford International Bank, Ltd., et al.*, Case

APP000002

No. 3:09-CV-0298-N (the "Stanford Entities"). On the same day, the Receiver retained FTI (of which I was a Senior Managing Director) to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities, forensic accounting analyses of those records (including cash tracing), and investigation of the underlying scheme. I oversee, and am personally involved in, the forensic accounting and cash tracing activities and the investigation of the Stanford Entities' scheme. The purpose of our work has been, in part, to: (a) determine the roles that the various Stanford Entities played in the Stanford Ponzi scheme and specifically in the sale and redemption of SIB certificates of deposit ("CDs"); (b) identify the source(s) of income and cash flows of the various Stanford Entities; (c) trace funds to determine how they were allocated and disbursed throughout the Stanford Entities; (d) investigate the circumstances surrounding the scheme and, in particular, the sale of SIB CDs; and (e) assist the Receiver in performing his duty to locate and recover assets traceable to the Receivership Estate.

3.      Our continued analysis of evidence, including the documents and records of Stanford International Bank, Ltd. ("SIB"), Stanford Financial Group Company ("SFGC"), Stanford Financial Group Global Management ("SFGGM"), and the other Stanford Entities and persons and the documents and other information referenced herein, was conducted using reliable practices and methodologies that are standard in the fields of accounting and finance. Further, based on our investigation, it is my opinion that such evidence is reliable and trustworthy and is the type of information upon which professionals in the fields of accounting and finance typically rely, when such information is available, during investigations of this nature.

4.     In further support of this declaration, I adopt and incorporate by reference my prior declarations and testimony listed below, which were also previously submitted to this Court in connection with related lawsuits, and can be obtained via the Public Access to Court Electronic Records system ("PACER") for the United States District Court for the Northern District of Texas:

- July 27, 2009 Declaration of Karyl Van Tassel, attached as exhibit KVT-2 [*see* Case No. 3:09-CV-0724-N-BL, Docs. 18, 616];
- March 26, 2010 Declaration of Karyl Van Tassel, attached as exhibit KVT-3 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 393];
- May 24, 2010 Declaration of Karyl Van Tassel, attached as exhibit KVT-4 [*see* Case No. 3:09-CV-0724-N-BL, Docs. 444, 616];
- July 15, 2010 Declaration of Karyl Van Tassel, attached as exhibit KVT-5 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 487];
- December 17, 2010 Declaration of Karyl Van Tassel, attached as exhibit KVT-6 [*see also* Case No. 3:10-CV-0346-N, Doc. 37]
- June 1, 2011 Declaration of Karyl Van Tassel, attached as exhibit KVT-7 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 616];
- June 2, 2011 Supplemental Declaration of Karyl Van Tassel, attached as exhibit KVT-8 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 616];
- June 7, 2011 Supplemental Declaration of Karyl Van Tassel, attached as exhibit KVT-9 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 616];
- October 12, 2011 Supplemental Declaration of Karyl Van Tassel, attached as exhibit KVT-10 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 784];
- December 5, 2011 Direct Testimony of Karyl Van Tassel, attached as exhibit KVT-11 [*see* Case No. 3:09-CV-0721-N-BL, Docs. 115, 116];
- December 17, 2012 Declaration of Karyl Van Tassel, attached as exhibit KVT-12 [*see* Case No. 3:11-CV-0294-N-BL, Doc. 38 through Doc. 56].
- 

**The Stanford Entities operated as a Ponzi scheme.**

5.     Based on our investigation — and as set forth in my prior declarations and testimony listed above and attached hereto — I have concluded that the Stanford Entities were collectively operated as a Ponzi scheme since at least 1999.  SIB, SGC, SFGGM, SFGC and Bank of Antigua were part of the Stanford Ponzi scheme.

6.     Allen Stanford was sole owner, directly or indirectly, of more than 130 separate entities, including SIB, SGC, SFGGM, SFGC, and Bank of Antigua.  These entities comprised a

DECLARATION OF KARYL VAN TASSEL                3

single commonly owned financial services network called the "Stanford Financial Group," which was headquartered in Houston and was controlled by Stanford and his close band of confidants.

7.      The SEC alleges in its Second Amended Complaint in Case No. 03-CV-0298-N that the Stanford Entities constitute "a massive Ponzi scheme" involving "misappropriat[ion of] billions of dollars of investor funds."  Likewise, James Davis, Chief Financial Officer for both SIB (according to SIB's published financial statements) and SFGC and a long-time business associate and confidant of Allen Stanford, has pled guilty to charges that he conspired with Allen Stanford and others in running a Ponzi scheme in violation of federal securities laws.  In connection with his guilty plea, Davis admitted that SIB was a "massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds." James Davis admitted in his rearraignment that the Stanford enterprise was a Ponzi scheme from the beginning. As explained in more detail below, my findings are consistent with the SEC's allegations and James Davis's admission that SIB and the Stanford Entities were a Ponzi scheme.  Furthermore, I have not seen anything in the records that I have reviewed indicating that SIB and the Stanford Entities were not a Ponzi scheme.

8.      Some of the Stanford Entities' roles in the Stanford Ponzi scheme are explained generally below:

- SIB is a wholly owned company of Stanford International Bank Holdings Limited ("SIBH"), and SIBH is a wholly owned company of R. Allen Stanford.  SIB issued the CDs that were at the heart of the Stanford Ponzi scheme and was not a typical commercial bank.  It had one principal product line — CDs — and one principal source of funds — customer deposits from CD purchases.  From at least 1999 forward, SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) and relied on proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors.  *See* KVT-36, paragraphs 34-40. The SIB CD sale proceeds that were not used to pay off prior investors

APP000005

were widely disbursed throughout the Stanford Entities — including to SFGC, SFGGM, SGC, and Bank of Antigua — and to R. Allen Stanford.

- SFGC is a wholly owned company of R. Allen Stanford. SFGC provided shared services, including Treasury and Investment services, to SIB and other Stanford Entities. From at least 2000 forward, SFGC was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) and received SIB CD funds. *See* KVT-42, paragraphs 8-11.

- SFGGM is a wholly owned company of R. Allen Stanford. SFGGM provided management support services to other Stanford Entities, including accounting, IT, legal, marketing, and other administrative services. In addition, SFGGM received portfolio management fees from SIB. Many of SFGGM's management support services were ultimately outsourced to SFGC. From at least 2007 forward, SFGGM was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) and received SIB CD funds. *See* KVT-42, paragraphs 8-11.

- SGC is a wholly owned company of Stanford Group Holdings, Inc. ("SGH"), and SGH is a wholly owned company of R. Allen Stanford. The financial advisors for SGC marketed and sold thousands of SIB CDs and received bonuses, commissions, referral fees, and other forms of compensation for these sales. SGC also performed portfolio management and other services for SIB.

- Bank of Antigua is owned by R. Allen Stanford. R. Allen Stanford directly owns 1% of Bank of Antigua. Stanford Bank Holdings Limited, a wholly owned company of R. Allen Stanford, owns the remaining 99%. Bank of Antigua was a commercial bank in Antigua. James Davis testified that the Bank of Antigua was insolvent when R. Allen Stanford first approached the Government of Antigua with the idea of setting up SIB in Antigua. Mr. Davis testified that it was "part and parcel to receiving a license" for SIB that R. Allen Stanford purchase the Bank of Antigua. Mr. Davis testified that the Bank of Antigua purchase was as much as $20 million and that the funds used to make the purchase came from CD funds. *See* KVT-92 at pages 180-182.

- Stanford Development Company Ltd. ("SDCL") is a wholly owned company of R. Allen Stanford. SDCL is the entity that owned the land, buildings, vehicles, equipment, furniture and fixtures used by the various Stanford entities in Antigua. SDCL financial statements reflect revenues in 2004 and 2005, but no revenues from 2006 through 2008. Additionally, in 2004 and 2005 the cost of sales exceeded revenues in each year.

- Stanford Financial Group Limited ("SFGL") is a wholly owned company of R. Allen Stanford. SFGL provided management support services to other Stanford Entities, including accounting, IT, legal, marketing, and other administrative services. Additionally, SFGL is the entity name on the "secret" Swiss bank account, Societe Generali 108.731.

**Sales of SIB CDs Perpetuated the Ponzi scheme.**

9.     SIB was not a typical commercial bank.  It did not offer checking accounts and did not make loans (other than to certain CD investors for up to 80% of their CD balance).  It had one principal product line — CDs — and one principal source of funds — customer deposits from CD purchases.  The terms of some SIB CDs permitted partial redemptions before maturity upon customer demand.

10.     SIB offered CD rates that were significantly greater than those offered in the United States.  A SIB 2007 marketing brochure[1] tracks SIB's historic CD yields against average US CD yields.  The SIB CD's yields reflected in its marketing brochure ranged from a high of 388% of the US CD yield in 2002 to a low of 140% of the US CD yield in 2006.  According to the brochure, SIB was able to pay high CD rates by investing in "a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."  As a result, the brochure continues, "[SIB] has been consistently profitable since inception."  In other words, SIB purported to function like a hedge fund but, unlike a hedge fund, its customers were guaranteed (by SIB) a specified return regardless of the fund's performance.

11.     SIB's reported returns were remarkably steady, fluctuating only from 11.7% to 14.9% between 1997 and 2007.  SIB showed a profit in economic good times and in bad.  The one exception was the second half of 2008, when financial sector businesses across the globe were struggling for survival and many feared they were on the brink of financial collapse.  Even then, SIB's accounting records reflected positive investment earnings, but a small overall loss — just 2% of total (purported) financial assets — after deductions for purported CD interest and other expenses.  What to some appeared to be too good to be true was indeed untrue.  As

---

[1] Ex. 1, STAN INVSTR GENL_058437 at 058446.

APP000007

Stanford himself said at an October 2008 financial advisor conference: "We're about, as of early October, down about four percent, I guess. . . . I'm not happy with that [but] in this market I guess it's astounding."

12.     SIB CDs were marketed through financial advisors employed by other Stanford-owned entities.  The financial advisors were heavily incentivized by above-market commissions and bonuses to steer their clients to SIB CDs rather than other investments.  SIB incentivized Stanford-affiliated financial advisors to convince their clients to purchase SIB CDs over other kinds of investments by paying the financial advisors above-market commissions and other compensation tied to CD sales and to the retention of the CDs within SIB.

13.     The most significant numbers on SIB's financial statements — revenue and asset value — were fictitious.  Davis states in his plea agreement that assets were inflated to offset CD obligations and that revenue was "reverse-engineered" to arrive at desired levels.  My findings are consistent with those admissions.[2]

14.     We found within SIB's accounting records worksheets used to derive fictitious SIB revenue back to 2004.  The Ponzi scheme conspirators would simply determine what level of fictitious revenue SIB needed to report in order to both look good to investors and regulators and purport to cover its CD obligations and other expenses.  They would then back into that total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative, etc.) of a fictitious investment allocation.

15.     The returns were fictitious, and they were based on fictitious asset totals:

(a)     SIB's records reflected that, as of December 31, 2008, it held $8.3 billion in "financial assets" — presumably actively traded securities and metals, as SIB represented to the public.  The reality was much different.  As of the end of 2008, SIB held less than $500 million in securities, or less than 7% of the total CD obligations.

---

[2] James Davis Plea Agreement (Ex. 2, STAN INVSTR GENL_057886)

**DECLARATION OF KARYL VAN TASSEL**          7

(b)    We also discovered that $3.174 billion of SIB's claimed 2008 assets consisted of two real estate holding entities that had been purchased that same year for only $63.5 million and whose only assets were tracts of undeveloped Antiguan real estate. The value of those assets was inflated by 50 times the purchase price through a series of paper transactions involving other Stanford-owned entities. These repetitive flips had no apparent economic substance and appear to have been engaged in solely to grossly overstate the value of the assets so as to prop up SIB's balance sheet.

(c)    I and my team found that at least another $1.8 billion in SIB assets consisted of notes receivable from Allen Stanford. Based on our investigation, however, Allen Stanford had no significant assets apart from the various Stanford Entities, which collectively owed billions of dollars more than the fair value of their combined assets.

(d)    Other assets were similarly overstated. Private equity investments, for example, were recorded on SIB's books at amounts that the Receiver's subsequent sales efforts have revealed to be many times greater than their realizable value. These were valued at $1.2 billion as of June 30, 2008, but it is expected that the Receivership will realize far less than that amount.

(e)    Moreover, the fact that many of SIB's assets consisted of real estate, unsecured notes from Allen Stanford, and private equity investments was contrary to SIB's assurances to customers that its investments consisted of "highly marketable securities issued by stable governments, strong multinational companies and major international banks" so as to "maintain[] the highest degree of liquidity." *See* exhibit **KVT-12** at 3.

16.    Misinformation regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was regularly disseminated from Stanford, Davis, and others working under them to Stanford financial advisors, for use in inducing potential investors to purchase SIB CDs. SIB induced investors to buy CDs by offering substantially above-market rates, issuing financial statements and other data that significantly overstated its earnings and assets, and misrepresenting its business model, investment strategy, financial strength, the safety and nature of its investments, and other facts important to investors.

17.    SIB's CD liabilities increased significantly between 2000 and the institution of the Receivership on February 17, 2009.

| Balance Sheet Date | Customer Deposit Liability | Annual Change in Customer Deposit Liability |
|---|---|---|
| December 31, 1999 | $623,559,959 | N/A |
| December 31, 2000 | $772,261,025 | $148,701,066 |
| December 31, 2001 | $1,116,454,586 | $344,193,561 |
| December 31, 2002 | $1,606,062,398 | $489,607,812 |
| December 31, 2003 | $2,083,397,998 | $477,335,600 |
| December 31, 2004 | $2,827,941,493 | $744,543,495 |
| December 31, 2005 | $3,763,011,040 | $935,069,547 |
| December 31, 2006 | $5,010,083,766 | $1,247,072,726 |
| December 31, 2007 | $6,689,964,303 | $1,679,880,537 |
| December 31, 2008 | $7,431,630,364 | $741,666,061 |
| February 17, 2009 | $7,191,011,843 | $(240,618,521) |

18.    Through analysis of SIB's financial records, I and my team have determined that SIB was insolvent from at least 1999 forward.  SIB's reported assets consisted overwhelmingly of "financial assets" and cash.  The published balance sheets represented that "financial assets" were reported at "fair value."  Of course, cash, by definition, is stated at fair value (assuming correct reporting).  We know, however, from our investigation and review of internal SIB records that the fair value of the SIB financial assets was much smaller than reported.  Each year, from 1999 forward, SIB's reported asset totals included, without disclosure to the public, notes receivable from Allen Stanford and certain assets with clearly inflated values.  When these amounts are deducted from the asset totals contained in SIB's published financial statements, it

DECLARATION OF KARYL VAN TASSEL                 9

is apparent that, from at least 1999, SIB's liabilities exceeded the fair value of its assets. Stanford's promissory notes were of no real value, because his apparent wealth was based on the SIB Ponzi scheme. Moreover, private equity stakes initially held by other Stanford Entities (although likely purchased with SIB CD proceeds) were transferred to Allen Stanford, and then from Stanford to SIB, which recorded them on its books at much inflated values with no apparent economic substance or gain. These transfers appear to have been booked for the purpose of giving SIB the false appearance of financial strength based upon the manner in which the transactions were recorded and related notes on supporting documentation. It is likely that other SIB assets were also fictitious or overvalued, as we saw in our analysis of 2008 data.

19.    Through an analysis of cash flows for the period January 1, 2004, through February 17, 2009, we have verified that proceeds of CD sales were used to make purported interest and redemption payments on existing CDs. This analysis just confirmed what we knew had to be true anyway, as SIB's assets, reserves, and investments were insufficient to fund its purported redemption and interest payments. For example, SIB's CD transaction records indicate that approximately $2 billion was paid to investors for principal and interest from January 1, 2008, through February 17, 2009. SIB's legitimate principal income-generating assets, which were managed in what was known as "Tier 2," never totaled more than $1 billion, even when the stock market was at a high and the economy was strong. By the end of 2008, "Tier 2" had declined to less than $500 million, due to a combination of increasing redemptions and liquidations and falling market values. Even if SIB had fully liquidated all investments in its portfolio, it would not have realized enough cash flow to cover just the redemptions in 2008 without the influx of new CD purchase money. And in fact, when the market declined, we

know that it took only 4 months for liquid assets to substantially deplete, even though $7.2 billion in CD obligations remained.  As a result of this decline, all actual gains earned on the "Tier 2" investments since 2003 were lost.  Thus, although the SIB CD portfolio contained some legitimate investments, the earnings from those investments were negligible in comparison, and could not reasonably have been expected, to cover SIB's total obligations to the CD holders.

20.    Based on our analysis to date, I have concluded that from at least 1999 forward, SIB relied on proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors.  This is especially evident from the fact that, when CD sales faltered in 2008, SIB was immediately forced to sell off most of its assets that were readily available for liquidation just to maintain payments for a short time.  By using the proceeds of new CD sales to pay interest and redemptions to existing CD holders, Stanford, Davis, and their cohorts perpetuated the Ponzi scheme.

21.    CD sales proceeds not used to pay purported interest, redemptions, and current operating expenses (including commissions and other incentive payments to financial advisors in other Stanford Entities) were either placed in speculative investments (many of them, such as real estate and private equity deals, illiquid), diverted to other Stanford Entities "on behalf of shareholder" (*i.e.*, for the benefit of Allen Stanford), or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, etc.).

22.    A tipping point was reached in October 2008: that month and every month thereafter, incoming funds from new investors were insufficient to offset outgoing payments to existing investors.  Continuing CD sales could no longer cover purported redemptions, interest

APP000012

payments and normal operating expenses.  This cash flow crisis caused a rapid depletion of liquid assets, which were inadequate to begin with to cover SIB's CD obligations.  By the time the U.S. Receivership was instituted, SIB had already suspended redemptions for certain investors and many Stanford Entities had stopped paying many contractual obligations.  For example, SIB received negative publicity concerning its failure, in early February 2009, to fund a $28 million commitment to a Florida communications company named Elandia International Inc.

23.    Notwithstanding SIB's insolvency (net assets minus net liabilities) and the rapid liquidation of its investments during 2008 and into 2009, CD sales continued until February 16, 2009, when the SEC and the U.S. Court intervened.  SIB's actual (as opposed to reported) earnings and assets were insufficient to meet its CD payment obligations.  SIB could only keep the scheme going by selling yet more CDs and using the proceeds to pay redemptions, interest, and operating expenses.  These CD purchases were too small, however, to continue to cover for the lack of assets owned by SIB.

24.    At the inception of the U.S. Receivership on February 16, 2009, SIB's total reported obligations to CD holders was approximately $7.2 billion (U.S.), versus reported investments valued at $8.3 billion as of December 31, 2008.  Based on my analysis, the market value of all assets for all Stanford Entities (including SIB) combined to total less than $1 billion. At the time SIB was placed into receivership, SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) by more than $6 billion.

**Transfers to the Barnes Defendants**

**SFGGM's Bank of Houston 8870 Account**

25.     Our analysis of the Stanford Entities' records and operations has revealed that at least $2,513,466.90 was transferred to an account at Prosperity Bank in the name of Ben Barnes Group LP from SFGC which consists of payments of $1,000,000 on June 30, 2005, $500,000 on December 7, 2005, $20,000 on January 19, 2006, $500,000 on February 28, 2006, $68,466.90 on July 31, 2006, $325,000 on February 22, 2007, and $100,000 on April 30, 2008. The payments to the Barnes Defendants were made from SFGC's Trustmark National Bank account number 3003104586 ("Trustmark 4586"). A list detailing the date, amount, and transferor, for each of these transfers is attached as exhibit **KVT-13**. The total deposits into SFGC's Trustmark 4586 account between January 1, 2005 and February 17, 2009 were approximately $1.6 billion. Based on the following analysis, I have concluded that the substantial majority of funds deposited into SFGC's Trustmark 4586 during this time period came directly or indirectly from CD sale proceeds.

26.     Based on FTI's review of records from Trustmark relating to the Trustmark 4586 account, 74%, or $1,144.0 million, of the deposits from January 1, 2005 to February 17, 2009 were transfers from SIB's Trustmark 1707 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into Trustmark 1707 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraph 34 and KVT-9 at paragraph 11.

27.     Another 8%, or $131.4 million, of the deposits into the Trustmark 4586 account from January 1, 2005 to February 17, 2009 were transfers from SFGGM's Bank of Houston account 8870 ("BOH 8870"). The transfers from SFFGM's BOH 8870 account to SFGC's

APP000014

Trustmark 4586 account occurred between January 1, 2007 and February 17, 2009. The total deposits into SFGGM's BOH 8870 account from January 1, 2007 through February 17, 2009 were approximately $691.5 million. Based on the following analysis, I have concluded that the substantial majority of funds deposited into SFGGM's BOH 8870 account during this time period came directly or indirectly from CD sale proceeds. Based on FTI's review of records from Bank of Houston related to this account, 78%, or $541.1 million, of the deposits into BOH 8870 from January 1, 2007 to February 17, 2009 were transfers from SIB's BOH 8706 account. Another 11%, or $76.6 million were transfers from SIB's TD 1670 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into BOH 8706 and TD 1670 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraphs 35-36 and KVT-9 at paragraphs 12 and 14.

28.     Another 3%, or $50.3 million, of the deposits into Trustmark 4586 from January 1, 2005 to February 17, 2009 were transfers from SIB's BOH 8706. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into BOH 8706 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraph 36 and KVT-9 at paragraph 14.

29.     Another 3%, or $48.3 million, of the deposits into Trustmark 4586 from January 1, 2005 to February 17, 2009 were transfers from SFGC's Bank of Houston account number 8854 ("BOH 8854"). Based on the following analysis, I have concluded that the overwhelming majority of funds deposited into SFGC's BOH 8854 account during this time period came directly or indirectly from CD sale proceeds. The transfers from SFGC's BOH 8854 account to

APP000015

SFGC's Trustmark 4586 account occurred between January 1, 2007 and February 17, 2009. The total deposits into SFGC's BOH 8854 account from January 1, 2007 to February 17, 2009 were approximately $148.8 million. Based on FTI's review of records from Bank of Houston related to this account 69%, or $103.2 million, of the deposits from January 1, 2007 to February 17, 2009 were transfers from SFGGM's BOH 8870 account. Another 16%, or $23.2 million, of the deposits during this time period were transfers from SIB's BOH 8706 account. Another 12%, or $17.8 million, of the deposits from January 1, 2007 to February 17, 2009 were transfers from SFGC's Trustmark 4586 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into BOH 8706 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraph 36 and KVT-9 at paragraph 14. See paragraph 25 above for my conclusion regarding the deposits in SFGC's Trustmark 4586 account and paragraph 27 above for my conclusion regarding the deposits into SFGGM's BOH 8870 account.

### SFGGM's Bank of Houston 8870 Account

30.     Our analysis of the Stanford Entities' records and operations has revealed that at least $910,000.00 was transferred to an account at Prosperity Bank in the name of Ben Barnes Group LP from SFGGM which consists of payments of $150,000 on February 29, 2008, $375,000 on June 2, 2008, $55,000 on July 18, 2008, $55,000 on August 15, 2008, $110,000 on October 24, 2008, $55,000 on November 7, 2008, and $110,000 on February 13, 2009. The payments to the Barnes Defendants were made from SFGGM's BOH 8870 account. A list detailing the date, amount, and transferor, for each of these transfers is attached as exhibit **KVT-13**. The total deposits into SFGGM's BOH 8870 account from January 1, 2007 through February

APP000016

17, 2009 were approximately $691.5 million. See paragraph 27 above for my conclusions regarding SFGGM's BOH 8870 account.

**Bank of Antigua**

31.     Our analysis of the Stanford Entities' records and operations has revealed that at least $1,650,000.00 was transferred to an account at Prosperity Bank in the name of Ben Barnes Group LP from R. Allen Stanford's personal Bank of Antigua account which consists of payments of $325,000 on April 17, 2007, $265,000 on July 2, 2007, $265,000 on August 2, 2007, $265,000 on September 18, 2007, $265,000 on October 19, 2007, and $265,000 on December 10, 2007. A list detailing the date, amount, and transferor, for each of these transfers to Barnes is attached as exhibit **KVT-13**.   All of these payments were processed from Bank of Antigua's Bank of America account 006550852033 ("BofA 2033"). The BofA 2033 is a clearing account so it is an accumulation of the funds of various account holders at Bank of Antigua, including R. Allen Stanford.  Disbursements are made "on the order of" the individual account holders to facilitate payments in the United States. I have reached the conclusion that the funds for the above-referenced payments came from R. Allen Stanford's personal account based on the following: 1) Funds transfer notifications and wire detail from Prosperity Bank indicate that the wires were "By Order Of: R. Allen Stanford" and 2) R. Allen Stanford stated in a December 7, 2007 email that he had "been personally paying Ben $265K each month this year." *See* exhibit KVT-27.

32.     Based on the following analysis I have concluded that the funds in BofA 2033 were comingled with CD sales proceeds and that the above-referenced payments therefore were tainted by CD sales proceeds. Our analysis of the incoming wire detail for BofA 2033 from January 1, 2007 through January 31, 2009 revealed that nearly $170 million of the incoming wire

APP000017

deposits into this account were transfers from Stanford entities other than Bank of Antigua. Over $163 million, or 96%, of these wire deposits came from accounts in which the substantial majority of the funds deposited in those accounts came directly or indirectly from CD sales proceeds.

33.     Based on our analysis of records from Bank of America relating to the BofA 2033 account, 38.5%, or $65.4 million of the wire deposits  into the BofA 2033 account, were transfers from SFGGM's BOH 8870 account. See paragraph 27 above for my conclusions regarding SFGGM's BOH 8870 account.

34.     Another 26%, or $43.5 million of the wire deposits into the BofA 2033 account, were transfers from Stanford Financial Group Limited's ("SFGL") Societe Generale account 108.731 ("SocGen 108.731"), which James Davis described in his plea agreement as a "secret" account that was used in various ways, including to pay bribes to Antiguan regulators and SIB's external auditor.[3] Between June 1, 2000 and September 15, 2008, of the $270[4] million deposited into SFGL's SocGen 108.731 account, over $235 million were transfers from SIB's TD 1670 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into TD 1670 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraphs 35-36 and KVT-9 at paragraphs 12 and 14.

35.     Another 16%, or $27.4 million of the wire deposits into the BofA 2033 account, were transfers from SFGC's Trustmark 4586 account. See paragraphs 25 through 29 above for my conclusions regarding SFGC's Trustmark 4586 account.

---

[33] James Davis Plea Agreement (Ex. 2, STAN INVSTR GENL_057886)
[4] The total deposit amount of $270 million excludes the return of principle on investment sales, short-term deposits, and loan proceeds subsequently paid off with external deposits.

APP000018

36.     Another 10%, or $17 million of the wire deposits into the BofA 2033 account, were transfers from SIB's Trustmark 1707 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into Trustmark 1707 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraph 34 and KVT-9 at paragraph 11.

37.     Another 5%, or $8.5 million of the wire deposits into the BofA 2033 account, were transfers from Stanford Development Company Limited's ("SDCL") Trustmark National Bank account 3003104131 ("Trustmark 4131"). The total deposits into SDCL's Trustmark 4131 account from January 1, 2007 through February 17, 2009 were approximately $33.8 million. Based on the following analysis, I have concluded that the substantial majority of funds deposited into SDCL's Trustmark 4131 account during this time frame came directly or indirectly from CD sale proceeds. Based on FTI's analysis of records from Trustmark National Bank related to this account, 42%, or $14.2 million, of the transfers during this time frame were transfers from SFGC's Trustmark 4586 account. Another 58%, or $19.5 million, were transfers from SFGGM's BOH 8870 account. See paragraph 25 through 29 for my conclusions regarding SFGC's Trustmark 4586 account and SFGGM's BOH 8870 account.

38.     Another and 1%, or $1.3 million of the wire deposits into the BofA 2033 account, were transfers from SIB's TD 1670 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into TD 1670 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraphs 35-36 and KVT-9 at paragraphs 12 and 14.

39.     Additionally, shortly before each of the payments made from Bank of Antigua's BofA 2033 account to the Prosperity Bank account in the name of Ben Barnes Group LP, there

APP000019

were deposits received from either SFGC's Trustmark 4586 account or SFGGM's BOH 8870 account that were more than sufficient to cover the amount of the outgoing payments to the Prosperity Bank account in the name of Ben Barnes Group LP. Prior to the $325,000 transfer on April 17, 2007, a deposit of $656,400 was received on April 13, 2007 from SFGC's Trustmark 4586. Prior to the $265,000 transfer on July 2, 2007, a deposit of $956,000 was received on June 29, 2007 from SFGC's Trustmark 4586 account. Prior to the $265,000 transfer on August 2, 2007, a deposit of $661,100 was received on July 27, 2007 from SFGC's Trustmark 4586 account. Prior to the transfer of $265,000 on September 18, 2007, a deposit of $1,619,100 was received on September 14, 2007 from SFGC's Trustmark 4586 account.  On the same date as the $265,000 transfer on October 19, 2007, a deposit of $477,400 was received from SFGGM's BOH 8870 account. Finally, prior to the $265,000 transfer on December 10, 2007, a deposit of $673,200 was received on November 21, 2007 from SFGGM's BOH 8870 account. See paragraphs 25 to 30 regarding my conclusions for SFGC's Trustmark 4586 account and SFGGM's BOH 8870 account.

## Services Provided by the Barnes Defendants Purportedly for Reasonably Equivalent Value

40.     Among many other documents, we analyzed the Defendant's Responses to the Receiver's Interrogatories. In response to the Receiver's request that the Defendants "[s]tate all facts that support Your affirmative defense that You provided 'reasonably equivalent value' in exchange for the payments You received from the Stanford Parties", the Defendants stated that "[a]t all times, in connection with services provided to The Stanford Parties, any such charges were for services provided at market rates, for legitimate purposes, and in accordance with charges rendered for services of the nature provided to the Stanford Parties, for clients involved

APP000020

in complex associated business and governmental relations activities." The Defendants further state that they provided several services to the Stanford entities, including, (1) "Initiated due diligence exercise that was conducted by the former general counsel to the Democratic National Committee regarding the reputation of corporations and its potential impact on political parties and elected officials accepting campaign contributions", (2) "Provided counsel on the risks and rewards of locating a global capital markets enterprise in the U.S. Virgin Islands…[and a] strategy to expand the global awareness of the Antigua 20/20 Cricket Tournament", (3) "Providing analysis and predictions" regarding the 2008 Democratic Presidential primary, the 2008 Presidential election, and the 2008 Congressional election and their related "impact[s] on global capital market strategies" and "U.S. policy" relating to the Caribbean region and companies residing in the U.S. Virgin Islands, (4) "Provided analysis and counsel…and [d]eveloped legislative strategy" to "effectuate…legislative changes to U.S. tax policy…in the U.S. Virgin Islands", (5) "Initiated review of campaign finance issues relating to the Antigua national election", and (6) Participated in and represented the corporate interest at various Democratic Governors Association events in the U.S. Virgin Islands to ensure the underlying policy reflects current global business environment." *See* exhibit **KVT-17** at pages 3-4.

41.     The above services, which the Defendants claim were delivered in exchange for reasonably equivalent value, can be broadly grouped into four categories, (1) services related to the lobbying campaign to change the U.S. tax laws regarding corporations operating in the U.S. Virgin Islands, (2) services related to the Antigua 20/20 Cricket Tournament, (3) services related to political donations and access to politicians, and (4) services related to the reputation of R. Allen Stanford and the Stanford Entities. These services are described in more detail below.

### U.S. Virgin Island Tax Laws

42.     In an April 2005 e-mail exchange between Carlos Loumiet and Yolanda Suarez, Loumiet recommended Jim Miller (instead of Ben Barnes) to "[go] before the Republican-controlled Administration, House and Senate to ask for a legislative favor" citing Mr. Millers' history and relationships with the "Bushes", "Grassley and his California counterpart at Ways and Means in the House", and his experience lobbying frequently "on other tax issues before Congress".   Suarez told Loumiet that she "fully anticipated that Jim would be working on this" but that "his schedule was not very flexible." While she acknowledged that she wanted Mr. Miller involved, she told Louimet that "we do need a team on this." Referencing his original email, Louimet responds that he "couldn't agree more" and that he "liked [Ben Barnes'] ideas." *See* exhibit **KVT-18**. Ben Barnes testified that this email was related to the lobbying campaign in which he and his firm were engaged to change the U.S. Virgin Islands tax laws. *See* exhibit **KVT-14** at pg. 83.

43.     In advance of an August 31, 2005 meeting, Barnes sent R. Allen Stanford and Yolanda Suarez a detailed lobbying campaign proposal for winning approval of the USVI tax proposal. The proposal centered on a strategy to develop a detailed "rationale" for the tax proposal, target legislative leaders, and third party advocates. *See* exhibit **KVT-19**.

44.     Evidenced by a series of e-mails, the USVI tax lobbying group, with Barnes' support and direction, decided to develop a national security argument to bolster their efforts. *See* exhibits **KVT-20**, **KVT-21**, **KVT-22**.   The completed argument, in the form of a white paper, *America's Third Border: Protecting National Security By Promoting Private Investment in the Caribbean*, was presented to R. Allen Stanford on September 27, 2005. *See* exhibits **KVT-23**, **KVT-24**, **and KVT-25**.

APP000022

45.     In a May 22, 2007 e-mail, Barnes proposed that Stanford pay a $135,000 per month retainer for the USVI tax lobbying effort. Barnes cited the retention of the services of Scott Reed and Mitchell Delk in his request. *See* exhibit **KVT-26**. Payments to Ben Barnes Group LP were actually $265,000 per month during the months of July 2007 through December 2007 and no documents or other information has been made available to explain why the amount is nearly twice as much as the proposed retention fee in the May 22, 2007 email.

46.     After seeing little results from the USVI tax lobbying effort, on December 7, 2007 R. Allen Stanford decided to stop paying Barnes $265,000 per month. Instead, he directed Yolanda Suarez to negotiate a success fee for the successful completion of the legislative effort. He made this request of Ms. Suarez irrespective of the fact that she believed the results they sought were not achievable. *See* exhibit **KVT-27** ("I know you don't think this is achievable but Barnes assures me if we get on this and get in front of key folks on the hill it can be accomplished next year" and "Yolanda I have been personally paying Ben $265K each month this year. I think the world of Ben and know he is very capable but this is too much for what we are getting in return. Ben has said Mitch and others were hired to do Stanford business only which I know is not the case.").

47.     In mid-February 2008 a "revised version of the 'story'" was prepared to sell the Governor of the USVI on the tax proposal and secure his support. *See* exhibits **KVT-28**, **KVT-29**, **and KVT-30**. A little over a week later, at the end of February 2008, Barnes and Mitchell Delk spoke with the USVI Governor after which Mitchell Delk stated that he had an "opportunity to underscore the need for and opportunity to modernize the tax incentives" and that the Governor "understood" the opportunities to "lure business to and enhance revenues for the USVI". *See* exhibit **KVT-31.**

APP000023

48.     Mitchell Delk stated that the lobbying campaign to change the U.S. tax laws regarding corporations operating in the U.S. Virgin Islands came down to two primary issues: 1) evaluation of what changes, if any, could be made to the residency requirements in the current tax laws and 2) evaluation of what changes, if any, could be made to expand the sourcing requirements in the current tax laws in order to allow the income earned by the Stanford Entities to be taxed at the U.S. Virgin Islands tax rate of 10% instead of the U.S. tax rate of 30%. *See* exhibit KVT-59 at pages 99-100.  Mr. Delk "understood" that what R. Allen Stanford "was hoping to do…was to take all the revenues associated with the business he was doing in Antigua and take advantage of the USVI tax law." *See* exhibit KVT-59at page 143-144. The proposed approach was to attempt to expand the sourcing rule to "Caribbean Islands" instead of just the USVI, thus encompassing Antigua. Ultimately Mr. Delk and the other individuals working for Ben Barnes and the Ben Barnes Group concluded that the "elimination of the residency requirement was politically impossible" leaving the "broadening of the sourcing rules" as the only option.  *See* exhibit KVT-59 at page 144.

49.     Ben Barnes and Mitchell Delk confirmed that ultimately, the effort to change the U.S. Virgin Island tax laws was not passed. See KVT-14 at pages. 88 and exhibit KVT-59 at page 159. Mr. Delk stated that in a typical engagement "ultimately, success depends on whether you either pass a bill or you, in fact, derail something that's harmful to your client." *See* exhibit KVT-59 at page 56.  Neither of those two things happened here.

**Antigua 20/20 Cricket Tournament**

50.     Ben Barnes stated that he introduced R. Allen Stanford to Lynn DeLuca, who was "the head of ESPN", and that Lynn DeLuca's agreement to "be a partial sponsor of the game…caused Sky Sports Network to come in and want a contract." *See* exhibit KVT-14 pg. 60. *See also* exhibits **KVT-32, KVT-33, KVT-34, and KVT-60 to 63.**  We have confirmed that

APP000024

both ESPN and Sky Sports Network agreed to be partial sponsors and broadcast distributors of the Antigua 20/20 Cricket Tournament. The agreement with ESPN called for three payments totaling $40,000 for the right to broadcast the 2008 Antigua 20/20 Cricket Tournament via broadband internet on ESPN's ESPN360 service. *See* exhibit KVT-64 and KVT-65. A separate agreement was entered into for the rights to broadcast the 2008 Antigua 20/20 Cricket Tournament on satellite and/or cable television and via broadband internet on ESPN360. The agreement called for five payments totaling $190,000. Stanford received at least $135,000 related to these contracts. *See* exhibits KVT-68 to KVT-73. While we have not been able to locate the Sky Sports Network agreement, we have found evidence of several payments received by Stanford 20/20 LLC that reference the broadcast rights for the 2008 and 2009 Antigua 20/20 Cricket tournament purchased by Sky Sports Network. We have identified three payments totaling $1,509,975.  *See* exhibits KVT-74 to KVT-79 and KVT-91. We have not seen any evidence confirming that ESPN's broadcast agreement caused Sky Sports Network to approach Stanford for broadcast rights or that Ben Barnes' introduction is what caused ESPN to enter into an agreement with the Stanford Entities. The funds received from both ESPN and Sky Sports Network were deposited into Stanford 20/20 LLC's Bank of St. Croix account number 0022016603. Further, individuals within Stanford saw the Antigua 20/20 Cricket Tournament as a "great opportunity to showcase the Stanford brand" and that they "look[ed] forward to hosting clients and prospects during the Stanford 20/20 matches." *See exhibits* KVT-80 and KVT 81.

     51.    The Defendants also assisted R. Allen Stanford and the Stanford Entities in their efforts to gain approval for Cuba's participation in the Antigua 20/20 Cricket Tournament from the U.S. State Department and the U.S. Treasury Department. Ultimately, Cuba's participation was not approved. *See* exhibit **KVT-35**. Ben Barnes stated that Cuba's participation would have

APP000025

benefited R. Allen Stanford because "it would give Stanford Financial the – a lot of recognition around the world" and attract more investors. *See* exhibit **KVT-14** at pg. 60.

## Political Donations and Access

52.     Our analysis of the documents and records of the Stanford entities has identified several emails and memoranda evidencing the Defendants' efforts recommending political donations Stanford should make and providing R. Allen Stanford or other employees of the Stanford Entities with access to politicians. Such communications include, but are not limited to the following examples. Through a September 7, 2006 Barnes memorandum, Representative Charlie Rangel (NY) asked R. Allen Stanford to make individual $2,000 contributions to twelve candidates of Rangel's choosing. Barnes stated that "it is important that we pursue this" and recommended that R. Allen Stanford make the donations as the "Democrats have a good chance of taking back the house". *See* exhibit **KVT-36**. In March 2007, a check was sent to Senator Dodd's campaign. *See* exhibit **KVT-37**. In July 2007, Ben Barnes suggested that R. Allen Stanford sponsor a party for B Rapoport at Jay Rockefeller's house for $50,000. Ultimately, R. Allen Stanford contributed $30,000. *See* exhibits **KVT-38** and **KVT-39**. In August 2008, Ben Barnes notified R. Allen Stanford of a request from the Governor of the USVI for R. Allen Stanford to be the "major sponsor" of an upcoming National Democratic Governor's Association event in the USVI. Ben Barnes stated that "it's a great opportunity". Ultimately R. Allen Stanford sponsored the event for $500,000. *See* exhibits **KVT-40, KVT-41,** and **KVT-42.**

## Reputation Management

53.     On May 17, 2006, Bloomberg ran an article on Stanford's claim that he had a family relationship to Leland Stanford, the founder of Stanford University.  The article not only

APP000026

suggested that Stanford's claimed connection to the founder was questionable, but also discussed Stanford's formation of the "offshore bank", "problems with U.S. investigators", "donations to U.S. political candidates and parties", and the use of the "Stanford jets" by U.S. lawmakers. *See* exhibit **KVT-44.** Barnes was involved in the effort to try and quash the story. *See* exhibits **KVT-45**, **KVT-46**, **KVT-47, KVT-48**, **KVT-49**, and **KVT-50**. At one point, in a conversation with Suzanne Hamm, SFGC Chief Marketing Officer – North America, James Davis suggested the idea of having Barnes reach out to Michael Bloomberg personally to "kill the story". *See* exhibit **KVT-51.**

54.     On February 23, 2007, in response to statements made by Antiguan Prime Minister Spencer stating "we have tried our best to work with Allen Stanford…[a]s your government, we have experienced nothing but threats, innuendos and now, downright political interference in our nation's affairs", R. Allen Stanford published a response in an Antiguan newspaper. In his response, R. Allen Stanford referred to the Prime Minister's statements as "un-statesman like", "badly misguided", "deceitful", "an outright lie", and "vile and slanderous". *See* exhibits **KVT-52** and **KVT-53.** Barnes sent Stanford talking points for an apology. *See* exhibit **KVT-54.**

55.     Later that year, Barnes suggested that R. Allen Stanford enlist the services of an online reputation firm to improve his online reputation. Barnes indicated that this and the hiring of a law firm that specializes in federal elections would also be helpful in improving Stanford's ability to give influential campaign donations. John Rafaelli, Mitch Delk, and Wyeth Wiedeman agreed with the strategy. See exhibit **KVT-55.**

56.     Barnes used his influence in dealing with regulators in Latin America on Stanford's behalf.  For example, in September 2004, Ben Barnes Group LP provided a reference

APP000027

letter from Barnes for Stanford to a Venezuelan banking official in support of Stanford's application for approval to operate a commercial bank in Venezuela.  *See* exhibit **KVT-57** ("I have known Mr. Stanford for more than 25 years on both a personal and professional level. Mr. Stanford is…a man of strong character and integrity. All of his business dealings have always been conducted to the highest possible standards…I have no reservation in recommending that R. Allen Stanford and his companies be given every possible courtesy and consideration."). Ben Barnes admits that prior to the early 2000s he didn't know anything about R. Allen Stanford, so that section of the letter is false. *See* exhibit **KVT-14** at pg. 33.

### Barnes' Defendants had Access to High Ranking Stanford Employees

57.     Throughout the rendering of the purported services by the Barnes Defendants, records and testimony from this case reflect that they had access to high-ranking Stanford personnel, including Allen Stanford, Jim Davis, and Yolanda Suarez.  Many of the interactions between these parties are noted above and occurred throughout the relationship.  However, many other interactions occurred that were not previously mentioned, including but not limited to the following:

(a)     Meetings in Antigua: Mr. Barnes indicates that he traveled to Antigua for meetings on Stanford business three or four times.  *See* Exhibit **KVT-14,** at page 74.  While there, he toured SIB's facilities and met with various Stanford employees.  He also toured the airport development and the other office buildings under development by the Stanford Entities.   On another visit Mr. Barnes attended a meeting held on Stanford's "one island concept", including sales meetings and meetings with "difficult" community members who opposed the plans. *See* exhibit **KVT-14,** at pages 74 and 75.

(b)     Flights by Barnes on Stanford's private planes:  Mr. Barnes was asked to pick up James Davis in Memphis on a private plane in June 2005 for a meeting in Antigua.  *See* exhibit **KVT-96 and KVT-97.**  As early as September of 2002, records indicate Mr. Barnes was a guest on Stanford's private plane.  *See* exhibit **KVT-98.**  These trips provided additional private access to Mr. Stanford and Mr. Davis, and perhaps other executives.

APP000028

(c)     Meeting at political fund raisers:  Mr. Caperton indicated that he had met Allen Stanford at a fund raiser in Washington DC.  See *exhibit* **KVT-93**, at page 58.  Scott Reed was a subcontractor engaged by BBG, and he also recalled meeting Mr. Stanford at a Washington DC fundraiser.  See *exhibit* **KVT-94**, see page 62

(d)     Meetings with Stanford personnel and its professional advisors:  Mr. Caperton described an occasion when lawyers and accountants (internal and external) for Stanford were included in a meeting with BBG professionals as well as subcontractors hired to assist in the Stanford engagement on BBG's behalf.  The meeting involved issues related to the USVI tax laws and policy impacting Stanford's tax positions.  See *exhibit* **KVT-93**, page 131.  As noted in paragraph 60 below, an email from internal Stanford accountant Henry Amadio refers to a meeting similar in nature and scope, with attached documents  (KVT- 84 and KVT-85) reflecting USVI tax issues and detailed breakdowns analyzing which Stanford revenue could potentially be identified as USVI sourced.

(e)     Further, the Defendants produced a detailed list identifying numerous meetings, trips to Antigua, Miami, and the US Virgin Islands, and fundraising events or meetings with politicians attended by both the Defendants and high-ranking Stanford personnel, including, R. Allen Stanford, Jim Davis, and Yolanda Suarez. See *exhibit* KVT-95.

### Purported Value Received by the Stanford Entities

58.     The Stanford Entities transferred a total of $5,073,466.90 to an account at Prosperity Bank in the name of Ben Barnes Group LP between June 30, 2005 and February 13, 2009.  The services purportedly provided by the Defendants to the Stanford Entities are set forth in paragraphs 40-57 above.  In our analysis of the Stanford Entities' documents and records and the deposition testimony taken in this case, we have seen no evidence that the purported "services" provided by the Defendants provided assets of tangible or intangible value to the creditors of the Stanford Entities.  Instead, the services served to further the Ponzi scheme.

59.     Mr. Caperton was designated by the Defendants to testify regarding whether the services rendered by BBG provided reasonably equivalent value to the creditors of the Stanford Entities. However, he was unable to connect any of the payments to any specific service

APP000029

provided or explain how such services created value for the creditors.  See *exhibit* **KVT-93,** at page 120.   For example, for the $1 million payment on June 30, 2005 Mr. Caperton cannot specify the services rendered but indicates only that they must have had value or Stanford would not have paid the invoice. To date, the Defendants have not produced documentation sufficient to determine the amount of time BBG personnel worked on Stanford related matters. Additionally, the Defendants were unable to provide this information during their deposition testimony, admitting that BBG did not keep time detail sufficient to "allocate" their time to specific projects." See *exhibit* **KVT-93,** at page 90.

60.   With regard to the Defendants' lobbying efforts concerning tax laws relating to the U.S. Virgin Islands, Barnes himself admitted the Defendants were not successful in their efforts to change the tax laws concerning the U.S. Virgin Islands.   The Defendants were attempting to expand the definition of "sourcing" in regard to what and how revenue and income could be considered sourced in the U.S. Virgin Islands, and therefore subject to the U.S. Virgin Islands more favorable tax rates. They were attempting to modify the tax laws to expand the sourcing requirement to include all revenues sourced in the Caribbean, which would have included all of the revenues from SIB. On March 30, 2007, Henry Amadio sent an email to Gil Lopez and Mark Kuhrt with the final version of a "USVI Initiative Meeting" report attached. The report was dated March 21, 2007. The purpose of the meeting was "to determine which of the 5 lines of revenue could qualify as revenue **sourced** from the VI (emphasis added)." The meeting concluded that "all revenue streams with the exception of the property management could be **sourced** through USVI Stanford Financial Group Global Management (emphasis added)." The final report includes graphs and charts showing that the goal was to have SFGGM charge the other Stanford Entities for Referral Fees, Marketing Fees, Management Support Fees, Capital

Market Fees, and Portfolio Management Fees so that these revenues would be treated as being "sourced" from the U.S. Virgin Islands. *See* exhibits KVT-84 and KVT-85. As stated previously in paragraph 58(d) above, Mr. Caperton referred to this meeting as well. Ultimately, even if the Ben Barnes Group had been successful in changing the sourcing requirements, which they were not, the ultimate value or benefit would have inured to R. Allen Stanford, as he was the sole owner and shareholder of the majority of the Stanford Entities. Further, Ben Barnes also admits in his deposition that even if the Defendants had been successful the U.S. Virgin Island tax law changes would have benefited ultimately the Stanford Entities and its shareholder, R. Allen Stanford. See exhibit KVT-14 at 88 and 95-96.

61.     Similarly, based on my analysis of the available documents and deposition testimony of the Defendants, the goal of the Defendants' services relating to Cuban participation in the Antigua 20/20 Cricket Tournament was to obtain approval from the U.S. State Department and the U.S. Treasury Department for the Cuban cricket team's participation in the tournament. The Defendants' did not obtain those approvals, thus any potential value, tangible or intangible, of those services was not realized. Again, had they done so, the result would have been the furtherance of the Ponzi scheme by attracting new investors.

62.     With regard to the $1,644,975 in funds received from the ESPN and Sky Sports Network's Sponsorship of the Antigua 20/20 Cricket tournaments, as previously discussed, we have seen no evidence confirming that ESPN's broadcast agreement caused Sky Sports Network to approach Stanford for broadcast rights or that Ben Barnes' introductions and relationships to and with ESPN directly caused ESPN to enter into an agreement with the Stanford Entities. Additionally, Ben Barnes stated that the benefit of these sponsorships would have been to "give Stanford Financial the – a lot of recognition around the world" and attract more investors. *See*

exhibit **KVT-14** at pg. 60. Further, internal communications at Stanford indicate that the Antigua 20/20 Cricket tournament was viewed as a "great opportunity to showcase the Stanford brand" and that they "look[ed] forward to hosting clients and prospects during the Stanford 20/20 matches." See exhibits KVT-80 and KVT-81.   Thus, the goal of those services was to expand the recognition and reputation of the Stanford Entities, and thereby extend the Ponzi scheme, which would have added no value to the Stanford Entities because investor funds create a liability, not an asset, for a financial institution or in this case, one run as a Ponzi scheme.   Any value from the additional investments into a Ponzi scheme would be due from income derived from the investment of the funds, which we know did not occur, except on a very limited basis, and these investments ultimately lost value  The revenue from investments and the investments themselves were fictitious. *(See* exhibit KVT-8, paragraphs 31-33. Moreover, the expenses incurred by the Stanford Entities to put on the Antigua 20/20 Cricket tournaments were many times over the value of the payments received by Stanford from the sponsorships.

63.     The ultimate goal of the services provided by the Defendants in making recommendations for political donations, providing access to politicians, and improving the reputation of R. Allen Stanford and the Stanford Entities was to give the appearance of legitimacy and credibility to  the Stanford Entities and R. Allen Stanford in an effort to extend the Ponzi scheme by attracting more investors.  As stated previously, this would have added no value to the Stanford Entities because investor funds create a liability, not an asset, for the Ponzi scheme.   Any value from the additional investments into a Ponzi scheme would be due from income derived from the investment of the funds, which we know did not occur.  The revenue from investments and the investments themselves were fictitious.

64.    In Mr. Caperton's testimony, he indicates that one service provided to the Stanford Entites in exchange for reasonably equivalent value was the advice Mr. Barnes provided regarding the Caribbean airlines purchase by Stanford.    In describing the service provided, Mr. Caperton testified "The fact that Stanford, you know, wanted an airline – you know, I think it ultimately failed because Caribbean airlines are notoriously difficult to make money at, but that was –that was a plus for the Stanford Group and for the Stanford creditors. " See *exhibit* **KVT-93**, at page 122.    Caperton's testimony that this purported service provided reasonably equivalent value is unsupportable.  In fact, over $270 million of SIB CD funds were funneled to Caribbean Sun Airline Inc. and Caribbean Star Airlines Ltd., and that these entities ultimately lost in excess of $301 million.  The advice provided by BBG is inconsistent with providing value.

### The Defendants Ignored Multiple Warnings Signs About the Nature of the SIB CD Program

65.    Based on our investigation regarding the Stanford Ponzi scheme and the facts and circumstances leading up to its collapse in late 2008 and early 2009, there were a number of "warning signs" or "red flags" that should have prompted significant concerns by the Defendants regarding the nature and validity of the business activities of the Stanford Entities, the SIB CDs and the underlying investment portfolio as well as the credibility of the sole owner of Stanford Entities operating the Ponzi scheme, R. Allen Stanford.

*SIB Was An International Bank in Antigua*

APP000033

66.     The fact that the SIB CDs were being sold by an international bank in Antigua, alone, should have prompted significant concerns and reasonably lead the Defendants to make further inquiries. Because SIB was an international bank, the Defendants would have known there was no FDIC insurance coverage of the CDs or any similar insurance protection. That is one of the well-known risks of investing with international banks. Moreover, Antigua, a country with a population today of approximately 85,000 people, is and has been well known in the United States for its lack of adequate regulation of the financial sector. The Barnes Defendants cannot deny knowledge of this concern, as Mr. Caperton testified that the fact that Stanford owned offshore banks was one of the reasons the Democratic Senatorial Campaign Committee rejected Stanford donations.  See *exhibit* **KVT-93** on page 109.  In fact, had the Barnes Defendants inquired, they could have learned that there were only three bank examiners in the Financial Services Regulatory Commission of Antigua who are responsible for all of the banks in Antigua. The entire country's gross domestic product for 2009 was $1.55 billion and its 2009 annual expenditures were $293 million (which put the country at a deficit), both amounts being small fractions of the value of assets claimed to be deposited with SIB in Antigua during that same time period. (See https://www.cia.gov/library/publications/the-world-factbook/geos/ac.html.) Had the Defendants reviewed similar publically available information prior to 2009, they would have found that the GDP and annual budget for Antigua were comparable. It is not surprising that a government with such limited resources was unable to adequately oversee SIB along with the many other banks operating on the island, and this fact should have caused significant concerns to the Defendants and reasonably lead the Defendants to make further inquiries.  Given the Defendants' access to high-ranking Stanford personnel, they could have made inquiries concerning the legitimacy of the Stanford operations.

APP000034

67.     Mitchell Delk was retained by Defendants to work on Stanford matters.  Mr. Delk specifically brought to the team experience with financial institutions in addition to his lobbying abilities.   Mr. Delk was an investment banker at First Boston for five years and counsel to SEC Chairman Richard Breedon.  (*See* exhibit KVT-59, at 32 and 33).  This experience at least would have provided Mr. Delk with the background regarding the offshore banking risks as well as many of the risks noted below.

*The Defendants Were Aware of Regulatory Violations by SGC Concerning the Sale of SIB CDs*

68.     On September 12, 2005, SGC received a letter from the SEC addressing multiple issues, including the commission structure paid to SGC relating to SIB CDs.  Specifically, the letter stated that the commission structure would result in SGC receiving a referral fee of 15% of the amount invested on a SIB CD with a 60-month maturity, which the SEC said was more than any rate legally allowed. *See* exhibit KVT-86.  SGC financial statements, which were publically available, referred to the letter regarding this SEC investigation in 2005, 2006, and 2007. On December 6, 2006, Ben Barnes emailed R. Allen Stanford stating, "I have some important thoughts regarding the SEC matter that I need to discuss with you at your underlined earliest convenience (emphasis in original)". It's important." *See* exhibit **KVT-15**.   Thus, the Barnes Defendants actually knew about ongoing SEC investigations and by virtue of the publically available SGC financial statement disclosures, had access to information that, if acted upon, would have either led them to the existence of that letter, or caused significant concerns if the letter they knew existed was not forthcoming upon request.

69.     Further on February 28, 2008, Mitchell Delk sent a draft of an agenda for a meeting with Yolanda Suarez to James Conzelman. One of the items on the agenda was "SEC

APP000035

investigation" with the comment "Leader can not [sic] be deposed." *See* exhibits KVT-89 and KVT-90. Additionally, on January 20, 2009 Mitchell Delk provided Ms. Suarez with recommendations for SEC enforcement related counsel to address the issue. *See* exhibit **KVT-16**. These emails and the other circumstances described above show that over the course of their relationship with the Stanford Entities and R. Allen Stanford, the Defendants were aware of SEC investigations into the Stanford Entities.   Such knowledge should have caused significant concerns on the part of the Defendants concerning the nature of the Stanford operations and reasonably lead the Defendants to make further inquiries concerning same.

70.    Further, had the Defendants inquired whether other regulatory bodies were similarly investigating the Stanford Entities, the Defendants may well have learned that the NASD concluded as early as 2006 that SGC violated NASD rules through "unwarranted and misleading" assertions that SIB's portfolio investments were "prudent"—at a time when SGC admitted that "no one at SGC knows what the investments are." *See* exhibit KVT-87.

*Defendants Were Aware of Reputational Issues with R. Allen Stanford and the Stanford Entities*

71.    In addition to the above information concerning Stanford, the Defendants were aware of other facts concerning Stanford that should have reasonably led them to make further inquiries.   As stated above, Barnes was aware of concerns raised by the media and politicians about Stanford's credibility and even suggested that R. Allen Stanford enlist the services of an online reputation firm to improve his online reputation. Barnes indicated that this and the hiring of a law firm that specializes in federal elections would also be helpful in improving Stanford's ability to give influential campaign donations. John Rafaelli, Mitch Delk, and Wyeth Wiedeman agreed with the strategy. See exhibit **KVT-55**.

72.    Ben Barnes was also aware that R. Allen Stanford did not "vet" with the Democratic Senatorial Campaign Committee ("DSCC") because it was the DSCC's position that "Stanford Financial…has lobbied for weakening of US money laundering laws and regulation of offshore banking." *See* exhibits **KVT-82 to KVT-83.**

73.    Further, the Defendants were aware of instances where R. Allen Stanford solicited letters of recommendation intended to help grow his operations in Latin America, which contained obviously false information. As stated previously, BBG provided a reference letter to a Venezuelan banking official in support of Stanford's application for approval to operate a commercial bank in Venezuela which stated that Barnes had known R. Allen Stanford for more than 25 years. *See* exhibit **KVT-57.** As previously discussed, Ben Barnes admits that prior to the early 2000s he didn't know anything about R. Allen Stanford. *See* exhibit **KVT-14** at pg. 33.

74.    Irrespective of the information BBG had in its procession and its ability to have personal access to the main perpetrators of the ponzi scheme, Mr. Caperton indicates that very few, if any, questions were ever posed regarding the economic sustainability or legitimacy of the Stanford Entities.

*SIB's Investment Returns Were Too Good To Be True*

74.    The high rates of return and consistent profitability of the SIB CD portfolio that were reported by SIB, at a time when the world economy was in crisis, likewise should have caused significant concerns to the Defendants and reasonably led them to further inquiries regarding how the SIB CD portfolio was invested and how it could achieve such results. The claimed historical performance of SIB's CDs was extraordinary, to say the least.  SIB offered CD rates that were significantly greater than those offered in the United States.  In its own

APP000037

marketing brochure, SIB included the following comparison in the yields of SIB CDs versus average U.S. Bank CD yields between 1997 and 2006:

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 10.13 | 9.25 | 8.71 | 9.625 | 9.13 | 7.17 | 6.38 | 6.21 | 6.52 | 7.13 |
| U.S. Yield (%) | 5.8 | 5.3 | 4.9 | 5.85 | 3.55 | 1.85 | 1.78 | 2.7 | 4.46 | 5.08 |

*Defendants Had Sufficient Information Such That They Could Have Known That SIB's Representations Regarding Their Investment Strategy and Purported Consistent Investments Returns Was Unusual*

75.     The extraordinary returns provided by the SIB CDs were particularly unusual considering SIB's representations regarding its conservative investment strategy and emphasis on guaranteed returns to its CD customers. As a general rule, in order to achieve higher levels of returns, it is necessary to take on a higher level of investment risk. Here, SIB in essence claimed to buck this trend by providing consistent and positive returns. SIB's claimed conservative investment strategy also did not square with the information SIB made available to the public about its portfolio.  For example, in its 2007 annual report, which was available to the public, SIB claimed that its investment portfolio at fair value consisted of 58.6% equity, 18.6% fixed income, 15.6% alternative investments (i.e. hedge funds) and 7.2% precious metals. SIB's investment allocation for the years prior, going back to at least 2004, was very similar to this. Other than the fixed income, the performance of every component of this investment allocation was volatile and subject to significant risk, particularly in the 2004 through 2007 time period. Even fixed income has risk. At a minimum, this apparent disconnect between a conservative investment strategy and consistent and/or above-market returns should have caused significant concerns with the Defendants.

APP000038

76.     By reviewing SIB's financial statements, a basic exercise that someone such as Ben Barnes, who attends meetings of the Investment Committee of the LBJ Foundation (see exhibit KVT-88) would have the ability to perform, the Defendants likewise would have seen that SIB's apparent assets were volatile and subject to change and that even a small drop in market performance of SIB's portfolio would have caused the total reported assets to become insufficient to pay CD obligations.  For example, in 2007 a mere drop of 4.50% of the reported financial assets would have resulted in SIB's combined cash, cash equivalents and reported financial assets being less than their outstanding purported CD obligations.  Indeed, non-Stanford CPAs advising SGC customers came to these conclusions based on presumably the same or even less information than was available to the Defendants. Mr.Caperton testified that BBG received SIB annual reports, the quarterly newsletter (the Stanford Eagle), and other publications.   See *exhibit* **KVT-93,** at page 47, page 67, and 75.   All of this information would have provided the necessary information to conclude, as some investor outsiders did, that the economic realities of the SIB CDs were highly volatile and not sustainable. Instead, even in the face of other factors that should have caused concerns and, with the Defendants access to high-ranking Stanford personnel which would have allowed them to inquire further about the Stanford operations, they either chose not to review the information in their possession or they reviewed the information and failed to make appropriate inquiries concerning the same.

I state under penalty of perjury that the foregoing is true and correct.  Executed on this 9th day of January, 2015.

_____
Karyl Van Tassel

APP000040

# EXHIBIT KVT-13

APP000041

**Stanford Financial Group Receivership**
*Listing of Payments Made to Ben Barnes and Ben Barnes Group, L.P.*

| Date | Amount | Payor |
|---|---|---|
| 6/30/2005 | $ 1,000,000.00 | Stanford Financial Group Company |
| 12/7/2005 | 500,000.00 | Stanford Financial Group Company |
| 1/19/2006 | 20,000.00 | Stanford Financial Group Company |
| 2/28/2006 | 500,000.00 | Stanford Financial Group Company |
| 7/31/2006 | 68,466.90 | Stanford Financial Group Company |
| 2/22/2007 | 325,000.00 | Stanford Financial Group Company |
| 4/17/2007 | 325,000.00 | R. Allen Stanford |
| 7/2/2007 | 265,000.00 | R. Allen Stanford |
| 8/2/2007 | 265,000.00 | R. Allen Stanford |
| 9/18/2007 | 265,000.00 | R. Allen Stanford |
| 10/19/2007 | 265,000.00 | R. Allen Stanford |
| 12/10/2007 | 265,000.00 | R. Allen Stanford |
| 2/29/2008 | 150,000.00 | Stanford Financial Group Global Management |
| 4/30/2008 | 100,000.00 | Stanford Financial Group Company |
| 6/2/2008 | 375,000.00 | Stanford Financial Group Global Management |
| 7/18/2008 | 55,000.00 | Stanford Financial Group Global Management |
| 8/15/2008 | 55,000.00 | Stanford Financial Group Global Management |
| 10/24/2008 | 110,000.00 | Stanford Financial Group Global Management |
| 11/7/2008 | 55,000.00 | Stanford Financial Group Global Management |
| 2/13/2009 | 110,000.00 | Stanford Financial Group Global Management |

APP000042

# EXHIBIT KVT-14

APP000043

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
                          DALLAS DIVISION

RALPH S. JANVEY, IN HIS CAPACITY AS)
COURT-APPOINTED RECEIVER FOR THE   )
STANFORD INTERNATIONAL BANK, LTD., )
ET AL., AND THE OFFICIAL STANFORD  )
INVESTORS COMMITTEE,               )
                  Plaintiffs,      )Case No. 3:10-CV-0527-N-BG
                                   )
v.                                 )
                                   )
BEN BARNES and BEN BARNES GROUP,   )
L.P.,                              )
                  Defendants.      )



              *******************************

                 ORAL VIDEOTAPED DEPOSITION OF

                    BENNY FRANK BARNES

              *******************************
```

        ORAL DEPOSITION OF BENNY FRANK BARNES, produced as

a witness at the instance of the Plaintiff, Official Stanford

Investors Committee, and duly sworn, was taken in the

above-styled and numbered cause on the 28th day of October,

2014, from 10:02 a.m. to 1:50 p.m. before LINDI S. ROBERTS,

Certified Shorthand Reporter in and for the State of Texas,

reported by machine shorthand, at the offices of Winstead, PC,

401 Congress Avenue, Suite 2100, Austin, Texas  78701,

pursuant to the Federal Rules of Civil Procedure.

APP000044

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1                        APPEARANCES

 2

   FOR THE PLAINTIFF, OFFICIAL STANFORD INVESTORS COMMITTEE:
 3       Mr. Jesse R. Castillo
         CASTILLO SNYDER, PC
 4       300 Convent Street, Suite 1020
         San Antonio, Texas
 5       Telephone: (210) 630-4200 - Fax: (210) 630-4210

 6       - and -

 7   FOR THE PLAINTIFF, OFFICIAL STANFORD INVESTORS COMMITTEE:
         Mr. Joshua E. Abraham
 8       BUTZEL, LONG, PC
         230 Park Avenue, Suite 850
 9       New York, New York 10169
         Telephone: (212) 818-1110 - Fax: (212) 818-0494
10

11   FOR THE DEFENDANTS:
         Mr. Jay J. Madrid
12       WINSTEAD, PC
         500 Winstead Building
13       2728 N. Harwood Street
         Dallas, Texas  75201
14       Telephone: (214) 745-5709 - Fax: (214) 745-5390

15

   ALSO PRESENT:  Nancy Martin, Videographer
16               Kent Caperton

17

18

19

20

21

22

23

24

25
```

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1                              INDEX

 2                                                      PAGE

 3   BENNY FRANK BARNES

 4   Examination by Mr. Castillo ......................6

 5

 6                            EXHIBITS

 7   EXHIBIT                DESCRIPTION             PAGE

 8   1              List showing Learjet usage        34

 9   2              List of Venezuela Bank            35
                    Reference Letters and List of
10                  Pending list

11   3              Letter from Ben Barnes to         35
                    Dr. Tino Alcides Diaz, dated
12                  September 30, 2004

13   5              Email chain between Yolanda       82
                    Suarez and Carlos Loumiet
14
     9              Email chain between Susan         97
15                  Martin and Julie Hodge, et al;
                    dated June 23, 2005
16
     10             Email chain between Susan         41
17                  Martin and Julie Hodge, dated
                    June 23, 2005
18
     11             Invoice from Ben Barnes Group,    41
19                  L.P. to Stanford Financial for
                    $1 million; dated 6/2/2005
20
     12             Email chain Julie Hodge,          100
21                  Aymeric Marinoia, et al

22   13             Email chain between Susan         100
                    Martin and Julie Hodge; dated
23                  June 23, 2005

24

25
```

**Lindi S. Roberts & Associates**
**(830)228-4634/(830)609-0266**

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1                        EXHIBITS (cont.)

 2    EXHIBIT            DESCRIPTION              PAGE

 3    15          Agenda: Tuesday, June 28th      102
                  through Thursday, June 30th,
 4                2005

 5    21          Email chain between James         84
                  Miller and Yolanda Suarez, et
 6                al; dated August 18, 2005

 7    24          "America's Third Border," dated  105
                  9/26/2005
 8
      50          Document entitled "Action         52
 9                Plan," Bates No. 651, 652 and
                  653
10
      51          Travel Itinerary (Washington,     39
11                D.C.; Oklahoma City; Austin)
                  November 3-12, 2003
12
      75          Memorandum from Larry Campagna   118
13                and Jaremi Chilton to Jim Davis
                  and Yolanda Suarez, dated
14                1/8/2008

15    76          Email chain between Allen        119
                  Stanford, Yolanda Suarez, et
16                al; dated January 15-16, 2008

17    83          Email chain between Yolanda      113
                  Suarez and Susan Martin; dated
18                May 6, 2008

19    101         Internet Article from           119
                  Chron.com, "Barnes again moves
20                into spotlight"

21    103         Email from Allen Stanford to     119
                  Yolanda Suarez; dated December
22                7, 2007

23

24

25
```

APP000047

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1                          EXHIBITS (cont.)

 2    EXHIBIT              DESCRIPTION                    PAGE

 3    110           "America's Third Border,"            109
                    dated November 2005
 4
      111           Documents reflecting                  78
 5                  transactions between Ben Barnes
                    Group, L.P. and Stanford
 6                  Financial

 7    116           Ben Barnes Group, L.P.               115
                    Transaction List from January
 8                  2008 through March 2009

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

APP000048

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1              THE VIDEOGRAPHER:  This is the videotaped

 2   deposition of Ben Barnes; In the Matter of Ralph S. Janvey, et

 3   al versus Ben Barnes and Ben Barnes Group, L.P.; Civil Action

 4   No. 3:10-CV-0527-N-BG; for the U.S. District Court, Northern

 5   District of Texas, Dallas Division; held in the Offices of

 6   Winstead, P.C. at 401 Congress Avenue, Suite 2100, Austin,

 7   Texas.

 8              This is the beginning of Tape One.  Today's date

 9   is October 28, 2014.  We are on the record at approximately

10   10:02 a.m.

11                      BENNY FRANK BARNES,

12   having been first duly sworn, testified as follows:

13                          EXAMINATION

14      Q.   (BY MR. CASTILLO) Sir, would you state your full

15   name.

16      A.   Benny Frank Barnes.

17      Q.   And Mr. Barnes, when were you born?

18      A.   April 17th, 1938.

19      Q.   Where?

20      A.   Gorman, Texas.

21      Q.   Okay.  And have you ever had your deposition taken

22   before?

23      A.   Yes, sir, I have.

24      Q.   On how many occasions?

25      A.   On several occasions.  A lot -- a lot of times when I
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1   was in office and when I was in private practice.
 2        Q.   Enough times that you're familiar with the process?
 3        A.   Yes.
 4        Q.   Okay.  And you shake your head like painfully so.
 5        A.   The shorter the better.  I was the defendant in about
 6   a dozen redistricting suits when I was in office.  And I gave
 7   my deposition when the legislature was not in session.  I
 8   almost gave my deposition all summer long for -- in two years.
 9        Q.   All right.
10        A.   So I got a -- I got a Ph.D. in redistricting.
11        Q.   So, Doctor Barnes, you're an expert in depositions as
12   well?
13        A.   Not depositions, but redistricting depositions.
14        Q.   All right.  And so we'll follow the same process
15   where I'll ask you questions and if you understand them,
16   you'll answer them; and I'll wait until you finish your answer
17   before I start my next question.
18             Sometimes I talk a little slower than I think
19   and so you may think that I'm finished with my question, but
20   I'm not.  So we'll -- I think we'll work through this process,
21   sir.
22        A.   I suffer from that same disease.
23        Q.   Thank you, sir.  Where did you get your undergraduate
24   education?
25        A.   The University of Texas and at TCU and at John
```

APP000050

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1   Tarleton.

 2      Q.   And what year did you graduate from the University of

 3   Texas?

 4      A.   I went into the law school on a three-year plan.  I

 5   went into law school in 1960 after -- after completing 90

 6   hours at the university and business school.

 7      Q.   Okay.  Did you get your -- a BA degree?

 8      A.   No, I never got a BA degree.

 9      Q.   All right.  So your degree at the University of Texas

10   is a Doctor of Law or JD?

11      A.   No, I -- I didn't complete the -- my law school

12   commitments to get a degree.  I have enough -- I had enough

13   hours, but -- to take the bar, but I didn't ever even take the

14   bar either.

15      Q.   All right.  So technically you didn't get a degree

16   from the University of Texas?

17      A.   That's right.

18      Q.   All right.  Or any other college?

19      A.   Several honorary degrees.

20      Q.   All right.  And what year did you finish your last

21   year at the University of Texas?

22      A.   1966.

23      Q.   Other than attending classes at the law school, did

24   you have what we would equate to a major in your undergraduate

25   studies?
```

APP000051

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1      A.   General business.

 2      Q.   All right.  And did you start working right after you

 3   finished your classes at the University of Texas law school?

 4      A.   I was elected to the legislature in 1960 when I was a

 5   freshman in law school.

 6      Q.   All right.  And I guess you were 21 years old,

 7   approximately, when you were first elected?

 8      A.   22 when I was sworn in.

 9      Q.   Okay.  And what district was that?

10      A.   District 64.

11      Q.   And how long did you serve in that capacity?

12      A.   Eight years.

13      Q.   Were you working besides being a legislator?

14      A.   I was associated with a construction company in

15   Brownwood sometime during the mid 1960s.  I don't remember

16   exactly when.

17      Q.   And what was your role with the construction company?

18      A.   I was to look around all -- the State of Texas for

19   sites to develop shopping centers and apartments.

20      Q.   Do you remember the name of the construction company?

21      A.   Yes.

22      Q.   What was it?

23      A.   The Herman Bennett Company.

24      Q.   All right.  And after working for the construction

25   company -- or how long did you work for the construction
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    company?

2        A.   Well, I worked for it part time for a few years and

3    then I -- in 1973 I became an owner -- a part owner of the

4    construction company and worked in the construction business

5    from 1963 until 1988 -- '87 or '88.

6        Q.   Any other employment during that period of time other

7    than working for the construction company?

8        A.   We did other things -- other construction.  But, yes,

9    no other -- other than just with that company and other

10   companies related to that company.

11       Q.   All right.  But, I mean, your -- your place of

12   employment, your ownership was with that company?

13       A.   Yes.

14       Q.   All right.  And at the same time you were still in

15   the legislature?

16       A.   I was in the legislature from 1960 to 1969.

17       Q.   Then what happened?

18       A.   I was elected Lieutenant Governor in 1968 and I

19   served as Lieutenant Governor from 1969 until 1973.

20       Q.   You were elected for two terms?

21       A.   Yes.

22       Q.   And you served as Lieutenant Governor for Governor

23   Connally?

24       A.   No, for -- Governor Smith was -- was governor.  But

25   in Texas, as you well -- so well know, and much more familiar

APP000053

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1  with Texas government than I am (sic), but the governor and

2  the lieutenant governor don't run together in Texas.  You --

3  it's a separate office, a separate campaign.

4      Q.   Right.  They're different -- different terms, aren't

5  they?

6      A.   Yes.

7      Q.   Okay.  And why did you decide not to run for a third

8  term as lieutenant governor?

9      A.   I ran for governor in 1972.

10     Q.   Okay.  And who did you run against?

11     A.   Dolph Briscoe, Frances Farenthold, and two other

12  minor candidates whose names I don't even remember.

13     Q.   Okay.  And you ran on the democratic side?

14     A.   Yes, I did.

15     Q.   Okay.  Were you working doing something else besides

16  being the lieutenant governor full time, during that period of

17  time that you were the lieutenant governor?

18     A.   I'm still affiliated with the Herman Bennett Company.

19  But I was mostly working full time as lieutenant governor.

20     Q.   All right.  Up until this point when you served as

21  lieutenant governor up through '73, were you doing any other

22  type of separate consulting work or a role as an adviser to

23  anybody else other than the company that you had a interest

24  in?

25     A.   No, I did not.  I held several national and

APP000054

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    international posts during that time that -- that took up a

2    lot of my time when I was outside of the office of lieutenant

3    governor.

4        Q.   Okay.  And what type of national post did you hold

5    during that period of time?

6        A.   I was President of the Southern Legislative

7    Conference; and then I was President of the National

8    Legislative Conference; and then I was Chairman of the Council

9    of State Governments; and then I served as a Special

10   Ambassador to NATO; and I served as a Special Ambassador to

11   the United Nation; and I served as a Special Representative

12   to -- of the United States to a conference in hun -- on hunger

13   in Rome.

14       Q.   Okay.  During your role as a member of a council or

15   ambassador to some of these -- the NATO or United Nations or

16   council for hunger, did you have any role in looking at

17   offshore banking?

18       A.   No.

19       Q.   Have you ever been in any role where you've had a

20   role in looking at the oversight of offshore banking?

21       A.   In the year -- in the period of the 2000s, yes, I

22   looked at -- I looked at the statutes pertaining to some of

23   the laws concerning offshore banking.

24       Q.   Okay.  And was that at the time when you already had

25   formed Ben Barnes Group?

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1      A.   Yes.

 2      Q.   All right.  Other than through your entity, Ben

 3   Barnes Group, did you have any role as an ambassador or as a

 4   council member where you had some responsibility to look at

 5   the oversight of offshore banking?

 6      A.   No.

 7      Q.   Okay.  And we'll get to the details of your looking

 8   at the statute concerning offshore banking --

 9      A.   Yeah.

10      Q.   -- after the -- in the 2000s.

11      A.   Yeah.

12      Q.   All right.  After your unsuccessful run for governor,

13   what did you do?

14      A.   I became president of the Herman Bennett Company.

15      Q.   The same construction company that we're --

16      A.   Yes.

17      Q.   -- you were talking about earlier?

18      A.   That's right.

19      Q.   Was it still based in Brownwood?

20      A.   Yes.

21      Q.   Did it have operations anywhere other than in the --

22   or offices other than in the Brownwood area?

23      A.   Other than construction offices on job sites where we

24   were doing construction jobs, no.

25      Q.   Okay.  And did it continue to do the same type of
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    developments that you described earlier:  Shopping centers?

2        A.   Yes.

3        Q.   Was it mainly commercial?

4        A.   It was mainly commercial, but we had some -- about

5    50 percent of our work was our own work and 50 percent was bid

6    work, where we built schools and hospitals.

7        Q.   Okay.  And how long did you stay in that position as

8    the president of Herman Construction Company (sic)?

9        A.   From 1973 until 1985 or '86.

10       Q.   Then what happened?

11       A.   We formed a -- the Barnes-Connally Development

12   Company and formed Ben Tex Construction Company.

13       Q.   And the Barnes-Connally Construction Company --

14       A.   That was -- that was a development company.

15       Q.   Was it to develop specific pieces of property or

16   generally a development company --

17       A.   To -- to continue the same type of business that I

18   had done with the Herman Bennett Company.

19       Q.   Okay.  What caused you to leave the Herman

20   Construction Company (sic)?

21       A.   Herman Bennett was getting older and -- and we had

22   development to be done in Austin, a very large tract of land

23   that later became the Barton Creek Country Club, and so I

24   moved to Austin really to develop that country club.

25       Q.   Okay.  What type of development, other than Barton

APP000057

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   Creek Country Club, did the Barnes-Connally Development

2   Company do?

3       A.   We did condominiums on Padre Island; condominiums in

4   Ruidoso, New Mexico; shopping centers in various and sundry

5   cities in Texas.  We did apartment houses in several cities in

6   Texas.  We did office buildings in Houston and in Austin.  We

7   did other commercial developments that I don't recall at this

8   time.  But there are probably some other things other than

9   apartments and office buildings and shopping centers.

10      Q.   And what was your area of expertise that you

11  contributed to the Barnes-Connally Construction Company?

12      A.   Well, by osmosis and being in the business from '73

13  until I got out of the business, I learned by mistake and by

14  experience some expertise about developing shopping centers

15  and apartments and single-family developments.

16           And I had already had some training perhaps to

17  know how to talk to public officials, county judges, county

18  commissioners, city council, mayors, planning and zoning

19  commissioners.  All of the part of local governments that

20  political subdivisions have over development in Texas and in

21  other states.  And so I spent a good bit of my time visiting

22  with county commissioners and mayors and city council people.

23      Q.   Okay.  And that's what I kind of envisioned, that

24  that would be your role.  If you needed a waiver of an

25  ordinance or something, that you would be the person that

APP000058

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    would make the contact with the public officials to see if you

2    could get that done.

3                    MR. MADRID:  Objection, form.

4        Q.  (BY MR. CASTILLO) Would that be kind of accurate?

5        A.   Yes, that would be accurate.

6        Q.   Okay.  And the same thing with the city?  If the city

7    had some favorable zoning issues or unfavorable zoning issues,

8    you would be the type of person that could talk to city

9    officials about --

10       A.   Well, attempt to talk to city officials.

11       Q.   Attempt to talk to city official.  Okay.  And at that

12   point were you ever registered as a lobbyist for any city or

13   county?

14       A.   No, not to my knowledge.

15       Q.   Okay.  Have you ever become registered to be a

16   lobbyist for any city -- at any city?

17       A.   I don't recall.

18       Q.   How about for any county?

19                   MR. MADRID:  Well, let me ask a clarification.

20                   MR. CASTILLO:  Yes, sir.

21                   MR. MADRID:  Jesse, when you say "you," are you

22   referring to Mr. Barnes, individually, or the entity that he

23   is representing?

24                   MR. CASTILLO:  Right now, him individually.

25   Yes, sir.

APP000059

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1              MR. MADRID:  Okay.

2        A.   No, not individually.

3        Q.   Okay.  At some point did you ever become registered

4    -- you, individually -- as a lobbyist for the United States

5    Congress?

6        A.   No, not to my knowledge.  And I was -- any

7    registration that I did in any lobbying was -- that was the

8    firm, not me as an individual.

9              It was always the -- it was -- at one time it

10   was called Entrecorp and then -- and then the name was changed

11   to -- well, it was Entrecorp and then Barnes-Connally and then

12   the Herman Bennett Company -- or Herman Bennett Company and

13   then Barnes-Connally and then later the Ben Barnes Group, but

14   it was -- it was always a company.

15       Q.   It was always the entity that was registered --

16       A.   Yes.

17       Q.   -- as the lobbyist?

18       A.   That's right.

19       Q.   Okay.  And that registration as a lobbyist would have

20   been limited to the United States Congress or to Washington,

21   D.C.?

22       A.   Well, you -- different states have different laws and

23   we always complied with the law in the state in which we were

24   operating.  And then there's -- there are federal laws, of

25   course, that we complied with.

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1      Q.   Okay.  Okay.  And we'll get to, I guess, some of the

2    details of that lobbying effort under U.S. federal law in a

3    little bit.

4      A.   Okay.

5      Q.   Tell me a little bit about the evolution of the

6    company so that it became from Entrecorp to finally the Ben

7    Barnes Group.

8      A.   I think probably we named it Entrecorp when we got

9    started in the late '80s.  And then I think -- and I don't --

10   I'm not certain of this, but I think maybe my partners -- the

11   other people in my company came to the conclusion that it was

12   probably better for us to be named the Ben Barnes Group than

13   it was Entrecorp, as far as getting our -- knowledge of our

14   firm out in the marketplace.

15     Q.   Okay.  And I know you're probably modest.  But why

16   would they want to change it to the Ben Barnes Group and have

17   your name on it?

18     A.   Well, I think they had very good judgment.  No.

19     Q.   Is the answer obvious?

20          (Laughter)

21     A.   No, I -- they made the decision, I didn't.

22     Q.   Okay.

23     A.   Yeah.

24     Q.   And they made the decision to capitalize on your

25   name?

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1    A.   Well, I don't know whether it capitalized on my name

2    or not, but they -- they decided that it was best to be named

3    the Ben Barnes Group.

4    Q.   All right.  And then Ben Barnes Group, is that a

5    limited partnership?

6    A.   Yes.

7    Q.   And who are the -- do you know who the general

8    partner is of Ben Barnes Group, L.P.?

9    A.   I am.

10   Q.   And do you know who the limited partners are?

11   A.   No, I don't know exactly how that's all set up.  I'll

12   have to get that for you.

13   Q.   How many limited partners do you think you have?

14   A.   Well, I don't know that I have limited partners.  I

15   have partners, but I don't know whether they're limited

16   partners as far as the way the whole corporation is

17   structured.  I don't -- I'm not certain of that.

18   Q.   Okay.  And how many partners do you think you have?

19   A.   One, two, three, four.

20   Q.   And I know you're looking at Mr. Caperton -- or

21   Senator Caperton.  Was he -- is he one of the partners?

22   A.   He certainly is.

23   Q.   And who are the other three --

24   A.   His feelings would be hurt if I didn't look at him

25   first.

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1                MR. MADRID:  Let me lodge just a form --
 2    objection to form.
 3                Okay.  Go ahead.
 4    A.   He --
 5    Q.   Who are some of the other partners?
 6    A.   He's the most important partner.
 7                SENATOR CAPERTON:  Here, yeah.
 8    A.   Wyeth Wiedeman, Scott Moorhead and Patsy Thomasson
 9    and certainly Mr. Caperton.
10    Q.   And do you continue operating as Ben Barnes Group,
11    L.P.?
12    A.   Yes.
13    Q.   All right.  And you're one of the part -- well,
14    you're the general partner of the limited partnership,
15    correct?
16    A.   Yes.
17    Q.   All right.  And so the jury can understand:  Where
18    does Ben Barnes Group, L.P. have offices?
19    A.   We have offices in Austin and in Washington.
20    Q.   And how long have you had -- Ben Barnes Group, L.P.
21    had an office in Washington?
22    A.   Oh, I don't recall.  Probably 20-plus years.  I don't
23    know.
24    Q.   If someone were to ask you at a cocktail party:
25    "What does Ben Barnes Group do?" what would your answer be?
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1      A.   I'd try to change the subject.  No, we -- I would say

2    that we are a consulting firm; a firm that has the ability to

3    represent various and sundry people that have government

4    problems, business problems that need to understand better the

5    regulatory process in state government, local government and

6    the federal government.

7      Q.   Does the Ben Barnes Group have literature that

8    describes the company?

9      A.   We have a website.

10     Q.   All right.  Beyond -- do you have something like a

11   brochure or a pamphlet or something that you can --

12     A.   No.  No, we don't have a brochure.

13     Q.   So the information on the website for Ben Barnes

14   Group kind of reflects the purpose of the firm and --

15     A.   Yes.

16     Q.   -- what it's able to deliver --

17     A.   Yes.

18     Q.   -- to its potential clients?

19     A.   Yes.  Many thousand hits a day -- I wish.

20     Q.   And that ability to represent various and sundry

21   clients or people that may need to understand the regulatory

22   process better, does that include every state in the -- in the

23   union?

24     A.   We certainly have the potential to find

25   representation in all the states.  We could go find somebody

APP000064

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

1    in Maine or Alaska that would probably understand what the

2    specific political terrain was in that state.

3         Q.   Okay.  How about within its own assets?  Within Ben

4    Barnes Group, is it tailored to a particular state or is it to

5    the federal system or what?

6         A.   I'd say it's tailored to the federal government and

7    also to the -- of course, we live in Texas and it's -- it has

8    a great deal of business from Texas.

9         Q.   Okay.  Other than the partners that you've named, how

10   big of a staff does Ben Barnes Group have, for instance, in

11   Austin?

12        A.   Three, four, five -- five other full-time employees.

13   And probably we -- various and sundry interns work at our firm

14   from time to time and that varies from two or three interns at

15   a time.

16        Q.   Yes, sir.  And how about in the Washington, D.C.

17   office?

18        A.   We have two full time and -- and also a lot of

19   interns that go through our offices there.

20        Q.   And if someone were to engage your services, how do

21   you sell your service or how do you get paid for your

22   services?

23        A.   We get paid by monthly fees and success fees.

24        Q.   Is there something in -- within the firm that sets

25   forth how much you would charge a particular client or is that

APP000065

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1   on a case-by-case basis?

2       A.   Case-by-case basis.

3       Q.   And do each of the partners have the ability to make

4   that decision of how much a particular client is going to be

5   billed on a monthly basis for the services?

6       A.   By and large they do.

7       Q.   And do each of those partners have the ability to

8   enter into an agreement with a potential client to represent

9   them on a success fee?

10      A.   It depends on the client, but probably not on -- it

11  depends on the client.

12      Q.   Okay.  And if a partner brought a client and said,

13  "Mr. Barnes, we're interested in representing this particular

14  client on a success fee," who would ultimately make that

15  decision?

16      A.   Well, there's several of us would.  No contracts are

17  written or agreed to unless they go across Mr. Caperton's

18  desk.

19      Q.   All right.  Is he reviewing for legal?

20      A.   For legal and -- but it's for discussion purposes for

21  what the scope and purpose of the contract is.

22      Q.   I'm kind of more interested in the business side of

23  it.

24      A.   Yes.

25      Q.   Who is -- who is or who are the people who would make

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1   the decision that it makes business sense?

2       A.   We -- several of us.  I'm very proud of the fact that

3   we don't have a high rate of turnover in my firm.  Wyeth

4   Wiedeman has been with me now almost 25 years.  He was working

5   in a clothing store a few blocks from here when I hired him.

6   He was still at the University of Texas.  He's been there 25

7   years.

8           Kent Caperton I've known for 35 years and he's

9   been with my firm now probably a decade.  I don't know

10  exactly.  It probably seems like three days for him and a

11  century for me.  But -- but anyway, he's been there for long

12  periods of time.

13          The -- Patsy Thomasson left the Clinton

14  administration and almost went to work immediately for us.

15          Scott Moorhead, our chief -- now chief operating

16  officer, is a young man that's been with our firm now probably

17  eight years.

18          But all of us enjoy an informal working

19  relationship and we all have input into -- into clients and

20  what the value of what they're asking us to do.  And it's a

21  general discussion.  There's not any one person that makes an

22  absolute decision.

23      Q.   Okay.  Okay.  And I guess I equate the success fee

24  kind of like a lawyer representing a client on a contingency

25  fee, where you get paid if you're successful.

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1      A.   Well, I'm sure you're aware of the federal statute

2   that you cannot receive a success -- a contingency fee for

3   anything that involves a federal appropriation whatsoever.  So

4   you can't have success fees with a lot our clients because of

5   the federal law.

6      Q.   If it involves a federal appropriation for whatever

7   it is you're trying having to have success --

8      A.   Yes.  Sure.

9      Q.   -- on?

10      A.   Yes.

11      Q.   Okay.  And the monthly fees -- is there, for

12   instance, a schedule that we know that Mr. Caperton might be

13   billing $500 an hour; so if it's going to take a certain

14   number of hours for him a month, that's what we're going to

15   set that monthly fee for?

16      A.   Well, we're not blessed like law firms like -- that

17   you represent, sir, that we can charge these big hourly fees.

18   And so we have to figure out what kind of -- what the -- kind

19   of the hours we're going to put in up front and estimate what

20   we're going to do.

21           I've always longed to be able to go charge

22   $1,000, $2,000 an hour like law firms do, but I've not been

23   able to do that.

24      Q.   Okay.  So you're able to -- what you are telling the

25   jury is that you try to anticipate the number of hours it's

APP000068

1    going to take your particular staff members for a project

2    and -- and set your monthly fee accordingly?

3        A.   That's true.

4        Q.   All right.  Is there some type of mathematical

5    calculation or form --

6        A.   No.

7        Q.   -- that you fill out?

8        A.   No, there's not.

9        Q.   Is it something that you just develop because of your

10   experience?

11       A.   Because of our experience and -- and, again, the

12   informality of our firm is such that we're all talking to one

13   another hourly, daily, weekly.  It's not hard to find out what

14   someone else thinks some client ought to be charged or what we

15   ought to be doing.

16       Q.   Okay.

17       A.   And, also, we don't work on a client -- we all work

18   on them, but, you know, it's -- if it's Senator Caperton's

19   responsibility for the client, he's going to have jurisdiction

20   over that client and what he has to -- he'll have a lot more

21   to say about what's going to be charged because he's going to

22   know.

23       Q.   He's going to want to be comfortable with the monthly

24   fee and he's going to make sure it generates some profit?

25       A.   That's right.

APP000069

1    Q.   At the end of the year do people get evaluated as

2    partners on what they were able to bill and collect for that

3    year?

4    A.   We have a -- we have a bonus program, but we also --

5    it's at different times of the year.  Again, this firm does

6    not have a policy in writing on what's going to happen.  It's

7    what we all decide.

8    Q.   You mentioned earlier -- and I want to follow up to

9    that.  Do you have a contract that Ben Barnes Group has

10   developed in order to communicate to the client what's going

11   to be charged and what work you're going to give in exchange

12   for that?

13   A.   We do.

14   Q.   And when was that developed?

15   A.   Four or five years -- five or six years ago, seven

16   years ago.

17   Q.   All right.  So 2007, maybe?  '07-ish?

18        MR. MADRID:  Objection, form.

19        Go ahead.

20   A.   I don't -- I don't really know.  Senator Caperton

21   wanted to prove he -- that he was worth a lot of money and he

22   came in and said, "We ought to be developing this form.  And I

23   can -- with my legal expertise and background, I can develop

24   it and do a hell of a job, so let me develop this form."

25   Q.   Okay.  But he joined you 35 years ago.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
1        A.   No, he was friends 35 years ago.

2              SENATOR CAPERTON:  Ten years ago.

3        Q.  (BY MR. CASTILLO) Ten years ago?

4        A.   Yeah.

5        Q.   All right.  So if he -- so if Mr. -- Senator

6   Caperton --

7        A.   Yes.

8        Q.   -- is the one that developed that contract or the

9   form?

10       A.   Yes.

11       Q.   Okay.  And in that form do you describe what you're

12  going to do for that client?

13       A.   Not specifically 1, 2, 3, but -- but general.  And

14  when you're complying with the federal law you have to put

15  down in broad terms the extent and purposes for what you've

16  been hired.

17       Q.   And do you have to separate in that engagement how

18  much of that time is going to be spent for lobbying efforts

19  for the federal government?

20       A.   You don't do it up front.  What you do it is as

21  you -- as you represent the client, you decide basically at

22  the end of each month or -- or a certain period, how much time

23  you spent on actual lobbying and how much time you spent on --

24  we call it business representation or representation on

25  problems other than lobby.
```

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1       Q.    And why do you have to do that?

2       A.    Because of the United States tax laws.  If I'm

3    representing this law firm on a business matter, they can

4    deduct it -- what I'm charged.  If it's on lobbying, they can

5    only deduct 50 percent of it.

6       Q.    And does Ben Barnes Group have to report the amount

7    that it has collected for lobbying efforts?

8       A.    Yes, I think -- I think that's probably accurate,

9    yeah.

10      Q.    Okay.  And do you know if that report is done

11   annually or monthly?

12      A.    It's done quarterly, I believe.

13            SENATOR CAPERTON:   Quarterly.

14      Q.    (BY MR. CASTILLO) So it's neither.  It's quarterly?

15      A.    Yes, it's -- and it's -- and it's all a matter of

16   public record.  It's easy for you -- it's there.  And so

17   whatever is there, is there.

18      Q.    Okay.  Do you coordinate with the client to make sure

19   that the number they're reporting as lobbying is consistent

20   with what you're reporting as lobbying?

21      A.    I really don't know.  But our financing -- our

22   financial department probably does that in many cases with the

23   bigger clients.  I don't really know.

24      Q.    You obviously know that we're here because of

25   Mr. Allen Stanford.

APP000072

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1      A.   Yes, sir.

 2      Q.   All right.  When did you first meet Mr. Stanford?

 3      A.   I don't know a specific year or -- that I met

 4  Mr. Stanford.

 5      Q.   Did you have -- do you remember when you first had

 6  any business dealings with Mr. Stanford?

 7      A.   Yes.

 8      Q.   When was that?

 9      A.   It was -- well, again, I don't remember the specific

10  year and time, but it's sometime in the early 2000s.

11      Q.   And what was -- what was the circumstances under

12  which you had a business dealing with Mr. Stanford in the

13  early 2000s?

14      A.   Mr. Stanford was recommended to me by Larry Temple

15  and that's the first time I had really heard of Allen

16  Stanford.

17      Q.   And Larry Temple is who?

18      A.   Larry Temple is a friend of mine -- a lifetime

19  friend.  He practices law here.  He is a financial institution

20  lawyer.  He had a very distinguished career.

21           He's been -- he was a special assistant to John

22  Connally and then chief of staff to John Connally when he was

23  governor.  Then he was special counsel for President Johnson

24  in his last two years in the White House.

25           He returned to Texas and became -- set up a
```

APP000073

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1   financial institution law practice and he was chairman of the

 2   coordinating board, chairman on the Committee of 125 (sic),

 3   had -- vice chairman of the Committee on 125 (sic) to evaluate

 4   the future of the University of Texas.  He's been -- he's

 5   president of the Lyndon B. Johnson Library and Foundation.

 6            He's a -- I've known Larry since he went to work

 7   for John Connally when I was 23 and he was 25 or 26.  It's

 8   been a lifetime friendship.

 9        Q.   All right.  And sometime in the early 2000s --

10        A.   Yeah.

11        Q.   -- is your memory of when Mr. Temple --

12        A.   Yeah.

13        Q.   -- recommended him?

14        A.   Yes.  It may have been 2000.  It may have been 2001.

15   I'm not -- I'm not exactly -- I don't -- I don't remember

16   when.

17        Q.   And when did you first meet Mr. Stanford after that

18   recommendation by Larry Temple?

19        A.   His -- a lawyer that worked for him, Lawanda --

20   Lawanda Suarez -- Yolanda Suarez, came to see me and then

21   sometime after that I met Mr. Stanford.  I don't know whether

22   he came to Austin to see me or whether I saw him when I was in

23   Houston.  I don't remember the first meeting.

24        Q.   All right.  And do you remember what the subject

25   matter was of the first meeting?
```

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1      A.   It's that they were wanting to be more active in

2   Washington.  And Larry had told him that he thought that we

3   knew our way around in Washington and they ought to talk to

4   us.

5           And I'm -- there may have been a specific

6   conversation about some -- a specific piece of legislation or

7   something specific, but I don't remember at that time.

8      Q.   Okay.  Do you remember when you were first -- when

9   the Ben Barnes Group was first hired to actually do some work

10  for Mr. Stanford?

11     A.   No.  The record should -- should show when we first

12  got paid.  I'm sorry.  I don't remember when.

13     Q.   So the first time that you did something for

14  Mr. Stanford would have been around the same timeframe that

15  you would have gotten paid?

16     A.   Yes.

17     Q.   Okay.  Because if you -- you weren't doing him any

18  favors?

19     A.   I was very active in the United fund in Austin, not

20  in the United fund in Austin (sic) -- or in Houston or

21  Washington.

22     Q.   Okay.  And I get the undertone meaning of that, that

23  you weren't doing anything for free?

24     A.   Yeah.  Right.

25     Q.   All right.  Prior to meeting with Yolanda Suarez and

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
1    some discussion about wanting to know their -- wanting to be
2    more active in Washington, did you know anything about
3    Mr. Stanford?
4        A.   Not until I heard from Larry Temple.
5        Q.   Did you know anything about his background?
6        A.   Not until I was told later.
7        Q.   Okay.  But up until the time that you were having
8    this meeting with Yolanda Suarez, did you know anything about
9    Mr. Stanford?
10       A.   No.
11       Q.   Know anything about the nature of his business?
12       A.   No.  I was told about the nature of his business
13   after I was -- but I didn't know anything about his business.
14   And quite frankly, I don't remember ever hearing -- having
15   heard the name Allen Stanford or the Stanford Corporation.
16       Q.   Okay.  And you weren't aware that Mr. Stanford had a
17   bank in Montserrat -- the Island of Montserrat?
18       A.   No.
19       Q.   Okay.  Or the reasons he had to leave Montserrat?
20       A.   No, I didn't know any of that.  I knew that his
21   father lived in Mexia and my old assistant football coach went
22   to Mexia as head coach in Mexia.
23       Q.   Okay.
24       A.   And so I called my football coach and -- one time, or
25   he called me, and I said, "Do you know the Stanford family
```

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    down there?"

2              He said, "Yeah, they're a real good family."  He

3    said, "Mr. Stanford" -- being Allen Stanford's dad -- "is a

4    good guy and supports the football team."

5         Q.   Okay.

6         A.   So that was a --

7         Q.   So he and Anna Nicole Smith were both from Mexia?

8         A.   I had forgotten about that.  I'd have gone to Mexia

9    if I had known Anna Nicole was there -- from there.

10        Q.   Yeah, the two famous people from Mexia.

11             I wanted to show you some documents.  And this

12   is really just to try to see if we can trigger some thoughts

13   or -- let me show you Plaintiff's Exhibit No. 1.

14             (Exhibit 1 was previously marked)

15             MR. MADRID:  Do you have extra copies?  If so,

16   great.  If you don't --

17             SENATOR CAPERTON:  It's not necessary, if you

18   don't.  Don't worry about it.

19             MR. MADRID:  If you don't, that's fine.

20             MR. CASTILLO:  I'm sure we do.

21        Q.  (BY MR. CASTILLO) And the reason I ask you this, sir,

22   is this is in a Stanford document and it's concerning airplane

23   usage.  And it appears that on September the 3rd, 2002 that

24   they attribute 3.2 hours of a Learjet to you.  Do you have any

25   recollection of any trip in September of 2002?

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1    A.   No, I have no recollection of that, but -- I don't

2    know about this trip specifically.  I know about -- I do

3    remember that Lawan -- Yolanda -- I'll get it right -- Yolanda

4    and I, in our first conversations, said that if they wanted me

5    to do some things before we got a contract negotiated, that

6    they might be willing to give me a lift on their -- on an

7    airplane or two while we were trying to do that.

8              That was -- I think that was -- she was using

9    that to try to -- when we were talking about fees and

10   everything, that that was another form of compensation that I

11   might receive.  I don't know whether -- I don't know whether I

12   had my deal worked out or not.  But I just see this -- me

13   flying on their airplane and that might have been it.

14   Q.   Okay.  But I'm -- I'll try to help with some more

15   time issues.  Let me show you Plaintiff's Exhibit Nos. 2

16   and 3.

17             (Exhibits 2 and 3 were previously marked)

18             MR. CASTILLO:  Here you go, Mr. Madrid.

19   Q.   (BY MR. CASTILLO) And I guess the one that I want you

20   to look at first is Exhibit No. 3.

21   A.   Number -- that one numbered 3?

22   Q.   Yes, sir.

23   A.   Okay.

24   Q.   And it appears from Plaintiff's Exhibit No. 3 -- is

25   that your signature, sir?

**Lindi S. Roberts & Associates**
**(830)228-4634/(830)609-0266**

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1    A.   No, that's sure -- that was -- somebody signed that

2    from my -- in my office.  That's not my signature.

3    Q.   All right.  And Ben Barnes Group, that's your

4    business, correct?

5    A.   Yes.

6    Q.   And up on the top it has some type of fax transmittal

7    from the Ben Barnes Group.  You see that?

8    A.   Yes.

9    Q.   All right.  Do you know why you were asked to write

10   this letter?

11   A.   Well, if you -- I'm sure that they were trying to get

12   letters written from anybody that they thought would be

13   helpful with the banking authorities in Venezuela that would

14   say that the Stanford Group was good people.

15   Q.   Okay.  And do you know if you were asked to write

16   such a letter?

17   A.   I don't remember.

18   Q.   Do you know if the Ben Barnes Group was asked to

19   write such a letter?

20   A.   I don't remember.

21   Q.   Okay.  Do you know what the Ben Barnes Group did to

22   familiarize itself with Mr. Stanford prior to September 30,

23   2004?

24   A.   No.  By -- but by that time we had an opportunity to

25   see the Stanford operation, to see the assets, to see what was

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1   happening and go to Houston and see the offices there and meet

 2   Yolanda and -- and probably Jim Davis, other people that

 3   the -- at the Stanford Corporation.

 4              They were very legitimate people in -- to the

 5   observation that we gave them.  They were -- it was -- it was

 6   a -- a substantial company.

 7   Q.   Okay.  So -- so there should be some records of that

 8   type of activity:  To get comfortable with their operation and

 9   their assets that you just described prior to September 30,

10   2004?

11              MR. MADRID:  Objection, form.

12   A.   We are not someone that does exten -- now, with the

13   internet, it's a little different.  But you don't -- like law

14   firms, I -- we don't go do investigations of clients that we

15   -- that we represent and like hire Crowell & Associates and

16   pay them several thousand dollars to go dwell into people's

17   backgrounds and past.

18              The fact that Larry Temple recommended to me to

19   Larry (sic) -- to Allen Stanford was a very good housekeeping

20   seal of approval to me.  Because Larry Temple had been

21   representing him and that was a very strong, strong message to

22   me that he wasn't going to be recommending anybody to me that

23   he had any doubts or reservations about.

24   Q.   All right.  So you relied on Mr. Temple or did you do

25   something in addition to that to familiarize yourself with the
```

APP000080

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    Stanford Group?

2        A.    Just by osmosis I started look -- seeing assets of

3    the Stanford Group and learning more about it.

4        Q.    Well, we'll get into that in a little bit.  If you

5    look at Plaintiff's Exhibit No. 3, it says, "I have known

6    Mr. Stanford for more than 25 years on both a personal and

7    professional level."  Is that true?

8        A.    No.

9        Q.    And you go on to say that, "He's a highly successful

10   individual and known to be a man of strong character and

11   integrity."  Did you know him well enough to make that

12   statement?

13       A.    This is a letter of recommendation.  I don't know who

14   dictated it.  But whether rightly or wrongly, my office in

15   both public and private have written letters of recommendation

16   for kids wanting to get in the University of Texas or other

17   colleges and universities; people wanting to get in the Naval

18   Academy; people wanting to be accepted to some accounting firm

19   or some legal firm or somebody that wants a letter of

20   recommendation.  And I'd say this is a typical letter of

21   recommendation that -- that I've written in the past.

22       Q.    Would you -- would you write that letter again?

23       A.    No.

24       Q.    Okay.  For instance, if somebody wanted to go into

25   the National Guard as opposed to Vietnam, you might write a

APP000081

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   letter of recommendation there, as well.  Right, sir?

2       A.   I wouldn't again.

3       Q.   Not again.  Okay.

4            Because it looks like -- if you'll look at

5   Plaintiff's Exhibit No. 2.  And it looks like "Venezuela Bank

6   Reference Letters," an internal Stanford document, they were

7   looking for letters of recommendation from a number of people

8   and you're at the top of the list.

9            MR. MADRID:  Is that a question?

10      Q.   (BY MR. CASTILLO) Right, sir?

11           MR. MADRID:  Objection.

12      A.   It looks like they may be in alphabetical -- no.  No,

13  they're not in alphabetical order.  But that's what -- it's at

14  the top of this piece of paper.

15      Q.   Yes, sir.  Do you -- did you have any discussions

16  with any of the other people that are listed in Nos. 1 through

17  15, about Mr. Stanford before, your office sent Plaintiff's

18  Exhibit 3?

19      A.   I don't -- I don't remember, but I don't think so.

20      Q.   Okay.  Let me show you Plaintiff's Exhibit No. 51.

21           (Exhibit 51 was previously marked)

22      Q.   (BY MR. CASTILLO) This appears to be a document that

23  was submitted, with a little Bates No. 1022, in response to

24  some discovery requests that I think the Baker Botts firm

25  sent.  Do you recognize this, Plaintiff's Exhibit 51?

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1      A.   I don't recognize it.  It looks like it was very

2   similar to my itineraries that were prepared by my office.

3      Q.   Okay.  And, again, I'm trying to get some time

4   perspective of when you were having these initial

5   conversations with Mr. Stanford.

6      A.   Yeah.

7      Q.   And if you look at the second page it looks like on

8   Monday, November the 10th, Mr. Stanford's plane was scheduled

9   to take you and John Sharp to Oklahoma City.

10      A.   Okay.

11      Q.   Do you know what you were doing at that time?

12      A.   No, I don't.

13      Q.   At that -- by that time had you been engaged already?

14      A.   I don't know that, either.

15      Q.   Do you know why you were going to Oklahoma City with

16   John Sharp?

17      A.   I have an idea that that name is incorrect.  That's

18   probably Jim Sharp, not John Sharp.  That's No. 1.

19           No. 2, that was the Temples that were on the

20   plane, too.  And that might have been something that Temple

21   had gotten the plane for.  I don't -- I don't know that.

22           But I -- it's in regard to a committee on the

23   Commission on 125 that I -- no, that was a conference call.  I

24   don't know -- I don't remember what this trip was for.

25      Q.   And the Temples -- where it says "the Temples," that

APP000083

1    was --

2        A.    Larry Temple.

3        Q.    -- Larry Temple, the person that introduced you to

4    Stanford, correct?

5        A.    Yes.

6        Q.    And then the Melanie there, that's your --

7        A.    Wife.

8        Q.    -- third wife, right?

9        A.    Yes.

10       Q.    Okay.  And Jim Sharp -- who is Jim Sharp?

11       A.    He's a partner of mine in Washington.

12       Q.    And his expertise is in what?

13       A.    Jim was an Assistant U.S. Attorney in Washington.  He

14   was -- as a matter of fact, he was senior prosecutor in the

15   D.C. office of the U.S. Attorney in the late '60s and early

16   '70s.  He left the U.S. Attorneys Office and established a law

17   firm in the '70s, where he practiced law for -- until now.

18       Q.    Let me show you a couple of other -- Plaintiff's

19   Exhibit No. 10 and No. 11.

20              (Exhibits 10 and 11 were previously marked)

21       Q.    (BY MR. CASTILLO) And first I'll direct your attention

22   to Plaintiff's Exhibit No. 11.

23       A.    Okay.  Okay.

24       Q.    I know you indicated that you wish you had the

25   ability to send out an invoice, but here's one.  What is

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    Plaintiff's Exhibit No. 11?

2        A.   It's an invoice from our group to -- to Allen

3    Stanford.

4        Q.   For how much?

5        A.   For a million dollars.

6        Q.   And what was the million dollars supposed to be for?

7        A.   Oh, I've got an idea.  I don't know specifically, but

8    this is probably for maybe a year's work or a year and a

9    half's work.  I'm not -- I don't -- I don't know how long a

10   period it would -- that it covered.

11       Q.   Now, it says "Retainer for Governmental Affairs."  Do

12   you see that on Plaintiff's Exhibit 11?

13       A.   Yeah.

14       Q.   Do you know whether you had -- whether the Ben Barnes

15   Group had been paid anything prior to June 23rd, 2005?

16       A.   I don't know.

17       Q.   Do you know if there was a written agreement between

18   Ben Barnes Group and Stanford Financial?

19       A.   No, I don't.  I don't believe so.

20       Q.   Do you remember anything about your discussion with

21   Mr. Stanford concerning what you were being retained for?

22       A.   It was an ongoing discussion of trying to get paid by

23   Mr. Stanford.  It was a -- like a lot of clients, they were

24   not as rapid -- I remember they were not a rapid pay.

25                There was an ongoing discussion about -- about

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1   what we were -- what we were going to be paid, what it was --
 2   I don't remember all the details.  But a discussion about
 3   whether it was going to -- how much a month it was going to
 4   be, what it was going to be for, different things.  But this
 5   was -- this was not -- this was not in advance.  This was for
 6   work performed.
 7       Q.   All right.  So there should have been work done prior
 8   to June 23rd, 2005?
 9       A.   Yes.
10       Q.   And so this million dollar invoice to Stanford
11   Financial was for work that predated June 23rd, 2005?
12       A.   Yes.
13       Q.   Do you remember when Ben Barnes Group first entered
14   into an agreement to start doing work in exchange for a fee
15   with Mr. Stanford, prior to June 23rd, 2005?
16       A.   No, I don't -- I don't recall those dates.  But
17   you've -- you've given me Plaintiff's Exhibit 3 where that I
18   -- I wrote that letter -- or that the firm wrote a letter --
19   the Ben Barnes Group wrote a letter, that someone signed for
20   me, that that's in 2004; this itinerary is in 2003.  So
21   this -- this million dollars could be for two years.  I don't
22   really know.  But it was for some period of time.
23       Q.   Who would know what Ben Barnes Group did in exchange
24   for the million dollars that was paid June 23rd, 2005?
25       A.   It would be a combination of the -- of the -- of the
```

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1    partners in my firm.

2        Q.    Okay.  Who would I have to talk to, Mr. Barnes, to

3    find out:  What did Ben Barnes Group, L.P. do for Stanford

4    Financial to get paid a million dollars on June 23rd, 2005?

5                MR. MADRID:  Objection, form.

6                Go ahead.

7        A.    We'd all have to sit down and go back and try to

8    remember and recollect all that -- what we did in 2003 and

9    2004.

10       Q.    Would there be some record of something that was

11   produced?  Generated?

12       A.    No, not necessarily.

13       Q.    Okay.  So tell the jury what, if anything, Ben Barnes

14   Group did, prior to June 23rd, 2005, in exchange for a million

15   dollars.

16                MR. MADRID:  Objection, form.

17       A.    We did a lot of things for the Stanford Corporation.

18   And I don't have -- while I don't have the dates, there were

19   many valuable services rendered by the Ben Barnes Group to the

20   Stanford Corporation from the -- from the initial stages of

21   our representation up until the end of our representation.

22       Q.    Who would know that?

23       A.    Well, as I testified to earlier, a combination of

24   different partners that worked on it.

25       Q.    Can you tell the jury what value you imparted to

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1    Stanford Financial Group in exchange for the million dollars

2    on June 23rd, 2005?

3        A.    I don't know exactly when we were talking about

4    changes in the U.S. Virgin tax laws.  I don't know exactly --

5    I don't have in my mind -- in my memory the timetable of what

6    was going on.  Was it specifically 2003?  2004?  2005?  2006?

7    I don't know.  Perhaps we can go back and recollect that and

8    put it together, but I don't have it in my memory.

9        Q.    And that hasn't been done up until today when --

10       A.    No.

11       Q.    -- you presented here for your deposition?

12       A.    That's right.

13       Q.    What would you have to do to -- to go back and

14   reconstruct that?

15       A.    Well, it would be a combination of people's memory.

16   We don't have a lot of things in writing that we do.  A lot of

17   our things are not filing briefs and going to a district court

18   and -- and leaving a paper trail and keeping up with your

19   phone calls and your emails and charging for them like that.

20   That's not what the -- that's not what representing people in

21   Washington is.  There's not necessarily a paper trail on

22   everything you do.

23            When you take Yolanda Suarez in and introduce

24   her to a member of the -- of the Banking Committee or the

25   Commerce Committee or take her to a meeting of the Black

APP000088

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    Caucus, when you want the Black Caucus to -- to make certain

2    it's high on their priority that you're going to -- that

3    they're going to strongly support the U.S. Virgin Islands tax

4    law changes, those things -- there's just not a paper trail.

5        Q.   So you have to rely on somebody's memory of that?

6        A.   Yes.  That's right.

7        Q.   Are you the type of person that keeps a calendar?

8        A.   Yes.

9        Q.   Do you have a written calendar?

10       A.   It's catch-and-catch-can.

11       Q.   Yes, sir.

12       A.   A lot of the times we do.

13       Q.   Okay.

14       A.   Yeah.  Sure.

15       Q.   And did you do that in 2004 or 2005?

16       A.   I'd have to check with my secretary and look and see

17   what she has.

18       Q.   And your secretary was Ms. Martin?

19       A.   Not in 2003, 2000 -- I don't think so.  She's been

20   there -- now, I think Susan's been there nine or ten years.

21   Well, she may -- she may have been.  I can find out who was my

22   secretary at that time.

23       Q.   Okay.  Because if you look at Plaintiff's Exhibit

24   No. 10, it looks like Susan Martin is sending a lot of the

25   information concerning wiring instructions.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1      A.   Okay.  That's -- and what year was that?

 2      Q.   2005.

 3      A.   Okay.  Yes, I'd say that Susan has been with me at

 4    least nine or ten years.

 5           MR. CASTILLO:  Okay.  I've got a note that I

 6    have to change a tape.  So why don't we take a five-minute

 7    break --

 8           THE WITNESS:  Okay.  That will be great.

 9           MR. CASTILLO:  -- and then we'll come back.

10           THE WITNESS:  Thank you.

11           THE VIDEOGRAPHER:  This marks the end of Tape

12    One.  We're off the record at approximately 10:57 a.m.

13           (Recess)

14           THE VIDEOGRAPHER:  This is the beginning of Tape

15    Two.  We're back on the record at approximately 11:11 a.m.

16      Q.   (BY MR. CASTILLO) Mr. Barnes, is there anything about

17    the first hour of your testimony that you need to correct or

18    amplify or say, "Well, what I told you wasn't necessarily true

19    and I need to correct it"?

20      A.   No.  I'm just embarrassed that I don't have a better

21    memory, but it's age and wear and tear.

22      Q.   I was asking a little bit about your practice of

23    keeping a calendar.  Do you know whether your secretary also

24    keeps a computerized version of your calendar?

25      A.   I have no idea at that time whether she does --
```

1    whether she did or not.

2        Q.   Now do you?

3        A.   Yes.

4        Q.   Okay.  And do you use something like an Outlook,

5    where you can check your calendar from your cell phone?

6        A.   I think this would be a good time for me to make a

7    confession.  Okay?

8        Q.   Okay.

9        A.   I --

10           MR. MADRID:  Are you sure you want to do this

11   with -- go ahead.

12       A.   I have probably been the butt of more jokes from my

13   children, my grandchildren, from my partners -- in the age of

14   information -- than anyone.  And I did not use a Blackberry.

15   I did not use a computer.  I don't have a computer today.  I

16   have an iPad.

17           I did not do text messages.  I didn't read text

18   messages, email messages.  I started probably a couple of

19   years ago doing text messages.  And when I -- and I sent the

20   same text to about a hundred people, that had made a lot of

21   fun of me, where that they would receive the first text from

22   me --

23       Q.   Uh-huh.  Uh-huh.

24       A.   -- to prove that I -- that I had the intelligence to

25   do that.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1                But if -- if someone wanted to enter a Texan or

2    a citizen of this country in a dinosaur contest, as far as the

3    information age, I would probably be a very good candidate.

4    It's highly likely that I would win.

5                But I -- I did not receive emails.  My secretary

6    would read emails.  And I'm -- I'm very sorry I receive emails

7    today, because she still reads them.  But because of the

8    political season we're in, last Friday I got 382 emails and

9    probably 380 of them were asking for money from people -- many

10   people that I had never heard of.

11       Q.   Uh-huh.

12       A.   So I -- we keep a calendar now and I can check the

13   calendar, but that is a new event in my life.

14       Q.   All right.  And in the 2005 era you -- would you rely

15   on your secretary printing out an itinerary so you would know

16   what you're doing this week or next week?

17       A.   We had printed itineraries, like the one that you

18   submitted to me as one of the exhibits, part of the time.  A

19   lot of the time was -- my calendar was picking up the

20   telephone and talking to my secretary and saying, "Where do I

21   go next?"

22       Q.   Okay.

23       A.   Okay.

24       Q.   And that would have been the practice in 2005 through

25   at least early 2009?

APP000092

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1     A.   Probably so.  I mean, yeah.  2009, yeah, that would

2   have been the practice.

3     Q.   And so you didn't -- you didn't email.  If you

4   emailed, your secretary would send out your email?

5     A.   Yes, or receive email.  I don't even know that she

6   emailed.  Maybe she did.  But when I would receive an email,

7   she would read it.  And it was really a low percentage that I

8   would ever read that email.  She would tell me that, "You got

9   an email that said so-and-so and so-and-so."  But I --

10    Q.   Was that a conscience decision you made or is it just

11  because you weren't familiar with the technology, like I

12  wasn't?

13    A.   I'd say that it was based on ignorance --

14    Q.   Okay.

15    A.   -- of the technology.

16    Q.   All right.  And so you didn't have your own laptop

17  that you carried around in 2005, up until the time you got

18  your iPad now?

19    A.   No, I didn't.

20    Q.   All right.

21    A.   I could have carried it for looks.

22    Q.   Made it seem like you --

23    A.   Yeah.

24    Q.   Okay.

25    A.   But --

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1      Q.   And I take it the nature of your business is that you

2  don't have to -- you don't record your hours that you've spent

3  on a particular client doing some work today --

4      A.   No, I don't.

5      Q.   -- versus work that you might be doing under a

6  monthly fee for someone else?

7      A.   Our firm -- when we are talking to clients in the

8  initial stages, we talk to them about that we don't bill by

9  the hour.  And probably half of our clients we don't bill

10  expenses and that's a -- probably a deficiency in our firm

11  because we should bill expenses.  In some instances, we do,

12  but not very many.  And as a result, you don't earn nearly as

13  much money as you think you're earning when you're not billing

14  expenses.

15      Q.   Okay.  Like, for instance, what type of expenses?

16      A.   Hotels, airlines, Senator Caperton's scotch.  Things

17  that cost a lot of money.

18      Q.   You are losing money, then.

19      A.   Yes.

20      Q.   Okay.  What about, you know, when a client comes to

21  you and asks you to help him in the political arena and

22  understand maybe the regulatory process, who puts the concept

23  of what the team is going to be to help this client -- who

24  puts that together?

25      A.   It's in an oral discussion at firm meetings or firm

APP000094

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1   conversations, very informal.  But it's been Senator

 2   Caperton's responsibility in the past few years to be the

 3   wordsman that puts down, for regulatory purposes and for our

 4   client's purposes, what the broad scope of our work is going

 5   to be.

 6       Q.   And then who puts together the team?  Who makes the

 7   decision to who's going to staff it?

 8       A.   I think we all ultimately do.  It's not a -- it's a

 9   very, very informal relationship.  It's -- it's more of a --

10   it's in many instances -- and I guess it would be correct that

11   members of families don't always get along.  But I think it's

12   more -- as much of a family as it is a firm.  And I think we

13   have amazingly good communications and amazingly good

14   relationships.

15       Q.   Okay.  Let me show you what we've now marked as

16   Plaintiff's Exhibit No. 50, sir.

17               (Exhibit 50 was previously marked)

18       Q.   (BY MR. CASTILLO) And I want to direct your attention

19   to the second page.

20       A.   Okay.

21       Q.   And this is kind of what I'm asking:  Who decides

22   what the structure of this campaign team is going to be, as

23   shown on Plaintiff's Exhibit No. 50, when you get an

24   assignment?

25       A.   My answer would remain basically the same.  There's
```

1    another party that's been added to this, Mitch Delk, that's

2    hired outside of our firm.  But this was a beginning of -- of

3    a team of -- internal team and external team that was going to

4    work on some Stanford matters.

5       Q.   And it has you as the manager --

6       A.   Well --

7       Q.   -- of the team?

8       A.   That's what it says on Page 2.  I don't -- I'd never

9    argue that I was the most important person in the room, but --

10   it created quite an argument for me to say that all the time.

11   But maybe out of deference to age and my name on the firm,

12   it -- that it would be manager.  But I would like to think

13   that -- that my name should be there.

14      Q.   And who would have had the contact with the principal

15   and the client, Allen Stanford, of all of the people listed on

16   Page 2 of Plaintiff's Exhibit 50?

17      A.   The client?  It all depends on who -- the client was

18   Stanford Financial.  Probably the most contact would have been

19   with Lawanda Suarez (sic).  That was her area of

20   responsibility.

21           So I don't know which one of these people talked

22   to Yolanda the most.  I mean, I don't know.  She would -- she

23   came to Washington a lot of times and met with people.  I

24   don't know who had the most contact with the -- with her and

25   the other people that represented Stanford internally and

APP000096

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1   externally and other law firms.  It's -- I just don't remember

2   to be able to tell you anymore of a specific answer to your

3   question.

4       Q.   And probably it was a poor question.  But really what

5   I'm asking for is:  You have a client that's Stanford

6   Financial, correct?

7       A.   Yes.

8       Q.   And there is a person who is the head of Stanford

9   Financial?

10      A.   Yes.

11      Q.   And you understood that to be Allen Stanford?

12      A.   Yes.

13      Q.   And I guess what -- on a high-level communication

14  between Ben Barnes Group and Stanford Financial, who would

15  have -- who had that communication?  Not on the details and

16  the workings of the team, but on a big picture.

17      A.   Allen was involved in the big, big picture.  But

18  communication with him on the day-to-day activities that was

19  performed in Washington by the Ben Barnes Group and by other

20  groups of people that were hired was -- that communication was

21  not with Allen.

22      Q.   And from the Ben Barnes Group, who would have had the

23  communication with Allen Stanford?

24      A.   Oh, whoever Allen got on the phone.  Allen -- I'm

25  sure I received the most phone calls.  But Allen is the kind

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   of guy that would call if he got -- he -- he -- patience was

2   not his best virtue.

3          If he wanted to find an answer and he couldn't

4   find somebody, he'd call -- he'd call anybody that he could

5   find.  He'd talk to the cleaning lady if he was trying to find

6   out something and he didn't -- he wasn't getting the answer.

7   Q.   And from the Ben Barnes Group, if you wanted an

8   answer from a big picture, who would call Allen Stanford?

9   A.   Well, we would try to and I would try to

10  communication through Yolanda and through Jim Davis and

11  through his other lawyers.

12         Allen Stanford was not a detail person when it

13  came to certainly writing federal legislation and the language

14  that -- how it should be construed and written in final

15  statute form.  That would not be a good use of my time or his

16  time, either one, for me to try to talk to him about it.

17  Q.   Did you feel like the communications you had with

18  Allen Stanford were more on a big picture level?

19  A.   Yes, it would -- it would be much more at a big

20  picture level and much less frequently than one would suppose

21  with Allen.  He had a thousand irons in the fire.

22         And I don't know very much about cricket.  I

23  never even played cricket.  I don't know whether you ever

24  played cricket or not.  I didn't.  But I had maybe an hour

25  conversation one time on the phone, with Allen telling me how

APP000098

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

1    dumb I was because I didn't understand about cricket.  And he

2    told me about cricket for one hour and I couldn't get off the

3    phone.  I put the phone down because I really had already

4    learned as much about cricket as I wanted to know, but he

5    wanted to tell you.

6            So you could get off involved in a lot of

7    conversations that were for your educational purposes, that

8    were not going to be of any real practical help to me talking

9    to the Senators and House members in Washington that I knew a

10   great deal more about cricket.

11           But it was a -- it was a -- a -- not phone calls

12   that I dreaded; but phone calls that with Allen, if he was in

13   an expansive mood, it was not really worth the investment of

14   my time.  I wanted to listen to my client and to -- and to do

15   what needed to be done for the client, but it was not -- it

16   was not the best use of my time to have long, extended

17   conversations with Allen.

18       Q.   Okay.  And one example is that cricket conversation?

19       A.   Yes.

20       Q.   All right.  I don't want you to think that I'm

21   chasing this trail needlessly.  But now that you brought this

22   cricket issue up, didn't Ben Barnes Group spend a significant

23   amount of time assisting Allen Stanford in setting up the

24   Cricket Twenty20 matches?

25       A.   Yes, as is outlined in the paper that Senator

**Lindi S. Roberts & Associates**
**(830)228-4634/(830)609-0266**

APP000099

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   Caperton prepared for the trustee (sic) that, to the best of

2   his ability -- and he talked to me about it before he prepared

3   it -- outlining the things that we had done for Stanford.

4       Q.   The receiver?

5       A.   The receiver.  I didn't mean the trustee.  The

6   receiver.  I'll stand corrected.  I'm sorry.

7            MR. MADRID:  That's all right.

8       A.   We talked about that there were -- the work we did on

9   trying to allow Cuba to come to the cricket tournament in

10  Antigua.  Cuba had been allowed to go -- to play -- a Cuban

11  baseball team to go participate in the United States and had

12  been exempt from the embargo act of Cuba in the 1980s.

13           And Mr. Stanford couldn't understand why -- that

14  if they would exempt a baseball team, why they wouldn't exempt

15  a cricket team; and that we should be able to get Mr. Castro

16  on the phone, along with President Bush, and get that taken

17  care of right away.

18           That was the kind of broad general instructions

19  we had that -- that we couldn't necessarily fulfill his -- his

20  work program he had outlined.  But we worked very hard on

21  trying to get the exemption and were unsuccessful.

22      Q.   Okay.  And the question that I -- that you just

23  answered was:  Didn't the Ben Barnes Group spend a significant

24  amount of time trying to accomplish the client's objectives to

25  get the government to approve Cuba to participate in the

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   Cricket Twenty20 Tournament?

2       A.   We did.  Patsy Thomasson, a partner in Washington,

3   had worked at the State Department for eight years.  She knew

4   the people at the State Department.  She spent a great deal of

5   time -- I'm -- maybe a hundred hours.  I don't know.  But

6   many, many, many phone calls and many -- and some personal

7   meetings trying to get this done.  And there was some degree

8   of optimism at the very beginning, but they just were not

9   going to yield on -- on Cuba.

10      Q.   Once you heard the request from Mr. Stanford for the

11  Ben Barnes Group to assist him in this cricket tournament, did

12  y'all have a discussion of how much you were going to charge

13  Allen Stanford or the Stanford Financial Group for that

14  effort?

15      A.   No.

16      Q.   Was that billed separately from any of the tax work

17  you were doing before?

18      A.   None of the -- none of the work was billed -- with

19  Mr. Stanford, based on my best of my memory, was not billed on

20  a specific project.  It was all just general billings by our

21  group and other group people that were a part of the Stanford

22  team in Washington that -- it was billed on just the overall

23  representation of Stanford.

24      Q.   All right.  So you can't attribute how much of

25  whatever you did collect was paid towards the tax work versus

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1    the cricket tournament versus any other work?

2        A.    No, versus any other work.  And then there was a lot

3    of other work that's outlined on the -- on the memorandum that

4    Senator Caperton submitted.

5        Q.    And so the answer is, "Correct."  You can't attribute

6    dollars collected per project?

7                MR. MADRID:  Objection, form.

8                Go ahead.

9        A.    That's correct.

10       Q.    Okay.  Was the Ben Barnes Group successful in getting

11   Cuba exempt?

12       A.    No, we were not.

13       Q.    Okay.  Was there any discussion with Mr. Stanford

14   about what the benefit would be of having this Twenty20

15   Tournament with a Cuban cricket team attending?

16       A.    He thought that it would increase the bureauship

17   tremendously in the Caribbean if, for the first time in 50

18   years, that Cuba was participating against the other islands

19   in the Caribbean in the game of cricket and other cricket

20   teams that he would bring from other places around the world

21   to play Cuba.

22               And then the T.V. audience that it would

23   build -- he was very interested in putting together a T.V.

24   audience that was larger than the Super Bowl's T.V. audience.

25       Q.    And how would that benefit Mr. Stanford?

**Lindi S. Roberts & Associates**
**(830)228-4634/(830)609-0266**

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1       A.   It would --

2            MR. MADRID:  Objection, form.

3       A.   I assume it would give Stanford Financial the -- a

4  lot of recognition around the world.

5       Q.   To attract more investors?

6            MR. MADRID:  Objection, form.

7       A.   Well, to investors.  And he had other projects that

8  were going on at that time.

9       Q.   Have you ever made a determination of what value you

10  gave Stanford Financial in connection with the attempts to get

11  Cuba exempt and a participant in the cricket tournament?

12            MR. MADRID:  Objection, form.

13       A.   There was another very valuable thing we contributed

14  to Mr. Stanford on the cricket tournament.  I knew Lynn

15  DeLuca, who was head of ESPN, and arranged for -- our firm

16  arranged for Mr. Stanford to meet Lynn DeLuca.

17            Lynn DeLuca agreed to part -- to be a partial

18  sponsor of the games; and then that caused Sky Sports Network

19  to come in and want a contract in addition, where ESPN could

20  not have an exclusive.  That went to England, India, many

21  parts of the -- of western and eastern Europe and other

22  continents.

23            So that was -- that was a great value as far as

24  getting T.V. coverage to the -- and ESPN paid several million

25  dollars for that contract, as did Sky.

APP000103

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1      Q.   To whom?

2      A.   To Stanford Financial.  And it may have gone to the

3  tournament itself.  I'm not certain about how to answer that

4  definitive.  But it's a -- the money went in the pot.

5      Q.   Did it go to Stanford Financial or did it go to the

6  Twenty20 Tournament to give to prize money?

7      A.   I don't have any idea.

8      Q.   Who would know that?

9      A.   Someone with Stanford.

10     Q.   No one within the Ben Barnes Group would know whether

11 or not Stanford Financial received any of the money?

12     A.   No.

13     Q.   I've heard you described as the quarterback of the

14 team that was helping Mr. Stanford change the tax laws.  Did

15 you consider yourself the quarterback?

16              MR. MADRID:  Objection, form.

17              Go ahead.

18     A.   I played defensive tackle and -- and -- and offensive

19 tackle on De Leon High football team.  I don't think that I've

20 ever been referred to as a quarterback on anything.  But I'd

21 like to as -- when I was Speaker of the House and Lieutenant

22 Governor, I would consider it greatly a compliment if someone

23 said I was a quarterback or a running back for the State of

24 Texas.

25              I don't know that anybody referred to me as a

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1  quarterback, but I like -- I'd like to think that, but it was

2  a team effort.  And if I was designated the quarterback,

3  again, that's probably based on age and experience, not on the

4  ability to block and tackle.

5      Q.   All right.  Well, then, would you consider yourself,

6  if not the quarterback, the manager of the team?

7      A.   I would consider myself an important person on the

8  team.

9      Q.   And would you describe for the jury what Ben Barnes

10 Group was hired to do in connection with the tax legislation.

11     A.   Well, the tax -- changing the tax legislation in the

12 Caribbean was a very, very important thing for -- not only for

13 Stanford, but for the whole economy in the U.S. Virgin Islands

14 and really the economy in the -- in the Caribbean.

15          The U.S. Virgin Islands were very poor.  The

16 United States had to appropriate a lot of money annually to

17 the U.S. Virgin Islands for them to really exist.  And getting

18 industry there and creating jobs and having jobs to pay taxes

19 was really part of their survival.  And the U.S. Congress

20 Caribbean Caucus, that was their main goal:  To be able to

21 bring private industry and create jobs and the economic

22 development in the U.S. Virgin Islands.

23          And so -- and there was a saying that:  So goes

24 the Virgin Islands, really goes the rest of the Caribbean.  It

25 was important for us to have -- and the Caribbean was looked

APP000105

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   upon as our third coastline.  It was very important for

2   defense purposes and economic development purposes.  So it was

3   -- it was important legislation.  It was important to -- it

4   was important what the United States' attitude was about the

5   U.S. Virgin Islands to a lot of people.

6       Q.   Important to who?

7       A.   To the people of the Virgin Islands.  To a lot of the

8   people in Congress who had very strong feelings that we should

9   be doing a great deal more in the Caribbean than what we were

10  doing.

11           China was loaning money -- the Chinese loaned

12  the money to build a hospital in Antigua.  The Russians and

13  Chinese had put medical schools in Cuba, were turning out

14  doctors and nurses.  And many of the Caribbean islands, the

15  whole medical staffs would be educated in Cuba.  It was very

16  -- other people were very interested -- other countries were

17  very, very interested in developing friendships and developing

18  a major presence in the Caribbean and so it was important to

19  us.

20           We don't -- we really didn't need the Chinese or

21  the Russians providing the doctors and the nurses for all of

22  the Caribbean and turn those countries into -- from allies of

23  our country and strong sporters of the United States into

24  people that had a primary allegiance to some other country

25  other than the United States.

APP000106

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

1      Q.   Were any of the islands in the Caribbean clients of

2   the Ben Barnes Group?

3      A.   No.

4      Q.   Were any companies that had offices in the Caribbean

5   clients of the Ben Barnes Group, other than Mr. Stanford?

6      A.   It was a conflict for us to take any other clients in

7   the U.S. Virgin Islands because Allen Stanford wanted tougher

8   rules on investing in the Caribbean than a lot of other

9   countries did.

10          He did not want -- there was -- under the

11   previous legislation that had passed, the interpretation of

12   the laws were such that an automobile dealer from Detroit was

13   running his sales through the Virgin Islands and being -- and

14   attempting to be taxed at the U.S. Virgin tax rate rather than

15   the United States.

16          And so there were a lot of people that tried to

17   take advantage of the U.S. Virgin Islands tax laws that were

18   not really putting any money into the U.S. Virgin Islands and

19   creating any jobs.

20          Stanford Financial's position was that they

21   wanted the level of investment to be high and the number of

22   jobs to be created to be high, where there could not be --

23   where there could not be companies invest in the Virgin

24   Islands that were doing it purely for just tax purposes.

25      Q.   Let me try my question again.  Were there any other

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1    entities that were clients --

 2        A.   No.

 3        Q.   -- of Ben Barnes Group?  Okay.

 4             MR. MADRID:  Let him finish his question,

 5    please.

 6             THE WITNESS:  But he already asked it one time.

 7    I didn't want him to have to ask it again.  I didn't want him

 8    tired.

 9             Okay.  Go ahead.

10        Q.  (BY MR. CASTILLO) Were there any other U.S. companies

11    that were the clients of Ben Barnes Group that were interested

12    in changing the tax laws in the United States Virgin Islands,

13    other than Allen Stanford?

14        A.   I don't know.  I don't think so, but there could have

15    been.  I don't know.

16        Q.   Were there any other clients that paid the Ben Barnes

17    Group for its efforts to change the tax laws concerning the

18    U.S. Virgin Islands, other than Stanford Financial?

19        A.   No.

20        Q.   And what were the two elements of the tax laws that

21    were going to be changed?

22        A.   One was the amount of time you had to spend in the

23    Virgin Islands.

24        Q.   Is that the residency requirement?

25        A.   Yes, the residency requirement.
```

APP000108

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1     Q.   And then what's the other?

2     A.   And the other would be the sourcing.

3     Q.   Had there been any efforts, by any of the public

4    officials in the U.S. Virgin Islands, to try to convince the

5    United States to change that tax law?

6     A.   Yes.

7     Q.   By whom?

8     A.   By the Governor of the U.S. Virgin Islands and by the

9    elected officials of the Virgin Islands and by the U.S. Virgin

10   Islands Chamber of Commerce.

11    Q.   And when was that?  Did it predate your involvement

12   with Mr. Stanford?

13    A.   Yes.

14    Q.   Was it concurrent with your involvement with

15   Mr. Stanford's efforts to change the tax law?

16    A.   That constituency in the U.S. Virgin Islands that I

17   just spoke of were -- were continually trying to work every

18   year to get tax laws that would encourage more investment in

19   the U.S. Virgin Islands.

20    Q.   And why had they been unsuccessful?

21    A.   There was -- because of some of the people that had

22   tried to take advantage of the tax laws, there was a group in

23   Washington that were very much opposed to any changes in the

24   law and very much opposed to anybody that was a United States

25   citizen having to do any business in the Virgin Islands; and

APP000109

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    then there were some people that were strong for it.

2              But the U.S. -- there was a caucus of the

3    Caribbean Caucus and the Black Caucus and the Hispanic Caucus.

4    There were a lot of people that were very interested in -- in

5    helping our neighbors to the south.  So there was a political

6    disagreement and a tug-of-war that was taking place in

7    Washington.

8        Q.   You're talking about the other -- the first and

9    second border being Canada and Mexico?

10       A.   Yes.

11       Q.   Okay.  And so the third border would be the

12   Caribbean --

13       A.   That's right.

14       Q.   -- right?  Was there any concern in the United States

15   government that the attempts to change the tax law in the

16   United States Virgin Islands would allow companies to avoid

17   regulation that they otherwise would have in the United

18   States?

19       A.   I think there was a division at Treasury about what

20   was the correct statutes and what was incorrect and how -- how

21   you could open the door and allow more investment into the

22   Virgin Islands for economic development and how you could keep

23   that door shut to people that were trying to use the Virgin

24   Islands for -- for tax avoidance.

25       Q.   What about other regulatory schemes in the United

APP000110

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

1    States?  If you were in the United States Virgin Islands that

2    you could avoid, for instance, the SEC requirements?

3        A.    No, I never had any discussion about that.

4        Q.    Or any oversight by banking commissions?

5        A.    No, I didn't have any discussion about that.

6        Q.    Were you aware that there was any opposition to

7    changing the tax laws in the Virgin Islands and the Caribbean

8    because of that?  That you would -- that companies would try

9    to avoid other regulatory schemes in the United States?

10       A.    I don't remember.  But I -- I know of no in-depth

11   discussions about regulatory agencies and what financial

12   institutions or public companies in the Virgin Islands could

13   be exempt from as far as U.S. -- other statutes.

14       Q.    Okay.  Now, did you ever visit Mr. Stanford's

15   operations in the Caribbean?

16       A.    Yes.

17       Q.    Which islands?

18       A.    Antigua and the U.S. Virgin Islands.

19       Q.    When we say "U.S. Virgin Islands," so the jury will

20   understand and doesn't have the luxury of going there, are

21   there many islands within the United States Virgin Islands or

22   is it just one island?

23       A.    I believe there's -- there's several, but I'm -- I

24   really don't know.  I think there are a couple, for sure.

25       Q.    How about St. Croix?

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1       A.    Yeah, St. Croix.

2       Q.    Is that part of the U.S. Virgin Islands?

3       A.    Yes.

4       Q.    Antigua, is that a --

5       A.    No.

6       Q.    Okay.  Antigua is under what --

7       A.    Great Britain.

8       Q.    -- country?  Okay.  So did you visit the operations

9  of Mr. Stanford in Antigua?

10      A.    Yes, I did.

11      Q.    Okay.  And why did you go?

12      A.    I went down there to meet with him to see the

13  operations.  And, also, he had a huge project island off the

14  coast of Antigua that he was going to develop or had -- and

15  started to develop, that he was going to sell to wealthy

16  people around the world.  That was going to be a rather unique

17  island:  The amenities that were going to be offered, the golf

18  course that was going to be built there.  He hired Jack

19  Nicklaus to develop the golf course.

20              But he wanted us to see the -- the island and

21  also to -- he knew that I had developed Barton Creek in a very

22  difficult regulatory area in Austin, Texas to develop golf

23  courses.

24              And there was opposition to -- in Antigua from

25  some local people about that kind of development.  And he

APP000112

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

1   wanted me to look at it and wanted my counsel and advice about

2   how to deal with and what you tell people, when you're

3   developing a development like that, to give them assurances

4   that you're going to do it in a -- in a correct way and in an

5   environmentally sensitive way.

6       Q.   Okay.  What was your advice concerning -- or your

7   involvement with giving Mr. Stanford advice on the project to

8   sell this development to wealthy people?  Was that in

9   connection with the total amount of money that you were

10  getting paid?

11      A.   Yes.

12      Q.   Did you separate out how much work you did on that?

13      A.   No.

14      Q.   You can't attribute how much you charged for that?

15      A.   No.

16      Q.   How much you got paid?

17      A.   No.

18      Q.   And what value you contributed to Mr. Stanford?

19      A.   No.

20      Q.   Did that project ever get off the ground?

21      A.   No.

22      Q.   Was it a private project or was it for Stanford

23  Financial?

24      A.   It was for Stanford Financial, I believe.  I don't --

25  I don't ever discuss -- I don't remember a discussion talking

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    about what entity it was going to go into.

2        Q.   That development on the island for that project to

3    build this wealthy complex, was that part of the scheme to

4    move that operation to the U.S. Virgin Islands?

5                MR. MADRID:  Objection, form.

6        A.   Would you mind asking the question again.

7        Q.   Yeah, it was a poor question.  I mean, that project

8    was going to be on the island of Antigua, right?

9        A.   Yes.

10       Q.   And could that ever qualify under the sourcing

11   requirement if you changed the tax law in the U.S. Virgin

12   Islands?

13       A.   It could qualify under a proposal that we were

14   discussing with the United States Government and the United

15   States Congress:  That if you were a citizen of the U.S.

16   Virgin Islands and you had development projects or other

17   income from non U.S. islands or from non U.S. entities, then

18   that income would be taxed at the Virg -- at the U.S. Virgin

19   Islands tax rate as opposed to the United States tax rate.

20       Q.   So you were going to change the tax law so all you

21   had to meet was a residency requirement?

22                MR. MADRID:  Objection, form.

23       A.   You had to meet the residency and you had to not be a

24   United States citizen.  You had to give up your citizenship

25   and be -- and be a citizen of the U.S. Virgin Islands.

APP000114

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1      Q.    So if you were a citizen of the United States Virgin

2   Islands, you would meet the residency requirement?

3      A.    That's right.

4      Q.    And you didn't have to worry about the sourcing

5   requirement?

6      A.    No, you -- yes, you still had to worry --

7      Q.    As long as it wasn't U.S.?

8      A.    No.

9      Q.    Okay.  Tell me again.

10      A.    That was a change that we were proposing in the law:

11   That if you were a citizen of the U.S. Virgin Islands and your

12   income is earned in other Caribbean Islands or in other places

13   of the world, that that income would be subject to the U.S.

14   Virgin Islands tax laws and not to the United States tax laws.

15              If you earned the income in England, the income

16   would be subject to the tax laws of England but not of the

17   double tax -- not of the United States.

18      Q.    As long as you met the residency requirement and the

19   income --

20      A.    As long as you met the -- yes.

21      Q.    -- wasn't in the United States?

22      A.    Yes.

23      Q.    Okay.  And we'll probably get some of the details in

24   a little bit.

25      A.    Pardon?

APP000115

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1      Q.   Any other projects that you remember helping

2   Mr. Stanford with, other than the tax law changes; this

3   project; and the Twenty20 cricket tournament?

4      A.   There was Caribbean Airline.

5      Q.   All right.  Tell me about that.

6      A.   Well, the airline service was not as good in the

7   Caribbean.  And he bought an airline and had very little

8   experience or no experience in the airline business.  And it's

9   hard to be in the airline business if you're -- the only man I

10  ever know that was really totally successful in the airline

11  business was Herb Kelleher.

12          C.R. Smith had started American Airline and was

13  never -- not ever totally successful in the airline business

14  and neither was Delta.  Most of the major airlines in the

15  United States have gone broke one time or the other, so

16  Mr. Stanford was not a unique person.

17          I went in the airline business from Brownwood to

18  DFW and consistently lost money.  I served on the Board of

19  Texas International and then later served on the Board of

20  Continental, later represented American Airlines.

21          It's a very difficult business, but he had a

22  very difficult task.  And the airline was losing money very

23  badly and I assisted him in being able to stop the bleeding

24  and being able to improve his intraline connections and his

25  reservation system.

APP000116

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    Q.    Who owned the airlines that he bought?

2    A.    I'm sure Stanford Financial.  I don't know.

3    Q.    Do you know?

4    A.    No, I don't.

5    Q.    Do you know if Mr. Stanford owned it, individually?

6    A.    I don't not.

7    Q.    Do you know if he owned it under a separate company

8    other than Stanford Financial?

9    A.    No.

10   Q.    Do you know how many entities were within the name

11   Stanford Financial as you use it?

12   A.    No, I have no idea.

13   Q.    Did you ever look at what the holdings of Stanford

14   Financial were?  In other words, companies?

15   A.    No.

16   Q.    The operation that you went to see in Antigua -- how

17   many times did you go there to Antigua?

18   A.    Probably three, four.  I don't know for sure.

19   Q.    And that's to look at -- what facility were you

20   looking at?  Not the project, but the facility.

21   A.    Well, I went to see the Stanford Financial Bank and

22   office buildings and the airport he was developing.

23         And I went down one time to hear his

24   presentation on the one island project and to actually attend

25   sales meetings and meetings where he was explaining to the

APP000117

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1   citizens -- the difficult citizens.  "Difficult" in the sense
 2   that they were not supportive of the one island plan.  I sat
 3   in the back of the room and listened to his presentation and
 4   gave him a critique on what I would have said and what I would
 5   not have said.
 6       Q.   Did you see -- what did you see when you were looking
 7   at the bank facility?
 8       A.   I saw a beautiful bank building that would have been
 9   an asset to -- the building would have been an asset to
10   Congress Avenue, like this bank building.  I mean, it was --
11   not in 2014 terms, but in 2000 -- early 2000 terms it was a
12   very -- very well-constructed, very magnificent building.
13            Very well-groomed, very intelligent,
14   enthusiastic people working in the bank.
15       Q.   Operating as a normal bank?
16       A.   Yes.
17       Q.   Nothing that would give you a red flag that it was
18   something other than a bank?
19       A.   None whatsoever.
20       Q.   Nothing in your -- ever in your discussions with
21   Mr. Stanford, up until the time you were first paid, that gave
22   you a red flag of the nature of Mr. Stanford's business?
23       A.   Not at all.
24       Q.   The fact that he had grown from being in bankruptcy
25   in the mid-'80s to now owning a bank, did that ever give you a
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   red flag?

2       A.   No.

3       Q.   Were you ever aware that he had filed bankruptcy?

4       A.   Not that I remember.  But Texas went bankrupt in the

5   '80s, all my friends, a lot of my banks.  First National Bank

6   of Dallas, Republic National Bank of Dallas.  I think -- other

7   than the Frost Bank in San Antonio, maybe 70 or 80 banks went

8   broke.  Even -- low and behold, even some law firms went broke

9   because there wasn't anybody to represent, like Barnes and

10  Connally and First National Republic.  So it was a -- it was a

11  difficult time in Texas in the '80s.

12      Q.   So that wouldn't have caused you any concern that he

13  had gone into bankruptcy in the '80s?

14      A.   I didn't -- I didn't know.  That was -- to my

15  knowledge, that was never called to my attention.  But I -- it

16  would not have caused a red flag to go off if -- about

17  Mr. Stanford, as it would anymore than Red McCombs or Trammell

18  Crow or anybody else that was people that I knew that had been

19  in the development business in Texas.

20      Q.   Okay.  I guess if Red McCombs went into bankruptcy

21  that would be a concern for everybody.

22      A.   Well, it would be now.

23           MR. MADRID:  Objection, form.

24      A.   It might not have been in the '80s.

25      Q.   Well, did you ever do any damage control concerning

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   potential stories that were to come out about Mr. Stanford in

2   Bloomberg?

3        A.   I don't remember.

4        Q.   Do you remember ever having any discussion about

5   trying to kill a story that Bloomberg was going to publish

6   concerning Stanford's claim that he was tied to the founders

7   of Stanford University?

8        A.   I don't remember trying to kill a story.  I remember

9   the discussion.  I mean, I could have been in a meeting where

10  they were talking about trying to -- I don't remember.

11       Q.   Do you know if your firm did any investigation to

12  determine whether or not there was a link between Allen

13  Stanford and the founders of Stanford University?

14       A.   I remember discussions we had, but I don't remember

15  the particulars.

16       Q.   Okay.  Anybody -- do you know how much your firm was

17  paid to try to assist Mr. Stanford in that issue?

18       A.   No, I don't.

19       Q.   And do you have any idea what value was imparted to

20  Mr. Stanford if you were paid for that?

21       A.   No, I don't.  I remember the Governor of California

22  at that time telling me that he thought Mr. Stanford was

23  related and that he was very happy that Mr. Stanford was

24  contributing money to refurbish the house.  Governor Davis

25  told me how much he appreciated Mr. Stanford.

APP000120

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1        Q.   Okay.  Well, I guess the question was:  Have you made

2    a determination of what value you imparted to Stanford in

3    connection with that effort for the Bloomberg article?

4        A.   No.

5        Q.   Who would know that?

6        A.   I don't -- some members of my firm might know it, but

7    I don't know.

8                (Exhibit 111 was previously marked)

9        Q.   (BY MR. CASTILLO) Let me show you what we've marked as

10   Plaintiff's Exhibit No. 111, sir.  And I'll represent to you

11   that this is some documents that were produced by your firm,

12   through your lawyers.  And they were asked to send a recap of

13   all the monies paid by Stanford Financial to your firm.

14                It appears on Plaintiff's Exhibit No. 111 that

15   it's a recap of all of the deposits that Stanford Financial

16   made to your firm.  Do you see that?

17       A.   Yes.

18       Q.   And it appears that the first one is on June 30,

19   2005.  And I know that --

20       A.   Yes, sir.

21       Q.   -- coordinates with Plaintiff's Exhibit No. 11,

22   doesn't it?

23       A.   Yes.

24       Q.   All right.  So you were paid the million dollars that

25   you invoiced on June 23rd, 2005, correct?

APP000121

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

1        A.   Yes, sir.

2        Q.   All right.  And from your testimony earlier, that was

3    for work that had been done up until June of 2005?

4        A.   Yes.

5        Q.   All right.  Now, was there any discussion with

6    Mr. Stanford about what you were going to charge going forward

7    after June 2005 through the end of that year?

8        A.   I don't remember.

9        Q.   Now, when you -- you were going to represent Stanford

10   Financial on a going-forward basis after June of 2005.  Do you

11   know whether you were doing it on a monthly fee, a success fee

12   or what?

13       A.   It was on a monthly fee.

14       Q.   Okay.  And do you know what the monthly fee was?

15       A.   No, I really don't.  And I can't really tell from

16   these -- these billings.  Because sometime there other people

17   were added to the team and money was paid for other outside

18   firms in addition to our firm.

19       Q.   All right.  And if we look at Plaintiff's Exhibit

20   No. 50, when you're talking about the team --

21       A.   Yes.

22       Q.   -- was there any discussion between you and

23   Mr. Stanford about who was going to cover the expenses of the

24   other members of the team?

25       A.   I don't recall specifically.  It was probably with

APP000122

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

1    Yolanda Suarez.

2        Q.    What do you remember of any discussion with

3    Ms. Suarez about how the team members were going to get

4    compensated?

5        A.    I remember some discussions, but I don't remember

6    specific discussions about who was going to be paid what.

7        Q.    Well, what was your understanding of the concept of

8    payment?  Were you going to get paid a fixed sum and then

9    you're paying the expenses of the team members?  Or were you

10   going to bill the team members separately?

11       A.    I don't remember how the billing was going to go, but

12   I -- but the -- they wanted to pay the Ben Barnes Group and us

13   to pay the individual contractors.

14       Q.    Okay.  And so the individual contractors that were on

15   the team initially -- if you look at Plaintiff's Exhibit

16   No. 50, which would be paid separately?

17       A.    They all would be paid separately.

18       Q.    All the lobbyists?

19       A.    Yes, and law firms.

20       Q.    The Counselor, Ambassador Romero?

21       A.    I don't remember.

22       Q.    Hunton & Williams and Jim Richard -- or Jim and/or

23   Richard?

24       A.    I think that, again, some of these people may have

25   already been representing Stanford in various and sundry

**Lindi S. Roberts & Associates**
**(830)228-4634/(830)609-0266**

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1    capacities.  So as far as the legal team and Ambassador

2    Romero, I don't remember that.  But I -- it seems -- something

3    in my mind thinks that they -- that they had already been

4    working.

5        Q.   The lobbyists that are listed:  It's Mitch Delk,

6    correct?

7        A.   That's right.

8        Q.   Who's the Kent?

9        A.   Senator Caperton.

10       Q.   Okay.  So we know we have to include his scotch bill

11   under -- under that portion, correct?

12       A.   That's right.  And as a matter of fact, don't ever

13   put --

14                SENATOR CAPERTON:  You're giving me a bad name.

15       A.   Don't ever put Mitch ahead of Kent.  Kent needs to go

16   up at the top up there.  You change that and we'll so note it

17   in the exhibit.

18       Q.   Yeah.

19       A.   It's all serious --

20       Q.   There was an error there.

21       A.   All serious goal (phonetic).

22       Q.   There's an error on the team member listing --

23       A.   That's right.

24       Q.   -- on the depth chart.

25       A.   Yeah.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1      Q.   And then the Scott?

2      A.   That would be Scott Reed.

3           MR. CASTILLO:  Okay.  It's 12:00.  Why don't we

4   take another five-minute break and --

5           THE VIDEOGRAPHER:  Off the record at 12:02.

6           (Lunch recess)

7           THE VIDEOGRAPHER:  This is the beginning of Tape

8   Three.  We're back on the record at approximately 12:38 p.m.

9           (Exhibit 5 was previously marked)

10     Q.   (BY MR. CASTILLO) Mr. Barnes, I'm trying to put some

11  perspective about when you first got hired.  And I know you

12  don't have a specific recollection, but let me show you

13  Plaintiff's Exhibit No. 5.

14     A.   Okay.

15     Q.   Okay.  And this is a Stanford document.  But it seems

16  to me that -- by looking at Plaintiff's Exhibit No. 5, that in

17  April of 2005 is when you were -- you were being discussed

18  internally between Ms. Suarez and Carlos Loumiet, with Hunton

19  & Williams, about potentially being retained.  Does that ring

20  a bell?

21     A.   Well, I think what this is a reference to is on the

22  -- is on the U.S. Virgin Islands project.  That's what -- this

23  is not -- this is not Stanford, in general.  This is the U.S.

24  Virgin Islands, I believe.

25     Q.   All right.  And so do you have -- does this refresh

APP000125

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   your memory that maybe it was in early -- in April 2005 when

2   you were being retained for the U.S. Virgin Islands tax issue?

3       A.   Well, I was already retained.  But I think -- I think

4   what this is is I went down and talked about the U.S. Virgin

5   Islands and the political -- what was possible and what I

6   considered not to be possible.  And that was a result -- and

7   this is -- this internal document is a result of this lawyer I

8   spoke to.

9       Q.   Okay.  But were there -- were there separate issues

10  for Stanford in connection with the U.S. Virgin Islands or was

11  it just trying to change the tax laws?

12      A.   Well, it was -- it was just an ongoing representation

13  of Stanford.  I mean, this was the -- and they wanted to gear

14  up and add people to the team and to really do an amphibious

15  landing on trying to -- on trying to change the tax laws.  And

16  that's what this was in regard to.  This was not the beginning

17  of our life with Stanford.  This was a continuation, but it

18  was a bigger assignment.

19      Q.   All right.  So when did the life of this putting a

20  team together to do the amphibious landing on the U.S. Virgin

21  Islands start?

22      A.   I don't know.  I'm not trying to not remember.  The

23  only thing I've really got to go by is to go back and look at

24  the dates of some of these memorandums to refresh my memory.

25  That's --

APP000126

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1      Q.   But Plaintiff's Exhibit No. 5 doesn't help you in

2   refreshing your memory?

3      A.   Not in the timeframe of what we're doing, no.

4      Q.   Now, was there a particular pressing deadline about

5   when you had to introduce that legislation vis-a-vis when

6   Congress was in session?

7      A.   I'm sorry.  Say it again.

8      Q.   Was there a deadline of when you wanted to get these

9   tax changes implemented?

10     A.   I don't know that.  But there could have easily been

11  a session deadline when a tax bill was going to move or when a

12  caption was going to move -- when we thought a caption was

13  going to move out of the Senate or out of the House that we

14  could put our language on.

15             (Exhibit 21 was previously marked)

16     Q.   (BY MR. CASTILLO) Let me show you Plaintiff's Exhibit

17  No. 21.

18     A.   Okay.

19     Q.   And the reason I'm showing you Plaintiff's Exhibit

20  No. 21 is to see if it helps you with:  When were you trying

21  to get that tax legislation to be considered?

22     A.   Well, based on this memorandum, it seems that we were

23  shooting toward the fall session and Congress maybe moving a

24  tax bill in the fall of 2005.

25     Q.   All right.  And so something had to be done between

APP000127

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   April of 2005 and the fall of 2005 to get this tax bill being

2   considered.

3        A.   That's true.

4        Q.   Tell the jury how you were going to go about doing

5   that.

6        A.   Well, we were going to assemble a team that could

7   talk to the Senate Finance Committee, the Majority and

8   Minority Members, Senator Baucus and Senator Hatch and other

9   members of the Senate; and we were going to assemble a team

10  that could talk to the House Ways and Means Committee Chairman

11  and the Ranking Member and solicit their help on -- on getting

12  the legislation introduced by the right people and -- or

13  whether we were going to try to just put it as an amendment to

14  the tax bill that was going to be authored by the Chairman and

15  Ranking Member.

16             So that's -- it was a -- kind of a standard

17  operating procedure on trying to go pass a tax bill that you

18  focus on the Ways and Means Committee in the House and the

19  Senate Finance Committee in the Senate.

20       Q.   Okay.  Do you do any study on who your client is

21  before you attempt to make these contacts and the

22  introductions?

23       A.   Can you elaborate on what "study" means?

24       Q.   Find out who your client is and what they do and any

25  skeletons in the closet.

APP000128

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1       A.   We had already been representing Stanford Financial.

2   I had already been down to the -- to the islands and seen the

3   bank, seen the facilities; been in the Houston offices; had

4   seen Mr. Stanford go into very, very high-powered,

5   high-priced, very legitimate law firms and seeking their

6   representation for his firm and -- and big -- and large law

7   firms agreeing to represent Mr. Stanford.  The recommendation

8   by Larry Temple, as I testified to earlier.

9            It was standard operating procedure the way that

10  you observed and learned about a client.  I did not feel the

11  necessity to really go beyond that.  It wasn't -- it wasn't in

12  my mind that there was -- that I had a -- a problem with a

13  client.  There had not been any warning lights go off that

14  certainly had come to my attention.

15      Q.   All right.  So what I hear you saying is that from

16  your observations of Mr. Stanford and his operations, you felt

17  comfortable taking him on as a client?

18      A.   Yes.

19      Q.   And you felt comfortable enough to introduce him or

20  introduce his name to Senators and Legislators --

21      A.   Yes.

22      Q.   -- in the House of Representatives, correct?

23      A.   Yes.

24      Q.   Did you --

25      A.   But --

APP000129

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1     Q.   Go ahead.

2     A.   This legislation had a much broader application than

3   Stanford that we were trying to do.

4     Q.   And the broader implication (sic) was for who?

5     A.   Other companies and -- that would be interested in

6   locating in the Virgin Islands, other companies doing business

7   in the Caribbean.  And -- and this was a number one goal of

8   the government of the U.S. Virgin Islands.

9     Q.   All right.  So what I hear you saying is that the

10   effort would have been paid for by Mr. Stanford, but the

11   benefit would enure to any other company who could take

12   advantage of the tax changes -- tax law change --

13     A.   Yes.

14     Q.   -- correct?

15          MR. MADRID:  Objection, form.

16     Q.   (BY MR. CASTILLO) And the other beneficiary of the

17   effort would be the U.S. Virgin Islands?

18     A.   Yes.

19     Q.   How did the U.S. Virgin Islands win?

20     A.   They would be the huge winners because people would

21   come down to the U.S. Virgin Islands.  They would have to --

22   from what we were proposing, they would have to become

23   citizens of the Virgin Islands.  And they would have to invest

24   up to X million dollars and have to employ X thousand

25   employees or X hundred employees to be able to qualify under

APP000130

1    the legislation that we were proposing.

2                    Mr. Stanford went to the Virgin Islands and made

3    a sizeable investment in real estate and built a building that

4    complied with the square footage that you would need to have

5    under the old statute and employed the number of people that

6    needed to be hired under the old statute.

7         Q.   Did he, in fact, do that in the U.S. Virgin Islands?

8         A.   Yes, he did.

9         Q.   Where?

10        A.   In St. Croix.

11        Q.   All right.  And was that already in place?

12        A.   No.  He -- he bought the -- the property in St. Croix

13   after all this got started, I believe.  Yes.

14        Q.   But before the -- well, the tax law never was

15   changed.

16        A.   No, but -- but during this period of time.

17        Q.   So did he buy it on the come, hoping that you're

18   going to be successful in getting the tax law changed?

19                    MR. MADRID:  Objection, form.

20        A.   I don't know that for sure, but I assume that.

21        Q.   So he bought it regardless of whether the tax law

22   changed?

23                    MR. MADRID:  Objection, form.

24        A.   Yes, he did.

25        Q.   Okay.  And the people that were employed by the

APP000131

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

1   bank -- or his operation that you say was in St. Croix were

2   employed whether the tax law changed or not, correct?

3        A.   Well, there would be many, many more that would be

4   working there if the tax law had been changed.

5        Q.   Because other companies would come in?

6        A.   Well, other companies.  But he would have moved more

7   of his operation to the --

8        Q.   From where to where?

9        A.   From Antigua and maybe Houston to the U.S. Virgin

10  Islands.

11       Q.   All right.  So the people of the United States Virgin

12  Islands would benefit from having more jobs, correct?

13       A.   Yes.

14       Q.   More tax base, correct?

15       A.   Yes.

16       Q.   Possibly more tourism, because it would open more

17  companies --

18       A.   That's right.

19       Q.   -- and more people would come, correct?

20       A.   More airlines, yes.

21       Q.   Okay.  The government of the U.S. Virgin Islands

22  would benefit, wouldn't it?

23       A.   Yes.

24       Q.   Because they would have an increased tax base,

25  correct?

APP000132

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1      A.   Yes.

 2      Q.   Did anybody in the U.S. Virgin Islands government pay

 3   any of the fee for this effort?

 4              MR. MADRID:  Objection, form.

 5      A.   Not to -- not to my firm.  Not to our firm, but to --

 6   there were other people that were hired, who represented the

 7   U.S. Virgin Islands, that they were paying large fees to.

 8      Q.   Okay.  Did anybody in the United States Virgin

 9   Islands government pay any fee to the Barnes Group?

10      A.   No.

11      Q.   All right.  So the only person that paid the Ben

12   Barnes Group would have been Allen Stanford?

13      A.   That's correct.

14      Q.   All right.  Any other U.S. company join in the effort

15   to pay your fee to get the tax law changed for their benefit?

16              MR. MADRID:  Objection, form.

17      A.   No.

18      Q.   Were there any other specific companies that were

19   identified as being supportive of your tax initiative?

20      A.   That were my clients?

21      Q.   Yes, sir.

22      A.   No.

23      Q.   How about any of them that heard about your efforts

24   and said, "We'll join in"?

25      A.   I don't remember.  There was probably some people we
```

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1   represented that would have benefited by it, if -- if the law

2   had been change, but I don't -- I don't recall.

3       Q.   Okay.  All right.  So we were talking a little bit

4   about whether you were doing any investigation.  And I think

5   you've described for the jury why you felt comfortable with

6   Stanford, correct?

7       A.   Yes.

8       Q.   Anything else that gave you that comfort?

9       A.   No.  I had been around the company, as a client

10  relationship, that I had -- I had seen -- I had seen no signs

11  of -- that any red lights ought to be going off.

12      Q.   Okay.  "Anything else that you did to give you the

13  comfort?" was the question.

14      A.   I think probably the fact that Tom Delay and Pete

15  Sessions and a group of Republican legislators that he -- that

16  John Cornyn had been to Antigua, our United States Senator,

17  and spent the weekend with Mr. Stanford.

18           That -- I just saw things happening.  Tom Delay

19  was ready to work as hard as he could on this legislation.  I

20  assumed that people who had political careers were probably

21  doing a little bit more due diligence than law firms were

22  doing and that firms like ours were doing, so that gave me

23  some degree of comfort.

24      Q.   Anything else other than you judged him by the

25  company he kept?

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1          MR. MADRID:  Objection, form.

 2     A.   No.

 3     Q.   That's what you were doing, right?  I mean, he was --

 4     A.   Yeah.  Sure.

 5     Q.   -- with Tom Delay and --

 6     A.   Sure.

 7     Q.   -- he was hobnobbing with important people.

 8     A.   Yeah.

 9          MR. MADRID:  Objection, form.

10     Q.  (BY MR. CASTILLO) And so that gave you some comfort in

11  who he was?

12     A.   Yes.

13     Q.   Anything else that you did to get some comfort on

14  Allen Stanford as a client?

15     A.   Not that I remember.

16     Q.   All right.  So what's the next step?  You know who

17  your client is and you know what he's trying to accomplish.

18  How do you go about getting a tax bill introduced?

19     A.   We assembled a team of people that -- who I

20  considered to be very experienced people in the legislative

21  process in Washington.

22          John Rafaelli had been General Counsel to the

23  Senate Finance Committee.  Senator Benson was Chairman, had a

24  lot of experience and knew how the Finance Committee worked.

25  Another one of the members we hired had worked on the Finance
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1   Committee when Senator Baucus was there.  Senator -- Scott
 2   Reed was a very good friend of Senator Hatch.  Senator McCain
 3   had been Chief of Staff to Senator Dole when he was Majority
 4   Leader.  There was a -- the law firm that represented the U.S.
 5   Virgin Islands was a good law firm.  They had good people on
 6   their team.  I think we assemble a pretty capable team.
 7      Q.   All right.  So you assemble a team and then you
 8   assign -- or somebody assigns projects or part of the
 9   responsibility --
10      A.   And we all meet --
11      Q.   -- and move ahead?
12      A.   We all meet around a table like this and say, "I'll
13   take them" and "I'll take this one," "You take this one."  I
14   mean, it was a -- it was a community effort and community
15   decision-making on who was going to do what.
16      Q.   At some point you have to convince either the Senate
17   Finance Committee or the Chairman of the House Ways and Means
18   Committee of "Why should we do this," don't you?
19            MR. MADRID:  Objection, form.
20      A.   Sure.
21      Q.   Okay.  And is there ever a question about:  What's
22   the economic impact of this change?
23      A.   There was a white paper that was prepared by a firm
24   that we hired.  There was other firms hired by the U.S. Virgin
25   Islands.  I think probably the OMB, the budget-making arm of
```

APP000136

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    the United States Government, did a study on economic impact.

2              There were a lot of studies on the economic

3    impact on changing the law in the U.S. Virgin Islands.  And it

4    had been worked on a lot longer than I had been working on it.

5        Q.   Was there an economic impact analysis done while you

6    were the manager of the team?

7        A.   Well, our firm was the manager of the team.  I -- I

8    think the white paper that we prepared had some economic

9    impact.  I think the Virgin Islands probably had a new

10   economic impact prepared.  I -- and maybe OMB.  I don't know.

11   I mean, there was -- there was -- there was a lot of current

12   numbers that we were -- that we were given and we were working

13   with.

14             You're dealing with -- with bureaucrats and

15   technocrats.  People that got paid to -- to look very

16   carefully at legislation and its economic impact on whoever

17   were the beneficiaries of the legislation.  So that was all

18   being done.

19       Q.   Okay.  And was there an economic analysis done for

20   the beneficiaries of the legislation?

21             MR. MADRID:  Objection, form.

22       A.   Yes, I assume there was.

23       Q.   Was there one done for what the economic impact would

24   be on the United States Virgin Islands?

25       A.   I'm sure there was.

APP000137

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
1       Q.   Was there an economic analysis done of what the

2   impact would be on the United States?

3       A.   I'm sure there was.

4       Q.   And part of that would be kind of a loss of a tax

5   base, correct?

6            MR. MADRID:  Objection, form.

7       A.   Yes, there would be some lost revenue.  It was --

8   they were -- I remember discussions about how that it would

9   cut down the amount of money that was being appropriated

10  directly to the U.S. Virgin Islands from the United States

11  Treasury.

12           I think that we had discussions about that there

13  was a good possibility that we might be able to make it

14  economic neutral.  In other words, there would be no loss to

15  the Treasury, nor any gain.  That's -- I think that's what our

16  ambitions were.

17      Q.   Okay.  Because you appropriate less, but you --

18      A.   Generate more taxes.

19      Q.   -- generate more taxes.  Okay.  Was there ever an

20  economic analysis of the impact on Stanford Financial?

21      A.   I don't know that.  I didn't -- we didn't do that.

22      Q.   Do you know if anybody did it?

23      A.   Oh, I'm sure that they did.  I'm sure that Jim Davis

24  and Yolanda -- I'm sure that they had a -- it would have been

25  -- and I don't remember the discussion of any numbers.  But it
```

APP000138

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1   would have had a big impact on the -- on the Stanford company

 2   and its shareholders.  It would have had a huge economic

 3   benefit to Stanford.

 4       Q.   Okay.  Have you ever seen that?

 5       A.   No.

 6       Q.   Did you ever look at it?

 7            MR. MADRID:  Objection, form.

 8       A.   I may have seen numbers.  I don't remember.

 9       Q.   Do you remember having any discussion with anyone

10   about the economic impact on Stanford?

11       A.   Oh, I'm sure I did.  I don't recall that.  I'm sure

12   that was part of the -- we had discussions about that.

13       Q.   With who?  Who did you have a discussion with?

14       A.   Well, probably Yolanda and maybe -- I don't know.

15   Different Stanford people that were moving back and forward to

16   Washington that were working on this and with the -- but I

17   don't recall the specific individual, no.

18       Q.   Do you recall any numbers being tossed around?

19       A.   No.

20       Q.   Do you recall any discussion on the economic impact

21   on the investors in Stanford?

22       A.   No.  But when I say shareholder, I would say

23   investors and that would be the beneficiaries, also.

24       Q.   Any discussion about specific benefit to any

25   shareholder?
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1      A.   No.

2      Q.   And you knew that Mr. Stanford was the hundred

3   percent shareholder of Stanford Financial, didn't you?

4           MR. MADRID:  Objection, form.

5      A.   Probably so.

6      Q.   Were you ever asking Stanford Financial for some

7   information about Stanford so you could share with the members

8   of the legislature, so they could be familiar with who

9   Stanford is?

10     A.   Well, we had the website.  We had the Stanford

11  statements.  We had the -- we had written material that was

12  provided by Stanford Financial that was available to us all.

13     Q.   Okay.  And that's what you were providing to members

14  of the legislature?

15     A.   Yeah, if -- those that asked for it.  It was not --

16  you didn't go see the members of Congress on the behalf of

17  Stanford.  You went to see -- they knew who your client was,

18  but you didn't have a discussion about Stanford.  You had a

19  discussion about the U.S. Virgin Islands and what impact it

20  would have on the investors there.

21     Q.   But you actually did mailouts, though, of the

22  Stanford Eagle, didn't you?

23     A.   No, I don't know we did mailouts.  I don't know.  I

24  don't know that.  We may have.  I don't know, to be honest.

25           (Exhibit 9 was previously marked)

1      Q.  (BY MR. CASTILLO) Let me show you Exhibit No. 9, sir.

2      A.  Okay.

3      Q.  And we had talked earlier about Susan Martin.  That

4  was your secretary, correct?

5      A.  Yes.

6      Q.  And it appears that she was asking for brochures

7  about Stanford.

8      A.  Yes.

9      Q.  And that somehow Julie Hodge was telling her that

10  they're going to provide the Eagle -- Stanford Eagle magazine

11  for her.

12      A.  Uh-huh.

13      Q.  Do you know whether or not those were being sent out

14  to members of the legislature?

15      A.  I --

16          MR. MADRID:  Objection, form.

17      A.  I don't have any idea.  This -- that's what this

18  says.  It's not unusual at all.  It's standard practice for

19  staffs to request information about companies that you

20  represent when you're going to go see the staffs.  They always

21  want --

22          MR. MADRID:  I think I heard your question being

23  the -- provided to the legislature?

24          MR. CASTILLO:  No.  Yeah, after --

25          MR. MADRID:  That's what you asked.

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

```
1                    MR. CASTILLO:  Right.

2                    MR. MADRID:  Because this -- this says the Cohen

3    Group.  I just want to make sure that this is the right

4    exhibit that you're --

5                    MR. CASTILLO:  Yeah.  Well, no, at first it was

6    that Ms. Martin was asking for brochures --

7                    MR. MADRID:  Right.

8                    MR. CASTILLO:  -- from Julie Hodge.  And then

9    the next question was:  Did you ever send that to the

10   legislature?  I mean, it's not going to be any secret.

11                   MR. MADRID:  I may have -- I may have misheard

12   you.

13                   MR. CASTILLO:  And I might have misspoken.  I'm

14   just trying to get done within --

15                   THE WITNESS:  Don't slow him down.

16                   MR. CASTILLO:  Hurry me up.  Hurry me up.

17                   THE WITNESS:  I mean, let's not -- look --

18                   MR. CASTILLO:  Whether it was sent or it wasn't

19   sent --

20                   THE WITNESS:  The Cohen -- the Cohen Group is --

21   is not the member.  I don't have any idea --

22                   MR. CASTILLO:  We'll get to that later --

23                   THE WITNESS:  Okay.  All right.  Go ahead.

24                   MR. CASTILLO:  -- where the mailout was mailed.

25   I mean, there's no secret to that.
```

APP000142

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1                  THE WITNESS:  Counselor, I apologize.

 2                  MR. MADRID:  Forget the last few minutes.

 3      Q.  (BY MR. CASTILLO) And I'm sorry to have to show you

 4  some of these documents, because I'm trying to get some

 5  timeframe and --

 6      A.   I understand.

 7      Q.   -- and I know it's been nine years ago.

 8      A.   Yeah.

 9                  (Exhibits 12 and 13 were previously marked)

10      Q.  (BY MR. CASTILLO) Let me show you Plaintiff's Exhibits

11  12 and 13.

12      A.   Okay.

13      Q.   Let me just substitute these for mine.  They're the

14  ones with the little yellow stickies.

15      A.   Okay.  Here you go.

16      Q.   Thank you, sir.

17      A.   I'm sorry.

18                  MR. MADRID:  Oh, this is the same thing, right?

19                  MR. CASTILLO:  Yes, sir.  Yes, sir.  It's

20  Exhibits 12 and 13 -- Plaintiff's Exhibits 12 and 13.

21      Q.  (BY MR. CASTILLO) Because I've looked for all -- at

22  all of the records of both your production and Stanford's

23  production to see when I could place Mr. Barnes in the Island

24  of Antigua.  And this is the first document where I see that

25  you're traveling to Antigua.
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1       A.   Okay.

2       Q.   If you would have traveled before, would there be

3  some record of it?

4       A.   I don't know.

5       Q.   If you paid for your airfare you would have had

6  expenses?

7       A.   Remember that one of the bad things about our

8  representation of Stanford is that we didn't get expenses.

9  And, therefore, a lot of the money we paid were -- went to

10  expenses.

11       Q.   Yes, sir.  But internally you would have had to buy

12  an airplane ticket.

13       A.   Oh, yes.

14       Q.   Okay.  That's what I mean.  So we would be able to

15  see if you had been to Antigua before June 20 -- June of 2005,

16  right?

17                 MR. MADRID:  If you know.

18       A.   I don't know.  I mean, yes, but -- have we produced

19  the records?  Do you have a ticket?  I don't know.

20       Q.   We don't.  This is the first --

21       A.   Okay.

22       Q.   -- indication I have other than that 2002 3.5 hours

23  of aircraft time on the Learjet.

24       A.   Okay.

25       Q.   I have nothing else that shows when you went to

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1    Antigua other than this Plaintiff's Exhibit No. 12 and 13.
 2        A.   Okay.
 3        Q.   All right.  So it appears that -- from looking at
 4    Plaintiff's Exhibit 12 and 13, that you were going and you
 5    were going to pick up Jim Davis in Memphis and you were flying
 6    together.
 7        A.   Yes.
 8        Q.   Do you see that?
 9        A.   Yeah.
10        Q.   Do you recall that meeting?
11        A.   Very vaguely.  But, I mean, I recall the meeting down
12    there.  I don't really -- I don't really recall going by
13    Memphis, but I'm sure I did.  I just don't remember that part.
14        Q.   And then do you remember talking to Mr. Davis about
15    the operation?
16        A.   We're talking about one where -- we were talking
17    about the -- the tax laws of the U.S. Virgin Islands, I'm
18    sure.
19        Q.   Okay.  Because that's kind of the project you were
20    involved in?
21        A.   Yeah.
22        Q.   We started seeing that April of 2005.  You're trying
23    to get it done by the fall of 2005, correct?
24        A.   Yes, sir.
25        Q.   All right.
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1          (Exhibit 15 was previously marked)

2     Q.   (BY MR. CASTILLO) Maybe this will help, Exhibit

3 No. 15.  And this appears to be the agenda for the June 2005

4 meeting.

5     A.   Okay.

6     Q.   Does this refresh your memory at all of whether this

7 was the very first visit that you've been -- that you went to

8 the Stanford property in Antigua in June of 2005?

9     A.   It really doesn't.  I know -- obviously, seeing this

10 makes me remember part of this trip right here.  But I don't

11 -- I don't remember whether this was my first trip or not.

12    Q.   Okay.  And this trip, was it in connection with the

13 tax initiative?

14    A.   Yes.

15    Q.   All right.  And by June 29th and 30th you had already

16 paid -- you had already earned and been paid a million

17 dollars, correct?

18    A.   Yes.

19    Q.   Did you ever change the agreement with Mr. Stanford

20 from a flat fee to an incentive payment?

21    A.   No.  Not to my memory, no.

22    Q.   Never -- you never had any discussions with Yolanda

23 Suarez about that?

24    A.   We may have had a discussion about this.  You know,

25 as I testified to you earlier, Mr. Stanford is kind of slow

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    pay.  It was -- I'm sure -- I don't -- I don't really know

2    whether I had a conversation or not about it.  But, you know,

3    he was not above about -- fussing about fees.

4        Q.   Okay.  My question was:  Do you remember having any

5    discussion with Yolanda Suarez about an incentive fee?

6        A.   No.  No, I don't.  I may have, but I don't know.

7        Q.   And I know you characterize Mr. Stanford as slow pay.

8    But we can look at Exhibit 111, the date of the invoices and

9    the day that you got -- the day you received payment, couldn't

10   we?

11       A.   Well, that's -- yes, you can look at that.  But it's

12   -- that -- those million dollars had been earned probably for

13   a long -- I mean, that was probably part of being earned for a

14   year, two years.  I mean, it hadn't been anything paid.  So,

15   you know --

16       Q.   The June 2005 million dollars, you had already earned

17   that before you even --

18       A.   Yes.

19       Q.   -- did any of this work going forward on the tax

20   incentive, right?

21       A.   On the tax incentive, yes.

22       Q.   And we should be able to see some work there to be

23   able to determine whether you gave any value to Stanford in

24   exchange for that.

25               MR. MADRID:  Objection, form.

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
1        Q.  (BY MR. CASTILLO) Right?

2        A.  I know there was value.  I don't know whether you've

3   got anything that shows that.  But it's -- it's going back to

4   the -- it goes back to the memorandum that Mr. Caperton

5   prepared and gave y'all some time ago, outlining the scope of

6   our work.

7        Q.  You talked about a white paper.

8                 (Off-the-record discussion)

9                 (Exhibit 24 was previously marked)

10       Q.  (BY MR. CASTILLO) First let me show you Exhibit

11  No. 24.  Is Plaintiff's Exhibit No. 24 what you call a white

12  paper?

13       A.  Yes, it is.

14       Q.  And this is a culmination of all of the efforts that

15  you're making to be able to introduce this rationale for the

16  change in the tax law, correct?

17       A.  Yes.

18       Q.  And who is this shared with?

19       A.  It's shared probably with all interested parties in

20  the legislation.  Probably shared with members of Congress --

21  I mean their staff.  Primarily their staffs.

22       Q.  And who distributes it to them?

23       A.  The various and sundry people that were working on

24  this:  The law firm for -- for U.S. Virgin Islands, the

25  Stanford's law firm, our team that had been assembled by our
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    firm.

2        Q.   Okay.  And who actually writes the language of the

3    proposed statute?

4                 MR. MADRID:  Objection, form.

5        A.   The staff of the Ways and Means and Finance

6    Committee.

7        Q.   Any input from your group?

8        A.   Yes.

9        Q.   Do you give them a draft?

10       A.   In some cases they will accept a draft.  In other

11   cases they won't.  They want you to talk while they're

12   drafting.

13       Q.   Do you remember what happened in this case?

14       A.   No, I don't.

15       Q.   Then once you introduce it to the Senate and the

16   House, what efforts do you make to see if they're on board and

17   they will support it?

18       A.   You work the committee and the committee staff people

19   and then you attempt to count votes.  When you get an author

20   and someone that's willing to -- to bring it up in committee,

21   get it on the calendar to be considered, then you start trying

22   to count votes.

23       Q.   My only familiarity with that whole process is what

24   I've seen on House of Cards.  Have you seen that episode of

25   House of Cards?

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1              MR. MADRID:  Objection, form.

 2       A.   No, I -- I've haven't.  I've not seen House of Cards.

 3       Q.   You haven't?  Okay.  Well, it seems to me that what

 4  you're doing is you're -- you're contacting people behind the

 5  scenes to see if they're supportive of your measure, correct?

 6       A.   If that's what -- I'm sure if it's -- if it's on

 7  House of Cards, it's correct.

 8       Q.   It's got to be.  No, I'm asking you --

 9       A.   Because they wouldn't put anything --

10       Q.   -- from your experience.  Isn't that what happens?

11       A.   Do you contact people behind the scenes?  Well, yeah,

12  you do.  Talking to a member of the legislature is a private

13  adventure.  Normally, you want -- you want to talk to the

14  legislator or his single staff person and you want to do it in

15  the privacy of their offices.

16       Q.   And you want to do it in person, as opposed to --

17       A.   Yes.

18       Q.   -- email?

19       A.   Yes.  Right.

20       Q.   Who are the people that your -- your group was

21  contacting?  Was Charlie Rangel one?

22       A.   Charlie Rangel, yes, sir.

23       Q.   "Rangel".  I'm sorry.

24       A.   Yes.  Sorry.

25       Q.   From the State of New York?
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1      A.    New York.  Harlem, New York City.

2      Q.    And what was his interest in the U.S. Virgin Islands?

3      A.    He had a big interest in it a long time before I

4   was -- had any interest in it.  He was -- I think he was a --

5   had been a long-time member of the Black Caucus, a long-time

6   member of the Caribbean Caucus.  He had been to the Caribbean

7   many times and has -- and at one time was Chairman of the

8   Caribbean Caucus.

9      Q.    Okay.  Was --

10     A.    Maybe at that time.

11     Q.    Was he on board with the --

12     A.    Yes, he was.

13     Q.    -- proposed changes?

14     A.    Uh-huh.

15     Q.    And do you have to do anything so that you can

16  convince him to be on board or was he on right away?

17     A.    I think he was on board with the improving economic

18  development in the Caribbean and for this legislation or

19  similar legislation a long time before I ever got interested

20  in this.

21     Q.    Did -- did he ask for campaign contributions for any

22  other members that were running?  House of Representatives or

23  Senators?

24          MR. MADRID:  Objection, form.

25     A.    I don't know.  I've met very few -- with great due

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1  respect to elected officials, I've met very few elected

2  officials that didn't ask for campaign contributions.

3      Q.   Did you, in turn, ask Mr. Stanford to contribute to

4  candidates of Mr. Rangel's choice?

5           MR. MADRID:  Objection, form.

6      A.   As with all of our clients, I ask them to make

7  contributions to political candidates and to Members of the

8  House and Senate.  It's part of our doing business in

9  Washington that we have to give money to people when they run

10  for office.  It's a never-ending process of raising money for

11  people that -- Members of the House have to run every two

12  years.  They have to raise money continually.

13           (Exhibit 110 was previously marked)

14      Q.  (BY MR. CASTILLO) Now if you look at Plaintiff's

15  Exhibit No. 24, this white paper, there was another version

16  that was later in the fall, Plaintiff's Exhibit 110.

17      A.   Uh-huh.  Do you want me to read this?

18      Q.   No, sir.  Just note the cover page.  It's the same.

19  It's a white paper, probably a different version, right?

20           MR. MADRID:  Well, look it through so you can

21  answer that question, please.

22      A.   (Witness complies.)  There's some -- it takes some

23  time to go through words.  It looks like there's some

24  difference in places -- placement of paragraphs and maybe a

25  difference in content.

APP000152

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1      Q.   Right.

2      A.   I'd be happy to take the time, if you want me to.

3      Q.   I think anybody on the jury can compare them and make

4    the determination that they're different.

5      A.   Okay.  Thank you.

6      Q.   They're different versions, at least.

7      A.   Okay.

8      Q.   Has anybody ever asked you to look at this white

9    paper to see what benefit this tax law change would have for

10   Stanford Financial?

11     A.   I don't recall anyone asking me to look at it.  I

12   looked at it.

13     Q.   But not with that in mind?

14     A.   No.

15     Q.   Okay.  And that's true as of today?

16     A.   Yes.

17     Q.   You couldn't -- you'd have to read it to tell me if

18   there was some --

19     A.   I'd have to read it.  Yes, I would have to.

20     Q.   Okay.  And I guess anybody that could read it could

21   make that determination?

22     A.   Well, it may take me longer than most people, but I

23   could probably do it.

24     Q.   All right.  What happened to that proposed change?

25     A.   It -- they didn't move a tax bill that fall, if I

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1    recall right.  And then we set about to try to get Treasury,

2    through their regulatory and rulemaking authority, to broaden

3    the regulations regarding USVI with anticipation of being able

4    to go back into Congress in 2006 or 2007 and make the changes.

5        Q.    Were there efforts done in 2006?

6        A.    I'm sure there was.

7        Q.    By the Ben Barnes Group?

8        A.    I'm sure there was.  I don't recall.  I'd have to go

9    back and find out.  But we continued -- we continued to

10   represent Stanford during that time, so I'm sure we were

11   working on it.

12       Q.    On the tax issue?

13       A.    Yes.

14       Q.    Okay.  And so if you look at -- going back to

15   Plaintiff's 111.  So we're going to try to put the work that

16   you did from June 2005 through the end of this white paper,

17   November 2005, to see if you got paid for that work.

18       A.    Yes.

19       Q.    Look at Plaintiff's Exhibit 111.

20       A.    (Witness complies.)  Okay.  I have it now, sir.

21       Q.    Did you bill Stanford Financial for the work that you

22   did from June 2005 through December 2005?

23       A.    Yes.

24       Q.    And that -- you got paid $500,000 on December 2005,

25   correct?

APP000154

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1      A.   Yes.

 2      Q.   Would that have brought you whole up until that

 3   point?

 4      A.   I assume so.  I'd have to -- it would be more.

 5      Q.   Well, that's why we asked you for all of the invoices

 6   and all of your payments.  And this appears to be the

 7   compilation.  Any other invoices that you thought were still

 8   outstanding as of December 2005?

 9      A.   I'd have to talk to my bookkeeper and find out.  But

10   this seems about -- that would be $50,000 a month.  That would

11   be about -- yeah, I assume that's correct.

12      Q.   All right.  So let's look at what the arrangement

13   was.  Because if you look at some of the invoices -- for

14   instance, let's look at the Invoice No. 844.

15              MR. MADRID:  Do you see a page number?

16              MR. CASTILLO:  I don't see a Bates number.

17              MR. MADRID:  There's a number at the bottom.  Is

18   it -- bottom right-hand corner.

19              MR. CASTILLO:  Right in the center: 1059 --

20   10591.

21              MR. MADRID:  Thank you.

22              MR. CASTILLO:  Right here, sir.  These little

23   numbers: 10591.

24              MR. MADRID:  10591.

25      A.   Okay.
```

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1      Q.   Is it -- if you'll look at the Invoice 844 on

2   Plaintiff's Exhibit 111, it's a retainer for the month of

3   October:  $265,000.

4      A.   Okay.

5      Q.   How much of that was for Ben Barnes Group as opposed

6   to some of the people that were doing some work for you?

7      A.   I'd have to go back and look at the breakdown of what

8   everyone was getting.  I can't recall that off the top of my

9   head.

10     Q.   Okay.

11     A.   There were a lot of different firms getting paid out

12  of that.

13             (Exhibit 83 was previously marked)

14     Q.  (BY MR. CASTILLO) Let me show you Plaintiff's Exhibit

15  No. 83.  Maybe this will help you.

16     A.   Okay.

17     Q.   Because it appears that out of the $265,000, $55,000

18  was going to people outside of Ben Barnes Group.

19     A.   Well, in this particular month that's what this says.

20  That's just this one month, though.

21     Q.   So this doesn't help you with how much you were

22  paying Scott Reed, Jim Sharp?

23     A.   Well, I'd have to -- I'd have to know -- look at --

24  look at this whole payment period globally to try to see who

25  got paid what.  And it seems to me like that Mitch Delk was

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1    getting paid more than this $25,000.  I think he was -- I just

2    remember vaguely that I thought he was getting paid $50,000 at

3    some time.  I mean, I -- but I don't know.  I don't know.

4            This -- this doesn't help me any.  It helps me

5    on this particular month.  This obviously happened that month.

6    I don't understand why Jim Sharp and -- or I really don't

7    understand why Scott Reed was --

8            MR. MADRID:  You've answered -- you've answered

9    his question.

10           THE WITNESS:  Okay.  Thank you.  Sorry.

11       Q.   (BY MR. CASTILLO) So you don't know how much was to

12   Ben Barnes Group versus how much was to the others of the

13   $265,000 per month?

14       A.   Well, I know about this month right here, based on

15   this piece of paper.

16       Q.   Well, go back to Plaintiff's Exhibit 111.  Have that

17   in front of you.

18       A.   (Witness complies.)  Okay.

19       Q.   For instance, in February of '06 you got a $500,000

20   retainer.  Can you tell us how much Ben Barnes Group got

21   versus any other people that were doing work?

22       A.   No, I can't.  I let -- I do it -- we'd have to go

23   look at the records.  And -- I'd just have to see the paper.

24       Q.   Okay.  So we should be able to see either a payment

25   out or a separate invoice from those subs that you included in

1   the $265,00?

2       A.   Yeah, I don't know whether we got separate invoices.

3   I don't know whether we got invoices -- we may or may not

4   have -- or whether we just paid them.  I don't -- I don't

5   know.  That's my bookkeeping department.

6               MR. CASTILLO:  Okay.  Why don't we take about

7   five minutes.  I'm going to probably -- I'm going to regroup

8   and probably be done in 30 minutes.

9               THE WITNESS:  Okay.

10              THE VIDEOGRAPHER:  Off the record at

11  approximately 1:24 p.m.

12              (Recess)

13              (Exhibit 116 was previously marked)

14              THE VIDEOGRAPHER:  This is the beginning of Tape

15  Four.  We're back on the record at approximately 1:37 p.m.

16      Q.   (BY MR. CASTILLO) Mr. Barnes, just a couple of more

17  areas that I want to talk to you about.

18              I'm showing you Plaintiff's Exhibit No. 116.

19  And this was provided to us in discovery.  And this appears to

20  be a listing of all of the invoices and payments received by

21  the Ben Barnes Group in 2008 through 2009.

22              And you see where in 2008 there was a lot of

23  $55,000 entries?

24      A.   Uh-huh.

25      Q.   Do you know if that was payment for the other team

APP000158

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1   members besides the Ben Barnes Group?

 2       A.   I don't know.

 3       Q.   And you see the last payment that's listed on

 4   Plaintiff's Exhibit 116 in the amount of $110,000?  This was

 5   right before the SEC filed the lawsuit against some of the

 6   Stanford folks.  Are you aware of that?

 7       A.   I'm not aware of the date they filed it, but I'll

 8   take your word for it.

 9       Q.   Okay.  In fact, you were the person that revealed

10   that Mr. Stanford actually had been served with a copy of the

11   lawsuit, weren't you?

12       A.   Revealed to whom?

13       Q.   To the public.

14       A.   I don't know.  If you say so.  I don't know.  It's --

15   I don't know.

16       Q.   Okay.  Were you in contact with Mr. Stanford during

17   the last four months before the SEC took over?

18       A.   Mr. Stanford came to my office in the last few days

19   of the -- before the SEC -- or when the SEC was taking over.

20       Q.   Okay.  And you were trying to arrange legal

21   representation for him?

22              MR. MADRID:  Objection, form.

23       A.   Yes.

24       Q.   Okay.  In fact, you had lawyers send engagement

25   letters so that you could present to Mr. Stanford?
```

1      A.    Probably so.

2      Q.    Any of that $110,000 payment that you got -- that the

3   Ben Barnes Group got paid on February 11, 2009, what was that

4   for?

5      A.    Well, I'm sure it -- it looks to me like he was

6   several months behind and that was a -- that was a catching up

7   on some of the months that he was behind.

8      Q.    We could actually look at your last invoice to figure

9   out what the last work you did, right?

10     A.    Well, the invoice could have been for past due

11  services.  The last invoice is -- is January 2009, $55,000.

12  It got -- and it got paid, yeah.

13     Q.    And you were also doing work for these -- in

14  connection with the Synergies -- Synergies -- Energy Service

15  Project?

16     A.    Yes, but that -- that money went to them.  That --

17  that didn't go to me.

18     Q.    Okay.

19     A.    It got paid through me, but that's all.

20     Q.    And was that -- what was Stanford doing in connection

21  with that?

22     A.    That was a wind energy project that he was trying to

23  do in the Caribbean and Antigua or U.S. Virgin Islands.  I

24  mean, they're in the wind business.  I had -- I had really

25  very little to do with that.  I don't really know what all

APP000160

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1   they were doing.

 2      Q.   On the United States Virgin Islands tax project,

 3   whose idea was that?

 4      A.   Oh, I have no idea.

 5      Q.   Was it a Stanford idea?

 6      A.   For him to hire -- for Stanford to hire us, I'm sure

 7   that was his idea.  But the changes in the U.S. tax law in the

 8   U.S. Virgin Islands, I'm sure that was not his idea.  That

 9   was -- that was an idea that had been going on for -- for

10   maybe 15 or 20 years.

11      Q.   But your efforts were being paid by Allen Stanford?

12      A.   That's true.

13              (Exhibit 75 was previously marked)

14      Q.  (BY MR. CASTILLO) Let me show you Plaintiff's

15   Exhibit 75.  Have you ever seen this before?

16              MR. MADRID:  Take your time to read it, please.

17              THE WITNESS:  Okay.

18      Q.  (BY MR. CASTILLO) You note in the Footnote No. 1 --

19   this is an attorney/client memo from the Chamberlain, Hrdlicka

20   firm to Mr. Davis.  And at Footnote No. 1 it says, "As noted

21   by Mr. Barnes, the amendment will be introduced as being for

22   the benefit of the Virgin Islands."

23      A.   Okay.

24      Q.   Do you know where they got that from?

25      A.   Probably --
```

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1                    MR. MADRID:  If you know.  If you know.

 2       A.   I really don't know.

 3       Q.   So do you deny that you never noted that?

 4                    MR. MADRID:  Objection, form.

 5       A.   Working on the U.S. Virgin Islands tax changes, the

 6  legislation was always being introduced as being for the

 7  benefit of the Virgin Islands.

 8       Q.   Okay.  Never for the benefit of Stanford Financial?

 9       A.   That's right.

10       Q.   Okay.  It wasn't a Stanford idea?

11       A.   No.

12                    (Exhibit 101 was previously marked)

13       Q.  (BY MR. CASTILLO) In fact, let me show you Plaintiff's

14  Exhibit No. 101.  This is after the SEC takes over Stanford.

15  And apparently you're in the spotlight again and you're being

16  quoted by the Austin Chronicle -- or the Houston Chronicle.

17       A.   Okay.

18       Q.   Do you see the second page where it says "Tax work"

19  on the right-hand column, second paragraph?

20       A.   Yeah.

21       Q.   Do you agree with that statement?

22       A.   Yes, I do.

23       Q.   Okay.

24       A.   I agree with Bob Lanier's statement, too.

25       Q.   Well, it's probably unanimous.
```

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1                    (Exhibit 76 and 103 were previously marked)

2      Q.  (BY MR. CASTILLO) And let me show you 76, 103 and 83.

3  It's going to be the last area.

4                    MR. CASTILLO:  You're short one, right?  Did I

5  give them to you?

6                    MR. MADRID:  I have two.  I'll look -- I'll look

7  at his.

8                    Just hand it when you finish.  I just want to

9  see them.

10                   MR. CASTILLO:  Here you go.

11                   MR. MADRID:  Oh, thanks.

12     Q.  (BY MR. CASTILLO) It appears that in January of 2008

13 there's some discussion between Yolanda Suarez and

14 Mr. Stanford concerning your fee.

15     A.  Uh-huh.

16     Q.  Did Mr. Stanford ever complain to you about your fee?

17     A.  I don't remember if he did.

18     Q.  Did he ever think that you -- he wasn't getting his

19 money's worth?

20     A.  He probably thought that about -- every day about

21 everybody he did business with.

22     Q.  Did he tell you that he wasn't getting his money's

23 worth?

24     A.  No, I don't remember that he did.

25     Q.  Did he ever tell you that he never thought that you

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1   were going to have any success with the proposed tax changes?

2       A.   No.

3       Q.   The residency requirement, you'll never be able to

4   meet it?

5       A.   Well, he was -- moved to the Virgin Islands, bought a

6   house, landed the plane there every other day to try to make

7   sure he met the residency requirements.  I don't think he

8   would have been going to all that effort and everything if

9   thought that it was not possible to do it.

10      Q.   So he would spend -- get there at ten minutes before

11  midnight and spend ten minutes after midnight and get two

12  days' credit, wouldn't he?

13      A.   That's what you said.

14      Q.   Isn't that what Mr. Delk said?

15      A.   I wouldn't be surprised.

16      Q.   All right.  And so some discussion about negotiating

17  a success fee -- you have no recollection about having a

18  discussion with Yolanda Suarez about a success fee?

19      A.   I may have had a discussion with her.  I don't

20  remember any real serious discussion where we sat down and

21  said, "We're going do this for this."  It could have happened.

22  I don't know.  I mean, I just don't remember it.

23      Q.   And why would you be hesitant in doing it as a

24  success fee --

25              MR. MADRID:  Objection, form.

**Case No. 3:10-cv-0527-N-BG**
**Oral Videotaped Deposition of Benny Frank Barnes**

1      Q.   -- as opposed to a retainer or flat payment?

2           MR. MADRID:  Objection, form.

3      A.   The -- you can't -- the payroll of firms come due and

4   expenses come due and things.  You can have a very

5   unsuccessful and a lot of cold winters if you do things just

6   based on success fees and contingent fees unless you're a very

7   high-powered trial lawyer, like some represented in this room,

8   that have gotten big contingency fees.  I've never been able

9   to do that.  So that's -- that's the reason I've had to get

10  paid by the month.

11     Q.   Who puts gas in the Volkswagen in the interim?

12     A.   Yeah.

13     Q.   Right?

14     A.   That's right.

15     Q.   Okay.  So you never had a discussion about having a

16  success fee?

17     A.   Not -- not really a serious discussion.

18     Q.   And the reasons that you just articulated to the jury

19  on why you wouldn't enter --

20     A.   Yes.

21     Q.   -- into a success fee in this case --

22     A.   Yes.

23     Q.   -- is because -- was it a long shot?

24          MR. MADRID:  Objection, form.

25     A.   Anytime you're talking about the tax code, it's

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

1    difficult.  With the constituency of the U.S. Virgin Islands

2    and with the United States spending so much money on the U.S.

3    Virgin Islands, this proposal had better odds than most

4    because there was a -- there was a constituency other than a

5    few businesses.  It was the people of the Virgin Islands and

6    the government of the Virgin Islands --

7        Q.   Okay.

8        A.   -- that were dependents of the United States

9    government.

10       Q.   Did you ever know what the net worth of Stanford

11   Financial was?

12       A.   Not really.

13       Q.   Any idea?

14       A.   Not right now.  I'm sure I looked at his statements,

15   but I never did do a financial analysis of Stanford.  And I --

16   we've discussed the reasons that I thought there was strength

17   and vitality and substance there.

18       Q.   Okay.  And I'm sorry to belabor, but I'm just asking:

19   Did you ever find out what the net worth of Stanford Financial

20   was?

21       A.   No.

22       Q.   Did you ever compare the financial -- the net worth

23   of Stanford Financial before you received the million dollar

24   payment and after you received the million dollar payment to

25   see if it changed?

APP000166

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

1      A.   No, nor did I do that on other companies that paid me

2    large consulting fees.

3      Q.   I mean, I just need to get a --

4           MR. CASTILLO:   I'm going to object to the

5    responsiveness of the answer.

6      Q.  (BY MR. CASTILLO) I just need an answer.  Did you ever

7    compare the net worth of Stanford Financial before you got

8    paid a million dollars and after you got paid a million

9    dollars?

10     A.   No, I did not.

11     Q.   All right.  I --

12          MR. MADRID:  You've answered.

13          THE WITNESS:  Okay.

14     Q.  (BY MR. CASTILLO) And did you ever compare the net

15   worth of Stanford Financial in December 2005, when you got

16   paid $500,000, versus the net worth of Stanford Financial

17   after you got the $500,000?

18     A.   No, I did not.

19     Q.   Don't know whether it increased or decreased, do you?

20          MR. MADRID:  Objection, form.

21     A.   No.

22     Q.   Would the same be true of every other payment that

23   you received?  You wouldn't know the financial net worth of

24   Stanford Financial before or after?

25     A.   It would be true on Stanford Financial and all other

```
 1    clients that I'm paid by.

 2              MR. CASTILLO:  Thank you, sir.  Those are all

 3    the questions that I have today.  We'll reserve the rest of

 4    them until the time of trial.

 5              MR. MADRID:  Thank you.  I have about two hours.

 6    I'll reserve.

 7              THE VIDEOGRAPHER:  This marks the end of the

 8    deposition.

 9              MR. MADRID:  We'll reserve our questions to the

10    time of trial.

11              THE VIDEOGRAPHER:  The time is 1:50.

12              (Proceedings concluded at 1:50 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

APP000168

Case No. 3:10-cv-0527-N-BG
**Oral Videotaped Deposition of Benny Frank Barnes**

```
 1                    CHANGES AND SIGNATURE

 2              DEPOSITION OF BENNY FRANK BARNES

 3   PAGE LINE  CHANGE                    REASON

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13       I, BENNY FRANK BARNES, have read the foregoing deposition

14   and hereby affix my signature that same is true and correct,

15   except as noted above.

16

17                            _____
                              BENNY FRANK BARNES

18   THE STATE OF _____)
     COUNTY OF _____)
19
         Before me, _____, on this day
20   personally appeared BENNY FRANK BARNES, and proved to me,
     through identification card or other document, to be the
21   person whose name is subscribed to the foregoing instrument
     and acknowledged to me that he/she executed the same for the
22   purpose and consideration therein expressed.
         Given under my hand and seal of office on this _____ day
23   of _____, 2014.

24                            _____
                              NOTARY PUBLIC IN AND FOR
25                            THE STATE OF _____
```

**Lindi S. Roberts & Associates**
**(830)228-4634/(830)609-0266**

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

```
 1              F E D E R A L   C E R T I F I C A T E

 2    STATE OF TEXAS  )

 3    COUNTY OF COMAL )

 4        I, LINDI S. ROBERTS, Certified Shorthand Reporter, in and

 5    for the State of Texas, do hereby certify that this deposition

 6    transcript is a true record of the testimony given by the

 7    witness named herein, after said witness was duly sworn or

 8    affirmed by me.

 9        I further certify that I am neither attorney nor counsel

10    for, related to, nor employed by any of the parties to the

11    action in which this testimony was taken.  Further, I am not a

12    relative or employee of any attorney of record in this cause,

13    nor do I have a financial interest in the action.

14        I further certify that the total cost for the preparation

15    of this Reporter's Record is $_____ and was/will be

16    paid by attorney for the Plaintiff, the Official Stanford

17    Investors Committee.

18        WITNESS MY OFFICIAL HAND on this, the _____ day of

19    _____, 2014.

20

21                          _____
                            LINDI S. ROBERTS, CSR
22                          Texas CSR 2410
                            Lindi S. Roberts & Associates
23                          Firm Registration No. 558
                            P.O. Box 311905
24                          New Braunfels, Texas  78131-1905
                            Expiration:  12/31/15
25
```

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

# EXHIBIT KVT-15

APP000171

**From:** Barlow, Laura
**Sent:** Thursday, January 04, 2007 6:15 PM
**To:** Hodge, Julie
**Subject:** David Becker's direct number is (202) 974-1610
Susan from Ben Barnes office called today and said David Becker is the Attorney working on the SEC matter for RAS. I sent Mr. Stanford the phone number this morning but thought you might need it in the future.    David Becker's direct number is (202) 974-1610.

CONFIDENTIAL

RECEIVER527-00279445

# EXHIBIT KVT-16

APP000173

From: yms59@yahoo.com
Sent: Tuesday, January 20, 2009 2:39 PM
To: Davis, James
Subject: Fw: counsel - SEC

FYI
------Original Message------
From: Mitchell Delk
To: Yms59@yahoo.com
Sent: Jan 20, 2009 8:57 AM
Subject: counsel - SEC

I think the best enforcement-related counsel is Bill McLucus. He headed the Enforcement
Division for almost a decade. He now practices at Wilmer Cutler Hale Dorr. His phone
number is 202-663-6000. I can make other suggestions, but no one is better than Bill. Hope
this is helpful.

Sent via BlackBerry by AT&T

CONFIDENTIAL

RECEIVER527-00219169

**APP000174**

# EXHIBIT KVT-17

APP000175

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., et al and THE OFFICIAL STANFORD INVESTORS COMMITTEE | § § § § § § | Civil Action No. 3:10-cv-527 |
| Plaintiffs, | § § | |
| v. | § § | |
| BEN BARNES AND BEN BARNES GROUP, L.P, | § § | |
| Defendants. | § | JURY TRIAL DEMANDED |

DEFENDANTS' RESPONSES TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES

TO:    Plaintiffs by and through their counsel of record, Peter D. Morgenstern, Esq., Joshua E. Abraham, Esq., Butzel Long, 230 Park Avenue, Suite 850, New York, New York 10169.

Pursuant to Fed. R. Civ. P. 33, Defendants Ben Barnes ("Barnes") and Ben Barnes Group, L.P. ("BBG") respond to Plaintiffs' First Set of Interrogatories as follows.

I.

GENERAL OBJECTIONS

1.    Defendants object to the interrogatories as a whole in that there is no time limitation.

2.    Defendants object to Exhibit A "Instructions" of Plaintiffs' First Set of Interrogatories to the extent that such instructions attempt to impose requirements not otherwise established by Fed. R. Civ. P.

DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 1

3.      Defendants object to the definition of "and" and "or" and additional and similar verbiage to the extent that same are intended to expand the reach of Plaintiffs' Requests improperly.

4.      Defendants object to the definition of "person" and "you" and "your" in that such definitions improperly include in their description attorneys and therefore purport to request communications which are otherwise privileged.

5.      Defendants object to the purported service date of May 28, 2014, as same is erroneous in that service was not had until June 17, 2014.

## II.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**      Identify all parties with knowledge of facts relevant to the Plaintiffs' claims or Your defenses and state the nature and substance of each party's knowledge.

**RESPONSE:** The following individuals are believed to have knowledge of facts relevant to Plaintiffs' claims and/or defenses asserted herein:

Yolanda Suarez. Ms. Suarez served as Chief of Staff to some of the Stanford Parties and she is believed to have knowledge of the types of services requested by Stanford Parties to be performed by BBG, the benefits arising from the provision of such services, the value of the services and the good faith with which BBG carried out its assignments, among other things.

Jim Miller. Mr. Miller was an attorney with the law firm of Hunton & Williams who worked with BBG in providing governmental relations and related work to the Stanford Parties, and Mr. Miller is believed to have knowledge of the benefits received by the Stanford Parties from work performed by BBG as well as BBG value of the contribution to what it viewed were legitimate activities of the Stanford Parties.

Ben Barnes. Mr. Barnes is a limited partner in BBG who participated with other employees of BBG in providing services to the Stanford Parties, and Mr. Barnes is expected to have knowledge of the types of services rendered, the conditions of BBG's employment by the Stanford Parties, the benefits rendered by the work done by BBG and the value of such.

Scott Reed, Mitch Delk, John B. Raffaelli and Jeffrey Forbes. Each of these gentlemen, or their respective companies, were engaged from time-to-time as consultants to either perform work directly for the Stanford Parties or to perform such work through the auspices of BBG.

**DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 2**

Each of these gentlemen is believed to be aware of the value and benefits conferred by their organization's work, that such work was conducted in good faith and for legitimate purposes, and that payments for any such work constituted equivalent value or greater for the ultimate services that were rendered.

Jim Davis. Mr. Davis served as the Chief Financial Officer for the Stanford Parties and had contact with BBG representatives from time-to-time. Mr. Davis is believed to have knowledge of services rendered by BBG, benefits conferred thereby and that services were of equivalent value to payments that were made.

Kent Caperton, Esq. Mr. Caperton is employed by BBG and over time had contact with various persons, including representatives of the Stanford Parties, relative to work being requested by the Stanford Parties or being performed by BBG. Mr. Caperton is believed to be familiar with the types of services rendered, the benefits conferred by the performance of such services and the value thereof.

Additional parties, both individual and corporate (or other entity) are identified in documents previously made available to the Receiver and to the Investors Committee, both through counsel, to which reference is made.

**INTERROGATORY NO. 2:**        Identify each payment You received from the Stanford

Parties by stating (i) the date of the payment, (ii) the amount of the payment, (iii) the reason for

the payment, and (iv) the entity making the payment and the entity receiving the payment.

**RESPONSE:** The answers to the subparts of this Interrogatory may be determined by examining BBG business records, produced under cover letter of March 18, 2013 to Plaintiffs' counsel, and the burden of ascertaining the answer hereto will be substantially the same for either party. Specifically, reference is made to previously produced documents within Bates stamped range beginning BBG 004627 through and including BBG 004966, among which documents are numerous invoices, evidence of payment and other matters inquired about.

**INTERROGATORY NO. 3:**        Identify and describe the "consulting services" You

provided to the Stanford Parties as alleged in paragraph 70 of the Answer [Doc. 35].

**RESPONSE:** BBG provided the following "consulting services" to the Stanford Parties, among other services:

1.      Interpreted global political developments and their impact on global capital markets.

**DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 3**

2.  Interpreted global political developments and their impact on American corporations doing business in a global marketplace.

3.  Initiated due diligence exercise that was conducted by the former general counsel to the Democratic National Committee regarding the reputation of corporations and its potential impact on political parties and elected officials accepting campaign contributions.

4.  Provided counsel on the risks and rewards of locating a global capital markets enterprise in the U.S. Virgin Islands.

5.  Provided counsel and strategy to expand the global awareness of the Antigua 20//20 Cricket Tournament.

6.  Provided analysis and predictions of the 2008 Democratic Presidential primary and its impact on global capital markets strategies.

7.  Predicted the 2008 Presidential election outcome and its impact on global capital market strategies.

8.  Predicted the 2008 Congressional elections and their impact on global capital market strategies.

9.  Predicted the 2008 Congressional elections and their impact on U.S. policy relating to the Caribbean region.

10. Predicted the 2008 Congressional elections and their impact on U.S. tax policy relating to companies residing in the U.S. Virgin Islands.

11. Provided analysis and counsel on legislative changes to U.S. tax policy relating to companies residing in the U.S. Virgin Islands to ensure the underlying policy reflects today's global business environment.

12. Developed legislative strategy to effectuate desired legislative changes to U.S. tax policy relating to companies residing in the U.S. Virgin Islands, specifically the issue of what income can be sourced to resident corporate parent operating in the territories.

13. Initiated review of campaign finance issues relating to the Antigua national election.

14. Participated in and represented the corporate interest at various Democratic Governors Association events in the U.S. Virgin Islands to ensure the underlying policy reflects current global business environment.

**DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 4**

**INTERROGATORY NO. 4:**        Identify each of the "various consultants and lobbyists"

referred to in paragraph 71 of the Answer [Doc. 35].

**RESPONSE:**  Among others, BBG engaged the following individuals or entities at the request of and on behalf of The Stanford Parties: Chesapeake Enterprise, Inc.; Capital Council, LLC; Coffin Forbes Williams LLC; and Robert Mitchell Delk.

**INTERROGATORY NO. 5:**        Identify and describe all work performed by each of the

"various consultants and lobbyists" identified in Your answer to the previous interrogatory.

**RESPONSE:**  The answer to this Interrogatory may be determined by examining the business records identified in Response to Interrogatory No. 2, among other records previously produced to counsel for both the Receiver and Investors Committee Council, and the burden of ascertaining the answer hereto will be substantially the same for either party.  Therefore, references made to such documents.

**INTERROGATORY NO. 6:**        Describe any investigation, research, background check,

due diligence, or similar inquiry into the nature and operations of the Stanford Parties that You

conducted at any time, including (i) the date of such investigation, (ii) the reason for the

investigation, (iii) the results of the investigation, (iv) the names of the person(s) involved in the

investigation, and (v) the documents related to the investigation.

**RESPONSE:**  No formal investigation was conducted regarding the nature and operations of The Stanford Parties other than an initial call(s) to individuals who had dealt with Allan Stanford or one or more of The Stanford Parties, and who attested to the bona fides of the Stanford Parties.  Such call(s) was made prior to the undertaking of any engagement on behalf of The Stanford Parties and was simply to gain more knowledge of Mr. Stanford and many of his entities prior to undertaking substantial work.

**INTERROGATORY NO. 7:**        State all facts that support Your affirmative defense that

you acted at all relevant times in "good faith" that You did not know, and/or that you objectively

had no reason to know, that the Stanford Parties were operating a Ponzi scheme.

**RESPONSE:**  The Stanford Parties appeared to be, from the perspective of these Defendants, substantial business entities engaged in banking, airlines and other legitimate industries.  They had high visibility, among other things being involved as high profile sponsors of international cricket tournaments, professional golfing activities and were in the midst of revitalizing locations

**DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 5**

in the Caribbean. In addition, the persons with whom BBG dealt were, until the very end of the Stanford Parties activities, competent individuals from all appearances. It was not until the Receivership action against Stanford and his various entities became known that the concept of a "Ponzi scheme" even appeared to be a credible assertion.

**INTERROGATORY NO. 8:**       State the date on which You first learned that the Stanford

Parties had been or were being investigated by any legal or regulatory agency.

**RESPONSE:** It was sometime in late 2008 or early 2009 that BBG first began hearing rumors about an investigation by a regulatory agency.

**INTERROGATORY NO. 9:**       Identify any documents or communications, including oral

communications, in which You expressed any doubt, reservation, concern, mistrust, or

skepticism about the legitimacy of the Stanford Parties' operations or the veracity of any

representation made by the Stanford Parties.

**RESPONSE:** Because of the volume of documents previously produced, Defendants believe that the response to this Interrogatory may be determined by examining the BBG business records previously produced to counsel for the Receiver and to the Investor's Committee, to which reference is made. In addition, such documents are available for reproduction for a third time to Plaintiffs' counsel.

**INTERROGATORY NO. 10:**       State all facts that support Your affirmative defense that

You provided "reasonably equivalent value" in exchange for the payments You received from

the Stanford Parties.

**RESPONSE:** At all times, in connection with services provided to The Stanford Parties, any such charges were for services provided at market rates, for legitimate purposes, and in accordance with charges rendered for services of the nature provided to The Stanford Parties, for clients involved in complex associated business and governmental relations activities.

**DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 6**

Respectfully submitted,

**WINSTEAD PC**

By: _____

Jay J. Madrid
Texas Bar No. 12802000
Kristen L. Sherwin
Texas Bar No. 24043918
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (phone)
(214) 745-5390 (fax)
jmadrid@winstead.com
ksherwin@winstead.com

-- AND --

Gary E. Zausmer
Texas Bar No. 2251350
401 Congress Ave., Suite 2100
Austin, Texas 78701
(512) 370-2800 (phone)
(512) 370-2850 (fax)
gzausmer@winstead.com

ATTORNEYS FOR DEFENDANTS BEN
BARNES & BEN BARNES GROUP, L.P.

**DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 7**

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2014, the foregoing Responses to Interrogatories were

sent to all counsel of record via email and Certified Mail, Return Receipt requested.

Peter D. Morgenstern, Esq.
Joshua E. Abraham, Esq.
Butzel Long
230 Park Avenue
Suite 850
New York, New York 10169

David T. Arlington, Esq.
Scott D. Powers, Esq.
Kevin M. Sadler, Esq.
Baker Botts L.L.P.
98 San Jacinto Blvd.
Suite 1500
Austin, Texas 78702-4039

Jay J. Madrid

**DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 8**

## VERIFICATION

STATE OF TEXAS      §
                        §

COUNTY OF DALLAS    §

       BEFORE ME, the undersigned notary public, on this day personally appeared Ben Barnes Group in its corporate capacity and being by me duly sworn on its oath did depose and say:

       Ben Barnes, being first duly sworn, says that he is the registered agent and officer of Entrecorp Management, Inc., General Partner of Ben Barnes Group, L.P. and that he executed this verification in such capacity. I have read the Responses to Interrogatories served on Ben Barnes Group, L.P., and the factual statements contained therein are, to the best of my knowledge and belief true and correct.

                              Ben Barnes Group, L.P.
                              By: Entrecorp Management, Inc.
                              Its: General Partner

                              By: 
                                   Ben Barnes, Its Registered Agent

       SUBSCRIBED AND SWORN TO before me by the said Ben Barnes, on the _16th_ day of July 2014, which witness my hand and official seal.

KERRI RENOUF
MY COMMISSION EXPIRES
March 2, 2015

                                   Notary Public in and for the State of Texas

My Commission Expires:

_3/2/15_

DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 9

<u>VERIFICATION</u>

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

BEFORE ME, the undersigned notary public, on this day personally appeared Ben Barnes, Individually, who, being by me duly sworn on his oath did depose and say:

My name is Ben Barnes.  I have read the Responses to Interrogatories served by Plaintiffs and the factual statements contained therein are, to the best of my knowledge and belief, true and correct.



Ben Barnes

SUBSCRIBED AND SWORN TO before me by the said Ben Barnes, on the _16th_ day of July 2014, which witness my hand and official seal.

KERRI RENOUF
MY COMMISSION EXPIRES
March 2, 2015

Notary Public in and for the State of Texas

My Commission Expires:

3/2/15

DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES – Page 10

# EXHIBIT KVT-18

APP000186

From: Loumiet, Carlos [cloumiet@hunton.com]
Sent: Saturday, April 09, 2005 12:58 PM
To: Suarez, Yolanda
Subject: Re: It was great seeing you yesterday. Please keep this e-mail
strictly confidential.

I couldn't agree more, and as I already indicated, I liked Ben and his ideas.

Un beso,


Carlos Loumiet
Hunton & Williams LLP - Miami
-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Suarez, Yolanda <ysuarez@stanfordeagle.com>
To: Loumiet, Carlos <cloumiet@hunton.com>
Sent: Fri Apr 08 19:01:07 2005
Subject: RE: It was great seeing you yesterday. Please keep this e-mail strictly
confidential.

Carlos,

I fully anticipated that Jim would be working on this, but his schedule was not very
flexible. I do want Jim fully on board, but we do need a team on this. YS


      _____

From: Loumiet, Carlos [mailto:cloumiet@hunton.com]
Sent: Fri 4/8/2005 1:51 PM
To: Suarez, Yolanda
Subject: It was great seeing you yesterday. Please keep this e-mail strictly confidential.


I believe I already have the economist - a highly-recommended, Cuban  Wharton PhD who is
available to undertake the project immediately, and is an acknowledged expert on Latin
America generally. I spoke to him today. When I get his info, I'll send it on to you.

It was great meeting Ben Barnes yesterday, after hearing about him for so long and seeing
him on 60 Minutes last Fall trying to help derail the Bush re-election campaign. I liked
him a lot and will thoroughly enjoy working with him, but as your old friend and lawyer, I
have to insert a cautionary word - my sources tell me that as a result of his notorious,
nationally-televised public "confession" last September about how he'd gotten Dubya into
the Texas National Guard and how much he regretted doing so, it might be advisable in
going before the Republican-controlled Administration, House and Senate to ask for a
legislative favor, to put a staunch Republican face on it as well.

Jim Miller, who's Andy Card's good friend from childhood, whose dad was a long-time
Republican US Senator from Iowa, who grew up with the Bushes, who is very close to
Grassley and his California counterpart at Ways and Means in the House (the name escapes
me right now),  who actually worked on tax planning issues at Treasury under Bush 41, and
who lobbies frequently on other tax issues before Congress, would seem to be a good
complement.

Un beso,


 Loumiet
Hunton & Williams


CONFIDENTIAL                                                        RECEIVER527-00262348


**APP000187**

1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Direct: (305) 810-2575
Fax:     (305) 810-2460
E-Mail: cloumiet@hunton.com

200 Park Avenue
New York, New York 10166-0136
Direct: (212) 309-1330
Fax:     (305) 810-1624
www.hunton.com

The information in this electronic message may be privileged and confidential and is
intended only for the use of the individual(s)and/or entity(entities) named above.  If you
are not the intended recipient, you are on notice that any unauthorized disclosure,
copying, distribution, or taking of any action in reliance on the contents of the
electronically transmitted materials is prohibited.

CONFIDENTIAL

RECEIVER527-00262349

# EXHIBIT KVT-19

APP000189

Proposed Legislative Initiative
**Stanford Financial Group**
prepared by
**Ben Barnes Group**

### Issue Overview

As a global network of affiliated companies that has become a powerful resource of financial services throughout the world, Stanford Financial recognizes the necessity of economic stability in the Caribbean and its connection to private investment. Therefore, the company is seeking the passage of legislation to encourage Caribbean investment through tax policy.

A team of professionals has been assembled to assist with this effort (see attached Campaign Team information), and proposes a legislative strategy involving three areas:

- **Legislative Affairs**
- **Third Party Advocates**
- **Media Relations** *(only as necessary)*

### Legislative Affairs

The Stanford campaign team has deep experience with a majority of the leadership who oversee foreign relations, banking and finance, and appropriations issues. In addition, several campaign team members bring long-standing, Texas-based ties with both the House and Senate leaders. We will approach both House and Senate Leaders, as their recommendations may dictate the direction in legislative strategy for this measure. Initial thoughts are that the Budget Reconciliation Act may be the most appropriate vehicle to attain our goal. To begin, we will organize priority meetings with key members of the following committees:

- Senate Finance
- Senate Banking
- Senate Appropriations
- Senate Special Committee on Foreign Affairs
- House Ways & Means
- House International Relations
- House Appropriations
- House Rules
- House Caribbean Caucus
- DSCC
- NRCC

CONFIDENTIAL

In approaching congressional representatives, the government relations team will form a rationale using these key message points (a more detailed rationale will be provided in a separate document):

– *A stable and economically viable Caribbean region is important for United States national security; the Caribbean region is our "third border."*
– *The Caribbean region faces daunting economic and related challenges, and unfriendly governments are attempting to exploit its economic stresses.*
– *The United States has a long-standing commitment to economic development and political stability in the Caribbean region.*
– *As a historical perspective, private investment incentives offered by the United States have spurred economic activity in the U.S. Virgin Islands.*
– *Expansion of the USVI tax-incentive model to include the Caribbean region would bolster of United States assistance efforts.*

**Third Party Advocates**

In order to both compliment and protect the legislative outreach efforts, we propose to proactively engage and educate third party groups with interests in this matter. For example, we will contact organizational and/or legal representatives of Caribbean-Central American Action, the Inter-American Economic Council, and the U.S. Virgin Islands to inform them of our effort. This will enable us to engage these groups as third-party allies, and neutralize any potential adversaries.

**Media Relations**

While we will not engage in proactively approaching the media (success in this matter does not require a media campaign), we recommend preparing a plan in case the media begins to inquire. The plan would include the following information:

- the identification of a single media spokesperson for this program
- primary message points to be adhered to by the spokesperson;
- a white paper for distribution to reporters; and
- the identification of trusted allies as references of support.

**Timeline**

It is recognized that time is of the essence because it is our understanding that the House is to pass its version of the Budget Recommendation Act in September. Additionally, there are already a lot of provisions in the budget, thus leaders need to be well-educated on our proposal. Therefore, it is essential that our work on these provisions be incorporated early the process.

We appreciate the opportunity to work with Stanford Financial in its goal to enable legislation allowing investment in the Caribbean, and look forward to further discussing the legislative strategy we propose to achieve it.

RECEIVER527-00261821

# Campaign Team



**Stanford Financial Group**
- Allen Stanford
- Jim Davis
- Yolanda Suarez

**Campaign Oversight**
- Ben Barnes

**Research**
*Stanford  Washington Research*
- Ed Garlich
- Joanne Thornton
- Dave Baker

**Legislative Strategy**
- Kent Caperton, Ben Barnes Group
- Mitch Delk
- Kent Hance
- Jim Miller, Hunton & Williams
- Scott Reed , Chesapeake Enterp.
- Wyeth Wiedeman, Ben Barnes Group

**Legal**
- Yolanda Suarez, Stanford Financial
- Richard Razook, Hunton & Williams

**Of Counsel**
- Ambassador Romero

**Media Relations**
*- to be determined*

CONFIDENTIAL

# EXHIBIT KVT-20

APP000193

From: Loumiet, Carlos [cloumiet@hunton.com]
Sent: Tuesday, June 21, 2005 10:47 PM
To: Miller, James; Razook, Richard; Ben Barnes (E-mail); 'Marjorie
Roberts (E-mail) ' (E-mail); 'Mitchell Delk' (E-mail); May, Richard;
Suarez, Yolanda
Cc: Ramsey, Katherine; Nichols, Amanda
Subject: RE: Views on Section 937 Overhaul

Jim, who's developing the national security argument?

>   -----Original Message-----
> From:     Miller, James
> Sent:     Tuesday, June 21, 2005 11:37 AM
> To: Razook, Richard; 'Ben Barnes (E-mail)'; Loumiet, Carlos; ''Marjorie Roberts (E-mail)
' (E-mail)'; ''Mitchell Delk' (E-mail)'; May, Richard; 'Yolanda Suarez (E-mail)'
> Cc: Ramsey, Katherine; Nichols, Amanda
> Subject:  Views on Section 937 Overhaul
>
>
>
>     Group:
>
>         As we look at a "Big Picture" strategy toward a goal of complete overhaul of
section 937, I wanted to throw out a few tactical considerations on which I believe we all
agree.
>
>         First, I continue to believe that using the setting of a House Ways and Means
Committee -- Senate Finance Committee conference is the best route to achieve our
objectives.  It involves only a few Members, two of whom (Baucus and Rangel) already are
intrigued by the idea of overhaul.  It does not require full blown committee markups and
the attendant press coverage which encourages the Members to speak for the cameras.  We do
not need to invite press attention.  There will be enough of that after a bill is passed
and sent to the President.
>
>         Second, to utilize the conference setting, it will be important to be
"germane" to the conference.  That is where Winston & Strawn comes in.  They will continue
to push incremental amendments to section 937, some of which might be in a House or Senate
bill.  These incremental changes will be the hook to our complete overhaul.  We will need
to stay close to Winston & Strawn and their efforts without revealing our hand.
>
>         Third, the Administration is very likely to play a role at conference
(although this is not always the case).  I believe that the Administration will be more
likely to go along with an overhaul approach that takes place in the conference setting
than one which takes place in full committee markups.  We could even encourage Baucus and
Rangel (hopefully Hatch) to invite into the conference Administration national and
homeland security officials to stress the need for the overhaul.
>
>         These are just a few thoughts with regard to tactics that we should keep in
mind as we go forward.  Our focus now, of course, needs to be on developing as soon as
possible our national security argument.
>
>         Jim Miller

CONFIDENTIAL

RECEIVER527-00262396

# Exhibit KVT-21

APP000195

From: Razook, Richard [rrazook@hunton.com]
Sent: Thursday, July 07, 2005 1:44 PM
To: Stanford, Allen; Ben Barnes (E-mail); Carlos Loumiet (E-mail); James
Miller (E-mail); 'Marjorie Roberts (E-mail) ' (E-mail); 'Mitchell Delk'
(E-mail); Richard May (E-mail); Suarez, Yolanda
Subject: New USVI Tax Legislation

Importance: High

Good moring.

At the conclusion of the meeting yesterday in Washington, Ben asked for us to compile and
deliver to him before noon tomorrow a package consisting of (i) an executive summary of
our position, (ii) a national security presentation and (iii) the proposed new tax statute
and explanation.

I will revise and send to you the tax statute and the explanation by late today.  This new
version will be substantially the same as the one you received on Tuesday; however,
certain technical points will be clarified.  It is intended that this next draft will be
suitable for presentation to staff and by early next week Jim Miller and I will be meeting
with Russ Sullivan again, this time based on this new version.

In the meantime, if any of you have questions or comments regarding the initial draft of
the statute and explanation which you already have, please let me know as soon as possible
so that I can respond appropriately in connection with the next draft.

Thank you.


Richard J. Razook
Hunton & Williams LLP
Mellon Financial Center
1111 Brickell Avenue
Suite 2500
Miami, Florida  33131
Tel:  305-810-2500
Fax: 305-810-1672

> To ensure compliance with requirements imposed by the IRS on all attorneys who advise
clients on federal tax issues, we are required to inform you that any U.S. federal tax
advice contained in this communication (including any attachments) is not intended or
written to be used, and cannot be used, for the purpose of (i) avoiding penalties under
the Internal Revenue Code or (ii) promoting, marketing or recommending to another party
any transaction or matter addressed herein.  This advice may not be forwarded without our
express written consent.
>

CONFIDENTIAL

# EXHIBIT KVT-22

APP000197

From: Baker, David [dbaker@StanfordEagle.com]
Sent: Friday, July 29, 2005 5:05 PM
To: Stanford, Allen; Davis, James; Suarez, Yolanda;
ben@benbarnesgroup.com; Pthomasson@benbarnesgroup.com;
mitchelldelk@comcast.net; Jfmiller@hunton.com; rrazook@hunton.com;
Garlich, Edward; sreed@chesenterp.com; kcaperton@pstrategies.com; Baker,
David; peteromero@experioradvisory.com
Subject: Current Cuba Picture


Thought this might be useful as we strengthen the theme of national security in our
Caribbean efforts. Regards, Gen. Baker


David E. Baker

Senior Vice President

Stanford Washington Research Group

Member NASD/SIPC

202.295.2345


Summary

Cuban leader Fidel Castro is tightening the screws of political repression and moving to
reassert state control over all economic activities. These actions are part of Castro's
strategy to strengthen the revolution ahead of his death to ensure that his younger
brother Raul can take power after Fidel dies. Raul will be only a transition figure,
however, and will be forced to make concessions to other senior figures in the Cuban power
structure to assure the revolution's continuity.

Analysis

Cuban leader Fidel Castro warned July 26, on the 52nd anniversary of the start of the
Cuban revolution, that he would not tolerate "acts of treason" aimed at destabilizing the
country. Castro's remarks -- made at a tightly controlled anniversary celebration
involving only his closest associates at the Karl Marx Theater in Havana -- came amid a
renewed wave of repression against pro-democracy dissidents that he dismissed as "paid
U.S. mercenaries."

Public discontent in Cuba is at its highest level in more than a decade. Many Cubans are
increasingly unhappy about chronic shortages of electricity, water, food, housing and
health care. Dissident leader Martha Beatriz Roque told The Miami Herald on July 26 that
opposition groups across the island are ready to "take to the streets" in massive
protests. "I see the strong possibility of civil unrest," she warned.

Castro is moving forcefully to prevent major protests from erupting. During the past
month, he has doubled the presence of police patrols in Havana and other major cities.
Sources with links to dissident leaders on the island said July 28 that Cuba's Interior
Ministry is implementing aggressive surveillance and intimidation tactics against
dissident leaders in an effort to dissuade them from initiating public protests against
the government. Castro also has deployed thousands of loyalists, many of them armed with
clubs, to disrupt anti-government demonstrations. Members of these revolutionary worker
brigades, as they are called, already clashed twice in July with dissident groups in
Havana that tried to hold public demonstrations. More than 50 dissidents have been
detained in recent weeks. As of July 28, at least 16 remained behind bars, according to a

CONFIDENTIAL

foreign source in Havana.

There is a significant possibility that Havana could experience some public protests in August, possibly around Antonio Maceo Plaza and La Punta Plaza, an area near the waterfront where anti-government protests involving thousands of Cubans last occurred Aug. 5, 1994. This area of Havana also is popular with foreign visitors. Castro responded to those protests by allowing 36,000 Cubans to flee the island on fragile homemade rafts. However, if similar protests erupt in Havana this August, Castro likely will respond violently in an effort to crush the seeds of future civil revolt.

Castro likely would resort to violent repression rather than allow another major exodus of Cubans by sea for two reasons. One, an aggressive show of force against dissidents would dispel notions that the Cuban regime is weakening. Also, the U.S. government has made it clear to Havana that another massive exodus by sea would be considered a hostile act against the United States and that it would quickly mount a naval blockade to stop it.

The 78-year-old Castro, whose health is visibly failing, is making preparations to ensure the revolution's survival after his death. Castro's designated heir is his younger brother Raul, who also is in his 70s. Fidel's recent actions to recentralize economic activities in Cuba, suppress political dissidents and build strong strategic linkages with Venezuela and China form part of his plan to tighten government control over the populace. Castro likely feels that tighter economic and political controls are necessary because Raul does not have the charisma and leadership capabilities to hold the revolution together once his older brother dies.

On the economic front, Castro is gradually eliminating licenses that allow individual Cubans to engage in private enterprise. The types of private economic activities licensed by the regime have been reduced in 2005 from 170 to 130, and the number of licensed self-employed Cubans shrunk to 140,000 at the start of 2005 compared with more than 240,000 in 1990. Foreign investors also are being pushed out of Cuba. Only 300 mixed ventures between the Cuban state and foreign investors are still operating in the metallurgical, tourism, energy and tobacco industries compared with 700 in 2002. Also, more than half of the 800 foreign companies that operated under Cuban free-trade-zone regulations have shut down and left the country.

Castro's strategic alliance with Venezuelan President Hugo Chavez is vital to his recentralization of economic activity in Cuba. Venezuela currently supplies Cuba about 90,000 barrels per day of crude oil at preferential prices and easy payment terms. In terms of the value of the crude oil it receives from Venezuela, and other commercial agreements such as Venezuelan payments for the "services" in Venezuela of more than 35,000 Cuban nationals, Castro's alliance with Chavez is worth more than $2 billion a year in foreign exchange for the Cuban regime. Moreover, the economic value to Cuba of the Castro-Chavez alliance likely will increase even more over the next couple of years. Petroleos de Venezuela recently installed its Central American and Caribbean region oil marketing office in Havana. The Venezuelan state-owned Industrial Bank of Venezuela and Guayana Development Corp., a major exporter of iron and steel, also opened commercial offices in Havana.

Castro's drive to recentralize control of economic activities is intended to strengthen the state's political control over the population, and make it easier for younger brother Raul to assume the presidency. Some U.S. government officials and anti-Castro Cuban exile leaders in the United States believe that Castro's revolution will collapse with his death. Raul Castro likely will be unable to keep the revolution afloat and significant economic and political changes can be expected after Castro dies. Due to his age and perceived weakness as a leader, however, Raul would be a short-lived transition figure -- though an immediate collapse of the revolution is unlikely. Instead, political realities likely would force Raul to make power-sharing concessions to other key figures in the Cuban government -- Vice President Carlos Lage, Vice President Gen. Abelardo Colome Ibarra, Foreign Minister Felipe Perez Roque and others-- to ensure continuity in the revolution.

CONFIDENTIAL

RECEIVER527-00262219

CONFIDENTIAL

RECEIVER527-00262220

# EXHIBIT KVT-23

APP000201

**From:** Susan Martin [smartin@benbarnesgroup.com]
**Sent:** Tuesday, September 27, 2005 4:42 PM
**To:** Stanford, Allen
**Subject:** America's Third Border - Documents From Ben Barnes

**Attachments:** America's Third Border 9-26-05.doc; AmericasThirdBorder9-26-05.ppt

Allen –

Here is the work of the economists and writers who were supervised by Mitch Delk, Scott Reed and Kent Caperton.  We are pleased with the final product and hope you share that view.

Best regards,

Ben

CONFIDENTIAL

RECEIVER527-00226707

# EXHIBIT KVT-24

APP000203

# America's Third Border

### *Protecting National Security*
### *By Promoting Private Investment in the Caribbean*



Prepared for the Stanford Washington Research Group
September 26, 2005

CONFIDENTIAL

RECEIVER527-00226708

APP000204

## America's Third Border
*Protecting National Security by Promoting Private Investment in the Caribbean*

### Executive Summary

Because of the Caribbean region's geographic proximity to the United States, its political and economic stability is essential for our national security. The area could serve as a launching pad for alien smuggling, drug trafficking, and terrorist activity. In the aftermath of the September 11, 2001 attacks, the United States has taken measures to strengthen our "first border" with Canada and "second border" with Mexico. Less attention has been focused on the region President Bush has called America's "third border" with the nations of the Caribbean.

Most Caribbean countries, historically, have shared our democratic values and had strong ties to the United States. Collectively, the 24 nations benefiting from the Caribbean Basin Initiative -- a U.S. program of trade preferences designed to promote investment and economic development in the Caribbean and Central America -- were America's 8th largest export destination and 12th largest source of imports in 2004. The United States has been a significant source of private foreign investment in the region and also provides a limited amount of direct government aid.

Caribbean Basin countries have performed reasonably well based on a number of economic measures, though some have fared much better than others. Moreover, a myriad of challenges threatens the region's future prosperity, including diminished productivity growth, soaring public debt, extensive poverty, youth unemployment, increasing crime and drug trade, and exposure to hurricanes and other natural disasters. Already there is evidence that performance is slowing down.

Unfriendly governments are seeking to exploit these vulnerabilities. Venezuela's President Hugo Chávez buys influence with subsidized oil sales and, in collaboration with Cuban leader Fidel Castro, promotes a "Bolivarian Alternative" to U.S. regional trade initiatives. China is significantly increasing its presence in the region, targeting nations that do not recognize Taiwan.

As the United States attempts to foster robust democracies around the world, we also should take action to strengthen our allies in our backyard. While providing direct aid could be prohibitive, strong precedents exist for providing incentives to generate greater U.S. private investment in the region. In particular, the tax incentives provided for investments in the U.S. Virgin Islands by USVI companies have resulted in significant investment in the territory. Extending similar incentives to investments by USVI companies in other Caribbean nations would bolster economic growth and democracy in the region -- and reduce security risks to the United States -- in the years ahead.

[APG]

CONFIDENTIAL

RECEIVER527-00226709

> *"If you're living in a neighborhood,
> you want your neighbors doing well …
> and that's in our national security interests."*
>
> President George W. Bush,
> July 21, 2005

1. **America's security depends on having economically strong democracies as neighbors.**

Because of its geographic proximity to the United States, a politically stable and economically viable Caribbean region is essential for our national security. In the aftermath of the September 11, 2001 terrorist attacks, the United States has taken measures to strengthen our "first border" with Canada and "second border" with Mexico. Less attention has been focused on the maritime border we share with the nations of the Caribbean, a region President Bush has called America's "third border."[1]

<u>Democratic Traditions</u>

The Caribbean region consists of a collection of relatively small independent islands, dependent territories, and sovereign states (see Appendix 1). Their small size, isolation from markets, susceptibility to natural disasters, and general ecological vulnerability present a special case for development, according to the U.S. Agency for International Development.[2]

Most Caribbean nations -- with the exception of Cuba -- are allied with the United States and have democratic traditions, though some of these democracies, particularly Haiti's, are more fragile. Caribbean nations typically have regular elections, but they are not immune from threats to their political stability, as evidenced by attempted coups over the years.[3] Caribbean economies, aside from Haiti's, have performed reasonably well but are vulnerable to challenges including slowing economic growth, massive public debt, and extensive poverty.

<u>Close to Home</u>

The third border is longer than the one we share with Mexico, more porous, and potentially more difficult to secure. A plane hijacked from the northern Caribbean islands could reach Florida in less than an hour. False passports and visas issued in Caribbean countries could enable a terrorist to enter the United States.

---

[1] The White House, Fact Sheet: Caribbean Third Border Initiative, April 21, 2001, www.whitehouse.gov/news/releases/2001/04/20010423-5.html.
[2] U.S. Agency for International Development, Fiscal Year 2006 Budget Summary, Complete U.S. AID/Caribbean Regional Program, www.usaid.gov/policy/budget/cbj2006/lac/pdf/crp_complete05.pdf.
[3] "Caribbean Region: Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.

[APG]

CONFIDENTIAL

RECEIVER527-00226710

The law enforcement capabilities of Caribbean nations are strained by sophisticated threats to their security.  Crime and violence have increased across the region, and drug trafficking is a significant concern.  President Bush designated the Bahamas, Dominican Republic, Haiti, and Jamaica as major drug producing or transit countries in September 2004.[4]

Even before the terrorist attacks on the United States, the Administration announced a "Third Border Initiative," highlighting the threat that illegal drug trafficking, migrant smuggling, and financial crime pose to U.S. and regional security interests.  Part of the funding was targeted for law enforcement cooperation, such as anti-money laundering, professional development of police and prosecutors, and anti-corruption training and assistance throughout the Caribbean.[5]

The nearby Panama Canal links the Atlantic and Pacific oceans.  The Canal is considered a major "choke point" for oil tankers and other commercial vessels, where traffic converges and could be halted.  The ability to cross it safely is a critical link in global trading, especially for the United States, which is the dominant country of origin for products transiting the Panama Canal, and the largest destination as well.[6]

In Our National Interest

A Caribbean region that remains economically strong and improves law enforcement will support multiple U.S. policy objectives.  In addition to helping to combat potential terrorist threats, it will support our policies to "promote a more secure, stable region, generate expanded markets for U.S. goods and services, ensure safe and secure destinations for U.S. tourists and investments, ensure respect for the rule of law, retard the transmission of HIV/AIDS, and strengthen respect for democratic values."[7]

---

[4] "Caribbean Region:  Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.
[5] The White House, Fact Sheet: Caribbean Third Border Initiative, April 21, 2001, www.whitehouse.gov/news/releases/2001/04/20010423-5.html.
[6] World Oil Transit Chokepoints, Energy Information Administration, April 2004, www.eia.doe.gov/emeu/cabs/choke.html.
[7] Fiscal Year 2006 Budget Request for the Eastern Caribbean countries of Antigua and Barbuda, Barbados, Dominica, Grenada, St. Kitts and Nevis, St. Lucia, and St. Vincent and the Grenadines, www.fas.org/asmp/profiles/aid/fy2006/CBJWHemisphere.pdf.

[APG]

CONFIDENTIAL

> *"The CBI remains one of the best examples of the positive power of trade... By opening its market to producers in the Caribbean and Central America, the United States is supporting the development of more prosperous economies, and stronger democracies, among our closest neighbors."*
>
> Robert Zoellick
> U.S Trade Representative
> December 31, 2001

## 2. The United States has a history of trade, aid, and private investment in the Caribbean Basin.

The United States has long supported economic development in the Caribbean through both government action and incentives for private initiatives. A key element of government efforts has been the establishment of trade preference programs collectively known as the Caribbean Basin Initiative (CBI).[8] Twenty-four countries are eligible for CBI benefits.[9]

<u>Trade Preferences Benefit the United States</u>

Beginning in 1983, U.S. trade preference programs have provided duty-free access to the U.S. market for an increasingly broad array of manufactured products from Central American and Caribbean countries. In 2002, 74 percent of imports from the region entered the United States duty-free.[10]

In conjunction with the liberalized trade policies of the Caribbean countries, the CBI has helped these nations diversify their exports beyond traditional products such as coffee, bananas, and mineral fuel. More than half of CBI exports in 2002 were manufactured

---

[8] The Caribbean Basin Initiative refers to the Caribbean Basin Economic Recovery Act of 1983 (CBERA), the Caribbean Basin Economic Recovery Expansion Act of 1990 (CBERA Expansion Act), and the U.S.-Caribbean Basin Trade Partnership Act of 2000 (CBTPA), collectively. Caribbean Basin Initiative, Frequently Asked Questions, www.mac.doc.gov/CBI/FAQs/faqcbi-all.htm. These earlier measures were reinforced by the Trade Act of 2002, which harmonized apparel eligibility criteria among the Andean Trade Preferences Act, the African Growth and Opportunity Act, and the CBTPA, and increased caps for knit apparel articles and t-shirts from the Caribbean Basin. Fifth Report to Congress on the Operation of the Caribbean Basin Economic Recovery Act, Office of the United States Trade Representative, December 31, 2003, www.ustr.gov/assets/Trade_Development/Preference_Programs/CBI/asset_upload_file160_7711.pdf.

[9] The 24 countries that benefit from the CBI program and may potentially benefit from CBTPA are Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, British Virgin Islands, Costa Rica, Dominica, Dominican Republic, El Salvador, Grenada, Guatemala, Guyana, Haiti, Honduras, Jamaica, Montserrat, Netherlands Antilles, Nicaragua, Panama, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Trinidad and Tobago. Caribbean Basin Initiative, Office of the United States Trade Representative, www.ustr.gov/Trade_Development/Preference_Programs/CBI/Section_Index.html.

[10] Trade Facts: Adding Dominican Republic to CAFTA, Office of the United States Trade Representative, March 15, 2004, www.ustr.gov/assets/Document_Library/Fact_Sheets/2004/asset_upload_file332_5686.pdf.

[APG]

CONFIDENTIAL

RECEIVER527-00226712

products, such as apparel and electrical and non-electrical machinery.[11]  Aided by CBI preferences, U.S. imports from 15 independent Caribbean nations (excluding Cuba) totaled more than $12 billion in 2004.[12]

The CBI has proven to have important benefits for the United States as well as the beneficiary countries.  U.S. exports to the Caribbean totaled more than $10 billion in 2004, concentrated in four countries.[13]  Counting all 24 CBI beneficiaries, including Central American countries, U.S. exports totaled $24.5 billion, making them collectively America's eighth largest export market – a little smaller than South Korea.[14]

U.S. engagement with the Caribbean region through the CBI offers an important opportunity to foster the region's active participation in the Free Trade Area of the Americas (FTAA).[15]  U.S. policy aims eventually to construct a network of reciprocal free trade relations among all 34 democracies in the Western Hemisphere.  The most generous CBI benefits will expire in September 2008 for countries that have not established reciprocal trade agreements with the United States.[16]  Though they may have varying interests, all Caribbean nations with the exception of Cuba are participating in FTAA negotiations.[17]  In addition, last year the Dominican Republic signed the Central American Free Trade Agreement (CAFTA) with the United States, Costa Rica, El Salvador, Guatemala, Honduras, and Nicaragua.

As the United States has entered into other trade agreements, such as with Andean and African nations, the value of CBI trade preferences has eroded.  The loss of trade preferences for key crops such as bananas and sugar has also contributed to decreased economic growth throughout the eastern Caribbean region.[18]  Relative benefits to CBI countries are expected to erode further as investors and businesses relocate to Central America to take advantage of CAFTA.

---

[11] Fifth Report to Congress on the Operation of the Caribbean Basin Economic Recovery Act, Office of the United States Trade Representative, December 31, 2003, www.ustr.gov/assets/Trade_Development/Preference_Programs/CBI/asset_upload_file160_7711.pdf.
[12] "Caribbean Region:  Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.
[13] The Dominican Republic, Trinidad and Tobago, Jamaica, and the Bahamas accounted for 80 percent of U.S. exports to Caribbean nations.  "Caribbean Region:  Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.
[14] U.S. International Trade Commission, Interactive Tariff and Trade DataWeb, July 2005, http://dataweb.usitc.gov.
[15] The 34 democratically elected leaders in the Western Hemisphere committed to the FTAA in December 1994 at the first Summit of the Americas.  In 2003, Ministers agreed on a new framework for the FTAA that calls for the creation of a "common set of rights and obligations" applicable to all countries and allows countries to pursue additional commitments through agreements under the umbrella of the FTAA.  Free Trade Area of the Americas, Office of NAFTA and Inter-American Affairs, www.mac.doc.gov/ftaa2006/index.html.
[16] Caribbean Basin Initiative, Office of the United States Trade Representative, www.ustr.gov/Trade_Development/Preference_Programs/CBI/Section_Index.html.
[17] "Caribbean Region:  Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.
[18] U.S. Agency for International Development, Fiscal Year 2006 Budget Summary, Complete U.S. AID/Caribbean Regional Program, www.usaid.gov/policy/budget/cbj2006/lac/pdf/crp_complete05.pdf.

[APG]

Direct U.S. Aid Varies

The United States provides direct foreign assistance to Caribbean nations, but it is concentrated in a few countries and the amounts vary considerably.[19] Over the 1980s, U.S. assistance to the region averaged about $320 million a year, most of it for the Dominican Republic, Jamaica, and Haiti. In the 1990s, this assistance declined to about $205 million a year, with Haiti receiving more than half the total. Since 2000, U.S. aid to the region has again increased because of greater HIV/AIDS assistance, assistance in the aftermath of several hurricanes and tropical storms in 2004, and support for the interim government in Haiti.

The Third Border Initiative receives a small amount of funding -- $6 million in the Administration's budget request for fiscal year 2006. Total military assistance to the region amounted to less than $60 million during the 1990s.[20] Operation Enduring Friendship, a new military assistance program designed to increase maritime security in the region, also is funded on a small scale.

Private Investment Is Crucial

In addition to trade preferences and direct government aid, the U.S. has a history of providing incentives for private development in the region, as is discussed further below. As a result of government incentives and the area's strengths for attracting business, U.S. investors have been a significant source of foreign direct investment in the region. According to the U.N. Economic Commission for Latin America and the Caribbean, the United States has accounted for about one-third of all recent foreign investment there.[21]

A number of factors will make maintaining this strong investment presence both more challenging and more crucial in the years ahead.

---

[19] "Caribbean Region: Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf, for all foreign assistance data.

[20] In 2003, the Administration ended military assistance to several nations because they did not sign agreements to exempt Americans from International Criminal Court (ICC) prosecution (known as Article 98 agreements). "Caribbean Region: Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.

[21] Economic Commission for Latin America and the Caribbean (ECLAC), Foreign Investment in Latin America and the Caribbean -- 2004, March 2005.

[APG]

CONFIDENTIAL

> *"The Caribbean is at a development crossroads. Decades of reliance on traditional markets, and on trade preferences, have given way to a new reality, where traditional agriculture plays a much smaller role in most economies, and where a much harsher and more competitive international wind blows. In such an environment, business as usual will no longer suffice."*
>
> "A Time To Choose"
> 2005 World Bank Report

**3. Caribbean economies have performed reasonably well, but slower growth and other challenges threaten their future performance.**

Caribbean Basin countries have performed reasonably well on a number of economic measures, though some have fared much better than others. The region was hard hit in the wake of the September 11 attacks because of its dependence on tourism. It has since rebounded, but a myriad of challenges threatens the region's future prosperity. Already there is evidence that economic performance is slowing down.

<u>Caribbean Economies Have Performed Reasonably Well</u>

Overall, macroeconomic performance in the region has been comparable or better than the rest of the emerging market world.[22] As has been the case in many emerging economies, inflation has fallen from previous high levels. Inflation averaged 16 percent from 1990 to 1997; it fell to 6.5 percent from 1998 to 2003.[23]

Nevertheless, the standard of living in these nations is not high. In 2002, nearly 36 percent of the population in Latin America and the Caribbean lived below the poverty line -- the same portion as a decade before.[24] The extent of poverty varies significantly, from 12 percent of the population in Antigua & Barbuda to 80 percent in Haiti (see Appendix 1). This compares to a 12 percent poverty rate in the United States in 2004.[25] The Caribbean region's out-migration rate of college-educated people is among the

---

[22] The Caribbean economies have recently been analyzed extensively. See "A Time to Choose: Caribbean Development in the 21st Century, World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf, and "Stabilization, Debt, and Fiscal Policy in the Caribbean," Ratna Sahay, International Monetary Fund, February 2005, www.imf.org/external/pubs/ft/wp/2005/wp0526.pdf.

[23] "Stabilization, Debt, and Fiscal Policy in the Caribbean," Ratna Sahay, International Monetary Fund, February 2005, www.imf.org/external/pubs/ft/wp/2005/wp0526.pdf.

[24] Danny M. Leipziger, "The Unfinished Poverty Agenda: Why Latin America and the Caribbean Lag Behind," *Finance and Development*, International Monetary Fund, March 2001, http://www.imf.org/external/pubs/ft/fandd/2001/03/.

[25] "The World Factbook," Central Intelligence Agency, 2005, www.cia.gov/cia/publications/factbook/geos/us.html.

[APG]

RECEIVER527-00226715

**APP000211**

highest in the world.[26]  The prevalence of HIV/AIDS in the Caribbean region is second only to Sub-Saharan Africa.[27]

The single best indicator of living standards is per capita Gross Domestic Product (GDP), which measures output divided by population.  Per capita GDP in Caribbean counties grew about 2 percent annually in the 1990s as shown in Table 1.

Over the full 40-year period, the economies of the region have grown at an average rate per capita of 2.6 percent.  At this rate, living standards double in less than 30 years.  By international standards of emerging markets this is about average.  Southern and eastern Asia have grown more rapidly, while Latin America has grown slower.  The differences have been even greater recently.

### Table 1

**Caribbean Nations Have Had Moderate Economic Growth
With Significant Variation Among Countries**
(Growth in Per Capita GDP)

| | 1960s | 1970s | 1980s | 1990s | Average |
|---|---|---|---|---|---|
| **Region** | | | | | |
| **Caribbean** | 2.3 | 3.9 | 2.2 | 1.9 | 2.6 |
| **Latin America plus Caribbean** | 2.4 | 3.3 | -0.2 | 1.2 | 1.7 |
| **Southern and Eastern Asia** | 1.8 | 5.0 | 5.7 | 6.2 | 4.7 |
| | | | | | |
| **Selected Countries** | | | | | |
| **Barbados** | 6.0 | 3.0 | 1.9 | 0.5 | 2.8 |
| **Belize** | 2.2 | 4.4 | 2.8 | 3.5 | 3.2 |
| **Haiti** | -1.3 | 1.8 | -1.5 | -3.2 | -1.1 |
| **Trinidad and Tobago** | 3.5 | 3.5 | -2.5 | 2.2 | 1.7 |

Source:  "A Time to Choose: Caribbean Development in the 21st Century," World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf.

The average performance of the region masks large variations among nations.  Per capita GDP ranges from about $500 in Haiti to more than $18,500 in Aruba, as shown in Appendix 1.  By contrast, GDP per capita in the United States was $40,100 in 2004,[28] more than double the highest of the Caribbean nations.  Unlike its neighbors, Haiti started

---

[26] Michelle Lapointe, "Diasporas in Caribbean Development," Report of the Inter-American Dialogue and the World Bank, August 2004, www.thedialogue.org/publications/country_studies/caribbean/diasporas.pdf.

[27] "Health in Latin America and the Caribbean," U.S. AID, www.usaid.gov/locations/latin_america_caribbean/issues/health_issue.html.

[28]"The World Factbook," Central Intelligence Agency, 2005, http://www.cia.gov/cia/publications/factbook/geos/us.html.

[APG]

RECEIVER527-00226716

poor and stayed poor. Haiti's per capita GDP of less than $2 a day is below the generally accepted definition of poverty around the world.

Economic Growth Is Slowing

Economic growth is essential to alleviate poverty and address issues such as out-migration. While the region's past growth has been reasonable, it is slowing. For example, tourism, a key driver of past performance, has declined as the Caribbean faces increasing competition from new markets in Cuba and Central America. More broadly, per capita GDP growth in the region slowed from a peak of 3.9 percent per year in the 1970s to 1.9 percent in the 1990s. The World Bank projects that growth in per capita GDP will average 2 percent per year from 2001 to 2010.[29]

The most important element in the slowing of economic growth has been the slowing of productivity growth. Labor productivity (output per worker) has been mediocre, growing at about 1 percent per year. Total factor productivity, a measure of output relative to all inputs (not just labor) grew by about 2 percent per year in the 1980s and then became essentially flat in the 1990s according to World Bank estimates.[30] The difference between no productivity growth and 2 percent growth adds up. At a 2 percent growth rate, productivity doubles every generation, with ensuing benefits for living standards. For living standards to keep rising in the region, productivity growth will have to increase.

Both labor productivity and total factor productivity matter. That the former is growing slowly suggests slow growth in per capita income; that the latter stopped growing suggests that the region has chosen relatively unproductive capital investments. For per capita income to grow at the 2 percent rate predicted by the World Bank, both measures will have to improve.

Soaring Government Deficits Limit Policy Options

Deficits in the region as a percent of GDP have doubled, from an average of 3 percent (1990 to 1997) to 6 percent (1998 to 2003), and government debt has climbed rapidly. Total public debt reached a regional average of 96 percent of GDP by 2003, up from 67 percent in 1997. As the recent World Bank report explains: "Fourteen Caribbean countries are among the 30 most indebted countries in the world, and this exacts a toll on sustainable growth and worsens expectations about macro instability."[31] Soaring deficits constrain the governments' ability to take a more active role in the economy.

---

[29] "A Time to Choose: Caribbean Development in the 21st Century, World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf.
[30] "A Time to Choose: Caribbean Development in the 21st Century," World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf.
[31] "A Time to Choose: Caribbean Development in the 21st Century, World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf.

[APG]

The traditional U.S. approaches to assisting these countries -- trade preferences and aid -- will be of limited value in today's environment.  Net overseas development assistance relative to GDP has been shrinking – from an average of 6 percent (1990 to 1997) to about 3 percent (1998 to 2002).[32]  Additionally, as trade has become more open, there is little to be gained by giving additional trade preferences.

Looking ahead, U.S. budget realities preclude substantial aid, and the budget realities of the Caribbean nations limit their ability to spend.  Filling these gaps will require participation by the private sector.  That is just as well because spurring productivity growth is best done with private-sector solutions.

---

[32]  "A Time to Choose: Caribbean Development in the 21st Century, World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf.

[APG]

> *"Some of these initiatives, such as Petrocaribe, expand on the policies of previous Venezuelan governments. But now their aim is to cement an anti-American block. This goal has also led Venezuela to seek close ties with countries such as Iran and China. With Mr Castro, Mr Chávez claims to be building an alternative (called ALBA) to the Free Trade Area of the Americas..."*
>
> *The Economist*
> July 28, 2005

## 4.  Unfriendly nations are attempting to exploit economic stress to gain influence in the region.

The United States benefits when the countries in the Caribbean Basin prosper.  In addition to our economic interests, thriving Caribbean countries would be better able to withstand pressure from America's strategic rivals.  Both Venezuela and China, for example, are attempting to use their economic clout to pursue their strategic interests in the Caribbean.

### Venezuela and Cuba Promote Alternatives to U.S. Trade Pacts

Venezuela's President Hugo Chávez, in collaboration with Cuban leader Fidel Castro, is promoting a "Bolivarian Alternative" to the FTAA.  Of the active member states in CARICOM,[33] only Barbados and Trinidad and Tobago declined to participate in the alternative.[34]  Venezuela and Cuba's collaboration is also demonstrated by the 49 trade and development agreements they have signed this year.[35]

Chávez' PetroCaribe is a program of concessionary oil sales to Caribbean nations that is viewed as an attempt to buy influence over a block of votes in international bodies.[36]  Thirteen nations have signed on.[37]  At a recent meeting of the Organization of American States (OAS), U.S. officials reportedly were unable to persuade members to commit the organization to intervene in a member nation's affairs if democracy there faced a serious threat.  They apparently viewed Venezuela as the target of the action.[38]

---

[33] CARICOM's member states are:  Antigua and Barbuda, the Bahamas (member of the Community but not the Common Market), Barbados, Belize, Dominica, Grenada, Guyana, Haiti, Jamaica, Montserrat, St. Kitts and Nevis, Saint Lucia, St. Vincent and the Grenadines, Suriname, and Trinidad and Tobago. "CARICOM Member States," www.jis.gov.jm/special_sections/CARICOMNew/CaricomMemberStates.html.

[34] Carol J. Williams, "Chavez Extends an Oil-Rich Hand to Neighbors," *Los Angeles Times*, September 13, 2005,.

[35] "Venezuelan-Cuban Accords," *Florida Sun-Sentinel*, September 11, 2005, www.sun-sentinel.com/news/local/cuba/sfl-acubabox11sep11,1,7099994.story?ctrack=1&cset=true.

[36] "Using Oil Sales to Spread Revolution," *The Economist*, July 28, 2005, http://www.economist.com/world/la/displayStory.cfm?story_id=4232330.

[37] Carol J. Williams, "Chavez Extends an Oil-Rich Hand to Neighbors," *Los Angeles Times*, September 13, 2005.

[38] Chris Kraul and Paul Richter, "Frustrated U.S. Finds Few Willing to Join Anti-Chavez Coalition," *Los Angeles Times*, September 17, 2005.

[APG]

While U.S. policy seeks to foster a democratic transition in Cuba, Venezuela's oil wealth helps keep the Cuban economy afloat.  The Integral Cooperation Accord signed in October 2000 laid the groundwork for an exchange of Venezuelan oil for Cuban goods and services that has become a lifeline for Cuba.[39]

### China Uses Trade to Isolate Taiwan

China has dramatically increased its trade and investment ties to the Caribbean region, in part to undermine support for Taiwan.  The first China-Caribbean Trade Fair was held in 2005.  China used the occasion to announce "Approved Destination Status" for ten Caribbean nations, which will allow them to attract Chinese tourists.  Notably absent from the list are Belize, St. Kitts-Nevis, St. Vincent & the Grenadines, the Dominican Republic, and Haiti -- countries that maintain diplomatic relations with Taiwan.[40]  Last year, China persuaded Dominica to withdraw its formal recognition of Taiwan in return for more than $100 million in economic assistance; Grenada followed suit this year.[41]

China's exports to Latin America and the Caribbean rose from $5 billion in 1999 to $18 billion in 2004, while imports rose from $3 billion to $22 billion.[42]  Beijing looks to the region as a source of key raw materials, including oil, copper, other minerals and soybeans.  To this end, China has secured trade and investment agreements with Argentina, Brazil, Chile, Cuba and Venezuela.[43]

China's trade with the region remains small by comparison to U.S. trade, but it bears watching.  As U.S. Assistant Secretary of State Roger Noriega recently said, "China's growing presence in the region reflects its growing engagement throughout the world.  It does not necessarily constitute a threat to U.S. interests.  Nonetheless, we remain keenly aware that China's growing economic ties to the [Western] Hemisphere includes a political dimension.  In the meantime, we will continue our historically strong and close ties in the Hemisphere and to advance our agenda by focusing on the pillars identified earlier -- bolstering security, strengthening democracy, promoting prosperity, and investing in people."[44]

---

[39] "Background Note: Cuba," U.S. Department of State, Bureau of Western Hemisphere Affairs, August 2005, www.state.gov/r/pa/ei/bgn/2886.htm
[40] John Collins, "China Poised For Caribbean Tourism," *Puerto Rico Herald*, February 10, 2005, www.puertorico-herald.org/issues2/2005/vol09n06/CBChinaPoised.shtml.
[41] "Dominica severs diplomatic relations with Taiwan," *Caribbean Net News*, March 30, 2004, www.caribbeannetnews.com/2004/03/30/taiwan.htm; "Grenada dumps Taiwan in favour of China," Caribbean Net News, January 21, 2005, www.caribbeannetnews.com/2005/01/21/dumps.shtml
[42] Testimony of Roger F. Noriega, Assistant Secretary of State for Western Hemisphere Affairs before the House Subcommittee on the Western Hemisphere, "China's Influence in the Western Hemisphere," April 6, 2005, wwwc.house.gov/international_relations/109/nor040605.pdf.
[43] R. Evan Ellis, "U.S. National Security Implications of Chinese Involvement in Latin America," Strategic Studies Institute, U.S. Army War College, June 2005, www.strategicstudiesinstitute.army.mil/pdffiles/PUB606.pdf.
[44] Testimony of Roger F. Noriega, Assistant Secretary of State for Western Hemisphere Affairs before the House Subcommittee on the Western Hemisphere, "China's Influence in the Western Hemisphere," April 6, 2005, wwwc.house.gov/international_relations/109/nor040605.pdf.

[APG]

While these efforts do not constitute an immediate threat, they pose long-term concerns that the United States should address now.  The best way to thwart efforts to undermine democracy and U.S. interests in the Caribbean region is to create jobs and help strengthen local economies though private-sector investment.

[APG]

CONFIDENTIAL

RECEIVER527-00226721

**APP000217**

> *"I consider the territory's economic development programme*
> *... a powerful engine that is reshaping the economy of the*
> *U.S. Virgin Islands."*
>
> Marjorie Rawls Roberts
> September 2004

## 5. Providing incentives for investment in the Caribbean promotes U.S. economic and national security interests.

Deteriorating economic conditions in the Caribbean could spill over onto our shores. As President Bush recently said, "Weak and troubled nations export their ills -- problems like economic instability and illegal immigration and crime and terrorism."[45] Traditional approaches will not be sufficient to address the economic challenges facing Caribbean nations. Alternatively, expanding long-standing incentives for private investment in the region would promote economic development and democracy in the region and U.S. national security.

Options to Improve Productivity Growth Are Limited

The key to spurring economic development in the Caribbean is increasing productivity growth, which requires increased investment. Caribbean governments have limited resources to spend for investment, however, because they already are heavily in debt.

U.S. assistance has typically come as a combination of trade preferences and aid. Neither can be relied upon in the current environment. Trade concessions have become widespread, so they no longer provide the same relative benefit to the Caribbean. U.S. budget funds for aid are scarce, and aid may not spur the investments needed to increase productivity. An alternative approach is to expand existing tax incentives designed to promote private investment.

Long-Standing Tradition of Incentives

The United States has a long-standing tradition of using the tax code to encourage investment in the region. For nearly half a century, U.S. tax policy has allowed taxes paid to the U.S. Virgin Islands to offset U.S. tax obligations. In what is known as a mirror system, standard federal tax forms are used to pay taxes to the USVI government. This income is then excluded from income for U.S. federal tax purposes. The obligation to pay federal taxes on the investments is met, yet all the tax funds remain in the local area.

In addition, the U.S. Virgin Islands created a tax incentive to invest in the territory, using the taxing authority granted to it by the U.S. government. Through a program

---

[45] President's Remarks at CEO Summit Closing Session, November 20, 2004, www.whitehouse.gov/news/releases/2004/11/20041120-6.html.

administered by the USVI's Economic Development Commission (EDC), qualified investments are eligible for substantial reductions in taxes. In 2003, approximately 95 USVI companies employing nearly 9,000 people received tax benefits from the EDC. These companies represented a range of sectors including hotels and tourist attractions, manufacturing, transportation, and export service businesses.[46]

<u>USVI Investment Incentives Provide a Model</u>

The tax incentives applicable to USVI investments provide a model for encouraging private investment, creating jobs, and preserving democracy throughout the region. The program imposes requirements and conditions on beneficiaries to ensure that public policy objectives are achieved.[47]

These requirements include:
- A minimum level of capital investment
- Employment of a minimum number of individuals
- Training for management and employees
- Health and retirement plans for employees
- A preference for the purchase of local goods and services

Congress modified the program to ensure that it promotes legitimate economic development in the USVI as part of the Jobs Creation Act of 2004. In response to perceived abuses, Congress tightened requirements relating to who is considered a USVI resident and restricted the type of income that qualifies for benefits. For this type of program to be successful and sustainable, it must achieve its public policy goals and operate without abuses.

<u>Benefits of the USVI Approach</u>

One benefit of using tax incentives instead of direct government aid is that they encourage investment while maintaining the efficiency of market-based solutions. The government is not well equipped to "pick winners." With tax incentives, private investors bring capital to the region and decide how to deploy that capital, control costs, and manage their projects.

In addition, tax incentives are more effective, dollar for dollar, than direct outlays because they provide leverage. A small amount of tax benefit can lead to a significant improvement in return on a project, relative to other projects, causing a switch to the tax-favored investments and generating an inflow of investment that is larger that the original tax expenditure.

---

[46] General Information, United States Virgin Islands Economic Development Authority, www.usvieda.org/EDC/GeneralInfo/general.info.asp.
[47] The USVI government's comments on the Treasury Department's proposed regulations to implement the American Jobs Creation Act of 2004, July 2005 and Marjorie Roberts, "Budget Extends Tax Benefit Periods for Business," *Tax Notes International*, September 6, 2004. Ms. Roberts was former tax counsel to the U.S. Treasury Department.

[APG]

CONFIDENTIAL

Tax incentives for investing in the USVI have succeeded in promoting economic development in the territory. The EDC program has "breathed new life into the Virgin Islands economy," according to the USVI government.[48]

In 2005, PricewaterhouseCoopers (PWC) analyzed the power of the program to achieve its public purpose of stimulating economic development in the region. The study looked at the number of businesses and jobs created, and the income tax revenues produced, by a major component of the program (for Designated Service Businesses).

PWC estimated that the program generated $100 million per year in additional tax revenues for the USVI government. More than 3,600 jobs were created according to the study -- 500 directly and the rest from "multiplier" effects. As the investing companies spend money on office equipment and materials, for example, these suppliers in turn spend money and create jobs.[49]

This program is helping stem the out-migration of skilled labor. "Many of these jobs are going to people who grew up in the U.S. Virgin Islands but left due to the lack of opportunity who are now moving back -- the brain drain reversal -- or to people who would leave without good jobs at home," says Marjorie Rawls Roberts.[50]

According to Roger Dewey, Executive Director of the St. Croix Foundation, because of this program: "People now have an opportunity to have meaningful, well paying employment in the private sector. Until the explosion in the economic development program, that had not been the case. The further development of a Virgin Islander middle class will result in better community governance in the long run."[51]

Expanding these tax incentives to include investments by USVI companies not only in the U.S. Virgin Islands but throughout the region would trigger private capital investment in the region and protect U.S economic and national security interests.

---

[48] The USVI government's comments on the Treasury Department's proposed regulations to implement the American Jobs Creation Act of 2004, July 2005.

[49] PricewaterhouseCoopers, "Economic Impact of H.R. 4520 on U.S. Virgin Islands," January 12, 2005, www.pwc.com/us/eng/tax/wnts/hr4520-virgin-islands.pdf. PWC estimated that the jobs created by this aspect of the program represented 8 percent of the USVI labor force. This may not all be a net increase in employment, as some of these jobs may have been created by bidding workers away from other employment. To do so would have increased wages.

[50] Marjorie Rawls Roberts, "The Case for Economic Incentives," September 2004, www.offshoreinvestment.com.

[51] Marjorie Rawls Roberts, "The Case for Economic Incentives," September 2004, www.offshoreinvestment.com.

[APG]

RECEIVER527-00226724

**Conclusion**

As the United States attempts to foster democracy around the world, we also should take action to strengthen our allies in our backyard.  Caribbean Basin nations are predominantly democracies with strong ties to the United States.  However, these strategically important countries are vulnerable to a wide range of economic and social problems, inroads by unfriendly nations, and natural disasters.

The economies of the Caribbean countries have performed reasonably well, but they still have high levels of poverty.  Economic growth, the key to improving living standards, is slowing.  Investment, whether public or private, is critical to improve productivity and provide the needed economic boost.

Trade preferences have become less effective for promoting economic development as they have become more widespread.  The high debt burdens of these countries preclude major increases in their own public investment, and there are limits to the amount of direct aid the United States is likely to provide.  Even if sufficient aid were feasible, productivity problems are better solved by private investment.

There are strong precedents for the U.S. government to provide incentives to generate greater private investment in the region.  In particular, the tax incentives for investing in the U.S. Virgin Islands have resulted in increased investment and employment in the territory.  Extending similar incentives to investments by USVI companies in other nations along America's Third Border would bolster economic growth and democracy in the region -- and reduce security risks to the United States -- in the years ahead.

[APG]

CONFIDENTIAL

RECEIVER527-00226725

Appendix 1

## Caribbean Basin Initiative Countries*

| Country | Government or Dependency Status | Population | GDP Per Capita 2005 ($US) | Percent of Pop. Below Poverty Line | U.S. Trade Progs and other Alliances | U.S. Imports 2004 ($US) | U.S. Exports 2004 ($US) |
|---|---|---|---|---|---|---|---|
| Anguilla | Overseas territory of the UK | 13,254 | NA | 23 | GSP | 888,108 | 20,837,198 |
| Antigua & Barbuda | Constitutional monarchy with UK-style parliament | 68,722 | 11,593 | 12 | GSP CBERA | 4,366,441 | 125,269,863 |
| Aruba | Parliamentary democracy | 71,566 | 18,588 | NA | CBERA | 1,776,373,462 | 374,432,847 |
| Bahamas | Constitutional parliamentary democracy | 301,790 | 18,548 | NA | CBERA | 637,330,752 | 1,182,066,249 |
| Barbados | Parliamentary democracy; independent sovereign state within the Commonwealth | 279,254 | 10,849 | 14 | GSP CBERA CBTPA | 36,871,668 | 347,578,725 |
| Belize | Parliamentary democracy | 279,457 | 3,987 | 33 | GSP CBERA CBTPA | 107,102,906 | 151,675,421 |
| British Virgin Islands | Overseas territory of the UK; internal self-governing | 22,643 | NA | NA | GSP CBERA | 17,327,074 | 97,693,408 |
| Cayman Islands | Overseas dependency UK | 44,270 | NA | NA | none | 14,818,693 | 399,498,745 |
| Costa Rica | Democratic republic | 4,016,173 | 4,526 | 18 | GSP CBERA CBTPA* CAFTA | 3,332,939,760 | 3,303,742,521 |
| Dominica | Parliamentary democracy; republic within the Commonwealth | 69,029 | 3,944 | 30 | GSP CBERA | 2,882,554 | 35,890,143 |
| Dominican Republic | Representative democracy | 8,950,034 | 2,424 | 25 | GSP CBERA CBTPA* CAFTA | 4,528,420,424 | 4,342,881,839 |
| El Salvador | Republic | 6,704,932 | 2,399 | 36 | GSP CBERA CBTPA* CAFTA | 2,052,615,007 | 1,867,806,415 |
| Grenada | Constitutional monarchy with Westminster-style parliament | 89,502 | 4,325 | 32 | GSP CBERA | 5,101,053 | 69,910,398 |
| Guatemala | Constitutional democratic republic | 14,655,189 | 1,995 | 75 | GSP CBERA CBTPA* CAFTA | 3,154,577,894 | 2,548,252,101 |

[APG]

RECEIVER527-00226726

APP000222

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Guyana | Republic within the Commonwealth | 765,283 | 1,030 | 35 | GSP CBERA CBTPA | 122,667,332 | 135,619,981 |
| Haiti | Elected government | 8,121,622 | 517 | 80 | GSP CBERA CBTPA | 370,666,305 | 663,000,588 |
| Honduras | Democratic constitutional republic | 6,975,204 | 1,086 | 53 | GSP CBERA CBTPA* CAFTA | 3,641,067,296 | 3,076,512,302 |
| Jamaica | Constitutional parliamentary democracy | 2,731,832 | 3,542 | 20 | GSP CBERA CBTPA | 320,304,040 | 1,431,596,126 |
| Montserrat | Overseas territory of the UK | 9,341 | NA | NA | GSP CBERA | 458,994 | 6,055,587 |
| Netherlands Antilles | Autonomous country within the Netherlands; Dutch government responsible for defense and foreign affairs | 219,958 | 16,237 | NA | CBERA | 443,858,386 | 872,640,316 |
| Nicaragua | Republic | 5,465,100 | 871 | 50 | CBERA CBTPA* CAFTA | 990,471,296 | 591,704,850 |
| Panama | Constitutional democracy | 3,039,150 | 4,513 | 37 | GSP CBERA CBTPA | 316,141,696 | 1,820,009,015 |
| St. Kitts & Nevis | Constitutional monarchy with Westminster-style parliament | 38,958 | 10,258 | 31 | GSP CBERA | 41,700,755 | 60,417,268 |
| St. Lucia | Westminster-style parliamentary democracy | 166,312 | 4,658 | 19 | GSP CBERA CBTPA | 14,347,007 | 103,303,535 |
| St. Vincent & Grenadines | Parliamentary democracy; independent sovereign state within the Commonwealth | 117,534 | 4,015 | 33 | GSP CBERA | 4,130,207 | 45,396,474 |
| Suriname | Constitutional Democracy | 438,144 | 2,403 | 70 | GSP | 140,804,365 | 178,561,051 |
| Trinidad & Tobago | Parliamentary democracy | 1,088,644 | 10,881 | 21 | GSP CBERA CBTPA | 5,854,311,208 | 1,207,193,573 |
| Turks & Caicos | Overseas territory of the UK | 20,556 | NA | NA | GSP | 7,275,360 | 137,239,402 |

*The Caribbean Basin Initiative (CBI) includes the Caribbean Basin Economic Recovery Act of 1983 (CBERA); the Caribbean Basin Economic Recovery Expansion Act of 1990 (CBERA Expansion Act), which made CBERA duty-free benefits permanent and added new benefits; and the U.S.-Caribbean Basin Trade Partnership Act of 2000 (CBTPA), which provides NAFTA-parity treatment to certain goods from eligible countries. NAFTA-parity benefits under CBTPA are scheduled to expire on September 30, 2008, or the date, if sooner, on which the Central American Free Trade Agreement (CAFTA), Free Trade Area of the Americas (FTAA), or other free trade agreement enters into force between the United States and a CBTPA beneficiary country. All these countries and territories were listed in CBERA as eligible for designation as beneficiary countries. However, Anguilla, Cayman Islands, Suriname, and Turks & Caicos never requested beneficiary status and therefore are not CBI beneficiaries. U.S. Department of Commerce,

[APG]

Caribbean Basin Initiative, Frequently Asked Questions, http://www.mac.doc.gov/CBI/FAQs/faqcbi-all.htm#Nine; Fifth Report to Congress on the Operation of the Caribbean Basin Economic Recovery Act, Office of the United States Trade Representative, December 31, 2003, www.ustr.gov/assets/Trade_Development/Preference_Programs/CBI/asset_upload_file160_771.pdf.

Generalized System of Preferences (GSP), a program designed to promote economic growth in the developing world, provides preferential duty-free entry for more than 4,650 products from 144 designated beneficiary countries and territories. The GSP program was instituted in 1976 and authorized under the Trade Act of 1974 for a 10-year period. It has been renewed periodically since then, most recently in 2002, when President Bush signed legislation that reauthorized the GSP program through 2006. Generalized System of Preferences, Office of the United States Trade Representative, www.ustr.gov/Trade_Development/Preference_Programs/GSP/Section_Index.html.

Data Sources

Government or Dependency Status: "The World Factbook," Central Intelligence Agency, 2005, www.cia.gov/cia/publications/factbook/index.html.

Population: "The World Factbook," Central Intelligence Agency, 2005, www.cia.gov/cia/publications/factbook/index.html.

GDP Per Capita: GDP from International Monetary Fund, World Economic Outlook Database, September 2005, www.imf.org/external/pubs/ft/weo/2005/01/data/index.htm. GDP for Aruba from "Caribbean Region Profile," 2005, www.caribbeanprofile.com/.

Percent of Population Below Poverty Line: Poverty figures for Anguilla, Belize, Costa Rica, Dominca, Dominican Republic, El Salvador, Grenada, Guatemala, Haiti, Honduras, Jamaica, Nicaragua, Panama, Suriname and Trinidad & Tobago are from the "The World Factbook," Central Intelligence Agency, 2005, www.cia.gov/cia/publications/factbook/index.html. Poverty figures for Antigua & Barbuda, Barbados, Guyana, St. Kitts/Nevis, St. Lucia and St. Vincent/Grenadines are from "A Time to Choose: Caribbean Development in the 21st Century, World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf.

U.S. Trade Programs and other Alliances: U.S. Trade Programs and other Alliances: United States International Trade Commission, Interactive Tariff and Trade DataWeb, July 2005, http://dataweb.usitc.gov/.

U.S. Imports: United States International Trade Commission, Interactive Tariff and Trade DataWeb, July 2005, http://dataweb.usitc.gov/.

U.S. Exports: United States International Trade Commission, Interactive Tariff and Trade DataWeb, July 2005, http://dataweb.usitc.gov/.

[APG]

CONFIDENTIAL

# EXHIBIT KVT-25

APP000225

# America's Third Border



*Protecting National Security*
*By Promoting Private Investment*
*In the Caribbean*

APP000226

# Overview

---

- Because of the Caribbean region's proximity to the United States, its political and economic stability are essential for our national security.

- The United States has a history of trade, aid, and private investment in the region.

- Caribbean economies have performed reasonably well, but slower growth, poverty, and other challenges threaten their future performance.

- Unfriendly nations are attempting to exploit economic stress to gain influence in the region.

- Traditional approaches of trade preferences and aid will not be sufficient to address slower economic growth.

- Expanding existing incentives for investment in the Caribbean would promote U.S. economic and national security interests.

# U.S. National Security Depends on the Political and Economic Stability of Our Neighbors

- Caribbean Basin nations are predominantly democracies with strong ties to the United States.

- They are vulnerable to a wide range of economic and social problems, inroads by unfriendly nations, and natural disasters.

- Because of their proximity to the United States, Caribbean nations could serve as a launching pad for alien smuggling, drug trafficking, and terrorist activity.

- As the United States attempts to spread democracy globally, we should take action to preserve it in our backyard -- the Caribbean region.

APP000228

# The U.S. Has a History of Trade, Aid, and Private Investment in the Caribbean Region

- U.S. trade preference programs have provided duty-free access to the U.S. market for a broad array of products from the region.

  - The Caribbean Basin Initiative is a U.S. program designed to promote economic development in the region.
  - Collectively, the 24 nations benefiting from this initiative were America's 8th largest export destination and 12th largest source of imports in 2004.

- The United States also provides a limited and variable amount of direct government aid to the region.

- The United States has been a significant source of private foreign investment to the region.

APP000229

# The Region Faces Slower Economic Growth, Extensive Poverty, and Soaring Debt

---

- Caribbean economies have performed reasonably well, though some have fared better than others.

- A myriad of challenges threatens the region's future prosperity including diminished productivity growth, extensive poverty, and soaring public debt.

- Economic growth is already slowing.

- Policy options are limited by U.S. and Caribbean budget realities and the diminished value of trade preferences, making private-sector investment necessary to spur economic growth.

APP000230

# Unfriendly Nations Are Exploiting Economic Stress to Gain Influence in the Region

- Venezuela is buying influence with Caribbean nations using subsidized oil sales.

- Venezuela and Cuba are promoting alternatives to U.S. trade pacts.

- China is increasing its presence in the region, using trade and investment to isolate Taiwan.

- Economic growth and jobs are the best way to thwart efforts to undermine democracy and U.S. interests in the Caribbean.

APP000231

# Traditional Approaches Will Not Be Sufficient

- As trade preferences become more widespread, the value they provide to the Caribbean is eroded.

- Because Caribbean countries have among the world's highest debt burdens, major increases in their own public investment are not feasible.

- U.S. budget realities also preclude providing the large amount of direct aid needed.

- Even if sufficient aid were feasible, improving economic growth is better accomplished through private investment.

APP000232

# Expanding Incentives for Investment in the Region Would Promote U.S. Interests

- There are strong precedents for the United States to provide incentives to generate greater private investment in the region.

- Tax incentives for investments in the U.S. Virgin Islands have resulted in increased economic activity and employment in the territory.

- Extending these incentives to investments made by USVI companies throughout the region would bolster economic growth and democracy.

- Stronger Caribbean nations would serve U.S. security interests.

APP000233

# Conclusion

- Because of the Caribbean region's proximity to the United States, its political and economic stability are essential for our national security.

- The United States has a history of trade, aid, and private investment in the region.

- Caribbean economies have performed reasonably well, but slower growth, poverty, and other challenges threaten their future performance.

- Unfriendly nations are attempting to exploit economic stress to gain influence in the region.

- Traditional approaches of trade preferences and aid will not be sufficient to address slower economic growth.

- Expanding existing incentives for investment in the Caribbean would promote U.S. economic and national security interests.

# EXHIBIT KVT-26

APP000235

**From:** Susan Martin [smartin@benbarnesgroup.com]
**Sent:** Tuesday, May 22, 2007 4:03 PM
**To:** Stanford, Allen
**Cc:** Hodge, Julie
**Subject:** A Note from Ben Barnes

Allen –

I'd like to discuss with you the following:

1.    I've been working with Tal Kimmel on a new anti-microbial disinfectant, EnviroDoctor.  This might be something worth your personal attention.  By the way, I find Tal very impressive.

2.    I'd like to suggest a proposed retainer-fee of $135,000 per month for the U.S. Virgin Islands Legislation effort.  I have retained Scott Reed and Mitch Delk, and am paying them $25,000 and $15,000 respectively.  We still owe them for May.  In addition, I'd like to discuss a success-fee for passage of that legislation.

3.    And finally, I've been working with Gene Ramirez, another impressive guy, on the generation of electricity and potable water from sea water, Current-to-Current.  This is another project deserving of your attention.

I am on the ground at 11:30 AM CDT and will call you then.

Best regards.
Ben

CONFIDENTIAL

RECEIVER527-00279187

# EXHIBIT KVT-27

APP000237

From: Stanford, Allen
Sent: Friday, December 07, 2007 11:41 AM
To: Suarez, Yolanda; Davis, James

Yolanda I want you to negotiate a success fee for getting new VI legislation passed in
2008 with Ben Barnes. I know you don't think this is achievable but Ben has assured me if
we get on this and get in front of key folks on the hill it can be accomplished next
year .

Jim we need the language of the new legislation asap and as you and I agreed this would be
your responsibility. We can discuss today.

Yolanda I have been personally paying Ben $265K each month this year.  I think the world
of Ben and know he is very capable but this is too much for what are getting in return.
Ben has said Mitch and others were hired to do Stanford business only which I know is not
the case. Anyway come to me when we meet next week with a proposal for paying Ben's team
for anything beyond a success fee

Last... Yolanda what is the status of our own office in DC? RAS

CONFIDENTIAL

RECEIVER527-00224838

**APP000238**

# EXHIBIT KVT-28

APP000239

**From:** Mitchell Delk [mitchelldelk@comcast.net]
**Sent:** Tuesday, February 19, 2008 11:52 AM
**To:** Suarez, Yolanda
**Subject:** Re: the "story"

I e-mailed Ben and Susan regarding Ben's calendar and availability for a call today, but have not heard from either of them as of this morning. I will follow up with both and let you know what I learn. What will be the best number to reach you today?

----- Original Message -----
**From:** Suarez, Yolanda
**To:** mitchelldelk@comcast.net
**Sent:** Monday, February 18, 2008 4:59 PM
**Subject:** FW: the "story"

Mitch

See Lionel's comments below. Not sure exactly how we are going to orchestrate meeting with Gov. Would be good to have a conference call tomorrow morning if possible with the two of us and Ben. Pls. let me know. Tks for the assistance. YS

**From:** Johnson, Lionel C.
**Sent:** Monday, February 18, 2008 4:55 PM
**To:** Suarez, Yolanda; Conzelman, James
**Cc:** Davis, James
**Subject:** RE: the "story"

Mitch has obviously put serious thought into this. I believe that the case for modernization of USVI tax incentives should be made to advance the foreign policy [versus national security] interests of the United States. This includes the economic revitalization of the region through investment and employment generation in the services sector, and fuller integration of the region into the global economy. We should avoid casting this as an element of the 'global war on terrorism', the argument for which is weaker, and which will have few adherents on the Democratic side of the aisle.

What specific elements of USVI tax modernization do we seek? Ben, or whomever we designate, should be able to clearly articulate what we think is needed in the approach to the governor, and Members of Congress, including Rep. Christianson. Making this a non-Stanford, but rather a pro-USVI investment and development initiative, is central to its credibility and its prospects for gaining traction in Congress.

**From:** Suarez, Yolanda
**Sent:** Monday, February 18, 2008 4:19 PM
**To:** Conzelman, James; Johnson, Lionel C.
**Cc:** Davis, James
**Subject:** FW: the "story"

Jim and Lionel

Forgot to forward this to you guys. Would appreciate your comments. Tks.

**From:** Mitchell Delk [mailto:mitchelldelk@comcast.net]
**Sent:** Thursday, February 14, 2008 3:39 PM

CONFIDENTIAL

RECEIVER527-00224538

**To:** Suarez, Yolanda
**Subject:** the "story"

Yolanda:
Attached is a revised version of the "story". I spent about two hours with John and Jim on Tuesday - both were very engaged. I have also talked with Jori several times over the past two weeks. I think the story is compelling - The Jobs Act was an over-reaction with pernicious impacts on the USVI, fundamental fairness and global economic factors argue for a modernization of the tax incentives, and modernization will bring economic life to the territories and the region - both of strategic interest to the United States. I also talked with Ben who indicated he is ready, willing and able to go talk to the Governor (his relationship with the Congressman from New York would provide an enticing entree) - probably not a bad idea for a non-Stanford employee to initiate the conversation, but clearly your call. If Ben does make the initial overture, I would suggest Jori go with him (she knows and has a relationship with the Governor.) I am also willing to go if you fear the story could become muddled. In any event, take a look at the re-draft and let's talk at your convenience.
M. Delk

CONFIDENTIAL

RECEIVER527-00224539

# EXHIBIT KVT-29

APP000242

**From:** Mitchell Delk [mitchelldelk@comcast.net]
**Sent:** Thursday, February 14, 2008 8:39 PM
**To:** Suarez, Yolanda
**Subject:** the "story"

**Attachments:** USVIGovernor'sStory.doc

Yolanda:
Attached is a revised version of the "story". I spent about two hours with John and Jim on Tuesday - both were very engaged. I have also talked with Jori several times over the past two weeks. I think the story is compelling - The Jobs Act was an over-reaction with pernicious impacts on the USVI, fundamental fairness and global economic factors argue for a modernization of the tax incentives, and modernization will bring economic life to the territories and the region -both of strategic interest to the United States. I also talked with Ben who indicated he is ready, willing and able to go talk to the Governor (his relationship with the Congressman from New York would provide an enticing entree) - probably not a bad idea for a non-Stanford employee to initiate the conversation, but clearly your call. If Ben does make the initial overture, I would suggest Jori go with him (she knows and has a relationship with the Governor.) I am also willing to go if you fear the story could become muddled. In any event, take a look at the re-draft and let's talk at your convenience.

M. Delk

CONFIDENTIAL

RECEIVER527-00224550

**APP000243**

# EXHIBIT KVT-30

APP000244

*USVI Tax Incentives: The Case for Modernization, Without Triggering Abuses*

## The USVI Tax Incentives

1.  The USVI tax incentives were created over 50 years ago to spur economic growth, create jobs, diversify the economy, and enhance the territory's revenues.

2.  By 2004, approximately 100 companies were participating in the EDC program.

3.  Original users of the tax incentives were primarily manufacturers whose products were exported, particularly watch manufacturers.

4.  Several EDC participants, in the absence of IRS regulations (regulations regarding what constituted bona fide USVI residency, what income was treated as USVI source or effectively connected income, and how the Internal Revenue Code would be applied to the USVI), took aggressive interpretations of the USVI tax incentives. Congress reacted by severely restricting eligibility to the program in the Jobs Act - it created tough residency requirements and prohibited benefits from being taken on any income sourced from the United States, even if it was effectively connected or a business activity sanctioned by the USVI government.

5.  As a result, participation is the EDC program has dropped precipitously, with service businesses shrinking by more than 50 percent. (Service businesses are the fastest growing sector in the United States economy.) Consequently, revenues for the territories have fallen and jobs relating to the EDC program have declined. While the Jobs Act was intended to eliminate abusive practices, it went further than necessary according to many observers and has had a "chilling effect" on all businesses which operated in the USVI or those who might have considered the territories for their primary business venue.

## A Changing Economic World

6.  During the past couple of decade, two phenomena occurred that have profoundly transformed world economics. Economies once dominated by manufacturing are now predominantly driven by service-oriented enterprises. Additionally, the world economy, once segregated by distinct geographic regions, now functions without borders in essentially one global marketplace.

7.  The confluence of these events – the globalization of the economy, one dominated by service-providing businesses – makes the USVI tax incentives, which encourage businesses to locate and do business almost exclusively in the territories, an antiquated public policy model. Gone are the days of the local widget maker.

CONFIDENTIAL

8.  The USVI tax incentives must be modernized to reflect these global realities, but accomplished in a manner that avoids the return of past abuses, such as those addressed in the Jobs Act. In that vein, the tough residency requirements embedded in the Act and subsequent regulations and the prohibition on benefits for U.S. sourced income must be preserved.

9.  Even with a modernization of the USVI tax incentives, the original policy objectives would remain paramount and unchanged - creating economic growth, fostering job creation, diversification of the economy, and enhancing the revenue base of the territories. In fact, given the impact on the USVI from the Jobs Act, modernization is a necessity.

10. While a modernization would encourage enterprises operating in the global marketplace to consider operating from the territories, the nexus with the USVI would have to be unambiguous and inseparable. In other words, while a corporation might do business outside the territory's borders, its brain trust, business-decisions apparatus and management of the global business operations would have to be performed in the USVI. In fact, many would argue that the Model Tax Treaty contemplates such a scenario. Fundamental fairness and multiple public policy rationales argue for this type of arrangement applying to global USVI-centric enterprises.

11. Many best-selling books have documented these paradigm-shifting economic trends, such as Thomas Freidman's *The World Is Flat*. Failure to modernize the USVI tax incentives to account for these phenomena would be punitive and would potentially result in the USVI being even more dependent on the United States.

### America's National Security Interest Protected

12. Incentivizing more businesses to operate in and from the USVI ensures the territory's economic viability. Modernization of the USVI tax incentives could be the catalyst that engenders renewed business interest in the islands – reversing the pernicious trend that began after the Jobs Act.

13. Modernized USVI tax incentives can not only serve to foster economic life in the territory, but could potentially catapult the USVI into a position to be the economic engine that drives economic growth in the Caribbean – a region with strategic relevance for the United States. At a minimum, a favorable business environment in the USVI will have salutary and spillover effect on the entire region.

14. As America and its allies fight the threat of terrorism across the globe, we do not want economic instability in our own backyard to present opportunities for the nefarious opportunists to exploit. Hardly a day passes without a reminder of the

CONFIDENTIAL

RECEIVER527-00224552

antics emanating from Venezuela. Cuban remains a tinderbox. China continues to view the Caribbean as a potential strategic partner. It is in our national security interest to have an economically robust Caribbean region – our third border. Without economic stability in the Caribbean, the potential for American's regional strategic interest to be compromised increases and the need for tax dollars to be employed to produce stability in the region increases exponentially.

**Modernization: A Win for Everyone**

15.   Modernization of the USVI tax incentives would result in a compelling win/win/win situation: one, a profound win for the USVI, and potentially the entire Caribbean region, for economic growth and diversification, job creation and an increased revenue base would be the byproduct of a reasonable update; two, a win for enterprises whose business spans the globe and who chose the USVI as their headquarters and operational epicenter; and finally, a win for our national security interest resulting from economic stability and democracy in the Caribbean region and the mitigation for the need to employ federal dollars to ensure our regional objectives are achieved.

CONFIDENTIAL

# EXHIBIT KVT-31

APP000248

```
From: mitchelldelk@comcast.net
Sent: Wednesday, February 27, 2008 3:25 AM
To: Suarez, Yolanda
Subject: Re: good event tonight

Works for me. Both of your staff were at tonight's event.
Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: "Suarez, Yolanda" <YSuarez@StanfordEagle.com>

Date: Tue, 26 Feb 2008 20:47:02
To:<mitchelldelk@comcast.net>
Subject: Re: good event tonight


Mitch

Good to hear about tonight. Looking forward to seeing you on Friday. Is 8am OK for
breakfast?

----- Original Message -----
From: Mitchell Delk <mitchelldelk@comcast.net>
To: Suarez, Yolanda
Sent: Tue Feb 26 19:52:40 2008
Subject: good event tonight
```

Tonight's event went well. Ben and I talked to the Governor for about five to ten minutes.
In a subsequent conversation with him, I had the opportunity to again underscore the need
for and opportunity to modernize the tax incentives, without repealing the Jobs Act. He
understood that the remaining tax opportunity to lure businesses to and enhance revenues
for the USVI was to permit foreign-sourced income (obviously excluding US-sourced income)
to be eligible for the favorable tax treatment. I even had the chance to point out that
the "attributable to" standard (embedded in the Model Tax Treaty) was a way to eliminate
the negative IRS precedents associated with the "effectively connected" standard and its
inexplicable application to service industries. Donna was present – said she missed the
Stanford event because she was not in the islands. I also talked with the lawyers who
represent the USVI. Although it was a brief conversation, they were in agreement with the
approach we are advocating – a policy recommendation I pointed out that is supported by a
myriad of legitimate arguments. I will follow-up with them – history has shown them to be
less than successful on many fronts. In any event, just a quick update.

CONFIDENTIAL

RECEIVER527-00224360

# EXHIBIT KVT-32

APP000250

From: Walker, Kye
Sent: Wednesday, May 09, 2007 4:41 PM
To: Hodge, Julie
Subject: RE: Ben Barnes

Thanks.  Feeling any better?

-----Original Message-----
From: Hodge, Julie
Sent: Wednesday, May 09, 2007 11:36 AM
To: Walker, Kye
Subject: Re: Ben Barnes

Done

----- Original Message -----
From: Walker, Kye
To: Hodge, Julie
Sent: Wed May 09 07:15:29 2007
Subject: Ben Barnes

Hi Julie-


Mr. Stanford asks that you contact Ben Barnes and tell him to stop talking to anyone (I believe he
has spoken to someone at ESPN) about the media rights to Stanford 20/20.


Thanks,


Kye Walker

Senior Executive Assistant

Office of the Chairman

Stanford Financial Group

340.244.6536 mobile

CONFIDENTIAL

# EXHIBIT KVT-33

APP000252

From: Hodge, Julie
Sent: Wednesday, May 09, 2007 2:19 PM
To: 'ben@benbarnesgroup.com'
Cc: 'smartin@benbarnesgroup.com'
Subject: Stanford 2020

Good morning Ben,

Mr. Stanford is requesting that you not speak to anyone else regarding TV Rights/Distribution for the Stanford 2020 Tournament.  We are in the process of reviewing options internally.

Let me know if you have any queries.
Regards

Julie

CONFIDENTIAL

RECEIVER527-00281551

**APP000253**

# EXHIBIT KVT-34

APP000254

From: Stanford, Allen
Sent: Tuesday, December 19, 2006 2:47 AM
To: 'smartin@benbarnesgroup.com'
Cc: Hodge, Julie
Subject: Re: A Request from Ben Barnes

Done.

----- Original Message -----
From: Susan Martin <smartin@benbarnesgroup.com>
To: Stanford, Allen
Cc: Hodge, Julie
Sent: Mon Dec 18 17:07:37 2006
Subject: A Request from Ben Barnes

Allen –


Please overnight the DVD on the highlights of the cricket matches for me to receive Wednesday
morning.  The address to the hotel is as follows:


The Carlyle

35 E. 76th Street

New York, NY  10021

Phn:  212-744-1600


I'll be meeting with the president of ESPN Wednesday.


Ben

CONFIDENTIAL

# EXHIBIT KVT-35

APP000256

**From:** Rhonda Kelly - Kelly Holding Ltd. [rhonda@kellyholding.com]
**Sent:** Friday, June 29, 2007 9:50 PM
**To:** Stanford, Allen
**Cc:** Walker, Kye; 'Laurie-Ann Holding'; Stoelker, Andrea
**Subject:** CUBA
Sir –

Excellent News!  Ben Barnes just called and said that it looks like Cuba will be a go with a few
stipulations and he was also trying to call you to let you know as well.

Basically he was saying their funds would have to be paid in-kind, which should not be a problem
because I would assume this could be done in the form of equipment, facilities etc and possibly
funding a coach etc for them.

Have a great weekend!

Rhonda

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

CONFIDENTIAL

RECEIVER527-00256652

**APP000257**

**From:** Patsy Thomasson [pthomasson@benbarnesgroup.com]
**Sent:** Thursday, June 28, 2007 6:21 PM
**To:** rhonda@kellyholding.com
**Cc:** laurieann@kellyholding.com; Walker, Kye
**Subject:** RE: Stanford 2020

Your so good.  When I sent this to someone else, I said we could rely on everything except your representation that Cuba would not win and use almost the same language you did.

pt

Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

---

**From:** Rhonda Kelly - Kelly Holding Ltd. [mailto:rhonda@kellyholding.com]
**Sent:** Thursday, June 28, 2007 12:49 PM
**To:** Patsy Thomasson
**Cc:** laurieann@kellyholding.com; 'Walker, Kye'
**Subject:** Stanford 2020

Hi Patsy –

I guess in regards to them winning I cannot guarantee they would not win -- I guess ANYTHING is possible.  However they are not traditionally a cricket country and we have teams in the tournament that have some of the best cricketers in the world on them so it is pretty much next to impossible they would be able to win the minimum of 4 matches required to do this.

Let me know if there is anything I can provide in this regard to help with the approval – thanks again.

Rhonda

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

---

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** June 28, 2007 11:32 AM
**To:** rhonda@kellyholding.com
**Subject:** RE: test message

One other thing, Rhonda says that there is no way the Cubans win the first year they play; I am not sure that we can rely on this representation.

CONFIDENTIAL

RECEIVER527-00256653

pt

Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

---

**From:** Rhonda Kelly - Kelly Holding Ltd. [mailto:rhonda@kellyholding.com]
**Sent:** Thursday, June 28, 2007 12:28 PM
**To:** Patsy Thomasson
**Cc:** 'Laurie-Ann Holding'; 'Walker, Kye'
**Subject:** RE: test message

Hi Again Patsy --

Attached is a breakdown showing the prize money and the development funds we discussed.  I hope
this is clear as I tried to make it simple but was converting it from the Government presentation
which is very detailed.

Let me know whatever questions you have either by email or phone.

Thanks so much for your assistance!

Best Regards,

Rhonda

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

---

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** June 28, 2007 10:20 AM
**To:** rhonda@kellyholding.com
**Subject:** test message

Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

CONFIDENTIAL

RECEIVER527-00256654

**APP000259**

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

CONFIDENTIAL

**APP000260**

From: Rhonda Kelly - Kelly Holding Ltd. [rhonda@kellyholding.com]
Sent: Thursday, June 28, 2007 6:14 PM
To: Stanford, Allen; laurieann@kellyholding.com
Cc: Walker, Kye
Subject: RE:

Mr. Barnes is waiting on a call back from the President of ESPN America who is in London
and will let him know who we are already meeting with and advise if we need to meet with
him as well.  Based on the timeframe he is in agreement with chasing all the angles!  He
is going to call me back as soon as he hears from him and let me know.

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

-----Original Message-----
From: Rhonda Kelly - Kelly Holding Ltd. [mailto:rhonda@kellyholding.com]
Sent: June 28, 2007 11:42 AM
To: 'Stanford, Allen'; 'laurieann@kellyholding.com'
Cc: 'Walker, Kye'
Subject: RE:

I just spoke with him and he is in a noisy location so I am to call him back in 20
minutes.

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

-----Original Message-----
From: Stanford, Allen [mailto:AStanford@StanfordEagle.com]
Sent: June 28, 2007 11:09 AM
To: laurieann@kellyholding.com
Cc: rhonda@kellyholding.com; Walker, Kye
Subject:

Laurie Ann call Ben Barnes at 5124151414 he knows the head guy at ESPN out of NY who
happens to be in London presently and can get you in touch with him. He is expecting your
call.

On another note we are aggressively working on the Cuba/US issue. I want Cuba in the
tournament.

Also all payments will go out tmr. RAS

CONFIDENTIAL

RECEIVER527-00256660

APP000261

```
From: Stanford, Allen
Sent: Wednesday, June 27, 2007 4:59 PM
To: Walker, Kye
Subject: Fw:

Also send me the telephone contact info for Susan RAS

----- Original Message -----
From: Stanford, Allen
To: Walker, Kye
Sent: Wed Jun 27 10:57:04 2007
Subject: Re:

Have Susan confirm this to Ben asap

----- Original Message -----
From: Walker, Kye
To: Stanford, Allen
Sent: Wed Jun 27 10:51:28 2007
Subject: RE:

Rhonda has dropped everything to put together a comprehensive package to Ben about next
week's events and why we need Cuba in the tournament-she will send it within the hour.  I
spoke to Susan who will be expecting it then.

-----Original Message-----
From: Stanford, Allen
Sent: Wednesday, June 27, 2007 11:47 AM
To: Walker, Kye; 'rhonda@kellyholding.com'
Subject:

What is going on I talked to both of you over an hour ago and Ben Barnes office has not
been in contact with or received any info on my call to the ESPN pres today. Do it now RAS
```

CONFIDENTIAL

RECEIVER527-00257384

From: rhonda@kellyholding.com
Sent: Thursday, July 05, 2007 8:18 PM
To: Patsy Thomasson
Cc: peteromero@experioradvisory.com; Laurie-Ann Holding; Walker, Kye;
Rhonda Kelly
Subject: Re: state sponsored crickett in Cuba?

Hi Patsy
No problem I will get this done and sent to you right away. Should we say from the outset
a plan to pay these in-kind as opposed to cash? Let me know. Thanks.
Rhonda Kelly
Mobile 345 329 4480

-----Original Message-----
From: "Patsy Thomasson" <pthomasson@benbarnesgroup.com>

Date: Thu, 5 Jul 2007 13:42:33
To:<rhonda@kellyholding.com>
Cc:<peteromero@experioradvisory.com>
Subject: RE: state sponsored crickett in Cuba?


Rhonda, we need to put together a letter application for the Cuban participation in the
tournament.  We could put the payment of the expenses of the Cuban team, the potential
prize winning money, and the development monies all in one "ask" but we think it is
probably cleaner to make two requests; one for the tournament and a different one for the
development costs.

One of the things that will have to be spelled out clearly is who (what is the name of the
entity) is making the payment for the expenses and who is making the check to the prize
winners.  Finally for the second application, for the development, we again will need to
know the grantor of these funds.

Let me suggest that you all put the first draft together and we will polish it before it
goes into the government.

I will send you a web site with directions in a separate e-mail but I think this pretty
much covers what we have to do.  If you have a problem with any of this, please do not
hesitate to call.

pt



Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

-----Original Message-----
From: Rhonda Kelly - Kelly Holding Ltd. [mailto:rhonda@kellyholding.com]
Sent: Tuesday, July 03, 2007 9:40 AM
To: Patsy Thomasson
Cc: 'Laurie-Ann Holding'
Subject: RE: state sponsored crickett in Cuba?

Yes it is all done through the Government.  The department is called INDER
and stands for: Sports, Physical Education and Recreation National
Institution.

CONFIDENTIAL

RECEIVER527-00257425

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com
-----Original Message-----
From: pthomasson@benbarnesgroup.com [mailto:pthomasson@benbarnesgroup.com]
Sent: July 3, 2007 8:03 AM
To: rhonda@kellyholding.com
Subject: Re: state sponsored crickett in Cuba?

Are they government sponsored?
Sent via BlackBerry from Cingular Wireless

-----Original Message-----
From: "Rhonda Kelly - Kelly Holding Ltd." <rhonda@kellyholding.com>

Date: Mon, 2 Jul 2007 20:06:24
To:"'Patsy Thomasson'" <pthomasson@benbarnesgroup.com>
Cc:"'Laurie-Ann Holding'" <laurieann@kellyholding.com>,"'Walker, Kye'"
<KWalker@StanfordEagle.com>
Subject: RE: state sponsored crickett in Cuba?


Hi Patsy,

Yes it does.  They have a youth cricket programme and compete in ICC
(International Cricket Council) Tournaments featuring teams that fall within
the Americas.

Let me know what else you need to know - looking forward to a confirmation.

 Thanks!

Rhonda


Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com


----------------

From:Sent:To:Subject:

          Does this exist at this time?

pt

Patsy L. Thomasson
 Ben Barnes Group
 1215 19th Street, NW
 Washington, DC  20036

 202-467-1613 voice line
 202-467-1625 fax line


CONFIDENTIAL                                            RECEIVER527-00257426


**APP000264**

202-297-8723 cell

CONFIDENTIAL

RECEIVER527-00257427

**APP000265**

July 319, 2009

Mr. Adam Szubin
Director
Office of Foreign Assets Control
Treasury Building Annex
Second Floor
Pennsylvania Avenue and Madison Place, NW
Washington, DC  20220

Dear Mr. Szubin

In the past few weeks, we have had visits with representatives of the State Department and a representative of the Office of Foreign Assets Control relative to our desire to have Cuba participate in the January 2008 Stanford 20/20 Caribbean Cricket Tournament.  They suggested that we seek a license from your office to facilitate these activities as they relate to Cuba.  Based on their suggestions and our understanding of the policies and regulations, we have tried to provide herein all of the data pertinent to the 2008 tournament, and moreover, our long term commitment to cricket in the Caribbean and it being a catalyst for a resurgence of love for the game and its return to the glory days.

Cricket is to the Caribbean as football was to the State of Texas when I was growing up.  At Stanford 20/20, we see West Indies cricket as an almost tangible force that can be utilized to unify an entire country, and entire group of people, and potentially the entire Caribbean Basin.  Not unlike little league baseball in America, we know and understand that for the sport to prosper we need a new approach; we need to provide an environment for young, talented, up-and-coming players that will keep them motivated and interested in developing their careers.

To build and enhance this atmosphere, we are providing support in a number of ways to all of the countries who are participating in the Stanford 20/20 Cricket tournament.  We have constructed a world class cricket stadium and complex in St. Johns, Antigua.  It serves as the centerpiece of cricket activity in Antigua.

CONFIDENTIAL

RECEIVER527-00279066

With regard to the January 2008 Stanford 20/20 Cricket Tournament, we propose that all participating teams be treated in the same manner.  The tournament will bear all travel costs, the uniforms costs, and equipment associated with and used in the tournament by all participating teams.  All items will be provided in-kind and go directly to the teams and players.  Stanford 20/20 proposes to treat the Cuban team in the same manner as all other participating teams and players pending a green light on the license request.

The tournament will feature twenty-one Caribbean teams vying for a million dollar US cash prize for first place in the single elimination tournament and $500,000 US to the second place team.  There are also prizes of US$25,000 and US$10,000 for Man of the Match and Play of the Match in each of the games.  It is our belief some young Cubans are now participating in organized cricket but to date they have not developed an aggressive program such as they have for baseball and boxing.  ~~It is very unlikely that~~Should the Cuban cricket team ~~will~~ or any of its individual players win any prizes~~,~~ ~~; however, in the unlikely event that they do~~in the ~~tournament; the event will be structured so that the Cubans are not winning any monies~~such prizes will be awarded in-kind in lieu of cash so that no actual monies are awarded to the Cuban nationals, as we are mindful of the restrictions on U.S. dollars to the Cuban government.~~ It is our belief some young Cubans are now participating in organized cricket but to date they have not developed an aggressive program such as they have for baseball and boxing.~~

Stanford 20/20 would appreciate very much the opportunity to work with your office to work through all of the necessary steps to be awarded a license to facilitate Cuban participation in the tournament.  This would make the tournament a true Caribbean wide event and the entire region would benefit from the games.

Thank you for your assistance in this regard.  We would be grateful to have the opportunity to meet with you about this project as soon as possible.

Sincerely,


Sir Allen Stanford


CONFIDENTIAL

CONFIDENTIAL

**From:** Walker, Kye
**Sent:** Tuesday, July 31, 2007 2:44 PM
**To:** Hodge, Julie
**Subject:** RE: Treasury Letter

**Attachments:** draft letter to treasury 5 7102007.doc
No problem.  Its attached-if he does a major re-write, it should be passed through Ben Barnes or Pete Romero.  He probably doesn't agree, but they are the ones in contact with the Treasury and know how the letter should be drafted.

---

**From:** Hodge, Julie
**Sent:** Tuesday, July 31, 2007 9:42 AM
**To:** Walker, Kye
**Subject:** Treasury Letter

Can you send me the version of the letter you have just so I can familiarize myself with what needs to be covered….just in case.  Thanks.

CONFIDENTIAL

**From:** Hodge, Julie
**Sent:** Thursday, August 30, 2007 6:27 PM
**To:** Laurie-Ann Holding; rhonda@kellyholding.com
**Subject:** FW: Cuba - Letter to Office of Foreign Assets Control
FYI

---

**From:** Susan Martin [mailto:smartin@benbarnesgroup.com]
**Sent:** Thursday, August 30, 2007 12:44 PM
**To:** Hodge, Julie
**Cc:** Walker, Kye
**Subject:** RE: Cuba - Letter to Office of Foreign Assets Control

Julie --

We have verified that the Treasury Department has in fact received the letter. The request is currently under review, and we plan to visit with the Department after Labor Day at the Department's suggestion.

Susan

---

**From:** Hodge, Julie [mailto:JHodge@StanfordEagle.com]
**Sent:** Thursday, August 30, 2007 11:24 AM
**To:** Susan Martin
**Cc:** Susan Martin; Walker, Kye
**Subject:** FW: Cuba - Letter to Office of Foreign Assets Control
**Importance:** High

Ben/Susan,

We have not received a response from the US Office of Foreign Assets Control to our letter of August 1, copy attached, which was delivered to them on August 3, regarding Cuba's participation in the upcoming Stanford 20/20 Cricket Tournament. Can you follow up with them to see if they received the letter and what the status is? I am noticing that there is not a physical mailing address on the letterhead, just an email address, so perhaps this might be a reason for non-response?

Please advise.

Thanks

Julie

---

**From:** Hodge, Julie
**Sent:** Thursday, August 02, 2007 12:00 PM
**To:** Alvarado, Mauricio; Suarez, Yolanda; Davis, James; ben@benbarnesgroup.com; peteromero@experioradvisory.com
**Subject:** Cuba - Letter to Office of Foreign Assets Control

See attached forwarded at the request of Mr. Stanford, being a letter that was sent via Fedex yesterday to the Office of Foreign Assets Control regarding Cuba's participation in the upcoming Stanford 20/20 Tournament.

Regards

Julie

CONFIDENTIAL

RECEIVER527-00281432

**From:** Walker, Kye
**Sent:** Wednesday, September 05, 2007 8:33 PM
**To:** Hodge, Julie
**Subject:** RE: Cuba
Great!!

---

**From:** Hodge, Julie
**Sent:** Wednesday, September 05, 2007 3:31 PM
**To:** Stoelker, Andrea
**Cc:** Stanford, Allen; Walker, Kye
**Subject:** Cuba

Ben Barnes just called and advise that he got approval from the State Department for Cuba and now it just has to go to Treasury, which he said will go through….and will advise further on that.  But basically wanted you to know that Cuba will be approved.

CONFIDENTIAL

RECEIVER527-00279021

**APP000271**

From: Walker, Kye
Sent: Tuesday, September 18, 2007 10:56 PM
To: Hodge, Julie; 'rhonda@stanford2020.com'; Helguera, Roberto; Lugo,
Denise; Tello, Ana
Cc: 'Bev@Stanford2020.com'; 'laurieann@stanford2020.com'; Stoelker,
Andrea
Subject: Re: Letter for Stanford 20/20 - Translation Needed

Will do

----- Original Message -----
From: Hodge, Julie
To: 'rhonda@stanford2020.com' <rhonda@stanford2020.com>; Helguera, Roberto; Lugo, Denise;
Tello, Ana
Cc: 'Bev@Stanford2020.com' <Bev@Stanford2020.com>; 'laurieann@stanford2020.com'
<laurieann@stanford2020.com>; Walker, Kye; Stoelker, Andrea
Sent: Tue Sep 18 15:55:00 2007
Subject: Re: Letter for Stanford 20/20 - Translation Needed

Kye,

Do you think you can run this by Ben tomorrow while he is in St. Croix just to ensure he's aware
and has no issue? He can also update where we are.

----- Original Message -----
From: Rhonda Kelly <rhonda@stanford2020.com>
To: Helguera, Roberto; Lugo, Denise; Tello, Ana
Cc: 'Bev Sinclair, Stanford 20/20' <Bev@Stanford2020.com>; 'Laurie-Ann Holding'
<laurieann@stanford2020.com>; Walker, Kye; Hodge, Julie; Stoelker, Andrea
Sent: Tue Sep 18 15:08:36 2007
Subject: RE: Letter for Stanford 20/20 - Translation Needed

Thanks Roberto


Kye/Julie – should I send this on to Peter Romero or Ben Barnes office?  I am not sure where we
are with the State Department approval, but I am happy to send this for review since I really want
to get it to them as soon as possible. Let me know.


Rhonda Kelly

Event Director

Stanford 20/20

Office 345 623 8823

Mobile 345 329 4480

www.Stanford2020.com

_____

From: Helguera, Roberto [mailto:RHelguera@StanfordEagle.com]

RECEIVER527-00278962

Sent: September 18, 2007 3:02 PM
To: Lugo, Denise; Rhonda Kelly; Tello, Ana
Cc: Bev Sinclair, Stanford 20/20; Laurie-Ann Holding; Walker, Kye; Hodge, Julie; Stoelker, Andrea
Subject: RE: Letter for Stanford 20/20 - Translation Needed


Rhonda,


Legally I have no objections, although I must make the disclaimer that I am not familiar with the specifics of what the US government requires to clear OFAC regulations on Cuba other than not paying them money. Make sure our external advisors on that matter are ok with the contents of the letter. I would like to see the Spanish translation when it is finished to compare it to the English version. Thank you.


Roberto

------------------------------

From: Lugo, Denise
Sent: Tuesday, September 18, 2007 11:52 AM
To: Rhonda Kelly; Tello, Ana
Cc: 'Bev Sinclair, Stanford 20/20'; 'Laurie-Ann Holding'; Walker, Kye; Helguera, Roberto; Hodge, Julie; Stoelker, Andrea
Subject: RE: Letter for Stanford 20/20 - Translation Needed

Hi Rhonda,

I´ll send you the letter in Spanish this affternoon, works for you?

Regards,

Denise

------------------------------

From: Rhonda Kelly [mailto:rhonda@stanford2020.com]
Sent: Martes, 18 de Septiembre de 2007 12:39 p.m.
To: Lugo, Denise; Tello, Ana
Cc: 'Bev Sinclair, Stanford 20/20'; 'Laurie-Ann Holding'; Walker, Kye; Helguera, Roberto; Hodge, Julie; Stoelker, Andrea
Subject: RE: Letter for Stanford 20/20 - Translation Needed


Hi Denise –


Attached is the letter we need to send off to Cuba per Laurie-Ann's email.  We need to get it

CONFIDENTIAL

RECEIVER527-00278963

translated please?  I told them we would send both the English and Spanish versions.

Also – Kye/Julie can you have Mr. Stanford approve please?  They wanted a very comprehensive letter and this has been done based specifically on what they told us needed to be in it.

Roberto – legal ok???

Thanks!

Rhonda


Rhonda Kelly

Event Director

Stanford 20/20

Office 345 623 8823

Mobile 345 329 4480

www.Stanford2020.com

--------------------------------

From: Laurie-Ann Holding [mailto:laurieann@kellyholding.com]
Sent: September 18, 2007 8:39 AM
To: 'Lugo, Denise'; 'Tello, Ana'
Cc: rhonda@kellyholding.com; 'Bev Sinclair - Kelly Holding Ltd.'
Subject: Letter for Stanford 20/20 - Translation Needed


Hi Denise,


We have a letter we have to get translated for Cuba who are playing in the next 20/20.  Can you assist with getting this done through the person you use in Venezuela and let us know the costs and how to pay from 20/20?


Thanks!

LA


Laurie-Ann Holding

CONFIDENTIAL

RECEIVER527-00278964

Kelly Holding Ltd.

Tel: 345.946.8822

Fax: 345.946.8811

Mobile: 345.329.5000

Email: laurieann@kellyholding.com

Website: www.kellyholding.com

Look out for exciting information on the next Stanford 20/20 Tournament!

CONFIDENTIAL

From: Rhonda Kelly - Kelly Holding Ltd. [rhonda@kellyholding.com]
Sent: Thursday, October 11, 2007 8:13 PM
To: 'Patsy Thomasson'; Hodge, Julie; peteromero@experioradvisory.com
Cc: laurieann@kellyholding.com; Hill, Karen
Subject: RE: Cuba OFAC Letter

Hi Patsy -

As discussed we are not proposing to ever give them any funding as we do with the other
countries. We would like to support their cricket with equipment, coaching etc but that would not
need to happen before they participate in the tournament as we do not want to hold up the most
essential aspect of the programme and that is getting their team to play in the tournament.

Let me know if you need to know anything else - I am in my office and online for the rest of the
day.

Thanks!

Rhonda

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

-----Original Message-----
From: Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
Sent: October 11, 2007 2:00 PM
To: Hodge, Julie; peteromero@experioradvisory.com
Cc: laurieann@kellyholding.com; rhonda@kellyholding.com; Hill, Karen
Subject: RE: Cuba OFAC Letter

Treasury wants to know what we are planning on doing with Cuba regarding support of their
teams like we are doing in the other Caribbean countries. I think the answer is that we are not
proposing to pay them in the same manner because of the law but I would like to make sure
before I call him back.

pt

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC 20036

202-467-1613 office
202-467-1625 fax
202-297-8723 cell

-----Original Message-----
From: Hodge, Julie [mailto:JHodge@StanfordEagle.com]
Sent: Thursday, October 11, 2007 2:57 PM
To: Patsy Thomasson; peteromero@experioradvisory.com
Cc: laurieann@kellyholding.com; rhonda@kellyholding.com; Hill, Karen
Subject: Re: Cuba OFAC Letter

CONFIDENTIAL

RECEIVER527-00278946

Can you email me the question?  Am in a meeting for the nxt hour or so.

----- Original Message -----
From: Patsy Thomasson <pthomasson@benbarnesgroup.com>
To: Hodge, Julie; peteromero@experioradvisory.com <peteromero@experioradvisory.com>
Cc: Laurie-Ann Holding <laurieann@kellyholding.com>; rhonda@kellyholding.com
<rhonda@kellyholding.com>; Hill, Karen
Sent: Thu Oct 11 13:54:43 2007
Subject: RE: Cuba OFAC Letter

Julie, can you call me, I have a question that I need to get an answer for Treasury.


pt


Patsy Thomasson


Ben Barnes Group

1215 19th Street NW

Washington, DC  20036


202-467-1613 office

202-467-1625 fax

202-297-8723  cell

_____

From: Hodge, Julie [mailto:JHodge@StanfordEagle.com]
Sent: Wednesday, October 10, 2007 2:45 PM
To: peteromero@experioradvisory.com
Cc: Patsy Thomasson; Laurie-Ann Holding; rhonda@kellyholding.com; Hill, Karen
Subject: Cuba OFAC Letter


Pete


Further to our conversation, attached is the letter that Allen sent to OFAC.  Please update us as soon as you have any further word from the State Department.  Timing is becoming critical for us to get official approval, as we begin our advertising campaign next week which features Cuba quite prominently, plus we have meetings in Cuba the first week of November to finalize all of the arrangements.

CONFIDENTIAL

RECEIVER527-00278947

Just in the interest of full disclosure, not that I think it will be an issue, there are some payments for travel and accommodation that might be made by a US registered company, but they are not being paid to Cuba, they are being paid directly to the airlines and the hotels etc. No payments whatsoever will be made to Cuba.

Please let me know if you have any queries or if there is anything that you need from us to speed up this process and we look forward to hearing from you shortly.

Regards

Julie

RECEIVER527-00278948

**From:** Rhonda Kelly - Kelly Holding Ltd. [rhonda@kellyholding.com]
**Sent:** Friday, October 12, 2007 10:07 PM
**To:** Hodge, Julie
**Cc:** 'Patsy Thomasson'
**Subject:** RE: questions from Antonio Cabral at Treasury

**Attachments:** letter to US Treasury.pdf

Oops!  More haste less speed -- hope this isn't too late OR he is not easily offended☺

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

**From:** Hodge, Julie [mailto:JHodge@StanfordEagle.com]
**Sent:** October 12, 2007 3:50 PM
**To:** rhonda@kellyholding.com
**Subject:** RE: questions from Antonio Cabral at Treasury

Hey Rhonda, should be Antonio

**From:** Rhonda Kelly - Kelly Holding Ltd. [mailto:rhonda@kellyholding.com]
**Sent:** Friday, October 12, 2007 4:47 PM
**To:** 'Patsy Thomasson'; Hodge, Julie
**Subject:** RE: questions from Antonio Cabral at Treasury

Hi Patsy --

Here you go!

Thanks!

Rhonda

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** October 12, 2007 3:26 PM
**To:** Hodge, Julie
**Cc:** rhonda@kellyholding.com
**Subject:** RE: questions from Antonio Cabral at Treasury

Julie, he wants the information in my e-mail in the form of a letter.  Do you have a problem with me signing on behalf of

CONFIDENTIAL

RECEIVER527-00278923

Stanford 20/20?  He says he is fine with it coming from me.

But If I could get something from Stanford 20/20 quickly, I think that is better but it has to be quick.

pt

pt

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723  cell

---

**From:** Hodge, Julie [mailto:JHodge@StanfordEagle.com]
**Sent:** Friday, October 12, 2007 4:11 PM
**To:** Patsy Thomasson
**Subject:** RE: questions from Antonio Cabral at Treasury

Ok Patsy, just change Alan to Allen.

---

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** Friday, October 12, 2007 3:58 PM
**To:** Hodge, Julie
**Subject:** RE: questions from Antonio Cabral at Treasury

I just talked with Pete Romero and he was fine with it.  I asked if he thought we should be more nuanced and he thought not.

pt

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723  cell

---

**From:** Patsy Thomasson
**Sent:** Friday, October 12, 2007 3:57 PM
**To:** 'Jhodge@stanfordeagle.com'
**Subject:** RE: questions from Antonio Cabral at Treasury

Have not heard from you.  am not sending until I hear from you.

pt

Patsy Thomasson

CONFIDENTIAL

RECEIVER527-00278924

**APP000280**

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723  cell

---

**From:** Patsy Thomasson
**Sent:** Friday, October 12, 2007 3:19 PM
**To:** 'Jhodge@stanfordeagle.com'
**Cc:** 'peteromero@experioradvisory.com'; Susan Martin
**Subject:** questions from Antonio Cabral at Treasury

All, I need for you to look at this at soon as possible.  I want to get this back to Antonio asap.

thanks

pt

Antonio,

    All of the activities for the cricket tournament are organized and supervised by Stanford 20/20 LLC, which is registered in the U. S. Virgin Islands.  Mr. Alan Stanford owns the majority of the company.  All funds for the operations of the cricket activities are funded through Stanford 20/20 LLC.  The banking activities are managed through banks in the U. S. Virgin Islands.

    The management of the Stanford 20/20 cricket activities are directed by foreign nationals through third party contracts.  All cricket matches will happen in Antigua.

    I believe this answers all of your questions from earlier this afternoon.

    Let me know what else I may need to provide you.

pt


Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723  cell

CONFIDENTIAL

RECEIVER527-00278925



12th October 2007

Mr. Antonio Cabral
US Department of Treasury
Treasure Building Annex
Pennsylvania Avenue & Madison Place West
Washington, DC 20220

Dear Mr. Cabral,

Further to your conversations with Patsy Thomasson of Ben Barnes Group this is
to confirm that all of the activities for the Stanford 20/20 cricket tournament are
organized and supervised by Stanford 20/20 LLC, which is registered in the U. S.
Virgin Islands.

Mr. Allen Stanford owns the majority of the company. All funds for the
operations of the cricket activities are funded through Stanford 20/20 LLC. The
banking activities are managed through banks in the U. S. Virgin Islands.

The management of the Stanford 20/20 cricket activities are directed by foreign
nationals through third party contracts. All cricket matches will happen in
Antigua.

Please do not hesitate to contact me if you require any further clarifications.

Sincerely

Rhonda Kelly
Event Director
Stanford 20/20

Stanford 20/20
No. 11 Pavilion Drive ✽ Coolidge ✽ Antigua ✽ West Indies
Tel: 345.623.8823 ✽ Fax: 345.946.8811
Email: info@Stanford2020.com ✽ Web: www.Stanford2020.com

CONFIDENTIAL

RECEIVER527-00278926

APP000282

**From:** Rhonda Kelly - Kelly Holding Ltd. [rhonda@kellyholding.com]
**Sent:** Tuesday, October 16, 2007 9:01 PM
**To:** 'Patsy Thomasson'; Hodge, Julie; peteromero@experioradvisory.com; Hill, Karen
**Cc:** 'Susan Martin'; 'Wyeth Wiedeman'; 'laurieann Holding'
**Subject:** RE: 20/20

Hi Patsy –

Obviously this is something you would best advise us on. From our perspective it would be a nightmare to have to remove them from the tournament at this stage – they are integrated in all the promotional materials and not to mention scheduled to be in the first match. Do you think this is a possibility?

Rhonda

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

---

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** October 16, 2007 1:56 PM
**To:** Hodge, Julie; peteromero@experioradvisory.com; Hill, Karen
**Cc:** rhonda@kellyholding.com; Susan Martin; Wyeth Wiedeman
**Subject:** 20/20

About 20 minutes ago I spoke with Ambassador Pete Romero who asked that I pass the information on to you. This morning Pete reports that he spoke with David McFarland at State Department regarding the Stanford request. State did receive the additional information that we submitted through Treasury (Stanford to Treasury on Friday; Treasury to State on Monday.) State Department has determined that a license is require (which we thought all along). McFarland has committed to Pete that he will try to get all of the sign-offs from the lower levels of State by tomorrow so that it can go to the Assistant Secretary Tom Shannon who will do the final sign off.

Question:

When Shannon has either approved or disapproved, the information will go back to Treasury. The question is whether we want ambassador Romero to raise the question with Assistant Secretary Shannon before he sees it or do we want to continue to let it take a lower profile and believe that it will be okay. The lower level staff was not willing to give Pete a definitive answer about their recommendations.

Alternative to Ambassador Romero asking the question before the information goes to Shannon is to let the request make its way through State without calling any additional information to it and if they do not recommend to Treasury, ask our contacts at Treasury **not** to make a final decision until we can get a firm handle on State's objections and see if we can over come the objections.

Clearly, this is not an easy decision but we think that it would probably be helpful to have Ambassador Romero let Assistant Secretary Shannon know that it is on the way to him through the State Department "chop" process. Just a heads up, not a pressure call.

Julie, Ambassador Romero lands between 3:00 and 4:00 p.m. EST and will call me during this period. We could conference us together to discuss the appropriate next step. What do you think?

pt

---

CONFIDENTIAL

RECEIVER527-00278911

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723  cell

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723  cell

CONFIDENTIAL

RECEIVER527-00278912

APP000284

From: Patsy Thomasson [pthomasson@benbarnesgroup.com]
Sent: Friday, October 26, 2007 3:48 PM
To: rhonda@kellyholding.com; peteromero@experioradvisory.com
Cc: Hodge, Julie; Hill, Karen; Susan Martin; Wyeth Wiedeman; Laurie-Ann
Holding
Subject: RE: 20/20

Rhonda, Pete is right on target with what he said last night or early this morning.

I have e-mails and calls into Treasury again this morning.  Have not gotten any feed back yet but
will stay on top of it today.

thanks

pt

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723  cell

-----Original Message-----
From: Rhonda Kelly - Kelly Holding Ltd. [mailto:rhonda@kellyholding.com]

Sent: Friday, October 26, 2007 12:26 AM
To: peteromero@experioradvisory.com
Cc: 'Hodge, Julie'; Patsy Thomasson; 'Hill, Karen'; Susan Martin; Wyeth Wiedeman; 'Laurie-Ann
Holding'
Subject: RE: 20/20

Thank you very much - my fingers (toes and eyes) are crossed!!

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

-----Original Message-----
From: peteromero@experioradvisory.com
[mailto:peteromero@experioradvisory.com]
Sent: October 25, 2007 11:13 PM
To: rhonda@kellyholding.com
Cc: 'Hodge, Julie'; 'Patsy Thomasson'; 'Hill, Karen'; 'Susan Martin'; 'Wyeth Wiedeman'
Subject: RE: 20/20

Rhonda: We have known that it (the State dep't's advisory opinion) has been at Treasury for two
or three days now. Treasury makes the final determination and then tells us specifically why we
can or cannot do this.  While they do not have to side with State, they usually do, unless State is
split, in which case they are relatively free to take whatever side they choose.  I suspect that
President Bush's recent hardline speech in Miami (against the Castro Regime) is having  an
impact (at least on the quantity of people at State and Treasury that are being consulted on the

RECEIVER527-00278846

issue). Patsy has left several calls and been promised an official response (now overdue). They really should
get back to us at any time now. Pete
            Quoting "Rhonda Kelly - Kelly Holding Ltd."
<rhonda@kellyholding.com>:

> Hi Pete -
>
> Checking in again - anything?  Thanks.
>
> Rhonda
>
> Rhonda Kelly
> Event Director
> Stanford 20/20
> Office 345 623 8823
> Mobile 345 329 4480
> www.Stanford2020.com
>
> -----Original Message-----
> From: peteromero@experioradvisory.com
> [mailto:peteromero@experioradvisory.com]
> Sent: October 19, 2007 10:42 AM
> To: Hodge, Julie
> Cc: Patsy Thomasson; Hill, Karen; rhonda@kellyholding.com; Susan
Martin;
> Wyeth Wiedeman
> Subject: RE: 20/20
>
> All: I have a call into David McFarland at State to see if the papers
> went back to Treasury. Pete     Quoting "Hodge, Julie"
> <JHodge@StanfordEagle.com>:
>
>> Patsy/Pete.....any updates?
>>
>>
>>
>> _____
>>
>> From: Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
>> Sent: Wednesday, October 17, 2007 4:03 PM
>> To: Hodge, Julie; peteromero@experioradvisory.com; Hill, Karen
>> Cc: rhonda@kellyholding.com; Susan Martin; Wyeth Wiedeman
>> Subject: RE: 20/20
>>
>>
>>
>>      I just got off the phone with Peter Romero who is in between
>> speeches and he had just talked with Tom Shannon, the Assistant
>> Secretary of State.
>>
>>      He began by having some discussions that he felt might soften
>> him somewhat before he discussed our issue.
>>
>>      Then he basically went for three points
>>
>> *      Pete provided the background of having been working on this
>> since July when we had our first conversations with State and

Treasury
>> officials in which we made perfect clear to both agencies that we wanted
>> to work with them on this and to make sure that they had what they
>> needed, etc
>>
>> *      He discussed the process and how it really does not allow for
>> our input throughout the process
>>
>> *      Finally he praised them for the work that has been going on in
>> the last ten days but before that we had not had any action so to speak.
>>
>>      Then Pete went through what we are asking with Shannon about how
>> we would be treating the Cubans and the gist of our application.
>>
>>      Shannon told Pete that "sounded like a reasonable request" and
>> that he would find the draft as soon as he got off the phone.
>>
>>      This is encouraging but not/not an answer yet.
>>
>>      We will stay on top of it.
>>
>> pt
>>
>> Patsy Thomasson
>>
>> Ben Barnes Group
>>
>> 1215 19th Street NW
>>
>> Washington, DC  20036
>>
>> 202-467-1613 office
>>
>> 202-467-1625 fax
>>
>> 202-297-8723  cell
>>
>> -----Original Message-----
>> From: Hodge, Julie [mailto:JHodge@StanfordEagle.com]
>> Sent: Tuesday, October 16, 2007 3:22 PM
>> To: Patsy Thomasson; peteromero@experioradvisory.com; Hill, Karen
>> Cc: rhonda@kellyholding.com; Susan Martin; Wyeth Wiedeman
>> Subject: Re: 20/20
>>
>> Let's conference this afternoon.
>>
>>
>>
>> ----- Original Message -----
>>
>> From: Patsy Thomasson <pthomasson@benbarnesgroup.com>
>>
>> To: Hodge, Julie; peteromero@experioradvisory.com

CONFIDENTIAL

RECEIVER527-00278848

APP000287

>> <peteromero@experioradvisory.com>; Hill, Karen
>>
>> Cc: rhonda@kellyholding.com <rhonda@kellyholding.com>; Susan Martin
>> <smartin@benbarnesgroup.com>; Wyeth Wiedeman
>> <wwiedeman@benbarnesgroup.com>
>>
>> Sent: Tue Oct 16 13:55:51 2007
>>
>> Subject: 20/20
>>
>> About 20 minutes ago I spoke with Ambassador Pete Romero who asked that
>> I pass the information on to you.  This morning Pete reports that he
>> spoke with David McFarland at State Department regarding the Stanford
>> request.  State did receive the additional information that we submitted
>> through Treasury (Stanford to Treasury on Friday; Treasury to State on
>> Monday.)  State Department has determined that a license is require
>> (which we thought all along).  McFarland has committed to Pete that he
>> will try to get all of the sign-offs from the lower levels of State by
>> tomorrow so that it can go to the Assistant Secretary Tom Shannon who
>> will do the final sign off.
>>
>>
>>
>> Question:
>>
>>
>>
>> When Shannon has either approved or disapproved, the information will go
>> back to Treasury.  The question is whether we want ambassador Romero to
>> raise the question with Assistant Secretary Shannon before he sees it or
>> do we want to continue to let it take a lower profile and believe that
>> it will be okay.  The lower level staff was not willing to give Pete a
>> definitive answer about their recommendations.
>>
>>
>>
>> Alternative to Ambassador Romero asking the question before the
>> information goes to Shannon is to let the request make its way through
>> State without calling any additional information to it and if they do
>> not recommend to Treasury, ask our contacts at Treasury not to make a
>> final decision until we can get a firm handle on State's objections and
>> see if we can over come the objections.
>>
>>
>>
>> Clearly, this is not an easy decision but we think that it would

CONFIDENTIAL

RECEIVER527-00278849

>> probably be helpful to have Ambassador Romero let Assistant Secretary
>> Shannon know that it is on the way to him through the State
Department
>> "chop" process.  Just a heads up, not a pressure call.
>>
>>
>>
>> Julie, Ambassador Romero lands between 3:00 and 4:00 p.m. EST and
will
>> call me during this period.  We could conference us together to
discuss
>> the appropriate next step.  What do you think?
>>
>>
>>
>> pt
>>
>>
>>
>> Patsy Thomasson
>>
>>
>>
>> Ben Barnes Group
>>
>> 1215 19th Street NW
>>
>> Washington, DC  20036
>>
>>
>>
>> 202-467-1613 office
>>
>> 202-467-1625 fax
>>
>> 202-297-8723  cell
>>
>>
>>
>>
>>
>>
>>
>> Patsy Thomasson
>>
>>
>>
>> Ben Barnes Group
>>
>> 1215 19th Street NW
>>
>> Washington, DC  20036
>>
>>
>>
>> 202-467-1613 office
>>
>> 202-467-1625 fax

CONFIDENTIAL

RECEIVER527-00278850

```
>>
>> 202-297-8723  cell
>>
>>
>>
>>
>
>
>
> --
> Ambassador Peter F. Romero
> Experior Advisory
> peteromero@experioradvisory.com
> 202-776-7723-office
>
>
>


--
Ambassador Peter F. Romero
Experior Advisory
peteromero@experioradvisory.com
202-776-7723-office
```

CONFIDENTIAL

**From:** Patsy Thomasson [pthomasson@benbarnesgroup.com]
**Sent:** Tuesday, October 30, 2007 7:24 PM
**To:** Hodge, Julie
**Subject:** String of e-mails from Antonio today
     Ben wanted to make sure that Mr. Stanford was aware of this string of e-mails today.

     I continue to pursue Mr. Cabral as aggressively as I dare.

pt

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723   cell

---

**From:** Antonio.Cabral@do.treas.gov [mailto:Antonio.Cabral@do.treas.gov]
**Sent:** Tuesday, October 30, 2007 2:23 PM
**To:** Patsy Thomasson
**Subject:** RE: Good Morning

no, unfortunately it wouldn't help. She's already reviewed it.

     -----Original Message-----
     **From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
     **Sent:** Tuesday, October 30, 2007 1:24 PM
     **To:** Cabral, Antonio
     **Subject:** RE: Good Morning

Would it help you if I called Clara David directly?  If you will remember she is the first person that we discussed this application with at Treasury back about the first of August.  I just thought we might consider it since we don't seem to be getting anywhere fast.

Let me know what you think.

pt

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723   cell

---

**From:** Antonio.Cabral@do.treas.gov [mailto:Antonio.Cabral@do.treas.gov]
**Sent:** Tuesday, October 30, 2007 10:27 AM
**To:** Patsy Thomasson
**Subject:** RE: Good Morning

Good morning Patsy,

CONFIDENTIAL

RECEIVER527-00278844

**APP000291**

I don't know what the hold up is with my supervisors...but I will check in with them this afternoon.

Regards,
Antonio

-----Original Message-----
**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** Tuesday, October 30, 2007 10:24 AM
**To:** Cabral, Antonio
**Subject:** Good Morning

Good morning,  I hope today is good for both of us – I look forward to hearing from you at your earliest convenience.

thanks

pt

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723  cell

=0

=0

CONFIDENTIAL

RECEIVER527-00278845

**APP000292**

From: Patsy Thomasson [pthomasson@benbarnesgroup.com]
Sent: Thursday, November 01, 2007 9:32 PM
To: rhonda@kellyholding.com
Cc: Hodge, Julie; Hill, Karen; Susan Martin; Wyeth Wiedeman; Laurie-Ann
Holding
Subject: RE: 20/20

Rhonda and all

    I am sorry that I did not communicate with you all yesterday.
The Treasury Department told us that our application will not be approved for the Cubans to play
in the tournament.

    We do not have an official answer and spokesmen for Treasury say they don't know when
we will have an official answer.  (they are very busy on Rangoon and Iran.)

    Mr. Barnes and Mr. Stanford have spoken and are thinking through next steps.

    If you have any questions, I am glad to try to answer them; Treasury was pretty
discouraging.

    pt

Patsy Thomasson

Ben Barnes Group
1215 19th Street NW
Washington, DC  20036

202-467-1613 office
202-467-1625 fax
202-297-8723  cell


-----Original Message-----
From: Rhonda Kelly - Kelly Holding Ltd. [mailto:rhonda@kellyholding.com]

Sent: Friday, October 26, 2007 12:26 AM
To: peteromero@experioradvisory.com
Cc: 'Hodge, Julie'; Patsy Thomasson; 'Hill, Karen'; Susan Martin; Wyeth Wiedeman; 'Laurie-Ann
Holding'
Subject: RE: 20/20

Thank you very much - my fingers (toes and eyes) are crossed!!

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

-----Original Message-----
From: peteromero@experioradvisory.com
[mailto:peteromero@experioradvisory.com]
Sent: October 25, 2007 11:13 PM
To: rhonda@kellyholding.com
Cc: 'Hodge, Julie'; 'Patsy Thomasson'; 'Hill, Karen'; 'Susan Martin'; 'Wyeth Wiedeman'

CONFIDENTIAL

RECEIVER527-00278754

Subject: RE: 20/20

Rhonda: We have known that it (the State dep't's advisory opinion) has been at Treasury for two or three days now. Treasury makes the final determination and then tells us specifically why we can or cannot do this.  While they do not have to side with State, they usually do, unless State is split, in which case they are relatively free to take whatever side they choose.  I suspect that President Bush's recent hardline speech in Miami (against the Castro Regime) is having  an impact (at least on the quantity of people at State and Treasury that are being consulted on the issue). Patsy has left several calls and been promised an official response (now overdue). They really should
get back to us at any time now. Pete
            Quoting "Rhonda Kelly - Kelly Holding Ltd."
<rhonda@kellyholding.com>:

> Hi Pete -
>
> Checking in again - anything?  Thanks.
>
> Rhonda
>
> Rhonda Kelly
> Event Director
> Stanford 20/20
> Office 345 623 8823
> Mobile 345 329 4480
> www.Stanford2020.com
>
> -----Original Message-----
> From: peteromero@experioradvisory.com
> [mailto:peteromero@experioradvisory.com]
> Sent: October 19, 2007 10:42 AM
> To: Hodge, Julie
> Cc: Patsy Thomasson; Hill, Karen; rhonda@kellyholding.com; Susan
Martin;
> Wyeth Wiedeman
> Subject: RE: 20/20
>
> All: I have a call into David McFarland at State to see if the papers
> went back to Treasury. Pete      Quoting "Hodge, Julie"
> <JHodge@StanfordEagle.com>:
>
>> Patsy/Pete.....any updates?
>>
>>
>>
>> _____
>>
>> From: Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
>> Sent: Wednesday, October 17, 2007 4:03 PM
>> To: Hodge, Julie; peteromero@experioradvisory.com; Hill, Karen
>> Cc: rhonda@kellyholding.com; Susan Martin; Wyeth Wiedeman
>> Subject: RE: 20/20
>>
>>
>>
>>       I just got off the phone with Peter Romero who is in between
>> speeches and he had just talked with Tom Shannon, the Assistant
>> Secretary of State.

CONFIDENTIAL

>>
>>        He began by having some discussions that he felt might soften
>> him somewhat before he discussed our issue.
>>
>>        Then he basically went for three points
>>
>> *      Pete provided the background of having been working on this
>> since July when we had our first conversations with State and Treasury
>> officials in which we made perfect clear to both agencies that we wanted
>> to work with them on this and to make sure that they had what they
>> needed, etc
>>
>> *      He discussed the process and how it really does not allow for
>> our input throughout the process
>>
>> *      Finally he praised them for the work that has been going on in
>> the last ten days but before that we had not had any action so to speak.
>>
>>        Then Pete went through what we are asking with Shannon about how
>> we would be treating the Cubans and the gist of our application.
>>
>>        Shannon told Pete that "sounded like a reasonable request" and
>> that he would find the draft as soon as he got off the phone.
>>
>>        This is encouraging but not/not an answer yet.
>>
>>        We will stay on top of it.
>>
>> pt
>>
>> Patsy Thomasson
>>
>> Ben Barnes Group
>>
>> 1215 19th Street NW
>>
>> Washington, DC  20036
>>
>> 202-467-1613 office
>>
>> 202-467-1625 fax
>>
>> 202-297-8723  cell
>>
>> -----Original Message-----
>> From: Hodge, Julie [mailto:JHodge@StanfordEagle.com]
>> Sent: Tuesday, October 16, 2007 3:22 PM
>> To: Patsy Thomasson; peteromero@experioradvisory.com; Hill, Karen
>> Cc: rhonda@kellyholding.com; Susan Martin; Wyeth Wiedeman
>> Subject: Re: 20/20
>>
>> Let's conference this afternoon.

CONFIDENTIAL

RECEIVER527-00278756

>>
>>
>>
>> ----- Original Message -----
>>
>> From: Patsy Thomasson <pthomasson@benbarnesgroup.com>
>>
>> To: Hodge, Julie; peteromero@experioradvisory.com
>> <peteromero@experioradvisory.com>; Hill, Karen
>>
>> Cc: rhonda@kellyholding.com <rhonda@kellyholding.com>; Susan Martin
>> <smartin@benbarnesgroup.com>; Wyeth Wiedeman
>> <wwiedeman@benbarnesgroup.com>
>>
>> Sent: Tue Oct 16 13:55:51 2007
>>
>> Subject: 20/20
>>
>> About 20 minutes ago I spoke with Ambassador Pete Romero who asked
that
>> I pass the information on to you.  This morning Pete reports that he
>> spoke with David McFarland at State Department regarding the Stanford
>> request. State did receive the additional information that we
submitted
>> through Treasury (Stanford to Treasury on Friday; Treasury to State
on
>> Monday.)  State Department has determined that a license is require
>> (which we thought all along).  McFarland has committed to Pete that
he
>> will try to get all of the sign-offs from the lower levels of State
by
>> tomorrow so that it can go to the Assistant Secretary Tom Shannon who
>> will do the final sign off.
>>
>>
>>
>> Question:
>>
>>
>>
>> When Shannon has either approved or disapproved, the information will
go
>> back to Treasury.  The question is whether we want ambassador Romero
to
>> raise the question with Assistant Secretary Shannon before he sees it
or
>> do we want to continue to let it take a lower profile and believe
that
>> it will be okay.  The lower level staff was not willing to give Pete
a
>> definitive answer about their recommendations.
>>
>>
>>
>> Alternative to Ambassador Romero asking the question before the
>> information goes to Shannon is to let the request make its way
through
>> State without calling any additional information to it and if they do

RECEIVER527-00278757

**APP000296**

>> not recommend to Treasury, ask our contacts at Treasury not to make a
>> final decision until we can get a firm handle on State's objections
and
>> see if we can over come the objections.
>>
>>
>>
>> Clearly, this is not an easy decision but we think that it would
>> probably be helpful to have Ambassador Romero let Assistant Secretary
>> Shannon know that it is on the way to him through the State
Department
>> "chop" process.  Just a heads up, not a pressure call.
>>
>>
>>
>> Julie, Ambassador Romero lands between 3:00 and 4:00 p.m. EST and
will
>> call me during this period.  We could conference us together to
discuss
>> the appropriate next step.  What do you think?
>>
>>
>>
>> pt
>>
>>
>>
>> Patsy Thomasson
>>
>>
>>
>> Ben Barnes Group
>>
>> 1215 19th Street NW
>>
>> Washington, DC  20036
>>
>>
>>
>> 202-467-1613 office
>>
>> 202-467-1625 fax
>>
>> 202-297-8723  cell
>>
>>
>>
>>
>>
>>
>>
>> Patsy Thomasson
>>
>>
>>
>> Ben Barnes Group
>>
>> 1215 19th Street NW

CONFIDENTIAL

```
>>
>> Washington, DC  20036
>>
>>
>>
>> 202-467-1613 office
>>
>> 202-467-1625 fax
>>
>> 202-297-8723  cell
>>
>>
>>
>>
>
>
>
> --
> Ambassador Peter F. Romero
> Experior Advisory
> peteromero@experioradvisory.com
> 202-776-7723-office
>
>
>


--
Ambassador Peter F. Romero
Experior Advisory
peteromero@experioradvisory.com
202-776-7723-office
```

CONFIDENTIAL

From: Hodge, Julie
Sent: Thursday, November 01, 2007 9:41 PM
To: Walker, Kye
Subject: RE: A note from Ben Barnes

Treasury is going to decline Cuba's participation in 20/20.

-----Original Message-----
From: Walker, Kye
Sent: Thursday, November 01, 2007 5:39 PM
To: Hodge, Julie
Subject: Re: A note from Ben Barnes

He hasnt said anything? What is the issue?

----- Original Message -----
From: Hodge, Julie
To: Walker, Kye
Sent: Thu Nov 01 16:28:22 2007
Subject: RE: A note from Ben Barnes

Thank you.  This sucks....has he advised if and when they might get together?

-----Original Message-----
From: Walker, Kye
Sent: Thursday, November 01, 2007 5:08 PM
To: Hodge, Julie
Subject: Fw: A note from Ben Barnes

Fyi-

----- Original Message -----
From: Susan Martin <smartin@benbarnesgroup.com>
To: Stanford, Allen
Cc: Walker, Kye
Sent: Thu Nov 01 16:04:54 2007
Subject: A note from Ben Barnes

Allen –


This is the lawyer who I want you to visit with regarding the cricket issue:

F. Joseph Warin, Esq.
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue NW
Washington, DC  20036-5306
Tel/direct:  202 887-3609
Right Fax: 202 530-9608
Cell:  703 447-4301
Email:  fwarin@gibsondunn.com

Please call me at my office (512-322-0128) or on my cell (512-415-1414 or 512-415-4070).

Ben

CONFIDENTIAL

RECEIVER527-00281345

CONFIDENTIAL

RECEIVER527-00281346

**APP000300**

```
From: Stanford, Allen
Sent: Friday, November 16, 2007 5:44 PM
To: Walker, Kye; Suarez, Yolanda
Cc: Hill, Karen
Subject: Re: Cuba research

Get this done asap RAS

----- Original Message -----
From: Walker, Kye
To: Suarez, Yolanda
Cc: Hill, Karen; Stanford, Allen
Sent: Fri Nov 16 11:07:03 2007
Subject: Cuba research

Hello Yolanda-


Per our conversation yesterday I am following up with what Karen-Mae and I have compiled
thus far.  Let me know whether I should FedEx a hard copy to your office.
```

TO:             Yolanda

FROM:           Karen-Mae and Kye

RE:             Cuba's participation in Stanford 20/20 Tournament

DATE:           November 16, 2007

CC:             Sir Allen

_____

Yolanda-


As you know, the Treasury Department through the Office of Foreign Assets Control denied
the request of Stanford 20/20 to have Cuba participate in next year's tournament.  Mr.
Stanford wants to move forward in the hopes that OFAC will reconsider its denial and allow
Stanford 20/20 to make an oral presentation to OFAC.  In that effort, he seeks to retain
outside counsel to advise Stanford 20/20 on how to proceed with OFAC and advise us of
other strategies available to Stanford 20/20.


Karen-Mae and I have compiled all the written correspondence and have attempted to
memorialize all the other communications with both the State and Treasury Departments.  We
have also chronicled Stanford 20/20's interaction with Cuba thus far to give you an
overall picture of what has occurred.  Our preliminary research of the Cuba Assets Control

CONFIDENTIAL

RECEIVER527-00230134

**APP000301**

Regulations shows that they allow for an oral presentation before OFAC, a reopening of a denial by OFAC and reapplication for a license.  We have also looked into the steps taken by the Major League Baseball and Player's Associations to secure Cuba's participation in the World Baseball Classic held last year in the U.S., Puerto Rico, and Japan.  In doing this research, we have discovered the name of an attorney, Wynn Segall of Akin Gump, who appears to be one of the leading experts on OFAC and economic sanctions and controls.  We have included both his bio and that of Attorney Joseph Warin of Gibson Dunn (referred to us by Ben Barnes), along with two other attorneys for your comment.


Let us know when you are available to discuss.

RECEIVER527-00230135

**From:** Suarez, Yolanda
**Sent:** Friday, November 16, 2007 9:11 PM
**To:** Walker, Kye
**Cc:** Hill, Karen; Stanford, Allen
**Subject:** RE: Cuba research
Kye,

I have reviewed the information you sent. Following are steps that I would recommend:

1. No further letters or requests to OFAC until such time as we have had the benefit of a meeting with counsel on the topic.

2. Based on a review of the bios you forwarded I think we should try to line up a meeting (or at least a teleconference call) with Wynn Seagell ASAP. Akin Gump is an excellent firm.

3.Is there any possiblity that we could get support from the ICC and the West Indies Cricket Board. I do think that having the support of recognized sports bodies would be helpful in any appeal. Additionally, could we get the other regional governments, whose teams will participate, to submit supporting letters? On a very cursory review of the materials related to baseball it is clear that it was a 3 year political battle with pressure coming from international organizations and sports bodies.

4. Would it be possible to explore the possibilty of the Cuban team participating without any support being provided by 20/20 LLC?

5. I did receive a briefing from Ambassador Romero on the matter, but do think it would be worthwhile to get details on exactly he spoke/met with.

As I mentioned to you yesterday when we spoke time is of the essence as next week DC pretty much shuts down. Am available on cell anytime. YS

---

**From:** Walker, Kye
**Sent:** Fri 11/16/2007 11:07 AM
**To:** Suarez, Yolanda
**Cc:** Hill, Karen; Stanford, Allen
**Subject:** Cuba research

Hello Yolanda-

Per our conversation yesterday I am following up with what Karen-Mae and I have compiled thus far. Let me know whether I should FedEx a hard copy to your office.

**TO:**        **Yolanda**

**FROM:**      **Karen-Mae and Kye**

**RE:**        **Cuba's participation in Stanford 20/20 Tournament**

**DATE:**      **November 16, 2007**

**CC:**        **Sir Allen**

_____

Yolanda-

CONFIDENTIAL

RECEIVER527-00226153

**APP000303**

As you know, the Treasury Department through the Office of Foreign Assets Control denied the request of Stanford 20/20 to have Cuba participate in next year's tournament. Mr. Stanford wants to move forward in the hopes that OFAC will reconsider its denial and allow Stanford 20/20 to make an oral presentation to OFAC. In that effort, he seeks to retain outside counsel to advise Stanford 20/20 on how to proceed with OFAC and advise us of other strategies available to Stanford 20/20.

Karen-Mae and I have compiled all the written correspondence and have attempted to memorialize all the other communications with both the State and Treasury Departments. We have also chronicled Stanford 20/20's interaction with Cuba thus far to give you an overall picture of what has occurred. Our preliminary research of the Cuba Assets Control Regulations shows that they allow for an oral presentation before OFAC, a reopening of a denial by OFAC and reapplication for a license. We have also looked into the steps taken by the Major League Baseball and Player's Associations to secure Cuba's participation in the World Baseball Classic held last year in the U.S., Puerto Rico, and Japan. In doing this research, we have discovered the name of an attorney, Wynn Segall of Akin Gump, who appears to be one of the leading experts on OFAC and economic sanctions and controls. We have included both his bio and that of Attorney Joseph Warin of Gibson Dunn (referred to us by Ben Barnes), along with two other attorneys for your comment.

Let us know when you are available to discuss.

CONFIDENTIAL

**From:** Walker, Kye
**Sent:** Friday, November 16, 2007 5:07 PM
**To:** Suarez, Yolanda
**Cc:** Hill, Karen; Stanford, Allen
**Subject:** Cuba research

**Attachments:** Cuba briefing part 1.pdf; Cuba briefing part 2.pdf

Hello Yolanda-

Per our conversation yesterday I am following up with what Karen-Mae and I have compiled thus far.  Let me know whether I should FedEx a hard copy to your office.

TO:          Yolanda

FROM:        Karen-Mae and Kye

RE:          Cuba's participation in Stanford 20/20 Tournament

DATE:        November 16, 2007

CC:          Sir Allen

_____

Yolanda-

As you know, the Treasury Department through the Office of Foreign Assets Control denied the request of Stanford 20/20 to have Cuba participate in next year's tournament.  Mr. Stanford wants to move forward in the hopes that OFAC will reconsider its denial and allow Stanford 20/20 to make an oral presentation to OFAC.  In that effort, he seeks to retain outside counsel to advise Stanford 20/20 on how to proceed with OFAC and advise us of other strategies available to Stanford 20/20.

Karen-Mae and I have compiled all the written correspondence and have attempted to memorialize all the other communications with both the State and Treasury Departments.  We have also chronicled Stanford 20/20's interaction with Cuba thus far to give you an overall picture of what has occurred.  Our preliminary research of the Cuba Assets Control Regulations shows that they allow for an oral presentation before OFAC, a reopening of a denial by OFAC and reapplication for a license.  We have also looked into the steps taken by the Major League Baseball and Player's Associations to secure Cuba's participation in the World Baseball Classic held last year in the U.S., Puerto Rico, and Japan.  In doing this research, we have discovered the name of an attorney, Wynn Segall of Akin Gump, who appears to be one of the leading experts on OFAC and economic sanctions and controls.  We have included both his bio and that of Attorney Joseph Warin of Gibson Dunn (referred to us by Ben Barnes), along with two other attorneys for your comment.

Let us know when you are available to discuss.

CONFIDENTIAL

RECEIVER527-00229951

APP000305

# EXHIBIT KVT-36

APP000306



September 7, 2006

MEMO TO:          Allen Stanford

FROM:             Ben Barnes

SUBJECT:          Political Contributions

Pursuant to our conversation, I spoke with Charlie Rangel, and he suggested that you make individual $2,000 contributions to 12 candidates of his choice.  I will get you the list as quickly as possible.  If you would overnight the checks to me, I can deliver them to Charlie personally.  I would do this myself, but I am maxed out on federal contributions.

I think it is important that we pursue this.  The Democrats have a good chance of taking back the House.  Charlie couldn't have been nicer or more helpful and said to give you his best.  He was so pleased that you are willing to this.

Regarding the Davis memo, I have been able to ascertain that this is a new memo.  We need to find its origin and put a stop to it.  I plan to travel to Washington Sunday and will make this a priority.  I will call you tomorrow or over the weekend to discuss a plan of action.

Best regards.

CONFIDENTIAL

# EXHIBIT KVT-37

APP000308

**From:** Martinez, Vanessa
**Sent:** Friday, March 30, 2007 10:36 PM
**To:** Suarez, Yolanda
**Subject:** FW: Check for Chris Dodd
Hi I scheduled a FEDEX pick at your house tomorrow between 10AM-12PM for the check.
Would you like me to call Emilio and give him the address where it needs to go?
The destination has to be written on the actual airbill when the envelope is picked up.
They will provide you with an envelope.

Thanks

Vanessa L. Martinez
Executive Assistant to the Chief of Staff
Stanford Financial Group
201 South Biscayne Boulevard
12th Floor
Miami, Florida 33131 USA
305.347.2414 Direct
305.347.2421 Fax
vamartinez@stanfordeagle.com

---

**From:** Susan Martin [mailto:smartin@benbarnesgroup.com]
**Sent:** Friday, March 30, 2007 5:16 PM
**To:** Martinez, Vanessa
**Subject:** Check for Chris Dodd

Vanessa –

Please have Yolanda make the check payable to Chris Dodd for President and overnight the check to:

Vince Fralichi
1100 H Street, NW
Suite 940
Washington, DC  20005

Phn:  202-737-3633

Regards,

Susan Martin
Assistant to Ben Barnes
512-322-0128

CONFIDENTIAL

RECEIVER527-00261334

# EXHIBIT KVT-38

APP000310

**From:** Susan Martin [smartin@benbarnesgroup.com]
**Sent:** Monday, July 09, 2007 5:33 PM
**To:** Stanford, Allen
**Cc:** Hodge, Julie
**Subject:** A Note from Ben Barnes regarding B Rapoport's Birthday Party

Allen –

B Rapoport's party begins with cocktails at 6PM July 17 at Jay Rockefeller's home.  If you contribute $50,000, you will be the main sponsor and have a prominent display in the program.

Ben

CONFIDENTIAL

RECEIVER527-00279148

**APP000311**

# EXHIBIT KVT-39

APP000312

**From:** Hodge, Julie
**Sent:** Thursday, August 09, 2007 8:32 PM
**To:** Walker, Kye
**Subject:** FW: B's 90th Birthday Bash

**Attachments:** Sir Allen Stanford.pdf
I gave this to RAS last week but he paid no attention to it.  I don't think he remembered committing to Ben that he would do this.  But attached is an invoice that he pledged to pay, so needs to be added to his list of payments to be made. Ben's office is following up.

---

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** Tuesday, July 31, 2007 5:53 PM
**To:** Hodge, Julie
**Subject:** B's 90th Birthday Bash

    Julie, please find attached correspondence regarding Sir Allen's commitment to B's 90th Birthday Bash.  Mr. Rapoport and the Texas Observer and us, of course, really appreciate Sir Allen's commitment.

    If you need anything else, please let us know.

Thanks

pt


Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

CONFIDENTIAL

RECEIVER527-00281457

# EXHIBIT KVT-40

APP000314

**From:** Susan Martin [smartin@benbarnesgroup.com]
**Sent:** Friday, August 15, 2008 3:23 PM
**To:** Stanford, Allen
**Cc:** Walker, Kye; Hodge, Julie
**Subject:** A Note from Ben Barnes

Allen –

I've tried to call you a couple of times without success.  I wanted to let you know that Charlie Rangel and I are going to the USVI September 5-6.  I have a definite appointment with the Governor either Thursday or Friday, and I want to talk to you before that meeting.

Also, the National Democratic Governors Association is having a meeting in the USVI sometime after the election.  The Governor asked if you would consider being the major sponsor for the event.  I think it's a great opportunity for you.

I need to catch up on a few other things, so I would appreciate a call.  I am traveling to New York today and am reachable on either cell (512-415-4070 or 512-415-1414) or you can call me at the Ritz Carlton (212-308-9100).

I look forward to hearing from you.


Best,
Ben

RECEIVER527-00278576

# EXHIBIT KVT-41

APP000316

**From:** Walker, Kye
**Sent:** Thursday, October 23, 2008 3:29 PM
**To:** Stanford, Allen
**Subject:** $500,000 donation to Democratic Governors Association

I have followed up with Ben Barnes regarding the donation to sponsor the DGA conference in St. Thomas.  The donation may be made with a corporate check payable directly to the DGA (as opposed to Govt of the VI).  The conference begins Friday, November 7th and ends Sunday, November 9th.  The DGA invites you to give remarks at the Chairman's Board Breakfast on Saturday, November 8th between 8 am and 9 am or the Cocktail Reception and Dinner of the same date. The breakfast will have an audience of approx. 50 people consisting of the participating Governors, their staff, and staff of the DGA.  The cocktail reception will have an audience of 300 people consisting of the Governors, staff, other sponsor and various VI govt officials and private sector members.  Please indicate your approval to have a check issued to the DGA for $500,000.

CONFIDENTIAL

# EXHIBIT KVT-42

APP000318

**From:** Blair, Scott
**Sent:** Tuesday, November 04, 2008 8:27 PM
**To:** Kuhrt, Mark
**Subject:** RE: DGA checks
All set.  Kye is picking up the checks at 5.

```
Scott C. Blair, CPA
Accounting Supervisor
Stanford Financial Group Global Management, LLC
340-713-5000 Main
340-713-5052 Direct
340-626-3722 Mobile
340-713-5085 Fax
sblair@stanfordeagle.com
```

--------------------------------------------------------------------------------

**From:** Kuhrt, Mark
**Sent:** Tuesday, November 04, 2008 2:56 PM
**To:** Blair, Scott
**Subject:** Fwd: DGA checks

Follow-up please!

Sincerely,

Mark Kuhrt

Begin forwarded message:

> **From:** "Walker, Kye" <<u>KWalker@StanfordEagle.com</u>>
> **To:** "Kuhrt, Mark" <<u>MKuhrt@StanfordEagle.com</u>>, "St.Remy, Christine"
> <<u>cstremy@stanfordeagle.com</u>>
> **Subject: FW: DGA checks**
>
> Mark-
>
> I have attached 2 invoices for Stanford's sponsorship of the Democratic Governors' Association
> conference in STT this weekend.  Please see RAS's approval of the invoices below.  The checks
> need to be cut asap as the DGA's check is being fedexed.  The Government's check may be hand
> delivered tomorrow.  Please advise as to when the checks will be ready.  Call me if you have any
> questions.
>
> Kye
>
> -----Original Message-----
> From: Stanford, Allen
> Sent: Tuesday, November 04, 2008 2:47 PM
> To: Walker, Kye
> Subject: Re: DGA checks
>
> Yes to both. RAS
>
> ----- Original Message -----
> From: Walker, Kye

CONFIDENTIAL

RECEIVER527-00292048

**APP000319**

To: Stanford, Allen
Sent: Tue Nov 04 12:46:01 2008
Subject: DGA checks

Do I have your approval to request 2 checks totaling $500,000?  Shall I proceed with the alternative plan to have JRT give remarks and attend the policy discussions with Lionel Johnson.  Please advise.

CONFIDENTIAL

RECEIVER527-00292049

APP000320

# EXHIBIT KVT-43

APP000321

```
From: Rodriguez, Lula
Sent: Thursday, January 15, 2009 2:31 PM
To: Walker, Kye
Cc: Johnson, Lionel C.; Conzelman, James
Subject: FW: Any word on the check to the Montana Fund from Mr Stanford?
```

Kye, attached is the response Jim got. I have spoken to Frank Sanchez and am waiting to
hear from him today. I will call him again if I don't hear by noon.

Lula

```
-----Original Message-----
From: Mitchell Delk [mailto:mitchelldelk@comcast.net]
Sent: Thursday, January 15, 2009 7:14 AM
To: Conzelman, James
Cc: kcaperton@benbarnesgroup.com
Subject: RE: Any word on the check to the Montana Fund from Mr Stanford?
```

It was received, not accepted for reason we have discussed, and returned.
They are tying to determine how it was returned (regular mail or FedEx) and if a letter
was included. This was an event that Ben had strongly recommended to Yolanda that Stanford
not participate or offer contributions.
His concern was it would raise issues from the past and he felt that letting "sleeping
dogs lie" would present opportunities in future election cycles (this new Congress). The
contribution, and others, spurred due diligence by the lawyers that unearth the issues
from the past and a ban on accepting the contribution and others - Ben's concern come
true. Hopefully the issues are behind us - a new Chair and staff at the DSCC should help.
If I get further information, I will pass it along.

```
-----Original Message-----
From: Conzelman, James [mailto:JConzelman@StanfordEagle.com]
Sent: Wednesday, January 14, 2009 11:44 PM
To: mitchelldelk@comcast.net
Cc: Rodriguez, Lula
Subject: Any word on the check to the Montana Fund from Mr Stanford?
```

I think you were going to check if it had ever been presented? Was it lost?
It was not returned to RAS. Please let me know asap. Thank you Mitch. Jkc

CONFIDENTIAL

RECEIVER527-00264304

# EXHIBIT KVT-44

APP000323

Stanford Financial's `Family' Tie Fails to Impress University
2006-05-17 00:03 (New York)

By Michael Forsythe and Alison Fitzgerald
    May 17 (Bloomberg) -- R. Allen Stanford, chairman of
Stanford Financial Group, has donated $2.5 million to restore the
home of Stanford University's founder, whom he describes in the
company magazine as a relative.
    If there is a blood connection, though, the California
university doesn't know it. ``We are familiar with Stanford
Financial but are not aware of any genealogical relationship
between Allen Stanford and Leland Stanford,'' says Susan
Weinstein, director of business development and guardian of the
use of the university's name.
    The claimed ties are only one way the Houston-based company,
which says it helps manage and advise on $30 billion in
investments, has burnished its image among investors and in
Washington.
    Among other things, the firm has contributed millions of
dollars to politicians of both parties and allowed them use of
its jets at cut-rate fares. It acquired a Washington research
group employing a former Federal Reserve governor, and high-
yielding certificates of deposit issued by its Antiguan bank have
attracted increasing numbers of affluent U.S. buyers.
    Such steps have helped the firm prosper in the wake of a
run-in with U.S. government officials, who complained that the
firm has exerted too much control over Antiguan regulators.
    ``When you're an offshore banker, you want to make sure that
you're not perceived as a villain,'' said Jack Blum, a lawyer at
Lobel, Novins & Lamont in Washington who specializes in overseas
financial transactions. Allen Stanford ``has been very
aggressive, not only in the political arena but also in hiring
people to tell everybody what a good guy he is.''

Texas Roots

    Stanford, 56, traces his company's roots to his
grandfather's insurance company, founded in the central Texas
town of Mexia in the 1930s. U.S. court records show that his core
business -- the offshore bank -- was formed in 1985 on the
Caribbean island of Montserrat and moved to Antigua in 1990.
    That's where he ran into problems with U.S. investigators.
In 1999, Stanford Financial tried to take over Antiguan
International Business Corp., which regulated offshore companies
on the island, said Jonathan Winer, who was then a deputy
assistant secretary of State. State Department cables sent from
the U.S. Embassy described a ``power grab'' and criticized the
company's hiring of U.S. consultants to revise Antigua's
offshore-banking rules.
    ``The high-powered legal and investigative hired guns from
the U.S. are likely being tasked with cleansing the files to make
sure there is nothing in them that could damage or implicate the
American offshore banker,'' one cable read.

Warning Lifted

    The U.S. advised financial institutions to be suspicious of

CONFIDENTIAL

RECEIVER527-00292073

transactions with Antigua banks, a warning that was lifted in August 2001 after Antigua took steps to fight money laundering. The warning didn't specifically mention Stanford Financial's bank.

Stanford Financial says Allen Stanford ``was asked to serve in an advisory capacity to the government of Antigua and Barbuda'' and hired a ``top-notch team of former U.S. legal and regulatory professionals'' that helped that country adopt anti-money-laundering rules.

That team included several lawyers from the Miami offices of Greenberg Traurig LLP, which represented Stanford Financial at the time.

Since then, Stanford Financial's U.S. business has surged, helped by a team in Baton Rouge, Louisiana, that sells the Antiguan CDs to affluent Americans such as doctors. The company says the team added about $17 million in new deposits in 2003, $150 million in 2004 and had a goal of $250 million for last year, according to a 2004 company video.

### Additional Cachet

In Washington, meanwhile, the company gained additional cachet last year by acquiring Charles Schwab & Co.'s Washington research team, now called Stanford Washington Research Group. The group employs former Federal Reserve Governor Lyle Gramley as senior economic adviser.

In the past six years, Stanford Financial and its employees have made more than $2 million in donations to U.S. political candidates and parties, according to the Federal Election Commission and congressional and Internal Revenue Service records.

Stanford gives to both Democrats and Republicans. Among its top beneficiaries have been former Senator Robert Torricelli, a New Jersey Democrat who left office in 2003 amid ethics allegations, and Republican Representatives Tom DeLay of Texas, who is resigning from Congress next month after having been indicted in a Texas election-fundraising case, and Bob Ney of Ohio, who's under investigation in the scandal involving lobbyist Jack Abramoff. Stanford Financial or its employees have contributed to the legal defense funds of the three lawmakers.

### Company Jets

DeLay's committees paid for flights on Stanford's jets at least 16 times since 2003, including on Oct. 20, the day the former House majority leader was booked in a Houston courthouse on money-laundering charges. Shannon Flaherty, a spokeswoman for DeLay, didn't respond to a request for comment.

Members of the House Caribbean Caucus take annual trips to the region on Stanford's jets. Lawmakers are required to reimburse companies at a first-class commercial rate, which is often a fraction of the actual cost.

``Our relationship with political leaders is and always will be proper, bipartisan and fully disclosed,'' Stanford Financial said in a written response to questions.

The company's in-house magazine, the Stanford Eagle, raises a different sort of relationship with another political leader: Leland Stanford, the 19th century California governor and U.S.

CONFIDENTIAL

senator who, with his wife, founded the university in memory of
their only child, Leland Jr., who died at the age of 15 in 1884.

Family Ties

The company's magazine, published in 2001, quoted Allen
Stanford as saying that his great-great-great-grandfather was
``closely related to'' Josiah Stanford, Leland's father, who was
born in 1795 and lived near Albany, New York. The magazine's
cover featured a photo of Allen Stanford, his father, James, and
former California Governor Gray Davis standing on the steps of
the Stanford Mansion, Leland Stanford's Sacramento home, now part
of a state park used for official functions.
On a promotional video distributed in 2004 as a sales and
information tool for its advisers, Allen Stanford says, ``I am
proud to say that we have been a major financial supporter for
the restoration of the Leland Stanford Mansion in Sacramento,
helping to preserve an important piece of California, and
Stanford family, history.''
The company, in a written response to questions, said, ``It
is clear that Stanford Financial Group has not tried to use a
family link to Leland Stanford to promote the image of the
company.'' It added, ``Our clients are sophisticated, affluent
investors who make their investment decisions based on our
company's current performance, not because of the kinship between
Mr. R. Allen Stanford's great-great-great grandfather and Leland
Stanford's father.''

`Of Swiss Descent'

In its statement, the company cited a book called ``The
History of Stewart County Georgia -- Volume II'' by Sara
Robertson Dixon to establish the family link. In the book,
available at the Library of Congress, Dixon, who died in 1967,
described R. Allen Stanford's great-great-great grandfather
Thomas as being ``closely related'' to Josiah Stanford, though
without saying how. The book said the family ``is said to be of
Swiss descent'' and was named St. Anford, moving to the U.S.
before the American Revolution.
Stanford University archivist Margaret Kimball said Leland
Stanford's family traces its origins to New York and
Massachusetts, where family members settled after migrating from
England, not Switzerland.
``I would probably argue that if the Stanfords, to whom R.
Allen Stanford lays his heritage, are indeed descended as
outlined, then there is probably little connection to our
Stanford and those who hail from Massachusetts and New York,''
Kimball said.

--Editor: Rubin (rxj/jto)

Story Illustration: For more information about Stanford
Financial Group, see the company's Web site:
http://www.stanfordfinancial.com/

To contact the reporters on this story:
Mike Forsythe in Washington (1)(202) 624-1940 or
mforsythe@bloomberg.net

CONFIDENTIAL

Alison Fitzgerald in Washington at (1)(202) 624-1846 or
afitzgerald2@bloomberg.net.

To contact the editor responsible for this story:
Ken Fireman at (1)(202) 624-1978 or kfireman1@bloomberg.net

[TAGINFO]
142238Z US <Equity>

NI BNK
NI TX
NI US
NI FEA
NI CNG
NI EDU
NI POL
NI GOV
NI MMK
NI OFFSHORE
NI ANTIGUA
NI CARIB
NI STATE
NI SEC
NI TRE
NI GOLF
NI TOP


#<698734.251583.2005-11-10T14:40:00.25>#
-0- May/17/2006 04:03 GMT

CONFIDENTIAL

# EXHIBIT KVT-45

APP000328

**From:** Suarez, Yolanda
**Sent:** Monday, May 08, 2006 10:25 PM
**To:** Suarez, Yolanda
**Cc:** Tello, Ana; Hodge, Julie
**Subject:** FW: BLOOMBERG RESPONSE

**Attachments:** STANFORD history.doc

.............................................................................................................................................................................................

**From:** Suarez, Yolanda
**Sent:** Mon 5/8/2006 5:24 PM
**To:** Stanford, Allen
**Subject:** BLOOMBERG RESPONSE

We have discussed this issue and the response below at length with Ben Barnes, Scott Reed and Kent Caperton and they are in agreement.  We will not be releasing this until the following:

1.  Ben's researcher gets additional information on the link between Thomas and Josiah, if possible.
2.  Until you approve.

Additionally, we suggest sending a copy of the 2 pages of the book cited in our response, and a copy of the commercial we aired nationally.

Ben has advised that absolutely under no circumstances should we have Sweeney's office make any calls on our behalf, this would be disastrous.  While I did speak to Sweeney's new Chief of Staff, I did not mention this.

The objective is to release this as early as possible tomorrow to the reporter.   I will be in the air tomorrow morning at 6:00 a.m., landing around 9:30.  YS


**It is the Stanford family's oral history that Thomas Stanford, great-great-great grandfather was closely related to Josiah Stanford, father of Leland Stanford, founder of Stanford University. The Stanford family arrived in New York around the time the Declaration of Independence was signed.  Thomas Stanford moved south to Georgia and Texas, while Josiah Stanford's family moved west to California.  This is history that has been passed along from generation to generation.**

**Birth records from the mid-1700s are too fragmented to confirm the exact relationship, but there is historical documentation that cites the close relationship between Thomas Stanford and Josiah Stanford.  For example, a book "History of Stewart County, Georgia" by Agnew and Marian Clark published in Georgia by A.H. Clark, "Thomas Stanford, Sr., who died in Cuthbert in 1839 was closely related to Oliver Perry and Jeptha Stanford of Stewart County and to Josiah Stanford of New York, father of Leland Stanford, founder of the college in California that bears his name."**

**In 2001, Charles Ansbach, Executive Director of the Leland Stanford Mansion Foundation, solicited a donation from Stanford Financial Group to support the renovation of the Stanford Mansion in Sacramento.  The 2001/2002 edition of both our corporate video and magazine highlight the donation as part of sections that review the Company's corporate giving.  These are the only mentions Mr. Stanford has ever made in marketing materials to his connection to Stanford University.  In contrast, Mr. Stanford refers constantly in meetings with employees, clients and others to his Texas heritage, even highlighting his roots in a recent national television commercial and other marketing materials.  Stanford Financial Group is proud of its**

CONFIDENTIAL

RECEIVER527-00280274

growth in the U.S., where we continue to hire well-known, talented professionals who can provide our clients with a wide range of services.

Our clients are savvy individuals who make investment decisions based on performance records, not because of the relationship between Mr. Stanford's great great great grandfather and Leland Stanford.

CONFIDENTIAL

RECEIVER527-00280275

APP000330

# EXHIBIT KVT-46

APP000331

STANFORD FAMILY – MEXIA, TEXAS HISTORY

| | |
|---|---|
| THOMAS STANFORD SR.- | Died 1839, Georgia.  Arrived in Georgia sometime in the late 1700's, around the time the Declaration of Independence was signed, from the Stanford family which originated in the U.S. in New York state area.  One part of the Stanford New York family migrated South and another migrated West.  Thomas Sr. was closely related by blood to Josiah Stanford, father of Leland Stanford.  He and his wife Keziah were wealthy early settlers of middle Georgia, and acquired a plantation seven miles from Cuthbert, Georgia in 1828.  They had 10 children, one of whom was DAVID ALLEN STANFORD born in 1815. |
| DAVID STANFORD - | Born 1815, Georgia; died 1891, Mexia, TX.  David was born in Georgia, was married and had a son, SIMON ALLEN STANFORD.  His wife subsequently died.  As a widower, following the Civil War, which dessimated the South and destroyed their plantation and property in Georgia, he moved with his son, SIMON ALLEN in  1866/7/8 to central Texas in railroad times, to an unincorporated area in Limestone County now known as Mexia.   David died in Mexia, Texas in 1891 and is buried in the Mexia cemetery. |
| SIMON ALLEN STANFORD - | Born 1846, Georgia;  died 1924, Mexia TX.  Simon Allen Stanford had a son, LODIS B. STANFORD in Mexia, Texas in 1897.  He passed away in 1924 and is buried in the Mexia cemetery. |
| LODIS B. STANFORD - | Born October 1897, died April 1969, Mexia TX.  Lodis was born in Mexia, Texas in 1897 and founded the first Stanford company, Stanford Insurance in 1932.  He had a son, JAMES STANFORD in 1927.  He passed away in 1969 and is buried in the Mexia cemetery. |
| JAMES ALLEN STANFORD - | Born August 30, 1927, Mexia, TX, still living.  James Stanford carried on the Stanford business and had three sons, one of which is  ROBERT ALLEN STANFORD. |
| ROBERT ALLEN STANFORD - | Born 1950, Mexia, TX.  Current Chairman and CEO of the Stanford Financial Group of companies.  R. ALLEN has always been told of his family history.  His great great great grandfather, Thomas Stanford Sr. was closely related by blood to Leland Stanford's father, Josiah Stanford.  Both families originated in New York state. |

CONFIDENTIAL

CONFIDENTIAL

RECEIVER527-00280277

APP000333

# EXHIBIT KVT-47

APP000334

**From:** Hodge, Julie
**Sent:** Wednesday, May 10, 2006 11:09 PM
**To:** Hamm, Suzanne
**Subject:** COMPANY RESPONSE TO BLOOMBERG

**Attachments:** Stanford history - response to Bloomberg.doc; FW: Questions for Stanford Financial for Bloomberg News Story
Suzanne

I am sending this to you via e-mail as your name is listed as the Media Contact Person.  Mr. Stanford has issued a response to Mike Forsythe regarding the e-mail he sent with questions for Stanford, see attached.

I will be Fedexing a package out tonight to you in Memphis with copies of everything that has been sent to him.  Others being copied are:

James Stanford
James Davis
Kelley Hawkins
Yolanda Suarez
Oreste Tonarelli
Juan Rodriguez
Mauricio Alvarado
Ben Barnes
Scott Reed, Ben Barnes Group
Kent Caperton, Ben Barnes Group
Charles Ansbach, Stanford Mansion Foundation


Please let me know if you have any queries.

Julie

CONFIDENTIAL

# EXHIBIT KVT-48

APP000336



May 10, 2006

Mr. Mike Forsythe
Bloomberg News

In response to your e-mail dated May 05, 2006 regarding questions for Stanford Financial for Bloomberg News Story, we provide the following information.

I.

In 2001, Charles Ansbach, Executive Director of the Leland Stanford Mansion Foundation, solicited a donation from Stanford Financial Group to support the renovation of the Stanford Mansion in Sacramento.  R. Allen Stanford and his father James A. Stanford gave a $2,500,000 cash gift in July 2001 to this effort.  The 2001/2002 edition of both our corporate video and magazine mention the donation as part of sections that review the Company's corporate giving.   Mr. Stanford has been asked a few times over the years by reporters and other curious individuals about his relation to Leland Stanford and he has always given the same answer: "It is my understanding that Leland Stanford is a distant relative through my great great great grandfather and Leland Stanford's father" *(see book reference below).*  Mr. Stanford however refers constantly in meetings with employees, clients and others only to his Texas heritage, even highlighting his roots in a recent national television advertising campaign.  Lodis Stanford is clearly and proudly identified as the Founder and inspiration for the Stanford Financial Group of companies in all marketing, promotional and educational material.  Anyone making any statements to the contrary is either grossly misinformed or outright not telling the truth.

In general, it is known that the Stanford family arrived in the Northeast corridor of the US from England in the 1600's and part of the Stanford family migrated south to Georgia around 1795.  The Mexia, Texas portion of the family tree, and relation to Leland Stanford's father Josiah, can trace its roots to Thomas Stanford Sr. son of William and Mary Stanford.

*Taken directly from The History of Stewart County, Georgia – Volume II (Page 1048) by Sara Robertson Dixon, with Family Histories Edited Annotated and Indexed by Agnew Hilsman Clark and Marean Moncrief Clark, which is cataloged in the U.S. Library of Congress –* "Thomas Stanford, Sr., who died in Cuthbert in 1839 was closely related to Oliver Perry and Jeptha Stanford of Stewart County and to Josiah Stanford of New York, father of Leland Stanford, founder of the college in California that bears his name. Thomas Sr., and his wife Keziah were wealthy early settlers of Middle Georgia, living in Morgan and Newton Counties before coming to Randolph Co. in 1828, where they purchased a plantation seven miles from Cuthbert.  He fought in the Indian War of 1836.  After his death in 1839, his widow lived in Alabama with some of her ten children.  Mary lived in Habersham Co., Edward in Newton Co., William in Henry County; Martha Ann in Ala.; Thomas Jr., (1806-1859) Randolph Co.; Nancy m. George Hobbs of Randolph Co.; Elizabeth m. a Mr. Elliott went to Ala.; David to Texas; John to Arkansas; and Keziah. Thomas Stanford Jr., b. Morgan Co., May 15 1806 was reared in Newton Co., where he married Dec. 24, 1835, Elizabeth Phillips of S.C., 5 children born in Randolph County."

[APG]

CONFIDENTIAL



Chronological Stanford family history of Thomas Stanford's son, David and grandson, Simon's departure from Georgia to Texas:

| | |
|---|---|
| **William Stanford -** (Great Great Great Great Grandfather) | Born 1732, Maryland; died 1810, Georgia. Had 7 children, one of whom was Thomas Stanford. |
| **Thomas Stanford Sr. -** (Great Great Great Grandfather) | Born 1761, North Carolina; died 1839, Georgia. He and his wife Keziah were wealthy early settlers of middle Georgia, and acquired a plantation seven miles from Cuthbert, Georgia in 1828. They had 10 children, one of whom was David Allen Stanford, born in 1815. |
| **David Allen Stanford -** (Great Great Grandfather) | Born 1815, Georgia; died 1891, Mexia, TX. David was born in Georgia, was married and had 7 children, one of whom was Simon Allen Stanford. Following the Civil War, which decimated the South and destroyed the Stanford family plantation, he moved with his family, in 1866/7 to central Texas in railroad times, to an unincorporated area in Limestone County near what is now known as Mexia. When Mexia became an incorporated town in 1871 both David and Simon are listed in censuses from that period which reflect the very first settlers of the area. David died in Mexia in 1891 and is buried in the Mexia cemetery. |
| **Simon Allen Stanford -** (Great Grandfather) | Born 1846, Georgia; died 1924, Mexia, TX. Simon Allen Stanford had 12 children, one of whom was Lodis B. Stanford born in Mexia in 1897. Simon Allen passed away in 1924 and is buried in the Mexia cemetery. |
| **Lodis B. Stanford -** (Grandfather) | Born 1897, Mexia, TX; died 1969, Mexia, TX. Lodis had a son James Stanford in 1927. He founded the first Stanford company, Stanford Insurance in Mexia, Texas during the Great Depression in 1932. Lodis also served for about 12 years on the Mexia City Council and during World War II served on various Limestone County boards including the Rations Board and Draft Board. Lodis passed away in 1969 and is buried in the Mexia cemetery. |

[APG]

CONFIDENTIAL

RECEIVER527-00282330



| James Allen Stanford - (Father) | Born 1927, Mexia, TX; still living in Mexia, TX. James Stanford carried on the Stanford business and had three children, one of which is Robert Allen Stanford. James served for 15 years on the Mexia City Council and as Mayor of Mexia for 3 and Mayor Pro Tem for 2 of those years. He also served on the State Mayor's Advisory Committee under Bill Clement's governorship for 2 years. |
| Robert Allen Stanford - (Son) | Born 1950, Mexia, TX. Current Chairman and CEO of the Stanford Financial Group of companies. |

Our clients are sophisticated, affluent investors who make their investment decisions based on our company's current performance not because of the kinship between Mr. R. Allen Stanford's great great great grandfather and Leland Stanford's father.


II.

In regards to the "1999 showdown with State and Treasury over the Antigua banking advisory board" it is well known that Mr. Stanford was asked to serve in an advisory capacity to the Government of Antigua and Barbuda on the drafting of anti-money laundering and regulatory matters in respect to the financial services sector. He assembled a top-notch team of former U.S. legal and regulatory professionals (former FBI, DEA, Customs, U.S. Attorney, Federal Banking oversight, regulatory and exam personnel) who delivered a detailed report on what Antigua and Barbuda should do in order to put in place a first rate regulatory, supervisory and anti-money laundering program through various measures including new legislation. Today, Antigua and Barbuda is regarded as a "model jurisdiction" by the United Nations and has received very favorable ratings from the IMF, CFATF and FATF. Mr. Stanford's role was purely as an advisor to the Government with no authority or powers. He served in this capacity for approximately 14 months.


III.

The Stanford Financial Group of companies worldwide consists of 4 banks, 3 trust companies, a full-service broker dealer, is a registered investment advisor, does institutional investment sales and has a fixed income trading desk. We have merchant banking, investment banking and capital markets divisions, are a market maker, do equity and policy research and provide financial planning and wealth management for high net worth clients globally, all branded under Stanford Private Wealth Management.


[APG]

CONFIDENTIAL

RECEIVER527-00282331

**APP000339**



We have 54 offices in 11 countries with over $30 billion under management or advisement. Our clients number in excess of 90,000 and reside in 102 countries around the world.

One of those companies is Stanford International Bank Ltd. (SIBL), a $4 billion institution that has been serving high net worth clients for over 20 years. Enclosed you will find a support booklet which answers the questions you have posed as to SIBL's operation.

## IV.

As to our success, it has been through working tirelessly day after day with a goal of building the best financial services firm in the world. Mr. Stanford has made a commitment to employ only the best and brightest people in the financial services industry whose work ethic, skills and integrity match Lodis Stanford's founding principles of hard work, clear vision and value for the client, established more than 70 years ago.

The top tier financial advisors in the large securities, investment banking and private banking firms have become frustrated with their working environment and lack of client-focused service. We are having tremendous success bringing them to Stanford and giving them and their clients a client-centered new home with a platform that is entrepreneurial in which to do their business.

## V.

Stanford has developed a Community Investment Model to generate brand awareness and differentiate us from our competitors as we expand our global footprint. Stanford Financial has made a commitment to our employees and to the communities in which we operate to do what we can to strengthen those communities. Each year, we give back to many different organizations and causes. We encourage our employees to give and volunteer. And we manage our clients' assets in such a way that they can, in turn, do good. With each commitment we make, we see dollars invested; we see increased employee volunteerism; we experience word-of-mouth publicity and the reciprocal relationships we build with each nonprofit partner. None of this occurs overnight – it involves a deliberate, measured strategy that takes time – but we know the results of our Strategic Community Investment Model have and will continue to yield long term results. And in order to meet these goals, we look to develop relationships with organizations whose "hearts" are similar to ours.

[APG]

CONFIDENTIAL

RECEIVER527-00282332



Stanford feels strongly that nothing strengthens the community more than healthy children. We are heavily involved with St. Jude Children's Research Hospital. We have named St. Jude as our corporate Charity of Choice partnering with them in all our U.S. markets and in areas where our global footprints coincide – this includes not only the U.S. but Central and Latin America and the Caribbean. Stanford will assume title sponsorship of the PGA Tournament (Fedex St. Jude Classic) in Memphis in 2007. This sponsorship provides global branding, multiple event marketing platforms as well as the opportunity to expand our relationship with St. Jude.


VI.

As we have publicly stated many times, Stanford, like any other company, has the right and obligation to our clients and employees to communicate with Congress about the impact of federal policies on our business. Our relationship with political leaders is and always has been proper, bipartisan and fully disclosed. All expenses related to the use of Stanford aircraft by either Rep. DeLay, Sen. Torricelli, Rep. Ney or any other public official were reimbursed in full accordance with Congressional regulations.



In summary, contrary to your proposed story, neither Mr. R. Allen Stanford nor his father James A. Stanford have ever "made an effort to link themselves to Leland Stanford" or Stanford University to improve the company's image and we have not "stressed" such a link in the company's marketing materials as has been suggested. All marketing, promotional and educational material on the Stanford Financial Group of companies proudly refers only to the Stanford family's Texas heritage and more specifically to Lodis B. Stanford and his success building his business on the principles of hard work, clear vision and value for the client.

It is the goal of every business to grow and prosper and that is what Stanford is doing by hiring the best of the best within the industry, differentiating ourselves from the competition, generating brand awareness, expanding our operations globally and doing business in an upright, ethical manner.

Mr. Forsythe, you are being sent by Federal Express today copies of census records verifying Thomas Stanford Sr.'s and his descendant's blood relation to each other. You are also being sent a small sampling of current and old marketing material which clearly demonstrates our Lodis B. Stanford, Mexia, Texas heritage.


Media contact:      Suzanne Hamm, Stanford Global Foundation
                    Tel:    (901) 277-6067
                    e-mail: shamm@stanfordeagle.com


[APG]

CONFIDENTIAL                                            RECEIVER527-00282333

**APP000341**

# EXHIBIT KVT-49

APP000342

From: Wolford, Lisa [lwolford@rlmnet.com]
Sent: Friday, May 05, 2006 7:17 PM
To: Tello, Ana; Hodge, Julie
Cc: zzz-howard.paster; Suarez, Yolanda
Subject: FW: Questions for Stanford Financial for Bloomberg News Story

Importance: High

Julie, Ana:  See below from Mike Forsythe.  We need to define the link
between Mr. Stanford and Leland Stanford - if we can do that, we take
away the reporter's "angle" for the story -- that RAS is using a link
between himself and the University to market his growing business.
Don't worry as much about the last graph, Mike says it will only "make
more people want to buy the CDs".  Thanks for sharing this e-mail with
Mr. Stanford.


-----Original Message-----
From: mforsythe@bloomberg.net [mailto:mforsythe@bloomberg.net]
Sent: Friday, May 05, 2006 1:57 PM
To: Wolford, Lisa
Subject: Questions for Stanford Financial for Bloomberg News Story

Hello Lisa. Bloomberg News is preparing a story for publication about
Stanford Financial, focusing on Mr. Stanford. We'd ask that the company
send us comment or give us a call by the afternoon of Wednesday, May 10.

Here is a synopsis of the story, that is subject to change depending on
the replies given by the company. We have interviewed 13 former and
current employees for our story.

Mr. Stanford, in a company video, in the company magazine, and in
meetings with employees stresses his family ties to Leland Stanford.
Stanford University's chief archivist and its business development
office know of no genealogical links. Saying that Mr. Stanford's
great-great-great grandfather is closely related to Josiah Stanford is
vague. What is the precise relationship and how do  we know that Thomas
Stanford Sr. is the great-great-great grandfather of Mr.
Stanford?

This is important because it's natural that people associate Leland
Stanford with Stanford University. We quote a professor of marketing
showing how those family links can instill trust and confidence in
Stanford Financial.

But our story is not primarily about the family ties. The larger picture
is that  Mr. Stanford's effort to link himself to Leland Stanford, and
hence to Stanford  University, is part of an effort to improve the
company's image and expand in the U.S. after the 1999 showdown with
State and Treasury over the Antigua banking advisory board. Other moves
include the hiring of equity analysts, centered in Boca Raton, the
hiring of financial advisors, such as those who came  to the Memphis
office from UBS, taking on sponsorship of the St. Jude PGA tournament,
taking over Washington Research Group from Schwab in 2005, and extensive
donations and provision of corporate jet flights to politicians of both
parties, including former Senator Toricelli, and Representatives Bob Ney
and Tom DeLay.

CONFIDENTIAL

Importantly, this comes as Stanford Financial, through its "SGC
Superstars" is  rapidly expanding the sale of SIBL CDs in the United
States. We cite company documents and training videos showing how such
deposits more than doubled from
2003 to 2004, with the company targeting affluent people such as doctors
to make  deposits to SIBL, deposits which are not FDIC insured. These
CDs make annual returns hundreds of basis points above rates found at US
banks.

Lisa, that's about it. I think the story is very fair and only based on
facts and on-the-record comments.

Regards,

Mike Forsythe
Bloomberg News
202 624 1940
This message is intended only for the use of the Addressee(s) and may
contain information that is PRIVILEGED and CONFIDENTIAL.
If you are not the intended recipient(s), you are hereby notified that any
dissemination of this communication is strictly prohibited. If you have
received this communication in error, please erase all copies of the
message and its attachments and notify us immediately.

Thank You

CONFIDENTIAL

# EXHIBIT KVT-50

APP000345

**From:** Scott W. Reed [SReed@Chesenterp.com]
**Sent:** Tuesday, May 16, 2006 6:07 PM
**To:** Hodge, Julie
**Subject:** Re: PROPOSED STANFORD ARTICLE

I will make the call now. It sounds like they have invested a lot of time in this and turning it off may be impossible.

----- Original Message -----
**From:** Hodge, Julie
**To:** sreed@chesenterp.com
**Cc:** ben@benbarnesgroup.com
**Sent:** Tuesday, May 16, 2006 12:24 PM
**Subject:** Fw: PROPOSED STANFORD ARTICLE

Scott

See below.  Mr. Stanford wants you to follow up with Al Hunt at Bloomberg.  Ideally,  we do not want a story run at all.

Please advise.

Thanks

-----Original Message-----
From: mforsythe@bloomberg.net
To: Hodge, Julie
Sent: Tue May 16 09:38:25 2006
Subject: RE: PROPOSED STANFORD ARTICLE

Hi Julie. After we received the company response, we took it upon ourselves to
obtain a copy of the genealogical text on which Mr. Stanford bases his claim of
kinship with Leland Stanford. We had that text, plus the genealogical timeline
offered by the company, reviewed by the Stanford University archivist. That, and
 very careful editing and vetting, explains the delay.

Pending approval by the editor-in-chief, we'd expect the story to run at
midnight tonight.

Regards,

Mike Forsythe
Bloomberg News
202 624 1940



----- Original Message -----
From: Julie Hodge  <jhodge@stanfordeagle.com>
At:  5/15 20:09:00

Mike

Has anything been run?

Please advise if and when you do run something.  Thanks.

Julie

-----Original Message-----
From: mforsythe@bloomberg.net [mailto:mforsythe@bloomberg.net]
Sent: Thursday, May 11, 2006 3:06 PM
To: Hodge, Julie
Subject: Re: PROPOSED STANFORD ARTICLE

CONFIDENTIAL

RECEIVER527-00280260

Julie, there will be no story until Sunday at midnight at the
earliest./Mike
Forsythe
----- Original Message -----
From: Julie Hodge  <jhodge@stanfordeagle.com>
At:  5/11 13:54:53

Mike


By now, you would have received the package sent to you via Fedex
yesterday with the response from Stanford to your inquiry of May 5.


Further to our response yesterday, we wish to advise that we have our
own in-house advertising company, Idea Advertising which has done our
marketing and promotion now for over 15 years.  We have gone back and
looked through a vast majority of our marketing pieces, including
brochures, magazines, advertisements, corporate communications etc that
have been produced over the years and identified well over 30 pieces
that mention Lodis Stanford, his heritage and origin of our company.  In
all of these pieces, there has not ever been any mention of Leland
Stanford or any ties to the Stanford family from California whatsoever,
with the exception of the 2 pieces that you have already identified, the
Eagle Magazine and Corporate Video from 2001/2 which highlight the
donation made to the Stanford Mansion restoration project at that time.
From the volume of this material, and the only reference to Leland
Stanford being mentioned briefly when talking about our donation, it is
clear that Stanford Financial Group has not tried to use a family link
to Leland Stanford to promote the image of the company, nor do we wish
to do so.


If there are any further questions you wish to ask please put them in
writing to Suzanne Hamm at shamm@stanfordeagle.com
<mailto:shamm@stanfordeagle.com> .


Yours truly,


Julie Hodge

Exec. Asst.

Tel:  (305) 960-8531

Fax: (305) 347-9141

CONFIDENTIAL

RECEIVER527-00280261

# EXHIBIT KVT-51

APP000348

**From:** Hamm, Suzanne [shamm@StanfordEagle.com]
**Sent:** Monday, May 08, 2006 5:35 PM
**To:** Hodge, Julie
**Subject:** RE: BLOOMBERG REPORTER

Julie –

The reporter has called the following:

(1)  John Santi (he let Danny Bogar know of the call)
(2)  Christy Cornell (she was a hire of John Santi's and he let her go after about 9 months)
(3)  Rocky Stein (he communicated with Rocky via email, a rather odd inquiry asking Rocky to confirm if he was related to Meyer Lansky.)  Rocky called me and we agreed it was an inappropriate question and he did not respond.
(4)  Paul Preisser -- employee of Rich Parker (NYC office) who referred the reporter to Rich.  Reporter did not respond to Rich's follow-up call.
(5)  There has also been calls made to Baldwyn High School (where Laura Pendergest graduated) asking numerous questions about Laura as well as Mr. Davis.  The receptionist at the School is Mary-Grace Gentry's Aunt Roberta McKay. (Mary-Grace works for me) and she said that the reporter wanted to know if Mr. Davis taught Laura at school.  He also asked her "don't' you think Laura is young to be the Chief Investment Officer of Stanford."  Aunt Roberta told her she graduated as valedictorian and any other questions to call Stanford.  Reporter seemed to know a lot about Laura's personal life and Laura confirmed to me that Christy Cornell (noted above) was one of the few people that had the details.  Laura has not spoken to Christy in quite awhile.

Reporter is doing a lot of "fishing" and seems to be targeting ex-employees who may provide leads to continue the fishing expedition.  I notified Yolanda of all of these calls and we looped Lisa Williford in from RLM and she called the reporter.  During this conversation, he noted that he was just "fishing" but was interested in Stanford.  He characterized us an "offshore company making a move domestically."

I think the connection to Stanford University is the "worst" he could dig up.  I spoke with Mr. Davis about this on Friday and told him that if we can show even a remote connection then the story is dead.  We do not solicit business or profit by promoting a relationship and this is the basis of this so-called story.  If we can disprove his assumption that we are promoting a false claim, then any editor will kill the story.  Mr.Davis mentioned the idea of having Ben Barnes contact Michael Bloomberg and having him kill the story.  If this happens, then it could possibly communicate to the editor and this reporter that we do have something to hide.

Let me know how else I can help.

Thx
Suzanne


---

**From:** Hodge, Julie [mailto:jhodge@stanfordeagle.com]
**Sent:** Monday, May 08, 2006 9:15 AM
**To:** Hamm, Suzanne; Hawkins, Kelley
**Subject:** BLOOMBERG REPORTER

Suzanne/Kelley

Can you please send me as soon as possible a list of our employees both current and former whom you are aware were contacted by Bloomberg reporters this year.

Thanks


Julie Hodge
*Exec. Asst.*
*Chairman's Office*
*Miami, FL*
*Tel: (305) 960-8531*
*Fax: (305) 347-9141*


CONFIDENTIAL

RECEIVER527-00280283

**APP000349**

# EXHIBIT KVT-52

APP000350

**From:** Hodge, Julie
**Sent:** Friday, February 23, 2007 11:56 PM
**To:** Hodge, Julie; 'ben@benbarnesgroup.com'
**Cc:** 'Susan Martin'
**Subject:** RE: Letter responding to PM Spencer

**Attachments:** Letter to PM Antigua February 23 07.doc
There has been one slight amendment.  See final final version attached.

--------------------------------------------------------------------------------

**From:** Hodge, Julie
**Sent:** Friday, February 23, 2007 6:47 PM
**To:** ben@benbarnesgroup.com
**Cc:** Susan Martin
**Subject:** Letter responding to PM Spencer

Ben

Attached is the letter that is being published in Antigua tomorrow in response to PM Spencer's release published today.

Regards

Julie Hodge
Executive Assistant
Stanford Financial Group
Miami, FL
(305) 960-8531 Ofc. Tel.
(305) 666-7188 Fax
(954) 235-7411 Cell
jhodge@stanfordeagle.com

CONFIDENTIAL

# EXHIBIT KVT-53

APP000352

**(FINAL FINAL)**

February 23, 2007

Prime Minister Spencer,

I was shocked and dismayed today when I read a press release supposedly written under your authorship. The very personal and un-statesmanlike manner in which you railed out at me is something I have never experienced before in my life. To say I am dumbfounded would be an enormous understatement. I must therefore give a public response to your badly misguided and deceitful statements.

Mr. Prime Minister, you have stated and I quote: "We have tried our best to work with Allen Stanford as an investor just as we have done with others. As your government, we have experienced nothing but threats, innuendos and now, downright political interference in our nation's affairs, from Allen Stanford, for our efforts on your behalf."

I take great personal offense to this statement which is nothing short of an outright lie. It is I and others in the Stanford Group of companies who have done their best to work with you and your Government for the greater good of Antigua and Barbuda. Since you came into power Mr. Prime Minister, everything that you have asked me to do, and the list is long, I have complied with. If you interpret my "strutting around" the Grays Green community as interfering with your governmental responsibilities then might I suggest that you follow my lead and do some "strutting around" Grays Green yourself and see first hand how deplorable conditions really are there. As far as our establishing Stanford Community Development offices around Antigua and Barbuda, if you would recall, it was your suggestion that I take our proposed Islands Club development in the North Sound to the grass roots, as you seem incapable of making a decision as to whether this project is one you endorse or not, despite the previous "green light" that your administration had given us and the many meetings that you and I have had on this subject with my full explanation to you of the economic benefits that this would bring to the nation. Therefore, we have begun our "I Believe" campaign to let the citizens of Antigua and Barbuda decide whether this is something that, as a majority, they will endorse and instruct their elected public servants, such as yourself, to truly once and for all give us the green light to proceed with.

However, what I am most appalled and sickened to the core of my soul over, is the manner in which you attempted to paint a picture of myself as a new colonial master and all of those in the Stanford organization as subservient to me by stating, and I quote: "I am sure Antiguans and Barbudans are aware of the many stories related by our first prime minister, the Rt Hon Dr Sir Vere Cornwall Bird, of our colonial past. Many are stories he told of our womenfolk taking their men to the manager of the Antigua Sugar Factory and giving him permission to administer corporal punishment to their men folk on the condition that he would re-employ him so that the children would have some way of being assured of food."

CONFIDENTIAL

**(FINAL FINAL)**

Prime Minister Spencer, you owe every Stanford employee in Antigua and Barbuda, whom you have offended in such an insulting and degrading manner, an apology. These are honest, hardworking individuals who do not deserve the disrespect that the leader of our nation has shown them.

I can only come to one conclusion for you issuing such vile and slanderous statements and that is you are attempting to deflect the attention of the citizens of our nation away from your inept leadership, by creating conflict and controversy with the nation's largest private employer and contributor to the economy.

I have given my heart and soul to Antigua and Barbuda, committed myself to excellence, and provided countless opportunities for our citizens. You can rest assured I will continue this long into the future.


Sir Allen Stanford

RECEIVER527-00281726

**APP000354**

# EXHIBIT KVT-54

APP000355

## Talking Points

1. I want to personally apologize to Prime Minister Spencer for my offensive and inappropriate response to an article that recently appeared in the newspaper. I have personally called and expressed my regret to the Prime Minister.

2. Such behavior was inconsistent with the motivations and intentions that have guided my business practices since coming to the island over two decades ago and will serve as a guidepost for future actions – to foster economic activity, to create jobs and to improve the quality of life for everyone on the island.

3. Clearly arguing with our Prime Minister in public was wrong, and I also apologize to the people of Antigua.

4. I am committed to making life better for all on the island and in the future my words and actions will reflect that sentiment.

CONFIDENTIAL

# EXHIBIT KVT-55

APP000357

**From:** Susan Martin [smartin@benbarnesgroup.com]
**Sent:** Tuesday, October 16, 2007 9:57 PM
**To:** Stanford, Allen
**Cc:** Hodge, Julie
**Subject:** A Note from Ben Barnes

Allen –

I hope you are doing well.   I have a few things I'd like to discuss with you.

When you do an Internet search of your name, the majority of the stories that pop up are very positive.  However, on Google, a few of the stories have a negative connotation.  I have spoken to you in the past about a company (Visible Technologies) that has developed algorithms, which push negative stories down and pull positive stories up.  With your permission, I would like to have them contact you again, so you can enlist these services.  I think this would go a long way in helping us with our political giving.

I also would like to discuss with you the possibility of hiring a law firm that specializes in federal elections.  This representation can ensure that only true information is used in the vetting process.  We need to go through the stories line by line to determine fact from fiction.  John Rafaelli, Mitch Delk, Wyeth Wiedeman and the other members of the team agree that this is a good strategy.

There are two upcoming fundraisers that I want to talk to you about.  The first one is for Senator Kay Bailey Hutchison, which is scheduled at my DC office Monday, October 22.  I have talked Yolanda into attending this event, and a meeting with the team will follow to discuss current giving issues and the VI legislation.  The second one is for Speaker Nancy Pelosi, which is scheduled at my Austin home Sunday, October 28.  I would like to visit with you further about this by telephone.

I've heard that Charlie Rangel has passed the VI legislation out of committee, but George Bush plans to veto it.  I have some strategic ideas that I'd like to run by you.

Currently, I am in my Austin office (512-322-0128), I'll be in my DC office tomorrow (202-467-4141), or you can reach me by cell phone (512-415-1414).

Best regards,

Ben

CONFIDENTIAL

RECEIVER527-00278909

# EXHIBIT KVT-56

APP000359

**From:** Hodge, Julie
**Sent:** Tuesday, April 18, 2006 6:00 PM
**To:** Hughes, Kay-La
**Subject:** GIFT FOR BOOK LAUNCH
Kay-La, my lady of corporate gift-giving.

We have a business associate and friend of Mr. Stanford's….Mr. Ben Barnes, whose book "Barn Burning, Barn Building – Tales of a Political Life from LBJ to George W. Bush and Beyond" is launching on April 27.

Any ideas as to what we can get as a congratulatory gift to him?  He and RAS go way back and are always joking around.

Any thoughts?

CONFIDENTIAL

RECEIVER527-00282362

APP000360

# EXHIBIT KVT-57

APP000361

Sep. 30. 2004  4.20PM   Ben Barnes Group                    No. 1510   P. 2/2



# BEN BARNES GROUP

September 30, 2004

Dr. Tino Alcides Díaz
Despacho del Superintendente
Superintendencia de Bacos y Otras Instituciones Financieras
Av. Universidad, Esquina Traposos, Edificio SUDEBAN
Apartado Postal 6761 Codigo Postal 1010
Caracas, Venezuela

Dear Sir:

I have been asked to write this letter of recommendation in support of Mr. R. Allen Stanford and his application to SUDEBAN for approval of Stanford Holdings Venezuela as the acquiring shareholder of a commercial bank in Venezuela.

I have known Mr. Stanford for more than 25 years on both a personal and professional level. Mr. Stanford is a highly successful individual and known to be a man of strong character and integrity. All of his business dealings have always been conducted to the highest possible standards, and I have no doubt that the approval of this application would result in a positive addition to the financial services industry in Venezuela.

I have no reservation in recommending that R. Allen Stanford and his companies be given every possible courtesy and consideration.

Regards,

Ben Barnes

CHICAGO
123 North Wacker Drive, Suite 1800 | Chicago, IL 60606
PHONE 312.474.7943 · FAX 312.474.7898

TEXAS
98 San Jacinto Boulevard, Suite 250 | Austin, TX 78701
PHONE 512.322.0128 · FAX 512.322.0106

WASHINGTON, DC
1215 19th Street, NW | Washington, DC 20036
PHONE 202.467.4141 FAX 202.467.1425

CONFIDENTIAL

RECEIVER527-00222802

APP000362

# EXHIBIT KVT-58

APP000363

```
From: Stanford, Allen
Sent: Friday, November 16, 2007 5:44 PM
To: Walker, Kye; Suarez, Yolanda
Cc: Hill, Karen
Subject: Re: Cuba research

Get this done asap RAS

----- Original Message -----
From: Walker, Kye
To: Suarez, Yolanda
Cc: Hill, Karen; Stanford, Allen
Sent: Fri Nov 16 11:07:03 2007
Subject: Cuba research

Hello Yolanda-
```

Per our conversation yesterday I am following up with what Karen-Mae and I have compiled thus far.  Let me know whether I should FedEx a hard copy to your office.


TO:              Yolanda


FROM:            Karen-Mae and Kye


RE:              Cuba's participation in Stanford 20/20 Tournament


DATE:            November 16, 2007


CC:              Sir Allen

_____


Yolanda-


As you know, the Treasury Department through the Office of Foreign Assets Control denied the request of Stanford 20/20 to have Cuba participate in next year's tournament.  Mr. Stanford wants to move forward in the hopes that OFAC will reconsider its denial and allow Stanford 20/20 to make an oral presentation to OFAC.  In that effort, he seeks to retain outside counsel to advise Stanford 20/20 on how to proceed with OFAC and advise us of other strategies available to Stanford 20/20.


Karen-Mae and I have compiled all the written correspondence and have attempted to memorialize all the other communications with both the State and Treasury Departments.  We have also chronicled Stanford 20/20's interaction with Cuba thus far to give you an overall picture of what has occurred.  Our preliminary research of the Cuba Assets Control

CONFIDENTIAL

RECEIVER527-00230134

**APP000364**

Regulations shows that they allow for an oral presentation before OFAC, a reopening of a denial by OFAC and reapplication for a license.  We have also looked into the steps taken by the Major League Baseball and Player's Associations to secure Cuba's participation in the World Baseball Classic held last year in the U.S., Puerto Rico, and Japan.  In doing this research, we have discovered the name of an attorney, Wynn Segall of Akin Gump, who appears to be one of the leading experts on OFAC and economic sanctions and controls.  We have included both his bio and that of Attorney Joseph Warin of Gibson Dunn (referred to us by Ben Barnes), along with two other attorneys for your comment.


Let us know when you are available to discuss.

CONFIDENTIAL

# EXHIBIT KVT-59

APP000366

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

```
-------------------------------X
RALPH S. JANVEY, IN HIS CAPACITY )
AS COURT-APPOINTED RECEIVER FOR  )
THE STANFORD INTERNATIONAL BANK, )
LTD., et al.,                    )
                                 )
        Plaintiff,               )
                                 )
 v.                              )  Civil Action No.
                                 )  3:10-cv-527
BEN BARNES and                   )
BEN BARNES GROUP, L.P.,          )
                                 )
        Defendants.              )
                                 )
-------------------------------X
BEN BARNES GROUP, L.P.,          )
                                 )
        Third-Party Plaintiff,   )
                                 )
 v.                              )
                                 )
Capitol Counsel, LLC, et al.,    )
                                 )
        Third-Party Defendants.  )
                                 )
-------------------------------X
```

VIDEOTAPED DEPOSITION OF
ROBERT MITCHELL DELK
Washington, District of Columbia
Monday, September 29, 2014

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR,
CLR, RSA, LiveDeposition Authorized Reporter
Job No. 12469

APP000367

Page 2

1

2                          September 29, 2014

3                            11:16 A.M.

4

5        Videotaped deposition of ROBERT MITCHELL

6    DELK, taken by the Plaintiffs, held at the law

7    offices of Butzel Long, 1747 Pennsylvania Avenue,

8    Northwest, Washington, D.C. 20006, before Cindy L.

9    Sebo, Registered Merit Court Reporter, Certified

10   Real-Time Reporter, Registered Professional

11   Reporter, Certified Shorthand Reporter, Certified

12   Court Reporter, Certified LiveNote Reporter,

13   Real-Time Systems Administrator, LiveDeposition

14   Authorized Reporter and Notary Public in and for

15   the District of Columbia, beginning at approximately

16   11:16 a.m., when were present on behalf of the

17   respective parties:

18

19

20

21

22

23

24

25

APP000368

```
 1            A P P E A R A N C E S:

 2

 3      Attorney for Plaintiffs:

 4           BUTZEL LONG

 5           JOSHUA E. ABRAHAM, ESQ.

 6           Suite 850

 7           230 Park Avenue

 8           New York, New York 10169

 9           212.374.5370

10           abraham@butzel.com

11                   -and-

12           BUTZEL LONG

13           AGHOGHO EDEVBIE, ESQ.

14           Suite 100

15           150 West Jefferson

16           Detroit, Michigan 48226

17           313.983.6950

18           edevbie@butzel.com

19

20

21

22

23

24

25
```

APP000369

```
 1          A P P E A R A N C E S (Continued):

 2

 3      Attorney for Defendants/Third-Party Plaintiff:

 4          WINSTEAD PC

 5          JAY J. MADRID, ESQ.

 6          500 Winstead Building

 7          2728 N. Harwood Street

 8          Dallas, Texas 75201

 9          214.745.5709

10          jmadrid@winstead.com

11

12      Attorney for Third-Party Defendants:

13          NEALON & ASSOCIATES, P.C.

14          JAY IAN IGIEL, ESQ.

15          119 North Henry Street

16          Old Town

17          Alexandria, Virginia 22314

18          703.684.5755

19          jigiel@nealon.com

20

21

22      ALSO PRESENT:

23          RICK SANBORN, Videographer

24

25
```

APP000370

```
 1                    INDEX OF EXAMINATION

 2

 3   ROBERT MITCHELL DELK

 4   EXAMINATION BY                               PAGE

 5     Mr. Abraham                                 10

 6     Mr. Madrid                                 211

 7                        -   -   -

 8                    INDEX TO EXHIBITS

 9                        -   -   -

10    (Exhibits Attached to the Original Transcript.)

11       DELK

12      EXHIBIT       DESCRIPTION                 PAGE

13

14    Number 1       Third-Party Defendant Robert

15                    Mitchell Delk's Responses to

16                    Plaintiff's First Request for

17                    Production of Documents       16

18

19    Number 2       Third-Party Defendant Robert

20                    Mitchell Delk's Responses to

21                    Plaintiff's First Set of

22                    Interrogatories             109

23

24

25
```

Page 6

```
 1    Number 3       E-mail, Martin to Miller, cc:

 2                   Stanford, Suarez, Razook,

 3                   Loumiet, Delk, Reed and Caperton,

 4                   August 22, 2005              120

 5

 6    Number 4       E-mail with attachment,

 7                   Martin to Stanford,

 8                   September 27, 2005          140

 9

10    Number 4-A     E-mail string              212

11

12    Number 5       E-mail with attachment,

13                   Martin to Stanford, cc:

14                   Tello, January 27, 2006     154

15

16    Number 5-A     E-mail, Delk to Martin,

17                   January 27, 2006            212

18

19    Number 6       E-mail with attachment,

20                   Delk to Suarez, September

21                   12, 2006                    170

22

23    Number 7       E-mail string              175

24

25
```

APP000372

| 1 | Number 8 | E-mail with attachment, | |
| 2 | | Delk to Caperton, cc: Martin, | |
| 3 | | February 19, 2009 | 184 |
| 4 | | | |
| 5 | Number 9 | E-mail string | 195 |
| 6 | | | |
| 7 | Number 10 | E-mail string | 199 |
| 8 | | | |
| 9 | Number 11 | E-mail string | 201 |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

APP000373

```
 1              ROBERT MITCHELL DELK

 2              P R O C E E D I N G S

 3

 4                  Washington, D.C.

 5        Monday, September 29, 2014; 11:16 a.m.

 6

 7              THE VIDEOGRAPHER:  This is the --

 8         Tape Number 1 of the videotaped deposition

 9         of Robert Mitchell Delk in the matter of

10         Ralph S. Janvey, et al. versus Ben Barnes,

11         et al.; and Ben Barnes Group, L.P. versus

12         Capitol Counsel, LLC, et al. filed in the

13         United States District Court for the

14         Northern District of Texas, Dallas

15         Division, Case Number 3:10-cv-527.

16              This deposition is being held at the

17         offices of Butzel Long, 1747 Pennsylvania

18         Avenue, Northwest, Washington, D.C. on

19         September 29th, 2014.

20              The time on the video monitor is

21         11:16 a.m.

22              My name is Rick Sanborn from the

23         firm of TransPerfect Deposition Services,

24         and I'm the legal video specialist.  The

25         court reporter is Cindy Sebo, also in
```

APP000374

```
 1              ROBERT MITCHELL DELK

 2       association with TransPerfect.

 3            Will counsel please introduce

 4       themselves and state whom they represent?

 5            MR. ABRAHAM:  Joshua Abraham for the

 6       Official Stanford Investors Committee.

 7            MR. EDEVBIE:  Aghogho Edevbie for

 8       the Official Stanford Investors Committee.

 9            MR. MADRID:  Jay Madrid representing

10       Ben Barnes Group, L.P. and Ben Barnes,

11       individually.

12            MR. IGIEL:  Jay Igiel on behalf of

13       the former Third-Party Defendants,

14       including the deponent, Mitchell Delk.

15            THE VIDEOGRAPHER:  Thank you.

16            Will the court reporter please swear

17       in the witness?

18                   -  -  -

19            ROBERT MITCHELL DELK,

20       after having been first duly sworn, was

21        examined and testified as follows:

22                   -  -  -

23

24

25
```

APP000375

```
 1                  ROBERT MITCHELL DELK

 2                       -  -  -

 3          EXAMINATION BY COUNSEL PLAINTIFFS,

 4          OFFICIAL STANFORD INVESTORS COMMITTEE

 5                       -  -  -

 6   BY MR. ABRAHAM:

 7          Q.    Thank you for appearing and

 8   testifying --

 9          A.    Sure.

10          Q.    -- today, Mr. Delk.

11                My name is Joshua Abraham.  I

12   represent the Official Stanford Investors

13   Committee in a lawsuit against Ben Barnes.

14                Have you ever been deposed before?

15          A.    Yes.

16          Q.    And when -- when, about, was that?

17          A.    It's been five or six years.

18          Q.    And do you recall what that

19   dispute -- that involved?

20          A.    I was -- worked for a major

21   corporation, Freddie Mac, that had accounting

22   issues, and I was deposed in a regulatory setting

23   regarding that.

24          Q.    And who deposed you?

25          A.    The Federal Election Commission.
```

APP000376

```
 1                    ROBERT MITCHELL DELK

 2          Q.    Okay.  Were you a -- a defendant in

 3   that action --

 4          A.    I was --

 5          Q.    -- or just a witness?

 6          A.    -- the complainant that -- and it

 7   was -- yes.

 8          Q.    Okay.  And how was that action

 9   resolved?

10          A.    It -- I, personally, was dismissed

11   from the suit.

12          Q.    Okay.  So you're familiar with --

13   with the process of -- of being deposed?

14          A.    Well, I've been deposed before, so

15   I'm as familiar as I could be having engaged in

16   it one time.

17          Q.    I see.

18                Well, the way it works, as you -- as

19   you're aware, is I'm going to ask you a series of

20   questions --

21          A.    Okay.

22          Q.    -- please answer them as truthfully

23   as you can --

24          A.    Okay.

25          Q.    -- and to the best of your
```

APP000377

```
 1                    ROBERT MITCHELL DELK
 2    recollection.
 3               If you don't understand a question,
 4    please let me know.
 5         A.    Okay.
 6         Q.    If you need to take a break, for
 7    whatever reason, just let me know, and I'm happy
 8    to accommodate that.
 9         A.    That's great.
10               Thank you.
11         Q.    There may be a point where your --
12    your attorney or Mr. Barnes' attorney objects to
13    a question.  You still need to answer the
14    question, unless your attorney specifically
15    instructs you not to.
16         A.    Okay.
17         Q.    Is there any reason why you feel you
18    can't testify today?
19         A.    No.
20         Q.    Okay.  And not taking any
21    medications that you think may affect --
22         A.    No.
23         Q.    -- your testimony?
24               Can you tell me what you did to
25    prepare for this deposition?
```

APP000378

1              ROBERT MITCHELL DELK

2        A.    I had a very brief conversation with

3   my counsel and -- on Friday, and then a brief

4   conversation when we walked in the door.

5        Q.    And we, you and I, have never met or

6   spoken before, correct?

7        A.    No.

8        Q.    Did you speak with Mr. Barnes'

9   attorney prior to this deposition?

10        A.    No, not other than an introduction.

11        Q.    Just now?

12        A.    Yes.

13        Q.    Okay.

14              And have you spoken with Ben Barnes

15   in preparation of this deposition?

16        A.    No.

17        Q.    When was last time you spoke with

18   Ben Barnes?

19        A.    Oh, I guess six, eight months ago, a

20   year ago.  I'm not really sure.  I -- I've seen

21   him periodically.  He is a family friend of my

22   father-in-law's, and I had seen him at a soc- --

23   some social event in Texas within the last year.

24              Nothing about this case was ever

25   discussed.

TransPerfect Legal Solutions
depo@transperfect.com -- 212.400.8845

APP000379

 1                    ROBERT MITCHELL DELK

 2          Q.    And that's what I was going to ask

 3    you --

 4          A.    Yeah.

 5          Q.    -- did you discuss anything --

 6          A.    No.

 7          Q.    -- about this case?

 8                Have you -- have you ever discussed

 9    the -- the facts or -- or circumstances of this

10    case with Ben Barnes?

11          A.    No.

12          Q.    Any -- have you discussed the facts

13    and circumstances of this case with any employee

14    of -- of Ben Barnes Group, L.P.?

15          A.    No.

16          Q.    Did you review any documents to

17    prepare for your testimony today?

18          A.    I -- I looked over a few documents.

19    To be candid with you, Jay sent me some

20    documents.  I was out of town all weekend, didn't

21    get back until late last night.  So I just

22    perused them very quickly.

23                And so I might need you to show me

24    documents if it's something that I'm not familiar

25    with.

APP000380

 1                  ROBERT MITCHELL DELK

 2          Q.    Okay.  Do you recall the documents

 3    that -- that Jay sent you in -- in your --

 4    what -- you know, in your perusal of those

 5    documents, do you recall what you looked at?

 6          A.    It was several e-mails.  It --

 7    the -- I would say, as I recall, maybe eight to

 8    10 documents, several e-mails, but nothing that

 9    really seemed particularly noteworthy, to me.

10          Q.    Are these the documents that you

11    produced in this case?  Do you recall?

12          A.    No.

13          Q.    These were other documents?

14          A.    Yes.

15          Q.    How do you know -- why do you recall

16    that -- these being other documents and not the

17    documents you produced?

18          A.    Because I had not seen the documents

19    in a long time when they were shown to me by --

20    by my counsel.

21          Q.    Okay.  Do you recall receiving

22    document requests from my office?

23          A.    I assume.  So these would be

24    the -- the interrogatories.

25          Q.    Okay.  Did you -- did you receive,

APP000381

```
 1                    ROBERT MITCHELL DELK
 2    in addition to interrogatories, requests for the
 3    production of documents?
 4         A.    It -- it would have gone through
 5    counsel.  And I -- I -- whatever has been
 6    presented to counsel, we've been cooperative in
 7    presenting any and everything we've had.
 8         Q.    Okay.
 9              MR. ABRAHAM:  I'm going to mark this
10         as Exhibit -- Exhibit 1.
11                    -  -  -
12              (Whereupon, Third-Party Defendant
13               Robert Mitchell Delk's Responses
14               to Plaintiffs' First Request for
15               Production of Documents was
16               marked, for identification
17               purposes, as Delk Exhibit
18               Number 1.)
19                    -  -  -
20              (Sotto voce discussion.)
21              MR. ABRAHAM:  Thank you.
22    BY MR. ABRAHAM:
23         Q.    I'm handing you what's been marked
24    as Delk 1, Exhibit Delk 1.
25              If you could just take a moment and
```

```
 1                    ROBERT MITCHELL DELK
 2   review this document.
 3                    (Whereupon, the witness reviews the
 4                     material provided.)
 5                    THE WITNESS:  Okay.
 6   BY MR. ABRAHAM:
 7          Q.    Does this document look familiar to
 8   you, Mr. Delk?
 9          A.    I think it does.
10          Q.    What's your understanding of what
11   this document is?
12          A.    I think this was our -- our response
13   to the interrogatories that you sent.
14                 Is that correct?
15          Q.    The document's titled, Third-Party
16   Defendant Robert Mitchell Delk's Responses to
17   Plaintiffs' First Request --
18          A.    Okay.
19          Q.    -- for Production of Documents.
20                 Does that refresh -- refresh your --
21          A     Yes.
22          Q.    -- recollection?
23                 Okay.  And --
24                 THE COURT REPORTER:  You have to let
25          him finish the question.
```

```
 1                    ROBERT MITCHELL DELK

 2                THE WITNESS:  Sorry.

 3   BY MR. ABRAHAM:

 4        Q.    -- and you recall reviewing this

 5   document?

 6        A.    I do.

 7        Q.    Okay.

 8              And can you tell me the steps that

 9   you took to search for documents that are

10   responsive to this request?

11        A.    Well, I went through files that I

12   have.  I'm kind of a -- a singled [verbatim]

13   individual, working on kind of public policy

14   issues.  And to the extent I had any records on

15   them, I produced them for my counsel.

16              Obviously, there was some issues

17   that go back over 10 years that I had no records

18   of.  Also, I had, in fact -- had an office in the

19   Ben Barnes Group working on several clients for

20   Mr. Barnes helping him, and I didn't have access

21   to that information.

22              But to the extent I had

23   documentations that were relevant to your

24   request, they were provided to my counsel --

25        Q.    Okay.
```

APP000384

```
 1              ROBERT MITCHELL DELK
 2       A.    -- with those two limitations.
 3       Q.    And of the documents that you found
 4  and produced, where -- where were they stored?
 5       A.    At my home where, you know --
 6       Q.    Okay.
 7       A.    -- not in a very organized fashion.
 8  But I went through every document that I had
 9  where I'd had copies, and we went through my hard
10  drive looking for anything relevant to this case.
11       Q.    So this would include physical
12  documents --
13       A.    Yes --
14       Q.    -- as well as --
15       A.    -- yes.
16       Q.    -- as well as documents on your
17  computer?
18       A.    Correct.
19       Q.    And did you undertake a search of
20  any e-mail accounts that you used for responsive
21  documents?
22       A.    Yes.
23             As I said to the previous question,
24  I had an e-mail address at the Ben Barnes Group,
25  which I did not have access to, but my assumption
```

1             ROBERT MITCHELL DELK

2    was, is that they probably submitted that in

3    their responses.  But I didn't have access to

4    those documents.

5         Q.    You said that you had an office at

6    Ben Barnes Group?

7         A.    Correct.

8         Q.    Where was that office located?

9         A.    On 19th Street in Washington, D.C.

10        Q.    Do you still maintain an office

11   there?

12        A.    No.

13        Q.    And how long did you maintain an

14   office at the Ben Barnes Group?

15        A.    Several years.  As I said, worked --

16   I was supporting him on several of those clients.

17   And to accommodate both parties, he provided me

18   an office.

19        Q.    And when did you cease maintaining

20   office space at that location?

21        A.    I can't give you an exact date.  I

22   would say it was probably about the time that I

23   was brought in as a Third-Party Defendant.

24        Q.    Understandable.

25        A.    Inexplicable and understandable.

```
 1                ROBERT MITCHELL DELK

 2         Q.    That would be in around -- around

 3   2011, to the best --

 4         A.    I think --

 5         Q.    -- of your recollection?

 6         A.    -- that's correct.

 7               Not to be flip.

 8         Q.    Okay.  I'd like you to turn to

 9   Page 5 --

10         A.    Okay.

11         Q.    -- of the document.

12               And on Page 5, you'll see

13   Request Number 3.  And that request seeks, quote,

14   All contracts and written agreements between you

15   and the Ben Barnes Defendants referring or

16   relating to the Stanford parties --

17         A.    Correct.

18         Q.    -- end -- end quote.

19               Your response to this request is

20   that Third-Party Defendant has no responsive

21   documents as it never entered into any written

22   contract or agreement with the Ben Barnes

23   Defendants?

24         A.    That's correct.

25         Q.    You testified that you worked with
```

APP000387

```
 1                  ROBERT MITCHELL DELK

 2  Ben Barnes and his entity for a number of years.

 3              Was it your practice not to enter

 4  into written agreements with Ben Barnes?

 5       A.   Correct.  It was -- it -- it was an

 6  oral agreement with him.

 7       Q.   And was that your practice with

 8  respect to all work or engagements that you did

 9  for him or on his behalf?

10       A.   Yes.  I never had a written

11  agreement with him.  It was purely an oral

12  contract with him.

13       Q.   Why was that?

14       A.    I had known him a long time, and he

15  would ask me to come in and support him on

16  particular clients that he represented and -- and

17  said he would give me, you know, a retainer for

18  doing so, and I did it.  I think that's kind of

19  the common practice in Washington with these

20  types of representations.

21              Having said that, there were other

22  clients that I had represented where there have

23  been contracts; but in this particular case,

24  there was not.  I never asked for one.  He never

25  offered one.
```

1                    ROBERT MITCHELL DELK

2          Q.    Is there a reason why you never

3     asked for one?

4          A.    I -- no.  I just didn't think one

5     was necessary.

6          Q.    And why is that?

7          A.    I'd had a relationship with him.  I

8     had known him for a number of years.

9          Q.    Okay.

10               I'd like you to turn to Page 4 of

11    the document, and I'd like you to look at your

12    response to Request Number 1.

13               And let me know when you're -- when

14    you're -- when you've done doing that -- when

15    you're done doing that.

16               (Whereupon, the witness reviews the

17                material provided.)

18               THE WITNESS:  Okay.

19    BY MR. ABRAHAM:

20         Q.    Your response references a computer

21    that you used in the offices of Ben Barnes Group,

22    L.P.

23               Do you recall what you stored on

24    that computer or how you used that computer?

25         A.    I -- I -- just in the normal course

1                    ROBERT MITCHELL DELK

2    of, you know, operating out of that office,

3    e-mails -- that was essentially it.  Maybe the

4    creation of doc- -- Word documents.

5          Q.    And did you take any steps to -- to

6    get access to that computer?

7          A.    No.

8          Q.    And why -- why is that?

9          A.    Well, as I said, I had pretty much

10   left that office and had not really had

11   communication with that office because I was

12   brought in as a Third-Party Defendant.  And I

13   just didn't think it was appropriate.  And I

14   didn't have access to the computer to begin with.

15         Q.    Do you know what happened to that

16   computer?

17         A.    I have no idea.

18         Q.    In your response to this request,

19   you also state that -- and I guess this is a bit

20   of a tangent, but you state that Since 2011, you

21   have, quote, done substantial pro bono work for

22   the Network for Investor Action and Protection

23   (NIAP) in order to influence legislation that

24   would assist the victims of the Stanford Ponzi

25   scheme and similarly situated individuals.

APP000390

1                    ROBERT MITCHELL DELK

2          A.     Correct.

3          Q.     What is the NIAP?

4          A.     Well, let me give you a little bit

5    of background on this.

6                 NIAP is an organization -- a

7    501(c)(4) that was formed to really benefit the

8    Madoff victims.  There was -- in -- in the

9    aftermath of the Madoff Ponzi scheme debacle.

10                SIPC, the Securities Investor

11   Corporation -- Protection Corporation, had really

12   taken some bizarre positions regarding some of

13   the -- many of the victims.  As you might know,

14   when there is a -- a failure of a broker/dealer,

15   SIPC is supposed to pay people up to $500,000 for

16   their claims, and the SIPC did not do that.

17                In addition, they initiated a number

18   of clawback lawsuits against, what I would say,

19   innocent individuals who were, quote, net

20   winners, meaning that they had invested money and

21   taken money out, but they had made more than they

22   had lost.

23                And so there was legislation --

24   bipartisan legislation in the House to correct

25   what SIPC was doing, because many Members of

1              ROBERT MITCHELL DELK

2    Congress thought it was inconsistent with the

3    original intention of the 1970 legislation.  And

4    I was helping with that.

5              There was a group that, in fact,

6    represented the Stanford victims, the group I

7    believe that you represent, and they ended up

8    coming to this NIAP group and saying they'd like

9    to join forces.  Because, as you probably know,

10   SIPC took a bizarre interpretation of the statute

11   with the Stanford victims saying that they were

12   not, quote, customers as defined by the statute

13   and, therefore, they were not entitled to the --

14   the SIPC advance.

15             And so the legislation was -- you

16   know, covered them to make sure that, in fact, if

17   you were a customer of broker/dealer, you would,

18   in fact, be, in fact, a customer.

19             And I've worked on that, really, for

20   two to three, almost four years on a pro bono

21   basis.

22             Subsequent to those two debacles or

23   failures, there is one in upstate New York,

24   McGinn, Smith.  And it also -- they took -- SIPC

25   took a similar interpretation that the customers

APP000392

1          ROBERT MITCHELL DELK

2    of the broker/dealer were not, quote, customers

3    as defined by the statute.  And so people in that

4    situation were not given the SIPC advance.

5              So there's legislation introduced in

6    the House that has about 60 bipartisan cosponsors

7    and legislation introduced in the Senate that has

8    a number of bipartisan cosponsors.  And I've

9    worked to try to, you know, help give them

10   strategic counsel on how to, in fact, get this

11   passed.

12             So --

13        Q.   NIAP is an organization which was

14   founded by net winners?

15        A.   No.  It was -- it was founded by

16   people who were adversely impacted by the Madoff

17   debacle, including net winners.  But there were a

18   lot of people who were net losers, but they

19   didn't get the SIPC advance because of the SIPC

20   taking interpretations about who was, in fact, a

21   customer.

22        Q.   Is it NIAP's position that SIPC

23   should cover losses incurred by net winners?

24        A.   Well, I'm -- I'm not sure what their

25   position would be on that.  They were more

```
 1                 ROBERT MITCHELL DELK
 2   dealing with net losers on the SIPC.  What they
 3   were dealing with more on the net winners was the
 4   potential for clawback, meaning if somebody was
 5   an innocent victim, why, in fact, should they, in
 6   fact, be able to go back to the trustee and get
 7   money back from these people if it couldn't be
 8   proven they knew nothing about the Ponzi scheme.
 9        Q.    And how did you come to do pro bono
10   work for this organization?
11        A.    I was just approached by them
12   because of my knowledge of kind of financial
13   services laws and my relationship with people who
14   deal with those policy issues.
15        Q.    Who approached you?
16        A.    It was a guy named Jim Smith and
17   Andy Barbour who run an organization, a lobbying
18   firm, called Smith-Free.
19        Q.    And why did they approach you?
20        A.    Well, they were doing pro bono work
21   since, I think, 2007 and just, you know,
22   explained the issue to me and said, We'd like to
23   have you help us if you would.  So I did it.
24        Q.    And how many hours have you
25   worked --
```

```
 1                    ROBERT MITCHELL DELK
 2         A.    I -- I couldn't --
 3         Q.    -- on a pro bono basis?
 4         A.    -- quantify that.
 5               There's -- a lot.
 6         Q.    Well, how -- how much would you
 7    estimate?
 8         A.    Well, you know, I don't know, five,
 9    10 hours a week.  We have a call on Mondays at
10    4 o'clock that last two hours, so I can tell you
11    it's at least two hours a week.
12               But there's been a lot of action
13    trying to get this passed.  There's -- in the
14    House.  There's -- Congressman Garrett from
15    New Jersey is trying to pass this, and he's
16    having problem getting it through his own
17    committee because of the chairman has problems
18    with the bill.  And so they're trying to work
19    this through.
20               So there's been a lot of back and
21    forth to try to get relief for the victims.
22         Q.    And, specifically, what kind of work
23    do you do for NIAP?
24         A.    Everything from kind of legislative
25    regulatory counsel; giving them grassroots
```

```
 1                    ROBERT MITCHELL DELK
 2   counsel, how to get -- execute that; public
 3   relations counsel, how to, in fact, tee up the
 4   issues so, in fact, people understand what's
 5   going on; educational kind of strategic de- --
 6   advice.
 7          Q.    Do you know if Ben Barnes has done
 8   any work for NIAP?
 9          A.    No.  I know -- yeah, he hasn't
10   worked with us, no.
11          Q.    And you testified earlier that you
12   work for yourself; is that correct?
13          A.    Yes.
14          Q.    And you consider yourself
15   self-employed?
16          A.    Yes.
17          Q.    Do you have an entity or -- or
18   d/b/a?
19          A.    No.  I just do it -- I -- I call
20   myself, where relevant, The Public Policy and
21   Advocacy Group, but it's -- it's just me.  And,
22   you know, on issues that I work on, if I see a
23   void for a particular relationship or a
24   subject-matter expert that's needed, then I'll
25   partnership with somebody else.  And that's the
```

```
 1                    ROBERT MITCHELL DELK
 2    way I've historically done it.
 3          Q.    And how long have you been
 4    self-employed?
 5          A.    About 10 years.
 6          Q.    And prior to that, where did you
 7    work?
 8          A.    I was at Freddie Mac.
 9          Q.    For how long?
10          A.    For 13 years.
11          Q.    What did you do at Freddie Mac?
12          A.    I ran their Government relations,
13    their external relations, their relationship with
14    regulators, dealt with policy issues in the
15    public policy arena, kind of what one would do in
16    managing an office for a large Fortune 100
17    company.
18          Q.    Did you have a title at Freddie Mac?
19          A.    Yeah.  I was the Senior Vice
20    President for Government Relations and Public
21    Policy.
22          Q.    So that involved lobbying and --
23          A.    Yes --
24          Q.    -- formulating --
25          A.    -- it was -- it was more of a
```

APP000397

```
 1                  ROBERT MITCHELL DELK

 2   management position.  I mean, it was an office

 3   that involved about 25 people and about 25 or 30

 4   consultants.  It was a -- so you were kind of

 5   making sure everybody was understanding the

 6   issues that were relevant to the company, and it

 7   was executing them -- the strategy in a way that

 8   tried to achieve the outcome that was most

 9   advantageous for the company.

10        Q.   And prior to Freddie Mac, where did

11   you work?

12        A.   Well, a little bit of my background,

13   I'm a lawyer by training.  I came to Washington

14   at the end of '79.  I worked on the Hill for

15   six years of which the last three or four years,

16   I was counsel to the Senate Banking Committee.

17             I then left and chose to try to get

18   some practical education in the financial

19   services area, and I went to First Boston and did

20   investment banking for four to five years.

21             I came back and was counsel to the

22   chairman of the SEC for two years when

23   Richard Breeden was the chairman.  And then I

24   went to Freddie Mac and was there for 13 years.

25             So my whole experience has been kind
```

APP000398

```
 1                    ROBERT MITCHELL DELK
 2    of in the financial services arena.
 3         Q.    So you would describe yourself as a
 4    lobbyist?
 5         A.    Yeah.
 6         Q.    Okay.  What is -- what is it -- what
 7    is a lobbyist?
 8         A.    Well, a lobbyist is in eyes of the
 9    beholder.  I don't know what you think a lobbyist
10    does, but I -- you know, I will end up, in fact,
11    interfacing with Members of Congress and their
12    staff, who, in fact, influence public policy in
13    the area of financial services.
14               I will work with clients on
15    designing strategies to try to get the best
16    outcome for them on legislative ideas, regulatory
17    issues.
18               And as I said, with the NIAP, I
19    mean, it goes all the way from public relations
20    to grassroots organization and -- to the actual,
21    you know, advocacy for a particular position to a
22    particular piece of legislation.
23         Q.    And as a lobbyist, do you have any
24    registration requirements?
25         A.    Yes.
```

APP000399

```
 1                    ROBERT MITCHELL DELK

 2          Q.    And what are those?

 3          A.    You have to register with the

 4  Congress, both the House and the Senate; and you

 5  have to -- if you're paid by a client, you have

 6  to, in fact, register each quarter on how much

 7  you're paid --

 8          Q.    And who --

 9          A.    -- and --

10          Q.    -- who do you register with?

11          A.    With the House --

12          Q.    With the House?

13          A.    -- the House and the Senate off- --

14  Clerk's office.

15          Q.    In -- in -- in that registration,

16  you have to disclose who your clients are?

17          A.    That are paying clients.

18          Q.    What about nonpaying clients?

19          A.    I -- I -- there's no obligation, I

20  don't think, to -- to do -- like NIAP, for

21  example, I will start registering for them, but

22  I -- I mean, I haven't been paid by them.

23                So it was -- I'm just doing it just

24  to in- -- include my -- increase my

25  representation on the -- the filings.
```

```
 1                    ROBERT MITCHELL DELK
 2                    But you have to put, you know, what
 3     your quarterly fees are.  You also have to file a
 4     document indicating campaign contributions that
 5     you make, who they go to --
 6          Q.    You -- you, personally, or your
 7     clients?
 8          A.    Me, personally --
 9          Q.    Okay.
10          A.    -- because -- that's one of the
11     requirements as a lobbyist.
12          Q.    Okay.  I'm sorry I interrupted you.
13          A.    No, no, that's fine.
14          Q.    You testified earlier that you have
15     a focus on financial services; is that correct?
16          A.    Um-hum.
17          Q.    How would you describe that?
18          A.    Well, it runs the gamut from
19     entities that are -- are -- you know, have a
20     nexus with the -- the Federal Government or State
21     Governments that, you know, run from banking to
22     brokerage firms, insurance companies and the
23     like.  And issues that, in fact, relate to them
24     go kind of all over the board.
25          Q.    Do you accept engagements for
```

APP000401

```
 1                    ROBERT MITCHELL DELK
 2   nonfinancial services work?
 3        A.    Yes, I have; but that's kind of my
 4   expertise.  I mean, I've been brought in on a
 5   couple of issues that are, per se, not financial
 6   in nature -- financial services in nature.
 7        Q.    Do you recall what those issues
 8   were?
 9        A.    Well, I'm working, for example, on
10   one issue now that is a company trying to buy the
11   Low-Income Housing Tax Credits from Freddie Mac.
12             They had previously had a contract
13   with the company when they went into the
14   conservatorship.  The Treasury blocked it; and
15   we've tried to, in fact, argue, in fact, it's in
16   the company and the Treasury's benefit to do
17   that, for example.
18             So I'm helping them try to figure
19   out a strategy both how to deal with the
20   Treasury, how to deal with their regulator for
21   the Housing Finance Agency, how to deal with the
22   company who is at a loss on how to deal with this
23   because they don't have any Government relations
24   professionals, as well as, you know, Members
25   of -- of Congress who have an interest in the
```

APP000402

```
 1                    ROBERT MITCHELL DELK

 2   issue.

 3                That's just an example.

 4        Q.    Okay.  Do you market yourself as

 5   somebody with financial services expertise?

 6        A.    Yes, I would.  I mean, you know,

 7   "marketing" is kind of an interesting term.  I

 8   mean, people normally come to me.  I found that

 9   going out and trying to do cold calls to try to

10   get work really doesn't work.  People find that

11   they need somebody with a niche or somebody with

12   a particular relationship, and they would come,

13   you know, to me for that.

14                I mean, I've been doing it for a

15   long, long time.  And so, you know, in the

16   financial services circles, I think people --

17   they understand what I do, what my success rate

18   has been, how I approach, you know, the issues,

19   and seem to be pleased with the -- with that

20   approach.

21        Q.    You mentioned success that you've

22   had.

23                Are there any notable successes

24   that -- that come to mind in the financial

25   services sector?
```

Page 38

```
 1              ROBERT MITCHELL DELK

 2         A.    Well, I can give you one.  When I

 3   was -- just as an example, when I was at Freddie

 4   Mac, Freddie Mac was under assault from a number

 5   of detractors arguing that there was not

 6   sufficient transparency and that their regulator,

 7   in fact, was not a competent regulator.  The

 8   result was the stock price was depressed as a

 9   result of that.

10              I designed a program whereby we

11   would go to the Government and to the Members of

12   the Hill who oversaw us and would make a

13   disclosure of six relevant item -- items that

14   really were emanating from Basel, the

15   international financial institute regulator.  And

16   without going into details, we made this

17   announcement, which was extremely noteworthy

18   and -- and well received.

19              We made six disclosures that no

20   financial institution in the world was making.

21   And as a result, from the end of October to the

22   end of December, our stock price doubled, which

23   benefited shareholders about $50 billion of

24   Freddie Mac and Fannie Mae.

25              So that's, you know, a pretty
```

APP000404

1              ROBERT MITCHELL DELK

2    noteworthy outcome.

3          Q.    Any other noteworthy successes?

4          A.    Well, yeah.  I could go down them,

5    you know, all day long if you want to talk about

6    them.  I mean --

7          Q.    Well, maybe not all day long --

8          A.    Okay --

9          Q.    -- a couple more.

10         A.    -- I made a number of -- you know,

11   during -- when I was at Freddie Mac, there was

12   many efforts to try to put a -- a user fee on the

13   company, and we were able to deride and -- and --

14   and derail that effort many, many times.

15         Q.    What do you mean "user fee"?

16         A.    Congress wanted to raise revenues by

17   putting a fee on the securities we issued,

18   recognizing the sheer volume of securities that

19   was issued by the two companies.  We produce a

20   lot of money.  And we turned that into a tax

21   rather than a user fee, which I think it would

22   have been, and we were able to derail that --

23         Q.    By "securities," you mean bonds?

24         A.    -- yes; right .

25               Yes.

APP000405

1                ROBERT MITCHELL DELK

2         Q.    So you were successful in converting

3    that fee into a tax?

4         A.    Right.

5         Q.    And how -- how did that benefit the

6    company?

7         A.    Well, we were successful in

8    depicting what people were trying to do as a tax

9    on homeownership, and, therefore, Members of

10   Congress thought that's a bad idea once they

11   understood it differently than a user fee.

12              That would -- you know, it would

13   have really harmed the company, but it would have

14   harmed homebuyers more than it would have

15   harmed -- harmed the two companies, I would

16   argue, because that fee would have been passed

17   on.

18              One other example, the reason I even

19   went to Freddie Mac was they were under assault

20   because they were two large companies without a

21   financial regulator at the Federal Government

22   level.

23              I came in and designed a piece of

24   legislation that was very state of the art that

25   created a regulatory structure of the company --

APP000406

Page 41

1              ROBERT MITCHELL DELK

2   over the company.  But what it also, then, did

3   was it embedded a risk-based capital standard,

4   meaning that you paid -- you had to hold capital

5   commensurate with the risks that you undertook.

6   Never had that been happened -- had that happened

7   before.

8              There's been a lot of talk about it

9   now because Geithner did it as a way of the

10  recovery.  But we did it.  And we designed not

11  only a model to show, really, what the capital

12  requirements should be, but we designed the model

13  and had that model essentially written to

14  statute, which is pretty unprecedented.

15             It gave some flexibility to the

16  regulator, but we knew that complete regulatory

17  discretion would work totally with our

18  disadvantage, and so we had the specificity

19  included in the statute; first it's ever -- time

20  it's ever happened in the history of financial

21  services.

22             And why that is valuable for the

23  company was banks, because there're 8,000 banks,

24  they're charged, really, a -- they have a capital

25  assessment based off of a ratio of their assets,

APP000407

Page 42

1                     ROBERT MITCHELL DELK

2    4 percent of their assets; they had to hold that

3    much capital.  We thought that that was a poor

4    way of judging capital -- I mean, judging risk.

5                   And, secondly, we thought that, in

6    fact, mortgages were pretty predictable in what

7    their risks were; and we thought that that would

8    be penalizing the company.

9                   And, in fact, the Congress bought

10   that and, in fact, embraced the risk-based

11   capital standard, which really reduced the

12   capital standards for the company.

13                  Unfortunately, as time played out,

14   the regulator never implemented the -- the

15   risk-based test but relied instead on a -- a

16   smaller ratio.  And had they, in fact, created a

17   risk-based test, you would have never seen the

18   implosion of Freddie and Fannie.

19        Q.    Can you describe some of the

20   engagements you're working on presently?

21        A.    Well, I described the one on the

22   Low-Income Housing Tax Credit, which is a very

23   big deal and takes a lot of my time.  I am also

24   doing work, as I said, for the Madoff victims.

25   And I just got a couple of others that I prefer

APP000408

 1                    ROBERT MITCHELL DELK

 2    not to disclose because they're somewhat

 3    sensitive.

 4         Q.    In what sense are they sensitive?

 5         A.    Well, I mean, I just -- I don't know

 6    if this will become a public document.  People

 7    had -- I signed a confidentiality agreement that

 8    I would give counsel to a couple of these

 9    financial institutions but -- and -- and would

10    not disclose that I was doing it.

11         Q.    Okay.  Can you describe, in general

12    terms, what you're doing for them?

13         A     Just give them counsel and strategic

14    advice on going -- or the issues before the

15    Congress; you know, how to approach those, how to

16    approach those intellectually so you, in fact,

17    you know, can be ahead of the curve and have a

18    substantive approach to legislative issues, in

19    fact, that makes your position unassailable in

20    positions you well do -- to be successful.

21         Q.    And with your current clients, do

22    you have services agreements in place with them?

23         A.    You mean contracts?

24         Q.    Contracts.

25         A.    Some, yes.  Mostly just oral.

APP000409

```
 1                     ROBERT MITCHELL DELK

 2     And -- and the reason I think they're oral is

 3     because, you know, they're of a limited duration.

 4     I mean, once, in fact, they're past a particular

 5     issue, which is kind of hard to define -- it's

 6     defined really by them rather than by me -- then,

 7     in fact, the engagement would extinguish.

 8          Q.    And are you paid a monthly retainer?

 9     Are you paid hourly?  How are you compensated for

10     your work?

11          A.    A month -- monthly retainer --

12          Q.    Okay.

13          A.    -- and then, on some of the issues,

14     for example, the -- the Low-Income Housing Tax

15     Credit, I'm paid a success fee on that if we

16     are -- if I am successful.

17          Q.    What's the nature of that success

18     fee?

19          A.    If -- if, in fact, if the sale is

20     consummated, then, in fact, I get a large success

21     fee.

22          Q.    Is that a percentage?

23          A.    No.

24          Q.    So it's just a stipulated amount?

25          A.    Yes.
```

APP000410

1                    ROBERT MITCHELL DELK

2          Q.    How often do you structure your

3    compensation as a success fee?

4          A.    I've got two clients that do that.

5                That's kind of an unusual situation.

6    I mean, you -- you know, if you're a single

7    proprietor in this field, you have to have some

8    cash flow, so you have to have some contracts.  I

9    mean, these things, I -- I would argue, are --

10   are very much long shots.  You invest a lot of

11   time.  And, you know, it's like going to trial --

12   you might win and you might not win -- if you're

13   a trial lawyer.

14               But if you do win, there's a, you

15   know, significant payday which justifies what

16   you've done; if you don't win, then, you know,

17   you didn't win, and you just move on.

18               So I've got, you know, some of both.

19               But, again, I think you have to have

20   a -- you know, a -- a client base that pays you a

21   cash flow.  You can't exist on -- on these types

22   of, you know, success fee arrangements

23   exclusively.

24         Q.    Now, I understand you have

25   confidentiality obligations with respect to your

```
 1                    ROBERT MITCHELL DELK
 2    current clients, but can you tell me what your
 3    monthly retainer is for these clients?
 4          A.    It averages anywhere from 12 --
 5    $25,000 a month to $100,000 a month.
 6          Q.    And what do you take into account
 7    for charging 25- or 100,000 or any other amount?
 8    How do you determine your monthly retainer, is
 9    what --
10          A.    Well, I'd say --
11          Q.    -- I'm asking?
12          A.    -- that, you know, because I'm an
13    individual firm -- a firm with one individual,
14    there's only a limited amount of time I can
15    provide my clients.  And so what I do is I don't
16    want to have more than four clients --
17          Q.    Okay.
18          A.    -- and so, you know, I would attempt
19    to at least get $25,000 a month.
20                But if I could get one -- a client
21    that is a greater risk and has greater risk
22    within the legislative and regulatory arenas,
23    then, in fact, they do cost-benefit analysis and
24    think it makes sense to pay me in that amount.
25          Q.    If I can ask, what -- what do your
```

```
 1                   ROBERT MITCHELL DELK
 2   clients see as ben- -- what benefit do they get
 3   for this $25,000 a month or $100,000 a month, or
 4   whatever the retainer may be?
 5           A.    Well, they would either promptly --
 6   and -- and, again, I'm generalizing this -- they
 7   would either have either one or two objectives:
 8   one would be to kill legislation that would
 9   affect their business model; or, two, to pass
10   legislation that would enhance their business
11   model.
12                And that could also fall within the
13   regulatory arena, you know, to kill a regulatory
14   proposal that would harm them or to modify it in
15   a way that, in fact, benefits them.
16                So, you know, it's -- it's -- that's
17   kind of where it goes.  It's -- it's all about
18   outcome, and there's specific outcomes that
19   they're trying to achieve.
20           Q.    Let's say you're retained by a
21   client to have legislation passed.
22                How did you go about doing that?
23           A.    Well, first of all, you would need
24   to understand the client's issue; then you would
25   need to understand, you know, what, in fact, the
```

APP000413

Page 48

1                   ROBERT MITCHELL DELK

2    current law is and where it need to be changed;

3    and, third of all, you would need to develop a

4    narrative that, in fact, could be marketed to

5    public policy officials; and then, you know, you

6    would try to convince somebody of the efficacy of

7    your effort and -- and the substance that you're

8    trying to promote -- does it promote good public

9    policy? -- then you would end up, hopefully,

10   getting someone to introduce legislation,

11   Number 5; and then, six, you would build

12   grassroot support for it and the support with

13   others to, in fact, support that effort with an

14   eventual goal of having it successfully passed in

15   a subcommittee or committee and in the full body

16   of Congress.

17        Q.   So the first step is understanding

18   your client's problem and the law?

19        A.   Right.

20        Q.   And what do you do to -- what do you

21   do to that end?

22        A.   Like you would do with any of the

23   clients you do, ask -- sit in and talk with the

24   client or talk with people who have worked with

25   the client and try to understand their issue.

```
 1                    ROBERT MITCHELL DELK
 2                 I mean, when you're in my position,
 3    for example, if -- if there's a -- you know, a --
 4    an issue that they're trying to derail, let's say
 5    it's a bill that would tax, you know, their
 6    existing business, you really don't need to know
 7    more than what their business is and what the
 8    benefits they provide to the public and how this,
 9    in fact, proposal would harm that business and
10    harm the public.
11                 You -- you know, that's kind of
12    where you would go.  It's generalized, but you
13    specifically just need to know how the particular
14    proposal impacts their company.
15         Q.    And how extensive is that initial
16    review of the client's business, typically?
17         A.    It depends.  I mean, it could
18    be -- it could require a lot of research, you
19    know, vis-a-vis using the Internet and trying --
20         Q.    What kind of research?
21         A.    -- to gather information; or it
22    could be, you know, information that could be
23    gathered because there's a lot of publicity
24    regarding the companies.
25                 For example, I do work for some
```

 1                 ROBERT MITCHELL DELK

 2   small-dollar Internet lenders, commonly called

 3   "payday lenders," and you know what the issues

 4   are; you know who's trying to, in fact, change

 5   their business model.

 6                 And so, you know, the ability to

 7   understand their issue would be a lot easier

 8   than, you know, somebody who was a more obscure

 9   company in something that was kind of on the

10   fringes of financial services I've never dealt

11   with.

12                 It's really a case-by-case kind of

13   analysis and exploration of -- of the -- of the

14   issues.

15        Q.    And how many people do you meet with

16   at that client or with that client in that first

17   stage of investigation that you undertake?

18        A.    Again, it would be a case-by-case

19   analysis.  I mean, if there's somebody in the

20   company -- for example, the small-dollar lenders,

21   they're -- they're -- they're more computer

22   driven than they are personnel driven.  And so

23   you could talk with just a few people to kind of

24   understand the business model, understand really

25   the -- the dynamics out there of their processes.

APP000416

```
 1               ROBERT MITCHELL DELK
 2    And it makes it a lot easier to understand,
 3    rather than something that's complex.
 4         Q.    And did you do any legal research as
 5    part of this process?
 6         A.    I will do some, but I don't offer
 7    legal opinions on the issues.  I primarily talked
 8    to their lawyers, in-house or outside counsel,
 9    about issues, would consult with them also about
10    the approaches that I would suggest, make sure
11    that -- you know, that we're aligned on,
12    substantively, how to approach an issue.
13               It's -- it's -- it's an observation
14    of the obvious, but it makes no good to try to
15    accomplish something that doesn't accomplish the
16    goal of the client.
17               So, you know, it -- it really goes
18    all over the park on who you would need to talk
19    to before you can, in fact, substantively feel
20    comfortable understanding an issue and make a
21    recommendation on kind of, you know, a
22    substantive approach to their issue.
23         Q.    And in this first stage, this
24    introductory phase of this engagement where
25    you're seeking to work with this client to pass
```

APP000417

Page 52

1                    ROBERT MITCHELL DELK

2    legislation, do you create any work product

3    during this first investigatory phase, typically?

4          A.    Yeah.

5          Q.    What type of work product do you

6    create?

7          A.    I mean, I would -- I would create a

8    notebook of kind of my understanding of the

9    company, all the articles surrounding the

10   company, things like that.

11              I mean, my -- my approach to this

12   has been refined as I've been doing it for

13   10 years.  When I first started out, you know, I

14   was not probably as thorough as understanding

15   because I just didn't have the resources and,

16   really, the Internet was not what it is today.

17              But, you know, again, there's no --

18   no better way of understanding, you know, what a

19   client is looking for than talking to the client

20   or the people who the client wants you to talk

21   with within the organization.

22              THE VIDEOGRAPHER:  Slide your mic up

23        a little bit.  It's hitting the table.

24   BY MR. ABRAHAM:

25        Q.    The next phase, I believe, is you

APP000418

 1                    ROBERT MITCHELL DELK

 2    testified that you create a narrative.  That

 3    would be the next phase of your typical

 4    engagement.

 5                    And what is that?  What do you mean

 6    by that?

 7            A.    Well, let's say, for example, you've

 8    got a company that makes widgets, and the

 9    Government wants to tax the widgets.  I think you

10    would try to develop a narrative, meaning that

11    you could, in fact, develop a white paper that

12    shows that the productions of widgets has a

13    public benefit and that, in fact, if the

14    Government's action, for example, attacks on

15    those widgets were to, in fact, be imposed, it

16    would make the product prohibitively expensive

17    for some class of people; it would make its

18    competitors -- it would give its competitors a

19    competitive advantage unfairly; and the public

20    benefit that ostensibly is the cause for it, for

21    example, the tax, is -- is really flawed.

22                    So you would develop that.  And

23    whether you, in fact, you know, created a

24    one-pager to articulate what you're trying to

25    accomplish, and the public benefits associated

APP000419

Page 54

1                    ROBERT MITCHELL DELK

2   with it would be one way of doing it, or creating

3   a white paper that, in fact, you, in fact, would

4   bring, for example, economists in or lawyers in

5   that could, in fact, you know, offer expert

6   opinions and could be folded into such a -- a

7   narrative.

8        Q.    What did you do with this white

9   paper once it's drafted -- or this narrative?

10        A.    Well, it depends on what the client

11   wants to do with it.  I mean, it -- if -- for

12   example, if it's to aid in the marketing of a --

13   a particular issue and a particular position on

14   an issue, then you would probably disseminate it

15   to public officials, disseminate it to the press

16   to try to get the article written -- an article

17   written in a way that is favorable for your

18   client and further what you're trying to

19   accomplish.

20        Q.    And after you draft this white paper

21   and you try and deploy this white paper or -- or

22   put it in the right hands, the next phase, I

23   believe you testified, is to get legislation

24   passed.

25                Tell me about that.

APP000420

 1                   ROBERT MITCHELL DELK

 2          A.     Well, it -- it -- as I said, you're

 3     either probably getting legislation passed or

 4     you're stopping legislation from being passed,

 5     depending on the client's perspective.  That's

 6     done through interfacing with Members of Congress

 7     and with their staff and, you know, finding

 8     somebody that is sympathetic to your position and

 9     understands either why this legislation would be

10     positive from a public policy perspective or the

11     outcome you're trying to derail would be hurting

12     to the public.

13          Q.     Do you ever draft the legislation

14     yourself?

15          A.     Well, I -- no.  I've -- I've relied

16     on the attorneys to do that with my own review of

17     it.

18                 Typically, what happens, though,

19     when somebody introduces a bill in the Congress,

20     even if somebody has drafted legislation, the

21     person who is promoting that, the Member, would

22     take it to what is called Legislative Counsel,

23     and they would put it in their own language.

24          Q.     So they would rewrite it?

25          A.     Right, yeah.  Correct.

APP000421

```
 1                   ROBERT MITCHELL DELK
 2          Q.    Okay.  And is there a moment in a
 3    typical engagement where you realize that your
 4    efforts have been successful or they have failed?
 5          A.    Well, ultimately, success depends on
 6    whether you either pass a bill or you, in fact,
 7    derail something that's harmful to your client.
 8                 So that's a pretty measurable
 9    outcome.
10                 There doesn't -- I mean, in the
11    current environment, I mean, it -- there's just
12    not a lot of legislation passed these days -- or
13    signed into law, I should say.  So, you know, I
14    mean, you know, you could go on for a period
15    of years trying to effectuate a -- a -- a law
16    change, and you just have to continue on.
17                 I mean, as you know, the Congress is
18    two years.  There are two different sessions.
19    And so if you're unsuccessful in one Congress,
20    depending on the appetite and the need for the
21    client, they might want to continue through the
22    next Congress, given that there's some momentum
23    hopefully generated and try to get it passed.
24          Q.    So aside from the -- this sort of
25    introductory due diligence phase and the
```

```
 1                ROBERT MITCHELL DELK
 2   narrative white paper phase and then the more
 3   active legislative phase, is there any other task
 4   that you undertake typically for a client?
 5         A.    Well, I think you have to monitor
 6   the process, and, you know, you have to make
 7   midcourse corrections in your strategy if
 8   something is not working.  I don't think you can
 9   lay out a strategy and assume it's going to
10   always be effective.  The dynamics change,
11   and you end up, you know, making changes
12   accordingly.
13              It's a very iterative process.
14   And -- and, again, while I've described it in
15   basically three or four stop -- steps, this could
16   take, you know, months; this could take years.  I
17   mean, this is -- you know, there are a lot of
18   people in -- just as an example -- in this town
19   who worked on the Glass-Steagall Act, pres- --
20   preserving it, and others who tried to repeal it.
21   And I've known people who worked on that for
22   25 years and sent kids to college and to graduate
23   school just on that one Act.
24              So, you know, if you look at the
25   legislative process -- and being a lobbyist in
```

APP000423

```
 1                    ROBERT MITCHELL DELK
 2   this arena, success is always not defined by
 3   passing something within one year or one week or
 4   one month.  I mean, it's a -- there's no way you
 5   can ever predict how long it's going to take and
 6   whether you'll be successful.
 7                    But, having said that, I think, at
 8   the end of the day, you know, the client can look
 9   at the cost-benefit analysis and say, Well, if
10   this, in fact, passes or, in fact, this is
11   derailed, here will be the quantifiable benefits
12   to my company.
13                    And it's worth going through years
14   of this process, including payment to lobbyists
15   that were, in fact, trying to achieve these
16   outcomes.  I mean, otherwise, you know, people
17   like Google wouldn't be spending a billion
18   dollars a year on lobbying.
19        Q.    Just getting back to the specific
20   type of lobbying that you do, you said your niche
21   was financial services.
22                    Would you describe yourself as
23   having any other type of niche within this
24   industry?
25        A.    Well, I would define financial
```

APP000424

```
 1                    ROBERT MITCHELL DELK
 2   services very broadly.
 3          Q.    How would you define financial
 4   services, then?
 5          A.    Anything that affects a company in
 6   the financial services arena would be a financial
 7   services issue.
 8          Q.    And what about taxation?
 9          A.    Yeah.
10          Q.    Did you have any specific focus or
11   specific expertise within -- within taxation?
12          A.    No.  I mean, I -- I've -- I
13   certainly have worked on tax issues that I just
14   articulated with Freddie Mac and with others that
15   impacted financial services companies, but my
16   expertise is not, quote, tax, per se.
17          Q.    Okay.
18                I'd like to talk a little bit about
19   Ben Barnes and the work you've done for
20   Ben Barnes --
21          A.    Okay.
22          Q.    -- when is the first time you met
23   Ben Barnes?
24          A.    I -- I'm guessing it was probably
25   35 years ago.
```

APP000425

Page 60

```
 1                ROBERT MITCHELL DELK
 2                As a little bit of background, my
 3    father-in-law was John Connally's Chief of Staff
 4    when he was Governor, and Connally -- and -- and
 5    Barnes was the Lieutenant Governor, so their
 6    relationship goes way back.
 7                I've been -- I've been either
 8    married or dating my wife for 35 years.  And so
 9    in the course of that interfacing within the
10    Austin community, I've known Barnes pretty much
11    since then.
12         Q.    Are you from Austin?
13         A.    No.  I'm from Georgia originally.
14         Q.    So how did you first meet
15    Ben Barnes?
16         A.    On some social occasion in --
17    probably in Austin.
18         Q.    And when was that?  Do you recall?
19         A.    I -- I have no clue.
20         Q.    And when was the first time you
21    worked with Ben Barnes in a professional
22    capacity?
23         A.    When I was head of Freddie Mac, I
24    had Barnes do some work for Freddie Mac --
25         Q.    Do you remember when that was?
```

APP000426

```
 1                ROBERT MITCHELL DELK

 2          A.    I would say it was probably in the

 3     late '90s, early 2000 -- mid-'90s, late '90s --

 4     I -- I -- it's -- we're talking, you know,

 5     20 years ago.

 6          Q.    Again, what was your position at

 7     Freddie Mac at that time?

 8          A.    I was the Senior Vice President,

 9     head of the Government Relations, the external

10     world for Freddie Mac in Washington.

11          Q.    And do you recall for what issue you

12     engaged Ben Barnes?

13          A.    Ben Barnes' reputation was having

14     very good relationships with Members of the

15     Democratic Party.  It was certainly well

16     documented that he was a major fund-raiser for

17     Democrat Members of Congress, including the

18     Senate and the House.  And he was very close with

19     people in the Leadership in the Senate and the

20     House.

21                And it was for that reason that I

22     retained him to try to have someone who could

23     have a -- who has a -- had an existing

24     relationship with the leadership, who, in fact,

25     could tell the Freddie Mac story and deal with
```

APP000427

Page 62

1                      ROBERT MITCHELL DELK

2      any Freddie Mac issues that were pending before

3      the Congress.

4            Q.    So there wasn't a specific issue for

5      which you retained him?

6            A.    No.

7            Q.    It was just generally to have --

8            A.    Exactly.

9            Q.    -- him on retainer?

10           A.    Yes.

11           Q.    Do you recall how you structured his

12     compensation at that time?

13           A.    I think he was paid $35,000 a month.

14     And it was like a, you know, one-year, two-year

15     contract that kind of renewed itself.

16           Q.    Was this pursuant to a written

17     agreement?

18           A.    Yes.

19                 This was a -- a major corporation.

20     It didn't do things like I do, orally --

21           Q.    That was Freddie Mac's practice --

22           A.    Right --

23           Q.    -- at the time?

24           A.    -- exactly.

25                 THE COURT REPORTER:  You have to let

1                    ROBERT MITCHELL DELK

2          him finish, please.

3    BY MR. ABRAHAM:

4          Q.    And what type of legislation were

5    you trying to influence at that time?

6          A.    I -- I -- I -- I can't recall

7    what -- I mean, it was user fees.  It was things

8    of that nature.  It was detractors, you know,

9    who, in fact, were competitors who try to use the

10   legislative regulatory process to, in fact,

11   deride the company and were -- were hostile to

12   the company.

13             And so what people like Barnes would

14   do would be -- you know, we would, in fact, give

15   him exactly the story about the benefit we

16   provided to taxpayers -- I mean to homebuyers

17   across the country, who would tell the leadership

18   about this.  So when they heard a story by a

19   detractor, they would be dubious of its, not

20   only, relevance but accuracy.

21             In a situation like that -- and this

22   is the way it works in Washington -- people are

23   retained every day but not used every day.  I

24   mean, it's kind of like an insurance policy.  And

25   Ben Barnes had great relationships with, you

```
 1                  ROBERT MITCHELL DELK

 2   know, the most high-ranking Democratic Members of

 3   the House and the Senate, was a very, you know,

 4   valuable asset to have in your lobbying team.

 5                  THE WITNESS:  Sorry.

 6   BY MR. ABRAHAM:

 7        Q.    Do you know if Ben Barnes registered

 8   at that time as a lobbyist for --

 9        A.    I don't --

10        Q.    -- Freddie Mac?

11        A.    -- recall if there were registration

12   requirements at that time.  I don't think there

13   were.

14        Q.    Okay.  And you testified that it was

15   the practice, and it still is the practice, to

16   retain high-profile individuals but perhaps not

17   even use their services?

18        A.    Well, it depends on how you define

19   "use."  I mean, you use their services because

20   you're constantly talking to them and you're

21   getting intelligence, which is invaluable.

22              So, you know, if you have a

23   conversation once a week with someone like a --

24   hypothetically, Ben Barnes, and you find out what

25   the Majority Leader of the Senate is thinking
```

APP000430

```
 1                    ROBERT MITCHELL DELK

 2    about a particular issue, I would argue that

 3    that's worth what they're retained to do, just

 4    that one phone call.

 5               But, again, it's in the eyes of the

 6    beholder.  I can just tell you, as running a

 7    major corporation's Government relations, having

 8    people who are either subject-matter experts or

 9    have tremendous relationships, that's a very

10    valuable thing to have.

11         Q.    So getting back to your retention of

12    Ben Barnes -- or I guess Freddie Mac's retention

13    of --

14         A.    Right.

15         Q.    -- Ben Barnes in the late '90s or

16    early 2000s, do you recall if you retained him,

17    personally, or an entity?

18         A.    Well, I retained him because of

19    Ben Barnes.  I -- I assumed it retained his

20    entity.  I don't know at that time how many

21    people worked for Ben Barnes or what, but the --

22    you know, the corporate structure was irrelevant,

23    to me.

24               I mean, Ben Barnes is the one that

25    knew everyone and had all the relationships.
```

APP000431

1             ROBERT MITCHELL DELK

2        Q.    And why did it occur to you at that

3    time to retain Ben Barnes?

4        A.    Again, he was well known as a major

5    fund-raiser for Democratic politicians, and

6    somebody like that is extremely valuable for a

7    very big Washington office who is, you know,

8    constantly interfacing and trying to either pass

9    legislation or derail legislation; or -- or --

10   or, alternatively, tell a very positive story

11   about the public benefits that your entity

12   provides on an everyday basis.

13       Q.    Do you recall specifically the

14   nature of the services he provided at that time?

15       A.    Well, as I said, I would have

16   conversations with him or people on my staff

17   would have conversations with him.  You know, he

18   was always with those high-ranking Democratic

19   politicians.  And my assumption would be that if

20   he understood our story, if an issue came up

21   regarding Freddie Mac, he could, one, at least on

22   a very superficial basis, tell the story of a

23   positive public benefit entity; or, if he picked

24   up something, he could come back to us and say,

25   There's an issue here, you need to address it,

```
 1                ROBERT MITCHELL DELK
 2   either you do or I do.
 3                So, you know, that's kind of the way
 4   it worked with him, the way it worked with a lot
 5   of consultants.  As I said earlier, I think we
 6   probably had 25 consultants like Ben Barnes on
 7   our retainer.
 8         Q.   When you say "consultants," you mean
 9   lobbyists or --
10         A.   Yeah --
11         Q.   -- other service providers?
12         A.   -- as I said, they either had very
13   good relationships and/or they were
14   subject-matter experts.
15         Q.   You testified that you paid
16   Mr. Barnes $35,000 a month --
17         A.   I think --
18         Q.   -- at that time?
19         A.   -- that's correct.  Again, it's been
20   a long time --
21         Q.   Understood.
22         A.   -- at 35-, $40,000 a month, he was
23   a -- you know, one of the higher paid lobbyists
24   at the time.
25         Q.   Do you recall who else was retained
```

```
 1                ROBERT MITCHELL DELK

 2   by Freddie Mac at that time?  Of these 25

 3   consultants, do you have any recollection of who

 4   these others were?

 5        A.    Well, I can -- you know, for

 6   example, after he was defeated,

 7   Senator Alfonse D'Amato was on retainer.  At the

 8   time, John Dugan was on retainer, who had been at

 9   the Treasury Department, was at Covington and

10   then subsequently became the Comptroller of the

11   Currency.

12             You know, I can go --

13   Susan Molinari, who was a Member of the House of

14   Representatives in the -- in the Republican

15   Leadership, she was on retainer.

16             And then you can go down the list

17   for people who -- you know, who had

18   subject-matter expertise in certain areas that I

19   would retain.

20             But, you know, it was -- it -- it --

21   it was all about, again, either relationships or

22   substantive knowledge of a particular area

23   whereby they were experts, and them making a

24   particular statement on an issue carried a lot of

25   gravitas.
```

APP000434

1                    ROBERT MITCHELL DELK

2          Q.    Do you recall the retainers paid to

3     these other individuals you mentioned?

4          A.    I'd say everybody was paid between

5     25- and $50,000.

6                 This was, again, 20 years ago.

7          Q.    Do you recall how you determined to

8     pay Ben Barnes 35,000 at that time, as opposed to

9     25 or 50?

10         A.    I assume it was based on a

11    conversation with him, but I thought that was a

12    very fair price for him, given the kind of the

13    relationships he enjoyed.

14         Q.    And how long did he do lobbying work

15    or other work for Freddie Mac?

16         A.    I -- I -- I -- I left in 2003, and

17    he was continuing to do it.  So I think he was

18    probably doing it for probably eight years.

19    Again, this is -- you -- you have to remember, it

20    is 15 years ago -- 10 years ago.

21         Q.    And why did you leave Freddie Mac in

22    2003?

23         A.    Well, you might recall from the

24    press there was a big accounting issue.  The

25    board ended up taking out everybody of the senior

```
 1                   ROBERT MITCHELL DELK

 2    management team but me and one other person, and

 3    we ended up losing our jobs when the new CEO came

 4    in because he wanted to, in fact, start a clean

 5    slate with nobody from the old positions.

 6               Clearly, doing the outside work, I

 7    had nothing to do with accounting issues, but I

 8    was just part of that unfortunate debacle.

 9         Q.    So you were a victim of

10    circumstance?

11         A.    I think so.

12         Q.    And in 2003, you struck out on your

13    own?

14         A.    Yes.

15         Q.    And why did you decide to strike out

16    on your own as opposed to taking another position

17    elsewhere?

18         A.    Well, I -- I had -- running the

19    Freddie Mac operation was a seven-day-a-week,

20    18-hour-a-day job.  And I had young kids at the

21    time, and it took away from seeing my family at

22    all.  And so I didn't want another corporate

23    environment like that.

24               Those -- those jobs are, you know,

25    more management of people and more management
```

APP000436

```
 1                ROBERT MITCHELL DELK

 2    internally of the organization, and I just didn't

 3    want to do that.  I wanted just to kind of focus

 4    on, you know, being a sole proprietor where I

 5    could kind of control my own time -- destiny.

 6         Q.    In 2003, did you form an entity, or

 7    did you just simply strike out as a sole

 8    proprietor?

 9         A.    The last.

10         Q.    And what type of work did you do

11    starting in 2003 when you struck out on your own?

12         A.    Well, again, my expertise -- or at

13    least what I consider my expertise -- was

14    financial services.  And so a number of people

15    came to me and said, You know, can you give us

16    counsel on certain issues?

17              I did work for the REALTORS --

18         Q.    What do you mean "the REALTORS"?

19         A.    The National Association of

20    REALTORS, which represents all the REALTORS in

21    the country.  It's a very powerful trade

22    association in -- in Washington.

23              They wanted counsel on how to

24    interpret certain acts of what was going on in

25    Congress in regulatory bodies.  I did that.  I
```

```
 1              ROBERT MITCHELL DELK
 2   didn't lobby for them; this was more a consulting
 3   role.
 4        Q.    And what's that distinction?  Is
 5   that a registration distinction?
 6        A.    Well, it -- it would be a
 7   registration thing now, but it -- the differences
 8   is it's just kind of what is expected by the
 9   client.  I mean, is the client expecting you to
10   go up and actually interface with somebody or are
11   they expecting you to give counsel, and they take
12   that counsel and they do the interfacing?
13              Most of the big organizations
14   within -- have a bevy of lobbyists, and so they
15   pretty much do it on their own and -- and have
16   the consultants really to help them have more
17   information about which they can develop
18   strategies to implement on their own.
19        Q.    And following 2003, did you continue
20   doing work with Ben Barnes on any other matters?
21        A.    No.
22        Q.    Subsequent to 2003, when did you
23   begin working with Ben Barnes again?
24        A.    I don't know the exact date.  Again,
25   this is a -- but it seems it was probably about
```

1                     ROBERT MITCHELL DELK

2    2007/2008.

3         Q.    And under what circumstances did you

4    start working with Ben Barnes again?

5         A.    Ben came to me and said he had a

6    client, Stanford Financial, that was looking at a

7    potential tax issue that would impact their

8    business model.  And he asked if I would come on

9    and help him better understand the issue and help

10   him manage the issue.

11              MR. ABRAHAM:  Go off the record for

12         a second.

13              THE VIDEOGRAPHER:  Off -- off the

14         record at 12:16.

15                    -  -  -

16              (Whereupon, a brief recess was taken

17               from 12:16 p.m. to 12:30 p.m.)

18                    -  -  -

19              THE VIDEOGRAPHER:  On the record at

20         12:30.

21   BY MR. ABRAHAM:

22         Q.    Okay.  You testified, Mr. Delk, that

23   Ben Barnes retained you in or around 2007 or 2008

24   to work on tax issues firsthand for financials;

25   is that -- is that correct?

APP000439

1              ROBERT MITCHELL DELK

2         A.    I'm not sure of the date.  It could

3    be 2005/'6 -- you know, again, it's 10 years ago.

4    But that was -- he asked me to help him with a

5    tax issue that Stanford was looking at.

6         Q.    And I assume -- are you familiar

7    with Stanford Financial?

8         A.    I was not -- I mean, I --

9    I'm familiar with who they are, but I didn't -- I

10   didn't really know -- I don't know what their

11   business model was, per se.

12        Q.    Prior to your work with or for

13   Ben Barnes at that -- at this time for which

14   you're testifying right now, had you done any

15   work for Stanford Financial prior to this?

16        A.    Yes.

17        Q.    And what do you recall about that?

18        A.    I only worked with a woman named

19   Yolanda Suarez, who was the -- I don't know if

20   she was the counsel or what her actual role --

21   title was, but she kind of ran their outside

22   world.  That was my interpretation or in --

23   impression.

24              And I worked with her -- she called

25   and asked to have lunch with me, which I did.

APP000440

1          ROBERT MITCHELL DELK

2    And she wanted to retain me to kind of give her

3    an interpretation of legislative regulatory

4    events in Washington.

5          Q.    What do you mean by that?

6          A.    She would say, I just want to have

7    access to you so when something happens, I can

8    call you and you can explain to me what's going

9    on.  What that means substantively -- you know,

10   essentially what that means politically, where is

11   that going to lead either, you know, on a

12   regulation or where is it going to lead on a

13   legislative proposal.

14         Q.    You don't recall when this was,

15   approximately?

16         A.    It was in 2004, 2000-, maybe, -5.

17              It did not involve any advocacy

18   before the Congress.  It was more just a

19   counseling role, wanting me to help her interpret

20   Washington.

21              And as I recall, she was interested

22   in issues such as the regulation of banks at the

23   national level, the regulation and oversight of

24   broker/dealers by the SEC.  And we would talk

25   about various things going on regarding those.

```
 1                    ROBERT MITCHELL DELK

 2              And I -- interestingly, you know, I

 3    knew who Stanford was, but I had really not a

 4    great understanding of why she wanted to know

 5    about those.  She really never told me, you know,

 6    what kind of her objective was.  It was a very

 7    enigmatic kind of relationship.

 8         Q.   Do you recall how she came to you or

 9    how -- or how -- did -- did you have any prior

10    relationship with her?

11         A.   I didn't.  I believe -- and I don't

12    know if I'm correct on this -- that maybe Ben had

13    told her that -- you know, that I was available

14    and my expertise in the financial services area,

15    and that she should call me and -- and talk to me

16    about kind of Washington.

17              MR. MADRID:  Let me respectfully

18         object to the assumption, form.

19    BY MR. ABRAHAM:

20         Q.   And this would have been about at

21    the time when you left Freddie Mac, a little bit

22    after?

23         A.   I was -- it was probably a year or

24    so after Freddie Mac, I'm guessing.  I'll say

25    2004/2005.  It was -- it was not immediately
```

APP000442

```
 1                ROBERT MITCHELL DELK

 2   after, because I only worked with a couple of

 3   clients for the first year or so.

 4        Q.    And do you recall your first

 5   interaction with Yolanda Suarez?

 6        A.    Yeah.  I had lunch or dinner with

 7   her at the Four Seasons.

 8        Q.    And what was discussed at that

 9   meeting?

10        A.    We were discuss -- basically,

11   discussed kind of, you know, the -- the

12   regulation of -- of -- of national banks; the

13   chartering of national banks; legislation

14   regarding national banks; the regulatory

15   oversight of banking, generally, how it was

16   broken up between the Federal Reserve, State

17   banking regulators, the OCC.

18              Very much that first conversation

19   was more about banks specific and about how they

20   were regulated, who regulated, and kind of a

21   political environment regarding the regulation of

22   banks.

23        Q.    So is it your testimony that that

24   initial conversation or first meeting was about

25   giving Yolanda Suarez a primer on bank regulation
```

```
 1                    ROBERT MITCHELL DELK

 2    and -- and the various agencies that --

 3          A.    Yeah --

 4          Q.    -- that oversee banks?

 5          A.    -- I think that's a fair way of

 6    representing it.  That was her primary focus and

 7    interest, and I was kind of explaining that to

 8    her.

 9          Q.    And that first meeting was just an

10    informational meeting?

11          A.    Yes.

12          Q.    And did Ms. Suarez state why she

13    wanted this information?

14          A.    No.

15                MR. MADRID:  Objection: form.

16                Go ahead.

17                THE WITNESS:  No, not that I recall.

18          Again, this is, you know, 10 years, 12,

19          15 years ago; but I do not recall why she

20          was asking.

21                As I testified, I didn't know what

22          she intended to do with the information,

23          but I was more than happy to provide it to

24          her.

25
```

APP000444

```
 1                ROBERT MITCHELL DELK

 2   BY MR. ABRAHAM:

 3        Q.   Was there any follow-up to this

 4   initial meeting?

 5        A.   Yeah, she followed up and said that

 6   the meeting was very helpful and wanted to have

 7   me available to give her counsel, you know, where

 8   she could call me weekly, monthly, periodically,

 9   and, you know, go over kind of events in

10   Washington, and said she would retain me to do

11   that.

12             MR. MADRID:  Belated objection to

13        form.

14             Go ahead.

15   BY MR. ABRAHAM:

16        Q.   And do you recall how you were

17   retained by Ms. Suarez?

18        A.   She basically said, you know, I want

19   to --

20             MR. MADRID:  Objection: form.

21             THE WITNESS:  -- I want to retain

22        you -- again, this is my recollection,

23        many years having passed -- to give her

24        counsel on events occurring in Washington

25        and was willing to pay me a retainer of
```

```
 1                  ROBERT MITCHELL DELK
 2          $25,000 a month.  And, you know, it would
 3          be -- you know, the relationship would be
 4          developed over time.
 5    BY MR. ABRAHAM:
 6          Q.   Were you retained pursuant to an
 7    agreement -- a written agreement?
 8          A.   Did not have a written agreement
 9    with her.
10          Q.   And how did you arrive at the
11    retainer amount?
12          A.   She -- I don't know.  I guess it --
13    I -- my assumption is I probably threw that
14    number out knowing that that was kind of the
15    bottom-line number that I had been paying people
16    at Freddie Mac.  I'm sure I justified the number
17    to her and said, You know, I'd be more than
18    willing to help you interpret these events based
19    on that retainer.
20          Q.   And there was never a discussion
21    about a written agreement?
22          A.   No.
23          Q.   Do you recall the name of the
24    Stanford entity that you provided services to?
25          A.   I do not.  As I testified, I only
```

1          ROBERT MITCHELL DELK

2  really interfaced with her on the issue.

3          Q.    Did she represent herself as an

4  employee of a specific entity?

5          A.    I don't recall that.

6          Q.    Did you have an understanding as to

7  what entity you were providing services to?

8          A.    No, I didn't -- I didn't -- I

9  thought Stanford Financial was

10 Stanford Financial.  I didn't know what their

11 corporate structure looked like.

12         Q.    Did you undertake any investigation

13 as to what their corporate structure looked like?

14         A.    No.

15         Q.    And when you were retained by

16 Stanford Financial at that time, did you do any

17 investigation of -- of the organization, any

18 Internet research or other due diligence, like

19 who they are?

20         A.    Just at the materials that they

21 provided to understand kind of what their, you

22 know, activities were --

23         Q.    And what did you --

24         A.    -- and I was not going to be doing

25 any kind of advocacy on her behalf.  I was just

APP000447

```
 1                ROBERT MITCHELL DELK

 2   giving her interpreted -- my interpretation of

 3   events in Washington.

 4        Q.    And what type of materials do you

 5   recall receiving from Yolanda Suarez?

 6        A.    Just general marketing materials

 7   about what Stanford did.

 8        Q.    So you were just retained to be

 9   available for answering questions and -- and

10   giving general advice --

11        A.    Right --

12        Q.    -- about issues; is that right?

13        A.    -- that's exactly right.  And I -- I

14   took it upon myself to be a little more

15   proactive.  If I saw something I thought she

16   might be interested in, I'd call her and tell

17   her.  But, again, it was in the -- the realm or

18   in the area of kind of bank regulation and

19   broker/dealer regul- -- registration --

20   regulation.

21        Q.    Do you recall the inst- -- any

22   instance in which you were proactive and provided

23   her with information?

24        A.    I would periodically call her and

25   tell her if there was a hearing on financial
```

```
 1                    ROBERT MITCHELL DELK
 2    institution regulation, kind of what it was like,
 3    who were the Members that were interested in the
 4    issue and where I saw it going as far as a
 5    potential policy issue.
 6         Q.    Do you recall what specific issues
 7    prompted --
 8         A.    I -- I don't --
 9         Q.    -- you to reach out and be proactive
10    with her?
11         A.    -- I don't.  It was just more just
12    Congressional hearings on financial institutions
13    generally.
14              Again, I didn't know what she needed
15    the information for, so I was really shooting in
16    the dark, just providing her with anything that
17    related kind of generally to the regulation of
18    financial institutions and broker/dealers.
19         Q.    And how long were you retained by
20    Stanford Financial at that time?  Do you recall
21    how many months?
22         A.    Well, I -- I think I probably ended
23    up talking with her, I would guess -- I'm saying
24    10 to 12 months.  And then the -- kind of a
25    communication cutoff even reaching out to her was
```

APP000449

```
 1                 ROBERT MITCHELL DELK

 2    not -- was -- she didn't respond.

 3                 And they never really paid me for

 4    what they owed me.  And she eventually said that,

 5    you know, she appreciated my services, but they

 6    didn't need me because they -- Ben was doing all

 7    their work now in Washington.

 8         Q.    So they just -- they just never paid

 9    you for -- for a number of the --

10         A.    Right --

11         Q.    -- months that you worked?

12         A.    -- correct.

13         Q.    And how many months did they pay you

14    for?

15         A.    I -- I'm trying to get those records

16    now.  I think they probably paid me for

17    10 months -- 10 -- 10 or 12 months.

18         Q.    And who are you trying to get these

19    records from?

20         A.    From the bank.

21         Q.    From your bank?

22         A.    Yes.

23                 Again, it was over 10 years ago, and

24    the bank has changed companies five times.  And

25    every time they try to get a copy of it, it runs
```

APP000450

Page 85

1                    ROBERT MITCHELL DELK

2  into the abyss.

3          Q.    Which bank are -- are --

4          A.    It's -- it's Wells Fargo now.  It

5  started out, you know, First American Bank in

6  Washington.  It's gone through four ownership

7  changes.

8          Q.    And when was the last time you

9  requested or had a conversation with respect to

10  your records request?

11          A.    I -- I requested, I guess, about two

12  months ago, and they're still trying to get the

13  records.

14          Q.    Okay.

15          A.    Again, this was 2004-2005.

16          Q.    Do you recall how you were paid?  By

17  wire or by check?

18          A.    I think I was paid on two occasions,

19  and one -- and I think one was via wire, possibly

20  both were via wire.  I don't recall.

21                But I do recall that they owed me a

22  lot of money and just kind of walked away from

23  the contract, which, you know, when you're in

24  kind of position I am, you find that happens a

25  lot of times.

1                    ROBERT MITCHELL DELK

2          Q.    So they just retained you and didn't

3    pay you for a lot of your time?

4          A.    That's right.

5          Q.    And what did you do to seek payment

6    of the amount you believed you were owed?

7          A.    Nothing more than just said, You

8    know, can you pay me?  And that precipitated the

9    response from her, Well, we don't need you

10   anymore.  You know, we don't have a written

11   contract with you.  Your information was

12   valuable, but we're going to rely exclusively on

13   Ben Barnes Group to provide the services to us.

14         Q.    So it's your recollection that

15   Yolanda Suarez made a point of the fact that you

16   two did not have an agreement?

17         A.    Again, that's my recollection.  I

18   don't know if she -- you know, I didn't have a

19   written agreement with her.  I knew, from a legal

20   perspective, I had nothing to -- you know,

21   nothing to really base a claim on other than an

22   implied contract.  And, furthermore, being in the

23   kind of financial position I was in, I didn't

24   have the money to retain a lawyer and sue them --

25         Q.    Did it occur to you to sue them?

APP000452

```
 1                ROBERT MITCHELL DELK

 2         A.    No.  I mean, that would be the last

 3    thing I could do.  I mean, I don't -- I did not

 4    want my name associated with a lobbyist who, in

 5    fact, didn't get paid money by a corporate client

 6    who, at the time, was a respectable one, at least

 7    I thought, and, you know, ends up suing them if

 8    they don't pay you.

 9         Q.    You testified that Yolanda --

10    Yolanda Suarez explained that she no longer needs

11    your services because, quote, Ben Barnes was

12    doing all the work.

13              What -- what did you mean by that?

14         A.    As I said, I didn't lobby for them

15    but it gave her interpretation of Washington

16    events.  And I assume -- again --

17              THE WITNESS:  God bless you.

18              -- I assumed what she meant is that,

19         you know, she could get that same counsel

20         from Ben Barnes Group.

21              And so, you know, it was redundant

22         that she had two people on retainer, and

23         so, Thank you.

24              Again, I -- I don't recall the exact

25         words, but that was the sum and substance
```

APP000453

```
 1                    ROBERT MITCHELL DELK

 2          of what she was saying.

 3   BY MR. ABRAHAM:

 4          Q.    At that time in 2004 --

 5          A.    '5 --

 6          Q.    -- or 2005, whenever --

 7          A.    -- whatever the year was, yes.

 8          Q.    -- at the time in which you were

 9   providing services directly to

10   Stanford Financial, did you have a relationship

11   with Ben Barnes?  Did you speak with him at that

12   time regularly?

13          A.    I would see him socially, but I

14   didn't talk to him about the representation of

15   Stanford.

16          Q.    When Yolanda Suarez said that

17   Ben Barnes was doing work for them, did you know

18   that already?  Was that a surprise to you?

19          A.    No, I -- I don't know -- I -- I

20   don't recall that.  But I'm not surprised that he

21   was.  I mean --

22          Q.    Why is that?

23          A.    Well, I mean, we know after the fact

24   that he was certainly representing them.  And I

25   knew at the time -- I mean, again, as I testified
```

1              ROBERT MITCHELL DELK

2    earlier, Ben Barnes was a -- you know, a name

3    that anybody who ran a Washington office would

4    enjoy having as part of their team.  He was well

5    connected with Democrats and

6    Republicans -- excuse me -- Democrats in the

7    House and Senate.

8                   Having said that, you know, I felt

9    like that, you know, the value I added was my

10   relationship with Republicans and my expertise on

11   financial services companies.  But I didn't argue

12   the fact with her.  I didn't really have a lot of

13   standing to argue.

14        Q.    So your expertise is with

15   interfacing with Republicans?

16        A.    Historically, had been, yeah.  But

17   my substantive expertise, as I testified, is

18   financial services companies and

19   their legislative and regulatory issues.

20        Q.    2004 was a period in which

21   Republicans were in control of the House?

22        A.    Correct.

23        Q.    And Ben Barnes, his expertise was

24   interfacing with Democrats?

25        A.    Correct.

APP000455

Page 90

1           ROBERT MITCHELL DELK

2       Q.    Do you have an understanding as to

3   why a financial services company at that specific

4   time would have wanted to retain Ben Barnes as

5   opposed to you?

6           MR. MADRID:  Objection to form.

7           MR. IGIEL:  I object to form --

8           THE WITNESS:  No.

9           MR. IGIEL:  -- it calls for

10       speculation.

11           THE WITNESS:  No.

12   BY MR. ABRAHAM:

13       Q.    Do you recall specifically the

14   issues that you advised Stanford Financial with

15   respect to at that time?

16       A.    Again, it was -- it was a

17   relationship where Yolanda was trying to

18   understand the regulation of financial

19   institutions, both banks and broker/dealers.  And

20   so any issue that was in that space, I tried to

21   interface with her and explain to her what I

22   thought was going on, what the politics are and

23   where it would lead.

24       Q.    And then there came a point, as you

25   testified -- you weren't sure exactly when, but

1                    ROBERT MITCHELL DELK

2    there came a point when Ben Barnes retained you

3    to work on tax issues for Stanford Financial?

4          A.   Well, he said that there was a tax

5    issue that Stanford was interested in, and -- and

6    that was basically the genesis of our

7    relationship.

8          Q.   And when was that?

9          A.   Again, I -- I think it was 2006 --

10   I -- again, these years are kind of blurring

11   together.  It was a decade ago, almost.

12         Q.   And why did Ben -- did you reach out

13   to Ben Barnes or did Ben Barnes reach out to you

14   at that time?

15         A.   He reached out to me.

16         Q.   How did he do that?  Do you recall?

17         A.   I -- I don't know if it was a phone

18   conversation or a lunch meeting or what, no.

19         Q.   Were you surprised when he reached

20   out to you?

21         A.   No.

22         Q.   Do you know why he reached out to

23   you for -- for a tax issue?

24         A.   Well, it was a financial services

25   company that had a tax issue.  I don't know what

APP000457

```
 1                    ROBERT MITCHELL DELK
 2   Ben's expertise was on financial services company
 3   or financial services tax issues, but I think Ben
 4   felt that I was smart enough to help him
 5   understand the issue and prepare him to be an
 6   effective advocate for Stanford in that effort.
 7        Q.   Did you -- at that time when
 8   Ben Barnes contacted you, did you believe that
 9   Ben Barnes needed your services to achieve
10   whatever goal he was trying to achieve?
11             MR. MADRID:  Objection: form.
12             THE WITNESS:  I -- I'm very
13        confident he believed I could add value to
14        his -- to his group's effort.
15   BY MR. ABRAHAM:
16        Q.   Do you know if Ben Barnes any -- has
17   any expertise or -- or understanding of financial
18   services issues?
19        A.   I don't.
20        Q.   You don't believe that he has that
21   expertise?
22        A.   I didn't say -- I don't know that he
23   does.  I don't know -- I mean, he certainly has
24   knowledge of financial institution issues, but,
25   you know, whether he has -- whether it's a
```

APP000458

```
 1                ROBERT MITCHELL DELK
 2    substantive expertise, I don't know.
 3              His background is he's, you know,
 4    done a lot of development, a lot of things; so, I
 5    mean, he would probably know something about
 6    banks.  But I don't know what his background was;
 7    but Ben, again, had many clients and was looking
 8    for somebody to help him with a specific one,
 9    reached out to me, thinking I could add value to
10    his effort.
11         Q.   Why did he specifically need you for
12    this specific engagement?
13         A.   I -- I --
14              MR. IGIEL:  Object to form.
15              THE WITNESS:  -- I can't answer
16         why --
17              MR. MADRID:  Object to form.
18              THE WITNESS:  -- what he was
19         thinking, but I do think that --
20              THE COURT REPORTER:  Wait, wait.
21         I'm sorry.
22              MR. MADRID:  Object to form.
23              THE WITNESS:  -- but I -- I did have
24         some expertise and a reputation of dealing
25         with financial services issues.  And I
```

APP000459

```
 1                    ROBERT MITCHELL DELK
 2            think he thinks that that was -- you know,
 3            somebody could help him.
 4     BY MR. ABRAHAM:
 5            Q.    Did he have expertise in that issue?
 6            A.    Again, I don't know what his
 7     expertise was on that particular issue.
 8            Q.    Aside from this tax issue, which
 9     we'll talk about soon, were you retained by
10     Ben Barnes for any other issue in connection with
11     Stanford Financial?
12            A.    No.
13            Q.    And when you were retained by
14     Ben Barnes, were you retained pursuant to a
15     agreement, a written agreement?
16            A.    An oral agreement.
17            Q.    And what was your monthly retainer
18     again?
19            A.    $25,000.
20            Q.    And when you were paid pursuant to
21     this engagement, were you paid by Ben Barnes or
22     by Stanford Financial?
23            A.    By the Ben Barnes Group.
24            Q.    Do you recall how you were paid?  By
25     check?  By wire?
```

APP000460

1                    ROBERT MITCHELL DELK

2          A.    Check.

3          Q.    In connection with your work for

4    Ben Barnes relating to the Stanford Financial

5    Group, were you ever paid by Stanford Financial

6    or any Stanford entity for this work?

7          A.    No.

8          Q.    And when you were working for

9    Ben Barnes for the Stanford Financial tax issue,

10   did you interface with anybody at

11   Stanford Financial?

12         A.    Primarily interfaced with Ben.

13         Q.    Do you recall interfacing with

14   anybody at Stanford In- -- International [sic]

15   for this tax issue?

16         A.    Well, this spanned a couple of

17   years, and there were a couple of meetings where

18   Yolanda Suarez was involved in a meeting.  They

19   eventually opened up a Washington office, and

20   they, in fact, were briefed on the tax issue.

21              There were a couple of meetings that

22   I was aware of where Allen Stanford was in a

23   meeting over the course of several years, and

24   that's it.

25              But, basically, interfacing was with

APP000461

```
 1                ROBERT MITCHELL DELK

 2    Barnes.  He was the quarterback of the project.

 3         Q.    You said Stanford opened up a

 4    Washington office?

 5         A.    Yes.

 6         Q.    And what do you recall about that?

 7         A.    Well, I -- I think that there was --

 8    from my perspective, they -- Yolanda Suarez

 9    wanted to open up a Washington office to kind of

10    manage things herself, as opposed to Ben managing

11    things.

12               And as it turned out, they opened up

13    a Washington office.  And she had -- had asked

14    Ben for recommendations, and he asked me for

15    recommendations on people that might be work

16    there.  And I gave him a couple of names, which

17    he passed on to Yolanda.

18               They did not -- as I recall --

19    again, this is sometime back -- as I recall, the

20    Washington office was there to follow legislative

21    regulatory issues that could potentially impact

22    the company, but they were excluded or they did

23    not do the tax issue.  That was done and overseen

24    and quarterbacked by Ben Barnes Group.

25         Q.    What do you mean by "quarterbacked"?
```

APP000462

1             ROBERT MITCHELL DELK

2        A.    Well, he was kind of the -- managed

3    the issue for the company; in other words, in all

4    aspects of it: trying to understand the issue,

5    trying to develop the narrative, trying to

6    develop the legislation, figuring out if the

7    legislation would work, advocating the

8    legislation before Members of Congress and the

9    like.

10        Q.    Do you recall when Stanford opened

11   up a Washington office?

12        A.    I don't.  I think it was probably

13   2009.

14        Q.    And you mentioned that they opened

15   the Washington office to replace the work that

16   Ben Barnes was doing?

17        A.    I think it was to supplement the

18   work, because they did not, as I recall -- again,

19   Ben was the person who interfaced with the

20   company and Yolanda, primarily.  I only did it

21   when I was directed by Ben.

22             It's my recollection, or at least my

23   impression, that it was to supplement Ben's role

24   and to have people who were more ambassadors of

25   the company within the Washington kind of arena

APP000463

1            ROBERT MITCHELL DELK

2    to promote the company.

3            Q.    Were you ever asked to do work for

4    the Washington office?

5            A.    No.  I -- I met on occasions, at

6    Ben's suggestion, with the Washington office and

7    would update them on what was going on in the tax

8    issue, maybe two or three times on that --

9            Q.    Do you recall who you met with at

10   the Washington office?

11           A.    Well, there were two people,

12   Jim Conzelman and Lionel Johnson, who worked in

13   that office, and that was the only two people --

14           Q     Con -- Conzel- --

15           A     - and so --

16           Q.    -- man?

17           A.    Uh-huh.

18                 -- and we would meet and go over

19   kind of where -- where Ben was on the strategy

20   regarding the tax issue.

21           Q.    Do you have an understanding as to

22   when Stanford retained Ben Barnes?

23           A.    No.

24           Q.    Do you have an understanding as to

25   what Ben Barnes was retained to do for

APP000464

```
 1                ROBERT MITCHELL DELK
 2   Stanford Financial?
 3        A.    Well, I know he was retained to work
 4   on this tax issue.  Other issues, I don't know if
 5   he was -- you know, what -- what his involvement
 6   was, to be honest with you.
 7              When I started helping Ben on the
 8   Stanford issue, it was specifically the tax
 9   issue.
10        Q.    So you believe Ben Barnes was
11   retained specifically for a tax issue?
12        A.    At a minimum.
13        Q.    What is this tax issue?
14        A.    The USVI, United States
15   Virgin Islands, has a tax break, and products and
16   services that emanate from the Virgin Islands
17   enjoy a much lower corporate tax rate, 10 percent
18   versus 30 percent.
19              I'm sure we'll get into this, but as
20   you look at the issue, there are a couple of
21   things, in fact, that drove this issue.  Congress
22   got involved in and regulations were passed
23   regarding the issue.  And to take advantage of
24   the tax break, the entity had to be in the USVI
25   183 days.  There was a residence requirement, and
```

```
 1              ROBERT MITCHELL DELK

 2   there was a sourcing requirement, meaning the

 3   source of the income had to emanate from the

 4   USVI.  So it was a two-part test.

 5              And as it turned out -- and I'm

 6   skipping over a lot of iterations -- they --

 7   Allen Stanford, apparently, moved his operations

 8   from Antigua to the USVI so he could meet the

 9   residency requirement, but because his income was

10   derived around the world, they were trying to

11   find a way where the sourcing would be broader

12   than just the USVI.

13              And they concluded -- at least I

14   think it -- and with Ben's counsel, that having a

15   sourcing from around the world was not practical,

16   but they would have to find a way potentially to

17   have the sourcing from, quote, the broader

18   Caribbean than the USVI.

19              And that's kind of, you know,

20   what -- after years and discussions -- many,

21   many, many hours of discussions -- that was the

22   conclusion, that, politically, that was the best

23   that could be done.

24        Q.    What do you mean by "sourcing"?

25        A.    The source of the income.  I mean,
```

APP000466

 1                ROBERT MITCHELL DELK

 2    it -- it emanates from a situs within a

 3    particular jurisdiction.  In this case, it would

 4    end up being -- coming from, I guess, their

 5    professionals that ran whatever entity it was in

 6    Stanford out of the Caribbean, as opposed to a

 7    world -- global kind of effort.

 8         Q.    So to qualify for the U.S.

 9    Virgin Island tax break, you had to be resident

10    in the Virgin Island -- U.S. Virgin Islands and

11    you had to operate, effectively, from the U.S.

12    Virgin Islands?

13         A.    Right.

14         Q.    And you were retained to influence

15    legislation to change this operational

16    requirement?

17         A.    Well, I was retained by Ben to help

18    him understand the issue, help him develop a

19    narrative around the issue, to help him develop a

20    strategy.

21              As I said, his -- I didn't lobby on

22    the issue.  His job was to, you know, come to a

23    conclusion, and then he would lobby the issue.

24    He was -- again, tax bills have to originate

25    constitutionally in the House of Representatives.

```
 1              ROBERT MITCHELL DELK

 2              And at that time, it moved into

 3    2006, the Democrats controlled the House of

 4    Representatives.  Charlie Rangel was the Chairman

 5    of the Ways and Means Committee.  And so, you

 6    know, it was Ben's role to, in fact, in- --

 7    influence the legislation.

 8         Q.    What do you mean by helping Ben

 9    understand the issue?

10         A.    Well, basically, "staffing Ben" on

11    the issue, is another way of saying it.

12              I basically sat him down after hours

13    and hours and hours, and this was with a group of

14    people, talking about what the tax issue is; why

15    the ticks -- tax issue is structured the way it

16    is; what are the problems for the way Stanford

17    was operating out of Antigua, as opposed to USVI;

18    what would be the alternatives, whether policy

19    alternatives, was there business arrangement

20    alternatives, that, in fact, could -- he could

21    fit under the -- the -- the test -- could the

22    test be expanded.

23              And so my role was kind of -- was

24    helping him understanding -- help him develop a

25    strategy.  And, again, Ben Barnes has been doing
```

1                 ROBERT MITCHELL DELK

2    this a long time, so I think he took my advice

3    and he put it into a Cuisinart and turned it on

4    with a lot of other advice and came out with his

5    own approach to how to do it.

6         Q.    Was it your understanding or your

7    recollection that -- at the time you were

8    retained to help Ben Barnes with this tax issue,

9    that he did not understand the issue?

10        A.    No, that's not my understanding.  My

11   understanding is, is I was helping him better

12   understand the issue and help him develop a

13   narrative around it and a strategy to find the

14   approach that worked for the business model that

15   existed for Stanford.

16             As it turns out, the existing

17   business model didn't work, and so it was a

18   recommendation that they had to change their

19   business model if they wanted to take advantage

20   of the law.

21        Q.    Well, how -- to the best of your

22   recollection, what was your impression as to how

23   well he understood the issue at that time?

24        A.    I think he very well understood the

25   issue.  It was, you know, trying to figure out

```
 1                ROBERT MITCHELL DELK

 2    where, in fact, there were ways of making it work

 3    for Stanford.  Was it a change in the statute?

 4    Was it a change in their business model?

 5                I mean, it's a very complex issue

 6    based on thousands of pages of regulations.  But

 7    we had summarized it basically into the two

 8    issues I've just described to you.

 9        Q.    When you say "we," what do you mean

10    by that?

11        A.    Working with Ben, discussing with

12    Ben, Ben's team.  I mean, the Ben Barnes Group

13    has a number of people who work on these issues.

14    They may have a bevy of clients.  It's a very big

15    operation.

16                This was not their only client, so I

17    was helping him with this one specific issue.

18    Although, as time elapsed, I helped him with

19    other issues.

20        Q.    Who else was working with you and

21    Ben Barnes on this tax issue?

22        A.    About the time that I started

23    helping Ben, Kent Caperton came onboard.  And it

24    was part of his responsibility to work on the

25    issue also, although Kent --
```

```
 1                    ROBERT MITCHELL DELK

 2          Q.     Who is Kent Caperton?

 3          A.     -- he's a -- an employee of the

 4   Ben Barnes Group.

 5          Q.     Is there anyone else that worked

 6   with you guys --

 7          A      Wyeth --

 8          Q      -- on this issue?

 9          A.     -- Wyeth Wiedeman worked on the

10   issue --

11          Q.     Who is --

12          A.     -- he works for --

13          Q.     -- Wyeth Wiedeman?

14          A.     -- he works for the

15   Ben Barnes Group.

16                 Patsy Thomasson is an employee of

17   the Ben Barnes Group.  She worked on the issue.

18                 Everybody was involved in this.

19   This is -- my impression was that it was a very

20   big client for Ben.

21                 And, eventually, then --

22          Q.     Why do you say this was a big client

23   for Ben?

24                 MR. MADRID:  Objection.  I don't

25          know that he finished his answer on that.
```

APP000471

```
 1                    ROBERT MITCHELL DELK

 2              THE WITNESS:  Well, I -- I had heard

 3         Ben say that this was an important issue

 4         for an important client.  And it was my

 5         impression -- again, impression -- that he

 6         was paid a lot of money to work this

 7         client and probably had a lot of riding on

 8         a success fee if it was successful.

 9              Again, that was just my impression

10         from conversations with Ben.  He -- he

11         didn't specifically or expressly say that.

12  BY MR. ABRAHAM:

13         Q.    Were there any other non-Ben Barnes

14  employees that you worked with --

15         A.    Yes.

16         Q.    -- on this issue?

17         A.    Eventually, Ben made the decision

18  that this was such a technical issue in the tax

19  area that he needed to have some help -- the

20  Ben Barnes Group needed help executing the issue.

21  And so he brought on John Raffaelli and one

22  other, who I'm forgetting.

23         Q.    Gould?

24         A.    No.  Gould worked for -- for

25  John Raffaelli.
```

APP000472

```
 1                ROBERT MITCHELL DELK
 2              MR. IGIEL:  I can't answer the
 3        question for you.
 4              THE WITNESS:  Okay.
 5              I -- I would need a document --
 6              MR. IGIEL:  I would if I could.
 7              THE WITNESS:  -- I would need a
 8        document --
 9  BY MR. ABRAHAM:
10        Q.    Okay.  But there were others --
11        A.    -- yeah, there were -- there --
12  there were people who were known to be so-called,
13  quote, tax experts that were brought in.
14        Q.    Why wasn't your expertise sufficient
15  at that time --
16        A.    Well --
17        Q.    -- to the best of your recollection?
18        A.    -- because my relationship was not
19  primarily with the tax writing committees but
20  with the financial services committee.  And so it
21  was a substantive expertise issue as well as a
22  relationship issue.
23              Again, at this time, the Democrats
24  were running the -- as I recall, the House and
25  the Senate.  And so he, you know, brought in some
```

1                    ROBERT MITCHELL DELK

2    people with Democratic relationships to buttress

3    his role and his leadership role for the group.

4         Q.    Why did his role need to be

5    buttressed?

6         A.    That's a decision he made.  I mean,

7    the -- these -- Raffaelli was known as being one

8    of the best tax lobbyists in town.  And I

9    thought -- I -- I assume Ben thought that that

10   could add value and help get this issue executed

11   in a way that benefited him.

12        Q.    And aside from Raffaelli, his

13   partner, did you recall anyone else being part of

14   this working group?

15        A.    Yes.  I -- I -- I'm just totally

16   drawing a blank on who the other individual was,

17   but --

18        Q.    Okay.

19        A.    -- he had been -- he had worked for

20   Senator Baucus for many years.

21        Q.    Do you recall if Ben Barnes was

22   working, with respect to this issue, for

23   Stanford Financial or for Allen Stanford,

24   personally?

25        A.    I have no idea.  I mean, again, I

APP000474

```
 1                    ROBERT MITCHELL DELK
 2   didn't work -- I was working for Ben, and I just
 3   was working for him on the issue and didn't know
 4   the corporate arrangement or the corporate entity
 5   that was -- I know that he had many conversations
 6   with -- with Allen Stanford; but I don't know who
 7   the representation was for.
 8        Q.    And all payments with respect to
 9   your work on this tax issue were made by
10   Ben Barnes and not Stanford Financial?
11        A.    They were made by the
12   Ben Barnes Group, not Ben Barnes.
13        Q.    Okay.
14             MR. ABRAHAM:  Let's mark this as
15        Delk 2.
16                       -  -  -
17             (Whereupon, Third-Party Defendant
18              Robert Mitchell Delk's Responses
19              to Plaintiff's First Set of
20              Interrogatories was marked, for
21              identification purposes, as Delk
22              Exhibit Number 2.)
23                       -  -  -
24   BY MR. ABRAHAM:
25        Q.    Okay.  I've placed before you what's
```

APP000475

```
 1                    ROBERT MITCHELL DELK
 2   been marked Delk 2 -- Exhibit Delk 2.
 3               Would you please take a moment and
 4   review it?
 5               (Whereupon, the witness reviews the
 6                material provided.)
 7   BY MR. ABRAHAM:
 8       Q.    Does this document look familiar to
 9   you?
10       A.    Yes.
11       Q.    And what is this document?
12       A.    This is Third-Party Defendant
13   response to the Plaintiff's First Set of
14   Interrogatories.
15       Q.    Did you -- do you recall working on
16   this document?
17       A.    Yes.
18       Q.    Okay.  I'd like you to turn to
19   Page 8 of this document --
20       A.    Before you do that, the other
21   individual I drew a blank on was Jeff Forbes.
22       Q.    Jeff Forbes --
23       A.    Yeah.
24       Q.    -- okay.
25               And you testified that Mr. Raffaelli
```

1              ROBERT MITCHELL DELK

2    was a well-known tax lobbyist --

3          A.    As was --

4          Q.    -- he --

5          A.    -- Mr. Forbes.

6          Q.    Okay.  That -- yeah, that's my

7    question.

8               Do you have an understanding as to

9    why Ben Barnes or Ben Barnes Group needed two tax

10   lobbyists for this issue, as opposed to one?

11         A.    No.  Both were very, very good,

12   though, well known in the field.

13         Q.    Do you know if they were engaged

14   pursuant to a written agreement?

15         A.    I have no idea.

16         Q.    Turning to Page 8 of the document

17   before you, Delk 2.

18               The bottom of Page 8 says, During

19   the relevant time frame, Delk was engaged by the

20   Ben Barnes Group, L.P. on numerous matters for

21   clients that were not the Stanford parties.

22         A.    Correct.

23         Q.    Do you recall who those clients

24   were?

25         A.    Yes.

```
 1                    ROBERT MITCHELL DELK

 2          Q.    Who were they?

 3          A.    One client was Meridian Investments;

 4     one client was Acacia, which was an FDIC case --

 5          Q.    What do you mean by that, "FDIC

 6     case"?  They had taken over that --

 7          A.    No.  They were trying to buy a

 8     property from the FDIC --

 9          Q.    Oh.

10          A.    -- the client was.

11                -- one client was a trade

12     association that represented small-dollar

13     Internet lenders.

14                And that was the three that I

15     recall.

16          Q.    Do you recall why you were engaged

17     by Ben Barnes Group for these other clients?

18          A.    Again, I think Ben was relying on me

19     to help him prepare for the -- to manage the

20     clients.  He reviewed -- he knew of my expertise

21     in the financial services arena and, I assume, my

22     relationships with some of the relevant Members

23     that oversaw those issues.

24          Q.    Was your work for Ben Barnes on

25     these other clients -- were you paid a separate
```

```
 1              ROBERT MITCHELL DELK

 2   retainer for -- for your work on --

 3        A.   Yes.

 4        Q.   -- them?

 5             Okay.  Do you recall what the

 6   amounts were for those other clients?

 7        A.   Well, the -- the Meridian was an

 8   initial up-front fee of $50,000; the Acacia was

 9   two payments, which I think totaled $50,000,

10   25,000 increments; and the Online Consumer [sic]

11   Network was a retainer of 25,000 a month; and

12   then the MCC Computer, I think, was two payments,

13   one of 10,000 and a second of 10,000.

14             All the payments did not come from

15   the clients but came from the Ben Barnes Group.

16        Q.   Did you invoice these payments

17   separately?  Did you segregate your invoicing --

18        A.   I -- I don't recall that.

19        Q.   Are you confident that you could

20   track the payments that were made specifically

21   from Ben Barnes for your work on

22   Stanford Financial in -- as opposed to the

23   payments that were made for these other clients?

24        A.   I think so.

25        Q.   On Page 9 of this document, the
```

```
 1                ROBERT MITCHELL DELK
 2   second line from the top, you write, Out of the
 3   $500,000 the Ben Barne Group -- Ben Barnes Group,
 4   L.P. claims it paid me for work related to the
 5   Stanford parties, approximately 125- to 175,000
 6   of that money was for services I performed for
 7   other clients --
 8            A.    Correct.
 9            Q.    -- and you list these other clients.
10            A.    Correct.
11            Q.    Why do you believe that
12   Ben Barnes Group's claims that they paid you more
13   for Stanford Financial than -- than they actually
14   did?
15            A.    I have --
16                  MR. MADRID:  Objection: form.
17                  THE WITNESS:  -- no idea.
18   BY MR. ABRAHAM:
19            Q.    Why do you estimate that it's
20   between 125- and $175,000, as opposed to a more
21   specific number?
22            A.    Because I -- I -- I don't have the
23   records of how much Acacia and MCC actually paid.
24   The -- the Meridian Investments was $50,000, as I
25   said.  Ben Barnes owed me money for the Online
```

APP000480

1                    ROBERT MITCHELL DELK

2   Consumer [sic] Network, which was never paid.

3              But I didn't know the exact amounts.

4   I didn't have the records of the exact amounts on

5   the Acacia and MCC because they were two or three

6   different payments.

7         Q.    So this is based on your

8   recollection?

9         A.    Yes, it is.

10        Q.    You also write that Ben Barnes

11  continues to owe you money for these services --

12  for other -- for non-Stanford clients?

13        A.    Well, the money was not paid.  I

14  don't know that -- if it's owed or what.  And

15  obviously not -- has not been paid, and I don't

16  think it will be paid.

17        Q.    Have you taken steps to seek payment

18  of those funds?

19        A.    Other than complaining, no.

20        Q.    Fair enough.

21              I'd like you to turn back to Page 8

22  of this document.

23        A.    Okay.

24        Q.    And towards the -- towards the top

25  is your response to Interrogatory Number 2.  And

APP000481

```
 1                ROBERT MITCHELL DELK
 2    you write that Delk was engaged by the
 3    Ben Barnes Group to perform Government relations
 4    and lobbying services with respect to certain
 5    offshore taxation issues and other issues.
 6             In addition to the taxation issues,
 7    what are these other issues that you refer to
 8    here?
 9        A.    Well, the only issue I really
10    staffed or counseled Ben on was the tax issue,
11    and it -- you know, it -- when I -- it was an
12    offshore taxation issues.  But the other issues
13    involved really the specifics of the tax issue,
14    you know, the residency issue and the sourcing
15    issue.  That's what I meant by that.  It was a
16    very limited focus on those particular issues as
17    they kind of un- -- unwound.
18        Q.    So, again, what do you mean by
19    "other issues"?  Is that -- or is it -- is that
20    sort of folded into these --
21        A.    It is --
22        Q.    -- other issues?
23        A.    -- yes, it is.  That's probably a
24    poor choice of words on my part.
25             The -- the -- the taxation issues --
```

APP000482

```
 1                    ROBERT MITCHELL DELK
 2    and it really should have said, more
 3    specifically, the residency requirements --
 4         Q.    I see.
 5         A.    -- and the sourcing requirement.
 6               There were no other issues that
 7    related to Stanford that I worked on.
 8         Q.    And you were engaged to provide
 9    lobbying services?
10         A.    Lobbying services, not lobbying.  I
11    mean, I --
12         Q.    What's the difference?
13         A.    -- I didn't actually engage in an
14    unarm -- ongoing -- interfacing with a Member of
15    Congress.  I did the -- I did materials for Ben
16    that he potentially used, talking points.
17               As I said earlier, I developed a
18    narrative regarding the importance of the
19    Caribbean to the United States, which was a
20    mammoth project.  I then went through and helped
21    understand the different issues involved in this
22    offshore tax issues and looked at it through
23    Ben's lens on kind of what would work and would
24    not work, from my perspective.
25         Q.    Did you register as a lobbyist for
```

APP000483

1                    ROBERT MITCHELL DELK

2     Stanford Financial?

3          A.    No.  I didn't lobby.  As I said,

4     this was -- I was providing these services to

5     Ben.

6          Q.    Did you register as a lobbyist for

7     Ben Barnes Group?

8          A.    No.  I was not lobbying -- again, I

9     was providing Ben's staffing on this and helping

10    him develop strategic -- giving him strategic

11    advice on, in fact, how to approach this.

12         Q.    Did you register as a lobbyist for

13    any of the clients you were working for in

14    connection with Ben Barnes?

15         A.    The only one that I did was -- was

16    the Online Consumer [sic] Network.

17         Q.    And that's because -- why did you

18    register specifically for that client, as opposed

19    to other clients?

20         A.    Because I was actually doing --

21    interfacing with Members of Congress on the issue

22    of MCC.  And Meridian, I didn't do lobbying on

23    that.  That was giving him strategic advice on

24    how to approach a -- a regulatory advice.

25         Q.    So it's your testimony that you

APP000484

1                 ROBERT MITCHELL DELK

2    provided strictly advisory services --

3          A.    Right.

4          Q.    -- but not lobbying services?

5          A.    Right.

6          Q.    Okay.

7                And your client was Ben Barnes, not

8    Stanford Financial?

9          A.    Yeah -- Ben Barnes Group.  I mean, I

10   don't know who it -- I mean, it was the --

11         Q.    Let me just clarify.  When I say

12   "Ben Barnes," I mean --

13         A.    Okay --

14         Q.    -- his entity.

15         A.    -- fair enough.

16               I just didn't want to -- you to

17   catch -- try to catch me and say, No, no, there's

18   a difference between Ben Barnes and

19   Ben Barnes Group, because I would view them as

20   the same thing also.

21         Q.    For purposes of -- of these

22   questions, let's --

23         A.    Okay.

24         Q.    -- let's say that they're one and

25   the same.

APP000485

```
 1                    ROBERT MITCHELL DELK
 2         A.    Fair enough.
 3               MR. IGIEL:  I would object to that.
 4               But, nonetheless, go ahead.
 5               MR. ABRAHAM:  Let's mark this as
 6         Delk 3.
 7                         -   -   -
 8               (Whereupon, an e-mail was marked,
 9                for identification purposes, as
10                Delk Exhibit Number 3.)
11                         -   -   -
12               (Whereupon, the witness reviews the
13                material provided.)
14    BY MR. ABRAHAM:
15         Q.    I've placed before you what's been
16    marked Exhibit Delk 3.  This is an e-mail from
17    smartin@benbarne- -- -barnesgroup.com to a number
18    of people, and you're cc'd on this e-mail.
19               Is that correct?
20         A.    Correct.
21         Q.    And do you recall this e-mail?
22         A.    No.
23         Q.    Does this e-mail look familiar to
24    you at all?
25         A.    No.
```

APP000486

```
 1                ROBERT MITCHELL DELK

 2          Q.    So do you have any reason to doubt

 3    that you were not cc'd on this e-mail?

 4          A.    Oh, no.

 5          Q.    Okay.  Now, the e-mail, nominally,

 6    is from a e-mail address with the name smartin,

 7    but it's signed Ben.

 8                Is that Ben Barnes who's sending

 9    this e-mail?

10          A.    That would be my understanding.

11          Q.    Do you know why Ben Barnes is

12    sending an e-mail from an e-mail address with the

13    name smartin?

14          A.    She was an assistant for Ben Barnes

15    and -- and had -- would send stuff out pursuant

16    to his instruction.  That would be my assumption.

17          Q.    Do you recall receiving e-mails from

18    an e-mail address with the name Ben Barnes in it,

19    or did he always send e-mails from Susan Martin's

20    e-mail address?

21          A.    I'd -- I would think that probably

22    most of the time, it'd be from Susan Martin.

23          Q.    Why would you -- why would you think

24    that, to the best of your recollection?

25          A.    I think that she was an assistant to
```

APP000487

```
 1                    ROBERT MITCHELL DELK
 2   him.  And I think, you know, he would just call
 3   her and say, Send out an e-mail.  That would be
 4   my experience.
 5              I don't think Ben was very much a
 6   user of e-mail, creating them himself.
 7        Q.   Okay.  Having reviewed this e-mail,
 8   the subject is Legislative Game Plan.
 9              Do you know what that refers to?
10        A.   My assumption is a legislative game
11   plan regarding the Tax Act and the proposed or
12   necessary changes that Stanford Financial was
13   pursuing.
14        Q.   And these are the tax changes?
15        A.   That would be my assumption.
16        Q.   The last line of the e-mail says
17   that I ask you, Scott Reed, Mitch Delk and/or
18   Kent Caperton either meet in person or by
19   conference call later this week in preparation
20   for our August 31st meeting.
21              Do you recall what you were being
22   asked to do at this meeting?
23        A.   I don't.
24        Q.   Okay.  I mean, it seems that
25   Ben Barnes is tasking you and a bunch of other
```

APP000488

 1                 ROBERT MITCHELL DELK

 2    people with meeting and proposing a legislative

 3    game plan; is that correct?

 4          A.    That's what it looks like, but as

 5    you see here, this -- I was cc'd.  This was to a

 6    guy named Jim Miller --

 7          Q.    And who is Jim Miller?

 8          A.    He was a -- a tax lawyer who I think

 9    did work for the Stanford people, not for Ben.

10                But I assume that that's what --

11    it's just to talk about legislative strategy.  As

12    you see here, he said he talked with

13    Senator Baucus, and he alludes to

14    Senator Grassley.  They were the two -- they were

15    the Chairman and Ranking Member of the Finance

16    Committee in the Senate.

17          Q.    And do you recall which law firm

18    Jim Miller worked for?

19          A.    I -- I don't.

20          Q.    Did you recall working with other

21    outside counsel in connection with this tax

22    issue?

23          A.    Yes.

24          Q.    And do you recall who they were?

25          A.    We worked with the law firm that

APP000489

```
 1              ROBERT MITCHELL DELK
 2   represented the United States Virgin Island
 3   Government, and that was -- I don't recall the
 4   name, but I -- I'm sure, in documentation, we'll
 5   recall it.
 6              But there were two gentlemen who
 7   worked the issue of the USVI tax advantage for
 8   the USVI.
 9        Q.   And as part of this process, you
10   were working with those attorneys, or you were
11   working opposite those attorneys?
12        A.   Oh, no; with them.
13        Q.   Why were you working with
14   attorneys --
15        A.   They --
16        Q.   -- from the U.S. Virgin Islands?
17        A.   -- had an interest in preserving and
18   en- -- enhancing the USVI tax advantage.  And
19   because they worked -- represented the USVI, Ben
20   had asked us to have a work- -- working
21   relationship with these people.  And we met with
22   them, Kent and I did, many, many, many, many,
23   many times.
24        Q.   And it appears from this e-mail that
25   Ben Barnes is sort of quarterbacking this general
```

APP000490

```
 1                ROBERT MITCHELL DELK
 2   effort; is that correct?
 3        A.    That would be my conclusion.
 4        Q.    And how involved in the details do
 5   you recall Ben Barnes being when it came to
 6   formulating an answer to this tax issue?
 7        A.    Well, I think Ben has a unique
 8   ability to take something very complicated and
 9   understand it from a political perspective,
10   having been a legislator himself.  And so, you
11   know, I think he can -- again, I -- I basically
12   had taken a thousand-page regulation and reduced
13   it, to Ben's knowledge, to one page.  And I think
14   he understood that the issue came down to two
15   very important issues.
16              And so I think he understood it very
17   well.
18        Q.    So the role of this group was to
19   analyze thousands of pages and reduce it to a
20   two-page document for Ben Barnes?
21        A.    No.  The objective of the group was
22   to come up with a strategy of getting the
23   legislation passed.  And in order to understand
24   a -- or develop a strategy, you have to have some
25   understanding of the substantive issues involved
```

APP000491

```
 1                    ROBERT MITCHELL DELK
 2    in the current law.
 3              And I think what I was saying was I
 4    was trying to help Ben understand the current law
 5    so he would understand what the changes that were
 6    needed, and then he could put that through his
 7    political filter, which was very, very good.
 8              That's why he was paid by a lot of
 9    people to give political counsel.
10         Q.   Do you know what he was paid by
11    Stanford Financial?
12         A.   I don't -- absolutely not.
13         Q.   Did he ever discuss that with you?
14         A.   No.
15         Q.   Is it common for a financial
16    institution to retain someone as a so-called
17    "quarterback lobbyist" with respect to a certain
18    issue?
19         A.   Well, it -- it would depend on the
20    issue and the firm.  I mean, most large firms --
21    let's take a Freddie Mac or a JPMorgan Chase --
22    they have their own office.  And so they would
23    hire people or retain people, like Ben Barnes, to
24    give them more counsel and -- or to specifically
25    target one Member that they had a great
```

APP000492

 1                    ROBERT MITCHELL DELK

 2   relationship with.

 3                There are 535 Members of Congress,

 4   so even a large office can't have a relationship

 5   with everybody.  And even if they did, there are

 6   people like Ben Barnes that have a better

 7   relationship than anybody does with particular

 8   Members.

 9                So I -- quarterbacking an issue for

10   them, probably not; but having them part of the

11   team and offering invaluable counsel and

12   invaluable relationships, yes.

13        Q.    So it's your understanding that

14   Ben Barnes was retained to quarterback this issue

15   for Stanford Financial, and then Ben Barnes

16   retained you and various other people to advise

17   him on this specific tax --

18        A     That's --

19        Q     -- issue?

20        A.    -- that's exactly right.

21        Q.    Is that an unusual arrangement?

22        A.    Well, as I just said, any large

23   financial institution would have their own

24   office, but since Stanford did not have their own

25   office, this is not unusual at all for them to

```
 1                    ROBERT MITCHELL DELK

 2    retain Ben to do this type of thing.

 3               THE VIDEOGRAPHER:  This concludes

 4         Disc 1 in the deposition of Robert

 5         Mitchell Delk.  Off the record at 1:24.

 6                        -  -  -

 7               (Whereupon, a discussion was held

 8                off the record.)

 9                        -  -  -

10               THE VIDEOGRAPHER:  This begins

11         Disc 2 in the deposition of Robert

12         Mitchell Delk.  On the record at 1:27.

13    BY MR. ABRAHAM:

14         Q.    Okay.  We spoke speci- -- we spoke

15    generally about this -- this tax issue that you

16    were retained by Ben Barnes to give advice on.

17               Can you describe specifically what

18    the issue was?

19         A.    Yeah.  As I've said, the -- the

20    United States Virgin Islands has a tax benefit

21    for individuals or enterprises that operate

22    within the USVI and their products and services

23    emanate from the USVI.

24               As a little background, there were a

25    lot of abuses of that -- that tax advantage,
```

APP000494

```
 1                    ROBERT MITCHELL DELK

 2   people owning car dealerships in the

 3   United States and moving their company --

 4   corporate headquarters but not themselves to the

 5   USVI.  And that was corrected around 2004, I

 6   believe.  And then the regulations I've alluded

 7   to earlier were spawned by that legislation.

 8                    And so the issue comes down, again,

 9   to who is a resident of the USVI and where is the

10   source of the income from the corporate entity to

11   qualify.

12                    So it's a two-part test.

13        Q.    And -- and how would you describe

14   the second part of that test?  What is the sort

15   of source test that -- that you refer to?

16        A.    Yeah.  Well, it's a very complicated

17   tax issue, which you'll get a much more eloquent

18   answer from Raffaelli or -- or the others.  But

19   my understanding is, does the, in fact, revenue

20   associated with the company, in fact, come from

21   the corporate -- corporate entity in the USVI?

22        Q.    In other words, is the item

23   manufactured in USVI?

24        A.    Right.  And that becomes a little

25   bit more difficult when you have financial
```

APP000495

```
 1                 ROBERT MITCHELL DELK
 2  services where it's more informational than it
 3  is, in fact, a product or a widget, or something
 4  of that nature.
 5         Q.    Are you familiar with any other
 6  financial services company that's based out of
 7  USVI?
 8         A.    There are a number of hedge funds
 9  that are.  There are a number of entities that
10  are in the low-dollar/small-dollar lending
11  business.
12               I don't know that they're there,
13  per se, to take advantage of the tax breaks or
14  they're there to, in fact -- to obviate some of
15  the regulatory oversight of their activities.
16         Q.    Are you familiar with any banking
17  institutions that are based in USVI?
18         A.    No.  But I -- that doesn't mean
19  they're not.  I'm just not familiar with them.
20         Q.    And what specifically was the
21  problem that Stanford Financial came to your
22  group with?
23         A.    Well, at the time,
24  Stanford Financial operated out of Antigua.  And
25  I say they operate out of Antigua.  They also
```

APP000496

```
 1              ROBERT MITCHELL DELK
 2   obviously had offices in Houston and other places
 3   that was -- you know, but they -- they had a --
 4   an entity out of Antigua.
 5              And the issue was, one, did
 6   Allen Stanford reside 183 days in the USVI; and,
 7   secondly, did the income that was produced by the
 8   company, did it emanate out of the USVI?
 9       Q.    Why was it a question as to where
10   Allen Stanford, himself, personally resided, as
11   opposed to the headquarters of the corporation?
12       A.    It was the tax opinion of -- of the
13   tax experts that, in fact -- that he was, in
14   fact, the corporation himself; and, therefore,
15   where he resided was important.
16              But having said that, it was clear
17   that, you know, the corporation itself or the
18   entity that was the financial corporation --
19   financial services corporation, likewise, would
20   have to be in the USVI.
21       Q.    And what advice did your group --
22   you and/or your group --
23       A.    The -- the --
24       Q.    -- ultimately give to
25   Allen Stanford?
```

 1                ROBERT MITCHELL DELK

 2        A.    -- the advice ulti- -- ultimately

 3   was is that Allen Stanford could not take

 4   advantage of that tax break from a residency

 5   perspective if he lived in Antigua, unless he, in

 6   fact, had 183 bed nights in the USVI.

 7              And there were one or two ways that

 8   he could meet that test:  One, he could fly in on

 9   his plane at 5 till 12:00, and then fly out at 5

10   after 12:00, and he could do that --

11        Q.    Twelve?

12        A.    -- 11:55 p.m. and fly out at

13   12:05 a.m.  And, technically, that would be

14   two days.  And he could end up doing that 92

15   times.

16        Q.    So he would have to stop for

17   10 minutes --

18        A.    Yeah --

19        Q.    -- in the USVI, and that's --

20        A.    -- and -- and --

21        Q.    -- considered two days of residency?

22        A.    -- and -- and tech- -- that would be

23   bed nights.

24              So, technically, I assume that would

25   certainly meet the test.  That wouldn't meet the

```
 1                  ROBERT MITCHELL DELK
 2    spirit of the test, obviously.
 3                  And so what Barnes told him, I
 4    believe -- I didn't -- I was not privy to
 5    conversations, but --
 6                  MR. MADRID:  I would object to
 7          speculation.
 8                  Excuse me.  Go ahead.
 9                  THE WITNESS:  -- well, what --
10                  MR. ABRAHAM:  While -- I'd ask you
11          to object after I -- after my question as
12          opposed to while the witness is
13          testifying.
14                  MR. MADRID:  I'm objecting to the
15          answer, not the object -- not the
16          question.
17                  THE WITNESS:  -- I think what Barnes
18          counseled him to meet that residency
19          requirement, he would have to, in fact,
20          move himself and the entity to the USVI.
21    BY MR. ABRAHAM:
22          Q.   And how did you
23    advise Allen Stanford or Stanford Financial to --
24    to address the second prong of the sourcing test?
25          A.   Well, that was the -- that was the
```

APP000499

1                    ROBERT MITCHELL DELK

2    real tickler in the legi- -- in -- in -- in the

3    law, because it was ambiguous as about what

4    sourcing income was.  And what eventually was

5    going to -- would -- preferred was be the law

6    read that, in fact, if the income is sourced from

7    a location in the USVI, despite the fact that

8    income -- if it came back into the USVI,

9    regardless of its loc- -- origination, in fact,

10   it would be sourced in the USVI.

11            That became the real issue for

12   Stanford.

13       Q.    Sorry.  Can you explain that again?

14       A.    If -- if, in fact, Allen Stanford

15   moved himself and the corporation, he would meet

16   the residency requirement.

17            The fact that he had brokers, let's

18   say, in Houston and in Atlanta, the fact that the

19   money came back to the entity in the USVI, if the

20   sourcing language was broad enough, it would, in

21   fact, include that income.

22            And so they were trying to make sure

23   that the income -- or the sourcing requirement

24   was sufficiently broad that it would, in fact,

25   entail those dollars that had really, I guess,

APP000500

```
 1                  ROBERT MITCHELL DELK

 2    emanated from Houston and Atlanta but,

 3    ultimately, were parked in the USVI --

 4         Q.    So --

 5         A.    -- the decision --

 6         Q.    -- if I'm understanding this

 7    correctly, the residency and the sourcing prongs

 8    would be met by having Allen Stanford resi- --

 9    reside for 100 and something bed nights in the

10    USVI.

11              In other words, his residency --

12         A.    The -- the residency would be --

13    residency require- --

14         Q.    -- would be sufficient for both

15    prongs --

16              THE COURT REPORTER:  Wait, wait,

17         wait.  One person at a time.

18              His residency what?

19    BY MR. ABRAHAM:

20         Q.    -- would be sufficient for both

21    prongs of the test?

22         A.    No --

23         Q.    Okay.

24         A.    -- no.  He could meet the residency

25    requirement by either a way that you've
```

1            ROBERT MITCHELL DELK

2    articulated or moving himself and his corporate

3    organization to the USVI.

4            The sourcing was a more tricky

5    issue.

6        Q.    In what sense was it more tricky?

7        A.    Because, let's say, for example, as

8    I just did, he had a brokerage firm in Houston,

9    but, nonetheless, the corporate entity in the

10   USVI.  It was unclear whether, in fact, that

11   brokerage activity, emanating out of Houston but,

12   nonetheless, the dollars flowing back to the

13   USVI, would qualify under the sourcing rules.

14   And it would require, my understanding, a

15   clarification of that rule.

16       Q.    And how did you seek to clarify that

17   rule for the benefit of your client?

18       A.    It would be done through a

19   legislative proposal.

20       Q.    To who?

21       A.    To the Tax Code.

22       Q.    To the U.S. Congress to amend the --

23       A.    Yes --

24       Q.    -- Tax Code?

25       A.    -- yes.

APP000502

```
 1                    ROBERT MITCHELL DELK
 2          Q.    Did it involve local regulations in
 3    USVI or was it -- that -- was it the Federal
 4    level?
 5          A.    That is at the Federal law because
 6    it's a Federal tax issue.
 7          Q.    I understand.
 8                And how did you propose amending the
 9    Tax Code in this regard?
10          A.    It would be amended to make the
11    sourcing rules broader than they currently were.
12    And that's where the expertise of people like
13    John Raffaelli, who understood those
14    idiosyncratic provisions of the Tax Code better
15    than anyone -- why I assume Ben brought them into
16    the -- to the team -- to his team.
17          Q.    And had this recommendation been
18    implemented, had the Tax Code been amended, who
19    would have benefited from this amendment in
20    the -- or this change in the Tax Code --
21          A.    Well --
22          Q.    -- is this Allen Stanford?
23          A.    -- yeah.
24                -- first of all, the USVI would have
25    benefited because they would have had a lot of
```

APP000503

1              ROBERT MITCHELL DELK

2    jobs created in the USVI, which was really an

3    economic-depressed area.

4         Q.    How would have jobs been created?

5         A.    Because he was going to move his

6    corporate organization to the USVI, and that

7    would have been -- I don't know -- he -- Ben

8    claims there would have been thousands of jobs

9    created, which was a big deal; and then,

10   secondly, certainly, Allen Stanford would have

11   benefited, or his organization would have,

12   because, as I allude to earlier, as opposed to

13   paying a 30 percent corporate tax, he would have

14   been paying a 10 percent corporate tax.

15              So let's say if you made a dollar

16   and you paid 30 cents under the existing Tax

17   Code, and under the new Tax Code, you paid

18   10 cents, you're going to have a 20-cent profit

19   there, just by virtue of the tax law change.  So

20   it could have been, you know, as Ben would argue,

21   a win-win situation, a win for the USVI and a win

22   for not only Allen Stanford, but a win for other

23   people who wanted to move their corporations

24   there and take advantage of it.

25         Q.    So this would have benefited

```
 1                  ROBERT MITCHELL DELK
 2   Allen Stanford financially?
 3        A.    Yes -- well, I -- when you say
 4   "Allen Stanford," again, like Ben Barnes and
 5   Ben Barnes Group --
 6        Q.    No.  I mean -- when I'm saying
 7   "Allen Stanford" now, I mean Allen Stanford,
 8   personally.
 9        A.    I -- I don't know that.
10              I don't know what his corporate
11   entity looked like.
12        Q.    Well, you testified earlier that it
13   was your understanding or the understanding of
14   certain attorneys that Allen Stanford and his
15   organizations were coextensive or were one.
16        A.    Well, as I said earlier, I believe
17   that what was decided was he would have to move
18   not only himself, personally, but his corporate
19   structure to the USVI.
20              So I don't know that you can draw
21   that distinction that they're one and the same.
22        Q.    Why did he have to move there
23   personally, to the best of your knowledge?
24        A.    That was what the tax lawyers
25   concluded based on looking at the regulations --
```

APP000505

```
 1                   ROBERT MITCHELL DELK

 2        Q.    Okay.

 3        A.     -- and I'm not sure whether that's

 4   a -- he was a principal shareholder or -- or how

 5   that corporate entity worked.

 6              MR. ABRAHAM:  I think we're up to 4,

 7        Delk 4.

 8                      -  -  -

 9              (Whereupon, an e-mail with

10                attachment was marked, for

11                identification purposes, as Delk

12                Exhibit Number 4.)

13                      -  -  -

14              THE WITNESS:  Thank you.

15   BY MR. ABRAHAM:

16        Q.    I've placed before you what's been

17   marked Exhibit Delk 4.

18        A.    Yep.

19        Q.    This is an e-mail from Ben Barnes to

20   Allen Stanford.  The subject of the e-mail is,

21   America's Third Border.

22              There are two documents attached:

23   One is a Word document; one is a PowerPoint

24   document.  And they're both dated September 26th,

25   2005.
```

APP000506

```
 1                    ROBERT MITCHELL DELK

 2              The e-mail states, Allen — Here is

 3    the work of the economists and writers who were

 4    supervised by Mitchell [verbatim] Delk,

 5    Scott Reed and Kent Caperton.  We are pleased

 6    with the final product and hope you share that

 7    view.  Best regards, Ben.

 8              The title of the documents attached

 9    also is America's Third Border.

10              First of all, does this -- does --

11    does this document look familiar to you, the

12    document that's attached to this e-mail?

13         A.    Yes.

14         Q.    And what -- what are these

15    documents, the Word document and the PowerPoint?

16         A.    This is a document that created the

17    narrative that the USVI and, more broadly, the

18    Caribbean are strategically important to the

19    United States --

20         Q.    And -- and let me just interrupt.

21              When you say this "created the

22    narrative," this would be the narrative phase of

23    your engagement?

24         A.    Yes.

25         Q.    Where you create a white paper?
```

```
 1                    ROBERT MITCHELL DELK

 2          A.    Yes.

 3          Q.    Okay.  So this is the white paper

 4     that you --

 5          A.    Yes.

 6          Q.    -- created for the tax issue?

 7          A.    Yes.

 8          Q.    Okay.  I'm sorry.  You can continue.

 9          A.    No, no, no.

10                And as you can see in the document,

11     it does not mention the tax issue.  It just talks

12     generally about the Caribbean and about the

13     importance of that region to this country.  And

14     it was really to -- to, you know, kind of change

15     the impression that USVI is more than just a

16     vacation location.

17                It really is a strategically

18     important region for a lot of reasons for the

19     United States, both from a national security

20     perspective, both from a trade point of view.

21                And if you look at it like that,

22     then, in fact, it probably makes sense that you

23     would do anything you can to enhance the business

24     and economic activity within this region to, in

25     fact, pro- -- to promote that strategic alliance
```

```
 1                ROBERT MITCHELL DELK

 2   with the region.

 3          Q.    So what is America's Third Border

 4   according to the document --

 5          A.    The Caribbean --

 6          Q.    -- the USVI or the Caribbean?

 7          A.    -- the Caribbean -- Caribbean.  You

 8   can see it's much broader than the USVI if you

 9   look at the map on the first page.

10          Q.    And why -- why is it relevant or --

11   or why is it relevant to your engagement to talk

12   about the Cari- -- Caribbean, as a whole, as

13   opposed to changing the Tax Code specifically as

14   it relates to the USVI?

15          A.    Well, when the whole project started

16   out, there were two things going on with -- as I

17   stated earlier: One is Allen Stanford lived

18   in Ant- -- as I understood his business part of

19   it, out of Antigua; and, second, in that regard,

20   he was creating a resort in the Antigua islands

21   that would, in fact, be alluring to, at least,

22   affluent people throughout the world.

23               And the objective there was to, in

24   fact, enhance the economic activity on that

25   particular island.  And what he was hoping to do,
```

APP000509

```
 1                    ROBERT MITCHELL DELK

 2   at that point in time, was to take all the

 3   revenues associated with the business he was

 4   doing in Antigua and take advantage of the USVI

 5   tax law.

 6              And so in order to do that, you

 7   would have to either eliminate -- and/or

 8   eliminate the residency requirement and/or

 9   tremendously expand the sourcing rules.

10              And after a lot of meetings, a lot

11   of discussions, it was concluded that elimination

12   of the residency requirement was politically

13   impossible, it couldn't be done; and that,

14   potentially, what could be done was a broadening

15   of the sourcing rules if, in fact, you could

16   establish a really economic nexus with the USVI.

17              So this initially was done to show

18   the importance of the entire region --

19       Q.    So if I understand this correctly,

20   the recommendation was to expand the sourcing

21   rule from USVI to the rest of the Caribbean?

22       A.    Well, initially, it was to

23   eliminate, potentially, the residency requirement

24   and expand the sourcing rule.  And that was

25   determined to be politically impossible to do.
```

APP000510

```
 1              ROBERT MITCHELL DELK
 2                   And so then it was to move his
 3    operations to the USVI and then to expand the
 4    sourcing rule only.  And that's why I assume he
 5    eventually moved himself and the operation to the
 6    USVI.
 7          Q.    Expanding the sourcing rule to
 8    include the rest of the Caribbean, would that
 9    have meant that entities could be located outside
10    of USVI or at least operate --
11          A.    No --
12          Q.    -- outside of --
13          A.    -- no --
14          Q.    -- USVI --
15          A.    -- the residency --
16          Q.    -- so what does --
17          A     No --
18          Q     -- that mean?
19          A.    -- the residency requirement would
20    still be in existence, and so any business that
21    took advantage of the tax advantage would have to
22    reside, both individually or the corporate
23    entity, in the USVI.  But this was making clear
24    that sourcing coming outside of activities in the
25    Caribbean could more broadly be used for the
```

APP000511

```
 1                ROBERT MITCHELL DELK
 2   sourcing rule in the USVI.
 3        Q.    Did you believe this was a viable
 4   proposal --
 5        A.    Yeah --
 6        Q.    -- at the time?
 7        A.    -- yeah, I did.
 8        Q.    And why is that?
 9        A.    I just think, when you look at this,
10   that there is a lot of strategic economic
11   and other interest in the Caribbean from the
12   United States that really goes overlooked unless
13   somebody had, in fact, produced something like
14   this and -- and -- and, you know, demonstrated to
15   the world and to public policy officials that, in
16   fact, it made sense.
17              I mean, you've got to make
18   something -- you -- you can't -- you know, if
19   you're trying to effectuate -- effect a change in
20   the law, you've got to demonstrate that the
21   existing policy either is not good or it can be
22   better.  And you've got to have at least a -- an
23   idea of, you know, what the advantages and
24   benefits would be coming from the change.
25        Q.    What would have been the benefits to
```

APP000512

```
 1                ROBERT MITCHELL DELK
 2   the USVI had the sourcing rule been expanded to
 3   the rest of the Caribbean?
 4        A.   It would have been somewhat diluted
 5   because you were, in fact, taking the sourcing
 6   rule and making it -- the Caribbean more specific
 7   than the USVI.
 8             Again, that's why I think, at the
 9   end of the day, both the residency
10   requirement -- the proposal would have maintained
11   that, and it would have just made the -- the
12   sourcing rules the USVI with a preference for the
13   Caribbean.
14        Q.   And this document says that it was
15   prepared for the Stanford Washington Research
16   Group.
17             What is the Stanford Washington
18   Reach -- Research Group?
19        A.   I -- I don't know what that entity
20   is.  There was a -- I know at one time, Stanford
21   had purchased a PaineWebber Research Group in
22   Washington, and I think that might be the
23   successor to that.
24             I don't know why it was for the
25   Washington Research Group instead of
```

APP000513

```
 1                    ROBERT MITCHELL DELK
 2   Stanford Financial.  I have no clue.
 3          Q.    And according to this e-mail, you
 4   supervised various economists and writers --
 5          A.    Right.
 6          Q.    -- for the creation of this white
 7   paper?
 8          A.    Right.
 9          Q.    And do you recall who you supervised
10   and when?
11          A.    There was a -- an economist named
12   Bob Vanderwarker (phonetic) and an economist
13   named Beth Price who helped do the research on
14   this.
15          Q.    Did you retain these individuals?
16          A.    No.  They were retained by
17   Ben Barnes Group at my recommendation.
18          Q.    So just so I understand the
19   structure correctly, Stanford Financial retains
20   Ben Barnes -- and by that, I mean
21   Ben Barnes Group -- Ben Barnes then retains you,
22   Scott Reed, Kent Caperton, Raffaelli, others; and
23   then you guys at that level make recommendations
24   that additional economists and writers, such as
25   those you just mentioned, be retained at a -- at
```

```
 1                  ROBERT MITCHELL DELK

 2   a lower point on the tier to all work together

 3   for --

 4          A.    I don't think there's any tiers,

 5   because we all worked for the Ben Barnes Group.

 6   I mean, this was part of the effort that had been

 7   substantively unassailably prepared to argue this

 8   case.

 9               And so the first step was to argue

10   the importance of the Caribbean, generally, and

11   then, you know -- so we needed some economists

12   who really had expertise on economic data and

13   research and could help do this.

14          Q.    How many people would you estimate

15   contributed to this white paper?

16          A.    Well, I'd say substantively it was

17   me and two economists; and then probably the

18   review included, you know, many, many others,

19   maybe 10 other people.

20          Q.    Did Ben Barnes contribute to this

21   document?

22          A.    He read it and gave recommendations

23   on it, yes.

24          Q.    Do you recall what recommendations

25   he gave?
```

APP000515

```
 1                 ROBERT MITCHELL DELK

 2         A.    Absolutely not.

 3         Q.    Do you recall if they were minimal

 4   or extensive?

 5         A.    I don't recall.

 6               And I will say this:  His

 7   recommendations would be how this would be viewed

 8   from a political -- politician's perspective,

 9   because that was really his expertise in this

10   area.

11               But he clearly read it many,

12   many times, talked about it many times, and I'm

13   sure added value as it was written.  I mean, this

14   was kind of the product of, as I said, 10 people.

15         Q.    Do you know what was done with this

16   white paper, ultimately?

17         A.    No -- well, I know that people

18   distributed it who, you know, were working on

19   this issue.

20               I mean, I had given it to people

21   that I knew.  I just said, You know, this is a --

22   a very good policy document; you know, you'd be

23   surprised to find that the Caribbean is more

24   important than you probably ever thought it was.

25         Q.    Do you recall who you gave this to?
```

APP000516

1              ROBERT MITCHELL DELK

2         A.    I -- I -- I don't rem- -- I gave it

3    to a number of people.  I mean, again, it was not

4    a -- the document advocating any kind of change

5    for tax law, or anything like that.  It was just

6    pointing out.

7              I'm just -- you know, friends of

8    mine that had worked in the public policy arena,

9    I would give it to them.  I mean, it's something

10   I was proud of that we had written.  I think it's

11   a very, very good document.

12        Q.    And what's the ultimate goal of this

13   document?

14        A.    It's to change the impression of the

15   Caribbean as being important to the

16   United States.

17        Q.    And to that end, how do you deploy

18   this document to achieve that result?

19        A.    I -- I think you -- you end up

20   giving it to opinion leaders, such as newspapers,

21   periodicals.  You have people -- if you were

22   today -- you didn't then -- who write blogs on

23   this subject.  You give it to elected officials.

24   You give it to staffers.

25              You -- it's -- you know, you

```
 1                  ROBERT MITCHELL DELK
 2    disseminate it any way you can disseminate any
 3    type of information today.
 4         Q.    Is the purpose of this document, or
 5    the ultimate goal of this document, to benefit
 6    the Caribbean or Allen Stanford and his
 7    companies?
 8         A.    I think the purpose is -- is to
 9    benefit the Caribbean and Allen Stanford.  I
10    mean, I'm not going to argue it was not written
11    with his legislative goals in mind.  But I think
12    the ultimate beneficiary would have been the
13    Caribbean.
14              Again --
15         Q.   Were Allen Stanford's legislative
16    goals in this document?
17         A.    No.  It doesn't talk anything about
18    tax legislation -- or a tax recommendation, I
19    should say.
20              I mean, I think, as I recall --
21    again, it's been 10 years -- you know, you can
22    see on the summary page it talks about, you know,
23    the proximity of the Caribbean; it talks about,
24    you know, the historical relevance of it; it
25    talks about the economics; it talks about
```

APP000518

1               ROBERT MITCHELL DELK

2   unfriendly governments are trying to exploit it.

3               I mean, the Chinese were trying to

4   exploit it.  Chavez was trying to exploit it.

5   And if we, in fact, want to promote democracy in

6   this part of the world, it's important for the

7   economic activity.  It's no different than how

8   you try to eradiate poverty in America: education

9   and jobs.

10        Q.    How did promoting economic activity

11   in the Caribbean tie into Allen Stanford's

12   existing operations in the Caribbean?

13        A.    Well, as I said, he was -- he --

14   according to Ben, he was, in fact, considering

15   developing a resort area that would bring a lot

16   of people to that island who would spend a lot of

17   money.

18               I mean, I think, according to Ben,

19   this was going to be -- you know, people would

20   spend $25 million on a home there and they would

21   come there year-round because of the climate, and

22   they would spend a lot of money, and it would

23   create a lot of jobs.  And as it was narrowed to,

24   in fact, benefit the USVI, I think that macro

25   argument could be translated to the USVI.

```
 1                   ROBERT MITCHELL DELK

 2               But the decision to -- to narrow the

 3   legislative, at least, objective was really

 4   fostered by the political realities.  And nobody

 5   was better to, in fact, identify and articulate

 6   those political realities than Ben Barnes and,

 7   arguably, the tax people and the people who have

 8   worked in kind of public policy for years.

 9       Q.    Did you elicit, as part of your

10   creation of this document, the input of Caribbean

11   Governments or Caribbean Government officials?

12       A.    No.  We used -- we used economic

13   data that had been produced by those countries,

14   as you can see in the back; but, no, there was no

15   discussion with those countries.

16       Q.    Okay.

17               MR. ABRAHAM:  Let's mark this as

18         Delk -- what are we up to? -- 5.

19                      -  -  -

20               (Whereupon, an e-mail was marked,

21                 for identification purposes, as

22                 Delk Exhibit Number 5.)

23                      -  -  -

24               (Whereupon, the witness reviews the

25                 material provided.)
```

APP000520

```
 1                    ROBERT MITCHELL DELK

 2   BY MR. ABRAHAM:

 3        Q.    So I've placed before you what we've

 4   marked as Exhibit Delk 5.  This is an e-mail from

 5   Ben Barnes to Allen Stanford and Yolanda Suarez,

 6   dated January 27th, 2006.  The subject is, Public

 7   Policy Issues Impacting Stanford.

 8               Attached is a Word document.  And

 9   the text of the e-mail reads, Allen/Yolanda,

10   Attached is a document prepared by Mitch Delk

11   concerning public policy issues of interest to

12   Stanford.  It includes a review of 2005 and a,

13   quote, game plan, end quote, for 2006.

14               This is exactly where I think we are

15   in regards to legislation.

16               Regards, Ben.

17               Does the document -- is the document

18   attached to this e-mail familiar to you?

19        A.    Yes.  I mean, I haven't seen it in

20   10 years, but, yes.

21        Q.    Did you draft this document?

22        A.    I did.

23        Q.    And what is this document?

24        A.    Well, basically, it was at the end

25   of the year, Ben got the team together and kind
```

 1                  ROBERT MITCHELL DELK

 2    of discussed where we are and, you know, where we

 3    need to go for next year.

 4                  And based on that, I kind of

 5    memorialized the conversation, as best I could,

 6    in this document --

 7         Q.    So this is --

 8         A.    -- for him.

 9         Q.    -- this is the result of a

10    conversation with -- with the broader team?

11         A.    Yeah.  I mean --

12         Q.    Who was on that team?

13         A.    I -- I don't recall.

14                  I don't even recall the meeting.

15    But, I mean, that's kind of what it was.  I mean,

16    we talked about -- I mean, Barnes managed this

17    very efficiently and effectively.

18                  I mean, he had meetings; wanted to

19    know what was going on; what he needed to do,

20    what he needed to be doing; and this was kind of

21    the -- an end-of-the-year kind of review or a

22    preview of the following year.

23         Q.    Did you prepare this document

24    specifically for Ben -- for Allen Stanford and

25    Yolanda Suarez?

1                    ROBERT MITCHELL DELK

2          A.    I prepared it for Ben.  And, again,

3     it was a meeting -- I think, as I recall, it was

4     a reflection of a meeting that we had had with

5     Ben, that he had called to talk about what had

6     happened and what will happen.

7                    I didn't know who he would share it

8     with, whether he would use it as his own

9     guidepost going forward or what he would do with

10    it.

11         Q.    Do you know if Ben Barnes edited

12    this document?  Do you have any recollection of

13    that?

14         A.    I'm -- I'm sure he probably did.  I

15    mean, again, Ben was actively involved in all

16    aspects of trying to manage this project.

17                   It's got his name on the e-mail.  So

18    I'm assuming, you know, you can make the

19    assumption he was accurate -- intimately involved

20    in it.

21         Q.    What do you mean by "intimately

22    involved"?  Why are you --

23         A.    Well --

24         Q.    -- deducing that?

25         A.    -- well, as I said, it emanates from

Page 158

```
 1                    ROBERT MITCHELL DELK
 2    a meeting that we had at the end of the year
 3    talking about what we accomplished and what he
 4    needed to accomplish going forward.
 5              And, you know, he was -- this was a
 6    big client, at least my impression, for
 7    Ben Barnes.  And so he was trying to communicate,
 8    I assume, with the client in a way that showed
 9    that he was on top of the issues.
10         Q.   Why did you prepare this document
11    and not Ben Barnes?
12         A.   You have to ask Ben Barnes that.
13              I mean, I was helping Ben Barnes
14    kind of manage this organization -- opportunity.
15    I mean, that's why Ben brought me in, to do these
16    kind of things.
17         Q.   So your job was to manage the
18    opportunity?
19         A.   No.  My job was to do whatever Ben
20    needed me to do and wherever my expertise fell to
21    further the objectives of the -- the team.
22         Q.   Do you believe your role was to
23    manage the opportunity?
24         A.   No.  I think that was Ben's role.
25              I was a pawn in the chess match.
```

APP000524

 1                    ROBERT MITCHELL DELK

 2         Q.    And we've just seen that you've

 3    created a white paper with respect to advancing

 4    the tax issue that you were advising Ben Barnes

 5    in respect of.

 6               What ultimately happened to this tax

 7    issue?

 8         A.    It -- it did not get passed.

 9         Q.    And if you could describe to me the

10    stages of -- of what happened following the

11    drafting of this white paper.

12               What was -- what was the step that

13    occurred after that in terms of advancing this

14    issue?

15         A.    Well, again, that paper was to tie

16    up -- I would argue, create a favorable

17    environment for the Caribbean generally.

18               And the goal of that was for people

19    to say, This is -- this region is important to

20    us, and we need to, in fact, do all we can, in

21    fact, to make it economically stable and viable.

22               And one part of that would be,

23    arguably, what could we do from a tax

24    perspective, in fact, to increase the --

25    include -- increase the economic activity in that

APP000525

1                    ROBERT MITCHELL DELK

2    region.

3                    And so a natural extension of that

4    conclusion would be looking at this USVI tax law

5    benefit.

6                    And, in fact, if you could, in fact,

7    either expand that in some form or fashion, what

8    would be the economic, not only advantage for the

9    Caribbean generally, but more specifically, the

10   USVI.

11                   As this whole process continued --

12   and this was, like, a four- or five-year process,

13   it was concluded, as I stated earlier, that

14   changing the residency requirement was

15   politically problematic, changing the sourcing

16   rules was possibly doable; but that was the

17   extent of the change that was, in fact, the goal

18   of the project as it kind of -- the iterations

19   and kind of the unfolding of it.

20        Q.   Did you -- did your group -- did you

21   or your group proceed to lobby for a change in

22   this rule?

23        A.   I did not.

24        Q.   Do you know if anyone else did

25   within the group?

```
 1                    ROBERT MITCHELL DELK

 2          A.    I -- I -- my assumption is, is that

 3    there were discussions about the Caribbean with

 4    Members of Congress; there were discussions about

 5    the law; there were discussions about how the

 6    law, in fact, could and probably be done.  I

 7    think others would have to testify to that.

 8                 I did not lobby on it.  But I know

 9    that we had hundreds of meetings -- and that

10    might be incorrect, "hundreds" -- but we had

11    many, many, many meetings to talk about the

12    political potential for making these changes.

13    And, in fact, that changed inside -- the entire

14    approach.

15                 Ultimately, by virtue of Ben

16    concluding and communicating with Allen Stanford

17    that he could not get this tax advantage unless

18    he moved to the USVI himself and moved his

19    company in operations, he did that.

20                 And so then it came down to, in

21    fact, could the sourcing rules be enlarged.

22                 And there was never an opportunity,

23    a tax bill, that went through that that could

24    have been done.

25                 There was never a bill introduced
```

APP000527

```
 1                ROBERT MITCHELL DELK

 2   that would specifically do that.  And my

 3   assumption is, is that Barnes felt like that this

 4   is something that was -- did not need to be

 5   introduced in a bill that could be done in a --

 6   in a -- a more narrow legislative kind of

 7   opportunity.

 8                And who he talked with, I couldn't

 9   opine to and give you an opinion.  But I'm sure

10   he did.  He was very close with the chairman of

11   the tax writing committee.

12                He -- as I said earlier, as these

13   discussions continued, there was a lot of

14   interfacing with Winston & Strawn, who was the --

15   the representation for the USVI and their

16   lawyers, about what, in fact, was doable, and

17   that helped reach the conclusion that the

18   residency requirement could not be modified and

19   that the sourcing rules possibly could.

20        Q.    But, ultimately, it was concluded

21   that the sourcing rules could not be modified; is

22   that correct?

23        A.    No.  Ultimately, it was decided that

24   the residency requirement could not be

25   eliminated, but the sourcing rules probably could
```

APP000528

```
 1                  ROBERT MITCHELL DELK
 2    be enlarged.
 3         Q.    And what efforts did you undertake
 4    to enlarge the sourcing rules?
 5         A.    I took no effort to do it --
 6         Q.    What about --
 7         A.    -- other than --
 8         Q.    -- what about your group?
 9         A.    I -- I couldn't tell you that.
10         Q.    So your role was simply to advise,
11    not to --
12         A.    Advise, and to come up with a
13    strategy of trying to get this.  And then, you
14    know, at that point in time, we've got experts
15    who are, you know, former tax writers who were
16    trying to help Barnes with a strategy at that
17    point in time.
18         Q.    And what did you recommend
19    strategically to cause a change in the sourcing
20    role?
21         A.    Strategically, I recommended that,
22    in fact, we can demonstrate that there would be
23    jobs created in the Caribbean if, in fact, this
24    logistical change by Stanford Financial occurred.
25    And then Barnes took that and, in fact, tried to,
```

APP000529

```
 1                    ROBERT MITCHELL DELK
 2   I guess, talk to people about changing the
 3   sourcing rules.
 4                Again, there was never a tax bill
 5   that presented an opportunity for the change to
 6   be done.  And I guess maybe a year, two years
 7   after Allen Stanford had moved his residency was
 8   when there was the exposure to the Ponzi scheme,
 9   and everything just kind of blew up at that point
10   in time.
11        Q.    So, ultimately, it's your
12   understanding that Allen Stanford moved himself
13   and his operations to the USVI; is that correct?
14        A     Yes.
15                And I -- I assume it's based on the
16   recommendation that Ben Barnes gave him.
17        Q.    Do you believe that Allen Stanford
18   or Stanford Financial in any way benefited from
19   the advice that you provided or the advice that
20   your working group provided to him?
21        A.    Yes.  I think that he would have
22   never even got out of the -- he would have never
23   even had a proposal or an idea had the
24   Ben Barnes Group not been advising him on this
25   particular issue.
```

APP000530

```
 1                    ROBERT MITCHELL DELK

 2              As I said before, you know, there

 3    are -- there were people who worked for 40 years

 4    on preserving Glass-Steagall, people who worked

 5    for 40 years to, in fact, eliminate it.

 6              Did they add value during that

 7    40 years?  I think so.  I mean, I don't think you

 8    can look at the ultimate success of whether

 9    you're adding value is did a piece of legislation

10    pass.

11              Had Allen Stanford not been a crook

12    and had, in fact, his institution not imploded

13    and they had, in fact, got this tax break, it

14    would have been tremendously beneficial to

15    Allen Stanford, but I believe it would have been

16    tremendously beneficial to the USVI.

17              I think, ultimately, that this was

18    an economic driver for the Caribbean.  And I

19    sincerely believe that.

20              I can't speak to what he did.  I

21    think he was horribly wrong.  But that was

22    something I knew nothing about, had nothing to do

23    with.

24         Q.    And did he move -- did -- did

25    Allen Stanford move himself and his operations to
```

APP000531

```
 1                    ROBERT MITCHELL DELK
 2    the USVI on Ben Barnes' recommendation?
 3           A.    That would be my assumption.
 4                 MR. MADRID:  Object to the
 5           assumption.
 6    BY MR. ABRAHAM:
 7           Q.    And was there any, ever, legislation
 8    passed, to the best of your knowledge, that
 9    would -- that actually benefited Allen Stanford's
10    organization beyond what the existing statutes
11    required?
12           A.    The -- the answer is no; but as I
13    just testified to, I don't think you can make
14    your ultimate judgment on whether there was value
15    added by whether there was a law passed.
16                 I mean, you -- you -- this just did
17    not play out to its conclusion.  But I think what
18    Ben did and what Ben's group did was to
19    demonstrate to Allen what could be done
20    politically.
21                 I mean, he would have wasted his
22    time and millions of dollars, arguably, trying to
23    get the residency requirement changed and trying
24    to get the sourcing to include the entire
25    Caribbean.
```

APP000532

```
 1                    ROBERT MITCHELL DELK
 2                    I think that -- that Ben gave him
 3     some advice that saved he money and ultimately
 4     created opportunities in the USVI that never
 5     would have existed.  And that was all based on,
 6     really, the expertise that Ben Barnes and his
 7     team uniquely provided.
 8          Q.    Why do you say "uniquely"?
 9          A.    I think the people that were
10     involved in that were very good at what they do.
11     They're very successful in Washington, and they,
12     in fact, approach their things very
13     professionally and don't engage in things that
14     otherwise wouldn't produce good public policy.
15          Q.    Do you recall where the genesis of
16     the idea arose to move Stanford's operation to
17     USVI?
18                    Was it -- did that arise with
19     Allen Stanford or Ben Barnes, to the best of your
20     knowledge?
21          A.    I -- I don't know the answer to
22     that.
23                    I do know the answer that -- I do
24     know that we, in fact, concluded, as a team, that
25     there was no way to change the residency
```

APP000533

1              ROBERT MITCHELL DELK

2    requirements; that optically that was a mammoth

3    deal.

4              When you had, as I alluded to

5    earlier, car dealers who, in fact, were setting

6    up operations in the USVI and never living there,

7    the 183-day residency requirement became

8    absolutely a condition precedent to getting any

9    kind of tax benefit.

10             And I think it was based on the

11   recommendation that Ben gave him, from his

12   political analysis, that you could never change

13   that residency requirement, that he knew that if

14   he wanted to, in fact, ever effectuate a change

15   in the USVI tax laws, he, in fact, would have to

16   move himself and his residence and his business.

17        Q.   Do you know if Allen Stanford

18   actually moved his residence to the USVI, or did

19   he just do what we discussed earlier, which was

20   stay on the tarmac for, you know, five minutes

21   before 12:00 and five minutes after 12:00?

22        A.   No.  He, in fact, moved his

23   residence -- let me say this:  I know he had a

24   residence in the USVI.  I don't know where he

25   lived and what he did, to be honest with you.

APP000534

1                   ROBERT MITCHELL DELK

2                   It was not his intention, at least

3     based on what Ben reported to us, for him to do

4     anything otherwise than move his residency, as

5     well as his business operations.

6          Q.   Do you have an understanding if

7     Allen Stanford or Stanford Financial actually

8     realized tax benefits as a result of that move?

9          A.   No -- no, they did not, because that

10    was only one part of the test.

11                   Now, there was some -- there was

12    some obvious income, I assume, based on the

13    activity in the USVI, and so they probably did.

14                   I don't know what their tax return

15    looked like.  But, again, they would benefit from

16    that, but they were needing a clarification -- at

17    least that's what the tax experts thought -- to,

18    in fact, broaden the definition of "source" to

19    include, you know, income that was broader than

20    the definition allowed.

21         Q.   So absent a change of the sourcing

22    rule, there was no way Allen Stanford and his

23    companies could have or would --

24         A.   No --

25         Q.   -- have benefited?

APP000535

1                    ROBERT MITCHELL DELK

2          A.    -- what I said was it -- to the

3     maximum -- the maximum benefit would have

4     occurred if they, in fact, had, in fact, got the

5     sourcing rules enlarged.

6               There had to be some benefit,

7     because there was some activity emanating from

8     the USVI that benefited on that lower tax rate

9     but not every dollar generated by the whole

10    financial empire.

11         Q.    Do you know if Allen -- if the move

12    caused or allowed Allen Stanford, personally, to

13    benefit on his personal taxes?

14         A.    I have no idea.  Again, I don't know

15    what the structure was of that entity.

16              MR. ABRAHAM:  Let's mark that as

17         Delk 6.

18                   -  -  -

19              (Whereupon, an e-mail was marked,

20               for identification purposes, as

21               Delk Exhibit Number 6.)

22                   -  -  -

23    BY MR. ABRAHAM:

24         Q.    So I've placed before you what's

25    been marked Exhibit Delk 6, which is an e-mail

APP000536

```
 1                    ROBERT MITCHELL DELK
 2   from you to Yolanda Suarez and Ben Barnes, dated
 3   September 12th, 2006.  Subject is, Payment from
 4   Stanford.
 5              And in this e-mail, you write,
 6   Yolanda, I received notice from my bank that
 7   $150,000 had been wired to my account from
 8   Stanford.
 9              Does this e-mail look familiar to
10   you?
11        A.    It does.  I haven't seen it in a
12   long time.
13        Q.    The e-mail indicates that you
14   received a wire directly from Stanford.
15        A.    Right.
16        Q.    Do you -- do you recall receiving
17   wires directly from Stanford?
18        A.    I only received two from them, as I
19   stated earlier.
20        Q.    Well, you stated earlier, if I
21   understand this correctly, that you received two
22   wires from him -- or from -- from
23   Stanford Financial in 2004, when you were
24   retained directly --
25        A.    Well, this is --
```

1              ROBERT MITCHELL DELK

2        Q.    -- by Al- -- by --

3        A.    -- this --

4        Q.    -- Stanford Financial --

5        A.    -- reflects --

6        Q.    -- this appears to --

7        A.    -- my dates were probably off, but

8    this is -- this reflects what -- the work I had

9    done for her.  And there were only two payments.

10   There's one voucher dated August 17th and, I

11   guess, this one dated September 12th.

12              And after I sent this document to

13   her, that's what spurred her to call me to say

14   that the relationship no longer existed, that

15   they were relying on Ben to do the work.

16        Q.    So this document relates to the work

17   you did prior to your involvement with

18   Ben Barnes?

19        A.    Right.

20        Q.    You testified earlier, if I recall,

21   that your involvement -- your direct involvement

22   with Stanford Financial was in 2004.  And, yet,

23   this e-mail is dated 2006.

24        A.    That's -- well, again, the dates are

25   kind of, you know, mushy in my mind.  I haven't

APP000538

```
 1                    ROBERT MITCHELL DELK
 2    seen any of this stuff.  I didn't have any
 3    records of this.  But as you can see, though,
 4    there was a payment -- and I continued to bill
 5    them, and they never paid me.
 6                   So that's what spurred this thing,
 7    and, you know, I was just pointing out to her
 8    that I was doing a lot of work on this issue.
 9          Q.    So this relates to your previous
10    engagement, your previous direct engagement, not
11    your subsequent engagement with Ben Barnes?
12          A.    No, it relates to both.
13                   I mean, clearly what I was brought
14    in to do with Ben Barnes was the tax bill, and
15    these two are kind of mixed together.
16                   What I was doing, I assume -- now, I
17    can't recall my state of mind here -- I was
18    trying to show that I was doing the work on the
19    tax issue as a way of spurring them to pay me for
20    what they owed me for previously --
21          Q.    I see --
22          A.    -- and it didn't work.
23          Q.    -- I see.
24                   And how much did they owe you
25    previously, to the best of your recollection?
```

APP000539

```
 1                  ROBERT MITCHELL DELK
 2         A.    Well, when -- they owed me about
 3    $400,000 that they never paid.
 4         Q.    That's a lot.
 5               This -- attached to this document --
 6    attached to this e-mail is a document -- is a
 7    statement, and the statement is from you,
 8    Mitchell Delk, but it's from an entity called The
 9    Public Policy and Advocacy Group.
10         A.    Yeah, that's what I said earlier,
11    that I created -- you know, I called myself The
12    Public Policy and Advocacy Group.
13         Q.    So was that a d/b/a, but that wasn't
14    an actual --
15         A.    No --
16         Q.    -- entity organized under the
17    laws --
18         A.    -- no --
19         Q.    -- of any specific state?
20         A.    -- no.
21         Q.    Okay.  And this statement is a
22    listing of -- of what appears to be invoices,
23    relates to your work prior to your engagement for
24    Ben Barnes or -- or for Ben Barnes?
25         A.    Before Ben Barnes.  But I continued
```

1                ROBERT MITCHELL DELK

2    to bill them because they never ceased the

3    relationship, and I was, you know, operating

4    under the assumption that I was continuing to do

5    work for Stanford as well as doing work for Ben,

6    but I never got paid for the Stanford people.

7                MR. ABRAHAM:  Let's mark this as

8         Delk 7.

9                      -  -  -

10               (Whereupon, an e-mail was marked,

11                 for identification purposes, as

12                 Delk Exhibit Number 7.)

13                     -  -  -

14   BY MR. ABRAHAM:

15        Q.    I've placed before you what's been

16   marked Exhibit Delk 7, which is an e-mail from

17   you to Yolanda Suarez, dated February 20th, 2007.

18               Does this e-mail look familiar to

19   you?

20        A.    Yes.

21        Q.    In this e-mail, you write, Yolanda,

22   if you have the time, please call me regarding

23   the indictments from Venezuela.

24               Do you recall what this e-mail was

25   about?

```
 1                   ROBERT MITCHELL DELK

 2          A.    Yeah.  Ben asked me to call her

 3    because there was a -- somebody at -- that worked

 4    at a brokerage firm or some entity in Venezuela

 5    that was indicted, and he wanted to find out what

 6    was going on with it so he could deal with it

 7    from a public relations perspective.

 8          Q.    So he was involved, to your

 9    understanding, in the public relations --

10          A.    Again --

11          Q.    -- response to --

12          A     -- it was --

13          Q     -- the indictments?

14          A.    -- I don't know how -- I don't even

15    know how he knew or how -- but I knew because Ben

16    told me there was some indictment.  He wanted me

17    to discover what was going on there because he

18    thought he could get relations -- somebody would

19    call him from the Hill about it.

20          Q.    You testified earlier that you were

21    retained by Ben Barnes to work on tax issues.

22                Did you believe this was beyond the

23    scope of your engagement with Ben Barnes?

24          A.    No.

25          Q.    Why is that?
```

```
 1                    ROBERT MITCHELL DELK
 2         A.    Well, I mean, it related to the
 3    financial services company, Stanford, but
 4    specifically what Ben asked me to do, I mean,
 5    this was an ancillary issue, but it would impact
 6    the potential tax legislation that he was
 7    promoting for the company.
 8         Q.    Did you do any subsequent work
 9    regarding responding to the indictments from
10    Venezuela?
11         A.    No.
12         Q.    Why is that?
13         A.    Never got any information from it
14    that I recall, and I recall it was -- I don't
15    know what -- the individual had stole money from
16    Stanford, I believe, as it was.  I don't recall.
17              Again, it's been, you know,
18    eight years.  But Ben just wanted me to know if,
19    in fact, that would create a problem for him on
20    the Hill representing Stanford.
21         Q.    So you were advising Ben Barnes
22    personally on this matter?
23         A.    Yeah.  I mean, as it relates to this
24    project, I mean, the Stanford project, it was,
25    you know -- if somebody, for example, got
```

APP000543

```
 1                    ROBERT MITCHELL DELK
 2     indicted for a company that he was representing
 3     or you were representing or I was representing,
 4     you would want to know the details of that,
 5     because one of your friends might invest- --
 6     investigate about it or ask about it and might be
 7     embarrassed by the -- the answer to it.
 8          Q.    So Ben Barnes was concerned about
 9     his own reputation, and that's why he asked you
10     to look into the --
11          A.    I think that -- I think that's --
12               THE COURT REPORTER:  Wait, wait,
13          wait, wait, wait.
14               MR. MADRID:  Objection.
15               MR. ABRAHAM:  Let me just finish my
16          question before you object.
17               MR. MADRID:  You elicited an answer
18          before you were finished.  So . . .
19               THE WITNESS:  No, I -- I don't know
20          that -- I think that is really --
21               THE COURT REPORTER:  Wait, wait,
22          wait.
23               You objected, but there was all
24          this.
25               MR. MADRID:  Okay.
```

```
 1               ROBERT MITCHELL DELK
 2          Objection: form.
 3          Go ahead.
 4          THE WITNESS:  To be candid, I think
 5      that's a, you know -- a -- an illogical
 6      leap here.
 7          I mean, I think what Ben was
 8      concerned about is, he was trying to get
 9      legislation passed for them.
10          If you're, in fact, lobbying on
11      behalf of a client, then it has some
12      international incident; like a employee
13      being indicted for stealing money, you
14      want to know about it because you need to
15      know -- you don't want to expose your
16      friends that they're trying to help you on
17      an issue or trying to help on a public
18      policy issue that could have, you know,
19      some negative implications.
20          I don't think it was much about his
21      reputation, as he was trying to, in fact,
22      get the legislation passed, or at least
23      develop a strategy to get it passed.  And
24      this could derail or could, in fact,
25      distract from his abilities.
```

APP000545

1                    ROBERT MITCHELL DELK

2    BY MR. ABRAHAM:

3         Q.   So this was framed to you as a

4    question of how do these indictments in

5    Venezuela --

6         A.   It was one individual, as I recall,

7    and the question was, what does this -- what does

8    this mean?  What did the individual do?  Does

9    this implicate the company in any way?

10        Q.   And did Ben Barnes ever express to

11   you a concern about how this would affect his own

12   reputation?

13        A.   No, I don't recall that.

14             Again, I think that's a -- you know,

15   you're -- you're jumping to a illogical

16   conclusion.

17        Q.   Well, I'm just asking you a

18   question.

19        A.   No.

20             And what I'm telling you is --

21   again, this is my opinion -- I don't know what

22   Ben Barnes was thinking -- I'm thinking he was

23   thinking that if this, in fact, implicated the

24   company in any way, it would make it much more

25   difficult to get legislation passed that, in

```
 1                    ROBERT MITCHELL DELK
 2    fact, they were advocating on behalf of
 3    Standard -- Stanford.
 4         Q.   So this was not work, in your view,
 5    that was done for Ben Barnes, personally?
 6         A.   This was done for -- at Ben Barnes'
 7    request, as I recall, and it was to, in fact --
 8    yes, it was to benefit Ben Barnes.  I mean, he --
 9    it was information Ben Barnes needed to have.
10              MR. IGIEL:  I'm going to object.
11              I know that you made the statement
12         earlier that when referring to Ben Barnes,
13         Ben Barnes, Ben Barnes Group is the same
14         thing, and now I'm getting a little
15         confused when we're saying, personally
16         Ben Barnes.
17              Are we still talk -- are Ben Barnes
18         and Ben Barnes Group still the same thing
19         within the scope of your questions?
20              MR. MADRID:  Only for purposes of
21         this deposition --
22              MR. IGIEL:  Right --
23              MR. MADRID:  -- as I understand.
24              MR. IGIEL:  I understand that.
25              But I mean, with respect to these
```

```
 1                  ROBERT MITCHELL DELK
 2          specific questions, are you asking about
 3          the Ben Barnes Group, or are you asking
 4          about Ben Barnes, personally and
 5          individually?
 6   BY MR. ABRAHAM:
 7          Q.    I'm asking you about both.
 8          A.    Again, I'll answer the question the
 9   same way, because it doesn't really matter, to
10   me.
11                I was doing work for
12   Ben Barnes Group.  And Ben Barnes, as my role in
13   this project, I -- you probably could have asked
14   anyone the same question.  I understand that
15   somebody who worked at Stanford was indicted in
16   Venezuela.
17                What does that mean?  What happened?
18   Does it have any implication for the company?
19   Does it implicate the company in any way, because
20   I assume --
21          Q.    When you say "the company," what do
22   you mean?
23          A.    The Stanford company.
24                I mean, that's -- my assumption is,
25   you know, what -- what happens if somebody is
```

1              ROBERT MITCHELL DELK

2    indicted who worked for a company.  Because the

3    guy's name, you know, in the press, as I recall,

4    was Joe Blow was indicted, a Stanford employee,

5    for embezzlement.  And I think what Ben was

6    trying to determine was, did, in fact, the

7    Stanford company, in fact, do anything wrong.

8    And I think the answer was, no, in this

9    particular case.

10         Q.    Did you believe it was part of your

11   engagement to advise Ben Barnes, himself, and his

12   entity about a reputational issue stemming from

13   his work for Stanford Financial?

14              MR. MADRID:  Objection to form.

15              THE WITNESS:  I don't -- that --

16         that -- no, that was never anything.

17              What I was helping him on was

18         legislation that Stanford was ending up

19         passing.  This had nothing to do with

20         Ben's reputation, per se.

21              I mean it had to do -- if it had

22         anything to do with the reputation of the

23         company, it could have undermined Ben's

24         efforts to get legislation passed --

25

```
 1                    ROBERT MITCHELL DELK

 2    BY MR. ABRAHAM:

 3         Q.    Okay.

 4         A.    -- I don't think Ben was concerned

 5    about his reputation.

 6              Again, I think he was trying to get

 7    the legislation in the best position that it

 8    could be in to pass, and that if this was somehow

 9    negative on the company, that would be harmful.

10              MR. ABRAHAM:  This is Delk Number 8.

11                       -  -  -

12              (Whereupon, an e-mail was marked,

13                 for identification purposes, as

14                 Delk Exhibit Number 8.)

15                       -  -  -

16    BY MR. ABRAHAM:

17         Q.    Now I've placed before you what's

18    been marked Exhibit Delk 8, which is an e-mail

19    dated February 19th, 2009 from you to

20    Kent Caperton and Susan Martin or Ben Barnes.

21              Does this e-mail look familiar to

22    you?

23         A.    It -- yeah, it does now.

24         Q.    And what is this e-mail?

25         A.    It looks like some talking points
```

```
 1                  ROBERT MITCHELL DELK

 2    that Ben had asked me to put together that would

 3    give him something to say if he was approached by

 4    the press.

 5                  I assume --

 6         Q.    About what?

 7         A.    I'm not sure the time frame here, if

 8    this is when it was reported that Stanford was

 9    being investigated or whether Stanford had been

10    indicted or -- or what it was.  I --

11         Q.    And attached to this document, it

12    appears that there are talking points.

13         A.    Yeah.

14         Q.    And did you draft these talking

15    points?

16         A.    I assume I did.

17         Q.    And who did you draft these talking

18    points for?

19         A.    For Ben.

20         Q.    Ben Barnes or Ben Barnes Group,

21    L.P.?

22         A.    They refer -- the Ben Barnes Group

23    for Ben Barnes, how -- I mean, you're trying to

24    draw a distinction between working for Ben and

25    working for the Ben Barnes Group.
```

APP000551

1                ROBERT MITCHELL DELK

2            In my mind --

3        Q.   I'm just responding to what your

4    counsel objected to --

5        A    No, no --

6        Q    -- so I just --

7        A    -- I'm just --

8        Q    -- want to be clear.

9        A.   -- telling you, in my mind, it was

10   the same thing.  I was working for the

11   Ben Barnes Group.  That's who paid me.

12       Q.   So when you say "Ben Barnes," it's

13   the same thing, Ben Barnes --

14       A.   That's fine.

15       Q.   -- and Ben Barnes Group?

16            Is that fine?

17       A.   Sure.

18       Q.   Okay.

19            Now, here, you are drafting talking

20   points for Ben Barnes.

21            Was this part of your engagement

22   with Ben Barnes, to draft talking points for

23   Ben Barnes about --

24       A.   No.

25       Q.   -- how to respond --

APP000552

```
 1                  ROBERT MITCHELL DELK
 2              THE COURT REPORTER:  Wait, wait,
 3         wait.
 4  BY MR. ABRAHAM:
 5         Q.    -- to press inquiries following the
 6  exposure of the Stanford fraud --
 7              THE COURT REPORTER:  Can you repeat
 8         that again?
 9              Talking points for Ben Barnes about
10         how to respond . . .
11  BY MR. ABRAHAM:
12         Q.    -- how to respond to media inquiries
13  following the exposure of the Stanford fraud?
14              Was that part of your engagement
15  with Ben Barnes?
16         A.    My engagement was to make sure Ben
17  was prepared to execute a strategy to, in fact,
18  effectuate legislation that would help Ben Barnes
19  Group and -- you know, and anything related to
20  that.
21              And the fact that, at some point in
22  time, unbeknownst to anyone, including
23  Ben Barnes, it was discovered that Allen Stanford
24  was a fraud.  And that certainly is embarrassing
25  to anyone who was associated with it.
```

APP000553

1              ROBERT MITCHELL DELK

2              And so I was trying to give Barnes,

3    at least, some points based on my many, many

4    meetings with him about this particular client,

5    how to respond.

6              Whether he was going to use them, I

7    have no objective -- I mean, I have no answer to

8    that or no idea whether he used them.

9         Q.    So this work product that you

10   created and forwarded to Ben Barnes was for the

11   benefit of Ben Barnes, not for

12   Stanford Financial?

13        A.    Well, again, I think the press looks

14   at -- the press wouldn't know the difference

15   between Ben Barnes Group and Ben Barnes at --

16   whatsoever.  And so I think, you know, Ben Barnes

17   being the Ben Barnes Group, somebody would have

18   to respond having their name associated with

19   Stanford.

20        Q.    And did you believe that this work

21   product was part of your engagement?

22              Were you paid for this work product?

23        A.    I was paid to help Ben manage the

24   Stanford relationship and to achieve a

25   legislative outcome.  This was a byproduct of

```
 1                ROBERT MITCHELL DELK
 2   that engagement by the Ben Barnes Group.
 3               This was not necessary -- I mean, I
 4   could have said, No, I don't want to do this.  I
 5   was -- I just had a lot of knowledge about the
 6   issues and, therefore, created the document.
 7               As I recall, I mean, I -- there's
 8   nothing nefarious about this.
 9               And, again, I was, you know -- it's
10   a byproduct of the engagement to help him with
11   this Stan- -- the relationship with Stanford and
12   their legislative objectives.
13        Q.    This document was -- was -- was for
14   the benefit of Stanford's legislative objectives?
15        A.    No, no, no, no.  I said it was a
16   byproduct of that -- that relationship with the
17   Ben Barnes Group.
18               I mean, it's a natural thing if
19   you're working on a particular issue and
20   something with -- regarding that client blows up.
21   As a member of that team who supported
22   Ben Barnes, we're just trying to figure out a
23   best way that Barnes could explain, you know,
24   that he knew nothing about this -- this Ponzi
25   scheme.
```

APP000555

```
 1                    ROBERT MITCHELL DELK

 2              And I don't think he did.

 3         Q.    Did you believe that this work was

 4   covered under your retention, your -- your

 5   engagement fees that were paid for your work for

 6   Ben Barnes, this document?

 7         A.    Yeah, I assume -- and, again, it's a

 8   byproduct of the -- the entire responsibilities.

 9   I haven't read the document.  But . . .

10         Q.    Well, take a moment to review it.

11              (Whereupon, the witness reviews the

12               material provided.)

13              THE WITNESS:  Now -- now I can tell

14         you what this is.

15              This was -- when it was in the

16         press -- and, again, I don't recall

17         whether Allen Stanford had been indicted

18         or whether, in fact, it was that he was

19         being investigated -- we sat down as a

20         team, and Barnes said, Well, what do we do

21         about this?  How do we respond to the

22         press?

23              We've got to respond or be prepared

24         to, because we've, in fact -- I have been,

25         in fact, the lead person on a legislative
```

```
 1                    ROBERT MITCHELL DELK

 2          effort that he was trying to promote.

 3               And I said, Well, I think the best

 4          way to do it is to say you're shocked,

 5          appalled and sad, and go into details

 6          about what you did and you didn't do.

 7               What this is to demonstrate is, in

 8          fact, that nobody in here working for

 9          Barnes or Barnes, himself, in fact, was

10          involved in his business decision that

11          made him a Ponzi scheme [verbatim].

12               This was about a legislative effort

13          and what was necessary to achieve the

14          legislation.

15    BY MR. ABRAHAM:

16          Q.    And do you believe -- did you

17    believe at the time that part of your job being

18    retained by Ben Barnes was to advise

19    Ben Barnes -- and by that, I mean Ben Barnes,

20    personally, and his entity -- on reputational

21    issues?

22          A.    Again, I think this is a byproduct

23    of -- of staffing and working with the

24    Ben Barnes Group on this issue specifically.

25               Nobody knew that he was a crook, and
```

APP000557

```
 1              ROBERT MITCHELL DELK
 2  nobody knew this whole thing was going to
 3  implode.  And this is a response of it.  I mean,
 4  I think it's a natural response.
 5              I think if you look at what Barnes'
 6  roles were, what my roles were working
 7  for Barnes, you'll see that we had nothing to do
 8  with his business.  I mean, the only thing we had
 9  to do with his business was making
10  recommendations on what his business had to look
11  like to, in fact, achieve those results to get
12  the tax advantages in the USVI.
13       Q.   But the purpose -- correct me if I'm
14  wrong, but the purpose of this document is to
15  give Ben Barnes advice about how to protect his
16  reputation --
17       A.   No --
18       Q.   -- not to give Ben Barnes --
19       A.   -- no, that was not --
20            THE COURT REPORTER:  Wait, wait,
21       wait, wait.
22  BY MR. ABRAHAM:
23       Q.   Excuse me.  Could I just finish my
24  question?
25            -- not to give Ben Barnes advice on
```

APP000558

```
 1                    ROBERT MITCHELL DELK

 2    how to help Allen Stanford --

 3                 MR. MADRID:  Objection --

 4    BY MR. ABRAHAM:

 5         Q.    -- is that correct?

 6                 MR. MADRID:  -- objection: form.

 7                 MR. IGIEL:  Same objection.

 8                 THE WITNESS:  The purpose of this

 9              document is to respond to the press when a

10              client Ben Barnes had represented finds

11              himself in a hell of a legal mess.

12                    Again, clearly, at that point in

13              time, you're not advancing anything for

14              Allen Stanford; but, nonetheless, this is

15              a byproduct of representing

16              Allen Stanford -- Ben representing

17              Allen Stanford, and we working with Ben

18              trying to effectuate this legislation.

19                    I don't see that -- it's not like

20              you flip a switch and then the next day,

21              you know, you've got a new engagement or a

22              new activity.  Again, I think this is the

23              byproduct.

24                    If you've worked on this issue for

25              three or four years and Allen Stanford is
```

APP000559

```
 1                    ROBERT MITCHELL DELK

 2          indicted or rumored to be indicted, you

 3          have to have some response.

 4               I mean, the team has to say, you

 5          know, What the hell do we do; I mean, what

 6          did we do; could we possibly be, you know,

 7          in fact -- our reputation's hurt; I mean,

 8          do we -- I mean, you know, everything we

 9          did was completely legal and related to

10          one issue, and that was regarding, you

11          know, the tax issues.

12               Now, Barnes, apparently, did other

13          things.  I mean, I picked -- I wrote this

14          down, again, almost verbatim to what

15          Ben Barnes had done for -- for Allen

16          according to Ben.

17               I can't validate this where he

18          provided counsel and strategy on the

19          Antigua cricket tournament.  But he said,

20          This is what I did.

21               I had nothing to do with his

22          business that lead to him being indicted

23          on a Ponzi scheme.

24    BY MR. ABRAHAM:

25          Q.   Did you ever provide advice to
```

```
 1                  ROBERT MITCHELL DELK

 2   Stanford Financial on reputational issues, how to

 3   answer press inquiries?

 4        A.   I -- I provided some to Ben on what

 5   they should do and what Stanford could

 6   potentially do when there was rumors about

 7   he -- you know, that they were, in fact, being

 8   investigated.

 9             This is after he had been indicted,

10   as I recall.

11        Q.   And who was the ultimate recipient

12   of these talking points, Stanford Financial or

13   Ben Barnes?

14        A.   I think this one was Ben Barnes.  He

15   was speaking for the team that -- that

16   represented Stanford.

17             MR. ABRAHAM:  This is Delk 9.

18                  -  -  -

19             (Whereupon, an e-mail string was

20              marked, for identification

21              purposes, as Delk Exhibit

22              Number 9.)

23                  -  -  -

24   BY MR. ABRAHAM:

25        Q.   I've placed before you what's been
```

APP000561

```
 1                ROBERT MITCHELL DELK
 2   marked Exhibit Delk 9.  This is a string of
 3   e-mails between you and Kent Caperton.
 4                Do these e-mails look familiar to
 5   you?
 6        A.    Yeah.  I mean, I haven't seen them
 7   in, obviously, a number of years, but . . .
 8        Q.    And on Page 2, there's an e-mail
 9   from you to Kent Caperton, August 10th, 2009 at
10   10:46 a.m., where you write, This is ridiculous.
11   Under this lawyer's theory, I assume all
12   employees have to give back their salaries.  I've
13   several boxes of documents that I produced for
14   Stanford.  Do you want me to bring them to the
15   office?  They are evidence that we were doing
16   legitimate work for the company.
17                There's a reference to "boxes of
18   documents."
19                Do you -- do you recall that?
20        A.    I -- I don't.  And I -- I gave
21   everything I had.  I didn't have any boxes -- I
22   had a box of this (indicating) document, which is
23   about the only thing I had.
24        Q.    And then Kent responds to you by
25   saying, No; but I think we need to start
```

APP000562

1              ROBERT MITCHELL DELK

2    documenting what Ben and all of us did to earn

3    the fee.

4              Was there a belief at the time that

5    Ben Barnes needed to begin documenting what he

6    did to earn his fee?

7         A.    Again, I -- you know, when -- when

8    somebody's accused of a Ponzi scheme, you don't

9    know what's going to happen.  And I think that

10   everybody was concerned that we had done

11   legitimate work for him, had nothing to do with

12   his business that, in fact, evolved into a Ponzi

13   scheme and we could document, in fact, all the

14   work we had done on the tax issue starting with

15   the white paper.

16        Q.    And did you believe it was your role

17   to be part of a group of individuals documenting

18   what Ben did to earn his fee?

19        A.    As it related to the tax issue?  I

20   certainly do.  I mean, I was intimately involved

21   in the strategies, from A to Z, on the tax issue.

22        Q.    And is documenting what Ben did to

23   earn his fee something that you believe you were

24   paid for by Ben Barnes and his organization?

25        A.    I don't know if I was paid for.  I

APP000563

1                    ROBERT MITCHELL DELK

2    think it's something I could easily document

3    because I had been in hundreds of meetings where

4    Ben had been involved in where the white paper

5    was discussed, where the strategy was outlined,

6    where Ben talked about the implementation.

7              Q.    And is documenting the work that

8    Ben Barnes did, was -- is that part of your

9    engagement for Ben Barnes?

10             A.    Yes.

11                   You didn't bring this up, but if you

12   look at the last document, it was a document in

13   value -- regarding a company called FastShip who

14   had approached Ben to help them on some

15   legislative issues, and Ben asked me to sit in on

16   the meetings and help him.

17                   And I drafted this letter.  And

18   this, again, shows that I did work for Ben Barnes

19   and not for the client FastShip, but, you know, I

20   would have been paid by Ben Barnes Group.

21             Q.    This is work for Ben Barnes --

22             A.    Right.

23             Q.    -- not for the client?

24             A.    Right.

25             Q.    And for the benefit of Ben Barnes,

APP000564

```
 1                   ROBERT MITCHELL DELK
 2   not the client?
 3        A.    The client would certainly benefit.
 4   I mean, that's what Ben Barnes was hired to do.
 5             MR. ABRAHAM:  This is Delk 10.
 6                      -  -  -
 7             (Whereupon, an e-mail was marked,
 8               for identification purposes, as
 9               Delk Exhibit Number 10.)
10                      -  -  -
11             (Whereupon, the witness reviews the
12               material provided.)
13   BY MR. ABRAHAM:
14        Q.    I've placed before you what's been
15   marked Exhibit Delk 10.  This is an e-mail from
16   you to Jeffrey Forbes from January 8th, 2009.
17             Does this e-mail look familiar to
18   you?
19        A.    Yeah.
20        Q.    And what's the subject of this
21   e-mail?
22        A.    Well, this has nothing to do with
23   this case.  This was an e-mail from Lil to
24   Baucus.
25             This was another client of Ben's
```

APP000565

```
 1                    ROBERT MITCHELL DELK
 2     that were health centers, and Lil was the
 3     president of the health center group, and it was
 4     a draft e-mail from her to the chairman.  And
 5     then it goes on from Jeff back to me, and he
 6     said, Make it, you know, more a personalized
 7     memo.
 8                    This was about healthcare reform.
 9                    And then I -- and the last thing I
10     said, Jim Conzelman, who works with Standard
11     [sic], called me and said that Stanford sent a
12     check to the Montana Fund, it was not cashed or
13     returned.  And then --
14           Q     And --
15           A     -- I was asking him what to do about
16     it.
17                    I mean, that was -- again, this was
18     about tax -- this was not about the Stanford
19     issue, other than since I was e-mailing with
20     Jeff, who had worked for Baucus, I was just
21     telling him that -- that the Stanford guy told
22     me -- I ran into him and he said that they had
23     sent something to the Montana Fund, he was going
24     to the event, and they never cashed the check.
25           Q.    What is the Montana Fund?
```

APP000566

```
 1                    ROBERT MITCHELL DELK

 2          A.    I don't know.  It's a -- it was a

 3    fund that Senator Baucus had, a Political Action

 4    Committee.  I'm assuming.  I don't know.

 5          Q.    And you write that The check, quote,

 6    was probably returned for reasons we have

 7    previously discussed, and it was probably lost in

 8    the mail.

 9          A.    It was -- as I -- as what Jim said

10    is the check was for greater than the amount that

11    can be done.  I think at that point in time it

12    was like $2,400 -- $2,200 or $2,600, and the

13    check had been written for $5,000.

14          Q.    I see.

15                So the reason the check wasn't

16    cashed, to the best of your knowledge, was it

17    exceeded the -- the maximum?

18          A.    The limits --

19          Q.    Okay.

20          A.    -- right.

21                MR. ABRAHAM:  This is Delk 11.

22                         -  -  -

23                (Whereupon, an e-mail string was

24                 marked, for identification

25                 purposes, as Delk Exhibit
```

APP000567

```
 1                    ROBERT MITCHELL DELK
 2                      Number 11.)
 3                          -  -  -
 4    BY MR. ABRAHAM:
 5          Q.    I've placed before you what's been
 6    marked Exhibit Delk 11, which is a series of
 7    e-mail exchanges.
 8                Does this document look familiar to
 9    you?
10          A.    Yeah.
11          Q.    And on the first page is an e-mail
12    from you to Scott Reed where you write, Allen
13    needs legal help, but equally important, he needs
14    some precut -- precrisis [verbatim] PR
15    professionals.
16          A.    And this was, I assume, before --
17    this was when there was press that he was being
18    investigated, and this was before he, in fact,
19    had been indicted.
20                And --
21          Q.    When you -- when you say "he," who
22    do you mean?
23          A.    Stanford.
24          Q.    Okay.
25          A.    -- and just as a little background,
```

APP000568

1              ROBERT MITCHELL DELK

2    when Freddie Mac had their accounting issues, the

3    chairman, president and CFO ended up being fired,

4    in one day, by the board, which created a

5    tremendous public relations issue.

6              And I managed a group of

7    professionals inside -- inside Freddie Mac that

8    involved 25 people.  And -- so what I did is I

9    created a document.  I said this is a PR and all

10   that in there (indicating).  I created a -- a

11   document kind of based on what we did at

12   Freddie Mac.

13             Again, this is --

14        Q.    You created --

15        A.    -- this is a byproduct --

16        Q.    -- you created a PR document for

17   who?

18        A.    For -- for Barnes, that I assumed he

19   would use with Allen Stanford.

20        Q.    Why did you assume that?

21        A.    Well, that's what I created it for.

22   Barnes didn't have a PR problem; it was

23   Allen Stanford did.  He's the one who's being

24   reported -- as this article says, being

25   investigated.

APP000569

```
 1                    ROBERT MITCHELL DELK

 2          Q.    So did you believe that part of

 3   Ben Barnes' work was to help Allen Stanford with

 4   PR issues?

 5          A.    No.

 6                I -- I believe that we represented

 7   the Stanford Group, and our whole objective was

 8   to pass legislation.  And when you work on that

 9   for four years and, in fact, the company blows

10   up, your name is associated with having

11   represented that individual and his company.

12                And so as a byproduct of that, when

13   this blows up, you have to be prepared to address

14   the press.  I mean, because in this day and time,

15   somebody's going to say, Well, you

16   investigated -- I mean, you represented him.  You

17   know, are you complicit?  Did you know anything

18   about this?  And the answer is, obviously, no.

19                So, no, I wasn't paid to create

20   public relations talking points for

21   Allen Stanford, but it was a -- I assumed that's

22   what you kind of do when you're a -- a consultant

23   to somebody on a specific issue.  If their firm

24   blows up, you have to justify how you work for

25   them for a number of years and, in fact, didn't
```

APP000570

 1                    ROBERT MITCHELL DELK

 2    know about that.

 3         Q.    Do you believe that was part of

 4    Ben Barnes' role, was to help the Stanford

 5    organization with PR issues?

 6              MR. MADRID:  Objection: asked and

 7         answered.

 8              THE WITNESS:  No.  I think, again,

 9         you know, as we've talked about, there was

10         some con- -- condition in the environment

11         that was done as it relates to the tax

12         benefits in the Caribbean and the USVI.

13         No, I don't -- I don't know what Ben

14         advised Allen Stanford on; but I do know,

15         as it relates to this one tax issue, there

16         was a public relations aspect of it, and

17         that was conditioning the environment to

18         make people appreciate that the Caribbean

19         was important to this country.

20              But, no, I don't think that was --

21         that was a byproduct of having represented

22         them in this tax issue.

23    BY MR. ABRAHAM:

24         Q.    In response to that e-mail,

25    Scott Reed writes, Ben seems to think he has it

```
 1                 ROBERT MITCHELL DELK

 2   under control!

 3         A.    Well, you're going to interview

 4   Scott Reed.  Ask him what he meant by that.

 5   I --

 6         Q.    I'm asking you --

 7         A.    -- don't know.  I --

 8         Q.    -- what did you understand that to

 9   mean at the time?

10         A.    I don't have a clue what he meant.

11   But I just thought -- when I read this article, I

12   said, The guy is -- you know, this is pretty

13   frigging bad.  And if this is accurate, there's

14   going to be -- people are going to ask Barnes,

15   You know, didn't you represent this guy before

16   the Congress?

17              And that was my concern, is, as a

18   part of that team working for Ben Barnes Group, I

19   was just providing something for him to, in fact,

20   respond.

21              Because everything Ben Barnes did

22   for him, he did a damn good job on it.  And he

23   had nothing to do, as far as I know, with this

24   Ponzi scheme.

25              I don't know what Scott meant.  He
```

1              ROBERT MITCHELL DELK

2    can tell you.

3         Q.    You respond to -- to Scott Reed with

4    an e-mail saying, This is going to be an

5    eight-headed monster.  The legal, political and

6    PR issues are going to be enormous, all with

7    different objectives and consistencies.

8              What did you mean by that?

9         A.    Anytime that you have -- you

10   represent somebody who is indicted or is about to

11   be indicted, you're going to have an issue of

12   whether, you know, there's -- you're legally

13   liable.  I didn't know what was going on there.

14   I didn't know what the legal liabilities could

15   possibly be.

16             I know one thing:  There was no

17   knowledge of what was going on without Stan --

18   Allen Stanford.  There clearly could be political

19   issues because Ben Barnes had represented

20   Allen Stanford, and this group had worked with

21   Ben Barnes in representing him.  And that

22   creates, obviously, public relations issues.

23             I mean, again, that would -- this

24   is a -- if you look at it, this was just a

25   cryptic e-mail.  I mean, you know, you can read

Page 208

1              ROBERT MITCHELL DELK

2    into it anything you want to; but it was nothing

3    more than, you know, Allen Stanford's in a lot of

4    trouble and, you know what, because we

5    represented him, we just need to be prepared to

6    explain that everything we did was legitimate, it

7    was legal, and it was to achieve a very sound

8    public policy.  And if anybody asked the

9    question, here's what we're going to say.

10          Q.    But the subject of this e-mail

11   appears to be whether Ben Barnes is equipped to

12   give cri- -- to give crisis and PR advice --

13          A.    Again --

14          Q.    -- to the --

15          A.    -- again --

16          Q.    -- Stanford organization --

17                THE COURT REPORTER:  Wait, wait --

18                THE WITNESS:  -- on --

19   BY MR. ABRAHAM:

20          Q.    -- isn't that correct?

21          A.    -- that is a gross jump to a

22   conclusion -- I don't know.  Ask Scott.  You're

23   going to have him here tomorrow.

24          Q.    Well, you -- you're -- you received

25   these e-mails, and you responded to them.

APP000574

1                    ROBERT MITCHELL DELK

2              So what --

3        A.    Yeah.

4        Q.    -- what do you think is happening?

5        A.    I don't know.

6              I'm just saying, you know, I don't

7    know what Ben's prepared to do, but I'm going to

8    prepare something because this team worked on a

9    legitimate issue; provided legitimate,

10   comprehensive, very good services.  And, in fact,

11   because we did that, we're going to have to

12   respond to it.

13        Q.    For whose benefit, Ben Barnes or

14   Allen Stanford?

15        A.    Not for Allen Stanford's benefit,

16   but, you know, I produced a document -- at the

17   time when it was shown that -- it was at least

18   alleged that Allen was being investigated but

19   hadn't been indicted, I produced a document for

20   Ben that said, you know, here's what we did at

21   Freddie Mac.  He wants to follow this lead, go to

22   it.  You need to have somebody who can manage,

23   you know, a war room, essentially.

24              But I did think there was -- you

25   know, there could be political fallout for the

```
 1                ROBERT MITCHELL DELK
 2    Ben Barnes Group and for people that Ben had
 3    hired to work on this issue.  It's a very unique
 4    situation that very seldom happens, thank God.
 5          Q.    And how did you manage or help
 6    manage the fallout to Ben Barnes' reputation?
 7                MR. MADRID:  Objection: form.
 8                THE WITNESS:  I -- I gave Ben a
 9          document explaining, you know, based on
10          our conversation when this broke, what he
11          had done for Stanford, what I had done for
12          Stanford, and it will show you that
13          everything we did were legitimate issues.
14          And we were paid for them and I think, you
15          know, were paid less than probably we were
16          deserved.
17                MR. ABRAHAM:  Okay.  Thank you.  I
18          have no more further questions.
19                THE WITNESS:  No, that's fine.
20                THE COURT REPORTER:  I need a
21          break --
22                MR. MADRID:  Yes --
23                THE COURT REPORTER:  -- please.
24                MR. MADRID:  -- let's take a
25          five-minute -- is that okay -- 10 minutes?
```

```
 1                    ROBERT MITCHELL DELK

 2              THE VIDEOGRAPHER:  Off the record at

 3         2:28.

 4                       -  -  -

 5              (Whereupon, a brief recess was taken

 6                from 2:28 p.m. to 2:58 p.m.)

 7                       -  -  -

 8              THE VIDEOGRAPHER:  On the record at

 9         2:58.

10                       -  -  -

11         EXAMINATION BY COUNSEL FOR DEFENDANTS

12         BEN BARNES AND BEN BARNES GROUP, L.P.

13                       -  -  -

14    BY MR. MADRID:

15         Q.   Good afternoon, Mr. Delk.  My name

16    is Jay Madrid.  I have the pleasure of

17    representing Ben Barnes Group and Mr. Barnes,

18    individually.

19              We met just before your deposition

20    began, is that correct, sir?

21         A.   Yes.

22         Q.   Okay.  I will do my best to finish

23    whatever I have to ask you in 15 minutes.

24              Here we go.

25                       -  -  -
```

APP000577

```
 1                    ROBERT MITCHELL DELK

 2                      (Whereupon, an e-mail string was

 3                       marked, for identification

 4                       purposes, as Delk Exhibit

 5                       Number 4-A.)

 6                         -  -  -

 7                         -  -  -

 8                      (Whereupon, an e-mail was marked,

 9                       for identification purposes, as

10                       Delk Exhibit Number 5-A.)

11                         -  -  -

12    BY MR. MADRID:

13            I've handed you Exhibit 4-A and --

14    I'm sorry -- 4-A and 5-A, correct, sir?

15        A.    Correct.

16        Q.    Would you match those up with

17    Exhibits 4 and 5, which were presented to you by

18    Mr. Abraham, please?

19        A.    Okay.

20        Q.    Do you have them?

21        A.    Yep.

22        Q.    Am I correct that -- let's take them

23    one at a time.

24            Exhibit 4-A is your transmittal

25    e-mail to, among others, Mr. Barnes, sending him
```

```
 1                  ROBERT MITCHELL DELK

 2   Exhibit 4 -- or a copy of Exhibit 4?

 3          A.    That's what it appears.

 4          Q.    And then the e-mail that is attached

 5   to Exhibit 4 is his forwarding it on to the

 6   Stanford Group, correct?

 7          A.    That's correct --

 8          Q.    Okay.

 9          A.    -- that's what it appears.

10          Q.    Same question -- and I realize this

11   was sort of in the nature of a housekeeping

12   issue -- same question with respect to 5-A --

13          A.    Correct.

14          Q.    -- your transmittal to Mr. Barnes,

15   and then he can forward it -- do whatever he

16   wants to with it -- on to the Stanford Group,

17   correct?

18          A.    Yeah, that's correct.

19          Q.    So it simply reinforces the fact

20   that these two documents, Exhibit 4 and

21   Exhibit 5, came out of your office or your --

22   your good works, forwarded on to Mr. Barnes,

23   correct?

24              MR. ABRAHAM:  Objection: form.

25              THE WITNESS:  Well, that is correct,
```

```
 1                    ROBERT MITCHELL DELK

 2          but they came out of a discussion with and

 3          a recommendation from Ben -- working for

 4          Ben that I prepare these documents.

 5   BY MR. MADRID:

 6          Q.    I understand --

 7          A.    Okay.

 8          Q.    -- the only point being you prepared

 9   them, you forwarded them to Mr. Barnes?

10          A.    That's because I work for

11   Mr. Barnes.

12          Q.    Understand.

13                Now, you've -- you've told us some

14   pieces of this, but how do you define your areas

15   of expertise, please?

16          A.    Well, some people would argue I have

17   no expertise, but my experience is in the area

18   primarily of financial services issues and issues

19   that fall under financial services companies.

20          Q.    Okay.  Anything beyond that, such as

21   this broad field that we sometimes hear of known

22   as Government relations?

23          A.    Well, I would say that that is a

24   subcategory of Government relations -- I should

25   have said Government relations is kind of, you
```

APP000580

```
 1                ROBERT MITCHELL DELK
 2   know, what I consider my --
 3        Q.    Right.
 4        A.    -- expertise in, and that broadly
 5   being Congressional relations, regulatory
 6   relations, issues related to that.
 7              But one layer below that is
 8   primarily in the area of financial services.
 9        Q.    And -- and you're comfortable, I
10   take it, defining your expertise as including
11   those areas, right?
12        A.    I -- I think so.
13        Q.    Okay.  You've been at it for how
14   many years?
15        A.    For a long time.
16        Q.    You are routinely hired by people,
17   are you not --
18        A.    Correct.
19        Q.    -- and companies, et cetera --
20        A.    Correct.
21        Q.    -- for just these kinds of
22   activities, right?
23        A.    Correct.
24        Q.    Over that period of time, have you
25   become familiar with the charges that are
```

APP000581

```
 1              ROBERT MITCHELL DELK

 2   typically charged to clients for persons who are

 3   in your -- in your area of --

 4        A.   Yes --

 5        Q.   -- of expertise?

 6        A.   -- as I testified earlier, when I

 7   managed Freddie Mac, which was one of the largest

 8   Government relations office in Washington, I had

 9   25 consultants.  That was a budget about

10   $12 million.

11              So, yes, the answer -- I think I

12   have a little experience in that area.

13        Q.   All right.  And I take some billed

14   on an hourly basis, others on a retainer basis,

15   correct?

16        A.   None -- none that I was ever aware

17   was billed on an hourly basis.  They all were

18   paid on a retainer basis --

19        Q.   Okay.

20        A.   -- now, for example, I retained some

21   people, like Covington & Burling, John Dugan, who

22   ultimately became the Comptroller of the

23   Currency.  It's my understanding that he took the

24   retainer and then billed against the retainer.

25              But as far as the payment from
```

APP000582

1          ROBERT MITCHELL DELK

2    Freddie Mac went, he, as well as all consultants,

3    were paid on a monthly basis.

4          Q.    Okay.

5                MR. ABRAHAM:  I just want to ob- --

6          object to the extent that counsel is

7          eliciting what appears to be expert

8          testimony from a fact witness.

9                MR. MADRID:  As yet unretained.

10               You're right.

11   BY MR. MADRID:

12         Q.    Look at Exhibit Delk 9, if you

13   would, please, sir.

14               And you'll see that's a string of

15   e-mails that, up at the top, is dated August 11,

16   2009.

17         A.    Okay.

18         Q.    And I would refer you to the front

19   page.  It's the last e-mail, the one down at the

20   bottom -- pardon me, not the last, it's the one

21   at the bottom from you addressed to

22   Kent Caperton.

23               Do you see that?

24         A.    Yep.

25         Q.    There's a reference to somebody

```
 1                ROBERT MITCHELL DELK

 2    named Jim Doty with the Baker Botts Washington

 3    office.

 4              Do you see that?

 5         A.   Yep.

 6         Q.   What area, if you know, is

 7    Mr. Doty -- or at least as of this period of

 8    time, what area of practice was he in?

 9         A.   He was -- he was -- he was the

10    managing partner of Baker Botts, and he was a

11    securities lawyer.

12         Q.   Okay.  To your knowledge, did the

13    Baker Botts office, Washington office, have a

14    Government relations practice?

15         A.   Yes.

16         Q.   Okay.  If you know, how did the

17    charges by the -- from the Baker Botts Government

18    relations lawyers compare with the charges you

19    rendered -- for services you rendered, I should

20    say, to the Stanford Group, albeit through the

21    Ben Barnes Group?

22              MR. ABRAHAM:  Objection: form.

23              THE WITNESS:  Well, I don't know the

24         answer to that.

25
```

1              ROBERT MITCHELL DELK

2    BY MR. MADRID:

3         Q.    Okay.  Well, were the charges that

4    you rendered as part of your monthly retainer --

5    how did those compare, to your knowledge, with

6    peers of yours in the same area?

7         A.    They were very consistent with

8    those.  As I testified earlier, years back at

9    Freddie Mac, my consultant fees ran anywhere from

10   25,000 to 60,000 per month.  So me getting

11   $25,000 a month, I thought, given the limited

12   clients that I would take on and the amount of

13   attention and knowledge I would bring and

14   expertise to the issue, was imminently

15   reasonable.

16        Q.    Could you have justified a higher

17   rate?

18        A.    Yes.

19        Q.    50,000?

20        A.    I -- I've got -- as I testified

21   earlier, I've got clients that pay much more than

22   $25,000 a month.

23        Q.    Do you have an opinion, sir, as to

24   whether the product that you issued, for example,

25   this white paper that we've talked about here,

APP000585

```
 1                 ROBERT MITCHELL DELK
 2   whether the Stanford Group received reasonably
 3   equivalent value in exchange for your charges?
 4             MR. ABRAHAM:  Objection --
 5             THE WITNESS:  Well --
 6             MR. ABRAHAM:  -- form.
 7             THE WITNESS:  -- well -- well, first
 8        of all, I didn't do this for Stanford; I
 9        did it for Ben, who asked me to do it, who
10        was giving it to Stanford --
11   BY MR. MADRID:
12        Q.    All right.
13        A.    -- and it was part of a grand
14   strategy --
15        Q.    Right.
16        A.    -- to eventually get legislation
17   passed.
18             And this was an initial step of kind
19   of conditioning the environment to educate --
20        Q.    Right.
21        A.    -- people on the importance of this
22   region.
23             Ultimately, the legislation didn't
24   pass because, as I said earlier, I don't believe
25   that that is the ultimate test of whether you're
```

APP000586

```
 1                    ROBERT MITCHELL DELK

 2    adding value to somebody.  I mean, as I said,

 3    Allen Stanford would have spent millions of

 4    dollars pursuing legislation arguing to repel the

 5    residency requirement and to expand, in an

 6    unreasonable way, the sourcing requirement and

 7    would have gotten nothing.

 8              So I think the value that Ben added

 9    to the Stanford issue as it relates to the

10    legislation was tremendous.

11         Q.   As it relates to the charges that

12    you sent to the Ben Barnes Group or as -- perhaps

13    to the Stanford Group, did your work product, in

14    your view, constitute a reasonably equivalent

15    value for the payments that were made?

16              MR. ABRAHAM:  Objection: form.

17              THE WITNESS:  There -- there were

18         two different issues there: one, I had

19         done previous work for Stanford, which,

20         absolutely, I provided a value to, in

21         fact, more value than I was paid --

22    BY MR. MADRID:

23         Q.   Right.

24         A.   -- and as you saw, I wasn't paid --

25    I was owed a lot of money when they finally just
```

APP000587

```
 1                ROBERT MITCHELL DELK
 2    said, We're going to work with Ben Barnes --
 3           Q.    Right.
 4           A.    -- and, secondly, unequivocally, I
 5    can state that the value I added to Ben Barnes
 6    was tremendously great, much [verbatim] value
 7    than what I, in fact, was, in fact, billing Ben
 8    for --
 9           Q.    Okay.
10           A.    -- and I think Ben benefited from it
11    by being able to, in fact, be paid himself.
12           Q.    Were you familiar with the charges
13    from the Ben Barnes Group to the Stanford --
14           A.    No --
15           Q.    -- parties?
16           A.    -- no.
17           Q.    You didn't become involved in that
18    at all?
19           A.    No.
20           Q.    Okay.
21           A.    In other words, do I know what
22    Ben Barnes charged to Stanford?
23           Q.    Yes.
24           A.    No, I have no clue.
25           Q.    Okay.  But from your point of view,
```

APP000588

```
 1                ROBERT MITCHELL DELK

 2    certainly, the product that you rendered to

 3    Ben Barnes on behalf of the Stanford Group

 4    certainly was worth every penny that you billed

 5    and perhaps more --

 6         A.    Again --

 7         Q.    -- is that correct?

 8         A.    -- I provided the services to Ben --

 9         Q.    Right.

10         A.    -- and I think the value I added to

11    that effort were much greater than what I was

12    paid.

13         Q.    Understand.

14              MR. MADRID:  Thank you, sir.

15              I --

16              THE WITNESS:  Thank you.

17              MR. MADRID:  -- pass the witness.

18              MR. IGIEL:  I have no questions.

19              THE VIDEOGRAPHER:  This concludes

20         Disc 2 in the deposition of Robert

21         Mitchell Delk.  The deposition concludes

22         at 3:07.

23                 (Witness excused.)

24                 (Deposition concluded at 3:07 p.m.)

25
```

```
 1                 C E R T I F I C A T E

 2    DISTRICT OF COLUMBIA:

 3         I, Cindy L. Sebo, a Notary Public within and

 4    for the Jurisdiction aforesaid, do hereby certify

 5    that the foregoing deposition was taken before me,

 6    pursuant to notice, at the time and place indicated;

 7    that said deponent was by me duly sworn to tell the

 8    truth, the whole truth, and nothing but the truth;

 9    that the testimony of said deponent was correctly

10    recorded in machine shorthand by me and thereafter

11    transcribed under my supervision with computer-aided

12    transcription; that the deposition is a true record

13    of the testimony given by the witness; and that I am

14    neither of counsel nor kin to any party in said

15    action, nor interested in the outcome thereof.

16

17

18

19         _____

20              Cindy L. Sebo, RMR, CRR, RPR, CSR,

21                 CCR, CLR, RSA, LiveDeposition

22            Authorized Reporter and Notary Public

23

24

25
```

APP000590

Page 225

```
 1                     INSTRUCTIONS TO WITNESS

 2                     Please read your deposition over

 3      carefully and make any necessary corrections.  You

 4      should state the reason in the appropriate space on

 5      the errata sheet for any corrections that are made.

 6                     After doing so, please sign the errata

 7      sheet and date it.

 8                     You are signing same subject to the

 9      changes you have noted on the errata sheet, which

10      will be attached to your deposition.

11                     It is imperative that you return the

12      original errata sheet to the deposing attorney within

13      thirty (30) days of receipt of the deposition

14      transcript by you.  If you fail to do so, the

15      deposition transcript may be deemed to be accurate

16      and may be used in court.

17

18

19

20

21

22

23

24

25
```

APP000591

```
 1                    E R R A T A

 2    WITNESS:   ROBERT MITCHELL DELK

 3    DATE:      MONDAY, SEPTEMBER 29, 2014

 4    CAPTION:   JANVEY, ET AL. V. BEN BARNES, ET AL.;

 5               and BEN BARNES GROUP, L.P. V.

 6               CAPITOL COUNSEL, LLC, ET AL.

 7    PAGE  LINE  REASON FOR CHANGE:

 8    ____  ____  _____

 9    PAGE  LINE  REASON FOR CHANGE:

10    ____  ____  _____

11    PAGE  LINE  REASON FOR CHANGE:

12    ____  ____  _____

13    PAGE  LINE  REASON FOR CHANGE:

14    ____  ____  _____

15    PAGE  LINE  REASON FOR CHANGE:

16    ____  ____  _____

17    PAGE  LINE  REASON FOR CHANGE:

18    ____  ____  _____

19    PAGE  LINE  REASON FOR CHANGE:

20    ____  ____  _____

21    PAGE  LINE  REASON FOR CHANGE:

22    ____  ____  _____

23    PAGE  LINE  REASON FOR CHANGE:

24    ____  ____  _____

25
```

1          ACKNOWLEDGMENT OF DEPONENT

2

3          I, _____ , do

4     hereby certify that I have read the foregoing

5     pages, 1 to 223, and that the same is a correct

6     transcription of the answers given by me to the

7     questions therein propounded, except for the

8     corrections or changes in form or substance,

9     if any, noted in the attached errata sheet.

10

11

12    _____          _____

13     DATE                         SIGNATURE

14

15

16

17

18    Subscribed and sworn to before me

19    this _____ day of_____, 20_____.

20

21        My Commission expires:

22

23    _____

24

25

APP000593

**A**

**$100,000** 46:5 47:3
**$12** 216:10
**$150,000** 171:7
**$175,000** 114:20
**$2,200** 201:12
**$2,400** 201:12
**$2,600** 201:12
**$25** 153:20
**$25,000** 46:5,19
  47:3 80:2 94:19
  219:11,22
**$35,000** 62:13
  67:16
**$40,000** 67:22
**$400,000** 174:3
**$5,000** 201:13
**$50** 38:23
**$50,000** 69:5 113:8
  113:9 114:24
**$500,000** 25:15
  114:3
**a.m** 2:3,16 8:5,21
  132:13 196:10
**abilities** 179:25
**ability** 50:6 125:8
**able** 28:6 39:13,22
  222:11
**Abraham** 3:5 5:5
  9:5,5 10:6,11 16:9
  16:21,22 17:6
  18:3 23:19 52:24
  63:3 64:6 73:11
  73:21 76:19 79:2
  79:15 80:5 88:3
  90:12 92:15 94:4
  106:12 107:9
  109:14,24 110:7
  114:18 120:5,14
  128:13 133:10,21
  135:19 140:6,15
  154:17 155:2
  166:6 170:16,23
  175:7,14 178:15
  180:2 182:6 184:2
  184:10,16 187:4

187:11 191:15
192:22 193:4
194:24 195:17,24
199:5,13 201:21
202:4 205:23
208:19 210:17
212:18 213:24
217:5 218:22
220:4,6 221:16
**abraham@butze...**
  3:10
**absent** 169:21
**absolutely** 126:12
  150:2 168:8
  221:20
**abuses** 128:25
**abyss** 85:2
**Acacia** 112:4 113:8
  114:23 115:5
**accept** 35:25
**access** 18:20 19:25
  20:3 24:6,14 75:7
**accommodate** 12:8
  20:17
**accomplish** 51:15
  51:15 53:25 54:19
  158:4
**accomplished**
  158:3
**account** 46:6 171:7
**accounting** 10:21
  69:24 70:7 203:2
**accounts** 19:20
**accuracy** 63:20
**accurate** 157:19
  206:13 225:15
**accused** 197:8
**achieve** 32:8 47:19
  58:15 92:9,10
  151:18 188:24
  191:13 192:11
  208:7
**ACKNOWLED...**
  227:1
**Act** 57:19,23
  122:11
**action** 1:8 11:3,8

24:22 29:12 53:14
201:3 224:15
**active** 57:3
**actively** 157:15
**activities** 81:22
  130:15 145:24
  215:22
**activity** 136:11
  142:24 143:24
  153:7,10 159:25
  169:13 170:7
  193:22
**acts** 71:24
**actual** 33:20 74:20
  174:14
**add** 92:13 93:9
  108:10 165:6
**added** 89:9 150:13
  166:15 221:8
  222:5 223:10
**adding** 165:9 221:2
**addition** 16:2 25:17
  116:6
**additional** 148:24
**address** 19:24
  66:25 121:6,12,18
  121:20 133:24
  204:13
**addressed** 217:21
**Administrator** 2:13
**advance** 26:14 27:4
  27:19
**advancing** 159:3,13
  193:13
**advantage** 53:19
  99:23 103:19
  124:7,18 128:25
  130:13 132:4
  138:24 144:4
  145:21,21 160:8
  161:17
**advantageous** 32:9
**advantages** 146:23
  192:12
**adversely** 27:16
**advice** 30:6 43:14
  82:10 103:2,4

118:11,23,24
128:16 131:21
132:2 164:19,19
167:3 192:15,25
194:25 208:12
**advise** 127:16
  133:23 163:10,12
  183:11 191:18
**advised** 90:14
  205:14
**advising** 159:4
  164:24 177:21
**advisory** 119:2
**advocacy** 30:21
  33:21 75:17 81:25
  174:9,12
**advocate** 92:6
**advocating** 97:7
  151:4 181:2
**affect** 12:21 47:9
  180:11
**affluent** 143:22
**aforesaid** 224:4
**aftermath** 25:9
**afternoon** 211:15
**agencies** 78:2
**Agency** 36:21
**Aghogho** 3:13 9:7
**ago** 13:19,20 59:25
  61:5 69:6,20,20
  74:3 78:19 84:23
  85:12 91:11
**agreement** 21:22
  22:6,11 43:7
  62:17 80:7,7,8,21
  86:16,19 94:15,15
  94:16 111:14
**agreements** 21:14
  22:4 43:22
**ahead** 43:17 78:16
  79:14 120:4 133:8
  179:3
**aid** 54:12
**al** 1:6,15 8:10,11,12
  172:2 226:4,4,6
**albeit** 218:20
**Alexandria** 4:17

**Alfonse** 68:7
**aligned** 51:11
**alleged** 209:18
**Allen** 95:22 100:7
  108:23 109:6
  131:6,10,25 132:3
  133:23 134:14
  135:8 137:22
  138:10,22 139:2,4
  139:7,7,14 140:20
  141:2 143:17
  152:6,9,15 153:11
  155:5 156:24
  161:16 164:7,12
  164:17 165:11,15
  165:25 166:9,19
  167:19 168:17
  169:7,22 170:11
  170:12 187:23
  190:17 193:2,14
  193:16,17,25
  194:15 202:12
  203:19,23 204:3
  204:21 205:14
  207:18,20 208:3
  209:14,15,18
  221:3
**Allen/Yolanda**
  155:9
**alliance** 142:25
**allowed** 169:20
  170:12
**allude** 138:12
**alluded** 129:6
  168:4
**alludes** 123:13
**alluring** 143:21
**alternatively** 66:10
**alternatives** 102:18
  102:19,20
**ambassadors** 97:24
**ambiguous** 134:3
**amend** 136:22
**amended** 137:10,18
**amending** 137:8
**amendment** 137:19
**America** 153:8

**America's** 140:21
141:9 143:3
**American** 85:5
**amount** 44:24 46:7
46:14,24 80:11
86:6 201:10
219:12
**amounts** 113:6
115:3,4
**analysis** 46:23
50:13,19 58:9
168:12
**analyze** 125:19
**ancillary** 177:5
**and/or** 67:13
122:17 131:22
144:7,8
**Andy** 28:17
**announcement**
38:17
**answer** 11:22 12:13
93:15 105:25
107:2 125:6
129:18 133:15
166:12 167:21,23
178:7,17 182:8
183:8 188:7 195:3
204:18 216:11
218:24
**answered** 205:7
**answering** 82:9
**answers** 227:6
**Ant** 143:18
**Antigua** 100:8
102:17 130:24,25
131:4 132:5
143:19,20 144:4
194:19
**anybody** 89:3
95:10,14 127:7
208:8
**anymore** 86:10
**Anytime** 207:9
**appalled** 191:5
**apparently** 100:7
194:12
**appearing** 10:7

**appears** 124:24
172:6 174:22
185:12 208:11
213:3,9 217:7
**appetite** 56:20
**appreciate** 205:18
**appreciated** 84:5
**approach** 28:19
37:18,20 43:15,16
43:18 51:12,22
52:11 103:5,14
118:11,24 161:14
167:12
**approached** 28:11
28:15 185:3
198:14
**approaches** 51:10
**appropriate** 24:13
225:4
**approximately**
2:15 75:15 114:5
**area** 32:19 33:13
68:22 76:14 82:18
106:19 138:3
150:10 153:15
214:17 215:8
216:3,12 218:6,8
219:6
**areas** 68:18 214:14
215:11
**arena** 31:15 33:2
47:13 58:2 59:6
97:25 112:21
151:8
**arenas** 46:22
**arguably** 154:7
159:23 166:22
**argue** 36:15 40:16
45:9 65:2 89:11
89:13 138:20
149:7,9 152:10
159:16 214:16
**arguing** 38:5 221:4
**argument** 153:25
**arose** 167:16
**arrangement**
102:19 109:4

127:21
**arrangements**
45:22
**arrive** 80:10
**art** 40:24
**article** 54:16,16
203:24 206:11
**articles** 52:9
**articulate** 53:24
154:5
**articulated** 59:14
136:2
**aside** 56:24 94:8
108:12
**asked** 22:24 23:3
73:8 74:4,25
96:13,14 98:3
122:22 124:20
176:2 177:4 178:9
182:13 185:2
198:15 205:6
208:8 220:9
**asking** 46:11 78:20
180:17 182:2,3,7
200:15 206:6
**aspect** 205:16
**aspects** 97:4 157:16
**assault** 38:4 40:19
**assessment** 41:25
**asset** 64:4
**assets** 41:25 42:2
**assist** 24:24
**assistant** 121:14,25
**associated** 53:25
87:4 129:20 144:3
187:25 188:18
204:10
**ASSOCIATES**
4:13
**association** 9:2
71:19,22 112:12
**assume** 15:23 57:9
69:10 74:6 87:16
108:9 112:21
123:10 132:24
137:15 145:4
158:8 164:15

169:12 173:16
182:20 185:5,16
190:7 196:11
202:16 203:20
**assumed** 65:19
87:18 203:18
204:21
**assuming** 157:18
201:4
**assumption** 19:25
66:19 76:18 80:13
121:16 122:10,15
157:19 161:2
162:3 166:3,5
175:4 182:24
**Atlanta** 134:18
135:2
**attached** 5:10
140:22 141:8,12
155:8,10,18 174:5
174:6 185:11
213:4 225:10
227:9
**attachment** 6:6,12
6:19 7:1 140:10
**attacks** 53:14
**attempt** 46:18
**attention** 219:13
**attorney** 3:3 4:3,12
12:12,12,14 13:9
225:12
**attorneys** 55:16
124:10,11,14
139:14
**August** 6:4 122:20
172:10 196:9
217:15
**Austin** 60:10,12,17
**Authorized** 1:24
2:14 224:22
**available** 76:13
79:7 82:9
**Avenue** 2:7 3:7
8:18
**averages** 46:4
**aware** 11:19 95:22
216:16

| **B** |
| --- |
| **back** 14:21 18:17 |
28:6,7 29:20
32:21 58:19 60:6
65:11 66:24 96:19
115:21 134:8,19
136:12 154:14
196:12 200:5
219:8
**background** 25:5
32:12 60:2 93:3,6
128:24 202:25
**bad** 40:10 206:13
**Baker** 218:2,10,13
218:17
**bank** 1:5 77:25
82:18 84:20,21,24
85:3,5 171:6
**banking** 32:16,20
35:21 77:15,17
130:16
**banks** 41:23,23
75:22 77:12,13,14
77:19,22 78:4
90:19 93:6
**Barbour** 28:17
**Barne** 114:3
**Barnes** 1:9,9,12
8:10,11 9:10,10
10:13 12:12 13:8
13:14,18 14:10,14
18:19,20 19:24
20:6,14 21:15,22
22:2,4 23:21 30:7
59:19,20,23 60:5
60:10,15,21,24
61:12,13 63:13,25
64:7,24 65:12,15
65:19,21,24 66:3
67:6,16 69:8
72:20,23 73:4,23
74:13 86:13 87:11
87:20 88:11,17
89:2,23 90:4 91:2
91:13,13 92:8,9
92:16 94:10,14,21

94:23 95:4,9 96:2
96:24 97:16 98:22
98:25 99:10
102:25 103:8
104:12,21 105:4
105:15,17 106:13
106:20 108:21
109:10,12,12
111:9,9,20 112:17
112:24 113:15,21
114:3,12,25
115:10 116:3
118:7,14 119:7,9
119:12,18,19
121:8,11,14,18
122:25 124:25
125:5,20 126:23
127:6,14,15
128:16 133:3,17
139:4,5 140:19
148:17,20,21,21
149:5,20 154:6
155:5 156:16
157:11 158:7,11
158:12,13 159:4
162:3 163:16,25
164:16,24 166:2
167:6,19 171:2
172:18 173:11,14
174:24,24,25
176:21,23 177:21
178:8 180:10,22
181:5,6,8,9,12,13
181:13,16,17,18
182:3,4,12,12
183:11 184:20
185:20,20,22,23
185:25 186:11,12
186:13,15,20,22
186:23 187:9,15
187:18,23 188:2
188:10,11,15,15
188:16,17 189:2
189:17,22,23
190:6,20 191:9,9
191:18,19,19,24
192:5,7,15,18,25

193:10 194:12,15
195:13,14 197:5
197:24 198:8,9,18
198:20,21,25
199:4 203:18,22
204:3 205:4
206:14,18,21
207:19,21 208:11
209:13 210:2,6
211:12,12,17,17
212:25 213:14,22
214:9,11 218:21
221:12 222:2,5,13
222:22 223:3
226:4,5
**barnesgroup.com**
120:17
**base** 45:20 86:21
**based** 41:25 69:10
80:18 104:6 115:7
130:6,17 139:25
156:4 164:15
167:5 168:10
169:3,12 188:3
203:11 210:9
**Basel** 38:14
**basically** 57:15
77:10 79:18 91:6
95:25 102:10,12
104:7 125:11
155:24
**basis** 26:21 29:3
66:12,22 216:14
216:14,17,18
217:3
**Baucus** 108:20
123:13 199:24
200:20 201:3
**bed** 132:6,23 135:9
**began** 211:20
**beginning** 2:15
**begins** 128:10
**behalf** 2:16 9:12
22:9 81:25 179:11
181:2 223:3
**beholder** 33:9 65:6
**Belated** 79:12

**belief** 197:4
**believe** 26:7 52:25
54:23 76:11 92:8
92:20 99:10
114:11 129:6
133:4 139:16
146:3 158:22
164:17 165:15,19
176:22 177:16
183:10 188:20
190:3 191:16,17
197:16,23 204:2,6
205:3 220:24
**believed** 86:6 92:13
**ben** 1:9,9,12 8:10
8:11 9:10,10
10:13 13:14,18
14:10,14 18:19
19:24 20:6,14
21:15,22 22:2,4
23:21 30:7 47:2
59:19,20,23 60:15
60:21 61:12,13
63:25 64:7,24
65:12,15,19,21,24
66:3 67:6 69:8
72:20,23 73:4,5
73:23 74:13 76:12
84:6 86:13 87:11
87:20 88:11,17
89:2,23 90:4 91:2
91:12,13,13 92:3
92:8,9,16 93:7
94:10,14,21,23
95:4,9,12 96:10
96:14,24 97:16,19
97:21 98:19,22,25
99:7,10 101:17
102:8,10,25 103:8
104:11,12,12,21
104:23 105:4,15
105:17,20,23
106:3,10,17,20
108:9,21 109:2,10
109:12,12 111:9,9
111:20 112:17,18
112:24 113:15,21

114:3,3,12,25
115:10 116:3,10
117:15 118:5,7,14
119:7,9,12,18,19
121:7,8,11,14,18
122:5,25 123:9
124:19,25 125:5,7
125:20 126:4,23
127:6,14,15 128:2
128:16 137:15
138:7,20 139:4,5
140:19 141:7
148:17,20,21,21
149:5,20 153:14
153:18 154:6
155:5,16,25
156:24 157:2,5,11
157:15 158:7,11
158:12,13,15,19
159:4 161:15
164:16,24 166:2
166:18 167:2,6,19
168:11 169:3
171:2 172:15,18
173:11,14 174:24
174:24,25 175:5
176:2,15,21,23
177:4,18,21 178:8
179:7 180:10,22
181:5,6,8,9,12,13
181:13,16,17,18
182:3,4,12,12
183:5,11 184:4,20
185:2,19,20,20,22
185:23,24,25
186:11,12,13,15
186:20,22,23
187:9,15,16,18,23
188:10,11,15,15
188:16,17,23
189:2,17,22 190:6
191:18,19,19,24
192:15,18,25
193:10,16,17
194:15,16 195:4
195:13,14 197:2,5
197:18,22,24

198:4,6,8,9,14,15
198:18,20,21,25
199:4 204:3 205:4
205:13,25 206:18
206:21 207:19,21
208:11 209:13,20
210:2,2,6,8
211:12,12,17
214:3,4 218:21
220:9 221:8,12
222:2,5,7,10,13
222:22 223:3,8
226:4,5
**Ben's** 92:2 97:23
98:6 100:14 102:6
104:12 117:23
118:9 125:13
158:24 166:18
183:20,23 199:25
209:7
**beneficial** 165:14
165:16
**beneficiary** 152:12
**benefit** 25:7 36:16
40:5 47:2 53:13
53:20 63:15 66:23
128:20 136:17
152:5,9 153:24
160:5 168:9
169:15 170:3,6,13
181:8 188:11
189:14 198:25
199:3 209:13,15
**benefited** 38:23
108:11 137:19,25
138:11,25 164:18
166:9 169:25
170:8 222:10
**benefits** 47:15 49:8
53:25 58:11 66:11
146:24,25 169:8
205:12
**best** 11:25 21:3
33:15 100:22
103:21 107:17
108:8 121:24
139:23 141:7

156:5 166:8
167:19 173:25
184:7 189:23
191:3 201:16
211:22
**Beth** 148:13
**better** 52:18 73:9
103:11 127:6
137:14 146:22
154:5
**bevy** 72:14 104:14
**beyond** 166:10
176:22 214:20
**big** 42:23 66:7
69:24 72:13
104:14 105:20,22
138:9 158:6
**bill** 29:18 49:5
55:19 56:6 161:23
161:25 162:5
164:4 173:4,14
175:2
**billed** 216:13,17,24
223:4
**billing** 222:7
**billion** 38:23 58:17
**bills** 101:24
**bipartisan** 25:24
27:6,8
**bit** 24:19 25:4
32:12 52:23 59:18
60:2 76:21 129:25
**bizarre** 25:12 26:10
**blank** 108:16
110:21
**bless** 87:17
**blew** 164:9
**blocked** 36:14
**blogs** 151:22
**Blow** 183:4
**blows** 189:20 204:9
204:13,24
**blurring** 91:10
**board** 35:24 69:25
203:4
**Bob** 148:12
**bodies** 71:25

**body** 48:15
**bonds** 39:23
**bono** 24:21 26:20
28:9,20 29:3
**Border** 140:21
141:9 143:3
**Boston** 32:19
**bottom** 111:18
217:20,21
**bottom-line** 80:15
**Botts** 218:2,10,13
218:17
**bought** 42:9
**box** 196:22
**boxes** 196:13,17,21
**break** 12:6 99:15
99:24 101:9 132:4
165:13 210:21
**breaks** 130:13
**Breeden** 32:23
**brief** 13:2,3 73:16
211:5
**briefed** 95:20
**bring** 54:4 153:15
196:14 198:11
219:13
**broad** 134:20,24
214:21
**broaden** 169:18
**broadening** 144:14
**broader** 100:11,17
137:11 143:8
156:10 169:19
**broadly** 59:2
141:17 145:25
215:4
**broke** 210:10
**broken** 77:16
**broker/dealer**
25:14 26:17 27:2
82:19
**broker/dealers**
75:24 83:18 90:19
**brokerage** 35:22
136:8,11 176:4
**brokers** 134:17
**brought** 20:23

24:12 36:4 106:21
107:13,25 137:15
158:15 173:13
**budget** 216:9
**build** 48:11
**Building** 4:6
**bunch** 122:25
**Burling** 216:21
**business** 47:9,10
49:6,7,9,16 50:5
50:24 73:8 74:11
102:19 103:14,17
103:19 104:4
130:11 142:23
143:18 144:3
145:20 168:16
169:5 191:10
192:8,9,10 194:22
197:12
**buttress** 108:2
**buttressed** 108:5
**Butzel** 2:7 3:4,12
8:17
**buy** 36:10 112:7
**byproduct** 188:25
189:10,16 190:8
191:22 193:15,23
203:15 204:12
205:21

---

**C**

**C** 3:1 4:1 8:2 224:1
224:1
**call** 29:9 30:19 65:4
75:8 76:15 79:8
82:16,24 122:2,19
172:13 175:22
176:2,19
**called** 28:18 50:2
55:22 74:24 157:5
174:8,11 198:13
200:11
**calls** 37:9 90:9
**campaign** 35:4
**candid** 14:19 179:4
**capacity** 1:4 60:22
**Caperton** 6:3 7:2

104:23 105:2
122:18 141:5
148:22 184:20
196:3,9 217:22
**capital** 41:3,4,11,24
42:3,4,11,12
**Capitol** 1:15 8:12
226:6
**CAPTION** 226:4
**car** 129:2 168:5
**carefully** 225:3
**Cari** 143:12
**Caribbean** 100:18
101:6 117:19
141:18 142:12
143:5,6,7,7,12
144:21 145:8,25
146:11 147:3,6,13
149:10 150:23
151:15 152:6,9,13
152:23 153:11,12
154:10,11 159:17
160:9 161:3
163:23 165:18
166:25 205:12,18
**carried** 68:24
**case** 8:15 13:24
14:7,10,13 15:11
19:10 22:23 101:3
112:4,6 149:8
183:9 199:23
**case-by-case** 50:12
50:18
**cash** 45:8,21
**cashed** 200:12,24
201:16
**catch** 119:17,17
**cause** 53:20 163:19
**caused** 170:12
**cc** 6:1,13 7:2
**cc'd** 120:18 121:3
123:5
**CCR** 1:24 224:21
**cease** 20:19
**ceased** 175:2
**center** 200:3
**centers** 200:2

**cents** 138:16,18
**CEO** 70:3
**certain** 68:18 71:16
71:24 116:4
126:17 139:14
**certainly** 59:13
61:15 88:24 92:23
132:25 138:10
187:24 197:20
199:3 223:2,4
**Certified** 2:9,11,11
2:12
**certify** 224:4 227:4
**cetera** 215:19
**CFO** 203:3
**chairman** 29:17
32:22,23 102:4
123:15 162:10
200:4 203:3
**change** 50:4 56:16
57:10 101:15
103:18 104:3,4
137:20 138:19
142:14 146:19,24
151:4,14 160:17
160:21 163:19,24
164:5 167:25
168:12,14 169:21
226:7,9,11,13,15
226:17,19,21,23
**changed** 48:2 84:24
161:13 166:23
**changes** 57:11 85:7
122:12,14 126:5
161:12 225:9
227:8
**changing** 143:13
160:14,15 164:2
**charged** 41:24
216:2 222:22
**charges** 215:25
218:17,18 219:3
220:3 221:11
222:12
**charging** 46:7
**Charlie** 102:4
**chartering** 77:13

**Chase** 126:21
**Chavez** 153:4
**check** 85:17 94:25
  95:2 200:12,24
  201:5,10,13,15
**chess** 158:25
**Chief** 60:3
**Chinese** 153:3
**choice** 116:24
**chose** 32:17
**Cindy** 1:24 2:8
  8:25 224:3,20
**circles** 37:16
**circumstance** 70:10
**circumstances** 14:9
  14:13 73:3
**Civil** 1:8
**claim** 86:21
**claims** 25:16 114:4
  114:12 138:8
**clarification**
  136:15 169:16
**clarify** 119:11
  136:16
**class** 53:17
**clawback** 25:18
  28:4
**clean** 70:4
**clear** 131:16 145:23
  186:8
**clearly** 70:6 150:11
  173:13 193:12
  207:18
**Clerk's** 34:14
**client** 34:5 45:20
  46:20 47:21 48:24
  48:25 50:16,16
  51:16,25 52:19,19
  52:20 54:10,18
  56:7,21 57:4 58:8
  72:9,9 73:6 87:5
  104:16 105:20,22
  106:4,7 112:3,4
  112:10,11 118:18
  119:7 136:17
  158:6,8 179:11
  188:4 189:20

193:10 198:19,23
  199:2,3,25
**client's** 47:24 48:18
  49:16 55:5
**clients** 18:19 20:16
  22:16,22 33:14
  34:16,17,18 35:7
  43:21 45:4 46:2,3
  46:15,16 47:2
  48:23 77:3 93:7
  104:14 111:21,23
  112:17,20,25
  113:6,15,23 114:7
  114:9 115:12
  118:13,19 216:2
  219:12,21
**climate** 153:21
**close** 61:18 162:10
**CLR** 1:24 224:21
**clue** 60:19 148:2
  206:10 222:24
**Code** 136:21,24
  137:9,14,18,20
  138:17,17 143:13
**coextensive** 139:15
**cold** 37:9
**college** 57:22
**Columbia** 1:20
  2:15 224:2
**come** 22:15 28:9
  37:8,12,24 66:24
  73:8 101:22
  113:14 125:22
  129:20 153:21
  163:12
**comes** 129:8
**comfortable** 51:20
  215:9
**coming** 26:8 101:4
  145:24 146:24
**commensurate**
  41:5
**Commission** 10:25
  227:21
**committee** 9:6,8
  10:4,13 29:17
  32:16 48:15 102:5

107:20 123:16
  162:11 201:4
**committees** 107:19
**common** 22:19
  126:15
**commonly** 50:2
**communicate**
  158:7
**communicating**
  161:16
**communication**
  24:11 83:25
**community** 60:10
**companies** 35:22
  39:19 40:15,20
  49:24 59:15 84:24
  89:11,18 152:7
  169:23 214:19
  215:19
**company** 31:17
  32:6,9 36:10,13
  36:16,22 39:13
  40:6,13,25 41:2
  41:23 42:8,12
  49:14 50:9,20
  52:9,10 53:8
  58:12 59:5 63:11
  63:12 90:3 91:25
  92:2 96:22 97:3
  97:20,25 98:2
  129:3,20 130:6
  131:8 161:19
  177:3,7 178:2
  180:9,24 182:18
  182:19,21,23
  183:2,7,23 184:9
  196:16 198:13
  204:9,11
**compare** 218:18
  219:5
**compensated** 44:9
**compensation** 45:3
  62:12
**competent** 38:7
**competitive** 53:19
**competitors** 53:18
  53:18 63:9

**complainant** 11:6
**complaining**
  115:19
**complete** 41:16
**completely** 194:9
**complex** 51:3 104:5
**complicated** 125:8
  129:16
**complicit** 204:17
**comprehensive**
  209:10
**Comptroller** 68:10
  216:22
**computer** 19:17
  23:20,24,24 24:6
  24:14,16 50:21
  113:12
**computer-aided**
  224:11
**con** 98:14 205:10
**concern** 180:11
  206:17
**concerned** 178:8
  179:8 184:4
  197:10
**concerning** 155:11
**concluded** 100:13
  139:25 144:11
  160:13 162:20
  167:24 223:24
**concludes** 128:3
  223:19,21
**concluding** 161:16
**conclusion** 100:22
  101:23 125:3
  160:4 162:17
  166:17 180:16
  208:22
**condition** 168:8
  205:10
**conditioning**
  205:17 220:19
**conference** 122:19
**confident** 92:13
  113:19
**confidentiality**
  43:7 45:25

**confused** 181:15
**Congress** 26:2
  33:11 34:4 36:25
  39:16 40:10 42:9
  43:15 48:16 55:6
  55:19 56:17,19,22
  61:17 62:3 71:25
  75:18 97:8 99:21
  117:15 118:21
  127:3 136:22
  161:4 206:16
**Congressional**
  83:12 215:5
**Congressman**
  29:14
**Connally** 60:4
**Connally's** 60:3
**connected** 89:5
**connection** 94:10
  95:3 118:14
  123:21
**conservatorship**
  36:14
**consider** 30:14
  71:13 215:2
**considered** 132:21
**considering** 153:14
**consistencies** 207:7
**consistent** 219:7
**constantly** 64:20
  66:8
**constitute** 221:14
**constitutionally**
  101:25
**consult** 51:9
**consultant** 204:22
  219:9
**consultants** 32:4
  67:5,6,8 68:3
  72:16 216:9 217:2
**consulting** 72:2
**Consumer** 113:10
  115:2 118:16
**consummated**
  44:20
**contacted** 92:8
**continue** 56:16,21

72:19 142:8
**continued** 4:1
   160:11 162:13
   173:4 174:25
**continues** 115:11
**continuing** 69:17
   175:4
**contract** 21:22
   22:12 36:12 62:15
   85:23 86:11,22
**contracts** 21:14
   22:23 43:23,24
   45:8
**contribute** 149:20
**contributed** 149:15
**contributions** 35:4
**control** 71:5 89:21
   206:2
**controlled** 102:3
**conversation** 13:2
   13:4 64:23 69:11
   77:18,24 85:9
   91:18 156:5,10
   210:10
**conversations**
   66:16,17 106:10
   109:5 133:5
**converting** 40:2
**convince** 48:6
**Conzel** 98:14
**Conzelman** 98:12
   200:10
**cooperative** 16:6
**copies** 19:9
**copy** 84:25 213:2
**corporate** 65:22
   70:22 81:11,13
   87:5 99:17 109:4
   109:4 129:4,10,21
   129:21 136:2,9
   138:6,13,14
   139:10,18 140:5
   145:22
**corporation** 10:21
   25:11,11 62:19
   131:11,14,17,18
   131:19 134:15

**corporation's** 65:7
**corporations**
   138:23
**correct** 13:6 17:14
   19:18 20:7 21:6
   21:17,24 22:5
   25:2,24 30:12
   35:15 55:25 67:19
   73:25 76:12 84:12
   89:22,25 111:22
   114:8,10 120:19
   120:20 123:3
   125:2 162:22
   164:13 192:13
   193:5 208:20
   211:20 212:14,15
   212:22 213:6,7,13
   213:17,18,23,25
   215:18,20,23
   216:15 223:7
   227:5
**corrected** 129:5
**corrections** 57:7
   225:3,5 227:8
**correctly** 135:7
   144:19 148:19
   171:21 224:9
**cosponsors** 27:6,8
**cost-benefit** 46:23
   58:9
**counsel** 1:15 8:12
   9:3 10:3 13:3
   15:20 16:5,6
   18:15,24 27:10
   29:25 30:2,3
   32:16,21 43:8,13
   51:8 55:22 71:16
   71:23 72:11,12
   74:20 79:7,24
   87:19 100:14
   123:21 126:9,24
   127:11 186:4
   194:18 211:11
   217:6 224:14
   226:6
**counseled** 116:10
   133:18

**counseling** 75:19
**countries** 154:13
   154:15
**country** 63:17
   71:21 142:13
   205:19
**couple** 36:5 39:9
   42:25 43:8 77:2
   95:16,17,21 96:16
   99:20
**course** 23:25 60:9
   95:23
**court** 1:1 2:9,12
   8:13,25 9:16
   17:24 62:25 93:20
   135:16 178:12,21
   187:2,7 192:20
   208:17 210:20,23
   225:16
**COURT-APPOI...**
   1:5
**cover** 27:23
**covered** 26:16
   190:4
**Covington** 68:9
   216:21
**create** 52:2,6,7 53:2
   141:25 153:23
   159:16 177:19
   204:19
**created** 40:25
   42:16 53:23 138:2
   138:4,9 141:16,21
   142:6 159:3
   163:23 167:4
   174:11 188:10
   189:6 203:4,9,10
   203:14,16,21
**creates** 207:22
**creating** 54:2 122:6
   143:20
**creation** 24:4 148:6
   154:10
**Credit** 42:22 44:15
**Credits** 36:11
**cri** 208:12
**cricket** 194:19

**crisis** 208:12
**crook** 165:11
   191:25
**CRR** 1:24 224:20
**cryptic** 207:25
**CSR** 1:24 224:20
**Cuisinart** 103:3
**Currency** 68:11
   216:23
**current** 43:21 46:2
   48:2 56:11 126:2
   126:4
**currently** 137:11
**curve** 43:17
**customer** 26:17,18
   27:21
**customers** 26:12,25
   27:2
**cutoff** 83:25

**D**

**D** 8:2
**D'Amato** 68:7
**D.C** 2:8 8:4,18 20:9
**d/b/a** 30:18 174:13
**Dallas** 1:3 4:8 8:14
**damn** 206:22
**dark** 83:16
**data** 149:12 154:13
**date** 20:21 74:2
   74:2 225:7 226:3
   227:13
**dated** 140:24 155:6
   171:2 172:10,11
   172:23 175:17
   184:19 217:15
**dates** 172:7,24
**dating** 60:8
**day** 39:5,7 58:8
   63:23,23 147:9
   193:20 203:4
   204:14 227:19
**days** 56:12 99:25
   131:6 132:14,21
   225:13
**de** 30:5
**deal** 28:14 36:19,20

36:21,22 42:23
   61:25 138:9 168:3
   176:6
**dealers** 168:5
**dealerships** 129:2
**dealing** 28:2,3
   93:24
**dealt** 31:14 50:10
**debacle** 25:9 27:17
   70:8
**debacles** 26:22
**decade** 91:11
**December** 38:22
**decide** 70:15
**decided** 139:17
   162:23
**decision** 106:17
   108:6 135:5 154:2
   191:10
**deducing** 157:24
**deemed** 225:15
**defeated** 68:6
**defendant** 5:14,19
   11:2 16:12 17:16
   20:23 21:20 24:12
   109:17 110:12
**Defendants** 1:10,16
   4:12 9:13 21:15
   21:23 211:11
**Defendants/Thir...**
   4:3
**define** 44:5 58:25
   59:3 64:18 214:14
**defined** 26:12 27:3
   44:6 58:2
**defining** 215:10
**definition** 169:18
   169:20
**Delk** 1:19 2:6 5:3
   5:11 6:3,16,20 7:2
   8:1,9 9:1,14,19
   10:1,10 11:1 12:1
   13:1 14:1 15:1
   16:1,17,24,24
   17:1,8 18:1 19:1
   20:1 21:1 22:1
   23:1 24:1 25:1

26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1,22
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
109:15,21 110:1,2
110:2 111:1,17,19
112:1 113:1 114:1
115:1 116:1,2
117:1 118:1 119:1
120:1,6,10,16
121:1 122:1,17
123:1 124:1 125:1
126:1 127:1 128:1
128:5,12 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1,7,11
140:17 141:1,4
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1

154:1,18,22 155:1
155:4,10 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1,17,21
170:25 171:1
172:1 173:1 174:1
174:8 175:1,8,12
175:16 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1,10,14
184:18 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1,17,21 196:1
196:2 197:1 198:1
199:1,5,9,15
200:1 201:1,21,25
202:1,6 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1,15
212:1,4,10 213:1
214:1 215:1 216:1
217:1,12 218:1
219:1 220:1 221:1
222:1 223:1,21
226:2
**Delk's** 5:15,20
16:13 17:16
109:18
**democracy** 153:5
**Democrat** 61:17
**Democratic** 61:15
64:2 66:5,18
108:2
**Democrats** 89:5,6
89:24 102:3
107:23
**demonstrate**
146:20 163:22
166:19 191:7
**demonstrated**

146:14
**Department** 68:9
**depend** 126:19
**depending** 55:5
56:20
**depends** 49:17
54:10 56:5 64:18
**depicting** 40:8
**deploy** 54:21
151:17
**deponent** 9:14
224:7,9 227:1
**deposed** 10:14,22
10:24 11:13,14
**deposing** 225:12
**deposition** 1:19 2:5
8:8,16,23 12:25
13:9,15 128:4,11
181:21 211:19
223:20,21,24
224:5,12 225:2,10
225:13,15
**depressed** 38:8
**derail** 39:14,22
49:4 55:11 56:7
66:9 179:24
**derailed** 58:11
**deride** 39:13 63:11
**derived** 100:10
**describe** 33:3 35:17
42:19 43:11 58:22
128:17 129:13
159:9
**described** 42:21
57:14 104:8
**DESCRIPTION**
5:12
**deserved** 210:16
**designed** 38:10
40:23 41:10,12
**designing** 33:15
**despite** 134:7
**destiny** 71:5
**details** 38:16 125:4
178:4 191:5
**determine** 46:8
183:6

**determined** 69:7
144:25
**detractor** 63:19
**detractors** 38:5
63:8
**Detroit** 3:16
**develop** 48:3 53:10
53:11,22 72:17
97:5,6 101:18,19
102:24 103:12
118:10 125:24
179:23
**developed** 80:4
117:17
**developing** 153:15
**development** 93:4
**difference** 117:12
119:18 188:14
**differences** 72:7
**different** 56:18
115:6 117:21
153:7 207:7
221:18
**differently** 40:11
**difficult** 129:25
180:25
**diligence** 56:25
81:18
**diluted** 147:4
**dinner** 77:6
**direct** 172:21
173:10
**directed** 97:21
**directly** 88:9
171:14,17,24
**disadvantage** 41:18
**Disc** 128:4,11
223:20
**disclose** 34:16 43:2
43:10
**disclosure** 38:13
**disclosures** 38:19
**discover** 176:17
**discovered** 187:23
**discretion** 41:17
**discuss** 14:5 77:10
126:13

**discussed** 13:25
14:8,12 77:8,11
156:2 168:19
198:5 201:7
**discussing** 104:11
**discussion** 16:20
80:20 128:7
154:15 214:2
**discussions** 100:20
100:21 144:11
161:3,4,5 162:13
**dismissed** 11:10
**dispute** 10:19
**disseminate** 54:14
54:15 152:2,2
**distinction** 72:4,5
139:21 185:24
**distract** 179:25
**distributed** 150:18
**District** 1:1,2,20
2:15 8:13,14
224:2
**Division** 1:3 8:15
**doable** 160:16
162:16
**doc** 24:4
**document** 15:22
17:2,7,11 18:5
19:8 21:11 23:11
35:4 43:6 107:5,8
110:8,11,16,19
111:16 113:25
115:22 125:20
140:23,24 141:11
141:12,15,16
142:10 143:4
147:14 149:21
150:22 151:4,11
151:13,18 152:4,5
152:16 154:10
155:8,10,17,17,21
155:23 156:6,23
157:12 158:10
172:12,16 174:5,6
185:11 189:6,13
190:6,9 192:14
193:9 196:22

197:13 198:2,12
198:12 202:8
203:9,11,16
209:16,19 210:9
**document's** 17:15
**documentation**
124:4
**documentations**
18:23
**documented** 61:16
**documenting** 197:2
197:5,17,22 198:7
**documents** 5:17
14:16,18,20,24
15:2,5,8,10,13,16
15:17,18 16:3,15
17:19 18:9 19:3
19:12,16,21 20:4
21:21 24:4 140:22
141:8,15 196:13
196:18 213:20
214:4
**doing** 22:18 23:14
23:15 25:25 28:20
34:23 37:14 42:24
43:10,12 47:22
52:12 54:2 69:18
70:6 72:20 81:24
84:6 87:12 88:17
97:16 102:25
118:20 132:14
144:4 156:20
173:8,16,18 175:5
182:11 196:15
225:6
**dollar** 138:15 170:9
**dollars** 58:18
134:25 136:12
166:22 221:4
**door** 13:4
**Doty** 218:2,7
**doubled** 38:22
**doubt** 121:2
**draft** 54:20 55:13
155:21 185:14,17
186:22 200:4
**drafted** 54:9 55:20

198:17
**drafting** 159:11
186:19
**draw** 139:20
185:24
**drawing** 108:16
**drew** 110:21
**drive** 19:10
**driven** 50:22,22
**driver** 165:18
**drove** 99:21
**dubious** 63:19
**due** 56:25 81:18
**Dugan** 68:8 216:21
**duly** 9:20 224:7
**duration** 44:3
**dynamics** 50:25
57:10

──────────
**E**
──────────
**E** 3:1,1,5 4:1,1 8:2
8:2 224:1,1 226:1
**e-mail** 6:1,6,10,12
6:16,19,23 7:1,5,7
7:9 19:20,24
120:8,16,18,21,23
121:3,5,6,9,12,12
121:18,20 122:3,6
122:7,16 124:24
140:9,19,20 141:2
141:12 148:3
154:20 155:4,9,18
157:17 170:19,25
171:5,9,13 172:23
174:6 175:10,16
175:18,21,24
184:12,18,21,24
195:19 196:8
199:7,15,17,21,23
200:4 201:23
202:7,11 205:24
207:4,25 208:10
212:2,8,25 213:4
217:19
**e-mailing** 200:19
**e-mails** 15:6,8 24:3
121:17,19 196:3,4

208:25 217:15
**earlier** 30:11 35:14
67:5 89:2 117:17
129:7 138:12
139:12,16 143:17
160:13 162:12
168:5,19 171:19
171:20 172:20
174:10 176:20
181:12 216:6
219:8,21 220:24
**early** 61:3 65:16
**earn** 197:2,6,18,23
**easier** 50:7 51:2
**easily** 198:2
**economic** 142:24
143:24 144:16
146:10 149:12
153:7,10 154:12
159:25 160:8
165:18
**economic-depres...**
138:3
**economically**
159:21
**economics** 152:25
**economist** 148:11
148:12
**economists** 54:4
141:3 148:4,24
149:11,17
**Edevbie** 3:13 9:7,7
**edevbie@butzel....**
3:18
**edited** 157:11
**educate** 220:19
**education** 32:18
153:8
**educational** 30:5
**effect** 146:19
**effective** 57:10 92:6
**effectively** 101:11
156:17
**effectuate** 56:15
146:19 168:14
187:18 193:18
**efficacy** 48:6

**efficiently** 156:17
**effort** 39:14 48:7
48:13 92:6,14
93:10 101:7 125:2
149:6 163:5 191:2
191:12 223:11
**efforts** 39:12 56:4
163:3 183:24
**eight** 13:19 15:7
69:18 177:18
**eight-headed** 207:5
**either** 47:5,7,7 55:3
55:9 56:6 60:7
65:8 66:8 67:2,12
68:21 75:11
122:18 135:25
144:7 146:21
160:7
**elapsed** 104:18
**elected** 151:23
**Election** 10:25
**elicit** 154:9
**elicited** 178:17
**eliciting** 217:7
**eliminate** 144:7,8
144:23 165:5
**eliminated** 162:25
**elimination** 144:11
**eloquent** 129:17
**emanate** 99:16
100:3 128:23
131:8
**emanated** 135:2
**emanates** 101:2
157:25
**emanating** 38:14
136:11 170:7
**embarrassed** 178:7
**embarrassing**
187:24
**embedded** 41:3
**embezzlement**
183:5
**embraced** 42:10
**empire** 170:10
**employee** 14:13
81:4 105:3,16

179:12 183:4
**employees** 106:14
196:12
**en** 124:18
**end-of-the-year**
156:21
**ended** 26:7 69:25
70:3 83:22 203:3
**ends** 87:7
**engage** 117:13
167:13
**engaged** 11:15
61:12 111:13,19
112:16 116:2
117:8
**engagement** 44:7
51:24 53:4 56:3
93:12 94:21
141:23 143:11
173:10,10,11
174:23 176:23
183:11 186:21
187:14,16 188:21
189:2,10 190:5
193:21 198:9
**engagements** 22:8
35:25 42:20
**enhance** 47:10
142:23 143:24
**enhancing** 124:14
**enigmatic** 76:7
**enjoy** 89:4 99:17
**enjoyed** 69:13
**enlarge** 163:4
**enlarged** 161:21
163:2 170:5
**enormous** 207:6
**entail** 134:25
**enter** 22:3
**entered** 21:21
**enterprises** 128:21
**entire** 144:18
161:13 166:24
190:8
**entities** 35:19 130:9
145:9
**entitled** 26:13

entity 22:2 30:17
  65:17,20 66:11,23
  71:6 80:24 81:4,7
  95:6 99:24 101:5
  109:4 119:14
  129:10,21 131:4
  131:18 133:20
  134:19 136:9
  139:11 140:5
  145:23 147:19
  170:15 174:8,16
  176:4 183:12
  191:20
environment 56:11
  70:23 77:21
  159:17 205:10,17
  220:19
equally 202:13
equipped 208:11
equivalent 220:3
  221:14
eradiate 153:8
errata 225:5,6,9,12
  227:9
ESQ 3:5,13 4:5,14
essentially 24:3
  41:13 75:10
  209:23
establish 144:16
estimate 29:7
  114:19 149:14
et 1:6,15 8:10,11,12
  215:19 226:4,4,6
event 13:23 200:24
events 75:4 79:9,24
  80:18 82:3 87:16
eventual 48:14
eventually 84:4
  95:19 105:21
  106:17 134:4
  145:5 220:16
everybody 32:5
  69:4,25 105:18
  127:5 197:10
everyday 66:12
evidence 196:15
evolved 197:12

exact 20:21 72:24
  87:24 115:3,4
exactly 62:8,24
  63:15 82:13 90:25
  127:20 155:14
**EXAMINATION**
  5:1,4 10:3 211:11
examined 9:21
example 34:21 36:9
  36:17 37:3 38:3
  40:18 44:14 49:3
  49:25 50:20 53:7
  53:14,21 54:4,12
  57:18 68:6 136:7
  177:25 216:20
  219:24
exceeded 201:17
exchange 220:3
exchanges 202:7
excluded 96:22
exclusively 45:23
  86:12
excuse 89:6 133:8
  192:23
excused 223:23
execute 30:2
  187:17
executed 108:10
executing 32:7
  106:20
**Exhibit** 5:12 16:10
  16:10,17,24
  109:22 110:2
  120:10,16 140:12
  140:17 154:22
  155:4 170:21,25
  175:12,16 184:14
  184:18 195:21
  196:2 199:9,15
  201:25 202:6
  212:4,10,13,24
  213:2,2,5,20,21
  217:12
**Exhibits** 5:8,10
  212:17
exist 45:21
existed 103:15

167:5 172:14
existence 145:20
existing 49:6 61:23
  103:16 138:16
  146:21 153:12
  166:10
expand 144:9,20,24
  145:3 160:7 221:5
expanded 102:22
  147:2
**Expanding** 145:7
expected 72:8
expecting 72:9,11
expensive 53:16
experience 32:25
  122:4 214:17
  216:12
expert 30:24 54:5
  217:7
expertise 36:4 37:5
  59:11,16 68:18
  71:12,13 76:14
  89:10,14,17,23
  92:2,17,21 93:2
  93:24 94:5,7
  107:14,21 112:20
  137:12 149:12
  150:9 158:20
  167:6 214:15,17
  215:4,10 216:5
  219:14
experts 65:8 67:14
  68:23 107:13
  131:13 163:14
  169:17
expires 227:21
explain 75:8 90:21
  134:13 189:23
  208:6
explained 28:22
  87:10
explaining 78:7
  210:9
exploit 153:2,4,4
exploration 50:13
expose 179:15
exposure 164:8

187:6,13
express 180:10
expressly 106:11
extension 160:3
extensive 49:15
  150:4
extent 18:14,22
  160:17 217:6
external 31:13 61:9
extinguish 44:7
extremely 38:17
  66:6
eyes 33:8 65:5

─────────

**F**

F 224:1
fact 18:18 26:5,16
  26:18,18 27:10,20
  28:5,6 30:3,4
  33:10,12 34:6
  35:23 36:15,15
  38:7 42:6,9,10,16
  43:16,19 44:4,7
  44:19,20 46:23
  47:15,25 48:4,13
  49:9 50:4 51:19
  53:11,13,15,23
  54:3,3,5 56:6
  58:10,10,15 61:24
  63:9,10,14 70:4
  86:15 87:5 88:23
  89:12 95:20 99:21
  102:6,20 104:2
  118:11 129:19,20
  130:3,14 131:13
  131:14 132:6
  133:19 134:6,7,9
  134:14,17,18,21
  134:24 136:10
  142:22,25 143:21
  143:24 144:15
  146:13,16 147:5
  153:5,14,24 154:5
  159:20,21,24
  160:6,6,17 161:6
  161:13,21 162:16
  163:22,23,25

165:5,12,13
  167:12,24 168:5
  168:14,15,22
  169:18 170:4,4
  177:19 179:10,21
  179:24 180:23
  181:2,7 183:6,7
  187:17,21 190:18
  190:24,25 191:8,9
  192:11 194:7
  195:7 197:12,13
  202:18 204:9,25
  206:19 209:10
  213:19 217:8
  221:21 222:7,7,11
facts 14:9,12
fail 225:14
failed 56:4
failure 25:14
failures 26:23
fair 69:12 78:5
  115:20 119:15
  120:2
fall 47:12 214:19
fallout 209:25
  210:6
familiar 11:12,15
  14:24 17:7 74:6,9
  110:8 120:23
  130:5,16,19
  141:11 155:18
  171:9 175:18
  184:21 196:4
  199:17 202:8
  215:25 222:12
family 13:21 70:21
**Fannie** 38:24 42:18
far 83:4 206:23
  216:25
**Fargo** 85:4
fashion 19:7 160:7
**FastShip** 198:13,19
**father-in-law** 60:3
**father-in-law's**
  13:22
favorable 54:17
  159:16

**FDIC** 112:4,5,8
**February** 7:3
  175:17 184:19
**Federal** 10:25
  35:20 40:21 77:16
  137:3,5,6
**fee** 39:12,15,17,21
  40:3,11,16 44:15
  44:18,21 45:3,22
  106:8 113:8 197:3
  197:6,18,23
**feel** 12:17 51:19
**fees** 35:3 63:7
  190:5 219:9
**fell** 158:20
**felt** 89:8 92:4 162:3
**field** 45:7 111:12
  214:21
**figure** 36:18 103:25
  189:22
**figuring** 97:6
**file** 35:3
**filed** 8:12
**files** 18:11
**filings** 34:25
**filter** 126:7
**final** 141:6
**finally** 221:25
**Finance** 36:21
  123:15
**financial** 28:12
  32:18 33:2,13
  35:15 36:5,6 37:5
  37:16,24 38:15,20
  40:21 41:20 43:9
  50:10 58:21,25
  59:3,6,6,15 71:14
  73:6 74:7,15
  76:14 81:9,10,16
  82:25 83:12,18,20
  86:23 88:10 89:11
  89:18 90:3,14,18
  91:3,24 92:2,3,17
  92:24 93:25 94:11
  94:22 95:4,5,9,11
  99:2 107:20
  108:23 109:10

112:21 113:22
114:13 118:2
119:8 122:12
126:11,15 127:15
127:23 129:25
130:6,21,24
131:18,19 133:23
148:2,19 163:24
164:18 169:7
170:10 171:23
172:4,22 177:3
183:13 188:12
195:2,12 214:18
214:19 215:8
**financially** 139:2
**financials** 73:24
**find** 37:10 64:24
  85:24 100:11,16
  103:13 150:23
  176:5
**finding** 55:7
**finds** 193:10
**fine** 35:13 186:14
  186:16 210:19
**finish** 17:25 63:2
  178:15 192:23
  211:22
**finished** 105:25
  178:18
**fired** 203:3
**firm** 8:23 28:18
  46:13,13 123:17
  123:25 126:20
  136:8 176:4
  204:23
**firms** 35:22 126:20
**first** 5:16,21 9:20
  16:14 17:17 32:19
  41:19 47:23 48:17
  50:16 51:23 52:3
  52:13 59:22 60:14
  60:20 77:3,4,18
  77:24 78:9 85:5
  109:19 110:13
  137:24 141:10
  143:9 149:9
  202:11 220:7

**firsthand** 73:24
**fit** 102:21
**five** 10:17 29:8
  32:20 84:24
  168:20,21
**five-minute** 210:25
**five-year** 160:12
**flawed** 53:21
**flexibility** 41:15
**flip** 21:7 193:20
**flow** 45:8,21
**flowing** 136:12
**fly** 132:8,9,12
**focus** 35:15 59:10
  71:3 78:6 116:16
**folded** 54:6 116:20
**follow** 96:20
  209:21
**follow-up** 79:3
**followed** 79:5
**following** 72:19
  156:22 159:10
  187:5,13
**follows** 9:21
**Forbes** 110:21,22
  111:5 199:16
**forces** 26:9
**foregoing** 224:5
  227:4
**forgetting** 106:22
**form** 71:6 76:18
  78:15 79:13,20
  90:6,7 92:11
  93:14,17,22
  114:16 160:7
  179:2 183:14
  193:6 210:7
  213:24 218:22
  220:6 221:16
  227:8
**formed** 25:7
**former** 9:13 163:15
**formulating** 31:24
  125:6
**forth** 29:21
**Fortune** 31:16
**forward** 157:9

158:4 213:15
**forwarded** 188:10
  213:22 214:9
**forwarding** 213:5
**fostered** 154:4
**found** 19:3 37:8
**founded** 27:14,15
**four** 26:20 32:15,20
  46:16 57:15 77:7
  85:6 160:12
  193:25 204:9
**frame** 111:19 185:7
**framed** 180:3
**fraud** 187:6,13,24
**Freddie** 10:21 31:8
  31:11,18 32:10,24
  36:11 38:3,4,24
  39:11 40:19 42:18
  59:14 60:23,24
  61:7,10,25 62:2
  62:21 64:10 65:12
  66:21 68:2 69:15
  69:21 70:19 76:21
  76:24 80:16
  126:21 203:2,7,12
  209:21 216:7
  217:2 219:9
**Friday** 13:3
**friend** 13:21
**friends** 151:7 178:5
  179:16
**frigging** 206:13
**fringes** 50:10
**front** 217:18
**full** 48:15
**fund** 200:12,23,25
  201:3
**fund-raiser** 61:16
  66:5
**funds** 115:18 130:8
**further** 54:18
  158:21 210:18
**furthermore** 86:22

———— **G** ————
**G** 8:2
**game** 122:8,10

123:3 155:13
**gamut** 35:18
**Garrett** 29:14
**gather** 49:21
**gathered** 49:23
**Geithner** 41:9
**general** 43:11 82:6
  82:10 124:25
**generalized** 49:12
**generalizing** 47:6
**generally** 62:7
  77:15 83:13,17
  128:15 142:12
  149:10 159:17
  160:9
**generated** 56:23
  170:9
**genesis** 91:6 167:15
**gentlemen** 124:6
**Georgia** 60:13
**getting** 29:16 48:10
  55:3 58:19 64:21
  65:11 125:22
  168:8 181:14
  219:10
**give** 20:21 22:17
  25:4 27:9 38:2
  43:8,13 53:18
  63:14 71:15 72:11
  75:2 79:7,23
  126:9,24 128:16
  131:24 151:9,23
  151:24 162:9
  185:3 188:2
  192:15,18,25
  196:12 208:12,12
**given** 27:4 56:22
  69:12 150:20
  219:11 224:13
  227:6
**giving** 29:25 77:25
  82:2,10 118:10,23
  151:20 220:10
**Glass–Steagall**
  57:19 165:4
**global** 101:7
**go** 18:17 28:6 35:5

35:24 38:11 39:4
47:22 49:12 56:14
68:12,16 72:10
73:11 78:16 79:9
79:14 98:18 120:4
133:8 156:3 179:3
191:5 209:21
211:24
**goal** 48:14 51:16
92:10 151:12
152:5 159:18
160:17
**goals** 152:11,16
**God** 87:17 210:4
**goes** 33:19 47:17
51:17 60:6 146:12
200:5
**going** 11:19 14:2
16:9 30:5 37:9
38:16 43:14 45:11
57:9 58:5,13
71:24 75:8,11,12
75:25 81:24 83:4
86:12 90:22 98:7
134:5 138:5,18
143:16 152:10
153:19 156:19
157:9 158:4 176:6
176:17 181:10
188:6 192:2 197:9
200:23 204:15
206:3,14,14 207:4
207:6,11,13,17
208:9,23 209:7,11
222:2
**good** 48:8 51:14
61:14 67:13
111:11 126:7
146:21 150:22
151:11 167:10,14
206:22 209:10
211:15 213:22
**Google** 58:17
**gotten** 221:7
**Gould** 106:23,24
**Government** 31:12
31:20 35:20 36:23

38:11 40:21 53:9
61:9 65:7 116:3
124:3 154:11
214:22,24,25
216:8 218:14,17
**Government's**
53:14
**governments** 35:21
153:2 154:11
**Governor** 60:4,5
**graduate** 57:22
**grand** 220:13
**Grassley** 123:14
**grassroot** 48:12
**grassroots** 29:25
33:20
**gravitas** 68:25
**great** 12:9 63:25
76:4 126:25 222:6
**greater** 46:21,21
201:10 223:11
**gross** 208:21
**group** 1:9,12 8:11
9:10 14:14 18:19
19:24 20:6,14
23:21 26:5,6,8
30:21 86:13 87:20
94:23 95:5 96:24
102:13 104:12
105:4,15,17
106:20 108:3,14
109:12 111:9,20
112:17 113:15
114:3,3 116:3
118:7 119:9,19
125:18,21 130:22
131:21,22 139:5
147:16,18,21,25
148:17,21 149:5
160:20,21,25
163:8 164:20,24
166:18 174:9,12
181:13,18 182:3
182:12 185:20,22
185:25 186:11,15
187:19 188:15,17
189:2,17 191:24

197:17 198:20
200:3 203:6 204:7
206:18 207:20
210:2 211:12,17
213:6,16 218:20
218:21 220:2
221:12,13 222:13
223:3 226:5
**group's** 92:14
114:12
**guess** 13:19 24:19
65:12 80:12 83:23
85:11 101:4
134:25 164:2,6
172:11
**guessing** 59:24
76:24
**guidepost** 157:9
**guy** 28:16 123:6
200:21 206:12,15
**guy's** 183:3
**guys** 105:6 148:23

---

**H**

**handed** 212:13
**handing** 16:23
**hands** 54:22
**happen** 157:6
197:9
**happened** 24:15
41:6,6,20 157:6
159:6,10 182:17
**happening** 209:4
**happens** 55:18 75:7
85:24 182:25
210:4
**happy** 12:7 78:23
**hard** 19:9 44:5
**harm** 47:14 49:9,10
**harmed** 40:13,14
40:15,15
**harmful** 56:7 184:9
**Harwood** 4:7
**head** 60:23 61:9
**headquarters**
129:4 131:11
**health** 200:2,3

**healthcare** 200:8
**hear** 214:21
**heard** 63:18 106:2
**hearing** 82:25
**hearings** 83:12
**hedge** 130:8
**held** 2:6 8:16 128:7
**hell** 193:11 194:5
**help** 27:9 28:23
72:16 73:9,9 74:4
75:19 80:18 92:4
93:8 94:3 101:17
101:18,19 102:24
103:8,12 106:19
106:20 108:10
112:19 126:4
149:13 163:16
179:16,17 187:18
188:23 189:10
193:2 198:14,16
202:13 204:3
205:4 210:5
**helped** 104:18
117:20 148:13
162:17
**helpful** 79:6
**helping** 18:20 26:4
36:18 99:7 102:8
102:24 103:11
104:17,23 118:9
158:13 183:17
**Henry** 4:15
**high-profile** 64:16
**high-ranking** 64:2
66:18
**higher** 67:23
219:16
**Hill** 32:14 38:12
176:19 177:20
**hire** 126:23
**hired** 199:4 210:3
215:16
**historical** 152:24
**historically** 31:2
89:16
**history** 41:20
**hitting** 52:23

**hold** 41:4 42:2
**home** 19:5 153:20
**homebuyers** 40:14
63:16
**homeownership**
40:9
**honest** 99:6 168:25
**hope** 141:6
**hopefully** 48:9
56:23
**hoping** 143:25
**horribly** 165:21
**hostile** 63:11
**hourly** 44:9 216:14
216:17
**hours** 28:24 29:9
29:10,11 100:21
102:12,13,13
**House** 25:24 27:6
29:14 34:4,11,12
34:13 61:18,20
64:3 68:13 89:7
89:21 101:25
102:3 107:24
**housekeeping**
213:11
**Housing** 36:11,21
42:22 44:14
**Houston** 131:2
134:18 135:2
136:8,11
**hundreds** 161:9,10
198:3
**hurt** 194:7
**hurting** 55:11
**hypothetically**
64:24

---

**I**

**IAN** 4:14
**idea** 24:17 40:10
108:25 111:15
114:17 146:23
164:23 167:16
170:14 188:8
**ideas** 33:16
**identification**

16:16 109:21
120:9 140:11
154:21 170:20
175:11 184:13
195:20 199:8
201:24 212:3,9
**identify** 154:5
**idiosyncratic**
137:14
**Igiel** 4:14 9:12,12
90:7,9 93:14
107:2,6 120:3
181:10,22,24
193:7 223:18
**illogical** 179:5
180:15
**immediately** 76:25
**imminently** 219:14
**impact** 73:7 96:21
177:5
**impacted** 27:16
59:15
**Impacting** 155:7
**impacts** 49:14
**imperative** 225:11
**implement** 72:18
**implementation**
198:6
**implemented** 42:14
137:18
**implicate** 180:9
182:19
**implicated** 180:23
**implication** 182:18
**implications**
179:19
**implied** 86:22
**implode** 192:3
**imploded** 165:12
**implosion** 42:18
**importance** 117:18
142:13 144:18
149:10 220:21
**important** 106:3,4
125:15 131:15
141:18 142:18
150:24 151:15

153:6 159:19
202:13 205:19
**imposed** 53:15
**impossible** 144:13
144:25
**impression** 74:23
97:23 103:22
105:19 106:5,5,9
142:15 151:14
158:6
**in-house** 51:8
**incident** 179:12
**include** 11:19 34:24
134:21 145:8
159:25 166:24
169:19
**included** 41:19
149:18
**includes** 155:12
**including** 9:14
27:17 58:14 61:17
187:22 215:10
**income** 100:3,9,25
129:10 131:7
134:4,6,8,21,23
169:12,19
**inconsistent** 26:2
**incorrect** 161:10
**increase** 34:24
159:24,25
**increments** 113:10
**incurred** 27:23
**INDEX** 5:1,8
**indicated** 224:6
**indicates** 171:13
**indicating** 35:4
196:22 203:10
**indicted** 176:5
178:2 179:13
182:15 183:2,4
185:10 190:17
194:2,2,22 195:9
202:19 207:10,11
209:19
**indictment** 176:16
**indictments** 175:23
176:13 177:9

180:4
**individual** 18:13
46:13,13 108:16
110:21 177:15
180:6,8 204:11
**individually** 9:11
145:22 182:5
211:18
**individuals** 24:25
25:19 64:16 69:3
128:21 148:15
197:17
**industry** 58:24
**Inexplicable** 20:25
**influence** 24:23
33:12 63:5 101:14
102:7
**information** 18:21
49:21,22 72:17
78:13,22 82:23
83:15 86:11 152:3
177:13 181:9
**informational**
78:10 130:2
**initial** 49:15 77:24
79:4 113:8 220:18
**initially** 144:17,22
**initiated** 25:17
**innocent** 25:19
28:5
**input** 154:10
**inquiries** 187:5,12
195:3
**inside** 161:13 203:7
203:7
**inst** 82:21
**instance** 82:22
**institute** 38:15
**institution** 38:20
83:2 92:24 126:16
127:23 165:12
**institutions** 43:9
83:12,18 90:19
130:17
**instruction** 121:16
**INSTRUCTIONS**
225:1

**instructs** 12:15
**insurance** 35:22
63:24
**intellectually** 43:16
**intelligence** 64:21
**intended** 78:22
**intention** 26:3
169:2
**interaction** 77:5
**interest** 36:25 78:7
124:17 146:11
155:11
**interested** 75:21
82:16 83:3 91:5
224:15
**interesting** 37:7
**interestingly** 76:2
**interface** 72:10
90:21 95:10
**interfaced** 81:2
95:12 97:19
**interfacing** 33:11
55:6 60:9 66:8
72:12 89:15,24
95:13,25 117:14
118:21 162:14
**internally** 71:2
**international** 1:5
38:15 95:14
179:12
**Internet** 49:19 50:2
52:16 81:18
112:13
**interpret** 71:24
75:19 80:18
**interpretation**
26:10,25 74:22
75:3 82:2 87:15
**interpretations**
27:20
**interpreted** 82:2
**interrogatories**
5:22 15:24 16:2
17:13 109:20
110:14
**Interrogatory**
115:25

**interrupt** 141:20
**interrupted** 35:12
**interview** 206:3
**intimately** 157:19
157:21 197:20
**introduce** 9:3 48:10
**introduced** 27:5,7
161:25 162:5
**introduces** 55:19
**introduction** 13:10
**introductory** 51:24
56:25
**invaluable** 64:21
127:11,12
**invest** 45:10 178:5
**invested** 25:20
**investigate** 178:6
**investigated** 185:9
190:19 195:8
202:18 203:25
204:16 209:18
**investigation** 50:17
81:12,17
**investigatory** 52:3
**investment** 32:20
**Investments** 112:3
114:24
**Investor** 24:22
25:10
**Investors** 9:6,8
10:4,12
**invoice** 113:16
**invoices** 174:22
**invoicing** 113:17
**involve** 75:17 137:2
**involved** 10:19
31:22 32:3 95:18
99:22 105:18
116:13 117:21
125:4,25 157:15
157:19,22 167:10
176:8 191:10
197:20 198:4
203:8 222:17
**involvement** 99:5
172:17,21,21
**irrelevant** 65:22

**island** 101:9,10
124:2 143:25
153:16
**islands** 99:15,16
101:10,12 124:16
128:20 143:20
**issue** 28:22 36:10
37:2 44:5 47:24
48:25 49:4 50:7
51:12,20,22 54:13
54:14 59:7 61:11
62:4 65:2 66:20
66:25 68:24 69:24
73:7,9,10 74:5
81:2 83:4,5 90:20
91:5,23,25 92:5
94:5,7,8,10 95:9
95:15,20 96:23
97:3,4 98:8,20
99:4,8,9,11,13,20
99:21,23 101:18
101:19,22,23
102:9,11,14,15
103:8,9,12,23,25
104:5,17,21,25
105:8,10,17 106:3
106:16,18,20
107:21,22 108:10
108:22 109:3,9
111:10 116:9,10
116:13,14,15
118:21 123:22
124:7 125:6,14
126:18,20 127:9
127:14,19 128:15
128:18 129:8,17
131:5 134:11
136:5 137:6 142:6
142:11 150:19
159:4,7,14 164:25
173:8,19 177:5
179:17,18 183:12
189:19 191:24
193:24 194:10
197:14,19,21
200:19 203:5
204:23 205:15,22

207:11 209:9
210:3 213:12
219:14 221:9
**issued** 39:17,19
219:24
**issues** 10:22 18:14
18:16 28:14 30:4
30:22 31:14 32:6
33:17 35:23 36:5
36:7 37:18 43:14
43:18 44:13 50:3
50:14 51:7,9
59:13 62:2 70:7
71:16 73:24 75:22
82:12 83:6 89:19
90:14 91:3 92:3
92:18,24 93:25
96:21 99:4 104:8
104:13,19 112:23
116:5,5,6,7,12,12
116:16,19,22,25
117:6,21,22
125:15,25 155:7
155:11 158:9
176:21 189:6
191:21 194:11
195:2 198:15
203:2 204:4 205:5
207:6,19,22
210:13 214:18,18
215:6 221:18
**it'd** 121:22
**item** 38:13 129:22
**items** 38:13
**iterations** 100:6
160:18
**iterative** 57:13

## J

**J** 4:5
**January** 6:14,17
155:6 199:16
**Janvey** 1:4 8:10
226:4
**Jay** 4:5,14 9:9,12
14:19 15:3 211:16
**Jeff** 110:21,22

200:5,20
**Jefferson** 3:15
**Jeffrey** 199:16
**Jersey** 29:15
**jigiel@nealon.com**
4:19
**Jim** 28:16 98:12
123:6,7,18 200:10
201:9 218:2
**jmadrid@winste...**
4:10
**job** 1:25 70:20
101:22 158:17,19
191:17 206:22
**jobs** 70:3,24 138:2
138:4,8 153:9,23
163:23
**Joe** 183:4
**John** 60:3 68:8
106:21,25 137:13
216:21
**Johnson** 98:12
**join** 26:9
**Joshua** 3:5 9:5
10:11
**JPMorgan** 126:21
**judging** 42:4,4
**judgment** 166:14
**jump** 208:21
**jumping** 180:15
**jurisdiction** 101:3
224:4
**justified** 80:16
219:16
**justifies** 45:15
**justify** 204:24

## K

**Kent** 104:23,25
105:2 122:18
124:22 141:5
148:22 184:20
196:3,9,24 217:22
**kids** 57:22 70:20
**kill** 47:8,13
**kin** 224:14
**kind** 18:12,13

22:18 28:12 29:22
29:24 30:5 31:15
32:4,25 35:24
36:3 37:7 44:5
45:5 47:17 49:11
49:20 50:9,12,23
51:21 52:8 62:15
63:24 67:3 69:12
71:3,5 72:8 74:21
75:2 76:6,7,16
77:11,20 78:7
79:9 80:14 81:21
81:25 82:18 83:2
83:17,24 85:22,24
86:23 91:10 96:9
97:2,25 98:19
100:19 101:7
102:23 116:17
117:23 142:14
150:14 151:4
154:8 155:25
156:4,15,20,21
158:14,16 160:18
160:19 162:6
164:9 168:9
172:25 173:15
203:11 204:22
214:25 220:18
**kinds** 215:21
**knew** 28:8 41:16
65:25 76:3 86:19
88:25 112:20
150:21 165:22
168:13 176:15,15
189:24 191:25
192:2
**know** 12:4,7 15:4
15:15 19:5 22:17
23:13 24:2,15
25:13 26:9,16
27:9 28:21 29:8,8
30:7,9,22 33:9,10
33:21 35:2,19,21
36:24 37:6,13,15
37:18 38:25 39:5
39:10 40:12 43:5
43:15,17 44:3

45:6,11,15,16,18
45:20,22 46:12,18
47:13,16,25 48:5
49:3,5,6,11,13,19
49:22 50:3,4,6,8
51:11,17,21 52:13
52:17,18 53:23
54:5 55:7 56:13
56:14,17 57:6,11
57:16,17,24 58:8
58:16 61:4 62:14
63:8,14 64:2,3,7
64:22 65:20,22
66:7,17 67:3,23
68:5,12,17,20
70:24 71:4,15
72:24 74:3,10,10
74:19 75:9,11
76:2,4,5,12,13
77:11 78:18,21
79:7,9,18 80:2,3
80:12,17 81:10,22
83:14 84:5 85:5
85:23 86:8,10,18
86:18,20 87:7,19
87:21 88:17,19,23
89:2,8,9 91:17,22
91:25 92:16,22,23
92:25 93:2,3,5,6
94:2,6 99:3,4,5
100:19 101:22
102:6 103:25
105:25 107:25
109:3,5,6 111:13
115:3,14 116:11
116:14 119:10
121:11 122:2,9
125:11 126:10
130:12 131:3,17
138:7,20 139:9,10
139:20 142:14
146:14,18,23
147:19,20,24
149:11,18 150:15
150:17,18,21,22
151:7,25 152:21
152:22,24 153:19

156:2,19 157:7,11
157:18 158:5
160:24 161:8
163:14,15 165:2
167:21,23,24
168:17,20,23,24
169:14,19 170:11
170:14 172:25
173:7 174:11
175:3 176:14,15
177:15,17,18,25
178:4,19 179:5,14
179:15,18 180:14
180:21 181:11
182:25 183:3
187:19 188:14,16
189:9,23 193:21
194:5,6,8,11
195:7 197:7,9,25
198:19 200:6
201:2,4 204:17,17
205:2,9,13,14
206:7,12,15,23,25
207:12,13,14,16
207:25 208:3,4,22
209:5,6,7,16,20
209:23,25 210:9
210:15 215:2
218:6,16,23
222:21
**knowing** 80:14
**knowledge** 28:12
68:22 92:24
125:13 139:23
166:8 167:20
189:5 201:16
207:17 218:12
219:5,13
**known** 22:14 23:8
57:21 60:10 66:4
107:12 108:7
111:12 214:21

**L**

**L** 1:24 2:8 224:3,20
**L.P** 1:9,12 8:11
9:10 14:14 23:22

111:20 114:4
185:21 211:12
226:5
**language** 55:23
134:20
**large** 31:16 40:20
44:20 126:20
127:4,22
**largest** 216:7
**late** 14:21 61:3,3
65:15
**law** 2:6 48:2,18
56:13,15 103:20
123:17,25 126:2,4
134:3,5 137:5
138:19 144:5
146:20 151:5
160:4 161:5,6
166:15
**laws** 28:13 168:15
174:17
**lawsuit** 10:13
**lawsuits** 25:18
**lawyer** 32:13 45:13
86:24 123:8
218:11
**lawyer's** 196:11
**lawyers** 51:8 54:4
139:24 162:16
218:18
**lay** 57:9
**layer** 215:7
**lead** 75:11,12 90:23
190:25 194:22
209:21
**Leader** 64:25
**leaders** 151:20
**leadership** 61:19
61:24 63:17 68:15
108:3
**leap** 179:6
**leave** 69:21
**left** 24:10 32:17
69:16 76:21
**legal** 8:24 51:4,7
86:19 193:11
194:9 202:13

207:5,14 208:7
**legally** 207:12
**legi** 134:2
**legislation** 24:23
25:23,24 26:3,15
27:5,7 33:22
40:24 47:8,10,21
48:10 52:2 54:23
55:3,4,9,13,20
56:12 63:4 66:9,9
77:13 97:6,7,8
101:15 102:7
125:23 129:7
152:18 155:15
165:9 166:7 177:6
179:9,22 180:25
183:18,24 184:7
187:18 191:14
193:18 204:8
220:16,23 221:4
221:10
**legislative** 29:24
33:16 43:18 46:22
55:22 57:3,25
63:10 75:3,13
89:19 96:20 122:8
122:10 123:2,11
136:19 152:11,15
154:3 162:6
188:25 189:12,14
190:25 191:12
198:15
**legislator** 125:10
**legitimate** 196:16
197:11 208:6
209:9,9 210:13
**lenders** 50:2,3,20
112:13
**lending** 130:10
**lens** 117:23
**let's** 47:20 49:4
53:7 109:14
119:22,24 120:5
126:21 134:17
136:7 138:15
154:17 170:16
175:7 210:24

212:22
**letter** 198:17
**level** 40:22 75:23
137:4 148:23
**liabilities** 207:14
**liable** 207:13
**Lieutenant** 60:5
**likewise** 131:19
**Lil** 199:23 200:2
**limitations** 19:2
**limited** 44:3 46:14
116:16 219:11
**limits** 201:18
**line** 114:2 122:16
226:7,9,11,13,15
226:17,19,21,23
**Lionel** 98:12
**list** 68:16 114:9
**listing** 174:22
**little** 25:4 32:12
52:23 59:18 60:2
76:21 82:14
128:24 129:24
181:14 202:25
216:12
**lived** 132:5 143:17
168:25
**LiveDeposition**
1:24 2:13 224:21
**LiveNote** 2:12
**living** 168:6
**LLC** 1:15 8:12
226:6
**lobby** 72:2 87:14
101:21,23 118:3
160:21 161:8
**lobbying** 28:17
31:22 58:18,20
64:4 69:14 116:4
117:9,10,10 118:8
118:22 119:4
179:10
**lobbyist** 33:4,7,8,9
33:23 35:11 57:25
64:8 87:4 111:2
117:25 118:6,12
126:17

**lobbyists** 58:14
67:9,23 72:14
108:8 111:10
**loc** 134:9
**local** 137:2
**located** 20:8 145:9
**location** 20:20
134:7 142:16
**logistical** 163:24
**long** 2:7 3:4,12 8:17
15:19 20:13 22:14
31:3,9 37:15,15
39:5,7 45:10 58:5
67:20 69:14 83:19
103:2 171:12
215:15
**longer** 87:10
172:14
**look** 17:7 23:11
57:24 58:8 99:20
110:8 120:23
141:11 142:21
143:9 146:9 165:8
171:9 175:18
178:10 184:21
192:5,10 196:4
198:12 199:17
202:8 207:24
217:12
**looked** 14:18 15:5
81:11,13 117:22
139:11 169:15
**looking** 19:10
52:19 73:6 74:5
93:7 139:25 160:4
**looks** 123:4 184:25
188:13
**losers** 27:18 28:2
**losing** 70:3
**loss** 36:22
**losses** 27:23
**lost** 25:22 201:7
**lot** 27:18 29:5,12,20
39:20 41:8 42:23
45:10 49:18,23
50:7 51:2 56:12
57:17 67:4 68:24

85:22,25 86:3
89:12 93:4,4
100:6 103:4 106:6
106:7 126:8
128:25 131:23
142:18 144:10,10
146:10 153:15,16
153:22,23 162:13
173:8 174:4 189:5
208:3 221:25
**Loumiet** 6:3
**low-dollar/small-...**
130:10
**Low-Income** 36:11
42:22 44:14
**lower** 99:17 149:2
170:8
**lunch** 74:25 77:6
91:18

### M

**Mac** 10:21 31:8,11
31:18 32:10,24
36:11 38:4,4,24
39:11 40:19 59:14
60:23,24 61:7,10
61:25 62:2 64:10
66:21 68:2 69:15
69:21 70:19 76:21
76:24 80:16
126:21 203:2,7,12
209:21 216:7
217:2 219:9
**Mac's** 62:21 65:12
**machine** 224:10
**macro** 153:24
**Madoff** 25:8,9
27:16 42:24
**Madrid** 4:5 5:6 9:9
9:9 76:17 78:15
79:12,20 90:6
92:11 93:17,22
105:24 114:16
133:6,14 166:4
178:14,17,25
181:20,23 183:14
193:3,6 205:6

210:7,22,24
211:14,16 212:12
214:5 217:9,11
219:2 220:11
221:22 223:14,17
**Mae** 38:24
**mail** 201:8
**maintain** 20:10,13
**maintained** 147:10
**maintaining** 20:19
**major** 10:20 61:16
62:19 65:7 66:4
**Majority** 64:25
**making** 32:5 38:20
57:11 68:23 104:2
145:23 147:6
161:12 192:9
**mammoth** 117:20
168:2
**man** 98:16
**manage** 73:10
96:10 112:19
157:16 158:14,17
158:23 188:23
209:22 210:5,6
**managed** 97:2
156:16 203:6
216:7
**management** 32:2
70:2,25,25
**managing** 31:16
96:10 218:10
**manufactured**
129:23
**map** 143:9
**mark** 16:9 109:14
120:5 154:17
170:16 175:7
**marked** 16:16,23
109:20 110:2
120:8,16 140:10
140:17 154:20
155:4 170:19,25
175:10,16 184:12
184:18 195:20
196:2 199:7,15
201:24 202:6

212:3,8
**market** 37:4
**marketed** 48:4
**marketing** 37:7
54:12 82:6
**married** 60:8
**Martin** 6:1,7,13,16
7:2 121:22 184:20
**Martin's** 121:19
**match** 158:25
212:16
**material** 17:4 23:17
110:6 120:13
154:25 190:12
199:12
**materials** 81:20
82:4,6 117:15
**matter** 8:9 177:22
182:9
**matters** 72:20
111:20
**maximum** 170:3,3
201:17
**MCC** 113:12
114:23 115:5
118:22
**McGinn** 26:24
**mean** 32:2 33:19
34:22 36:4 37:6,8
37:14 39:6,15,23
42:4 43:5,23 44:4
45:6,9 49:2,17
50:19 52:7,11
53:5 54:11 56:10
56:11,14,17 57:17
58:4,16 59:12
63:7,16,24 64:19
65:24 67:8 71:18
72:9 74:8 75:5
87:2,3,13 88:21
88:23,25 92:23
93:5 96:25 100:24
100:25 102:8
104:5,9,12 108:6
108:25 112:5
116:18 117:11
119:9,10,12

122:24 126:20
130:18 139:6,7
145:18 146:17
148:20 149:6
150:13,20 151:3,9
152:10,20 153:3
153:18 155:19
156:11,15,15,16
156:18 157:15,21
158:13,15 165:7
166:16,21 173:13
177:2,4,23,24
179:7 180:8 181:8
181:25 182:17,22
182:24 183:21
185:23 188:7
189:3,7,18 191:19
192:3,8 194:4,5,7
194:8,13 196:6
197:20 199:4
200:17 202:22
204:14,16 206:9
207:8,23,25 221:2
**meaning** 25:20
28:4 41:4 53:10
100:2
**means** 75:9,10
102:5
**meant** 87:18
116:15 145:9
206:4,10,25
**measurable** 56:8
**media** 187:12
**medications** 12:21
**meet** 50:15 60:14
98:18 100:8
122:18 132:8,25
132:25 133:18
134:15 135:24
**meeting** 77:9,24
78:9,10 79:4,6
91:18 95:18,23
122:20,22 123:2
156:14 157:3,4
158:2
**meetings** 95:17,21
144:10 156:18

161:9,11 188:4
198:3,16
**member** 55:21
68:13 117:14
123:15 126:25
189:21
**Members** 25:25
33:11 36:24 38:11
40:9 55:6 61:14
61:17 64:2 83:3
97:8 112:22
118:21 127:3,8
161:4
**memo** 200:7
**memorialized**
156:5
**mention** 142:11
**mentioned** 37:21
69:3 97:14 148:25
**Meridian** 112:3
113:7 114:24
118:22
**Merit** 2:9
**mess** 193:11
**met** 13:5 59:22 98:5
98:9 124:21 135:8
211:19
**mic** 52:22
**Michigan** 3:16
**mid** 61:3
**midcourse** 57:7
**Miller** 6:1 123:6,7
123:18
**million** 153:20
216:10
**millions** 166:22
221:3
**mind** 37:24 152:11
172:25 173:17
186:2,9
**mine** 151:8
**minimal** 150:3
**minimum** 99:12
**minutes** 132:17
168:20,21 210:25
211:23
**Mitch** 122:17

155:10
**Mitchell** 1:19 2:5
5:3,15,20 8:1,9
9:1,14,19 10:1
11:1 12:1 13:1
14:1 15:1 16:1,13
17:1,16 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
109:18 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
128:5,12 129:1
130:1 131:1 132:1
133:1 134:1 135:1

136:1 137:1 138:1
139:1 140:1 141:1
141:4 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1,8 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
223:21 226:2
**mixed** 173:15
**model** 41:11,12,13
47:9,11 50:5,24
73:8 74:11 103:14
103:17,19 104:4
**modified** 162:18,21
**modify** 47:14
**Molinari** 68:13
**moment** 16:25 56:2
110:3 190:10
**momentum** 56:22
**Monday** 1:20 8:5
226:3
**Mondays** 29:9
**money** 25:20,21
28:7 39:20 85:22

86:24 87:5 106:6
114:6,25 115:11
115:13 134:19
153:17,22 167:3
177:15 179:13
221:25
**monitor** 8:20 57:5
**monster** 207:5
**Montana** 200:12,23
200:25
**month** 44:11 46:5,5
46:19 47:3,3 58:4
62:13 67:16,22
80:2 113:11
219:10,11,22
**monthly** 44:8,11
46:3,8 79:8 94:17
217:3 219:4
**months** 13:19
57:16 83:21,24
84:11,13,17,17
85:12
**mortgages** 42:6
**move** 45:17 133:20
138:5,23 139:17
139:22 145:2
165:24,25 167:16
168:16 169:4,8
170:11
**moved** 100:7 102:2
134:15 145:5
161:18,18 164:7
164:12 168:18,22
**moving** 129:3
136:2
**mushy** 172:25

_____

### N

N 3:1 4:1,7 8:2
**name** 8:22 10:11
80:23 87:4 89:2
121:6,13,18 124:4
157:17 183:3
188:18 204:10
211:15
**named** 28:16 74:18
123:6 148:11,13

218:2
**names** 96:16
**narrative** 48:4 53:2
53:10 54:7,9 57:2
97:5 101:19
103:13 117:18
141:17,22,22
**narrow** 154:2
162:6
**narrowed** 153:23
**national** 71:19
75:23 77:12,13,14
142:19
**natural** 160:3
189:18 192:4
**nature** 36:6,6 44:17
63:8 66:14 130:4
213:11
**NEALON** 4:13
**necessary** 23:5
122:12 189:3
191:13 225:3
**need** 12:6,13 14:23
37:11 47:23,25
48:2,3 49:6,13
51:18 56:20 66:25
84:6 86:9 93:11
107:5,7 108:4
156:3 159:20
162:4 179:14
196:25 208:5
209:22 210:20
**needed** 30:24 83:14
92:9 106:19,20
111:9 126:6
149:11 156:19,20
158:4,20 181:9
197:5
**needing** 169:16
**needs** 87:10 202:13
202:13
**nefarious** 189:8
**negative** 179:19
184:9
**neither** 224:14
**net** 25:19 27:14,17
27:18,23 28:2,3

**Network** 24:22
113:11 115:2
118:16
**never** 13:5 21:21
22:10,24,24 23:2
41:6 42:14,17
50:10 76:5 80:20
84:3,8 115:2
161:22,25 164:4
164:22,22 167:4
168:6,12 173:5
174:3 175:2,6
177:13 183:16
200:24
**new** 3:8,8 26:23
29:15 70:3 138:17
193:21,22
**newspapers** 151:20
**nexus** 35:20 144:16
**NIAP** 24:23 25:3,6
26:8 27:13 29:23
30:8 33:18 34:20
**NIAP's** 27:22
**niche** 37:11 58:20
58:23
**night** 14:21
**nights** 132:6,23
135:9
**nominally** 121:5
**non-Ben** 106:13
**non-Stanford**
115:12
**nonfinancial** 36:2
**nonpaying** 34:18
**normal** 23:25
**normally** 37:8
**North** 4:15
**Northern** 1:2 8:14
**Northwest** 2:8 8:18
**notable** 37:23
**Notary** 2:14 224:3
224:22
**notebook** 52:8
**noted** 225:9 227:9
**noteworthy** 15:9
38:17 39:2,3
**notice** 171:6 224:6

**number** 5:14,19
6:1,6,10,12,16,19
6:23 7:1,5,7,9 8:8
8:15 16:18 21:13
22:2 23:8,12
25:17 27:8 38:4
39:10 48:11 71:14
80:14,15,16 84:9
104:13 109:22
114:21 115:25
120:10,17 130:8,9
140:12 151:3
154:22 170:21
175:12 184:10,14
195:22 196:7
199:9 202:2
204:25 212:5,10
**numerous** 111:20

**O**

**O** 8:2
**o'clock** 29:10
**ob** 217:5
**object** 76:18 90:7
93:14,17,22 120:3
133:6,11,15 166:4
178:16 181:10
217:6
**objected** 178:23
186:4
**objecting** 133:14
**objection** 78:15
79:12,20 90:6
92:11 105:24
114:16 178:14
179:2 183:14
193:3,6,7 205:6
210:7 213:24
218:22 220:4
221:16
**objective** 76:6
125:21 143:23
154:3 188:7 204:7
**objectives** 47:7
158:21 189:12,14
207:7
**objects** 12:12

**obligation** 34:19
**obligations** 45:25
**obscure** 50:8
**observation** 51:13
**obviate** 130:14
**obvious** 51:14
169:12
**obviously** 18:16
115:15 131:2
133:2 196:7
204:18 207:22
**OCC** 77:17
**occasion** 60:16
**occasions** 85:18
98:5
**occur** 66:2 86:25
**occurred** 159:13
163:24 170:4
**occurring** 79:24
**October** 38:21
**offer** 51:6 54:5
**offered** 22:25
**offering** 127:11
**office** 15:22 18:18
20:5,8,10,14,18
20:20 24:2,10,11
31:16 32:2 34:14
66:7 89:3 95:19
96:4,9,13,20
97:11,15 98:4,6
98:10,13 126:22
127:4,24,25
196:15 213:21
216:8 218:3,13,13
**offices** 2:7 8:17
23:21 131:2
**Official** 9:6,8 10:4
10:12
**officials** 48:5 54:15
146:15 151:23
154:11
**offshore** 116:5,12
117:22
**Oh** 13:19 112:9
121:4 124:12
**okay** 11:2,8,12,21
11:24 12:5,16,20

13:13 15:2,21,25
16:8 17:5,18,23
18:7,25 19:6 21:8
21:10 23:9,18
33:6 35:9,12 37:4
39:8 43:11 44:12
46:17 56:2 59:17
59:21 64:14 73:22
85:14 107:4,10
108:18 109:13,25
110:18,24 111:6
113:5 115:23
119:6,13,23 121:5
122:7,24 128:14
135:23 140:2
142:3,8 154:16
174:21 178:25
184:3 186:18
201:19 202:24
210:17,25 211:22
212:19 213:8
214:7,20 215:13
216:19 217:4,17
218:12,16 219:3
222:9,20,25
**old** 4:16 70:5
**onboard** 104:23
**once** 40:10 44:4
54:9 64:23
**one-pager** 53:24
**one-year** 62:14
**ongoing** 117:14
**Online** 113:10
114:25 118:16
**open** 96:9
**opened** 95:19 96:3
96:12 97:10,14
**operate** 101:11
128:21 130:25
145:10
**operated** 130:24
**operating** 24:2
102:17 175:3
**operation** 70:19
104:15 145:5
167:16
**operational** 101:15

**operations** 100:7
145:3 153:12
161:19 164:13
165:25 168:6
169:5
**opine** 162:9
**opinion** 131:12
151:20 162:9
180:21 219:23
**opinions** 51:7 54:6
**opportunities**
167:4
**opportunity** 158:14
158:18,23 161:22
162:7 164:5
**opposed** 69:8 70:16
90:5 96:10 101:6
102:17 111:10
113:22 114:20
118:18 131:11
133:12 138:12
143:13
**opposite** 124:11
**optically** 168:2
**oral** 22:6,11 43:25
44:2 94:16
**orally** 62:20
**order** 24:23 125:23
144:6
**organization** 25:6
27:13 28:10,17
33:20 52:21 71:2
81:17 136:3 138:6
138:11 158:14
166:10 197:24
205:5 208:16
**organizations**
72:13 139:15
**organized** 19:7
174:16
**original** 5:10 26:3
225:12
**originally** 60:13
**originate** 101:24
**origination** 134:9
**ostensibly** 53:20
**outcome** 32:8 33:16

39:2 47:18 55:11
56:9 188:25
224:15
**outcomes** 47:18
58:16
**outlined** 198:5
**outside** 51:8 70:6
74:21 123:21
145:9,12,24
**overlooked** 146:12
**oversaw** 38:12
112:23
**oversee** 78:4
**overseen** 96:23
**oversight** 75:23
77:15 130:15
**owe** 115:11 173:24
**owed** 84:4 85:21
86:6 114:25
115:14 173:20
174:2 221:25
**ownership** 85:6
**owning** 129:2

**P**

**P** 3:1,1 4:1,1 8:2
**P.C** 4:13
**p.m** 73:17,17
132:12 211:6,6
223:24
**page** 5:4,12 21:9,12
23:10 110:19
111:16,18 113:25
115:21 125:13
143:9 152:22
196:8 202:11
217:19 226:7,9,11
226:13,15,17,19
226:21,23
**pages** 104:6 125:19
227:5
**paid** 34:5,7,22 41:4
44:8,9,15 62:13
67:15,23 69:2,4
84:3,8,16 85:16
85:18 87:5 94:20
94:21,24 95:5

106:6 112:25
114:4,12,23 115:2
115:13,15,16
126:8,10 138:16
138:17 173:5
174:3 175:6
186:11 188:22,23
190:5 197:24,25
198:20 204:19
210:14,15 216:18
217:3 221:21,24
222:11 223:12
**PaineWebber**
147:21
**paper** 53:11 54:3,9
54:20,21 57:2
141:25 142:3
148:7 149:15
150:16 159:3,11
159:15 197:15
198:4 219:25
**pardon** 217:20
**park** 3:7 51:18
**parked** 135:3
**part** 51:5 70:8 89:4
104:24 108:13
116:24 124:9
127:10 129:14
143:18 149:6
153:6 154:9
159:22 169:10
183:10 186:21
187:14 188:21
191:17 197:17
198:8 204:2 205:3
206:18 219:4
220:13
**particular** 22:16,23
30:23 33:21,22
37:12 44:4 49:13
54:13,13 65:2
68:22,24 94:7
101:3 116:16
127:7 143:25
164:25 183:9
188:4 189:19
**particularly** 15:9

**parties** 2:17 20:17
21:16 111:21
114:5 222:15
**partner** 108:13
218:10
**partnership** 30:25
**party** 61:15 224:14
**pass** 29:15 47:9
51:25 56:6 66:8
165:10 184:8
204:8 220:24
223:17
**passed** 27:11 29:13
40:16 47:21 48:14
54:24 55:3,4
56:12,23 79:23
96:17 99:22
125:23 159:8
166:8,15 179:9,22
179:23 180:25
183:24 220:17
**passes** 58:10
**passing** 58:3
183:19
**Patsy** 105:25
**pawn** 158:25
**pay** 25:15 46:24
69:8 79:25 84:13
86:3,8 87:8
173:19 219:21
**payday** 45:15 50:3
**paying** 34:17 80:15
138:13,14
**payment** 58:14
86:5 115:17 171:3
173:4 216:25
**payments** 109:8
113:9,12,14,16,20
113:23 115:6
172:9 221:15
**pays** 45:20
**PC** 4:4
**peers** 219:6
**penalizing** 42:8
**pending** 62:2
**Pennsylvania** 2:7
8:17

**penny** 223:4
**people** 25:15 27:3
27:16,18 28:7,13
30:4 32:3 37:8,10
37:16 40:8 43:6
48:24 50:15,23
52:20 53:17 57:18
57:21 58:16 61:19
63:13,22 65:8,21
66:16 68:17 70:25
71:14 80:15 87:22
96:15 97:24 98:11
98:13 102:14
104:13 107:12
108:2 120:18
123:2,9 124:21
126:9,23,23 127:6
127:16 129:2
137:12 138:23
143:22 149:14,19
150:14,17,20
151:3,21 153:16
153:19 154:7,7
159:18 164:2
165:3,4 167:9
175:6 203:8
205:18 206:14
210:2 214:16
215:16 216:21
220:21
**percent** 42:2 99:17
99:18 138:13,14
**percentage** 44:22
**perform** 116:3
**performed** 114:6
**period** 56:14 89:20
215:24 218:7
**periodically** 13:21
79:8 82:24
**periodicals** 151:21
**person** 55:21 70:2
97:19 122:18
135:17 190:25
**personal** 170:13
**personalized** 200:6
**personally** 11:10
35:6,8 65:17

108:24 131:10
139:8,18,23
170:12 177:22
181:5,15 182:4
191:20
**personnel** 50:22
**persons** 216:2
**perspective** 55:5,10
86:20 96:8 117:24
125:9 132:5
142:20 150:8
159:24 176:7
**perusal** 15:4
**perused** 14:22
**phase** 51:24 52:3
52:25 53:3 54:22
56:25 57:2,3
141:22
**phone** 65:4 91:17
**phonetic** 148:12
**physical** 19:11
**picked** 66:23
194:13
**piece** 33:22 40:23
165:9
**pieces** 214:14
**place** 43:22 224:6
**placed** 109:25
120:15 140:16
155:3 170:24
175:15 184:17
195:25 199:14
202:5
**places** 131:2
**Plaintiff** 1:7,13 4:3
**Plaintiff's** 5:16,21
109:19 110:13
**Plaintiffs** 2:6 3:3
10:3 16:14 17:17
**plan** 122:8,11
123:3 155:13
**plane** 132:9
**play** 166:17
**played** 42:13
**please** 9:3,16 11:22
12:4 63:2 110:3
175:22 210:23

212:18 214:15
217:13 225:2,6
**pleased** 37:19
141:5
**pleasure** 211:16
**point** 12:11 86:15
90:24 91:2 142:20
144:2 149:2
163:14,17 164:9
187:21 193:12
201:11 214:8
222:25
**pointing** 151:6
173:7
**points** 117:16
184:25 185:12,15
185:18 186:20,22
187:9 188:3
195:12 204:20
**policy** 18:13 28:14
30:20 31:14,15,21
33:12 48:5,9
55:10 63:24 83:5
102:18 146:15,21
150:22 151:8
154:8 155:7,11
167:14 174:9,12
179:18 208:8
**political** 77:21
125:9 126:7,9
150:8 154:4,6
161:12 168:12
201:3 207:5,18
209:25
**politically** 75:10
100:22 144:12,25
160:15 166:20
**politician's** 150:8
**politicians** 66:5,19
**politics** 90:24
**Ponzi** 24:24 25:9
28:8 164:8 189:24
191:11 194:23
197:8,12 206:24
**poor** 42:3 116:24
**position** 27:22,25
32:2 33:21 43:19

49:2 54:13 55:8
61:6 70:16 85:24
86:23 184:7
**positions** 25:12
43:20 70:5
**positive** 55:10
66:10,23
**possibly** 85:19
160:16 162:19
194:6 207:15
**potential** 28:4 73:7
83:5 161:12 177:6
**potentially** 96:21
100:16 117:16
144:14,23 195:6
**poverty** 153:8
**powerful** 71:21
**PowerPoint** 140:23
141:15
**PR** 202:14 203:9,16
203:22 204:4
205:5 207:6
208:12
**practical** 32:18
100:15
**practice** 22:3,7,19
62:21 64:15,15
218:8,14
**precedent** 168:8
**precipitated** 86:8
**precrisis** 202:14
**precut** 202:14
**predict** 58:5
**predictable** 42:6
**prefer** 42:25
**preference** 147:12
**preferred** 134:5
**preparation** 13:15
122:19
**prepare** 12:25
14:17 92:5 112:19
156:23 158:10
209:8 214:4
**prepared** 147:15
149:7 155:10
157:2 187:17
190:23 204:13

208:5 209:7 214:8
**pres** 57:19
**present** 2:16 4:22
**presented** 16:6
164:5 212:17
**presenting** 16:7
**presently** 42:20
**preserving** 57:20
124:17 165:4
**president** 31:20
61:8 200:3 203:3
**press** 54:15 69:24
183:3 185:4 187:5
188:13,14 190:16
190:22 193:9
195:3 202:17
204:14
**pretty** 24:9 38:25
41:14 42:6 56:8
60:10 72:15
206:12
**preview** 156:22
**previous** 19:23
173:9,10 221:19
**previously** 36:12
173:20,25 201:7
**price** 38:8,22 69:12
148:13
**primarily** 51:7
95:12 97:20
107:19 214:18
215:8
**primary** 78:6
**primer** 77:25
**principal** 140:4
**prior** 13:9 31:6
32:10 74:12,15
76:9 172:17
174:23
**privy** 133:4
**pro** 24:21 26:20
28:9,20 29:3
142:25
**proactive** 82:15,22
83:9
**probably** 20:2,22
26:9 52:14 54:14

55:3 59:24 60:17
61:2 67:6 69:18
69:18 72:25 76:23
80:13 83:22 84:16
93:5 97:12 106:7
116:23 121:21
127:10 142:22
149:17 150:24
157:14 161:6
162:25 169:13
172:7 182:13
201:6,7 210:15
**problem** 29:16
48:18 130:21
177:19 203:22
**problematic** 160:15
**problems** 29:17
102:16
**proceed** 160:21
**process** 11:13 51:5
57:6,13,25 58:14
63:10 124:9
160:11,12
**processes** 50:25
**produce** 39:19
167:14
**produced** 15:11,17
18:15 19:4 131:7
146:13 154:13
196:13 209:16,19
**product** 52:2,5
53:16 130:3 141:6
150:14 188:9,21
188:22 219:24
221:13 223:2
**production** 5:17
16:3,15 17:19
**productions** 53:12
**products** 99:15
128:22
**professional** 2:10
60:21
**professionally**
167:13
**professionals** 36:24
101:5 202:15
203:7

**profit** 138:18
**program** 38:10
**prohibitively** 53:16
**project** 96:2 117:20
143:15 157:16
160:18 177:24,24
182:13
**promote** 48:8,8
98:2 142:25 153:5
191:2
**promoting** 55:21
153:10 177:7
**prompted** 83:7
**promptly** 47:5
**prong** 133:24
**prongs** 135:7,15,21
**property** 112:8
**proposal** 47:14
49:9,14 75:13
136:19 146:4
147:10 164:23
**propose** 137:8
**proposed** 122:11
**proposing** 123:2
**propounded** 227:7
**proprietor** 45:7
71:4,8
**protect** 192:15
**Protection** 24:22
25:11
**proud** 151:10
**proven** 28:8
**provide** 46:15 49:8
78:23 86:13 117:8
194:25
**provided** 17:4
18:24 20:17 23:17
63:16 66:14 80:24
81:21 82:22 110:6
119:2 120:13
154:25 164:19,20
167:7 190:12
194:18 195:4
199:12 209:9
221:20 223:8
**providers** 67:11
**provides** 66:12

**providing** 81:7
83:16 88:9 118:4
118:9 206:19
**provisions** 137:14
**proximity** 152:23
**public** 2:14 18:13
30:2,20 31:15,20
33:12,19 43:6
48:5,8 49:8,10
53:13,19,25 54:15
55:10,12 66:11,23
146:15 151:8
154:8 155:6,11
167:14 174:9,12
176:7,9 179:17
203:5 204:20
205:16 207:22
208:8 224:3,22
**publicity** 49:23
**purchased** 147:21
**purely** 22:11
**purpose** 152:4,8
192:13,14 193:8
**purposes** 16:17
109:21 119:21
120:9 140:11
154:21 170:20
175:11 181:20
184:13 195:21
199:8 201:25
212:4,9
**pursuant** 62:16
80:6 94:14,20
111:14 121:15
224:6
**pursuing** 122:13
221:4
**put** 35:2 39:12
54:22 55:23 103:3
126:6 185:2
**putting** 39:17

---

**Q**

**qualify** 101:8
129:11 136:13
**quantifiable** 58:11
**quantify** 29:4

**quarter** 34:6
**quarterback** 96:2
   126:17 127:14
**quarterbacked**
   96:24,25
**quarterbacking**
   124:25 127:9
**quarterly** 35:3
**question** 12:3,13,14
   17:25 19:23 107:3
   111:7 131:9
   133:11,16 178:16
   180:4,7,18 182:8
   182:14 192:24
   208:9 213:10,12
**questions** 11:20
   82:9 119:22
   181:19 182:2
   210:18 223:18
   227:7
**quickly** 14:22
**quote** 21:13,18
   24:21 25:19 26:12
   27:2 59:16 87:11
   100:17 107:13
   155:13,13 201:5

**R**

**R** 3:1 4:1 8:2 224:1
   226:1,1
**Raffaelli** 106:21,25
   108:7,12 110:25
   129:18 137:13
   148:22
**raise** 39:16
**Ralph** 1:4 8:10
**ran** 31:12 74:21
   89:3 101:5 200:22
   219:9
**Rangel** 102:4
**Ranking** 123:15
**rate** 37:17 99:17
   170:8 219:17
**ratio** 41:25 42:16
**Razook** 6:2
**reach** 83:9 91:12
   91:13 147:18

162:17
**reached** 91:15,19
   91:22 93:9
**reaching** 83:25
**read** 134:6 149:22
   150:11 190:9
   206:11 207:25
   225:2 227:4
**reads** 155:9
**real** 134:2,11
**Real-Time** 2:10,13
**realities** 154:4,6
**realize** 56:3 213:10
**realized** 169:8
**really** 13:20 15:9
   24:10 25:7,11
   26:19 37:10 38:14
   40:13 41:11,24
   42:11 44:6 49:6
   50:12,24 51:17
   52:16 53:21 72:16
   74:10 76:3,5 81:2
   83:15 84:3 86:21
   89:12 116:9,13
   117:2 134:25
   138:2 142:14,17
   144:16 146:12
   149:12 150:9
   154:3 167:6
   178:20 182:9
**realm** 82:17
**REALTORS** 71:17
   71:18,20,20
**reason** 12:7,17 23:2
   40:18 44:2 61:21
   121:2 201:15
   225:4 226:7,9,11
   226:13,15,17,19
   226:21,23
**reasonable** 219:15
**reasonably** 220:2
   221:14
**reasons** 142:18
   201:6
**recall** 10:18 15:2,5
   15:7,11,15,21
   18:4 23:23 36:7

60:18 61:11 62:11
   63:6 64:11 65:16
   66:13 67:25 69:2
   69:7,23 74:17
   75:14,21 76:8
   77:4 78:17,19
   79:16 80:23 81:5
   82:5,21 83:6,20
   85:16,20,21 87:24
   88:20 90:13 91:16
   94:24 95:13 96:6
   96:18,19 97:10,18
   98:9 107:24
   108:13,21 110:15
   111:23 112:15,16
   113:5,18 120:21
   121:17 122:21
   123:17,20,24
   124:3,5 125:5
   148:9 149:24
   150:3,5,25 152:20
   156:13,14 157:3
   167:15 171:16
   172:20 173:17
   175:24 177:14,14
   177:16 180:6,13
   181:7 183:3 189:7
   190:16 195:10
   196:19
**receipt** 225:13
**receive** 15:25
**received** 38:18
   171:6,14,18,21
   208:24 220:2
**RECEIVER** 1:5
**receiving** 15:21
   82:5 121:17
   171:16
**recess** 73:16 211:5
**recipient** 195:11
**recognizing** 39:18
**recollection** 12:2
   17:22 21:5 68:3
   79:22 86:14,17
   97:22 103:7,22
   107:17 115:8
   121:24 157:12

173:25
**recommend** 163:18
**recommendation**
   51:21 103:18
   137:17 144:20
   148:17 152:18
   164:16 166:2
   168:11 214:3
**recommendations**
   96:14,15 148:23
   149:22,24 150:7
   192:10
**recommended**
   163:21
**record** 73:11,14,19
   128:5,8,12 211:2
   211:8 224:12
**recorded** 224:10
**records** 18:14,17
   84:15,19 85:10,13
   114:23 115:4
   173:3
**recovery** 41:10
**reduce** 125:19
**reduced** 42:11
   125:12
**redundant** 87:21
**Reed** 6:3 122:17
   141:5 148:22
   202:12 205:25
   206:4 207:3
**refer** 116:7 129:15
   185:22 217:18
**reference** 196:17
   217:25
**references** 23:20
**referring** 21:15
   181:12
**refers** 122:9
**refined** 52:12
**reflection** 157:4
**reflects** 172:5,8
**reform** 200:8
**refresh** 17:20,20
**regard** 137:9
   143:19
**regarding** 10:23

25:12 49:24 66:21
   75:25 77:14,21
   98:20 99:23
   117:18 122:11
   175:22 177:9
   189:20 194:10
   198:13
**regardless** 134:9
**regards** 141:7
   155:15,16
**region** 142:13,18
   142:24 143:2
   144:18 159:19
   160:2 220:22
**register** 34:3,6,10
   117:25 118:6,12
   118:18
**registered** 2:9,10
   64:7
**registering** 34:21
**registration** 33:24
   34:15 64:11 72:5
   72:7 82:19
**regul** 82:19
**regularly** 88:12
**regulated** 77:20,20
**regulation** 75:12,22
   75:23 77:12,21,25
   82:18,20 83:2,17
   90:18 125:12
**regulations** 99:22
   104:6 129:6 137:2
   139:25
**regulator** 36:20
   38:6,7,15 40:21
   41:16 42:14
**regulators** 31:14
   77:17
**regulatory** 10:22
   29:25 33:16 40:25
   41:16 46:22 47:13
   47:13 63:10 71:25
   75:3 77:14 89:19
   96:21 118:24
   130:15 215:5
**reinforces** 213:19
**relate** 35:23

**related** 83:17 114:4
  117:7 177:2
  187:19 194:9
  197:19 215:6
**relates** 143:14
  172:16 173:9,12
  174:23 177:23
  205:11,15 221:9
  221:11
**relating** 21:16 95:4
**relations** 30:3
  31:12,13,20 33:19
  36:23 61:9 65:7
  116:3 176:7,9,18
  203:5 204:20
  205:16 207:22
  214:22,24,25
  215:5,6 216:8
  218:14,18
**relationship** 23:7
  28:13 30:23 31:13
  37:12 60:6 61:24
  76:7,10 80:3
  88:10 89:10 90:17
  91:7 107:18,22
  124:21 127:2,4,7
  172:14 175:3
  188:24 189:11,16
**relationships** 61:14
  63:25 65:9,25
  67:13 68:21 69:13
  108:2 112:22
  127:12
**relevance** 63:20
  152:24
**relevant** 18:23
  19:10 30:20 32:6
  38:13 111:19
  112:22 143:10,11
**relied** 42:15 55:15
**relief** 29:21
**rely** 86:12
**relying** 112:18
  172:15
**rem** 151:2
**remember** 60:25
  69:19

**rendered** 218:19,19
  219:4 223:2
**renewed** 62:15
**repeal** 57:20
**repeat** 187:7
**repel** 221:4
**replace** 97:15
**reported** 1:24
  169:3 185:8
  203:24
**reporter** 1:24 2:9
  2:10,11,11,12,12
  2:14 8:25 9:16
  17:24 62:25 93:20
  135:16 178:12,21
  187:2,7 192:20
  208:17 210:20,23
  224:22
**represent** 9:4 10:12
  26:7 81:3 206:15
  207:10
**representation**
  34:25 88:14 109:7
  162:15
**representations**
  22:20
**Representatives**
  68:14 101:25
  102:4
**represented** 22:16
  22:22 26:6 112:12
  124:2,19 193:10
  195:16 204:6,11
  204:16 205:21
  207:19 208:5
**representing** 9:9
  78:6 88:24 177:20
  178:2,3,3 193:15
  193:16 207:21
  211:17
**represents** 71:20
**Republican** 68:14
**Republicans** 89:6
  89:10,15,21
**reputation** 61:13
  93:24 178:9
  179:21 180:12

183:20,22 184:5
  192:16 210:6
**reputation's** 194:7
**reputational**
  183:12 191:20
  195:2
**request** 5:16 16:14
  17:17 18:10,24
  21:13,13,19 23:12
  24:18 85:10 181:7
**requested** 85:9,11
**requests** 15:22 16:2
**require** 49:18
  135:13 136:14
**required** 166:11
**requirement** 99:25
  100:2,9 101:16
  117:5 133:19
  134:16,23 135:25
  144:8,12,23
  145:19 147:10
  160:14 162:18,24
  166:23 168:7,13
  221:5,6
**requirements**
  33:24 35:11 41:12
  64:12 117:3 168:2
**research** 49:18,20
  51:4 81:18 147:15
  147:18,21,25
  148:13 149:13
**Reserve** 77:16
**resi** 135:8
**reside** 131:6 135:9
  145:22
**resided** 131:10,15
**residence** 99:25
  168:16,18,23,24
**residency** 100:9
  116:14 117:3
  132:4,21 133:18
  134:16 135:7,11
  135:12,13,18,24
  144:8,12,23
  145:15,19 147:9
  160:14 162:18,24
  164:7 166:23

167:25 168:7,13
  169:4 221:5
**resident** 101:9
  129:9
**resolved** 11:9
**resort** 143:20
  153:15
**resources** 52:15
**respect** 22:8 45:25
  85:9 90:15 108:22
  109:8 116:4
  126:17 159:3,5
  181:25 213:12
**respectable** 87:6
**respectfully** 76:17
**respective** 2:17
**respond** 84:2
  186:25 187:10,12
  188:5,18 190:21
  190:23 193:9
  206:20 207:3
  209:12
**responded** 208:25
**responding** 177:9
  186:3
**responds** 196:24
**response** 17:12
  21:19 23:12,20
  24:18 86:9 110:13
  115:25 176:11
  192:3,4 194:3
  205:24
**responses** 5:15,20
  16:13 17:16 20:3
  109:18
**responsibilities**
  190:8
**responsibility**
  104:24
**responsive** 18:10
  19:20 21:20
**rest** 144:21 145:8
  147:3
**result** 38:8,9,21
  151:18 156:9
  169:8
**results** 192:11

**retain** 64:16 66:3
  68:19 75:2 79:10
  79:21 86:24 90:4
  126:16,23 128:2
  148:15
**retained** 47:20
  61:22 62:5 63:23
  65:3,16,18,19
  67:25 73:23 79:17
  80:6 81:15 82:8
  83:19 86:2 91:2
  94:9,13,14 98:22
  98:25 99:3,11
  101:14,17 103:8
  127:14,16 128:16
  148:16,25 171:24
  176:21 191:18
  216:20
**retainer** 22:17 44:8
  44:11 46:3,8 47:4
  62:9 67:7 68:7,8
  68:15 79:25 80:11
  80:19 87:22 94:17
  113:2,11 216:14
  216:18,24,24
  219:4
**retainers** 69:2
**retains** 148:19,21
**retention** 65:11,12
  190:4
**return** 169:14
  225:11
**returned** 200:13
  201:6
**revenue** 129:19
**revenues** 39:16
  144:3
**review** 14:16 17:2
  49:16 55:16 110:4
  149:18 155:12
  156:21 190:10
**reviewed** 112:20
  122:7
**reviewing** 18:4
**reviews** 17:3 23:16
  110:5 120:12
  154:24 190:11

199:11
**rewrite** 55:24
**Richard** 32:23
**Rick** 4:23 8:22
**ridiculous** 196:10
**riding** 106:7
**right** 39:24 40:4
48:19 54:22 55:25
62:22 65:14 74:14
82:11,12,13 84:10
86:4 101:13 119:3
119:5 127:20
129:24 148:5,8
171:15 172:19
181:22 198:22,24
201:20 215:3,11
215:22 216:13
217:10 220:12,15
220:20 221:23
222:3 223:9
**risk** 42:4 46:21,21
**risk-based** 41:3
42:10,15,17
**risks** 41:5 42:7
**RMR** 1:24 224:20
**Robert** 1:19 2:5 5:3
5:14,19 8:1,9 9:1
9:19 10:1 11:1
12:1 13:1 14:1
15:1 16:1,13 17:1
17:16 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1

68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
109:18 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
128:4,11 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1

205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1,20 226:2
**role** 72:3 74:20
75:19 97:23 102:6
102:23 108:3,3,4
125:18 158:22,24
163:10,20 182:12
197:16 205:4
**roles** 192:6,6
**room** 209:23
**routinely** 215:16
**RPR** 1:24 224:20
**RSA** 1:24 224:21
**rule** 136:15,17
144:21,24 145:4,7
146:2 147:2,6
160:22 169:22
**rules** 136:13 137:11
144:9,15 147:12
160:16 161:21
162:19,21,25
163:4 164:3 170:5
**rumored** 194:2
**rumors** 195:6
**run** 28:17 35:21
**running** 65:6 70:18
107:24
**runs** 35:18 84:25

_____

**S**

**S** 1:4 3:1 4:1 8:2,10
**sad** 191:5
**salaries** 196:12
**sale** 44:19
**Sanborn** 4:23 8:22
**sat** 102:12 190:19
**saved** 167:3
**saw** 82:15 83:4
221:24
**saying** 26:8,11
83:23 88:2 102:11
126:3 139:6

181:15 196:25
207:4 209:6
**says** 111:18 122:16
147:14 203:24
**scheme** 24:25 25:9
28:8 164:8 189:25
191:11 194:23
197:8,13 206:24
**school** 57:23
**scope** 176:23
181:19
**Scott** 122:17 141:5
148:22 202:12
205:25 206:4,25
207:3 208:22
**se** 36:5 59:16 74:11
130:13 183:20
**search** 18:9 19:19
**Seasons** 77:7
**Sebo** 1:24 2:9 8:25
224:3,20
**SEC** 32:22 75:24
**second** 73:12
113:13 114:2
129:14 133:24
143:19
**secondly** 42:5
131:7 138:10
222:4
**sector** 37:25
**securities** 25:10
39:17,18,23
218:11
**security** 142:19
**see** 11:17 21:12
30:22 47:2 88:13
117:4 123:5,12
142:10 143:8
152:22 154:14
173:3,21,23 192:7
193:19 201:14
217:14,23 218:4
**seeing** 70:21
**seek** 86:5 115:17
136:16
**seeking** 51:25
**seeks** 21:13

**seen** 13:20,22 15:18
42:17 155:19
159:2 171:11
173:2 196:6
**segregate** 113:17
**seldom** 210:4
**self-employed**
30:15 31:4
**Senate** 27:7 32:16
34:4,13 61:18,19
64:3,25 89:7
107:25 123:16
**Senator** 68:7
108:20 123:13,14
201:3
**send** 121:15,19
122:3
**sending** 121:8,12
212:25
**senior** 31:19 61:8
69:25
**sense** 43:4 46:24
136:6 142:22
146:16
**sensitive** 43:3,4
**sent** 14:19 15:3
17:13 57:22
172:12 200:11,23
221:12
**separate** 112:25
**separately** 113:17
**September** 1:20 2:2
6:8,20 8:5,19
140:24 171:3
172:11 226:3
**series** 11:19 202:6
**service** 67:11
**services** 8:23 28:13
32:19 33:2,13
35:15 36:2,6 37:5
37:16,25 41:21
43:22 50:10 58:21
59:2,4,6,7,15
64:17,19 66:14
71:14 76:14 80:24
81:7 84:5 86:13
87:11 88:9 89:11

89:18 90:3 91:24
92:2,3,9,18 93:25
99:16 107:20
112:21 114:6
115:11 116:4
117:9,10 118:4
119:2,4 128:22
130:2,6 131:19
177:3 209:10
214:18,19 215:8
218:19 223:8
**sessions** 56:18
**Set** 5:21 109:19
110:13
**setting** 10:22 168:5
**seven-day-a-week**
70:19
**share** 141:6 157:7
**shareholder** 140:4
**shareholders** 38:23
**sheer** 39:18
**sheet** 225:5,7,9,12
227:9
**shocked** 191:4
**shooting** 83:15
**shorthand** 2:11
224:10
**shots** 45:10
**show** 14:23 41:11
144:17 173:18
210:12
**showed** 158:8
**shown** 15:19
209:17
**shows** 53:12 198:18
**sic** 95:14 113:10
115:2 118:16
200:11
**sign** 225:6
**SIGNATURE**
227:13
**signed** 43:7 56:13
121:7
**significant** 45:15
**signing** 225:8
**similar** 26:25
**similarly** 24:25

**simply** 71:7 163:10
213:19
**sincerely** 165:19
**single** 45:6
**singled** 18:12
**SIPC** 25:10,15,16
25:25 26:10,14,24
27:4,19,19,22
28:2
**sir** 211:20 212:14
217:13 219:23
223:14
**sit** 48:23 198:15
**situated** 24:25
**situation** 27:4 45:5
63:21 138:21
210:4
**situs** 101:2
**six** 10:17 13:19
32:15 38:13,19
48:11
**skipping** 100:6
**slate** 70:5
**Slide** 52:22
**small-dollar** 50:2
50:20 112:12
**smaller** 42:16
**smart** 92:4
**smartin** 121:6,13
**smartin@benbar...**
120:17
**Smith** 26:24 28:16
**Smith-Free** 28:18
**so-called** 107:12
126:16
**soc** 13:22
**social** 13:23 60:16
**socially** 88:13
**sole** 71:4,7
**somebody** 28:4
30:25 37:5,11,11
48:6 50:8,19 55:8
55:19,20 66:6
72:10 93:8 94:3
146:13 176:3,18
177:25 182:15,25
188:17 204:23

207:10 209:22
217:25 221:2
**somebody's** 197:8
204:15
**somewhat** 43:2
147:4
**soon** 94:9
**sorry** 18:2 35:12
64:5 93:21 134:13
142:8 212:14
**sort** 56:24 116:20
124:25 129:14
213:11
**Sotto** 16:20
**sound** 208:7
**source** 100:3,25
129:10,15 169:18
**sourced** 134:6,10
**sourcing** 100:2,11
100:15,17,24
116:14 117:5
133:24 134:4,20
134:23 135:7
136:4,13 137:11
144:9,15,20,24
145:4,7,24 146:2
147:2,5,12 160:15
161:21 162:19,21
162:25 163:4,19
164:3 166:24
169:21 170:5
221:6
**space** 20:20 90:20
225:4
**spanned** 95:16
**spawned** 129:7
**speak** 13:8 88:11
165:20
**speaking** 195:15
**speci** 128:14
**specialist** 8:24
**specific** 47:18
58:19 59:10,11
62:4 77:19 81:4
83:6 90:3 93:8,12
104:17 114:21
127:17 147:6

174:19 182:2
204:23
**specifically** 12:14
29:22 49:13 66:13
90:13 93:11 99:8
99:11 106:11
113:20 117:3
118:18 126:24
128:17 130:20
143:13 156:24
160:9 162:2 177:4
191:24
**specificity** 41:18
**specifics** 116:13
**speculation** 90:10
133:7
**spend** 153:16,20,22
**spending** 58:17
**spent** 221:3
**spirit** 133:2
**spoke** 13:17 128:14
128:14
**spoken** 13:6,14
**spurred** 172:13
173:6
**spurring** 173:19
**stable** 159:21
**staff** 33:12 55:7
60:3 66:16
**staffed** 116:10
**staffers** 151:24
**staffing** 102:10
118:9 191:23
**stage** 50:17 51:23
**stages** 159:10
**Stan** 189:11 207:17
**standard** 41:3
42:11 181:3
200:10
**standards** 42:12
**standing** 89:13
**Stanford** 1:5 6:2,7
6:13 9:6,8 10:4,12
21:16 24:24 26:6
26:11 73:6 74:5,7
74:15 76:3 80:24
81:9,10,16 82:7

83:20 88:10,15
90:14 91:3,5 92:6
94:11,22 95:4,5,6
95:9,11,14,22
96:3 97:10 98:22
99:2,8 100:7
101:6 102:16
103:15 104:3
108:23,23 109:6
109:10 111:21
113:22 114:5,13
117:7 118:2 119:8
122:12 123:9
126:11 127:15,24
130:21,24 131:6
131:10,25 132:3
133:23,23 134:12
134:14 135:8
137:22 138:10,22
139:2,4,7,7,14
140:20 143:17
147:15,17,20
148:2,19 152:6,9
155:5,7,12 156:24
161:16 163:24
164:7,12,17,18
165:11,15,25
167:19 168:17
169:7,7,22 170:12
171:4,8,14,17,23
172:4,22 175:5,6
177:3,16,20,24
181:3 182:15,23
183:4,7,13,18
185:8,9 187:6,13
187:23 188:12,19
188:24 189:11
190:17 193:2,14
193:16,17,25
195:2,5,12,16
196:14 200:11,18
200:21 202:23
203:19,23 204:3,7
204:21 205:4,14
207:18,20 208:16
209:14 210:11,12
213:6,16 218:20

220:2,8,10 221:3
221:9,13,19
222:13,22 223:3
**Stanford's** 152:15
153:11 166:9
167:16 189:14
208:3 209:15
**start** 34:21 70:4
73:4 196:25
**started** 52:13 85:5
99:7 104:22
143:15
**starting** 71:11
197:14
**state** 9:4 24:19,20
35:20 40:24 77:16
78:12 173:17
174:19 222:5
225:4
**stated** 143:17
160:13 171:19,20
**statement** 68:24
174:7,7,21 181:11
**states** 1:1 8:13
99:14 117:19
124:2 128:20
129:3 141:2,19
142:19 146:12
151:16
**statute** 26:10,12
27:3 41:14,19
104:3
**statutes** 166:10
**stay** 168:20
**stealing** 179:13
**stemming** 183:12
**step** 48:17 149:9
159:12 220:18
**steps** 18:8 24:5
57:15 115:17
**stipulated** 44:24
**stock** 38:8,22
**stole** 177:15
**stop** 57:15 132:16
**stopping** 55:4
**stored** 19:4 23:23
**story** 61:25 63:15

63:18 66:10,20,22
**strategic** 27:10
30:5 43:13 118:10
118:10,23 142:25
146:10
**strategically**
141:18 142:17
163:19,21
**strategies** 33:15
72:18 197:21
**strategy** 32:7 36:19
57:7,9 98:19
101:20 102:25
103:13 123:11
125:22,24 163:13
163:16 179:23
187:17 194:18
198:5 220:14
**Strawn** 162:14
**Street** 4:7,15 20:9
**strictly** 119:2
**strike** 70:15 71:7
**string** 6:10,23 7:5,7
7:9 195:19 196:2
201:23 212:2
217:14
**struck** 70:12 71:11
**structure** 40:25
45:2 65:22 81:11
81:13 139:19
148:19 170:15
**structured** 62:11
102:15
**stuff** 121:15 173:2
**Suarez** 6:2,20
74:19 77:5,25
78:12 79:17 82:5
86:15 87:10 88:16
95:18 96:8 155:5
156:25 171:2
175:17
**subcategory**
214:24
**subcommittee**
48:15
**subject** 122:8
140:20 151:23

155:6 171:3
199:20 208:10
225:8
**subject-matter**
30:24 65:8 67:14
68:18
**submitted** 20:2
**Subscribed** 227:18
**subsequent** 26:22
72:22 173:11
177:8
**subsequently** 68:10
**substance** 48:7
87:25 227:8
**substantial** 24:21
**substantive** 43:18
51:22 68:22 89:17
93:2 107:21
125:25
**substantively** 51:12
51:19 75:9 149:7
149:16
**success** 37:17,21
44:15,17,20 45:3
45:22 56:5 58:2
106:8 165:8
**successes** 37:23
39:3
**successful** 40:2,7
43:20 44:16 56:4
58:6 106:8 167:11
**successfully** 48:14
**successor** 147:23
**sue** 86:24,25
**sufficient** 38:6
107:14 135:14,20
**sufficiently** 134:24
**suggest** 51:10
**suggestion** 98:6
**suing** 87:7
**suit** 11:11
**Suite** 3:6,14
**sum** 87:25
**summarized** 104:7
**summary** 152:22
**superficial** 66:22
**supervised** 141:4

148:4,9
**supervision** 224:11
**supplement** 97:17
97:23
**support** 22:15
48:12,12,13
**supported** 189:21
**supporting** 20:16
**supposed** 25:15
**sure** 10:9 13:20
26:16 27:24 32:5
51:10 74:2 80:16
90:25 99:19 124:4
134:22 140:3
150:13 157:14
162:9 185:7
186:17 187:16
**surprise** 88:18
**surprised** 88:20
91:19 150:23
**surrounding** 52:9
**Susan** 68:13 121:19
121:22 184:20
**swear** 9:16
**switch** 193:20
**sworn** 9:20 224:7
227:18
**sympathetic** 55:8
**Systems** 2:13

**T**

**T** 224:1,1 226:1
**table** 52:23
**take** 12:6 16:25
24:5 46:6 55:22
57:16,16 58:5
72:11 99:23
103:19 110:3
125:8 126:21
130:13 132:3
138:24 144:2,4
190:10 210:24
212:22 215:10
216:13 219:12
**taken** 2:6 25:12,21
73:16 112:6
115:17 125:12

211:5 224:5
**takes** 42:23
**talk** 39:5 41:8
48:23,24 50:23
51:18 52:20 59:18
75:24 76:15 88:14
94:9 123:11
143:11 152:17
157:5 161:11
164:2 181:17
**talked** 51:7 123:12
150:12 156:16
162:8 198:6 205:9
219:25
**talking** 52:19 61:4
64:20 83:23
102:14 117:16
158:3 184:25
185:12,14,17
186:19,22 187:9
195:12 204:20
**talks** 142:11 152:22
152:23,25,25
**tangent** 24:20
**Tape** 8:8
**target** 126:25
**tarmac** 168:20
**task** 57:3
**tasking** 122:25
**tax** 36:11 39:20
40:3,8 42:22
44:14 49:5 53:9
53:21 59:13,16
73:7,24 74:5 91:3
91:4,23,25 92:3
94:8 95:9,15,20
96:23 98:7,20
99:4,8,11,13,15
99:17,24 101:9,24
102:14,15 103:8
104:21 106:18
107:13,19 108:8
109:9 111:2,9
116:10,13 117:22
122:11,14 123:8
123:21 124:7,18
125:6 127:17

APP000617

128:15,20,25
129:17 130:13
131:12,13 132:4
136:21,24 137:6,9
137:14,18,20
138:13,14,16,17
138:19 139:24
142:6,11 143:13
144:5 145:21
151:5 152:18,18
154:7 159:4,6,23
160:4 161:17,23
162:11 163:15
164:4 165:13
168:9,15 169:8,14
169:17 170:8
173:14,19 176:21
177:6 192:12
194:11 197:14,19
197:21 200:18
205:11,15,22
**taxation** 59:8,11
116:5,6,12,25
**taxes** 170:13
**taxpayers** 63:16
**team** 64:4 70:2 89:4
104:12 127:11
137:16,16 155:25
156:10,12 158:21
167:7,24 189:21
190:20 194:4
195:15 206:18
209:8
**tech** 132:22
**technical** 106:18
**technically** 132:13
132:24
**tee** 30:3
**tell** 12:24 18:8
29:10 46:2 54:25
61:25 63:17 65:6
66:10,22 82:16,25
163:9 190:13
207:2 224:7
**telling** 180:20
186:9 200:21
**Tello** 6:14

**term** 37:7
**terms** 43:12 159:13
**test** 42:15,17 100:4
102:21,22 129:12
129:14,15 132:8
132:25 133:2,24
135:21 169:10
220:25
**testified** 9:21 21:25
30:11 35:14 53:2
54:23 64:14 67:15
73:22 78:21 80:25
87:9 88:25 89:17
90:25 110:25
139:12 166:13
172:20 176:20
216:6 219:8,20
**testify** 12:18 161:7
**testifying** 10:8
74:14 133:13
**testimony** 12:23
14:17 77:23
118:25 217:8
224:9,13
**Texas** 1:2 4:8 8:14
13:23
**text** 155:9
**thank** 9:15 10:7
12:10 16:21 87:23
140:14 210:4,17
223:14,16
**theory** 196:11
**thereof** 224:15
**they'd** 26:8
**thing** 65:10 72:7
87:3 119:20 128:2
173:6 181:14,18
186:10,13 189:18
192:2,8 196:23
200:9 207:16
**things** 45:9 52:10
62:20 63:7 75:25
93:4 96:10,11
99:21 143:16
158:16 167:12,13
194:13
**think** 12:21 17:9,12

21:4 22:18 23:4
24:13 28:21 33:9
34:20 37:16 39:21
44:2 45:19 46:24
53:9 57:5,8 58:7
62:13 64:12 67:5
67:17 69:17 70:11
78:5 83:22 84:16
85:18,19 91:9
92:3 93:19 94:2
96:7 97:12,17
100:14 103:2,24
112:18 113:9,12
113:24 115:16
121:21,23,25
122:2,5 123:8
125:7,11,13,16
126:3 133:17
140:6 146:9 147:8
147:22 149:4
151:10,19 152:8
152:11,20 153:18
153:24 155:14
157:3 158:24
161:7 164:21
165:7,7,17,21
166:13,17 167:2,9
168:10 178:11,11
178:20 179:4,7,20
180:14 183:5,8
184:4,6 188:13,16
190:2 191:3,22
192:4,5 193:22
195:14 196:25
197:9 198:2
201:11 205:8,20
205:25 209:4,24
210:14 215:12
216:11 221:8
222:10 223:10
**thinking** 64:25
93:9,19 180:22,22
180:23
**thinks** 94:2
**third** 48:3 140:21
141:9 143:3
**Third-Party** 1:13

1:16 4:12 5:14,19
9:13 16:12 17:15
20:23 21:20 24:12
109:17 110:12
**thirty** 225:13
**Thomasson** 105:16
**thorough** 52:14
**thought** 26:2 40:10
42:3,5,7 69:11
81:9 82:15 87:7
90:22 108:9,9
150:24 169:17
176:18 206:11
219:11
**thousand-page**
125:12
**thousands** 104:6
125:19 138:8
**three** 26:20 32:15
57:15 98:8 112:14
115:5 193:25
**threw** 80:13
**tickler** 134:2
**ticks** 102:15
**tie** 153:11 159:15
**tier** 149:2
**tiers** 149:4
**till** 132:9
**time** 8:20 11:16
13:17 15:19 20:22
22:14 37:15 41:19
42:13,23 45:11
46:14 59:22 60:20
61:7 62:12,23
63:5 64:8,12
65:20 66:3,14
67:18,20,24 68:2
68:8 69:8 70:21
71:5 74:13 76:21
80:4 81:16 83:20
84:25 85:8 86:3
87:6 88:4,8,12,25
90:4,15 91:14
92:7 102:2 103:2
103:7,23 104:18
104:22 107:15,23
111:19 121:22

130:23 135:17
144:2 146:6
147:20 163:14,17
164:10 166:22
171:12 175:22
185:7 187:22
191:17 193:13
197:4 201:11
204:14 206:9
209:17 212:23
215:15,24 218:8
224:6
**times** 39:14 84:24
85:25 98:8 124:23
132:15 150:12,12
**title** 31:18 74:21
141:8
**titled** 17:15
**today** 10:10 12:18
14:17 52:16
151:22 152:3
**told** 76:5,13 133:3
176:16 200:21
214:13
**tomorrow** 208:23
**top** 114:2 115:24
158:9 217:15
**totaled** 113:9
**totally** 41:17
108:15
**tournament** 194:19
**town** 4:16 14:20
57:18 108:8
**track** 13:20
**trade** 71:21 112:11
142:20
**training** 32:13
**transcribed** 224:11
**transcript** 5:10
225:14,15
**transcription**
224:12 227:6
**translated** 153:25
**transmittal** 212:24
213:14
**transparency** 38:6
**TransPerfect** 8:23

9:2
**Treasury** 36:14,20
68:9
**Treasury's** 36:16
**tremendous** 65:9
203:5 221:10
**tremendously**
144:9 165:14,16
222:6
**trial** 45:11,13
**tricky** 136:4,6
**tried** 32:8 36:15
57:20 90:20
163:25
**trouble** 208:4
**true** 224:12
**trustee** 28:6
**truth** 224:8,8,8
**truthfully** 11:22
**try** 27:9 29:21
32:17 33:15 36:18
37:9 39:12 48:6
48:25 51:14 53:10
54:16,21 56:23
61:22 63:9 84:25
119:17 153:8
**trying** 29:13,15,18
36:10 37:9 40:8
47:19 48:8 49:4
49:19 50:4 53:24
54:18 55:11 56:15
58:15 63:5 66:8
84:15,18 85:12
90:17 92:10 97:4
97:5,5 100:10
103:25 112:7
126:4 134:22
146:19 153:2,3,4
157:16 158:7
163:13,16 166:22
166:23 173:18
179:8,16,17,21
183:6 184:6
185:23 188:2
189:22 191:2
193:18
**turn** 21:8 23:10

110:18 115:21
**turned** 39:20 96:12
100:5 103:3
**Turning** 111:16
**turns** 103:16
**Twelve** 132:11
**two** 19:2 26:20,22
29:10,11 32:22
39:19 40:15,20
45:4 47:7,9 56:18
56:18 85:11,18
86:16 87:22 98:8
98:11,13 104:7
111:9 113:9,12
115:5 123:14
124:6 125:14
132:7,14,21
140:22 143:16
149:17 164:6
171:18,21 172:9
173:15 213:20
221:18
**two-page** 125:20
**two-part** 100:4
129:12
**two-year** 62:14
**type** 52:5 58:20,23
63:4 71:10 82:4
128:2 152:3
**types** 22:20 45:21
**typical** 53:3 56:3
**typically** 49:16
52:3 55:18 57:4
216:2

_____

          **U**
**U.S** 101:8,10,11
124:16 136:22
**Uh-huh** 98:17
**ulti** 132:2
**ultimate** 151:12
152:5,12 165:8
166:14 195:11
220:25
**ultimately** 56:5
131:24 132:2
135:3 150:16

159:6 161:15
162:20,23 164:11
165:17 167:3
216:22 220:23
**Um-hum** 35:16
**un** 116:17
**unarm** 117:14
**unassailable** 43:19
**unassailably** 149:7
**unbeknownst**
187:22
**unclear** 136:10
**undermined**
183:23
**understand** 12:3
30:4 37:17 45:24
47:24,25 48:25
50:7,24,24 51:2
73:9 81:21 90:18
92:5 97:4 101:18
102:9 103:9,12
117:21 125:9,23
126:4,5 137:7
144:19 148:18
171:21 181:23,24
182:14 206:8
214:6,12 223:13
**understandable**
20:24,25
**understanding**
17:10 32:5 48:17
51:20 52:8,14,18
76:4 81:6 90:2
92:17 98:21,24
102:24 103:6,10
103:11 111:8
121:10 125:25
127:13 129:19
135:6 136:14
139:13,13 164:12
169:6 176:9
216:23
**understands** 55:9
**understood** 40:11
66:20 67:21
103:23,24 125:14
125:16 137:13

143:18
**undertake** 19:19
50:17 57:4 81:12
163:3
**undertook** 41:5
**unequivocally**
222:4
**unfairly** 53:19
**unfolding** 160:19
**unfortunate** 70:8
**Unfortunately**
42:13
**unfriendly** 153:2
**unique** 125:7 210:3
**uniquely** 167:7,8
**United** 1:1 8:13
99:14 117:19
124:2 128:20
129:3 141:19
142:19 146:12
151:16
**unprecedented**
41:14
**unreasonable**
221:6
**unretained** 217:9
**unsuccessful** 56:19
**unusual** 45:5
127:21,25
**unwound** 116:17
**up-front** 113:8
**update** 98:7
**upstate** 26:23
**use** 63:9 64:17,19
64:19 157:8 188:6
203:19
**user** 39:12,15,21
40:11 63:7 122:6
**USVI** 99:14,24
100:4,8,12,18
102:17 124:7,8,18
124:19 128:22,23
129:5,9,21,23
130:7,17 131:6,8
131:20 132:6,19
133:20 134:7,8,10
134:19 135:3,10

136:3,10,13 137:3
137:24 138:2,6,21
139:19 141:17
142:15 143:6,8,14
144:4,16,21 145:3
145:6,10,14,23
146:2 147:2,7,12
153:24,25 160:4
160:10 161:18
162:15 164:13
165:16 166:2
167:4,17 168:6,15
168:18,24 169:13
170:8 192:12
205:12

_____

          **V**
**v** 1:8,14 226:4,5
**vacation** 142:16
**validate** 194:17
**valuable** 41:22 64:4
65:10 66:6 86:12
**value** 89:9 92:13
93:9 108:10
150:13 165:6,9
166:14 198:13
220:3 221:2,8,15
221:20,21 222:5,6
223:10
**Vanderwarker**
148:12
**various** 75:25 78:2
127:16 148:4
**Venezuela** 175:23
176:4 177:10
180:5 182:16
**verbatim** 18:12
141:4 191:11
194:14 202:14
222:6
**versus** 8:10,11
99:18
**viable** 146:3 159:21
**Vice** 31:19 61:8
**victim** 28:5 70:9
**victims** 24:24 25:8
25:13 26:6,11

29:21 42:24
**video** 8:20,24
**Videographer** 4:23
    8:7 9:15 52:22
    73:13,19 128:3,10
    211:2,8 223:19
**videotaped** 1:19
    2:5 8:8
**view** 119:19 141:7
    142:20 181:4
    221:14 222:25
**viewed** 150:7
**Virgin** 99:15,16
    101:9,10,10,12
    124:2,16 128:20
**Virginia** 4:17
**virtue** 138:19
    161:15
**vis-a-vis** 49:19
**voce** 16:20
**void** 30:23
**volume** 39:18
**voucher** 172:10

**W**

**wait** 93:20,20
    135:16,16,17
    178:12,12,13,13
    178:13,21,21,22
    187:2,2,3 192:20
    192:20,21,21
    208:17,17
**walked** 13:4 85:22
**want** 39:5 46:16
    56:21 70:22 71:3
    75:6 79:18,21
    87:4 119:16 153:5
    178:4 179:14,15
    186:8 189:4
    196:14 208:2
    217:5
**wanted** 39:16 70:4
    71:3,23 75:2 76:4
    78:13 79:6 90:4
    96:9 103:19
    138:23 156:18
    168:14 176:5,16

177:18
**wanting** 75:19
**wants** 52:20 53:9
    54:11 209:21
    213:16
**war** 209:23
**Washington** 1:20
    2:8 8:4,18 20:9
    22:19 32:13 61:10
    63:22 66:7 71:22
    75:4,20 76:16
    79:10,24 82:3
    84:7 85:6 87:15
    89:3 95:19 96:4,9
    96:13,20 97:11,15
    97:25 98:4,6,10
    147:15,17,22,25
    167:11 216:8
    218:2,13
**wasn't** 62:4 107:14
    174:13 201:15
    204:19 221:24
**wasted** 166:21
**way** 11:18 31:2
    32:7 33:19 41:9
    42:4 47:15 52:18
    54:2,17 58:4 60:6
    63:22 67:3,4 78:5
    100:11,16 102:11
    102:15,16 108:11
    135:25 152:2
    158:8 164:18
    167:25 169:22
    173:19 180:9,24
    182:9,19 189:23
    191:4 221:6
**ways** 102:5 104:2
    132:7
**we'll** 94:9 99:19
    124:4
**we're** 51:11 61:4
    86:12 140:6
    181:15 189:22
    208:9 209:11
    222:2
**we've** 16:6,7 36:15
    155:3 159:2

163:14 190:23,24
    205:9 219:25
**week** 29:9,11 58:3
    64:23 122:19
**weekend** 14:20
**weekly** 79:8
**well-known** 111:2
**Wells** 85:4
**went** 18:11 19:8,9
    32:19,24 36:13
    40:19 117:20
    161:23 217:2
**weren't** 90:25
**West** 3:15
**whatsoever** 188:16
**white** 53:11 54:3,8
    54:20,21 57:2
    141:25 142:3
    148:6 149:15
    150:16 159:3,11
    197:15 198:4
    219:25
**widget** 130:3
**widgets** 53:8,9,12
    53:15
**Wiedeman** 105:9
    105:13
**wife** 60:8
**willing** 79:25 80:18
**win** 45:12,12,14,16
    45:17 138:21,21
    138:22
**win-win** 138:21
**winners** 25:20
    27:14,17,23 28:3
**Winstead** 4:4,6
**Winston** 162:14
**wire** 85:17,19,20
    94:25 171:14
**wired** 171:7
**wires** 171:17,22
**witness** 9:17 11:5
    17:3,5 18:2 23:16
    23:18 64:5 78:17
    79:21 87:17 90:8
    90:11 92:12 93:15
    93:18,23 106:2

107:4,7 110:5
    114:17 120:12
    133:9,12,17
    140:14 154:24
    178:19 179:4
    183:15 190:11,13
    193:8 199:11
    205:8 208:18
    210:8,19 213:25
    217:8 218:23
    220:5,7 221:17
    223:16,17,23
    224:13 225:1
    226:2
**woman** 74:18
**Word** 24:4 140:23
    141:15 155:8
**words** 87:25 97:3
    116:24 129:22
    135:11 222:21
**work** 22:8 24:21
    28:10,20 29:18,22
    30:8,12,22 31:7
    32:11 33:14 36:2
    37:10,10 41:17
    42:24 44:10 49:25
    51:25 52:2,5
    59:19 60:24 69:14
    69:15 70:6 71:10
    71:17 72:20 73:24
    74:12,15 84:7
    87:12 88:17 91:3
    95:3,6 96:15 97:7
    97:15,18 98:3
    99:3 103:17 104:2
    104:13,24 106:6
    109:2,9 112:24
    113:2,21 114:4
    117:23,24 123:9
    124:20 141:3
    149:2 172:8,15,16
    173:8,18,22
    174:23 175:5,5
    176:21 177:8
    181:4 182:11
    183:13 188:9,20
    188:22 190:3,5

196:16 197:11,14
    198:7,18,21 204:3
    204:8,24 210:3
    214:10 221:13,19
    222:2
**worked** 10:20
    20:15 21:25 26:19
    27:9 28:25 30:10
    32:14 48:24 57:19
    57:21 59:13 60:21
    65:21 67:4,4
    74:18,24 77:2
    84:11 98:12
    103:14 105:5,9,17
    106:14,24 108:19
    117:7 123:18,25
    124:7,19 140:5
    149:5 151:8 154:8
    165:3,4 176:3
    182:15 183:2
    193:24 200:20
    207:20 209:8
**working** 18:13,19
    36:9 42:20 57:8
    72:23 73:4 95:8
    104:11,20 108:14
    108:22 109:2,3
    110:15 118:13
    123:20 124:10,11
    124:13,20 150:18
    164:20 185:24,25
    186:10 189:19
    191:8,23 192:6
    193:17 206:18
    214:3
**works** 11:18 63:22
    105:12,14 200:10
    213:22
**world** 38:20 61:10
    74:22 100:10,15
    101:7 143:22
    146:15 153:6
**worth** 58:13 65:3
    223:4
**wouldn't** 58:17
    132:25 167:14
    188:14

**write** 114:2 115:10
  116:2 151:22
  171:5 175:21
  196:10 201:5
  202:12
**writers** 141:3 148:4
  148:24 163:15
**writes** 205:25
**writing** 107:19
  162:11
**written** 21:14,21
  22:4,10 41:13
  54:16,17 62:16
  80:7,8,21 86:10
  86:19 94:15
  111:14 150:13
  151:10 152:10
  201:13
**wrong** 165:21
  183:7 192:14
**wrote** 194:13
**Wyeth** 105:7,9,13

―――――――――
**X**
―――――――――
**X** 1:4,11,17

―――――――――
**Y**
―――――――――
**yeah** 14:4 30:9
  31:19 33:5 39:4
  52:4 55:25 59:9
  67:10 77:6 78:3
  79:5 89:16 107:11
  110:23 111:6
  119:9 128:19
  129:16 132:18
  137:23 146:5,7
  156:11 174:10
  176:2 177:23
  184:23 185:13
  190:7 196:6
  199:19 202:10
  209:3 213:18
**year** 13:20,23 58:3
  58:18 76:23 77:3
  88:7 155:25 156:3
  156:22 158:2
  164:6

**year-round** 153:21
**years** 10:17 18:17
  20:15 22:2 23:8
  26:20 31:5,10
  32:15,15,20,22,24
  52:13 56:15,18
  57:16,22 58:13
  59:25 60:8 61:5
  69:6,18,20,20
  74:3 78:18,19
  79:23 84:23 91:10
  95:17,23 100:20
  108:20 152:21
  154:8 155:20
  164:6 165:3,5,7
  177:18 193:25
  196:7 204:9,25
  215:14 219:8
**Yep** 140:18 212:21
  217:24 218:5
**Yolanda** 74:19 77:5
  77:25 82:5 86:15
  87:9,10 88:16
  90:17 95:18 96:8
  96:17 97:20 155:5
  156:25 171:2,6
  175:17,21
**York** 3:8,8 26:23
**young** 70:20

―――――――――
**Z**
―――――――――
**Z** 197:21

―――――――――
**0**
―――――――――

―――――――――
**1**
―――――――――
**1** 5:14 8:8 16:10,18
  16:24,24 23:12
  128:4 227:5
**1:24** 128:5
**1:27** 128:12
**10** 5:5 7:7 15:8
  18:17 29:9 31:5
  52:13 69:20 74:3
  78:18 83:24 84:17
  84:17,17,23 99:17
  132:17 138:14,18

149:19 150:14
  152:21 155:20
  199:5,9,15 210:25
**10,000** 113:13,13
**10:46** 196:10
**100** 3:14 31:16
  135:9
**100,000** 46:7
**10169** 3:8
**109** 5:22
**10th** 196:9
**11** 7:9 201:21 202:2
  202:6 217:15
**11:16** 2:3,16 8:5,21
**11:55** 132:12
**119** 4:15
**12** 6:21 46:4 78:18
  83:24 84:17
**12:00** 132:9,10
  168:21,21
**12:05** 132:13
**12:16** 73:14,17
**12:30** 73:17,20
**120** 6:4
**12469** 1:25
**125** 114:5,20
**12th** 171:3 172:11
**13** 31:10 32:24
**140** 6:8
**15** 69:20 78:19
  211:23
**150** 3:15
**154** 6:14
**16** 5:17
**170** 6:21
**1747** 2:7 8:17
**175** 6:23
**175,000** 114:5
**17th** 172:10
**18-hour-a-day**
  70:20
**183** 99:25 131:6
  132:6
**183-day** 168:7
**184** 7:3
**19** 7:3
**195** 7:5

**1970** 26:3
**199** 7:7
**19th** 20:9 184:19

―――――――――
**2**
―――――――――
**2** 5:19 109:15,22
  110:2,2 111:17
  115:25 128:11
  196:8 223:20
**2:28** 211:3,6
**2:58** 211:6,9
**20** 61:5 69:6 227:19
**20-cent** 138:18
**2000** 61:3 75:16
**20006** 2:8
**2000s** 65:16
**2003** 69:16,22
  70:12 71:6,11
  72:19,22
**2004** 75:16 88:4
  89:20 129:5
  171:23 172:22
**2004-2005** 85:15
**2004/2005** 76:25
**2005** 6:4,8 74:3
  88:6 140:25
  155:12
**2006** 6:14,17,21
  91:9 102:3 155:6
  155:13 171:3
  172:23
**2007** 28:21 73:23
  175:17
**2007/2008** 73:2
**2008** 73:23
**2009** 7:3 97:13
  184:19 196:9
  199:16 217:16
**201** 7:9
**2011** 21:3 24:20
**2014** 1:20 2:2 8:5
  8:19 226:3
**20th** 175:17
**211** 5:6
**212** 6:10,17
**212.374.5370** 3:9
**214.745.5709** 4:9

**22** 6:4
**223** 227:5
**22314** 4:17
**230** 3:7
**25** 32:3,3 46:7
  57:22 67:6 68:2
  69:5,9 203:8
  216:9
**25,000** 113:10,11
  219:10
**26th** 140:24
**27** 6:8,14,17
**2728** 4:7
**27th** 155:6
**29** 1:20 2:2 8:5
  226:3
**29th** 8:19

―――――――――
**3**
―――――――――
**3** 6:1 21:13 120:6
  120:10,16
**3:07** 223:22,24
**3:10-cv-527** 1:8
  8:15
**30** 32:3 99:18
  138:13,16 225:13
**313.983.6950** 3:17
**31st** 122:20
**35** 59:25 60:8 67:22
**35,000** 69:8

―――――――――
**4**
―――――――――
**4** 6:6 23:10 29:10
  42:2 140:6,7,12
  140:17 212:17
  213:2,2,5,20
**4-A** 6:10 212:5,13
  212:14,24
**40** 165:3,5,7
**48226** 3:16

―――――――――
**5**
―――――――――
**5** 6:12 21:9,12
  48:11 75:16 88:5
  132:9,9 154:18,22
  155:4 212:17
  213:21

**5-A** 6:16 212:10,14
   213:12
**50** 69:9
**50,000** 219:19
**500** 4:6
**501(c)(4)** 25:7
**535** 127:3

---
**6**

**6** 6:19 74:3 170:17
   170:21,25
**60** 27:6
**60,000** 219:10

---
**7**

**7** 6:23 175:8,12,16
**703.684.5755** 4:18
**75201** 4:8
**79** 32:14

---
**8**

**8** 7:1 110:19 111:16
   111:18 115:21
   184:10,14,18
**8,000** 41:23
**850** 3:6
**8th** 199:16

---
**9**

# EXHIBIT KVT-60

APP000623

**From:** Rhonda Kelly - Kelly Holding Ltd. [rhonda@kellyholding.com]
**Sent:** Friday, June 29, 2007 4:35 PM
**To:** Walker, Kye
**Cc:** laurieann@kellyholding.com
**Subject:** ESPN

Ben Barnes just called and said he is still waiting to hear back from Len DeLuca (ESPN America Pres) but is working hard to ensure he sets up a meeting for tonight or tomorrow for certain with Laurie-Ann.

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

CONFIDENTIAL

RECEIVER527-00256659

# EXHIBIT KVT-61

APP000625

```
From: Laurie-Ann Holding [laurieann@kellyholding.com]
Sent: Friday, June 29, 2007 12:27 AM
To: Walker, Kye
Subject: RE:

Yes we got him and think we are ok until we hear back re Rhonda's last update.

L. Holding
Mobile: 345.329.5000
Email: laurieann@stanford2020.com

-----Original Message-----
From: Walker, Kye [mailto:KWalker@StanfordEagle.com]
Sent: Thursday, June 28, 2007 12:11 PM
To: Laurie-Ann Holding
Subject: FW:

Let me know if you have any trouble contacting Ben-I have other numbers for him.

-----Original Message-----
From: Stanford, Allen
Sent: Thursday, June 28, 2007 12:09 PM
To: 'laurieann@kellyholding.com'
Cc: 'rhonda@kellyholding.com'; Walker, Kye
Subject:

Laurie Ann call Ben Barnes at 5124151414 he knows the head guy at ESPN out of NY who
happens to be in London presently and can get you in touch with him. He is expecting your
call.

On another note we are aggressively working on the Cuba/US issue. I want Cuba in the
tournament.

Also all payments will go out tmr. RAS
```

CONFIDENTIAL

# EXHIBIT KVT-62

APP000627

**From:** Rhonda Kelly - Kelly Holding Ltd. [rhonda@kellyholding.com]
**Sent:** Friday, June 29, 2007 4:27 PM
**To:** 'Patsy Thomasson'
**Cc:** laurieann@kellyholding.com; Walker, Kye
**Subject:** RE: Stanford 2020

Hi Patsy –

Just checking in to see if you had everything you needed for this now? Also I was expecting to hear back from Mr. Barnes about a contact in London for ESPN – would you be able to help with that?

Thanks!

Rhonda

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** June 28, 2007 12:21 PM
**To:** rhonda@kellyholding.com
**Cc:** laurieann@kellyholding.com; Walker, Kye
**Subject:** RE: Stanford 2020

Your so good.  When I sent this to someone else, I said we could rely on everything except your representation that Cuba would not win and use almost the same language you did.

pt

Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

**From:** Rhonda Kelly - Kelly Holding Ltd. [mailto:rhonda@kellyholding.com]
**Sent:** Thursday, June 28, 2007 12:49 PM
**To:** Patsy Thomasson
**Cc:** laurieann@kellyholding.com; 'Walker, Kye'
**Subject:** Stanford 2020

Hi Patsy –

I guess in regards to them winning I cannot guarantee they would not win – I guess ANYTHING is possible.  However they are not traditionally a cricket country and we have teams in the tournament

CONFIDENTIAL

RECEIVER527-00257429

that have some of the best cricketers in the world on them so it is pretty much next to impossible they would be able to win the minimum of 4 matches required to do this.

Let me know if there is anything I can provide in this regard to help with the approval – thanks again.

Rhonda

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** June 28, 2007 11:32 AM
**To:** rhonda@kellyholding.com
**Subject:** RE: test message

One other thing, Rhonda says that there is no way the Cubans win the first year they play; I am not sure that we can rely on this representation.

pt

Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

**From:** Rhonda Kelly - Kelly Holding Ltd. [mailto:rhonda@kellyholding.com]
**Sent:** Thursday, June 28, 2007 12:28 PM
**To:** Patsy Thomasson
**Cc:** 'Laurie-Ann Holding'; 'Walker, Kye'
**Subject:** RE: test message

Hi Again Patsy --

Attached is a breakdown showing the prize money and the development funds we discussed.  I hope this is clear as I tried to make it simple but was converting it from the Government presentation which is very detailed.

Let me know whatever questions you have either by email or phone.

Thanks so much for your assistance!

CONFIDENTIAL

RECEIVER527-00257430

Best Regards,

Rhonda

Rhonda Kelly
Event Director
Stanford 20/20
Office 345 623 8823
Mobile 345 329 4480
www.Stanford2020.com

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** June 28, 2007 10:20 AM
**To:** rhonda@kellyholding.com
**Subject:** test message

Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

CONFIDENTIAL

RECEIVER527-00257431

# EXHIBIT KVT-63

APP000631

**From:** Laurie-Ann Holding [laurieann@kellyholding.com]
**Sent:** Monday, July 02, 2007 7:06 PM
**To:** Walker, Kye
**Cc:** rhonda@kellyholding.com
**Subject:** RE: ESPN meeting

No updates on that as I was not able to meet with them – both myself and Ben Barnes were trying however as you may know there were lots of problems in London on Friday and Saturday and getting around the city was not easy. The guy I was talking to (Anurag) could not get his flight changed to meet me on Saturday and the guys Ben Barnes was trying to arrange with did not get back in touch with us.

I have left messages for them all again today to see if we can at least talk again before tomorrow. As soon as I have any updates I will let you know.

LA

L. Holding
Mobile: 345.329.5000
Email: laurieann@stanford2020.com

**From:** Walker, Kye [mailto:KWalker@StanfordEagle.com]
**Sent:** Monday, July 02, 2007 1:22 PM
**To:** Laurie-Ann Holding
**Subject:** ESPN meeting

How did your meeting go this weekend?

Kye Walker
Senior Executive Assistant
Office of the Chairman
Stanford Financial Group
340.244.6536 mobile

CONFIDENTIAL

RECEIVER527-00257151

# EXHIBIT KVT-64

APP000633

**From:** Hodge, Julie
**Sent:** Thursday, July 31, 2008 3:41 PM
**To:** Stoelker, Andrea
**Subject:** FW: ESPN 360 Agreement

**Attachments:** ESPN360 Agreement.tif
Attached is the ESPN 360 agreement.  It is an exclusive agreement for Broadband rights in the USA, whether live or delayed for broadcast on the ESPN 260 platform plus highlight rights.  It covers the 2008 Stanford 20/20 Tournament and 2009 Stanford 20/20 Tournament on dates to be determined.  However the licensed period is only January 25, 2008 to March 9, 2009.   Given that the regional 2009 Tournament is taking place outside of the licensed period, this may be a possible out for this contract.

---

**From:** Hodge, Julie
**Sent:** Monday, July 14, 2008 1:20 PM
**To:** Karl Bistany
**Subject:** ESPN 360 Agreement

Hi Karl

This agreements needs to be kept confidential as it is an agreement between TWI dba IMG Media and ESPN and we are not really at liberty to disclose to third parties.

I do not believe that it covers the Stanford 20/20 for 20 match, but it does include the 2009 Tournament, although term does expire March 9th 2009 and the 2009 Tournament falls after that date so we may be able to get out of that as well.

Julie

---

**From:** Karl Bistany [mailto:karl@fmstv.com]
**Sent:** Monday, July 14, 2008 12:58 PM
**To:** Hodge, Julie
**Subject:** RE: TIME Magazine Article

Hi Julie,

Can I trouble you for a copy of the ESPN 360 agreement?

Many thanks
**Karl Bistany**
**Future Media Services Ltd**
23 Chelsea Wharf
15 Lots Road
London SW10 0QJ

**Tel:** +44 (0)870 608 1818
**Fax:** +44(0)207 751 4500
**Mob:** +44(0)7785 110018
**e-mail:** karl@fmstv.com
This electronic message contains information which may be privileged and confidential. The information is intended to be for the use of the individual(s) or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic message in error, please notify me by telephone or e-mail (to the number or address above) immediately.

No virus found in this outgoing message.
Checked by AVG.
Version: 7.5.526 / Virus Database: 270.4.10/1550 - Release Date: 13/07/2008 17:58

CONFIDENTIAL

RECEIVER527-00292301

APP000634

# EXHIBIT KVT-65

APP000635

APR-08-2003 10:05 From:                                    To:913057895320        P.2

## AGREEMENT

This AGREEMENT is made as of _January 7_, 200_8_ ("Effective Date") by and between:

**"LICENSOR":**                          **"LICENSEE":**
**TRANS WORLD INTERNATIONAL, INC.**      ESPN, Inc.
**d/b/a IMG MEDIA**                      ESPN Plaza
IMG Center                               Bristol
1360 East 9th Street                     Connecticut
Suite 100                                06010
Cleveland                                United States of America
OHIO 44114
United States of America                 Contact: John T Lasker, Director, Digital
Media

A.   **PROGRAMMES/EVENTS:**     Package of the following cricket matches to be
     played:  The 2008 Stanford 20/20 Tournament, 25 January to 24 February at the
     Stanford Cricket Ground in Antigua ("2008 20/20 Tournament") and 2009
     Stanford 20/20 Tournament, on dates to be determined by Licensor at the
     Stanford Cricket Ground in Antigua ("2009 20/20 Tournament" and together the
     "20/20 Tournaments").

     (Each game of the 20/20 Tournaments an "Event" and the host broadcaster's coverage
     thereof a "Programme").

     Start times and dates of the Events will be notified and confirmed by Licensor to
     Licensee as soon as Licensor is informed and no later than 2 weeks prior to each Event.
     The term of this Agreement commences as of the Effective Date and expires on March
     9, 2009.

     If Licensor has substantially similar rights to the Stanford 20/20 Tournament in 2010,
     Licensor shall so notify Licensee in writing within a commercially reasonable period after
     the 2010 match schedule is determined.  Licensee shall have the exclusive right to
     negotiate with Licensor for a period of 60 days following the date of such notice, for the
     exclusive U.S. broadband rights, on terms and conditions as may be agreed by the
     parties.  At the end of the negotiation period, if the parties have not reached agreement,
     Licensor may offer such rights to a third party.

B.   **RIGHTS AND DEFINITIONS:** The following rights and terms shall be defined as set forth
     below for the purposes of this Agreement:

     **Designated Rights:**                  Broadband rights, whether live or delayed
                                             coverage, for broadcast on the ESPN 360
                                             platform(s).   Highlight rights of up to 5
                                             minutes per match in the Licensed Territory
                                             and up to 2 minutes per match outside of the

K:\LDT\C\Legal\2007\309635

CONFIDENTIAL

RECEIVER527-00292302

**APP000636**

Licensed Territory for broadcast on cricinfo.com ("Highlight Rights") only.

**Licensed Period:**      January 25th 2008 to 9th March 2009

**Licensed Territory:**      United States of America.

**Licensed Languages:**      All languages, provided that matches will only be made available to Licensee in English (unless only the local language in respect of an Event is available and Licensee agrees to take such version, further to Special Term G(3) below).

The aforementioned Designated Rights are granted to Licensee for the Licensed Period in the Licensed Territory in the Licensed Languages on an exclusive basis, except for the Highlight Rights, which are non-exclusive.

**C.**    **GRANT:**

Licensor hereby grants to Licensee the Designated Rights to the Programmes during the Licensed Period in the Licensed Languages only throughout the Licensed Territory on an exclusive basis (except as provided herein) in accordance with the Basic Provisions set forth below and the attached Standard Terms and Conditions and in consideration of the payment of the Licence Fee and the Technical Costs.

**D.**    **LICENCE FEES:**

The Licence Fees shall be as follows:

- In respect of all of the Programmes in the 20/20 Tournaments, eighty thousand United States Dollars (US$80,000.00), which Licence Fee shall be paid as follows, and in each case payment shall be made in accordance with the terms and conditions of Licensor's valid invoice and upon Licensee's receipt of such valid invoice:

US$15,000 to be paid within 15 days of fully executed Agreement

January 15th, 2008:   US$15,000
February 15th 2008:   US$10,000

2009 20/20 Tournament

December 15th 2008: US$15,000
January 15th 2009:    US$15,000
February 16th 2009:   US$10,000

**E.**    **TECHNICAL COSTS:**

K:\L.DXTC\Legal\2007\306835

CONFIDENTIAL         RECEIVER527-00292303

APP000637

APR-09-2009 10:05 From:                                To:913057895820        P.4

Programme feeds will be available at BT Tower, London, Licensee shall be entitled to access it free of charge. Licensee shall pay all other Technical Costs due hereunder in accordance with the terms and conditions of and upon Licensee's receipt of Licensor's valid invoice(s).

**F.    BASIC PROVISIONS:**

|  |  |  |  |
|---|---|---|---|
| (1) | **Number of transmissions allowed:** | | Unlimited |
| (2) | **Technical Elements to be supplied:** | | Via BT Tower, London, a feed with English commentary, in the English language, with international sound and graphics. |
| (3) | **Payment Provisions:** | | Licensee agrees to make the payments required under this Agreement in accordance with the transmittal instructions set forth on the invoices issued to Licensee by Licensor. |

**G.    SPECIAL TERMS:**

1.    Licensee undertakes and agrees that the exercise of the Designated Rights and the performance of its obligations hereunder is subject to the regulations, rules and statutes of any relevant Cricket Association or Federation and all other applicable national and international laws and regulations regarding the broadcast of the Programmes and any virtual advertising therein.

2.    Time is of the essence in relation to the payment dates specified in Paragraph D above. In the case of any failure to pay any of the Licence Fee on or before the relevant Due Date, Licensor will be entitled to terminate this Agreement if such Licence Fee is not paid within ten (10) business days of demand therefor.

3.    It is condition of this Agreement that the feed is in the English language, fully cleared and available at BT Tower, London. Where any or all of these criteria are not met in respect of a particular Programme or Event, it shall be at Licensee's absolute discretion whether or not to take such Programme or Event. In the event that Licensee opts not to take a Programme or Event because one or more of the aforesaid criteria are not met, Licensee shall not be obliged to pay a pro rata portion of the Licence Fee in respect of such Programme or Event or Licensee shall be entitled to a pro rata refund for any Licence Fee or part Licence Fee already paid to Licensor in respect of such Programme or Event.

4.    Licensee agrees that, upon reasonable request by Licensor, Licensee will furnish Licensor, in a timely manner, with detailed reports of the number of viewers and/or subscribers who accessed and/or viewed any Programme on the ESPN 360 platform(s).

K:\LD\TC\Legal\2007\306635

CONFIDENTIAL

RECEIVER527-00292304

APP000638

5.     Licensee hereby acknowledges and agrees that the Designated Rights granted hereunder are in respect of the Licensed Territory only and, accordingly, Licensee undertakes to employ a digital rights management system of international quality standard which is capable of ensuring that the Programmes or Events cannot be viewed or accessed from outside the Licensed Territory.

This Agreement comprises the provisions set out above and the Standard Terms and Conditions attached hereto and only when signed by both parties shall this Agreement constitute a legally binding Agreement between the parties. In the event of any inconsistency between the provisions set out above and the Standard Terms and Conditions, the provisions set out above shall take precedence.

**READ AND AGREED:**

For and on behalf of Licensor                     For and on behalf of Licensee


Trans World International, Inc.                    ESPN, Inc.
d/b/a IMG Media                                   Print Name:
Print Name   Robert Porter                        Title
Title   Vice President of Finance and Administration

James B. Noel
Vice President, Business Affairs
Programming
ESPN, Inc.

K:\LD\TO\Legal\2007\306635

CONFIDENTIAL                                      RECEIVER527-00292305

APP000639

APR-08-2008 10:05 From:                                    To:913057896820         P.6

## STANDARD TERMS AND CONDITIONS

1.  **Payments**

(a)  All payment shall be made on or before the Due Date in the manner requested in the relevant invoice or set forth in the Basic Provisions.

(b)  Timely payment is of the essence of this Agreement. In the event that payment is not made on or before fifteen days following the Due Date, interest will be charged at the rate of one per cent (1%) per month or the maximum amount permitted by the applicable law.

(c)  All payments will be made to Licensor together with Value Added Tax, or any similar taxes, if applicable.

(d)  Licensee shall not make any deductions of any kind from payments due hereunder except withholding tax as required to be deducted under the applicable law of the country of residence of the Licensee. If any deduction is made from any payment hereunder for withholding tax in accordance with the foregoing, then simultaneously with any such payment Licensee shall provide Licensor with a certificate of payment of tax from the relevant local taxation authority in relation to that payment. Further, Licensee agrees to provide Licensor with all reasonable assistance in order that Licensor may recover such withheld tax within the shortest delay.

2.  Delivery of the Programme

The Programme shall be delivered to Licensee on a live or recorded basis as indicated in the Basic Provisions.

3.  Return, Further Delivery or Erasure of Programme(s)

Licensee agrees to comply with the reasonable instructions of Licensor with respect to the return, further delivery or erasure of any recording of the Programme. All shipping charges incurred in connection with such further delivery shall be borne by Licensee or charged to the account of Licensee.

4.  News and Other Access

Licensor will not grant the Designated Rights (if exclusive) to the Programme in the Licensed Language within the Licensed Territory during the Licensed Period to any third party; provided, however, that access to the Event may be granted by Licensor for use, not to exceed two minutes per bulletin, in regularly scheduled news or sports-news programmes and provided further that Licensor may authorise the use of up to five minutes of the Programme within the Licensed Territory on not less than a seventy-two (72) hour delay from completion of the relevant days play, for inclusion within any sports magazine, sports anthology or other programme.

5.  Clearances

Licensor agrees to arrange and pay for all performing rights or equivalent clearances in the music, if any, and, in respect of non-library music only, for any other music clearances which are necessary in the Licensed Territory during the Licensed Period.

6.  Force Majeure

Licensor shall not be liable for any event of force majeure, as defined in this clause which effects the staging or coverage of the Event except that if the staging or coverage of an entire Event or of a whole day of an Event consisting of more than one day, on which the Programme is based should be prevented or cancelled due to a casualty or other act of God, inevitable accident, strike or other labour dispute, fire, flood, epidemic, earthquake, explosion, war or armed conflict, blockade, embargo, restraints, sanctions,

K:\LD\TC\Legal\2007\308835

CONFIDENTIAL                                                      RECEIVER527-00292306

APP000640

APR-08-2003 10:06 From:                    To:913057895820          P.7

or orders of civil, civil defence, or military authorities; government action or decree, act of public enemy, riot or civil disturbance, or threat thereof or other inability to secure sufficient labour, technical or other personnel; or any other cause or causes, similar to or dissimilar to the foregoing, beyond the control of Licensor, ("force majeure") then, subject to the provisions of Clause 20 below, neither Licensor nor Licensee shall be obligated in any manner to the other with respect to the Programme relating to the Event or to that day of the Event so affected. However, if the Event is postponed or delayed for any force majeure reasons and rescheduled within a reasonable time after the original date, then all terms and conditions of this Agreement shall apply to the Programme on such rescheduled date.

7.    Credit

Licensee agrees not to edit or otherwise delete the copyright notice contained in the recording or signal of the Programme.

8.    Licensor's Property

Licensee acknowledges that the rights licensed to it hereunder are limited to the material constituting the Programme. If additional non-licensed material is delivered with the Programme, Licensee has no rights to such additional material and provided that Licensor identifies such material to Licensee, shall indemnify Licensor against all liabilities arising from the broadcast by Licensee of such additional material. Any and all rights not herein specifically granted to Licensee shall be and remain the property of Licensor, to be used by Licensor in any manner it deems appropriate. In particular, it is agreed and acknowledged by Licensee that, unless specifically included under this Agreement, the Designated Rights do not include radio, non-theatrical, in-flight, ship at sea and all other forms of transport, closed circuit, home video, laser disc, optical disc, DVD format, CD interactive, CD Rom, and/or any programme service delivered via the internet or on-line service other than the Designated Rights, any web-site rights, Wireless Application Protocol (WAP), Third Generation Mobile (3G), Short Messaging Service (SMS), Multimedia Messaging Service (MMS), UMTS and/or any other services for mobile communications devices (such as the use of DVB-H or similar technology to transmit the Programmes to mobile communications devices, or via mobile network), any form of video-on-demand, any form of interactive television (such as two-way television) or any other multimedia rights whether now known or hereafter invented. For the avoidance of doubt, references above to in-flight, ship at sea and all other forms of transport shall mean all forms of exhibition of the Programme within aircraft, ships and other forms of transport respectively including, but without limitation, transmission (whether on a simultaneous basis or otherwise) of television broadcasts within the aircraft, ship and all other forms of transport respectively. Licensee shall neither copy nor duplicate nor license nor authorise the copying or duplicating of the Programme or any part thereof without Licensor's prior written consent. Unless specifically authorised in the Basic Provisions, Licensee shall not have the right to use any Programme excerpts or stills separately from the Programme and the whole Programme must be broadcast in its entirety for each licensed transmission and Licensee shall not be permitted to edit, amend, add to, or in any other way alter the Programme for such transmission except for editing required to remove segments (with the approval of Licensor) for the purposes of censorship. In particular, but without limiting the generality of the foregoing, Licensee shall not use (a) any system of modification, removal or replacement of, or addition to, specific parts, such as signage or billboards, of the images/pictures contained within the Programme, nor (b) carry out any similar manipulation of the images/pictures constituting the Programme, ((a) and (b) together called "Modification Rights"). Licensee acknowledges that Modification Rights shall be retained by Licensor and Licensor shall be entitled to exercise Modification Rights at its sole discretion and to retain all income from the exercise thereof.

9.    Official Film

Intentionally Deleted

K:\LDATC\Legal\200\306835

CONFIDENTIAL                                              RECEIVER527-00292307

APP000641

10.    Overspill

Licensee acknowledges and agrees that Licensor reserves the right to authorise third parties to transmit the Programmes for reception outside the Licensed Territory or for reception in those parts of the Licensed Territory where the Designated Rights are non-exclusive. Licensee further acknowledges that such transmission may be capable of reception within the Licensed Territory including those parts of the Licensed Territory where the Designated Rights granted hereunder are exclusive due to the inherent capability of satellites to beam down signals which are not confined to territorial boundaries ("Overspill"). Licensee agrees that the occurrence of such Overspill shall not constitute a breach of this Agreement, provided that Licensee takes commercially reasonable efforts to prevent it.

11.    Provision of Transmission Information

Upon request of Licensor, Licensee agrees to provide Licensor, within thirty (30) days after Licensee's first telecast of the Event or Programme thereof, a list of dates and times of the applicable transmissions, the territorial coverage of such transmissions and, to the fullest extent available, the ratings for each transmission and the demographic profile of the audience.

12.    Licensor Ceasing to own or control the Designated Rights

In the event that Licensor ceases to own or control the Designated Rights, this Agreement shall automatically terminate upon such cessation without any liability to Licensor.  In the event of such termination, Licensee will remain liable to pay the Licence Fee pro rata in respect of Programme(s) already transmitted.  If Licensee has made advance payment(s) and the event of termination of this Agreement results in all or part of such advance payment(s) being refundable to Licensee then Licensor will make the appropriate refund within 30 days of the event of termination of this Agreement.

13.    Indemnity

Each party represents and warrants to the other that it has the right to enter into this Agreement and Licensor represents and warrants to Licensee that Licensee's exercise of the Designated Rights in accordance with this Agreement will not infringe the right of any third party.

Licensee and Licensor shall indemnify and hold the other and its affiliates, and each entities' directors, officers, employees and agents harmless from and against any and all claims, damages, liabilities, costs and expenses (including attorney's fees) arising out of any breach by it of any warranty, representation or Agreement of it hereunder, the parties' relationship or with respect to any materials added by Licensee to the Programme or used in the advertising and promotion thereof.

14.    Suspension/Termination

(a)    Either party shall have the right to terminate this Agreement by giving written notice to  the other in the event that:

(i)    The other has committed a material breach of any of its obligations hereunder which cannot be remedied;

(ii)    The other has committed a material or repeated breach (including, without limitation, failure to make payment of any sum due hereunder on or before the Due Date) of any of its obligations hereunder and shall not remedy such breach (if the same is capable of remedy) within 10 days of being required by written notice so to do;

(iii)    [Intentionally omitted.]

(iv)    Licensee ceases or threatens to cease to carry on business or is removed from the relevant register of companies.

K:\LD\TO\Legal\2007\306535

CONFIDENTIAL                                    RECEIVER527-00292308

Upon the occurrence of any of the events referred to in this Clause 14(a)(ii), the Licensor may (without prejudice to any other rights or remedies it may have, whether pursuant to this Agreement or otherwise) immediately suspend the delivery of the Programme upon notice to Licensee and reasonable right of cure (including without limitation access to the live feed, if any) to the Licensee.

(b)     [N/A]

(c)     In the event this Agreement is terminated under the provisions of this Clause or Clause 20, all rights granted to Licensee hereunder shall revert immediately to Licensor. Any such termination shall not affect Licensor's rights to any payments then due. Furthermore termination under this clause or clause 1 shall be without prejudice to any other remedy available to Licensor. Licensee acknowledges and agrees that the amount recoverable by it in connection with any dispute or controversy relating to this Agreement or the parties' relationship is limited to the amount of the Licence Fee actually paid to Licensor.

15.     Notices

Any notices to be given or served hereunder shall be in writing and shall be delivered or sent by first class post (air mail if to an overseas address) or facsimile with a copy to IMG Media legal department, 420 West 45th Street, New York, NY 10025 (confirmed by a copy sent by post) to the party to be served at the address set out in the Basic Provisions (or such other address as either party may notify in writing to the other party) and shall be deemed to have been served on the second business day after posting (five (5) days in the case of posting overseas) and immediately in the case of facsimile.

16.     Confidentiality

Neither party nor any of its employees shall divulge to any third party any of the terms of this Agreement or the existence of this Agreement without the express permission of the other save as may be necessary in order to comply with any legal or regulatory requirements.

17.     No Partnership/No Joint Venture

This Agreement is made between principals and nothing herein contained shall be deemed to constitute a partnership or joint venture between the parties hereto.

18.     Waiver

A waiver by either party of any breach or default by the other party will not be construed as a continuing waiver of the same or any other breach or default under this Agreement and no waiver shall be effective unless made in writing.

19.     Tapes on Loan

Intentionally Deleted

20.     Withdrawal/Substitution of Programme(s)

(a)     Licensor may withdraw any Programme(s) from this Agreement prior to delivery of such Programme(s), if necessitated either by a force majeure reason under Paragraph 6 above or by any other circumstances unforeseen at the time of entering into the Agreement.

(b)     If Licensor elects to withdraw any Programme(s) pursuant to sub-clause (a) above, then Licensor shall have the right either to deliver to Licensee another Programme of comparable quality which Programme shall be deemed to replace the Programme withdrawn, or alternatively, at Licensor's election, Licensor may reduce the number of Programme(s) to be delivered and paid for hereunder by one and

K:\LD\TC\Legal\2007\308635

CONFIDENTIAL

RECEIVER527-00292309

APP000643

APR-08-2008 10:07 From:                         To:913057895820                    P.10

Licensee shall be given a refund or rebate as appropriate of that part of the Licence Fee allocated to such withdrawn Programme.

(c)   Notwithstanding the withdrawal/substitution of any Programme(s) hereunder by the Licensor this Agreement shall remain in full force and effect as regards the remaining Programme(s) and Licensor shall have no liability for such withdrawal except as set out in sub-clause (b) above.

21.   No Assignment by Licensee

(a)   Subject to 21(b) this Agreement shall be binding upon and inure to the benefit of Licensor and the successors and assigns of Licensor. The rights granted Licensee hereunder shall be exclusive to it and shall not, without the prior written consent of Licensor, be sub-licensed, transferred or assigned except to a company controlling, controlled by or under common control with Licensee. In the event of the merger or consolidation of Licensee with, or acquisition by, any other entity, Licensor shall have the right to terminate this Agreement by so notifying Licensee in writing on or before 60 days after Licensor has received written notice of such merger, consolidation or requisition.

(b)   Licensor shall be entitled to assign any of its rights and obligations hereunder to any of its affiliated/associated companies.

22.   Third Parties

This Agreement is for the mutual and exclusive benefit of the parties hereto and shall not be deemed to be for the direct or indirect benefit of any third parties, none of which are intended to be beneficiaries of this Agreement.

23.   Governing Law

This Agreement shall be governed by and construed in accordance with the laws of New York. Any disputes between the parties arising out of this Agreement shall be subject to the non-exclusive jurisdiction of the courts in New York City.

24.   Complete Understanding

This Agreement contains the full and complete understanding between the parties hereto, supersedes all prior agreements and understandings, whether written or oral, and may not be modified except by written instrument signed by the parties hereto.

K:\LD\YC\Logan\2007\306635

CONFIDENTIAL                                                        RECEIVER527-00292310

# EXHIBIT KVT-66

APP000645

**From:** Hodge, Julie
**Sent:** Friday, October 17, 2008 7:44 PM
**To:** Lewis -Flynn, Natasha
**Subject:** RE: Invoices required

**Attachments:** BBC.pdf; ESPN.pdf; Ten.pdf
Of course, it would help if I actually attached the contracts.

---

**From:** Hodge, Julie
**Sent:** Friday, October 17, 2008 2:28 PM
**To:** Lewis -Flynn, Natasha
**Cc:** Stoelker, Andrea
**Subject:** Invoices required

Natasha

Can you prepare Invoices based on the attached contracts and forward via email to karl@fmstv.com, cc: jon.higton@couchmanharrington.com, and myself for onward forwarding to the broadcasters:

1.   British Broadcasting Corporation
     Broadcasting House
     Portland Place
     London  W1A 1AA

     US$7,500

2.   ESPN, Inc.
     ESPN Plaza
     Bristol,  CT  06010-1099

     US$70,000   for installments 7.1.1 ($35,000) and 7.1.2  ($35,000)

3.   TAJ Television Ltd.
     Manor House, 1st Floor
     Corner St. George/Chazal Street
     Port Louis
     Mauritius

     US$40,000

Please make reminders also for the remaining amounts due under the contract.  Let me know if you have any questions.

Thanks

**Julie Hodge**
Media Relations and Marketing Director
**Stanford 20/20**
Office Main:  268-481-2020
Office Direct:  305-960-8531
Fax:          268-481-3552
website:     www.stanford2020.com



CONFIDENTIAL

RECEIVER527-00292267

**APP000646**

# EXHIBIT KVT-67

APP000647

BROADCAST RIGHTS FOR STANFORD 20/20 MATCHES

AGREEMENT

DATED:                                                          October 14, 2008

PARTIES:

(1)   STANFORD 20/20 LLC, a limited liability company domiciled at PO Box 224602, Christianstead, St Croix, United States Virgin Islands 00822 ("**Stanford**")

and

(2)   ESPN, Inc., a Delaware corporation with its principal place of business at ESPN Plaza, Bristol, Connecticut 06010-1099 ("ESPN")

1.   GRANT OF RIGHTS

In consideration of the Licence Fee Stanford hereby grants to ESPN the Broadcast Rights to the Matches for the Territory during the Term on the terms and conditions set out below. This Agreement replaces and supercedes any and all previous understandings and/or agreements between the Parties and as between ESPN and Stanford, any third party and ESPN relating to the Matches or any of them including without limitation the purported agreement between IMG and ESPN relating to the Regional Event which is acknowledged by both Parties hereto to have been terminated.

2.   MATCHES

Each of those cricket matches played under the auspices or control of Stanford which are specifically set out in Schedule 1 attached hereto (the "**Matches**") (The Trinidad, Tobago vs County Champion, the four warm-up Matches, the Feature Match and described in Part A of Schedule 1, hereinafter separately referred to as the "Stanford Super Series" and the Matches and of the Stanford 2009 Regional Tournament as the "Regional Event").

3.   TERRITORY

The Territory comprises three areas:

Part A – the USA
Part B – the Caribbean
Part C – the Pacific Rim

All as more full detailed in Schedule 2.

(collectively the "Territory")

4.   TERM

From the date hereof until 31 May 2009.

5.   BROADCAST RIGHTS

5.1   The Broadcast Rights shall comprise, subject always to the Excluded Rights:

5.1.1   (a)   in Part A of the Territory, the exclusive right to transmit the Feed (as defined in clause 9 below) of the Stanford Super Series and the nonexclusive right to transmit the Feed of the Regional Event solely in the Territory on ESPN-branded television channels (in whole or in part, whether live, delayed or as highlights, clips and/or stills) by means of satellite and/or cable pay television and the right to transmit the Feed of the Matches exclusively live and non-exclusively delayed via broadband internet on the ESPN360 service, an

1

d-081014 jh (ESPN agreement) cc

APP000648

unlimited number of times, with commentary in the English language during the period commencing on the date hereof and continuing until 31 May 2009 ("Licence Period") together with the right during the Licence Period to make available up to 5 minutes of clips for exhibition on all ESPN "Platforms" provided that such availability is restricted to the Territory. For purposes of this Agreement, ESPN "Platforms" shall mean ESPN's various branded and/or otherwise approvedWeb sites, including but not limited to ESPN.com, Cricinfo.com and ESPNdeportes.com and in Australia only, ESPN's microsite accessed via the Big Pond Sport home page.

(b)     in Part B of the Territory the exclusive right to broadcast the Feed of the Matches by means of nonstandard (i.e., not free to air) satellite, cable and other not-free-to-air television ("Nonstandard Television") on ESPN-branded television channels an unlimited number of times, with commentary in the English language, only during the Licence Period. For the avoidance of doubt Stanford retains absolutely the right to licence free to air broadcasters in Part B of the Territory to exhibit the Feed of the Matches on their free to air television services, howsoever, such services are distributed and ESPN will not broadcast nor will it authorise or permit any of its distributors and/or affiliates to re-transmit the Feed via any form of free to air television;

(c)     in Part C of the Territory the exclusive right to exhibit the Feed of the Matches and other events comprising the Stanford Super Series, but not the Regional Event, by means of terrestrial television and Nonstandard Television on ESPN-branded television channels an unlimited number of times, with commentary in the English language, only during the Licence Period.

(d)     throughout the Territory the nonexclusive right to make available on a delayed basis during the Licence Period clips of up to 5 minutes per Match, in total, upon ESPN Platforms provided always that ESPN restricts such availability to the Territory.

(e)     ESPN shall advise Stanford as soon as possible and as far in advance of the Matches as possible of the identity of all channels via which it will be exploiting the Broadcast Rights and their applicable schedules.

5.1.2   the nonexclusive right solely in the Territory to use the names, photographs and likenesses of persons appearing in the Matches and clips from the Feeds for the purposes of exercising the Broadcast Rights granted under this Agreement. Use of clips and/or still images from the Matches solely for the purposes of promoting ESPN's forthcoming exhibitions of the Matches is also permitted. ESPN recognises and confirm that any use of participants' names, likenesses or images for promotional purposes that construes or implies an endorsement by such persons of any product or service will require further separate approval on a case by case basis.;

5.1.3   the right in connection with the exercise of the Broadcast Rights set out in Clauses 5.1.1 and 5.1.2 to:

(i)     cut, dub and/or edit footage of the Matches for the purposes of complying with all relevant laws, regulations and/or codes of practice;

(ii)    cut, and/or edit footage of the Matches for the purposes of creating delayed transmissions, highlights, clips and/or stills; and

(iii)   cut and/or edit footage of the Matches for the purposes of meeting timing requirements and in order to insert and interpolate breaks, advertisements and/or sponsorship billboards.

5.2     Subject to the Excluded Rights (as defined below) which are fully reserved to Stanford and the provisions of Clause 5.1.1 above, Stanford agrees that it will not grant any other third party the exclusive Broadcast Rights in the Territory during the Term in any language. For the purposes

2

d-081014 ph (ESPN agreement) co

of this Agreement, the term "**Excluded Rights**" shall mean all rights not expressly granted to ESPN hereunder including without limitation:

5.2.1   **Fixed Media Rights**

all fixed media rights including without limitation the right to create, sell and/or otherwise distribute DVDs, CD-ROMs, videograms, video games and other fixed media carriers featuring footage of the Matches.

5.2.2   **News Access Rights**

the right to authorise other broadcasters in the Territory and/or news gathering and dissemination organisations such as Reuters and SNTV to use and exploit clips of Match footage for news access purposes Stanford confirms that it will not authorise any such use until conclusion of the subject Match, subject always to local regulations..

5.2.3   **Clip Licensing**

the right to use and exploit and to authorise third parties to use and exploit clips of footage of Matches within television (and any other audiovisual media) commercials, and magazine, sport and entertainment programming which may be transmitted within the Territory by any means subject to each such programme or commercial comprising no more than 3 minutes of footage taken from any single Match.

5.2.4   **Mobile Rights**

the right to make and/or permit a third party to make available audio and/or audio-visual coverage of Matches by means of mobile telecommunications services that are intended for reception and viewing on mobile devices in the Territory, Stanford confirms that it will not authorise live streaming of full Match coverage via such mobile telecommunication services in Part A or Part C of the Territory.

5.2.5   **Internet Rights**

the right to itself and/or permit third parties to transmit and/or make available audio and/or audio-visual coverage of the Matches in the Territory for delivery and viewing via the internet save that in Part A of the Territory Stanford shall not authorise any exhibition of audio-visual coverage of the Matches via the internet on a live basis and/or in the form of substantial highlights (more than 20 minutes per Match) until at least 24 hours following conclusion of the Match in question. In Part C of the Territory Stanford shall not authorise live streaming of the Matches via the internet.

5.2.6   **Commercial Partners**

without prejudice to the extent of the Excluded Rights as set out in clause 5.2 above (which rights shall not be limited by this clause 5.2.6), and not withstanding any other provisions of this Agreement, the right to use or authorise Stanford sponsors to use edited extracts of footage of Matches not exceeding 3 minutes per Match for advertising and promotional purposes only in any and all media within the Territory.

5.2.7   **Radio Rights**

the right to broadcast and/or make available (and authorise others to broadcast and/or make available) audio only coverage of the Matches either on a linear or on-demand basis by means of analogue and/or digital radio broadcasting and/or via the internet and/or any other platform,

3

CONFIDENTIAL

RECEIVER527-00292277

APP000650

5.3  Stanford may exercise the Excluded Rights inside and outside of the Territory as it sees fit.  For the avoidance of doubt the unavoidable overspill of other licensees' broadcasts into the Territory and their unauthorised relay (if any) shall not constitute a breach of this Agreement.

6.  **LICENCE FEE**

6.1  ESPN shall pay to Stanford the total sum of US$190,000 apportioned as follows:

   (i)   In respect of the Stanford Super Series  US$95,000

   (ii)  In respect of the Regional Event US$95,000

6.2  All Licence Fees to be paid plus VAT/sales taxes if applicable but net of any and all other taxes save for withholding tax.

7.  **PAYMENT**

7.1  The Licence Fee shall be payable by ESPN in instalments in accordance with the following payment schedule, subject to receipt of a valid and appropriate invoice by ESPN into the account nominated by Stanford in accordance with clause 7.7 below:

   | 7.1.1 | Within 10 days following signature of this Agreement. | US $35,000 |
   | 7.1.2 | The later of 21 days prior to the start of the Stanford Super Series or 10 days following signature of this Agreement | US $35,000 |
   | 7.1.3 | 15 November 2008 or 14 days following the Feature Match, whichever is later | US $25,000 |
   | 7.1.4 | 1 March 2009 | US $70,000 |
   | 7.1.5 | 30 April 2009 | US $25,000 |

7.2  The Licence Fee and each instalment thereof shall be paid without deduction or set off of any kind.  If ESPN is required by law or regulation to make any withholding or deduction in respect of any instalment or amount of the Licence Fee payable hereunder it will provide all reasonable assistance as Stanford may require to enable it to recoup such sums.

7.3  In the event that the Feature Match (as described in Schedule 1) does not take place as scheduled and/or on its Reserve Day and/or the Regional Event does not take place (as described in Schedule 1), then the following provisions shall apply:

   7.3.1  If the Feature Match or the Regional Event is re-scheduled to take place during the Term then Stanford and ESPN agree that, subject to Clause 7.3.1, ESPN's Broadcast Rights hereunder shall apply to such rescheduled Feature Match/Regional Event when it is actually played mutatis mutandis.

   7.3.2  If the Feature Match is cancelled without a ball being bowled and/or a result is not achieved based upon play that takes place and/or the Regional Event does not take place, then ESPN shall be entitled as its sole remedy to request an equitable reduction/refund if the Licence Fee.  Such reduction/refund to be agreed in good faith between the parties within 30 days of the expiry of the Term (the "Negotiating Period") and based on the allocation set out above.  In the event that the Parties are unable to agree upon such reduction/refund with the Negotiating Period then either party may refer the issue to arbitration for final resolution in accordance with the provisions of the Arbitration Act 1996 (as amended).

   7.3.3  For the avoidance of doubt no refund or reduction shall apply in respect of any Matches of the Stanford Super Series which do not take place other than the Feature Match nor in regard to individual Matches of the Regional Event.

4

d-081014 jh (ESPN agreement) oc

CONFIDENTIAL

RECEIVER527-00292278

**APP000651**

7.3.4     Stanford acknowledges that if the Stanford Super Series, including the Feature Match, is cancelled in accordance with a final binding court ruling enforceable upon Stanford and arising from the current proceedings in London, and after all appeals have been exhausted it will not be rescheduled during the Term, then ESPN shall be entitled by notice in writing within one week of being notified of same to nullify this Agreement. In the event that ESPN so exercises its right to nullify this Agreement, the Agreement shall be deemed void ab initio and as its only liability Stanford shall promptly repay to ESPN as its only remedy all Licence Fees paid by ESPN at that date.

7.4   Stanford shall be entitled to charge interest on any late payments at 2% above the 3 month LIBOR rate applicable on the due date for payment.

7.5   Without prejudice to any other rights or remedies Stanford may have, in the event of non-payment by the dates set out above Stanford may withhold access to the signal of the Matches (or part thereof) pending receipt of payment.

7.6   Time is of the essence in relation to ESPN's payment obligations hereunder.

7.7   Payment of all Licence Fees hereunder shall be made to the following account or such other account as Stanford may direct:

| | |
|---|---|
| Name: | Bank of St. Croix |
| Address: | 5025 Anchorway, Christiansted, VI 00820 |
| ABA: | 021606690 |
| Account Name: | Stanford 20/20 LLC |
| Account #: | 0022016603 |

**8.    ESPN'S OBLIGATIONS**

8.1   ESPN undertakes as a minimum guaranteed commitment:

8.1.1    In Part A of the Territory:

(i)   to transmit live and in full on ESPN360 broadband services the Feature Match and at least four of the five other Matches comprising the Stanford Super Series (minimum of 5 Matches in total as attached in Schedule 1) together with any presentation ceremonies forming part thereof;

(ii)   to broadcast upon ESPN2 a 2-hour special, to be produced by ESPN at its cost, of the Feature Match to be first broadcast between 12:00 and 19:00 hours EST on Sunday 2nd November 2008.

(iii)   to transmit on ESPN360 broadband services live and in full coverage of all Matches in the Regional Event.

8.1.2    In Part B of the Territory:

(i)   to telecast live and in full ball by ball coverage of the Stanford Super Series;

(ii)   to telecast live ball by ball coverage of the Regional Event, subject to ESPN's being able to accommodate scheduling, and in any event a minimum of 60% (sixty per cent) of such Matches to be telecast live ball by ball.

8.1.3    In Part C of the Territory:

(i)   to broadcast live and in full coverage of the whole of the Stanford Super Series on ESPN International throughout Part C of the Territory.

8.1.4    If in either Part A, Part B and/or Part C of the Territory, ESPN desires to transmit highlights of the Stanford Super Series, Stanford confirms that it will make available such highlights programmes as are available at no extra cost to ESPN.

5

d-081014 jh (ESPN agreement) cc

RECEIVER527-00292279

**APP000652**

8.1.5    Stanford recognises that in the event that the Stanford Super Series is rescheduled such that the Feature Match does not take place on 1st November 2008, then ESPN may not be able to fulfil the broadcast commitments given in 8.1.1 (ii), 8.1.2 (i) and 8.1.3 (ii) above due to scheduling clashes with contracted live sports programming. In such circumstances ESPN undertakes to transmit the programming with equivalent as-live scheduling within no more than 48 hours of the Match taking place and, where the Match took place live during Prime Time, in Prime Time. For these purposes it is agreed that weekend Prime Time shall be as set out in 8.1.1 (ii) and weekday Prime Time shall be 17.00 to 22.00 EST.

8.2    If Stanford so requests reasonably in advance, which request is hereby acknowledged in regard of the two-hour special to be aired on ESPN2, ESPN will within 7 days of such request provide Stanford with a copy in a format reasonably specified by Stanford of all programming and/or transmissions featuring the Matches broadcast and/or made available by ESPN.

8.3    Prior to offering for sale to any third party any broadcast sponsorship packages and/or any commercial airtime in relation to its proposed transmissions of the Matches, ESPN will grant Stanford and Stanford's appointed sponsors/commercial partners (including without limitation the "Presenting Sponsor" as referred to below), as notified by Stanford, an exclusive five day negotiating period on and from the date of this Agreement for the purchase of broadcast sponsorship and/or commercial airtime packages in and around ESPN's transmissions of the Matches. Further, ESPN agrees that it will not sell any broadcast sponsorship packages to any third party whose business involves the provision of financial products and/or services. Other than this prohibition on appointing competitors as broadcast sponsors, and provided that ESPN has given the exclusive first right of negotiation as set out in this clause 8.3, ESPN shall have absolute discretion regarding who (if anyone) it appoints as its advertisers and/or broadcast sponsor(s).

ESPN shall have no right to sell or otherwise grant to any third party any sponsorship or the promotional rights (including, by way of example only, a marketing or promotional partnership or an "official" status sponsorship) that suggest in any way that such party is a sponsor of, or in any way affiliated with Stanford and/or the Matches or any of them. ESPN shall not identify, present, or promote any advertiser or sponsor of any Programme as having any relationship, affiliation or association with Stanford and/or the Matches and/or the Super Series and/or the Regional Event unless such relationship(s) in fact exist.

Telecast sponsorships or titles for all event telecasts authorised by this Agreement will b presented in the following manner: "This telecast presented by..." or "This telecast brought to you by..." or "This telecast sponsored by..." or "This telecast presented on ESPN by..." if ESPN desires to present such a sponsorship in another manner, it shall consult with and obtain prior written approval of Stanford.

8.4    ESPN will refer to the Matches by their full and proper title including reasonable inclusion of any title sponsors' names, if any, as advised by Stanford. Inadvertent and accidental failure to comply on every occasion with this requirement shall not constitute a breach of this Agreement.

8.5    ESPN will comply with all reasonable copyright and trade mark guidelines (which shall be provided to ESPN as soon as practicable following execution of this Agreement) relating to Stanford and Match names and logos and will broadcast all copyright notices and other credits, as advised by Stanford and included in the Feeds or other programming in its broadcasts and/or transmissions of the Matches.

8.6    ESPN shall not:



d-081014 jh (ESPN agreement) cc

6

CONFIDENTIAL

RECEIVER527-00292280

**APP000653**

8.6.1    use or permit the use of any footage of the Matches in any advertising in any media for so as to express or imply an endorsement by Stanford of any goods or services;

8.6.2    other than in accordance with this Agreement use or adopt any name or trade mark which identifies with Stanford or any Match;

8.6.3    modify the Feed (whether by virtual advertising or otherwise) in any way other than in accordance with ESPN's rights set out in Clause 5.1.3.

8.7    ESPN undertakes to ensure that its transmissions and exhibitions is restricted to the Territory and accordingly undertakes to insure:

8.7.1    all of ESPN's satellite transmissions to its affiliated distributors are encrypted, and ESPN will require that any subsequent satellite transmissions by its affiliated distributors are encrypted;

8.7.2    that it uses geo-blocking technology to ensure its transmissions and/or exhibitions made available via the Internet are not available to viewers outside the applicable part of the Territory.

8.7.3    to use all reasonable efforts as may be requested by Stanford to prevent any unauthorised reception and/or relay and/or retransmission of its exhibitions outside the Territory. Stanford acknowledges that it is not possible to prevent all "piracy" and that ESPN shall not be obligated to engage in futile litigation.

8.8    ESPN shall supply to Stanford by 15 November 2008 and 20th May 2009 respectively such returns as are available to ESPN showing the audience figures (together with any demographic data) for each transmission of Match footage (whether live, delayed or highlights) made by it during the Licence Period, in respect of each channel.

## 9.    PRODUCTION / DELIVERY / TECHNICAL COSTS

9.1    Stanford shall procure production of the international feed of the Matches (which comprises the audio visual coverage of the Matches with English language commentary, ambient sound and graphics, including the logo of the event) in 16:9 format to a first class international broadcast standard (the "Feed"). The Feed for the 20:20 Matches comprising the Stanford Super Series (not the Beach Cricket) shall be made available in high definition format.

9.2    ESPN shall be entitled to access the Feed free of charge upon a satellite to be advised by Stanford or, if ESPN so requests access to the Feed shall be made available to ESPN at the venue of the Match.

9.3    In the event that same are incurred over and above accessing the Feed as described in 9.2 above, ESPN shall pay any relevant technical or service charges to Stanford/its nominee within 30 days of receipt of valid and appropriate invoice.

## 10.    INTELLECTUAL PROPERTY RIGHTS

Any and all copyright and other intellectual property rights in the Feed of the Matches and/or any recordings or adaptations thereof shall vest in and belong to Stanford and ESPN hereby assigns to Stanford by way of assignment of future copyright any and all such rights that may arise by the operation of this Agreement, but Stanford shall not exhibit or authorize the exhibition or distribution of versions of such material that include ESPN branding or identification.

## 11.    REPRESENTATIONS WARRANTIES AND UNDERTAKINGS

11.1    Stanford represents warrants and undertakes to ESPN:

7

d-061014 (h (ESPN agreement) cc

CONFIDENTIAL

RECEIVER527-00292281

**APP000654**