**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY | § | |
| AS COURT-APPOINTED RECEIVER | § | |
| FOR THE STANFORD INTERNATIONAL | § | |
| BANK LTD., ET AL. and the OFFICIAL | § | |
| STANFORD INVESTORS COMMITTEE, | § | |
| | § | Civil Action No. 3:10-CV-0527-N-BG |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| BEN BARNES and BEN BARNES GROUP, L.P., | § | |
| | § | |
| Defendants. | § | |

---

**PLAINTIFFS' JOINT RESPONSE
TO DEFENDANT BEN BARNES' MOTION FOR SUMMARY JUDGMENT**

---

**CASTILLO SNYDER, P.C.**
Jesse R. Castillo
State Bar No. 03986600
Edward C. Snyder
State Bar No. 00791699
Bank of America Plaza, Suite 1020
300 Convent Street
San Antonio, TX 78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210

**BUTZEL LONG, P.C.**
Peter D. Morgenstern (*Pro Hac Vice*)
Joshua E. Abraham (*Pro Hac Vice*)
230 Park Avenue, Suite 850
New York, NY 10169
Telephone: (212) 818-1110
Facsimile: (212) 818-0494
morgenstern@butzel.com
abraham@butzel.com

*Attorneys for The Official Stanford
Investors Committee*

**BAKER BOTTS L.L.P.**
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
98 San Jacinto Boulevard, Suite 1500
Austin, Texas 78701
Telephone: (512) 322-2500
Facsimile: (512) 322-2501

*Attorneys for Receiver Ralph S. Janvey*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

I.      PRELIMINARY STATEMENT ............................................................................. 1

II.     INTRODUCTION & FACTUAL BACKGROUND............................................... 2

      **A.**    THE STANFORD PONZI SCHEME...................................................2

      **B.**    STANFORD RETAINS BEN BARNES...............................................3

      **C.**    BEN BARNES WORKS TO EXPAND AND CONCEAL THE PONZI SCHEME. ...........................................................................6

      **D.**    BARNES IGNORED NUMEROUS INDICIA OF FRAUD .................9

III.    ARGUMENTS & AUTHORITIES ....................................................................... 11

      **A.**    BEN BARNES IS AN INITIAL TRANSFEREE UNDER TUFTA....................12

      **B.**    BEN BARNES IS A SUBSEQUENT TRANSFEREE UNDER TUFTA ...........14

      **C.**    BEN BARNES IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE UNJUST ENRICHMENT CLAIM...............................................16

IV.     CONCLUSION..................................................................................................... 17

# TABLE OF AUTHORITIES

Page

**Cases**

*Am. Cancer Society v. Cook*,
675 F.3d 524 (5th Cir. 2012) ........................................................................... 11

*Carroll v. Stettler*,
No. 10-2262, 2010 WL 4611450 (E.D. Pa. Nov. 12, 2010) ................................... 12

*Citizens National Bank of Texas v. NXS Construction, Inc.*,
387 S.W.3d 74 (Tex. App.—Houston [14th Dist.] 2014 ...................................... 14

*Esse v. Empire Energy III, LTD.*,
333 S.W.3d 166 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ................. 12, 13

*Floyd v. Dunson (In re Rodriguez)*,
209 B.R. 424 (Bankr. S.D. Tex. 1997) ................................................................ 11

*GE Capital Commercial, Inc. v. Worthington Nat. Bank*,
No. 3:09-CV-572-L, 2012 WL 2159185  (N.D. Tex. Jun. 3, 2012) ........................ 15

*In re Agric. Research & Tech. Grp.*,
916 F.2d 528 (9th Cir. 1990) ............................................................................. 11

*In re Int'l Admin. Services, Inc.*,
408 F.3d at 705-06 ......................................................................................... 15

*Janvey v. Adams*,
588 F.3d 831 (5th Cir. 2009) .............................................................................. 2

*Janvey v. Alguire*,
Case No. 3:09-cv-00724-N [Doc. 765]  (N.D. Tex. Sept. 26, 2011) .................. 11, 16

*Janvey v. Bogar*,
No. 3:10-CV-2583-N-BG, 2014 WL 4907074 (N.D. Tex. May 1, 2014) ................ 15

*Janvey v. Dem. Sen. Camp. Comm.*,
793 F. Supp. 2d 825 (N.D. Tex. 2011) ............................................................. 2, 3

*Janvey v. Democratic Senatorial Campaign Committee, Inc., et al.*, Case No. 3:10-cv-00346-N
[Doc. 109] (N.D. Tex. filed Jun. 22, 2011) ......................................................... 9

*London v. London*,
192 S.W.3d 6 (Tex. App.—Houston [14th Dist.] 2005, pet. den.) ........................ 16

*Quilling v. 3D Marketing, LLC*,
No. 3-06-CV-0293-L, 2007 WL 1058217 (N.D. Tex. Feb. 8, 2007) ........................................ 11

*Rotstain et al. v. Trustmark National Bank*, *et al.*,
Case No. 3:09-CV-2384-N (N.D. Tex. Jun. 5, 2014) ...................................................................... 2

*SEC v. Res. Dev. Int'l, LLC*,
487 F.3d 295 (5th Cir. 2007) ....................................................................................................... 11

*Southern U.S. Trade Ass'n v. Unidentified Parties*, Civil Action No. 10-1669, 2012 WL 579439
(E.D. La. Feb. 22, 2012) ............................................................................................................. 14

*Staats v. Miller*,
243 S.W.2d 686 (Tex. 1951)). ..................................................................................................... 16

*Trigeant Holdings, Ltd. v. Jones*,
183 S.W.3d 717 (Tex.App.-Houston [1st Dist.] 2005 – pet. denied) ........................................ 15

*Tyler v. Cedar Hill Independent School District*,
426 Fed.Appx. 306 (5th Cir. 2011) ........................................................................................... 14

*Warfield v. Byron*,
436 F.3d. 551 (5th Cir. 2006). .................................................................................................... 11

## **<u>Statutes</u>**

11 U.S.C. § 550(a)(1) ..................................................................................................................... 13

Tex. Bus. & Com. Ann. Code § 24.001 ........................................................................................... 2

Tex. Bus. & Com. Code Ann. § 24.009(b)(1) ................................................................................ 12

Tex. Bus. & Com. Code Ann. § 24.009(b)(1)). .............................................................................. 13

Tex. Bus. & Com. Code Ann. § 24.009(b)(2) ................................................................................ 14

Plaintiffs submit this Joint Response to Defendant Ben Barnes' Motion for Summary Judgment[1] [Docs. 107-109, 53], and respectfully show the Court as follows:

## I.  PRELIMINARY STATEMENT

In 2005, R. Allen Stanford ("Stanford") hired his friend Ben Barnes – with a handshake and without a contract – to provide supposed government advisory and lobbying services to Stanford and the entities he operated and controlled.  In reality, these services furthered the Stanford Ponzi scheme and lent an air of legitimacy to what was otherwise one of the largest frauds in U.S. history.

Ben Barnes worked diligently for over three years to counter personal threats to Stanford's public image and reputation, and to investigate the feasibility of tax avoidance legislation that if passed would have served only to enrich Stanford personally to the detriment of his creditors and the investors he defrauded.  In doing so, Ben Barnes was made aware of information that should have caused him – and indeed, would have caused any reasonable person – to question and investigate Stanford's criminal operations.

Ben Barnes has now filed a motion for summary judgment, seeking dismissal of the fraudulent transfer and unjust enrichment claims made against him in his personal capacity.  Ben Barnes argues that only defendant Ben Barnes Group, LP ("BBG") can be liable for Stanford-related activity during the relevant period because he, personally, was not a "transferee" of Stanford-related funds under applicable law.

Ben Barnes is mistaken.  There is no basis at this stage of the proceedings to allow Ben Barnes to hide behind BBG, or other entities he operates and controls, to escape liability for his misconduct.  The evidence shows that Ben Barnes was an initial transferee or person for whose

---

[1]   Defendant Ben Barnes Group, L.P. did not file a motion for summary judgment in this action.

benefit the transfers to BBG were made and was alternatively a subsequent transferee of Stanford's fraudulent transfers to BBG within the meaning of the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE § 24.001, *et seq*. ("UTFTA").  The transfers to BBG were made for the direct benefit of Ben Barnes because he was the person who Stanford intended to benefit and because he controlled BBG as the sole Shareholder of BBG's general partner.  Ben Barnes certainly received salary payments and distributions directly related to BBG's work for Stanford, and Ben Barnes took these transfers in bad faith and without providing any value whatsoever to Stanford's creditors.  Having been personally enriched at the expense of the creditors he helped impoverish, Ben Barnes should be required in law and equity to return the transfers he received.  Ben Barnes' motion for summary dismissal should be denied and the case should proceed expeditiously to trial.

## II.  INTRODUCTION & FACTUAL BACKGROUND

### A.    THE STANFORD PONZI SCHEME

This action arises out of the multi-billion-dollar Ponzi scheme perpetrated by Stanford and the Stanford Entities in over 13 countries over a period of at least 15 years (collectively, the "Stanford Entities").  *See Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009); *Rotstain et al. v. Trustmark National Bank, et al.*, Case No. 3:09-CV-2384-N, Order [Doc. 194] pp. 1-2 (N.D. Tex. Jun. 5, 2014); *Janvey v. Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d 825, 856-57 (N.D. Tex. 2011).  As the Court has previously recognized, Stanford's core objective was to sell CDs issued by Stanford International Bank Limited ("SIB") and marketed by the Stanford Entities.  *Adams*, 588 F.3d at 833; *Rotstain*, pp. 1-2; *Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d at 856-57.  SIB maintained a high volume of CD sales by promising above-market returns and falsely assuring investors that the CDs were backed by safe, liquid investments.  *Adams*, 588 F.3d at 833.  In fact, SIB had to use new CD sales proceeds to make interest and redemption payments on pre-existing

CDs because it did not have sufficient assets, reserves and investments to cover its liabilities. *Id.*; *Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d at 856-57.

### B.    STANFORD RETAINS BEN BARNES

Stanford and the Stanford Entities employed the supposed "services" of a number of individuals and third-party professionals to burnish their public image and to create the impression in the minds of investors and regulators of a legitimate, profitable operation.  *See* Appendix ("App.") p. 009. (Transcript of Deposition of James M. Davis ("Davis Tr.") 54:2-24). One of these individuals was Ben Barnes.

Stanford hired Ben Barnes in 2005.   *See* App. pp.  030. ¶ 42 (Declaration of Karyl Van Tassel ("Declaration")).[2]  Barnes' claim that it was BBG, rather than Ben Barnes, who Stanford intended to retain is belied by the fact that there was never a written services agreement between the parties.  *See* App. p. 149 (Transcript of Deposition of Kent Caperton ("Caperton Tr.") 52:16-24).   And, as discussed below, it was Ben Barnes, rather than BBG, who Stanford knew and intended to develop a working relationship with.  *See, e.g.,* App. p. 052. (KVT-27, Exhibit of Declaration) ("Yolanda I have been personally paying Ben $265K each month this year.  I think the world of Ben and know he is very capable but this is too much for what we are getting in return.").  The idea that Stanford considered Ben Barnes, a respected and influential former Lieutenant Governor of the State of Texas, to be fungible with other BBG employees defies credibility.  Thus, although all payments were made nominally to BBG, that was only as a result of Ben Barnes' instructions to Stanford about where to send the payments.  *See* App. pp.  022, 024-25. ¶¶ 25, 30, 31 (Declaration).  Indeed, many of these payments were made directly by

---

[2]      The Court and the Fifth Circuit have previously relied on Ms. Van Tassel's declarations to establish the existence and operations of the Stanford Ponzi scheme.  *See Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d at 856-57; *Janvey v. Alguire*, 647 F.3d 585, 597-598 (5th Cir. 2011).

Stanford to BBG from Stanford's <u>personal</u> bank account – an unusual arrangement even by Stanford's already corrupt standards of practice.[3]  *See* App. p. 025. ¶ 31 (Declaration). In total, BBG received $5,073,466.00 in transfers from Stanford personally and the Stanford Entities during the relevant period (the "<u>Transfers</u>").  *See* App. p.  050. (KVT-13, Exhibit of Declaration).

Ben Barnes was an initial and/or subsequent beneficiary of Transfers.  *See* Amended Complaint [Doc. 33] ¶ 3.   The Transfers were made to BBG by Stanford and the Stanford Entities for the direct benefit of Ben Barnes, as Ben Barnes was the person retained by Stanford, was the person whose credentials Stanford sought, was the person who exercised control over BBG's operations, and was the sole shareholder of BBG's general partner.  *See* Ben Barnes Affidavit, [Doc 109] ¶ 4 ("At all times relevant to this Affidavit, the General Partner of BBG has been (and currently is), EMI, a Texas corporation of which I am the sole shareholder."). According to his motion, Barnes was also a limited partner of BBG, *see* Doc. 108 at 3, and there is no record evidence that anyone else besides Barnes was a limited partner of BBG.  *See* App. pp. 129-30 (Caperton Tr. 32:13-33:6).   Thus, the summary judgment evidence supports the inference that Barnes, through a combination of his limited partner interest in BBG and his sole ownership of the general partner, has the only existing ownership interest in BBG.  Accordingly, the claim that Barnes received no share from the Stanford fees to BBG defies credibility.  Those statements in the declarations of Barnes and BBG's human resources director, if they have any truth at all, reflect nothing other than that money is fungible and that BBG made no special effort to segregate the funds paid by Stanford for a special payment to Barnes.

---

[3]     Ben Barnes' claim in his affidavit that "SFG wrote all checks and paid all funds for services rendered by BBG" is accordingly demonstrably false.  *See* [Doc. 109] ¶ 10.

As a result of the foregoing, Ben Barnes is an initial transferee or the person for whose benefit the transfers were made, within the meaning of TUFTA.[4]  Moreover, the summary judgment evidence presented by Ben Barnes does not reveal one way or another how exactly BBG deployed the Transfers it received from Stanford and the Stanford Entities.  Aside from self-serving and general claims that he did exercise "dominion or control" over the Transfers, there has been no evidentiary showing by Ben Barnes which would justify this bare legal conclusion.   BBG's operations are such that its 30(b)(6) witness does not even know how BBG is owned or the identity of its partners.  *See* App. pp. 129-30 (Caperton Tr. 32:20-22; 33:7-10).  Even Ben Barnes himself doesn't quite know.  *See* Ben Barnes Affidavit, [Doc. 109] ¶ 4.

Ben Barnes was certainly a subsequent transferee of the Transfers because he claims he was a paid employee of BBG; and as the sole owner of BBG's general partner, he would have received Stanford-related distributions.[5]  *See* Ben Barnes Affidavit, [Doc 109] ¶ 12 ("I receive a salary from BBG as an employee"); ¶ 3 ("I am employed by Ben Barnes Group, L.P. ("BBG"), a Texas limited partnership.  I serve as the President and Secretary of the General Partner of BBD, Entercorp. Management Inc. ("EMI")"); ¶ 4 ("At all times relevant to this Affidavit, the General Partner of BBG has been (and currently is), EMI, a Texas corporation of which I am the sole shareholder.").   And there is no evidence that any other person besides Barnes would have received distributions from the income of BBG,

In these dual capacities, Ben Barnes certainly received proceeds which can be traced to the Transfers.  Indeed, Ben Barnes fails to put forth any competent evidence demonstrating how else BBG could possibly have used the Transfers.

---

[4]     Under TUFTA, Ben Barnes qualifies as either a "transferee" or "the person for whose benefit the transfer was made."  TEX. BUS. & COM. CODE ANN. § 24.009(b)(1).

[5]     Once a transfer is avoided under TUFTA, recovery is permitted against "any subsequent transferee other than a good faith transferee who took for value …."  TEX. BUS. & COM. CODE ANN. § 24.009(b)(2).

### C.      BEN BARNES WORKS TO EXPAND AND CONCEAL THE PONZI SCHEME.

Ben Barnes, in his individual capacity or in his capacity as an employee of BBG, provided services to Stanford and the Stanford Entities that in actuality served to further perpetuate and conceal the Ponzi scheme.

Sometime in 2000 or 2001, Ben Barnes and Stanford were introduced to one another. *See* App. p. 252 (Transcript of Deposition of Ben Barnes ("Barnes Tr.") 31).  Their friendship blossomed to the point that staffers for the Stanford Entities commented that "[Ben Barnes] and RAS [i.e., Stanford] go way back and are always joking around."  *See* App. p. 254. (April 18, 2006 Email, RECEIVER527-00282362).  Indeed, James Davis, the former CFO of Stanford Financial Group and one of Stanford's admitted co-conspirators, confirmed that Ben Barnes and Stanford had many personal interactions and communicated "often."  *See* App. p. 007. (Davis Tr. 49:6-50:15).

This friendship was so important to Ben Barnes that he became willing to shill and lie about the nature of his relationship with Stanford to help boost Stanford's reputation, and ultimately the criminal Ponzi scheme.  In September 2004, Ben Barnes provided a false reference letter on behalf of Stanford to a Venezuelan banking regulator in support of Stanford's application for approval to purchase and operate a commercial bank in Venezuela.  In the letter, their three or four year friendship had suddenly become one of "twenty-five years."  *See* App.  p. 255. (Letter, RECEIVER527-00222802) ("I have known Mr. Stanford for more than 25 years on both a personal and professional level.  Mr. Stanford is…a man of strong character and integrity.  All of his business dealings have always been conducted to the highest possible standards … I have no reservation in recommending that R. Allen Stanford and his companies be given every possible courtesy and consideration.").

The evidence shows that Ben Barnes provided "services" to Stanford in three key areas: (i) assisting Stanford to manage his public persona and reputation; (ii) assisting Stanford to pass tax avoidance legislation; and (iii) assisting Stanford in making political donations to public officials.

The record evidence shows that Ben Barnes was a significant advisor to Stanford in his attempts to manage his public persona and quash any reporting about negative aspects of his operations.  In 2006 Stanford decided to donate $25 million to the University of Houston as an "opportunity…to communicate a piece of the 'Stanford Story. [sic]"  *See* App. p. 256. (March 3, 2006 Email, RECEIVER527-00280362—63).   Ben Barnes was consulted on how to best structure the gift and rollout to meet that goal.   *See* App. p. 258. (Feb. 14, 2006 Email, RECEIVER527-00261635).  Ben Barnes was again consulted after Stanford and Antiguan Prime Minister Spencer got into a very public war of words, with Spencer calling Stanford "haughty, arrogant, and obnoxious."  *See* App. p. 259-262. (Feb. 23, 2007 Daily Observer Article, RECEIVER527-00281731—32) (Feb. 23, 2007 Letter, RECEIVER527-00281725—26).   Ben Barnes urged Stanford to apologize and drafted talking points for him to do so.  *See* App. p. 263 (Feb. 23, 2007 Memo, RECEIVER527-00279349).    Additionally, on two separate occasions, Ben Barnes advised Stanford to hire an online reputation firm to boost his reputation and bury negative reports about his background. *See* App. p. 092, 264-65. (Emails and Power Point Presentation).

Ben Barnes also assisted Stanford in his efforts to influence the U.S. government to pass tax avoidance legislation.  Ben Barnes was tasked with drafting and analyzing proposed legislation, which would have allowed for "income" earned by Stanford and the Stanford Entities in the U.S. and Caribbean to be taxed as if earned in the U.S. Virgin Islands ("<u>USVI</u>").  *See* App.

p. 285. (Transcript of Deposition of Robert Mitchell Delk ("Delk Tr.") 99:14-18).  In order for Stanford to take advantage of lower USVI tax rates, Ben Barnes led a lobbying campaign to pass legislation that would ensure the "sourcing requirement [of USVI taxable income] was sufficiently broad that it would, in fact, entail those dollars that had really, I guess, emanated from Houston and Atlanta." *See* App. p. 287-88. (Delk Tr. 134:22-135:3). This effort was designed specifically to benefit Stanford personally, as he was the sole shareholder of the various Stanford Entities.  *See* App. p. 286 (Delk Tr. 131:9-15).

Stanford and the Stanford Entities made payments to Ben Barnes and BBG to support this tax avoidance effort.  However, BBG's corporate designee was unable to connect any of the Transfers to any specific service provided or explain how those services created value for the creditors. *See* App. 217-18. (Caperton Tr. 120:9-121:2). Even Stanford himself harbored doubts about the effectiveness of Ben Barnes' tax avoidance strategy.  *See* App. p. 052. (KVT-27, Exhibit of Declaration) ("Yolanda I have been personally paying Ben $265K each month this year.  I think the world of Ben and know he is very capable but this is too much for what we are getting in return.").

Finally, Ben Barnes also assisted Stanford to make numerous political donations – donations that were designed to boost the reputation of Stanford and the Stanford Entities. Ben Barnes urged Stanford to make twelve separate $2000 campaign contributions to candidates of Charles Rangel's choosing, after speaking with the New York Congressman. *See* App. 054. (KVT-36, Exhibit of Declaration). Ben Barnes stated that "it is important that we pursue this" and recommended that Stanford make the donations as the "Democrats have a good chance of taking back the house."  *See Id*. Stanford's Chief of Staff, Yolanda Suarez, sent a check to Senator Dodd's presidential campaign at the direction of Ben Barnes' personal assistant in

March 2007. *See* App. 056. (KVT-37, Exhibit of Declaration). At Ben Barnes' suggestion, Stanford contributed $30,000 for a fundraiser in honor of Bernard Rapoport, a prominent Democratic Party fundraiser in Texas. *See* App. p. 289-90 (August 9, 2007 Email, RECEIVER527-00281457) (July 30, 2007 Invoice, RECEIVER527-00281458). With the contribution, Stanford had "a table for 10 [that Ben Barnes pledged to fill with] people in Congress most beneficial for him to be with." *See* App. p. 291 (July 12, 2007 Email, RECEIVER527-00281471). In August 2008, Ben Barnes notified Stanford of a request from the Governor of the U.S. Virgin Islands for Stanford to be the "major sponsor" of an upcoming National Democratic Governors' Association event. *See* App. p. 058 (KVT-40, Exhibit of Declaration). Ben Barnes stated that "it's a great opportunity". *See Id*. Stanford sponsored the event for $500,000.  *See* App. 060-62  (KVT-41 and KVT-42, Exhibits of Declaration).

Of course, Stanford used stolen funds to make these donations and none of this activity had any benefit whatsoever to Stanford's creditors.[6]

### D.       BARNES IGNORED NUMEROUS INDICIA OF FRAUD

During his tenure working for Stanford, Ben Barnes ignored repeated warning signs that should have prompted significant concerns about the business activities of Stanford and the Stanford Entities.

For example, on May 17, 2006, *Bloomberg* ran an article reporting on Stanford's claim that he had a family relationship to Leland Stanford, the founder of Stanford University.  The article not only suggested that Stanford's claimed connection to the founder was questionable, but also discussed Stanford's formation of an "offshore bank" and "problems with U.S. investigators."  *See* App. 065.  (KVT-44, Exhibit of Declaration).  Ben Barnes was involved in

---

[6]      Indeed, the Court, in a related action, entered an order avoiding political donations made by Stanford under TUFTA.  *See Janvey v. Democratic Senatorial Campaign Committee, Inc., et al.*, Case No. 3:10-cv-00346-N [Doc. 109] (N.D. Tex. filed Jun. 22, 2011).

the effort to try and quash the story.  *See* App. 070-88 (KVT-45, KVT-46, KVT-47, KVT-48,

KVT-49, and KVT-50, Exhibits of Declaration).  At one point, even James Davis suggested the

idea of having Ben Barnes reach out personally to Michael Bloomberg to "kill the story".  *See*

App. 090. (KVT-51, Exhibit of Declaration).

The *Bloomberg* article should have also been a red flag as Stanford indicated in

correspondence with Ben Barnes that he was concerned with the reference to Jonathan Winer, a

former Deputy Assistant Secretary of State, in the article.  *See* App. 292. (Feb. 22, 2007 Email,

RECEIVER527-00281736).  The reference noted Winer's concern that Stanford was using an

Antigua bank as a "power grab" to rewrite Antigua's offshore-banking rules. *See* App. 293 (May

17, 2006 Bloomberg.com Article, RECEIVER527-00281737).  According to media reports, Allen

Stanford was so concerned about Winer exposing his Ponzi scheme that he retained Kroll, Inc.,

the corporate intelligence firm, to investigate Winer's personal life. *See* App. 296-300.

(McClatchy DC Article: "Ponzi artist investigated ex-State Dept. official, records show").

The state of Stanford's reputation was so concerning that Ben Barnes suggested that

Stanford enlist the services of an online reputation firm.  Ben Barnes indicated that this, and the

hiring of a law firm specializing in federal elections, would be helpful in improving Stanford's

ability to give influential campaign donations.  *See* App. 092. (KVT-55, Exhibit of Declaration).

Ultimately, Stanford hired Joe Sandler of Sandler Reiff & Young, PC to help improve Stanford's

ability to give campaign donations, especially to the Democratic Senatorial Campaign

Committee ("DSCC"). In a memorandum by Sandler, he reported:

> We have been told by DSCC Finance that he does not "vet" for
> reasons that, based on discussions between our counsel and
> counsel for DSCC, appear to be linked to the perception that his
> company, Stanford Financial, which owns 2 major banks in
> Antigua among many other business interests around the world,

> has lobbied for weakening of US money laundering laws and
> regulation of offshore banking.

*See* App. 094-96. (KVT-83, Exhibit of Declaration).

In the face of all of this evidence, Ben Barnes failed to do any due diligence to make sure he wasn't working for and providing services to a fraudulent operation.

## III.   ARGUMENTS & AUTHORITIES

There is no dispute in the present case that the Transfers are fraudulent as a matter of law under TUFTA.

"In this circuit, proving that a transferor operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011) (citing *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007)); *see also In re Agric. Research & Tech. Grp.*, 916 F.2d 528, 535 (9th Cir. 1990) ("[T]he debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme."). Thus, a plaintiff is not required to demonstrate that the transfers at issue were made with actual fraudulent intent; "the mere existence" of a Ponzi scheme establishes such intent as a matter of law. *Quilling v. 3D Marketing, LLC*, No. 3-06-CV-0293-L, 2007 WL 1058217, at *2 (N.D. Tex. Feb. 8, 2007) (citing *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006)).

Both this Court and the Fifth Circuit have held repeatedly that Stanford operated all the Stanford Entities as a Ponzi scheme. *See*, e.g., *Alguire*, 647 F.3d at 597. Consequently, all transfers by the Stanford Entities, including the Transfers to BBG and Ben Barnes, were made with fraudulent intent as a matter of law. *See Am. Cancer Society v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012); *Alguire*, 647 F.3d at 598; *see* also *In re Ramirez (Floyd v. Dunson)*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997) ("[T]he criminal conviction of Ms. Rodriguez based on the debtors' operation of a Ponzi scheme conclusively establishes fraudulent intent, and precludes

the defendant from relitigating this issue.  As a matter of law, the fraudulent transfers were made to the defendant with the actual intent to hinder, delay or defraud later investors in debtors' scheme.") (internal citations omitted).

Ben Barnes, in his motion for summary judgment, does not dispute the existence of the Stanford Ponzi scheme or the actually fraudulent nature of the Transfers under TUFTA. Instead, Ben Barnes argues that he never actually received these Transfers as a matter of fact. Ben Barnes' motion for summary judgment is premised solely on the bare claim that he was not a "transferee" of Stanford-related funds within the meaning of TUFTA, and therefore the Transfers cannot be recovered from him, in his individual capacity.  *See* [Doc. 108] p. 4-8.  But Ben Barnes was, in fact, an initial and subsequent transferee of the Transfers and a person for whose benefit the Transfers were made.

### A.     BEN BARNES IS AN INITIAL TRANSFEREE UNDER TUFTA

A fraudulent transfer may be avoided and recovered from either a "transferee" or "the person for whose benefit the transfer was made."   TEX. BUS. & COM. CODE ANN. § 24.009(b)(1) (emphasis supplied).

Under TUFTA, sole shareholders of a transferee corporation can be deemed a "transferee" or "the person for whose benefit the transfer was made."  *See Esse v. Empire Energy III, LTD.*, 333 S.W.3d 166, 180–81 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (sole shareholders who assented to and benefited from a fraudulent transfer to their corporation were liable as persons for whose benefit the transfer was made) (quoting Tex. Bus. & Com. Code Ann. § 24.009(b)(1))); *see also Carroll v. Stettler*, No. 10-2262, 2010 WL 4611450, *3 (E.D. Pa. Nov. 12, 2010) (rejecting argument that fraudulent transfer claims brought by Ponzi scheme creditors under Pennsylvania's version of UFTA against transferees' owners required piercing of corporate veil because "even if [individual defendants] were not the first transferee of the asset,"

they were "the person for whose benefit the transfer was made") (internal quotation marks omitted)); *cf. In re Slatkin*, 243 Fed. App'x 255, 257–58 (9th Cir. 2007) (holding that sole shareholder of corporation could be held liable under bankruptcy code for fraudulent conveyances from Ponzi scheme because trustee in bankruptcy can recover such transfers from "the entity for whose benefit such transfer was made") (quoting 11 U.S.C. § 550(a)(1))).

Here, it is undisputed that Ben Barnes was the sole shareholder of BBG's general partner. *See* Ben Barnes Affidavit, [Doc 109] ¶ 4 ("At all times relevant to this Affidavit, the General Partner of BBG has been (and currently is), EMI, a Texas corporation of which I am the sole shareholder."). Ben Barnes clearly dominated BBG's operations, as the evidence shows that BBG's corporate designee had no knowledge of BBG's actual ownership and partnership structure. *See* App. pp. 129-30. (Caperton Tr. 32:20-22; 33:7-10). Moreover, Stanford retained Ben Barnes and the eponymous BBG as the culmination of a long-standing friendship with Ben Barnes. *See* App. p. 007. (Davis Tr. 49:6-50:15). The record evidence establishes that Allen Stanford himself subjectively intended to benefit Ben Barnes, rather than BBG. *See, e.g.,* App. p. 052. (KVT-27, Exhibit of Declaration) ("Yolanda I have been personally paying Ben $265K each month this year. I think the world of Ben and know he is very capable but this is too much for what we are getting in return."). There can be no doubt that the Transfers to BBG were "more than just an incidental or indirect benefit to [Ben Barnes]. Under the plain meaning of the statute [Ben Barnes was the] "person for whose benefit the transfer was made." *Esse*, 333 S.W.3d at 181 (citing Tex. Bus. & Com. Code Ann. § 24.009(b)(1)).

Ben Barnes, of course, disputes this and claims that he was merely a passive employee of BBG who had no input whatsoever into how the Transfers to BBG were deployed. *See* Ben Barnes Affidavit [Doc. 109] p. 5, ¶ 11. But that claim is as irrelevant as it is untrue. The

transfers were made to benefit Ben Barnes; what Barnes chose to do with them once they were at BBG is of no moment.  Further, the bare claim, made in a self-serving affidavit, that Barnes was a passive employee of BBG is not sufficient to support his burden on summary judgment.  *See e.g., Southern U.S. Trade Ass'n v. Unidentified Parties*, Civil Action No. 10-1669, 2012 WL 579439, at *3 (E.D. La. Feb. 22, 2012) ("Defendant's motion for summary judgment relies solely on his self-serving affidavits for support, and because the Defendant's credibility is a fact issue to be decided by the jury, the Court must conclude that summary judgment is inappropriate at this time. Accordingly, Defendant's motion must be denied"); *Tyler v. Cedar Hill Independent School District*, 426 Fed.Appx. 306, 309 (5th Cir. 2011) (criticizing use of self-serving affidavits on summary judgment).   Nor is it plausible that Ben Barnes was simply a passive employee of BBG and did not direct or otherwise control its operations.

If anything, the opposite conclusion is warranted:  Ben Barnes was the named proprietor and operator of BBG; there are no known limited partners of BBG besides Barnes; Ben Barnes is the sole shareholder of BBG's general partner (which indisputably benefited from the Transfers); and Ben Barnes is a close friend of an advisor to Stanford.  Ben Barnes is a "transferee" because the Transfers were clearly made to BBG "for the benefit of" Ben Barnes and the entities he owned directly.  *See Citizens National Bank of Texas v. NXS Construction*, Inc., 387 S.W.3d 74, 85 (Tex. App.—Houston [14th Dist.] 2014, rehearing overruled) ("The transfer directly benefited CNB because it increased the value of an entity owned by CNB").   There can be no doubt that Ben Barnes is a "transferee" or  a person for whose benefit the transfers were made within the meaning of TUFTA.

### B.    BEN BARNES IS A SUBSEQUENT TRANSFEREE UNDER TUFTA

Alternatively, it cannot possibly be disputed that Ben Barnes is a "subsequent transferee" of the Transfers under TUFTA.  *See* TEX. BUS. & COM. CODE ANN. § 24.009(b)(2) (recovery is

permitted against "any subsequent transferee other than a good faith transferee who took for value …."); *see also In re Int'l Admin. Services, Inc.*, 408 F.3d 689, 706-07 (11th Cir. 2005) ("once the plaintiff proves that an avoidable transfer exists[,] he can then skip over the initial transferee and recover from those next in line . . . .  Certainly, the plaintiff can pursue the initial transferee, but the plaintiff is not obligated to do so.").

Ben Barnes was a paid employee of BBG, the only known limited partner of BBG, and the sole owner of BBG's general partner.  *See* Ben Barnes Affidavit, [Doc 109] ¶ 12 ("<u>I receive a salary from BBG as an employee</u>") (emphasis added); ¶ 3 ("I am employed by Ben Barnes Group, L.P. ("BBG"), a Texas limited partnership.  I serve as the President and Secretary of the General Partner of BBD, Entercorp. Management Inc. ("EMI")"); ¶ 4 ("At all times relevant to this Affidavit, the General Partner of BBG has been (and currently is), EMI, a Texas corporation of which I am the sole shareholder.").  In these capacities, he certainly received direct or indirect payments as a result of his and BBG's work for Stanford and the Stanford Entities. *See Janvey v. Bogar*, No. 3:10-CV-2583-N-BG, 2014 WL 4907074, at *2 (N.D. Tex. May 1, 2014) (Stanford Receiver properly stated claim against wife of former Stanford employee as subsequent transferee because wife received "direct and indirect" benefits of the fraudulent transfers); *GE Capital Commercial, Inc. v. Worthington Nat. Bank*, No. 3:09-CV-572-L, 2012 WL 2159185, at *10 (N.D. Tex. Jun. 3, 2012) ("TUFTA not only creates liability against the person for whose benefit the transfer was made, such as the debtor, but also against the first transferee of the asset, or any subsequent transferee") (citing *Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex.App.-Houston [1st Dist.] 2005 – pet. denied); *In re Int'l Admin. Services, Inc.*, 408 F.3d at 705-06 (debtor transferred assets through multi-step international transactions as part of asset

protection plan; held, "mere conduit theory" was inapplicable because transferees could not be said to have acted without bad faith and as innocent participants to underlying fraud).

Ben Barnes claims, incredibly, that although he was a salaried employee of BBG he "did not personally receive any of the funds paid to BBG by the Stanford Entities, nor did he receive a distribution from or share of those funds." *See* [Doc. 108] p. 8-9.   However, he submits no evidence whatsoever demonstrating how exactly BBG deployed or made use of the over $5 million Stanford paid BBG.   Accordingly, Ben Barnes' claims that he was not in any way a subsequent transferee or beneficiary of Stanford-related funds should be disregarded.   Certainly, questions of fact preclude such a finding at this stage of the proceedings.

### C.    BEN BARNES IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE UNJUST ENRICHMENT CLAIM

Finally, there is no basis to dismiss Plaintiffs' claim against Ben Barnes for unjust enrichment.

"Texas courts have read claims for 'unjust enrichment' as pleading an equitable common law claim for money had and received."  *See Janvey v. Alguire*, Case No. 3:09-cv-00724-N [Doc. 765] p. 14 (N.D. Tex. Sept. 26, 2011) (citing *London v. London*, 192 S.W.3d 6, 12-14 (Tex. App.—Houston [14th Dist.] 2005, pet. den.).  "A claim for money had a received is not premised on wrongdoing, but looks to the justice of the case and inquires whether the party has received money that rightfully belongs to another."  *Id.* (citing and quoting *London*).  "The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong.   All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him."  *Id.*  (citing and quoting *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951)).

In the present case, the record-evidence shows that Ben Barnes was a recipient of and beneficiary of Stanford-related funds.  In return for his "services" to Stanford and the Stanford Entities, Ben Barnes and the entities he owns and controls were paid with Stanford CD proceeds. "Because SIB CDs served as the primary conduit of funds in and out of the Stanford [Ponzi] scheme" Ben Barnes's CD proceeds "are little more than stolen money that properly belongs to the Receivership Estate." *Id.* at 15.  It would be unconscionable for Ben Barnes to keep funds derived from investors in Stanford's fraud, whether or not he owned the funds directly or indirectly through his entities, because these investors were ultimately harmed by Ben Barnes's work for Stanford and the Stanford Entities.  Accordingly, Plaintiffs should be permitted at trial to obtain a judgment against Ben Barnes ordering him, in equity, to return to the victims of the Ponzi scheme the funds he received directly or indirectly.

## IV.   CONCLUSION

For the foregoing reasons, Ben Barnes's Motion for Summary Judgment should be denied in its entirety.

Dated:  March 3, 2015                    Respectfully submitted,

                                         CASTILLO SNYDER, P.C.

                                         By:   /s/ *Jesse Castillo*
                                               JESSE R. CASTILLO
                                               State Bar No. 03986600
                                               EDWARD C. SNYDER
                                               State Bar No. 00791699
                                               Bank of America Plaza, Suite 1020
                                               300 Convent Street
                                               San Antonio, TX 78205
                                               Telephone: (210) 630-4200
                                               Facsimile: (210) 630-4210

                                         BUTZEL LONG, P.C.

                                         By:   /s/ *Peter D. Morgenstern*

Peter D. Morgenstern (*admitted pro hac vice*)
Joshua E. Abraham (*admitted pro hac vice*)
morgenstern@butzel.com
abraham@butzel.com
230 Park Avenue, Suite 850
New York, New York 10169
(212) 818-1110
(212) 818-0494 (Facsimile)

**ATTORNEYS FOR THE OFFICIAL STANFORD
INVESTORS COMMITTEE**


**BAKER BOTTS L.L.P.**

By:   /s/ *David T. Arlington*
        David T. Arlington
        Texas Bar No. 00790238
        david.arlington@bakerbotts.com
        Scott D. Powers
        Texas Bar No. 24027746
        scott.powers@bakerbotts.com
        Kevin M. Sadler
        Texas Bar No. 17512450
        kevin.sadler@bakerbotts.com
        98 San Jacinto Blvd., Suite 1500
        Austin, Texas 78701-4039
        512.322.2500
        512.322.2501 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**


## CERTIFICATE OF SERVICE

        I hereby certify that on the 3rd day of March, 2015, I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all counsel of record.


                        /s/ *Jesse R. Castillo*
                         Jesse R. Castillo