**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY | § | |
| AS COURT-APPOINTED RECEIVER | § | |
| FOR THE STANFORD INTERNATIONAL | § | |
| BANK LTD., ET AL. and the OFFICIAL | § | |
| STANFORD INVESTORS COMMITTEE, | § | |
| | § | Civil Action No. 3:10-CV-0527-N-BG |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| BEN BARNES and BEN BARNES GROUP, L.P., | § | |
| | § | |
| Defendants. | § | |

_____

**APPENDIX TO PLAINTIFFS' JOINT RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

_____

| APP# | Document | Bates Numbers |
|---|---|---|
| APP 001-009 | Excerpts of Deposition of James M. Davis | Not applicable |
| APP 010-245 | Declaration of Karyl Van Tassel and excerpts of its exhibits. | Not applicable |
| APP 246-253 | Excerpts of Deposition of Kent Caperton | Not applicable |
| APP 246-253 | Excerpts of Deposition of Ben Barnes | Not applicable |
| APP 254 | April 18, 2006 Email to Kay-La Hughes from Julie Hodges – Subject: "GIFT FOR BOOK LAUNCH" | RECEIVER527-00282362[1] |
| APP 255 | September 30, 2004 Letter to Dr. Tino Alcides Diaz from Ben Barnes – Recommendation for Stanford to acquire a commercial bank in Venezuela. | RECEIVER527-00222802 |
| APP 256-257 | March 3, 2006 Email to Yolanda Suarez from Suzanne Hamm – Subject: "Univ of Houston/Meeting Recap" | RECEIVER527-00280362—63 |

_____

[1] All documents bearing a Bates label beginning with "RECEIVER527-" were produced by Plaintiffs' in the above-referenced matter.

| APP 258 | February 14, 2006 Email to Yolanda Suarez from Suzanne Hamm – Subject: "RE: UNIVERSITY OF HOUSTON" | RECEIVER527-00261635 |
|---|---|---|
| APP 259-260 | February 23, 2007 The Daily Observer – Article: "PM: Sir Allen Haughty, Arrogant Obnoxious" | RECEIVER527-00281731—32 |
| APP 261-262 | February 23, 2007 Public Letter to Antigua Prime Minister Spencer from Allen Stanford. | RECEIVER527-00281725—26 |
| APP 263 | February 27, 2007 Talking Points to Allen Stanford from Ben Barnes regarding apology to Antigua Prime Minister Spencer. | RECEIVER527-00279349 |
| APP 264 | March 15, 2007 Email to Allen Stanford from Julie Hodge – Subject: "From Visible Technologies, Ben Barnes" | RECEIVER527-00281644 |
| APP 265-275 | "Online Reputation Management Recommendations for Allen Stanford" from Visible Technologies | Not applicable[2] |
| APP 276-288 | Excerpts of Deposition of Robert Mitchell Delk | Not applicable |
| APP 289 | August 9, 2007 Email to Kye Walker from Julie Hodge – Subject: "FW: B[Bernard Rapoport]'s 90th Birthday Bash" | RECEIVER527-00281457 |
| APP 290 | July 30, 2007 Invoice to Allen Stanford from the Board of the Texas Democracy Foundation and the staff of the Texas Observer regarding "B's 90th Birthday Bash" | RECEIVER527-00281458 |
| APP 291 | July 12, 2007 Email to Kye Walker from Julie Hodge – Subject: "FW: B Rapoport 90th birth day dinner" | RECEIVER527-00281471 |
| APP 292 | February 22, 2007 Email to Susan Martin from Julie Hodge – Subject: "Bloomberg Article for Ben Barnes" | RECEIVER527-00281736 |
| APP 293-295 | May 17, 2006 Bloomberg.com – Article: "Stanford Financial's 'Family' Tie Fails to Impress University" | RECEIVER527-00281737—39 |
| APP 296-300 | November 29, 2012 McClatchy DC – Article: "Ponzi artist investigated ex-State Dept. official, records show" | Not applicable |

Dated:  March 3, 2015                          Respectfully submitted,

                                               **CASTILLO SNYDER, P.C.**

                                               By:  /s/ *Jesse Castillo*
                                                      JESSE R. CASTILLO
                                                      State Bar No. 03986600
                                                      EDWARD C. SNYDER
                                                      State Bar No. 00791699
                                                      Bank of America Plaza, Suite 1020
                                                      300 Convent Street
                                                      San Antonio, TX 78205
                                                      Telephone: (210) 630-4200
                                                      Facsimile: (210) 630-4210

---

[2] This document was produced by Plaintiffs' in a native file format. The file was entitled "RECEIVER527-00281645."

**BUTZEL LONG, P.C.**

By:  /s/ *Peter D. Morgenstern*

   Peter D. Morgenstern (*admitted pro hac vice*)
   Joshua E. Abraham (*admitted pro hac vice*)
   morgenstern@butzel.com
   abraham@butzel.com
   230 Park Avenue, Suite 850
   New York, New York 10169
   (212) 818-1110
   (212) 818-0494 (Facsimile)

**ATTORNEYS FOR THE OFFICIAL STANFORD INVESTORS COMMITTEE**

**BAKER BOTTS L.L.P.**

By:  /s/ *David T. Arlington*

   David T. Arlington
   Texas Bar No. 00790238
   david.arlington@bakerbotts.com
   Scott D. Powers
   Texas Bar No. 24027746
   scott.powers@bakerbotts.com
   Kevin M. Sadler
   Texas Bar No. 17512450
   kevin.sadler@bakerbotts.com
   98 San Jacinto Blvd., Suite 1500
   Austin, Texas 78701-4039
   512.322.2500
   512.322.2501 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 3rd day of March, 2015, I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ *Jesse R. Castillo*</u>
Jesse R. Castillo

1512963

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
_____

RALPH S. JANVEY, IN HIS    )
CAPACITY AS COURT-         )
APPOINTED RECEIVER FOR THE)
STANFORD INTERNATIONAL     )
BANK, LTD., et al. And the)
OFFICIAL STANFORD          )
INVESTORS COMMITTEE,       )
                           )
                           )
        Plaintiff,         )
                           )
VS.                        )    NO. 3:10-cv-527
                           )
                           )
BEN BARNES AND BEN BARNES )
GROUP, L.P.,               )
                           )
                           )
        Defendants.        )
_____

                        DEPOSITION OF

                    JAMES MILTON DAVIS

                     October 24, 2014

Reported by:

Valerie Hall Gilliam, LCR

Job no: 12770

Page 2

1           The Deposition of JAMES MILTON DAVIS is taken

2    on this, the 24th day of October 2014, on behalf

3    of the Defendant, pursuant to notice and consent

4    of counsel, beginning at approximately 10:30 a.m.

5    in the Federal Prison Camp, Millington, 6696 Navy

6    Road, Millington, Tennessee.

7           This deposition is taken pursuant to the

8    terms and provisions of the Federal Rules of

9    Civil Procedure.

10          All forms and formalities are waived.

11   Objections are reserved, except as to form of the

12   question, to be disposed of at or before the

13   hearing.

14          The signature of the witness is waived.

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2

     FOR THE PLAINTIFF:
 3
                    JOSHUA E. ABRAHAM, ESQ.
 4                  BUTZEL LONG
                    230 Park Avenue, Suite 850
 5                  New York, New York 10169
                    212-374-5370
 6                  abraham@butzel.com

 7                  JESSE CASTILLO, ESQ.
                    CASTILLO SYNDER, PC
 8                  300 Convent, Suite 1020
                    San Antonio, Texas 78705
 9                  210-630-4200

10

11   FOR THE DEFENDANT:

12                  JAY MADRID, ESQ.
                    STEPHEN R. CLARKE, ESQ.
13                  WINSTEAD, PC
                    500 Winstead Building
14                  2728 North Harwood Street
                    Dallas, Texas 75201
15                  214-745-5709
                    jmadrid@winstead.com
16                  sclarke@winstead.com

17

     FOR THE WITNESS:
18

19                  DAVID FINN, ESQ.
                    MILNER FINN PRICE
20                  2828 North Harwood Street,
                    Suite 1950
21                  Dallas, Texas 75201
                    214-651-1121
22                  david@milnerfinn.com

23   COURT REPORTER:

24          Valerie Hall Gilliam, LCR

25
```

```
 1                  I N D E X
 2              EXAMINATION INDEX
 3
    JAMES MILTON DAVIS
 4      BY MR. MADRID . . . . . . . . . . . . . . 6
        BY MR. ABRAHAM . . . . . . . . . . . . . 47
 5
 6                  EXHIBIT INDEX
 7   EXHIBIT NO.        DESCRIPTION            PAGE
      EXHIBIT NO. 1  Notice of Deposition      14
 8
      EXHIBIT NO. 2  Affidavit                 28
 9
      EXHIBIT NO. 3  America's Third Border    20
10
      EXHIBIT NO. 4  E-mail                    52
11
      EXHIBIT NO. 5  Letter                    61
12
      EXHIBIT NO. 6  E-mail                    64
13
14                  OBJECTION INDEX
15      BY MR. ABRAHAM . . . . . . . . . . . . . 14
        BY MR. ABRAHAM . . . . . . . . . . . . . 16
16      BY MR. ABRAHAM . . . . . . . . . . . . . 19
        BY MR. ABRAHAM . . . . . . . . . . . . . 21
17      BY MR. ABRAHAM . . . . . . . . . . . . . 25
        BY MR. ABRAHAM . . . . . . . . . . . . . 26
18      BY MR. ABRAHAM . . . . . . . . . . . . . 27
        BY MR. ABRAHAM . . . . . . . . . . . . . 27
19      BY MR. ABRAHAM . . . . . . . . . . . . . 28
        BY MR. ABRAHAM . . . . . . . . . . . . . 31
20      BY MR. ABRAHAM . . . . . . . . . . . . . 34
        BY MR. ABRAHAM . . . . . . . . . . . . . 36
21      BY MR. ABRAHAM . . . . . . . . . . . . . 38
        BY MR. ABRAHAM . . . . . . . . . . . . . 38
22      BY MR. ABRAHAM . . . . . . . . . . . . . 38
        BY MR. ABRAHAM . . . . . . . . . . . . . 39
23      BY MR. ABRAHAM . . . . . . . . . . . . . 40
        BY MR. ABRAHAM . . . . . . . . . . . . . 40
24      BY MR. ABRAHAM . . . . . . . . . . . . . 41
        BY MR. ABRAHAM . . . . . . . . . . . . . 43
25      BY MR. ABRAHAM . . . . . . . . . . . . . 43
```

1

                    INDEX CONTINUED

2

        BY MR. ABRAHAM . . . . . . . . . . . . 44
3       BY MR. ABRAHAM . . . . . . . . . . . . 44
        BY MR. ABRAHAM . . . . . . . . . . . . 45
4       BY MR. ABRAHAM . . . . . . . . . . . . 46
        BY MR. ABRAHAM . . . . . . . . . . . . 47
5       BY MR. MADRID  . . . . . . . . . . . . 49
        BY MR. MADRID  . . . . . . . . . . . . 49
6       BY MR. MADRID  . . . . . . . . . . . . 50
        BY MR. MADRID  . . . . . . . . . . . . 50
7       BY MR. MADRID  . . . . . . . . . . . . 51
        BY MR. FINN  . . . . . . . . . . . . . 51
8       BY MR. MADRID  . . . . . . . . . . . . 53
        BY MR. MADRID  . . . . . . . . . . . . 54
9       BY MR. MADRID  . . . . . . . . . . . . 54
        BY MR. FINN  . . . . . . . . . . . . . 55
10      BY MR. MADRID  . . . . . . . . . . . . 55
        BY MR. FINN  . . . . . . . . . . . . . 55
11      BY MR. MADRID  . . . . . . . . . . . . 55
        BY MR. MADRID  . . . . . . . . . . . . 59
12      BY MR. MADRID  . . . . . . . . . . . . 59
        BY MR. FINN  . . . . . . . . . . . . . 62
13      BY MR. MADRID  . . . . . . . . . . . . 62
        BY MR. FINN  . . . . . . . . . . . . . 62
14      BY MR. MADRID  . . . . . . . . . . . . 63
        BY MR. MADRID  . . . . . . . . . . . . 63
15      BY MR. MADRID  . . . . . . . . . . . . 64
        BY MR. MADRID  . . . . . . . . . . . . 65
16      BY MR. MADRID  . . . . . . . . . . . . 66
        BY MR. MADRID  . . . . . . . . . . . . 67
17      BY MR. MADRID  . . . . . . . . . . . . 68
        BY MR. MADRID  . . . . . . . . . . . . 69
18      BY MR. MADRID  . . . . . . . . . . . . 69
        BY MR. MADRID  . . . . . . . . . . . . 69
19      BY MR. MADRID  . . . . . . . . . . . . 70

20

21

22

23

24

25

Page 6

1                    JAMES MILTON DAVIS,

2      having been called as a witness, was duly sworn

3      and testified as follows:

4                         EXAMINATION

5      BY MR. MADRID:

6          Q.   Good morning, sir.  Would you give us

7      your full name.

8          A.   Yes.  James Milton Davis.

9          Q.   Mr. Davis, what age man are you, please?

10         A.   Growing old isn't for sissies.  I'm 66.

11         Q.   You're a young man, according to my

12     book.

13         A.   Okay.  Well, thank you very much.

14         Q.   Sir, we are here at -- I think I've got

15     this right -- the Federal Correctional

16     Institution Camp in Millington, Tennessee.  Is

17     that correct, sir?

18         A.   Yes.  Federal Prison Camp Millington.

19         Q.   Federal Prison Camp.  Thank you.

20              And am I correct that you are currently

21     serving time here --

22         A.   Yes.

23         Q.   -- in this camp?

24         A.   Yes, sir.

25         Q.   And was that or -- should I say, was the

1        A.    No, sir.

2        Q.    Okay.   You testified earlier that you

3    were introduced to Ben Barnes by Allen Stanford;

4    is that correct?

5        A.    Yes, sir.

6        Q.    Is it your understanding that the

7    relationship between Allen Stanford and Ben

8    Barnes preceded your relationship with Ben

9    Barnes?

10            MR. MADRID:  Object to the form.

11            THE WITNESS:  It's my understanding.

12   BY MR. ABRAHAM:

13       Q.    Do you have any idea as to how long that

14   relationship preceded your relationship with Ben

15   Barnes?

16       A.    No, sir.

17       Q.    Would you describe them as good friends?

18            MR. MADRID:  Objection.  Form.

19            THE WITNESS:  I would say they were

20   friends, yes.

21   BY MR. ABRAHAM:

22       Q.    Do you have an understanding as to how

23   their friendship began?

24       A.    It's my understanding that he was --

25   Mr. Stanford was introduced to Mr. Barnes by

Page 50

1    Yolanda Suarez.  I don't know when.

2        Q.   Do you have any understanding as to how

3    often Ben Barnes and Allen Stanford communicated?

4        A.   Often.

5        Q.   And would that be weekly?  Monthly?

6             MR. MADRID:  Objection.  Form.

7             THE WITNESS:  I wasn't a party to their

8    communication, but I would say that they

9    communicated often.

10   BY MR. ABRAHAM:

11       Q.   If you had to estimate, how often do you

12   believe they communicated?

13             MR. MADRID:  Objection.  Form.

14             THE WITNESS:  Estimate, say monthly,

15   maybe quarterly at the outside.

16   BY MR. ABRAHAM:

17       Q.   And do you have any understanding as to

18   topics they communicated during those

19   conversations?

20       A.   Say again, please.

21       Q.   Were you privy to those conversations?

22       A.   No, sir.

23       Q.   So you have no idea what they spoke

24   about during those conversations; is that

25   correct?

Page 54

1          A.   Very few, but I did.

2          Q.   Was it ever the purpose, to the best of

3     your recollection, in retaining certain outside

4     consultants or professionals to lend a certain

5     legitimacy to Allen Stanford's operations?

6               MR. MADRID:  Objection.  Form.

7               THE WITNESS:  Mr. Stanford was known for

8     having relationship building for a multitude of

9     purposes, and he liked to be associated with

10    people of stature in their field.

11    BY MR. ABRAHAM:

12         Q.   And why did he like to be associated

13    with people of stature in the field?

14         A.   Good for business.

15         Q.   Was it also good for his reputation?

16              MR. MADRID:  Objection.  Form.

17              THE WITNESS:  Yes.  That's part of it.

18    BY MR. ABRAHAM:

19         Q.   And to the best of your recollection,

20    was Ben Barnes someone of high stature at the

21    time that he was retained by the Stanford

22    companies?

23         A.   I believe he was considered a leader in

24    his field, yes.

25         Q.   And do you believe that Stanford

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., and the OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § § § § | |
| Plaintiffs, | § § | Case No. 3:10-cv-0527-N-BG |
| v. | § § | |
| BEN BARNES and. BEN BARNES GROUP, L.P., | § § | |
| Defendants. | § § § | |

---

**DECLARATION OF KARYL VAN TASSEL**

---

I, Karyl Van Tassel, of 1201 Louisiana, Suite 2600, Houston, Texas 77002, state as follows:

1.      I am over the age of 21 years and am legally competent to make this declaration. The statements made in this declaration are true and correct based on the knowledge I have gained from the evidence and many documents I have reviewed and other work I and my team have performed in the course of our investigation on behalf of the Receiver.  A copy of my résumé is attached as exhibit **KVT-1**.

2.      On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey as the Receiver for all entities owned or controlled by R. Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, and the other defendants in the case styled *Securities & Exchange Commission v. Stanford International Bank, Ltd., et al.*, Case

No. 3:09-CV-0298-N (the "Stanford Entities").  On the same day, the Receiver retained FTI (of which I was a Senior Managing Director) to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities, forensic accounting analyses of those records (including cash tracing), and investigation of the underlying scheme.  I oversee, and am personally involved in, the forensic accounting and cash tracing activities and the investigation of the Stanford Entities' scheme.  The purpose of our work has been, in part, to: (a) determine the roles that the various Stanford Entities played in the Stanford Ponzi scheme and specifically in the sale and redemption of SIB certificates of deposit ("CDs"); (b) identify the source(s) of income and cash flows of the various Stanford Entities; (c) trace funds to determine how they were allocated and disbursed throughout the Stanford Entities; (d) investigate the circumstances surrounding the scheme and, in particular, the sale of SIB CDs; and (e) assist the Receiver in performing his duty to locate and recover assets traceable to the Receivership Estate.

3.     Our continued analysis of evidence, including the documents and records of Stanford International Bank, Ltd. ("SIB"), Stanford Financial Group Company ("SFGC"), Stanford Financial Group Global Management ("SFGGM"), and the other Stanford Entities and persons and the documents and other information referenced herein, was conducted using reliable practices and methodologies that are standard in the fields of accounting and finance. Further, based on our investigation, it is my opinion that such evidence is reliable and trustworthy and is the type of information upon which professionals in the fields of accounting and finance typically rely, when such information is available, during investigations of this nature.

4.      In further support of this declaration, I adopt and incorporate by reference my prior declarations and testimony listed below, which were also previously submitted to this Court in connection with related lawsuits, and can be obtained via the Public Access to Court Electronic Records system ("PACER") for the United States District Court for the Northern District of Texas:

- July 27, 2009 Declaration of Karyl Van Tassel, attached as exhibit KVT-2 [*see* Case No. 3:09-CV-0724-N-BL, Docs. 18, 616];
- March 26, 2010 Declaration of Karyl Van Tassel, attached as exhibit KVT-3 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 393];
- May 24, 2010 Declaration of Karyl Van Tassel, attached as exhibit KVT-4 [*see* Case No. 3:09-CV-0724-N-BL, Docs. 444, 616];
- July 15, 2010 Declaration of Karyl Van Tassel, attached as exhibit KVT-5 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 487];
- December 17, 2010 Declaration of Karyl Van Tassel, attached as exhibit KVT-6 [*see also* Case No. 3:10-CV-0346-N, Doc. 37]
- June 1, 2011 Declaration of Karyl Van Tassel, attached as exhibit KVT-7 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 616];
- June 2, 2011 Supplemental Declaration of Karyl Van Tassel, attached as exhibit KVT-8 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 616];
- June 7, 2011 Supplemental Declaration of Karyl Van Tassel, attached as exhibit KVT-9 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 616];
- October 12, 2011 Supplemental Declaration of Karyl Van Tassel, attached as exhibit KVT-10 [*see* Case No. 3:09-CV-0724-N-BL, Doc. 784];
- December 5, 2011 Direct Testimony of Karyl Van Tassel,  attached as exhibit KVT-11 [*see* Case No. 3:09-CV-0721-N-BL, Docs. 115, 116];
- December 17, 2012 Declaration of Karyl Van Tassel, attached as exhibit KVT-12 [*see* Case No. 3:11-CV-0294-N-BL, Doc. 38 through Doc. 56].
- 

**The Stanford Entities operated as a Ponzi scheme.**

5.      Based on our investigation — and as set forth in my prior declarations and testimony listed above and attached hereto — I have concluded that the Stanford Entities were collectively operated as a Ponzi scheme since at least 1999.  SIB, SGC, SFGGM, SFGC and Bank of Antigua were part of the Stanford Ponzi scheme.

6.      Allen Stanford was sole owner, directly or indirectly, of more than 130 separate entities, including SIB, SGC, SFGGM, SFGC, and Bank of Antigua.  These entities comprised a

single commonly owned financial services network called the "Stanford Financial Group," which was headquartered in Houston and was controlled by Stanford and his close band of confidants.

7.      The SEC alleges in its Second Amended Complaint in Case No. 03-CV-0298-N that the Stanford Entities constitute "a massive Ponzi scheme" involving "misappropriat[ion of] billions of dollars of investor funds."  Likewise, James Davis, Chief Financial Officer for both SIB (according to SIB's published financial statements) and SFGC and a long-time business associate and confidant of Allen Stanford, has pled guilty to charges that he conspired with Allen Stanford and others in running a Ponzi scheme in violation of federal securities laws.  In connection with his guilty plea, Davis admitted that SIB was a "massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds." James Davis admitted in his rearraignment that the Stanford enterprise was a Ponzi scheme from the beginning. As explained in more detail below, my findings are consistent with the SEC's allegations and James Davis's admission that SIB and the Stanford Entities were a Ponzi scheme.  Furthermore, I have not seen anything in the records that I have reviewed indicating that SIB and the Stanford Entities were not a Ponzi scheme.

8.      Some of the Stanford Entities' roles in the Stanford Ponzi scheme are explained generally below:

- SIB is a wholly owned company of Stanford International Bank Holdings Limited ("SIBH"), and SIBH is a wholly owned company of R. Allen Stanford.  SIB issued the CDs that were at the heart of the Stanford Ponzi scheme and was not a typical commercial bank.  It had one principal product line — CDs — and one principal source of funds — customer deposits from CD purchases.  From at least 1999 forward, SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) and relied on proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors.  *See* KVT-36, paragraphs 34-40. The SIB CD sale proceeds that were not used to pay off prior investors

were widely disbursed throughout the Stanford Entities — including to SFGC, SFGGM, SGC, and Bank of Antigua — and to R. Allen Stanford.

- SFGC is a wholly owned company of R. Allen Stanford. SFGC provided shared services, including Treasury and Investment services, to SIB and other Stanford Entities. From at least 2000 forward, SFGC was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) and received SIB CD funds. *See* KVT-42, paragraphs 8-11.

- SFGGM is a wholly owned company of R. Allen Stanford. SFGGM provided management support services to other Stanford Entities, including accounting, IT, legal, marketing, and other administrative services. In addition, SFGGM received portfolio management fees from SIB. Many of SFGGM's management support services were ultimately outsourced to SFGC. From at least 2007 forward, SFGGM was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) and received SIB CD funds. *See* KVT-42, paragraphs 8-11.

- SGC is a wholly owned company of Stanford Group Holdings, Inc. ("<u>SGH</u>"), and SGH is a wholly owned company of R. Allen Stanford. The financial advisors for SGC marketed and sold thousands of SIB CDs and received bonuses, commissions, referral fees, and other forms of compensation for these sales. SGC also performed portfolio management and other services for SIB.

- Bank of Antigua is owned by R. Allen Stanford. R. Allen Stanford directly owns 1% of Bank of Antigua. Stanford Bank Holdings Limited, a wholly owned company of R. Allen Stanford, owns the remaining 99%. Bank of Antigua was a commercial bank in Antigua. James Davis testified that the Bank of Antigua was insolvent when R. Allen Stanford first approached the Government of Antigua with the idea of setting up SIB in Antigua. Mr. Davis testified that it was "part and parcel to receiving a license" for SIB that R. Allen Stanford purchase the Bank of Antigua. Mr. Davis testified that the Bank of Antigua purchase was as much as $20 million and that the funds used to make the purchase came from CD funds. *See* KVT-92 at pages 180-182.

- Stanford Development Company Ltd. ("SDCL") is a wholly owned company of R. Allen Stanford. SDCL is the entity that owned the land, buildings, vehicles, equipment, furniture and fixtures used by the various Stanford entities in Antigua. SDCL financial statements reflect revenues in 2004 and 2005, but no revenues from 2006 through 2008. Additionally, in 2004 and 2005 the cost of sales exceeded revenues in each year.

- Stanford Financial Group Limited ("SFGL") is a wholly owned company of R. Allen Stanford. SFGL provided management support services to other Stanford Entities, including accounting, IT, legal, marketing, and other administrative services. Additionally, SFGL is the entity name on the "secret" Swiss bank account, Societe Generali 108.731.

## Sales of SIB CDs Perpetuated the Ponzi scheme.

9.      SIB was not a typical commercial bank.  It did not offer checking accounts and did not make loans (other than to certain CD investors for up to 80% of their CD balance).  It had one principal product line — CDs — and one principal source of funds — customer deposits from CD purchases.  The terms of some SIB CDs permitted partial redemptions before maturity upon customer demand.

10.      SIB offered CD rates that were significantly greater than those offered in the United States.  A SIB 2007 marketing brochure[1] tracks SIB's historic CD yields against average US CD yields.  The SIB CD's yields reflected in its marketing brochure ranged from a high of 388% of the US CD yield in 2002 to a low of 140% of the US CD yield in 2006.  According to the brochure, SIB was able to pay high CD rates by investing in "a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."  As a result, the brochure continues, "[SIB] has been consistently profitable since inception."  In other words, SIB purported to function like a hedge fund but, unlike a hedge fund, its customers were guaranteed (by SIB) a specified return regardless of the fund's performance.

11.      SIB's reported returns were remarkably steady, fluctuating only from 11.7% to 14.9% between 1997 and 2007.  SIB showed a profit in economic good times and in bad.  The one exception was the second half of 2008, when financial sector businesses across the globe were struggling for survival and many feared they were on the brink of financial collapse.  Even then, SIB's accounting records reflected positive investment earnings, but a small overall loss — just 2% of total (purported) financial assets — after deductions for purported CD interest and other expenses.  What to some appeared to be too good to be true was indeed untrue.  As

---

[1] Ex. 1, STAN INVSTR GENL_058437 at 058446.

Stanford himself said at an October 2008 financial advisor conference: "We're about, as of early October, down about four percent, I guess. . . . I'm not happy with that [but] in this market I guess it's astounding."

12.     SIB CDs were marketed through financial advisors employed by other Stanford-owned entities.  The financial advisors were heavily incentivized by above-market commissions and bonuses to steer their clients to SIB CDs rather than other investments.  SIB incentivized Stanford-affiliated financial advisors to convince their clients to purchase SIB CDs over other kinds of investments by paying the financial advisors above-market commissions and other compensation tied to CD sales and to the retention of the CDs within SIB.

13.     The most significant numbers on SIB's financial statements — revenue and asset value — were fictitious.  Davis states in his plea agreement that assets were inflated to offset CD obligations and that revenue was "reverse-engineered" to arrive at desired levels.  My findings are consistent with those admissions.[2]

14.     We found within SIB's accounting records worksheets used to derive fictitious SIB revenue back to 2004.  The Ponzi scheme conspirators would simply determine what level of fictitious revenue SIB needed to report in order to both look good to investors and regulators and purport to cover its CD obligations and other expenses.  They would then back into that total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative, etc.) of a fictitious investment allocation.

15.     The returns were fictitious, and they were based on fictitious asset totals:

(a)     SIB's records reflected that, as of December 31, 2008, it held $8.3 billion in "financial assets" — presumably actively traded securities and metals, as SIB represented to the public.  The reality was much different.  As of the end of 2008, SIB held less than $500 million in securities, or less than 7% of the total CD obligations.

---

[2] James Davis Plea Agreement (Ex. 2, STAN INVSTR GENL_057886)

(b)     We also discovered that $3.174 billion of SIB's claimed 2008 assets consisted of two real estate holding entities that had been purchased that same year for only $63.5 million and whose only assets were tracts of undeveloped Antiguan real estate.  The value of those assets was inflated by 50 times the purchase price through a series of paper transactions involving other Stanford-owned entities.  These repetitive flips had no apparent economic substance and appear to have been engaged in solely to grossly overstate the value of the assets so as to prop up SIB's balance sheet.

(c)     I and my team found that at least another $1.8 billion in SIB assets consisted of notes receivable from Allen Stanford.  Based on our investigation, however, Allen Stanford had no significant assets apart from the various Stanford Entities, which collectively owed billions of dollars more than the fair value of their combined assets.

(d)     Other assets were similarly overstated.  Private equity investments, for example, were recorded on SIB's books at amounts that the Receiver's subsequent sales efforts have revealed to be many times greater than their realizable value.  These were valued at $1.2 billion as of June 30, 2008, but it is expected that the Receivership will realize far less than that amount.

(e)     Moreover, the fact that many of SIB's assets consisted of real estate, unsecured notes from Allen Stanford, and private equity investments was contrary to SIB's assurances to customers that its investments consisted of "highly marketable securities issued by stable governments, strong multinational companies and major international banks" so as to "maintain[] the highest degree of liquidity."  *See* exhibit **KVT-12** at 3.

16.     Misinformation regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was regularly disseminated from Stanford, Davis, and others working under them to Stanford financial advisors, for use in inducing potential investors to purchase SIB CDs.  SIB induced investors to buy CDs by offering substantially above-market rates, issuing financial statements and other data that significantly overstated its earnings and assets, and misrepresenting its business model, investment strategy, financial strength, the safety and nature of its investments, and other facts important to investors.

17.   SIB's CD liabilities increased significantly between 2000 and the institution of the Receivership on February 17, 2009.

| Balance Sheet Date | Customer Deposit Liability | Annual Change in Customer Deposit Liability |
|---|---|---|
| December 31, 1999 | $623,559,959 | N/A |
| December 31, 2000 | $772,261,025 | $148,701,066 |
| December 31, 2001 | $1,116,454,586 | $344,193,561 |
| December 31, 2002 | $1,606,062,398 | $489,607,812 |
| December 31, 2003 | $2,083,397,998 | $477,335,600 |
| December 31, 2004 | $2,827,941,493 | $744,543,495 |
| December 31, 2005 | $3,763,011,040 | $935,069,547 |
| December 31, 2006 | $5,010,083,766 | $1,247,072,726 |
| December 31, 2007 | $6,689,964,303 | $1,679,880,537 |
| December 31, 2008 | $7,431,630,364 | $741,666,061 |
| February 17, 2009 | $7,191,011,843 | $(240,618,521) |

18.   Through analysis of SIB's financial records, I and my team have determined that SIB was insolvent from at least 1999 forward.  SIB's reported assets consisted overwhelmingly of "financial assets" and cash.  The published balance sheets represented that "financial assets" were reported at "fair value."  Of course, cash, by definition, is stated at fair value (assuming correct reporting).  We know, however, from our investigation and review of internal SIB records that the fair value of the SIB financial assets was much smaller than reported.  Each year, from 1999 forward, SIB's reported asset totals included, without disclosure to the public, notes receivable from Allen Stanford and certain assets with clearly inflated values.  When these amounts are deducted from the asset totals contained in SIB's published financial statements, it

is apparent that, from at least 1999, SIB's liabilities exceeded the fair value of its assets. Stanford's promissory notes were of no real value, because his apparent wealth was based on the SIB Ponzi scheme.  Moreover, private equity stakes initially held by other Stanford Entities (although likely purchased with SIB CD proceeds) were transferred to Allen Stanford, and then from Stanford to SIB, which recorded them on its books at much inflated values with no apparent economic substance or gain.  These transfers appear to have been booked for the purpose of giving SIB the false appearance of financial strength based upon the manner in which the transactions were recorded and related notes on supporting documentation.  It is likely that other SIB assets were also fictitious or overvalued, as we saw in our analysis of 2008 data.

19.    Through an analysis of cash flows for the period January 1, 2004, through February 17, 2009, we have verified that proceeds of CD sales were used to make purported interest and redemption payments on existing CDs.  This analysis just confirmed what we knew had to be true anyway, as SIB's assets, reserves, and investments were insufficient to fund its purported redemption and interest payments.  For example, SIB's CD transaction records indicate that approximately $2 billion was paid to investors for principal and interest from January 1, 2008, through February 17, 2009.  SIB's legitimate principal income-generating assets, which were managed in what was known as "Tier 2," never totaled more than $1 billion, even when the stock market was at a high and the economy was strong.  By the end of 2008, "Tier 2" had declined to less than $500 million, due to a combination of increasing redemptions and liquidations and falling market values.  Even if SIB had fully liquidated all investments in its portfolio, it would not have realized enough cash flow to cover just the redemptions in 2008 without the influx of new CD purchase money.  And in fact, when the market declined, we

know that it took only 4 months for liquid assets to substantially deplete, even though $7.2 billion in CD obligations remained.  As a result of this decline, all actual gains earned on the "Tier 2" investments since 2003 were lost.  Thus, although the SIB CD portfolio contained some legitimate investments, the earnings from those investments were negligible in comparison, and could not reasonably have been expected, to cover SIB's total obligations to the CD holders.

20.    Based on our analysis to date, I have concluded that from at least 1999 forward, SIB relied on proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors.  This is especially evident from the fact that, when CD sales faltered in 2008, SIB was immediately forced to sell off most of its assets that were readily available for liquidation just to maintain payments for a short time.  By using the proceeds of new CD sales to pay interest and redemptions to existing CD holders, Stanford, Davis, and their cohorts perpetuated the Ponzi scheme.

21.    CD sales proceeds not used to pay purported interest, redemptions, and current operating expenses (including commissions and other incentive payments to financial advisors in other Stanford Entities) were either placed in speculative investments (many of them, such as real estate and private equity deals, illiquid), diverted to other Stanford Entities "on behalf of shareholder" (*i.e.*, for the benefit of Allen Stanford), or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, etc.).

22.    A tipping point was reached in October 2008: that month and every month thereafter, incoming funds from new investors were insufficient to offset outgoing payments to existing investors.  Continuing CD sales could no longer cover purported redemptions, interest

payments and normal operating expenses. This cash flow crisis caused a rapid depletion of liquid assets, which were inadequate to begin with to cover SIB's CD obligations. By the time the U.S. Receivership was instituted, SIB had already suspended redemptions for certain investors and many Stanford Entities had stopped paying many contractual obligations. For example, SIB received negative publicity concerning its failure, in early February 2009, to fund a $28 million commitment to a Florida communications company named Elandia International Inc.

23.   Notwithstanding SIB's insolvency (net assets minus net liabilities) and the rapid liquidation of its investments during 2008 and into 2009, CD sales continued until February 16, 2009, when the SEC and the U.S. Court intervened. SIB's actual (as opposed to reported) earnings and assets were insufficient to meet its CD payment obligations. SIB could only keep the scheme going by selling yet more CDs and using the proceeds to pay redemptions, interest, and operating expenses. These CD purchases were too small, however, to continue to cover for the lack of assets owned by SIB.

24.   At the inception of the U.S. Receivership on February 16, 2009, SIB's total reported obligations to CD holders was approximately $7.2 billion (U.S.), versus reported investments valued at $8.3 billion as of December 31, 2008. Based on my analysis, the market value of all assets for all Stanford Entities (including SIB) combined to total less than $1 billion. At the time SIB was placed into receivership, SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) by more than $6 billion.

**Transfers to the Barnes Defendants**

**SFGGM's Bank of Houston 8870 Account**

25.     Our analysis of the Stanford Entities' records and operations has revealed that at least $2,513,466.90 was transferred to an account at Prosperity Bank in the name of Ben Barnes Group LP from SFGC which consists of payments of $1,000,000 on June 30, 2005, $500,000 on December 7, 2005, $20,000 on January 19, 2006, $500,000 on February 28, 2006, $68,466.90 on July 31, 2006, $325,000 on February 22, 2007, and $100,000 on April 30, 2008. The payments to the Barnes Defendants were made from SFGC's Trustmark National Bank account number 3003104586 ("Trustmark 4586"). A list detailing the date, amount, and transferor, for each of these transfers is attached as exhibit **KVT-13**. The total deposits into SFGC's Trustmark 4586 account between January 1, 2005 and February 17, 2009 were approximately $1.6 billion. Based on the following analysis, I have concluded that the substantial majority of funds deposited into SFGC's Trustmark 4586 during this time period came directly or indirectly from CD sale proceeds.

26.     Based on FTI's review of records from Trustmark relating to the Trustmark 4586 account, 74%, or $1,144.0 million, of the deposits from January 1, 2005 to February 17, 2009 were transfers from SIB's Trustmark 1707 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into Trustmark 1707 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraph 34 and KVT-9 at paragraph 11.

27.     Another 8%, or $131.4 million, of the deposits into the Trustmark 4586 account from January 1, 2005 to February 17, 2009 were transfers from SFGGM's Bank of Houston account 8870 ("BOH 8870"). The transfers from SFFGM's BOH 8870 account to SFGC's

Trustmark 4586 account occurred between January 1, 2007 and February 17, 2009. The total deposits into SFGGM's BOH 8870 account from January 1, 2007 through February 17, 2009 were approximately $691.5 million. Based on the following analysis, I have concluded that the substantial majority of funds deposited into SFGGM's BOH 8870 account during this time period came directly or indirectly from CD sale proceeds. Based on FTI's review of records from Bank of Houston related to this account, 78%, or $541.1 million, of the deposits into BOH 8870 from January 1, 2007 to February 17, 2009 were transfers from SIB's BOH 8706 account. Another 11%, or $76.6 million were transfers from SIB's TD 1670 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into BOH 8706 and TD 1670 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraphs 35-36 and KVT-9 at paragraphs 12 and 14.

28.   Another 3%, or $50.3 million, of the deposits into Trustmark 4586 from January 1, 2005 to February 17, 2009 were transfers from SIB's BOH 8706. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into BOH 8706 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraph 36 and KVT-9 at paragraph 14.

29.   Another 3%, or $48.3 million, of the deposits into Trustmark 4586 from January 1, 2005 to February 17, 2009 were transfers from SFGC's Bank of Houston account number 8854 ("BOH 8854"). Based on the following analysis, I have concluded that the overwhelming majority of funds deposited into SFGC's BOH 8854 account during this time period came directly or indirectly from CD sale proceeds. The transfers from SFGC's BOH 8854 account to

SFGC's Trustmark 4586 account occurred between January 1, 2007 and February 17, 2009. The total deposits into SFGC's BOH 8854 account from January 1, 2007 to February 17, 2009 were approximately $148.8 million. Based on FTI's review of records from Bank of Houston related to this account 69%, or $103.2 million, of the deposits from January 1, 2007 to February 17, 2009 were transfers from SFGGM's BOH 8870 account. Another 16%, or $23.2 million, of the deposits during this time period were transfers from SIB's BOH 8706 account. Another 12%, or $17.8 million, of the deposits from January 1, 2007 to February 17, 2009 were transfers from SFGC's Trustmark 4586 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into BOH 8706 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraph 36 and KVT-9 at paragraph 14. See paragraph 25 above for my conclusion regarding the deposits in SFGC's Trustmark 4586 account and paragraph 27 above for my conclusion regarding the deposits into SFGGM's BOH 8870 account.

### SFGGM's Bank of Houston 8870 Account

30.    Our analysis of the Stanford Entities' records and operations has revealed that at least $910,000.00 was transferred to an account at Prosperity Bank in the name of Ben Barnes Group LP from SFGGM which consists of payments of $150,000 on February 29, 2008, $375,000 on June 2, 2008, $55,000 on July 18, 2008, $55,000 on August 15, 2008, $110,000 on October 24, 2008, $55,000 on November 7, 2008, and $110,000 on February 13, 2009. The payments to the Barnes Defendants were made from SFGGM's BOH 8870 account. A list detailing the date, amount, and transferor, for each of these transfers is attached as exhibit **KVT-13**. The total deposits into SFGGM's BOH 8870 account from January 1, 2007 through February

17, 2009 were approximately $691.5 million. See paragraph 27 above for my conclusions regarding SFGGM's BOH 8870 account.

## Bank of Antigua

31.    Our analysis of the Stanford Entities' records and operations has revealed that at least $1,650,000.00 was transferred to an account at Prosperity Bank in the name of Ben Barnes Group LP from R. Allen Stanford's personal Bank of Antigua account which consists of payments of $325,000 on April 17, 2007, $265,000 on July 2, 2007, $265,000 on August 2, 2007, $265,000 on September 18, 2007, $265,000 on October 19, 2007, and $265,000 on December 10, 2007. A list detailing the date, amount, and transferor, for each of these transfers to Barnes is attached as exhibit **KVT-13**.   All of these payments were processed from Bank of Antigua's Bank of America account 006550852033 ("BofA 2033"). The BofA 2033 is a clearing account so it is an accumulation of the funds of various account holders at Bank of Antigua, including R. Allen Stanford.  Disbursements are made "on the order of" the individual account holders to facilitate payments in the United States. I have reached the conclusion that the funds for the above-referenced payments came from R. Allen Stanford's personal account based on the following: 1) Funds transfer notifications and wire detail from Prosperity Bank indicate that the wires were "By Order Of: R. Allen Stanford" and 2) R. Allen Stanford stated in a December 7, 2007 email that he had "been personally paying Ben $265K each month this year." *See* exhibit KVT-27.

32.    Based on the following analysis I have concluded that the funds in BofA 2033 were comingled with CD sales proceeds and that the above-referenced payments therefore were tainted by CD sales proceeds. Our analysis of the incoming wire detail for BofA 2033 from January 1, 2007 through January 31, 2009 revealed that nearly $170 million of the incoming wire

deposits into this account were transfers from Stanford entities other than Bank of Antigua. Over $163 million, or 96%, of these wire deposits came from accounts in which the substantial majority of the funds deposited in those accounts came directly or indirectly from CD sales proceeds.

33.    Based on our analysis of records from Bank of America relating to the BofA 2033 account, 38.5%, or $65.4 million of the wire deposits  into the BofA 2033 account, were transfers from SFGGM's BOH 8870 account. See paragraph 27 above for my conclusions regarding SFGGM's BOH 8870 account.

34.    Another 26%, or $43.5 million of the wire deposits into the BofA 2033 account, were transfers from Stanford Financial Group Limited's ("SFGL") Societe Generale account 108.731 ("SocGen 108.731"), which James Davis described in his plea agreement as a "secret" account that was used in various ways, including to pay bribes to Antiguan regulators and SIB's external auditor.[3] Between June 1, 2000 and September 15, 2008, of the $270[4] million deposited into SFGL's SocGen 108.731 account, over $235 million were transfers from SIB's TD 1670 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into TD 1670 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraphs 35-36 and KVT-9 at paragraphs 12 and 14.

35.    Another 16%, or $27.4 million of the wire deposits into the BofA 2033 account, were transfers from SFGC's Trustmark 4586 account. See paragraphs 25 through 29 above for my conclusions regarding SFGC's Trustmark 4586 account.

---

[3] James Davis Plea Agreement (Ex. 2, STAN INVSTR GENL_057886)
[4] The total deposit amount of $270 million excludes the return of principle on investment sales, short-term deposits, and loan proceeds subsequently paid off with external deposits.

36.     Another 10%, or $17 million of the wire deposits into the BofA 2033 account, were transfers from SIB's Trustmark 1707 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into Trustmark 1707 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraph 34 and KVT-9 at paragraph 11.

37.     Another 5%, or $8.5 million of the wire deposits into the BofA 2033 account, were transfers from Stanford Development Company Limited's ("SDCL") Trustmark National Bank account 3003104131 ("Trustmark 4131"). The total deposits into SDCL's Trustmark 4131 account from January 1, 2007 through February 17, 2009 were approximately $33.8 million. Based on the following analysis, I have concluded that the substantial majority of funds deposited into SDCL's Trustmark 4131 account during this time frame came directly or indirectly from CD sale proceeds. Based on FTI's analysis of records from Trustmark National Bank related to this account, 42%, or $14.2 million, of the transfers during this time frame were transfers from SFGC's Trustmark 4586 account. Another 58%, or $19.5 million, were transfers from SFGGM's BOH 8870 account. See paragraph 25 through 29 for my conclusions regarding SFGC's Trustmark 4586 account and SFGGM's BOH 8870 account.

38.     Another and 1%, or $1.3 million of the wire deposits into the BofA 2033 account, were transfers from SIB's TD 1670 account. As I have previously concluded in my July 27, 2009 and June 7, 2011 declarations (attached as KVT-2 and KVT-9 respectively), the overwhelming majority of funds received by SIB into TD 1670 came directly or indirectly from CD sale proceeds. See KVT-2 at paragraphs 35-36 and KVT-9 at paragraphs 12 and 14.

39.     Additionally, shortly before each of the payments made from Bank of Antigua's BofA 2033 account to the Prosperity Bank account in the name of Ben Barnes Group LP, there

were deposits received from either SFGC's Trustmark 4586 account or SFGGM's BOH 8870 account that were more than sufficient to cover the amount of the outgoing payments to the Prosperity Bank account in the name of Ben Barnes Group LP. Prior to the $325,000 transfer on April 17, 2007, a deposit of $656,400 was received on April 13, 2007 from SFGC's Trustmark 4586. Prior to the $265,000 transfer on July 2, 2007, a deposit of $956,000 was received on June 29, 2007 from SFGC's Trustmark 4586 account. Prior to the $265,000 transfer on August 2, 2007, a deposit of $661,100 was received on July 27, 2007 from SFGC's Trustmark 4586 account. Prior to the transfer of $265,000 on September 18, 2007, a deposit of $1,619,100 was received on September 14, 2007 from SFGC's Trustmark 4586 account.  On the same date as the $265,000 transfer on October 19, 2007, a deposit of $477,400 was received from SFGGM's BOH 8870 account. Finally, prior to the $265,000 transfer on December 10, 2007, a deposit of $673,200 was received on November 21, 2007 from SFGGM's BOH 8870 account. See paragraphs 25 to 30 regarding my conclusions for SFGC's Trustmark 4586 account and SFGGM's BOH 8870 account.

## Services Provided by the Barnes Defendants Purportedly for Reasonably Equivalent Value

40.     Among many other documents, we analyzed the Defendant's Responses to the Receiver's Interrogatories. In response to the Receiver's request that the Defendants "[s]tate all facts that support Your affirmative defense that You provided 'reasonably equivalent value' in exchange for the payments You received from the Stanford Parties", the Defendants stated that "[a]t all times, in connection with services provided to The Stanford Parties, any such charges were for services provided at market rates, for legitimate purposes, and in accordance with charges rendered for services of the nature provided to the Stanford Parties, for clients involved

in complex associated business and governmental relations activities." The Defendants further state that they provided several services to the Stanford entities, including, (1) "Initiated due diligence exercise that was conducted by the former general counsel to the Democratic  National Committee  regarding  the reputation  of corporations and  its  potential impact  on  political parties  and  elected  officials  accepting campaign contributions", (2) "Provided counsel on the risks and rewards of locating a global capital markets enterprise in the U.S. Virgin Islands…[and a] strategy to expand  the  global  awareness  of  the  Antigua  20/20  Cricket  Tournament", (3) "Providing analysis and predictions" regarding the 2008 Democratic Presidential primary, the 2008 Presidential election, and the 2008 Congressional election and their related "impact[s] on global  capital  market  strategies"  and  "U.S.  policy"  relating  to  the  Caribbean  region  and companies  residing  in  the  U.S.  Virgin  Islands,  (4)  "Provided  analysis  and  counsel…and [d]eveloped legislative strategy" to "effectuate…legislative changes to U.S. tax policy…in the U.S.  Virgin  Islands",  (5)  "Initiated   review   of   campaign   finance   issues   relating   to   the Antigua  national election",  and (6) Participated   in  and  represented  the  corporate  interest  at various   Democratic  Governors  Association  events  in  the  U.S.  Virgin  Islands  to  ensure  the underlying policy reflects current global business environment." *See* exhibit **KVT-17** at pages 3-4.

41.    The above services, which the Defendants claim were delivered in exchange for reasonably equivalent value, can be broadly grouped into four categories, (1) services related to the lobbying campaign to change the U.S. tax laws regarding corporations operating in the U.S. Virgin Islands, (2) services related to the Antigua 20/20 Cricket Tournament, (3) services related to political donations and access to politicians, and (4) services related to the reputation of R. Allen Stanford and the Stanford Entities.  These services are described in more detail below.

## U.S. Virgin Island Tax Laws

42.     In an April 2005 e-mail exchange between Carlos Loumiet and Yolanda Suarez, Loumiet recommended Jim Miller (instead of Ben Barnes) to "[go] before the Republican-controlled Administration, House and Senate to ask for a legislative favor" citing Mr. Millers' history and relationships with the "Bushes", "Grassley and his California counterpart at Ways and Means in the House", and his experience lobbying frequently "on other tax issues before Congress".  Suarez told Loumiet that she "fully anticipated that Jim would be working on this" but that "his schedule was not very flexible." While she acknowledged that she wanted Mr. Miller involved, she told Louimet that "we do need a team on this." Referencing his original email, Louimet responds that he "couldn't agree more" and that he "liked [Ben Barnes'] ideas." *See* exhibit **KVT-18**. Ben Barnes testified that this email was related to the lobbying campaign in which he and his firm were engaged to change the U.S. Virgin Islands tax laws. *See* exhibit **KVT-14** at pg. 83.

43.     In advance of an August 31, 2005 meeting, Barnes sent R. Allen Stanford and Yolanda Suarez a detailed lobbying campaign proposal for winning approval of the USVI tax proposal. The proposal centered on a strategy to develop a detailed "rationale" for the tax proposal, target legislative leaders, and third party advocates. *See* exhibit **KVT-19**.

44.     Evidenced by a series of e-mails, the USVI tax lobbying group, with Barnes' support and direction, decided to develop a national security argument to bolster their efforts. *See* exhibits **KVT-20**, **KVT-21**, **KVT-22**.  The completed argument, in the form of a white paper, *America's Third Border: Protecting National Security By Promoting Private Investment in the Caribbean*, was presented to R. Allen Stanford on September 27, 2005. *See* exhibits **KVT-23**, **KVT-24**, **and KVT-25**.

45.     In a May 22, 2007 e-mail, Barnes proposed that Stanford pay a $135,000 per month retainer for the USVI tax lobbying effort. Barnes cited the retention of the services of Scott Reed and Mitchell Delk in his request. *See* exhibit **KVT-26**. Payments to Ben Barnes Group LP were actually $265,000 per month during the months of July 2007 through December 2007 and no documents or other information has been made available to explain why the amount is nearly twice as much as the proposed retention fee in the May 22, 2007 email.

46.     After seeing little results from the USVI tax lobbying effort, on December 7, 2007 R. Allen Stanford decided to stop paying Barnes $265,000 per month. Instead, he directed Yolanda Suarez to negotiate a success fee for the successful completion of the legislative effort. He made this request of Ms. Suarez irrespective of the fact that she believed the results they sought were not achievable.  *See* exhibit **KVT-27** ("I know you don't think this is achievable but Barnes assures me if we get on this and get in front of key folks on the hill it can be accomplished next year" and "Yolanda I have been personally paying Ben $265K each month this year.  I think the world of Ben and know he is very capable but this is too much for what we are getting in return. Ben has said Mitch and others were hired to do Stanford business only which I know is not the case.").

47.     In mid-February 2008 a "revised version of the 'story'" was prepared to sell the Governor of the USVI on the tax proposal and secure his support. *See* exhibits **KVT-28**, **KVT-29**, **and KVT-30**. A little over a week later, at the end of February 2008, Barnes and Mitchell Delk spoke with the USVI Governor after which Mitchell Delk stated that he had an "opportunity to underscore the need for and opportunity to modernize the tax incentives" and that the Governor "understood" the opportunities to "lure business to and enhance revenues for the USVI". *See* exhibit **KVT-31.**

48.     Mitchell Delk stated that the lobbying campaign to change the U.S. tax laws regarding corporations operating in the U.S. Virgin Islands came down to two primary issues: 1) evaluation of what changes, if any, could be made to the residency requirements in the current tax laws and 2) evaluation of what changes, if any, could be made to expand the sourcing requirements in the current tax laws in order to allow the income earned by the Stanford Entities to be taxed at the U.S. Virgin Islands tax rate of 10% instead of the U.S. tax rate of 30%. *See* exhibit KVT-59 at pages 99-100.  Mr. Delk "understood" that what R. Allen Stanford "was hoping to do…was to take all the revenues associated with the business he was doing in Antigua and take advantage of the USVI tax law." *See* exhibit KVT-59 at page 143-144. The proposed approach was to attempt to expand the sourcing rule to "Caribbean Islands" instead of just the USVI, thus encompassing Antigua. Ultimately Mr. Delk and the other individuals working for Ben Barnes and the Ben Barnes Group concluded that the "elimination of the residency requirement was politically impossible" leaving the "broadening of the sourcing rules" as the only option.  *See* exhibit KVT-59 at page 144.

49.     Ben Barnes and Mitchell Delk confirmed that ultimately, the effort to change the U.S. Virgin Island tax laws was not passed. See KVT-14 at pages. 88 and exhibit KVT-59 at page 159. Mr. Delk stated that in a typical engagement "ultimately, success depends on whether you either pass a bill or you, in fact, derail something that's harmful to your client." *See* exhibit KVT-59 at page 56.  Neither of those two things happened here.

**Antigua 20/20 Cricket Tournament**

50.     Ben Barnes stated that he introduced R. Allen Stanford to Lynn DeLuca, who was "the head of ESPN", and that Lynn DeLuca's agreement to "be a partial sponsor of the game…caused Sky Sports Network to come in and want a contract." *See* exhibit KVT-14 pg. 60. *See* also exhibits **KVT-32, KVT-33, KVT-34, and KVT-60 to 63.**  We have confirmed that

both ESPN and Sky Sports Network agreed to be partial sponsors and broadcast distributors of the Antigua 20/20 Cricket Tournament. The agreement with ESPN called for three payments totaling $40,000 for the right to broadcast the 2008 Antigua 20/20 Cricket Tournament via broadband internet on ESPN's ESPN360 service. *See* exhibit KVT-64 and KVT-65. A separate agreement was entered into for the rights to broadcast the 2008 Antigua 20/20 Cricket Tournament on satellite and/or cable television and via broadband internet on ESPN360. The agreement called for five payments totaling $190,000. Stanford received at least $135,000 related to these contracts. *See* exhibits KVT-68 to KVT-73. While we have not been able to locate the Sky Sports Network agreement, we have found evidence of several payments received by Stanford 20/20 LLC that reference the broadcast rights for the 2008 and 2009 Antigua 20/20 Cricket tournament purchased by Sky Sports Network. We have identified three payments totaling $1,509,975.  *See* exhibits KVT-74 to KVT-79 and KVT-91. We have not seen any evidence confirming that ESPN's broadcast agreement caused Sky Sports Network to approach Stanford for broadcast rights or that Ben Barnes' introduction is what caused ESPN to enter into an agreement with the Stanford Entities. The funds received from both ESPN and Sky Sports Network were deposited into Stanford 20/20 LLC's Bank of St. Croix account number 0022016603. Further, individuals within Stanford saw the Antigua 20/20 Cricket Tournament as a "great opportunity to showcase the Stanford brand" and that they "look[ed] forward to hosting clients and prospects during the Stanford 20/20 matches." *See exhibits* KVT-80 and KVT 81.

  51.  The Defendants also assisted R. Allen Stanford and the Stanford Entities in their efforts to gain approval for Cuba's participation in the Antigua 20/20 Cricket Tournament from the U.S. State Department and the U.S. Treasury Department. Ultimately, Cuba's participation was not approved. *See* exhibit **KVT-35**. Ben Barnes stated that Cuba's participation would have

benefited R. Allen Stanford because "it would give Stanford Financial the – a lot of recognition around the world" and attract more investors. *See* exhibit **KVT-14** at pg. 60.

## Political Donations and Access

52.    Our analysis of the documents and records of the Stanford entities has identified several emails and memoranda evidencing the Defendants' efforts recommending political donations Stanford should make and providing R. Allen Stanford or other employees of the Stanford Entities with access to politicians. Such communications include, but are not limited to the following examples. Through a September 7, 2006 Barnes memorandum, Representative Charlie Rangel (NY) asked R. Allen Stanford to make individual $2,000 contributions to twelve candidates of Rangel's choosing. Barnes stated that "it is important that we pursue this" and recommended that R. Allen Stanford make the donations as the "Democrats have a good chance of taking back the house". *See* exhibit **KVT-36**. In March 2007, a check was sent to Senator Dodd's campaign. *See* exhibit **KVT-37**. In July 2007, Ben Barnes suggested that R. Allen Stanford sponsor a party for B Rapoport at Jay Rockefeller's house for $50,000. Ultimately, R. Allen Stanford contributed $30,000. *See* exhibits **KVT-38** and **KVT-39**. In August 2008, Ben Barnes notified R. Allen Stanford of a request from the Governor of the USVI for R. Allen Stanford to be the "major sponsor" of an upcoming National Democratic Governor's Association event in the USVI. Ben Barnes stated that "it's a great opportunity". Ultimately R. Allen Stanford sponsored the event for $500,000. *See* exhibits **KVT-40, KVT-41,** and **KVT-42.**

## Reputation Management

53.    On May 17, 2006, Bloomberg ran an article on Stanford's claim that he had a family relationship to Leland Stanford, the founder of Stanford University.  The article not only

suggested that Stanford's claimed connection to the founder was questionable, but also discussed Stanford's formation of the "offshore bank", "problems with U.S. investigators", "donations to U.S. political candidates and parties", and the use of the "Stanford jets" by U.S. lawmakers.  *See* exhibit **KVT-44.** Barnes was involved in the effort to try and quash the story.  *See* exhibits **KVT-45**, **KVT-46**, **KVT-47, KVT-48**, **KVT-49**, and **KVT-50**. At one point, in a conversation with Suzanne Hamm, SFGC Chief Marketing Officer – North America, James Davis suggested the idea of having Barnes reach out to Michael Bloomberg personally to "kill the story".  *See* exhibit **KVT-51.**

54.     On February 23, 2007, in response to statements made by Antiguan Prime Minister Spencer stating "we have tried our best to work with Allen Stanford…[a]s your government, we have experienced nothing but threats, innuendos and now, downright political interference in our nation's affairs", R. Allen Stanford published a response in an Antiguan newspaper. In his response, R. Allen Stanford referred to the Prime Minister's statements as "un-statesman like", "badly misguided", "deceitful", "an outright lie", and "vile and slanderous". *See* exhibits **KVT-52** and **KVT-53.** Barnes sent Stanford talking points for an apology.  *See* exhibit **KVT-54.**

55.     Later that year, Barnes suggested that R. Allen Stanford enlist the services of an online reputation firm to improve his online reputation. Barnes indicated that this and the hiring of a law firm that specializes in federal elections would also be helpful in improving Stanford's ability to give influential campaign donations. John Rafaelli, Mitch Delk, and Wyeth Wiedeman agreed with the strategy. See exhibit **KVT-55**.

56.     Barnes used his influence in dealing with regulators in Latin America on Stanford's behalf.  For example, in September 2004, Ben Barnes Group LP provided a reference

letter from Barnes for Stanford to a Venezuelan banking official in support of Stanford's application for approval to operate a commercial bank in Venezuela.  *See* exhibit **KVT-57** ("I have known Mr. Stanford for more than 25 years on both a personal and professional level. Mr. Stanford is…a man of strong character and integrity. All of his business dealings have always been conducted to the highest possible standards…I have no reservation in recommending that R. Allen Stanford and his companies be given every possible courtesy and consideration.").  Ben Barnes admits that prior to the early 2000s he didn't know anything about R. Allen Stanford, so that section of the letter is false. *See* exhibit **KVT-14** at pg. 33.

### Barnes' Defendants had Access to High Ranking Stanford Employees

57.      Throughout the rendering of the purported services by the Barnes Defendants, records and testimony from this case reflect that they had access to high-ranking Stanford personnel, including Allen Stanford, Jim Davis, and Yolanda Suarez.  Many of the interactions between these parties are noted above and occurred throughout the relationship.  However, many other interactions occurred that were not previously mentioned, including but not limited to the following:

(a)      Meetings in Antigua: Mr. Barnes indicates that he traveled to Antigua for meetings on Stanford business three or four times.  *See* Exhibit **KVT-14,** at page 74.   While there, he toured SIB's facilities and met with various Stanford employees.  He also toured the airport development and the other office buildings under development by the Stanford Entities.   On another visit Mr. Barnes attended a meeting held on Stanford's "one island concept", including sales meetings and meetings with "difficult" community members who opposed the plans. *See* exhibit **KVT-14,** at pages 74 and 75.

(b)      Flights by Barnes on Stanford's private planes:  Mr. Barnes was asked to pick up James Davis in Memphis on a private plane in June 2005 for a meeting in Antigua.  *See* exhibit **KVT-96 and KVT-97.**  As early as September of 2002, records indicate Mr. Barnes was a guest on Stanford's private plane.  *See* exhibit **KVT-98.**  These trips provided additional private access to Mr. Stanford and Mr. Davis, and perhaps other executives.

(c)   Meeting at political fund raisers:  Mr. Caperton indicated that he had met Allen Stanford at a fund raiser in Washington DC.  See *exhibit* **KVT-93**, at page 58.  Scott Reed was a subcontractor engaged by BBG, and he also recalled meeting Mr. Stanford at a Washington DC fundraiser.  See *exhibit* **KVT-94**, see page 62

(d)   Meetings with Stanford personnel and its professional advisors:  Mr. Caperton described an occasion when lawyers and accountants (internal and external) for Stanford were included in a meeting with BBG professionals as well as subcontractors hired to assist in the Stanford engagement on BBG's behalf.  The meeting involved issues related to the USVI tax laws and policy impacting Stanford's tax positions.  See *exhibit* **KVT-93**, page 131.  As noted in paragraph 60 below, an email from internal Stanford accountant Henry Amadio refers to a meeting similar in nature and scope, with attached documents  (KVT- 84 and KVT-85) reflecting USVI tax issues and detailed breakdowns analyzing which Stanford revenue could potentially be identified as USVI sourced.

(e)   Further, the Defendants produced a detailed list identifying numerous meetings, trips to Antigua, Miami, and the US Virgin Islands, and fundraising events or meetings with politicians attended by both the Defendants and high-ranking Stanford personnel, including, R. Allen Stanford, Jim Davis, and Yolanda Suarez. See *exhibit* KVT-95.

## Purported Value Received by the Stanford Entities

58.     The Stanford Entities transferred a total of $5,073,466.90 to an account at Prosperity Bank in the name of Ben Barnes Group LP between June 30, 2005 and February 13, 2009.  The services purportedly provided by the Defendants to the Stanford Entities are set forth in paragraphs 40-57 above.  In our analysis of the Stanford Entities' documents and records and the deposition testimony taken in this case, we have seen no evidence that the purported "services" provided by the Defendants provided assets of tangible or intangible value to the creditors of the Stanford Entities.  Instead, the services served to further the Ponzi scheme.

59.     Mr. Caperton was designated by the Defendants to testify regarding whether the services rendered by BBG provided reasonably equivalent value to the creditors of the Stanford Entities.  However, he was unable to connect any of the payments to any specific service

provided or explain how such services created value for the creditors.  See *exhibit* **KVT-93,** at page 120.   For example, for the $1 million payment on June 30, 2005 Mr. Caperton cannot specify the services rendered but indicates only that they must have had value or Stanford would not have paid the invoice. To date, the Defendants have not produced documentation sufficient to determine the amount of time BBG personnel worked on Stanford related matters. Additionally, the Defendants were unable to provide this information during their deposition testimony, admitting that BBG did not keep time detail sufficient to "allocate" their time to specific projects." See *exhibit* **KVT-93,** at page 90.

60.    With regard to the Defendants' lobbying efforts concerning tax laws relating to the U.S. Virgin Islands, Barnes himself admitted the Defendants were not successful in their efforts to change the tax laws concerning the U.S. Virgin Islands.   The Defendants were attempting to expand the definition of "sourcing" in regard to what and how revenue and income could be considered sourced in the U.S. Virgin Islands, and therefore subject to the U.S. Virgin Islands more favorable tax rates. They were attempting to modify the tax laws to expand the sourcing requirement to include all revenues sourced in the Caribbean, which would have included all of the revenues from SIB. On March 30, 2007, Henry Amadio sent an email to Gil Lopez and Mark Kuhrt with the final version of a "USVI Initiative Meeting" report attached. The report was dated March 21, 2007. The purpose of the meeting was "to determine which of the 5 lines of revenue could qualify as revenue **sourced** from the VI (emphasis added)." The meeting concluded that "all revenue streams with the exception of the property management could be **sourced** through USVI Stanford Financial Group Global Management (emphasis added)." The final report includes graphs and charts showing that the goal was to have SFGGM charge the other Stanford Entities for Referral Fees, Marketing Fees, Management Support Fees, Capital

Market Fees, and Portfolio Management Fees so that these revenues would be treated as being "sourced" from the U.S. Virgin Islands. *See* exhibits KVT-84 and KVT-85. As stated previously in paragraph 58(d) above, Mr. Caperton referred to this meeting as well.  Ultimately, even if the Ben Barnes Group had been successful in changing the sourcing requirements, which they were not, the ultimate value or benefit would have inured to R. Allen Stanford, as he was the sole owner and shareholder of the majority of the Stanford Entities. Further, Ben Barnes also admits in his deposition that even if the Defendants had been successful the U.S. Virgin Island tax law changes would have benefited ultimately the Stanford Entities and its shareholder, R. Allen Stanford. See exhibit KVT-14 at 88 and 95-96.

61.     Similarly, based on my analysis of the available documents and deposition testimony of the Defendants, the goal of the Defendants' services relating to Cuban participation in the Antigua 20/20 Cricket Tournament was to obtain approval from the U.S. State Department and the U.S. Treasury Department for the Cuban cricket team's participation in the tournament. The Defendants' did not obtain those approvals, thus any potential value, tangible or intangible, of those services was not realized.  Again, had they done so, the result would have been the furtherance of the Ponzi scheme by attracting new investors.

62.     With regard to the $1,644,975 in funds received from the ESPN and Sky Sports Network's Sponsorship of the Antigua 20/20 Cricket tournaments, as previously discussed, we have seen no evidence confirming that ESPN's broadcast agreement caused Sky Sports Network to approach Stanford for broadcast rights or that Ben Barnes' introductions and relationships to and with ESPN directly caused ESPN to enter into an agreement with the Stanford Entities. Additionally, Ben Barnes stated that the benefit of these sponsorships would have been to "give Stanford Financial the – a lot of recognition around the world" and attract more investors. *See*

exhibit **KVT-14** at pg. 60. Further, internal communications at Stanford indicate that the Antigua 20/20 Cricket tournament was viewed as a "great opportunity to showcase the Stanford brand" and that they "look[ed] forward to hosting clients and prospects during the Stanford 20/20 matches." See exhibits KVT-80 and KVT-81.   Thus, the goal of those services was to expand the recognition and reputation of the Stanford Entities, and thereby extend the Ponzi scheme, which would have added no value to the Stanford Entities because investor funds create a liability, not an asset, for a financial institution or in this case, one run as a Ponzi scheme.   Any value from the additional investments into a Ponzi scheme would be due from income derived from the investment of the funds, which we know did not occur, except on a very limited basis, and these investments ultimately lost value  The revenue from investments and the investments themselves were fictitious. *(See* exhibit KVT-8, paragraphs 31-33. Moreover, the expenses incurred by the Stanford Entities to put on the Antigua 20/20 Cricket tournaments were many times over the value of the payments received by Stanford from the sponsorships.

63.    The ultimate goal of the services provided by the Defendants in making recommendations for political donations, providing access to politicians, and improving the reputation of R. Allen Stanford and the Stanford Entities was to give the appearance of legitimacy and credibility to  the Stanford Entities and R. Allen Stanford in an effort to extend the Ponzi scheme by attracting more investors.  As stated previously, this would have added no value to the Stanford Entities because investor funds create a liability, not an asset, for the Ponzi scheme.   Any value from the additional investments into a Ponzi scheme would be due from income derived from the investment of the funds, which we know did not occur.  The revenue from investments and the investments themselves were fictitious.

64.     In Mr. Caperton's testimony, he indicates that one service provided to the Stanford Entites in exchange for reasonably equivalent value was the advice Mr. Barnes provided regarding the Caribbean airlines purchase by Stanford.    In describing the service provided, Mr. Caperton testified "The fact that Stanford, you know, wanted an airline – you know, I think it ultimately failed because Caribbean airlines are notoriously difficult to make money at, but that was –that was a plus for the Stanford Group and for the Stanford creditors. " See *exhibit* **KVT-93**, at page 122.    Caperton's testimony that this purported service provided reasonably equivalent value is unsupportable.  In fact, over $270 million of SIB CD funds were funneled to Caribbean Sun Airline Inc. and Caribbean Star Airlines Ltd., and that these entities ultimately lost in excess of $301 million.  The advice provided by BBG is inconsistent with providing value.

## The Defendants Ignored Multiple Warnings Signs About the Nature of the SIB CD Program

65.     Based on our investigation regarding the Stanford Ponzi scheme and the facts and circumstances leading up to its collapse in late 2008 and early 2009, there were a number of "warning signs" or "red flags" that should have prompted significant concerns by the Defendants regarding the nature and validity of the business activities of the Stanford Entities, the SIB CDs and the underlying investment portfolio as well as the credibility of the sole owner of Stanford Entities operating the Ponzi scheme, R. Allen Stanford.

*SIB Was An International Bank in Antigua*

66.    The fact that the SIB CDs were being sold by an international bank in Antigua, alone, should have prompted significant concerns and reasonably lead the Defendants to make further inquiries. Because SIB was an international bank, the Defendants would have known there was no FDIC insurance coverage of the CDs or any similar insurance protection. That is one of the well-known risks of investing with international banks. Moreover, Antigua, a country with a population today of approximately 85,000 people, is and has been well known in the United States for its lack of adequate regulation of the financial sector. The Barnes Defendants cannot deny knowledge of this concern, as Mr. Caperton testified that the fact that Stanford owned offshore banks was one of the reasons the Democratic Senatorial Campaign Committee rejected Stanford donations.   See *exhibit* **KVT-93** on page 109.   In fact, had the Barnes Defendants inquired, they could have learned that there were only three bank examiners in the Financial Services Regulatory Commission of Antigua who are responsible for all of the banks in Antigua. The entire country's gross domestic product for 2009 was $1.55 billion and its 2009 annual expenditures were $293 million (which put the country at a deficit), both amounts being small fractions of the value of assets claimed to be deposited with SIB in Antigua during that same       time       period.       (See       https://www.cia.gov/library/publications/the-world-factbook/geos/ac.html.) Had the Defendants reviewed similar publically available information prior to 2009, they would have found that the GDP and annual budget for Antigua were comparable. It is not surprising that a government with such limited resources was unable to adequately oversee SIB along with the many other banks operating on the island, and this fact should have caused significant concerns to the Defendants and reasonably lead the Defendants to make further inquiries.  Given the Defendants' access to high-ranking Stanford personnel, they could have made inquiries concerning the legitimacy of the Stanford operations.

67.    Mitchell Delk was retained by Defendants to work on Stanford matters.  Mr. Delk specifically brought to the team experience with financial institutions in addition to his lobbying abilities.   Mr. Delk was an investment banker at First Boston for five years and counsel to SEC Chairman Richard Breedon.  (*See* exhibit KVT-59, at 32 and 33).  This experience at least would have provided Mr. Delk with the background regarding the offshore banking risks as well as many of the risks noted below.

*The Defendants Were Aware of Regulatory Violations by SGC Concerning the Sale of SIB CDs*

68.    On September 12, 2005, SGC received a letter from the SEC addressing multiple issues, including the commission structure paid to SGC relating to SIB CDs.  Specifically, the letter stated that the commission structure would result in SGC receiving a referral fee of 15% of the amount invested on a SIB CD with a 60-month maturity, which the SEC said was more than any rate legally allowed. *See* exhibit KVT-86.  SGC financial statements, which were publically available, referred to the letter regarding this SEC investigation in 2005, 2006, and 2007. On December 6, 2006, Ben Barnes emailed R. Allen Stanford stating, "I have some important thoughts regarding the SEC matter that I need to discuss with you at your earliest convenience (emphasis in original)". It's important." *See* exhibit **KVT-15**.  Thus, the Barnes Defendants actually knew about ongoing SEC investigations and by virtue of the publically available SGC financial statement disclosures, had access to information that, if acted upon, would have either led them to the existence of that letter, or caused significant concerns if the letter they knew existed was not forthcoming upon request.

69.    Further on February 28, 2008, Mitchell Delk sent a draft of an agenda for a meeting with Yolanda Suarez to James Conzelman. One of the items on the agenda was "SEC

investigation" with the comment "Leader can not [sic] be deposed." *See* exhibits KVT-89 and KVT-90. Additionally, on January 20, 2009 Mitchell Delk provided Ms. Suarez with recommendations for SEC enforcement related counsel to address the issue. *See* exhibit **KVT-16**. These emails and the other circumstances described above show that over the course of their relationship with the Stanford Entities and R. Allen Stanford, the Defendants were aware of SEC investigations into the Stanford Entities. Such knowledge should have caused significant concerns on the part of the Defendants concerning the nature of the Stanford operations and reasonably lead the Defendants to make further inquiries concerning same.

70.     Further, had the Defendants inquired whether other regulatory bodies were similarly investigating the Stanford Entities, the Defendants may well have learned that the NASD concluded as early as 2006 that SGC violated NASD rules through "unwarranted and misleading" assertions that SIB's portfolio investments were "prudent"—at a time when SGC admitted that "no one at SGC knows what the investments are." *See* exhibit KVT-87.

*Defendants Were Aware of Reputational Issues with R. Allen Stanford and the Stanford Entities*

71.     In addition to the above information concerning Stanford, the Defendants were aware of other facts concerning Stanford that should have reasonably led them to make further inquiries. As stated above, Barnes was aware of concerns raised by the media and politicians about Stanford's credibility and even suggested that R. Allen Stanford enlist the services of an online reputation firm to improve his online reputation. Barnes indicated that this and the hiring of a law firm that specializes in federal elections would also be helpful in improving Stanford's ability to give influential campaign donations. John Rafaelli, Mitch Delk, and Wyeth Wiedeman agreed with the strategy. See exhibit **KVT-55**.

72.     Ben Barnes was also aware that R. Allen Stanford did not "vet" with the Democratic Senatorial Campaign Committee ("DSCC") because it was the DSCC's position that "Stanford Financial...has lobbied for weakening of US money laundering laws and regulation of offshore banking." *See* exhibits **KVT-82 to KVT-83.**

73.     Further, the Defendants were aware of instances where R. Allen Stanford solicited letters of recommendation intended to help grow his operations in Latin America, which contained obviously false information. As stated previously, BBG provided a reference letter to a Venezuelan banking official in support of Stanford's application for approval to operate a commercial bank in Venezuela which stated that Barnes had known R. Allen Stanford for more than 25 years. *See* exhibit **KVT-57.** As previously discussed, Ben Barnes admits that prior to the early 2000s he didn't know anything about R. Allen Stanford. *See* exhibit **KVT-14** at pg. 33.

74.     Irrespective of the information BBG had in its procession and its ability to have personal access to the main perpetrators of the ponzi scheme, Mr. Caperton indicates that very few, if any, questions were ever posed regarding the economic sustainability or legitimacy of the Stanford Entities.

### *SIB's Investment Returns Were Too Good To Be True*

74.     The high rates of return and consistent profitability of the SIB CD portfolio that were reported by SIB, at a time when the world economy was in crisis, likewise should have caused significant concerns to the Defendants and reasonably led them to further inquiries regarding how the SIB CD portfolio was invested and how it could achieve such results. The claimed historical performance of SIB's CDs was extraordinary, to say the least.  SIB offered CD rates that were significantly greater than those offered in the United States.  In its own

marketing brochure, SIB included the following comparison in the yields of SIB CDs versus average U.S. Bank CD yields between 1997 and 2006:

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 10.13 | 9.25 | 8.71 | 9.625 | 9.13 | 7.17 | 6.38 | 6.21 | 6.52 | 7.13 |
| U.S. Yield (%) | 5.8 | 5.3 | 4.9 | 5.85 | 3.55 | 1.85 | 1.78 | 2.7 | 4.46 | 5.08 |

*Defendants Had Sufficient Information Such That They Could Have Known That SIB's Representations Regarding Their Investment Strategy and Purported Consistent Investments Returns Was Unusual*

75.      The extraordinary returns provided by the SIB CDs were particularly unusual considering SIB's representations regarding its conservative investment strategy and emphasis on guaranteed returns to its CD customers. As a general rule, in order to achieve higher levels of returns, it is necessary to take on a higher level of investment risk. Here, SIB in essence claimed to buck this trend by providing consistent and positive returns. SIB's claimed conservative investment strategy also did not square with the information SIB made available to the public about its portfolio.  For example, in its 2007 annual report, which was available to the public, SIB claimed that its investment portfolio at fair value consisted of 58.6% equity, 18.6% fixed income, 15.6% alternative investments (i.e. hedge funds) and 7.2% precious metals. SIB's investment allocation for the years prior, going back to at least 2004, was very similar to this. Other than the fixed income, the performance of every component of this investment allocation was volatile and subject to significant risk, particularly in the 2004 through 2007 time period. Even fixed income has risk. At a minimum, this apparent disconnect between a conservative investment strategy and consistent and/or above-market returns should have caused significant concerns with the Defendants.

76.     By reviewing SIB's financial statements, a basic exercise that someone such as Ben Barnes, who attends meetings of the Investment Committee of the LBJ Foundation (see exhibit KVT-88) would have the ability to perform, the Defendants likewise would have seen that SIB's apparent assets were volatile and subject to change and that even a small drop in market performance of SIB's portfolio would have caused the total reported assets to become insufficient to pay CD obligations.  For example, in 2007 a mere drop of 4.50% of the reported financial assets would have resulted in SIB's combined cash, cash equivalents and reported financial assets being less than their outstanding purported CD obligations.  Indeed, non-Stanford CPAs advising SGC customers came to these conclusions based on presumably the same or even less information than was available to the Defendants. Mr.Caperton testified that BBG received SIB annual reports, the quarterly newsletter (the Stanford Eagle), and other publications.   See *exhibit* **KVT-93,** at page 47, page 67, and 75.   All of this information would have provided the necessary information to conclude, as some investor outsiders did, that the economic realities of the SIB CDs were highly volatile and not sustainable. Instead, even in the face of other factors that should have caused concerns and, with the Defendants access to high-ranking Stanford personnel which would have allowed them to inquire further about the Stanford operations, they either chose not to review the information in their possession or they reviewed the information and failed to make appropriate inquiries concerning the same.

I state under penalty of perjury that the foregoing is true and correct.  Executed on this 9th day of January, 2015.

_____
Karyl Van Tassel

# EXHIBIT KVT-13

**Stanford Financial Group Receivership**

*Listing of Payments Made to Ben Barnes and Ben Barnes Group, L.P.*

| Date | Amount | Payor |
|---|---|---|
| 6/30/2005 | $ 1,000,000.00 | Stanford Financial Group Company |
| 12/7/2005 | 500,000.00 | Stanford Financial Group Company |
| 1/19/2006 | 20,000.00 | Stanford Financial Group Company |
| 2/28/2006 | 500,000.00 | Stanford Financial Group Company |
| 7/31/2006 | 68,466.90 | Stanford Financial Group Company |
| 2/22/2007 | 325,000.00 | Stanford Financial Group Company |
| 4/17/2007 | 325,000.00 | R. Allen Stanford |
| 7/2/2007 | 265,000.00 | R. Allen Stanford |
| 8/2/2007 | 265,000.00 | R. Allen Stanford |
| 9/18/2007 | 265,000.00 | R. Allen Stanford |
| 10/19/2007 | 265,000.00 | R. Allen Stanford |
| 12/10/2007 | 265,000.00 | R. Allen Stanford |
| 2/29/2008 | 150,000.00 | Stanford Financial Group Global Management |
| 4/30/2008 | 100,000.00 | Stanford Financial Group Company |
| 6/2/2008 | 375,000.00 | Stanford Financial Group Global Management |
| 7/18/2008 | 55,000.00 | Stanford Financial Group Global Management |
| 8/15/2008 | 55,000.00 | Stanford Financial Group Global Management |
| 10/24/2008 | 110,000.00 | Stanford Financial Group Global Management |
| 11/7/2008 | 55,000.00 | Stanford Financial Group Global Management |
| 2/13/2009 | 110,000.00 | Stanford Financial Group Global Management |

# EXHIBIT KVT-27

From: Stanford, Allen
Sent: Friday, December 07, 2007 11:41 AM
To: Suarez, Yolanda; Davis, James

Yolanda I want you to negotiate a success fee for getting new VI legislation passed in
2008 with Ben Barnes. I know you don't think this is achievable but Ben has assured me if
we get on this and get in front of key folks on the hill it can be accomplished next
year .

Jim we need the language of the new legislation asap and as you and I agreed this would be
your responsibility. We can discuss today.

Yolanda I have been personally paying Ben $265K each month this year.  I think the world
of Ben and know he is very capable but this is too much for what we are getting in return.
Ben has said Mitch and others were hired to do Stanford business only which I know is not
the case. Anyway come to me when we meet next week with a proposal for paying Ben's team
for anything beyond a success fee

Last... Yolanda what is the status of our own office in DC? RAS

CONFIDENTIAL                                                      RECEIVER527-00224838

# EXHIBIT KVT-36



September 7, 2006

MEMO TO:        Allen Stanford

FROM:           Ben Barnes

SUBJECT:        Political Contributions


Pursuant to our conversation, I spoke with Charlie Rangel, and he suggested that you make individual $2,000 contributions to 12 candidates of his choice.  I will get you the list as quickly as possible.  If you would overnight the checks to me, I can deliver them to Charlie personally.  I would do this myself, but I am maxed out on federal contributions.

I think it is important that we pursue this.  The Democrats have a good chance of taking back the House.  Charlie couldn't have been nicer or more helpful and said to give you his best.  He was so pleased that you are willing to this.

Regarding the Davis memo, I have been able to ascertain that this is a new memo.  We need to find its origin and put a stop to it.  I plan to travel to Washington Sunday and will make this a priority.  I will call you tomorrow or over the weekend to discuss a plan of action.

Best regards.

CONFIDENTIAL

RECEIVER527-00282147

# EXHIBIT KVT-37

**From:** Martinez, Vanessa
**Sent:** Friday, March 30, 2007 10:36 PM
**To:** Suarez, Yolanda
**Subject:** FW: Check for Chris Dodd

Hi I scheduled a FEDEX pick at your house tomorrow between 10AM-12PM for the check.
Would you like me to call Emilio and give him the address where it needs to go?
The destination has to be written on the actual airbill when the envelope is picked up.
They will provide you with an envelope.

Thanks

Vanessa L. Martinez
Executive Assistant to the Chief of Staff
Stanford Financial Group
201 South Biscayne Boulevard
12th Floor
Miami, Florida 33131 USA
305.347.2414 Direct
305.347.2421 Fax
vamartinez@stanfordeagle.com

---

**From:** Susan Martin [mailto:smartin@benbarnesgroup.com]
**Sent:** Friday, March 30, 2007 5:16 PM
**To:** Martinez, Vanessa
**Subject:** Check for Chris Dodd

Vanessa –

Please have Yolanda make the check payable to Chris Dodd for President and overnight the check to:

Vince Fralichi
1100 H Street, NW
Suite 940
Washington, DC  20005

Phn:  202-737-3633

Regards,

Susan Martin
Assistant to Ben Barnes
512-322-0128

CONFIDENTIAL

RECEIVER527-00261334

# EXHIBIT KVT-40

**From:** Susan Martin [smartin@benbarnesgroup.com]
**Sent:** Friday, August 15, 2008 3:23 PM
**To:** Stanford, Allen
**Cc:** Walker, Kye; Hodge, Julie
**Subject:** A Note from Ben Barnes

Allen –

I've tried to call you a couple of times without success.  I wanted to let you know that Charlie Rangel and I are going to the USVI September 5-6.  I have a definite appointment with the Governor either Thursday or Friday, and I want to talk to you before that meeting.

Also, the National Democratic Governors Association is having a meeting in the USVI sometime after the election.  The Governor asked if you would consider being the major sponsor for the event.  I think it's a great opportunity for you.

I need to catch up on a few other things, so I would appreciate a call.  I am traveling to New York today and am reachable on either cell (512-415-4070 or 512-415-1414) or you can call me at the Ritz Carlton (212-308-9100).

I look forward to hearing from you.


Best,
Ben

CONFIDENTIAL

RECEIVER527-00278576

# Exhibit KVT-41

**From:** Walker, Kye
**Sent:** Thursday, October 23, 2008 3:29 PM
**To:** Stanford, Allen
**Subject:** $500,000 donation to Democratic Governors Association

I have followed up with Ben Barnes regarding the donation to sponsor the DGA conference in St. Thomas.  The donation may be made with a corporate check payable directly to the DGA (as opposed to Govt of the VI).  The conference begins Friday, November 7th and ends Sunday, November 9th.  The DGA invites you to give remarks at the Chairman's Board Breakfast on Saturday, November 8th between 8 am and 9 am or the Cocktail Reception and Dinner of the same date.  The breakfast will have an audience of approx. 50 people consisting of the participating Governors, their staff, and staff of the DGA.  The cocktail reception will have an audience of 300 people consisting of the Governors, staff, other sponsor and various VI govt officials and private sector members.  Please indicate your approval to have a check issued to the DGA for $500,000.

RECEIVER527-00229316

# EXHIBIT KVT-42

**From:** Blair, Scott
**Sent:** Tuesday, November 04, 2008 8:27 PM
**To:** Kuhrt, Mark
**Subject:** RE: DGA checks
All set.  Kye is picking up the checks at 5.

```
Scott C. Blair, CPA
Accounting Supervisor
Stanford Financial Group Global Management, LLC
340-713-5000 Main
340-713-5052 Direct
340-626-3722 Mobile
340-713-5085 Fax
sblair@stanfordeagle.com
```

-------------------------------------------------------------------------------

**From:** Kuhrt, Mark
**Sent:** Tuesday, November 04, 2008 2:56 PM
**To:** Blair, Scott
**Subject:** Fwd: DGA checks

Follow-up please!

Sincerely,

Mark Kuhrt

Begin forwarded message:

> **From:** "Walker, Kye" <KWalker@StanfordEagle.com>
> **To:** "Kuhrt, Mark" <MKuhrt@StanfordEagle.com>, "St.Remy, Christine"
> <cstremy@stanfordeagle.com>
> **Subject: FW: DGA checks**
>
> Mark-
>
> I have attached 2 invoices for Stanford's sponsorship of the Democratic Governors' Association
> conference in STT this weekend.  Please see RAS's approval of the invoices below.  The checks
> need to be cut asap as the DGA's check is being fedexed.  The Government's check may be hand
> delivered tomorrow.  Please advise as to when the checks will be ready.  Call me if you have any
> questions.
>
> Kye
>
> -----Original Message-----
> From: Stanford, Allen
> Sent: Tuesday, November 04, 2008 2:47 PM
> To: Walker, Kye
> Subject: Re: DGA checks
>
> Yes to both. RAS
>
> ----- Original Message -----
> From: Walker, Kye

RECEIVER527-00292048

To: Stanford, Allen
Sent: Tue Nov 04 12:46:01 2008
Subject: DGA checks

Do I have your approval to request 2 checks totaling $500,000?  Shall I proceed with the alternative plan to have JRT give remarks and attend the policy discussions with Lionel Johnson.  Please advise.

CONFIDENTIAL

RECEIVER527-00292049

# EXHIBIT KVT-44

Stanford Financial's `Family' Tie Fails to Impress University
2006-05-17 00:03 (New York)

By Michael Forsythe and Alison Fitzgerald
    May 17 (Bloomberg) -- R. Allen Stanford, chairman of
Stanford Financial Group, has donated $2.5 million to restore the
home of Stanford University's founder, whom he describes in the
company magazine as a relative.
    If there is a blood connection, though, the California
university doesn't know it. ``We are familiar with Stanford
Financial but are not aware of any genealogical relationship
between Allen Stanford and Leland Stanford,'' says Susan
Weinstein, director of business development and guardian of the
use of the university's name.
    The claimed ties are only one way the Houston-based company,
which says it helps manage and advise on $30 billion in
investments, has burnished its image among investors and in
Washington.
    Among other things, the firm has contributed millions of
dollars to politicians of both parties and allowed them use of
its jets at cut-rate fares. It acquired a Washington research
group employing a former Federal Reserve governor, and high-
yielding certificates of deposit issued by its Antiguan bank have
attracted increasing numbers of affluent U.S. buyers.
    Such steps have helped the firm prosper in the wake of a
run-in with U.S. government officials, who complained that the
firm has exerted too much control over Antiguan regulators.
    ``When you're an offshore banker, you want to make sure that
you're not perceived as a villain,'' said Jack Blum, a lawyer at
Lobel, Novins & Lamont in Washington who specializes in overseas
financial transactions. Allen Stanford ``has been very
aggressive, not only in the political arena but also in hiring
people to tell everybody what a good guy he is.''


                    Texas Roots

    Stanford, 56, traces his company's roots to his
grandfather's insurance company, founded in the central Texas
town of Mexia in the 1930s. U.S. court records show that his core
business -- the offshore bank -- was formed in 1985 on the
Caribbean island of Montserrat and moved to Antigua in 1990.
    That's where he ran into problems with U.S. investigators.
In 1999, Stanford Financial tried to take over Antiguan
International Business Corp., which regulated offshore companies
on the island, said Jonathan Winer, who was then a deputy
assistant secretary of State. State Department cables sent from
the U.S. Embassy described a ``power grab'' and criticized the
company's hiring of U.S. consultants to revise Antigua's
offshore-banking rules.
    ``The high-powered legal and investigative hired guns from
the U.S. are likely being tasked with cleansing the files to make
sure there is nothing in them that could damage or implicate the
American offshore banker,'' one cable read.


                    Warning Lifted

    The U.S. advised financial institutions to be suspicious of

transactions with Antigua banks, a warning that was lifted in
August 2001 after Antigua took steps to fight money laundering.
The warning didn't specifically mention Stanford Financial's
bank.

Stanford Financial says Allen Stanford ``was asked to serve
in an advisory capacity to the government of Antigua and
Barbuda'' and hired a ``top-notch team of former U.S. legal and
regulatory professionals'' that helped that country adopt anti-
money-laundering rules.

That team included several lawyers from the Miami offices of
Greenberg Traurig LLP, which represented Stanford Financial at
the time.

Since then, Stanford Financial's U.S. business has surged,
helped by a team in Baton Rouge, Louisiana, that sells the
Antiguan CDs to affluent Americans such as doctors. The company
says the team added about $17 million in new deposits in 2003,
$150 million in 2004 and had a goal of $250 million for last
year, according to a 2004 company video.

### Additional Cachet

In Washington, meanwhile, the company gained additional
cachet last year by acquiring Charles Schwab & Co.'s Washington
research team, now called Stanford Washington Research Group. The
group employs former Federal Reserve Governor Lyle Gramley as
senior economic adviser.

In the past six years, Stanford Financial and its employees
have made more than $2 million in donations to U.S. political
candidates and parties, according to the Federal Election
Commission and congressional and Internal Revenue Service
records.

Stanford gives to both Democrats and Republicans. Among its
top beneficiaries have been former Senator Robert Torricelli, a
New Jersey Democrat who left office in 2003 amid ethics
allegations, and Republican Representatives Tom DeLay of Texas,
who is resigning from Congress next month after having been
indicted in a Texas election-fundraising case, and Bob Ney of
Ohio, who's under investigation in the scandal involving lobbyist
Jack Abramoff. Stanford Financial or its employees have
contributed to the legal defense funds of the three lawmakers.

### Company Jets

DeLay's committees paid for flights on Stanford's jets at
least 16 times since 2003, including on Oct. 20, the day the
former House majority leader was booked in a Houston courthouse
on money-laundering charges. Shannon Flaherty, a spokeswoman for
DeLay, didn't respond to a request for comment.

Members of the House Caribbean Caucus take annual trips to
the region on Stanford's jets. Lawmakers are required to
reimburse companies at a first-class commercial rate, which is
often a fraction of the actual cost.

``Our relationship with political leaders is and always will
be proper, bipartisan and fully disclosed,'' Stanford Financial
said in a written response to questions.

The company's in-house magazine, the Stanford Eagle, raises
a different sort of relationship with another political leader:
Leland Stanford, the 19th century California governor and U.S.

senator who, with his wife, founded the university in memory of their only child, Leland Jr., who died at the age of 15 in 1884.

Family Ties

The company's magazine, published in 2001, quoted Allen Stanford as saying that his great-great-great-grandfather was ``closely related to'' Josiah Stanford, Leland's father, who was born in 1795 and lived near Albany, New York. The magazine's cover featured a photo of Allen Stanford, his father, James, and former California Governor Gray Davis standing on the steps of the Stanford Mansion, Leland Stanford's Sacramento home, now part of a state park used for official functions.

On a promotional video distributed in 2004 as a sales and information tool for its advisers, Allen Stanford says, ``I am proud to say that we have been a major financial supporter for the restoration of the Leland Stanford Mansion in Sacramento, helping to preserve an important piece of California, and Stanford family, history.''

The company, in a written response to questions, said, ``It is clear that Stanford Financial Group has not tried to use a family link to Leland Stanford to promote the image of the company.'' It added, ``Our clients are sophisticated, affluent investors who make their investment decisions based on our company's current performance, not because of the kinship between Mr. R. Allen Stanford's great-great-great grandfather and Leland Stanford's father.''

`Of Swiss Descent'

In its statement, the company cited a book called ``The History of Stewart County Georgia -- Volume II'' by Sara Robertson Dixon to establish the family link. In the book, available at the Library of Congress, Dixon, who died in 1967, described R. Allen Stanford's great-great-great grandfather Thomas as being ``closely related'' to Josiah Stanford, though without saying how. The book said the family ``is said to be of Swiss descent'' and was named St. Anford, moving to the U.S. before the American Revolution.

Stanford University archivist Margaret Kimball said Leland Stanford's family traces its origins to New York and Massachusetts, where family members settled after migrating from England, not Switzerland.

``I would probably argue that if the Stanfords, to whom R. Allen Stanford lays his heritage, are indeed descended as outlined, then there is probably little connection to our Stanford and those who hail from Massachusetts and New York,'' Kimball said.

--Editor: Rubin (rxj/jto)

Story Illustration: For more information about Stanford Financial Group, see the company's Web site:
http://www.stanfordfinancial.com/

To contact the reporters on this story:
Mike Forsythe in Washington (1)(202) 624-1940 or
mforsythe@bloomberg.net

RECEIVER527-00292075

Alison Fitzgerald in Washington at (1)(202) 624-1846 or
afitzgerald2@bloomberg.net.

To contact the editor responsible for this story:
Ken Fireman at (1)(202) 624-1978 or kfireman1@bloomberg.net

[TAGINFO]
142238Z US <Equity>

NI BNK
NI TX
NI US
NI FEA
NI CNG
NI EDU
NI POL
NI GOV
NI MMK
NI OFFSHORE
NI ANTIGUA
NI CARIB
NI STATE
NI SEC
NI TRE
NI GOLF
NI TOP


#<698734.251583.2005-11-10T14:40:00.25>#
-0- May/17/2006 04:03 GMT

# EXHIBIT KVT-45

**From:** Suarez, Yolanda
**Sent:** Monday, May 08, 2006 10:25 PM
**To:** Suarez, Yolanda
**Cc:** Tello, Ana; Hodge, Julie
**Subject:** FW: BLOOMBERG RESPONSE

**Attachments:** STANFORD history.doc

---

**From:** Suarez, Yolanda
**Sent:** Mon 5/8/2006 5:24 PM
**To:** Stanford, Allen
**Subject:** BLOOMBERG RESPONSE

We have discussed this issue and the response below at length with Ben Barnes, Scott Reed and Kent Caperton and they are in agreement.  We will not be releasing this until the following:

1.  Ben's researcher gets additional information on the link between Thomas and Josiah, if possible.
2.  Until you approve.

Additionally, we suggest sending a copy of the 2 pages of the book cited in our response, and a copy of the commercial we aired nationally.

Ben has advised that absolutely under no circumstances should we have Sweeney's office make any calls on our behalf, this would be disastrous.  While I did speak to Sweeney's new Chief of Staff, I did not mention this.

The objective is to release this as early as possible tomorrow to the reporter.    I will be in the air tomorrow morning at 6:00 a.m., landing around 9:30.  YS


**It is the Stanford family's oral history that Thomas Stanford, great-great-great grandfather was closely related to Josiah Stanford, father of Leland Stanford, founder of Stanford University.  The Stanford family arrived in New York around the time the Declaration of Independence was signed.  Thomas Stanford moved south to Georgia and Texas, while Josiah Stanford's family moved west to California.  This is history that has been passed along from generation to generation.**

**Birth records from the mid-1700s are too fragmented to confirm the exact relationship, but there is historical documentation that cites the close relationship between Thomas Stanford and Josiah Stanford.  For example, a book "History of Stewart County, Georgia" by Agnew and Marian Clark published in Georgia by A.H. Clark, "Thomas Stanford, Sr., who died in Cuthbert in 1839 was closely related to Oliver Perry and Jeptha Stanford of Stewart County and to Josiah Stanford of New York, father of Leland Stanford, founder of the college in California that bears his name."**

**In 2001, Charles Ansbach, Executive Director of the Leland Stanford Mansion Foundation, solicited a donation from Stanford Financial Group to support the renovation of the Stanford Mansion in Sacramento.  The 2001/2002 edition of both our corporate video and magazine highlight the donation as part of sections that review the Company's corporate giving.  These are the only mentions Mr. Stanford has ever made in marketing materials to his connection to Stanford University.  In contrast, Mr. Stanford refers constantly in meetings with employees, clients and others to his Texas heritage, even highlighting his roots in a recent national television commercial and other marketing materials.  Stanford Financial Group is proud of its**

growth in the U.S., where we continue to hire well-known, talented professionals who can provide our clients with a wide range of services.

Our clients are savvy individuals who make investment decisions based on performance records, not because of the relationship between Mr. Stanford's great great great grandfather and Leland Stanford.

CONFIDENTIAL

RECEIVER527-00280275

# EXHIBIT KVT-46

Case 3:10-cv-00527-N-BQ   Document 131-1   Filed 03/03/15   Page 77 of 304   PageID 2345

STANFORD FAMILY – MEXIA, TEXAS HISTORY

| | |
|---|---|
| THOMAS STANFORD SR.- | Died 1839, Georgia.  Arrived in Georgia sometime in the late 1700's, around the time the Declaration of Independence was signed, from the Stanford family which originated in the U.S. in New York state area.  One part of the Stanford New York family migrated South and another migrated West.  Thomas Sr. was closely related by blood to Josiah Stanford, father of Leland Stanford.  He and his wife Keziah were wealthy early settlers of middle Georgia, and acquired a plantation seven miles from Cuthbert, Georgia in 1828.  They had 10 children, one of whom was DAVID ALLEN STANFORD born in 1815. |
| DAVID STANFORD - | Born 1815, Georgia; died 1891, Mexia, TX.  David was born in Georgia, was married and had a son, SIMON ALLEN STANFORD.  His wife subsequently died.  As a widower, following the Civil War, which dessimated the South and destroyed their plantation and property in Georgia, he moved with his son, SIMON ALLEN in 1866/7/8 to central Texas in railroad times, to an unincorporated area in Limestone County now known as Mexia.  David died in Mexia, Texas in 1891 and is buried in the Mexia cemetery. |
| SIMON ALLEN STANFORD - | Born 1846, Georgia;  died 1924, Mexia TX.  Simon Allen Stanford had a son, LODIS B. STANFORD in Mexia, Texas in 1897.  He passed away in 1924 and is buried in the Mexia cemetery. |
| LODIS B. STANFORD - | Born October 1897, died April 1969, Mexia TX.  Lodis was born in Mexia, Texas in 1897 and founded the first Stanford company, Stanford Insurance in 1932.  He had a son, JAMES STANFORD in 1927.  He passed away in 1969 and is buried in the Mexia cemetery. |
| JAMES ALLEN STANFORD - | Born August 30, 1927, Mexia, TX, still living.  James Stanford carried on the Stanford business and had three sons, one of which is  ROBERT ALLEN STANFORD. |
| ROBERT ALLEN STANFORD - | Born 1950, Mexia, TX.  Current Chairman and CEO of the Stanford Financial Group of companies.  R. ALLEN has always been told of his family history.  His great great great grandfather, Thomas Stanford Sr. was closely related by blood to Leland Stanford's father, Josiah Stanford.  Both families originated in New York state. |

RECEIVER527-00280276

CONFIDENTIAL

# EXHIBIT KVT-47

**From:** Hodge, Julie
**Sent:** Wednesday, May 10, 2006 11:09 PM
**To:** Hamm, Suzanne
**Subject:** COMPANY RESPONSE TO BLOOMBERG

**Attachments:** Stanford history - response to Bloomberg.doc; FW: Questions for Stanford Financial for Bloomberg News Story
Suzanne

I am sending this to you via e-mail as your name is listed as the Media Contact Person.  Mr. Stanford has issued a response to Mike Forsythe regarding the e-mail he sent with questions for Stanford, see attached.

I will be Fedexing a package out tonight to you in Memphis with copies of everything that has been sent to him.  Others being copied are:

James Stanford
James Davis
Kelley Hawkins
Yolanda Suarez
Oreste Tonarelli
Juan Rodriguez
Mauricio Alvarado
Ben Barnes
Scott Reed, Ben Barnes Group
Kent Caperton, Ben Barnes Group
Charles Ansbach, Stanford Mansion Foundation


Please let me know if you have any queries.

Julie

CONFIDENTIAL

# EXHIBIT KVT-48



May 10, 2006

Mr. Mike Forsythe
Bloomberg News

In response to your e-mail dated May 05, 2006 regarding questions for Stanford Financial for Bloomberg News Story, we provide the following information.

I.

In 2001, Charles Ansbach, Executive Director of the Leland Stanford Mansion Foundation, solicited a donation from Stanford Financial Group to support the renovation of the Stanford Mansion in Sacramento.  R. Allen Stanford and his father James A. Stanford gave a $2,500,000 cash gift in July 2001 to this effort.  The 2001/2002 edition of both our corporate video and magazine mention the donation as part of sections that review the Company's corporate giving.   Mr. Stanford has been asked a few times over the years by reporters and other curious individuals about his relation to Leland Stanford and he has always given the same answer: "It is my understanding that Leland Stanford is a distant relative through my great great great grandfather and Leland Stanford's father" *(see book reference below)*.  Mr. Stanford however refers constantly in meetings with employees, clients and others only to his Texas heritage, even highlighting his roots in a recent national television advertising campaign.  Lodis Stanford is clearly and proudly identified as the Founder and inspiration for the Stanford Financial Group of companies in all marketing, promotional and educational material.  Anyone making any statements to the contrary is either grossly misinformed or outright not telling the truth.

In general, it is known that the Stanford family arrived in the Northeast corridor of the US from England in the 1600's and part of the Stanford family migrated south to Georgia around 1795.   The Mexia, Texas portion of the family tree, and relation to Leland Stanford's father Josiah, can trace its roots to Thomas Stanford Sr. son of William and Mary Stanford.

*Taken directly from The History of Stewart County, Georgia – Volume II (Page 1048) by Sara Robertson Dixon, with Family Histories Edited Annotated and Indexed by Agnew Hilsman Clark and Marean Moncrief Clark, which is cataloged in the U.S. Library of Congress –* "Thomas Stanford, Sr., who died in Cuthbert in 1839 was closely related to Oliver Perry and Jeptha Stanford of Stewart County and to Josiah Stanford of New York, father of Leland Stanford, founder of the college in California that bears his name. Thomas Sr., and his wife Keziah were wealthy early settlers of Middle Georgia, living in Morgan and Newton Counties before coming to Randolph Co. in 1828, where they purchased a plantation seven miles from Cuthbert.  He fought in the Indian War of 1836.  After his death in 1839, his widow lived in Alabama with some of her ten children.  Mary lived in Habersham Co., Edward in Newton Co., William in Henry County; Martha Ann in Ala.; Thomas Jr., (1806-1859) Randolph Co.; Nancy m. George Hobbs of Randolph Co.; Elizabeth m. a Mr. Elliott went to Ala.; David to Texas; John to Arkansas; and Keziah. Thomas Stanford Jr., b. Morgan Co., May 15 1806 was reared in Newton Co., where he married Dec. 24, 1835, Elizabeth Phillips of S.C., 5 children born in Randolph County."

[APG]

CONFIDENTIAL



Chronological Stanford family history of Thomas Stanford's son, David and grandson, Simon's departure from Georgia to Texas:

| | |
|---|---|
| **William Stanford -** (Great Great Great Great Grandfather) | Born 1732, Maryland; died 1810, Georgia. Had 7 children, one of whom was Thomas Stanford. |
| **Thomas Stanford Sr. -** (Great Great Great Grandfather) | Born 1761, North Carolina; died 1839, Georgia. He and his wife Keziah were wealthy early settlers of middle Georgia, and acquired a plantation seven miles from Cuthbert, Georgia in 1828. They had 10 children, one of whom was David Allen Stanford, born in 1815. |
| **David Allen Stanford -** (Great Great Grandfather) | Born 1815, Georgia; died 1891, Mexia, TX. David was born in Georgia, was married and had 7 children, one of whom was Simon Allen Stanford. Following the Civil War, which decimated the South and destroyed the Stanford family plantation, he moved with his family, in 1866/7 to central Texas in railroad times, to an unincorporated area in Limestone County near what is now known as Mexia. When Mexia became an incorporated town in 1871 both David and Simon are listed in censuses from that period which reflect the very first settlers of the area. David died in Mexia in 1891 and is buried in the Mexia cemetery. |
| **Simon Allen Stanford -** (Great Grandfather) | Born 1846, Georgia; died 1924, Mexia, TX. Simon Allen Stanford had 12 children, one of whom was Lodis B. Stanford born in Mexia in 1897. Simon Allen passed away in 1924 and is buried in the Mexia cemetery. |
| **Lodis B. Stanford -** (Grandfather) | Born 1897, Mexia, TX; died 1969, Mexia, TX. Lodis had a son James Stanford in 1927. He founded the first Stanford company, Stanford Insurance in Mexia, Texas during the Great Depression in 1932. Lodis also served for about 12 years on the Mexia City Council and during World War II served on various Limestone County boards including the Rations Board and Draft Board. Lodis passed away in 1969 and is buried in the Mexia cemetery. |

[APG]

CONFIDENTIAL

RECEIVER527-00282330



| James Allen Stanford - (Father) | Born 1927, Mexia, TX; still living in Mexia, TX. James Stanford carried on the Stanford business and had three children, one of which is Robert Allen Stanford. James served for 15 years on the Mexia City Council and as Mayor of Mexia for 3 and Mayor Pro Tem for 2 of those years.  He also served on the State Mayor's Advisory Committee under Bill Clement's governorship for 2 years. |
|---|---|
| Robert Allen Stanford - (Son) | Born 1950, Mexia, TX. Current Chairman and CEO of the Stanford Financial Group of companies. |

Our clients are sophisticated, affluent investors who make their investment decisions based on our company's current performance not because of the kinship between Mr. R. Allen Stanford's great great great grandfather and Leland Stanford's father.

## II.

In regards to the "1999 showdown with State and Treasury over the Antigua banking advisory board" it is well known that Mr. Stanford was asked to serve in an advisory capacity to the Government of Antigua and Barbuda on the drafting of anti-money laundering and regulatory matters in respect to the financial services sector.  He assembled a top-notch team of former U.S. legal and regulatory professionals (former FBI, DEA, Customs, U.S. Attorney, Federal Banking oversight, regulatory and exam personnel) who delivered a detailed report on what Antigua and Barbuda should do in order to put in place a first rate regulatory, supervisory and anti-money laundering program through various measures including new legislation.  Today, Antigua and Barbuda is regarded as a "model jurisdiction" by the United Nations and has received very favorable ratings from the IMF, CFATF and FATF.  Mr. Stanford's role was purely as an advisor to the Government with no authority or powers.  He served in this capacity for approximately 14 months.

## III.

The Stanford Financial Group of companies worldwide consists of 4 banks, 3 trust companies, a full-service broker dealer, is a registered investment advisor, does institutional investment sales and has a fixed income trading desk.  We have merchant banking, investment banking and capital markets divisions, are a market maker, do equity and policy research and provide financial planning and wealth management for high net worth clients globally, all branded under Stanford Private Wealth Management.

[APG]

CONFIDENTIAL

RECEIVER527-00282331



We have 54 offices in 11 countries with over $30 billion under management or advisement.  Our clients number in excess of 90,000 and reside in 102 countries around the world.

One of those companies is Stanford International Bank Ltd. (SIBL), a $4 billion institution that has been serving high net worth clients for over 20 years.  Enclosed you will find a support booklet which answers the questions you have posed as to SIBL's operation.

## IV.

As to our success, it has been through working tirelessly day after day with a goal of building the best financial services firm in the world.  Mr. Stanford has made a commitment to employ only the best and brightest people in the financial services industry whose work ethic, skills and integrity match Lodis Stanford's founding principles of hard work, clear vision and value for the client, established more than 70 years ago.

The top tier financial advisors in the large securities, investment banking and private banking firms have become frustrated with their working environment and lack of client-focused service.  We are having tremendous success bringing them to Stanford and giving them and their clients a client-centered new home with a platform that is entrepreneurial in which to do their business.

## V.

Stanford has developed a Community Investment Model to generate brand awareness and differentiate us from our competitors as we expand our global footprint.  Stanford Financial has made a commitment to our employees and to the communities in which we operate to do what we can to strengthen those communities.  Each year, we give back to many different organizations and causes.  We encourage our employees to give and volunteer.  And we manage our clients' assets in such a way that they can, in turn, do good.  With each commitment we make, we see dollars invested; we see increased employee volunteerism; we experience word-of-mouth publicity and the reciprocal relationships we build with each nonprofit partner.  None of this occurs overnight – it involves a deliberate, measured strategy that takes time – but we know the results of our Strategic Community Investment Model have and will continue to yield long term results.  And in order to meet these goals, we look to develop relationships with organizations whose "hearts" are similar to ours.

[APG]

CONFIDENTIAL                                                           RECEIVER527-00282332



Stanford feels strongly that nothing strengthens the community more than healthy children. We are heavily involved with St. Jude Children's Research Hospital. We have named St. Jude as our corporate Charity of Choice partnering with them in all our U.S. markets and in areas where our global footprints coincide – this includes not only the U.S. but Central and Latin America and the Caribbean. Stanford will assume title sponsorship of the PGA Tournament (Fedex St. Jude Classic) in Memphis in 2007. This sponsorship provides global branding, multiple event marketing platforms as well as the opportunity to expand our relationship with St. Jude.

## VI.

As we have publicly stated many times, Stanford, like any other company, has the right and obligation to our clients and employees to communicate with Congress about the impact of federal policies on our business. Our relationship with political leaders is and always has been proper, bipartisan and fully disclosed. All expenses related to the use of Stanford aircraft by either Rep. DeLay, Sen. Torricelli, Rep. Ney or any other public official were reimbursed in full accordance with Congressional regulations.

In summary, contrary to your proposed story, neither Mr. R. Allen Stanford nor his father James A. Stanford have ever "made an effort to link themselves to Leland Stanford" or Stanford University to improve the company's image and we have not "stressed" such a link in the company's marketing materials as has been suggested. All marketing, promotional and educational material on the Stanford Financial Group of companies proudly refers only to the Stanford family's Texas heritage and more specifically to Lodis B. Stanford and his success building his business on the principles of hard work, clear vision and value for the client.

It is the goal of every business to grow and prosper and that is what Stanford is doing by hiring the best of the best within the industry, differentiating ourselves from the competition, generating brand awareness, expanding our operations globally and doing business in an upright, ethical manner.

Mr. Forsythe, you are being sent by Federal Express today copies of census records verifying Thomas Stanford Sr.'s and his descendant's blood relation to each other. You are also being sent a small sampling of current and old marketing material which clearly demonstrates our Lodis B. Stanford, Mexia, Texas heritage.

Media contact:       Suzanne Hamm, Stanford Global Foundation
                     Tel:    (901) 277-6067
                     e-mail: shamm@stanfordeagle.com

[APG]

CONFIDENTIAL                                                                RECEIVER527-00282333

# EXHIBIT KVT-49

From: Wolford, Lisa [lwolford@rlmnet.com]
Sent: Friday, May 05, 2006 7:17 PM
To: Tello, Ana; Hodge, Julie
Cc: zzz-howard.paster; Suarez, Yolanda
Subject: FW: Questions for Stanford Financial for Bloomberg News Story

Importance: High

Julie, Ana:  See below from Mike Forsythe.  We need to define the link
between Mr. Stanford and Leland Stanford - if we can do that, we take
away the reporter's "angle" for the story -- that RAS is using a link
between himself and the University to market his growing business.
Don't worry as much about the last graph, Mike says it will only "make
more people want to buy the CDs".  Thanks for sharing this e-mail with
Mr. Stanford.


-----Original Message-----
From: mforsythe@bloomberg.net [mailto:mforsythe@bloomberg.net]
Sent: Friday, May 05, 2006 1:57 PM
To: Wolford, Lisa
Subject: Questions for Stanford Financial for Bloomberg News Story

Hello Lisa. Bloomberg News is preparing a story for publication about
Stanford Financial, focusing on Mr. Stanford. We'd ask that the company
send us comment or give us a call by the afternoon of Wednesday, May 10.

Here is a synopsis of the story, that is subject to change depending on
the replies given by the company. We have interviewed 13 former and
current employees for our story.

Mr. Stanford, in a company video, in the company magazine, and in
meetings with employees stresses his family ties to Leland Stanford.
Stanford University's chief archivist and its business development
office know of no genealogical links. Saying that Mr. Stanford's
great-great-great grandfather is closely related to Josiah Stanford is
vague. What is the precise relationship and how do  we know that Thomas
Stanford Sr. is the great-great-great grandfather of Mr.
Stanford?

This is important because it's natural that people associate Leland
Stanford with Stanford University. We quote a professor of marketing
showing how those family links can instill trust and confidence in
Stanford Financial.

But our story is not primarily about the family ties. The larger picture
is that  Mr. Stanford's effort to link himself to Leland Stanford, and
hence to Stanford  University, is part of an effort to improve the
company's image and expand in the U.S. after the 1999 showdown with
State and Treasury over the Antigua banking advisory board. Other moves
include the hiring of equity analysts, centered in Boca Raton, the
hiring of financial advisors, such as those who came  to the Memphis
office from UBS, taking on sponsorship of the St. Jude PGA tournament,
taking over Washington Research Group from Schwab in 2005, and extensive
donations and provision of corporate jet flights to politicians of both
parties, including former Senator Toricelli, and Representatives Bob Ney
and Tom DeLay.

CONFIDENTIAL

Importantly, this comes as Stanford Financial, through its "SGC
Superstars" is  rapidly expanding the sale of SIBL CDs in the United
States. We cite company documents and training videos showing how such
deposits more than doubled from
2003 to 2004, with the company targeting affluent people such as doctors
to make  deposits to SIBL, deposits which are not FDIC insured. These
CDs make annual returns hundreds of basis points above rates found at US
banks.

Lisa, that's about it. I think the story is very fair and only based on
facts and on-the-record comments.

Regards,

Mike Forsythe
Bloomberg News
202 624 1940
This message is intended only for the use of the Addressee(s) and may
contain information that is PRIVILEGED and CONFIDENTIAL.
If you are not the intended recipient(s), you are hereby notified that any
dissemination of this communication is strictly prohibited. If you have
received this communication in error, please erase all copies of the
message and its attachments and notify us immediately.

Thank You

RECEIVER527-00282335

# EXHIBIT KVT-50

**From:** Scott W. Reed [SReed@Chesenterp.com]
**Sent:** Tuesday, May 16, 2006 6:07 PM
**To:** Hodge, Julie
**Subject:** Re: PROPOSED STANFORD ARTICLE

I will make the call now. It sounds like they have invested a lot of time in this and turning it off may be impossible.

----- Original Message -----
**From:** Hodge, Julie
**To:** sreed@chesenterp.com
**Cc:** ben@benbarnesgroup.com
**Sent:** Tuesday, May 16, 2006 12:24 PM
**Subject:** Fw: PROPOSED STANFORD ARTICLE

Scott

See below.  Mr. Stanford wants you to follow up with Al Hunt at Bloomberg.  Ideally,  we do not want a story run at all.

Please advise.

Thanks

-----Original Message-----
From: mforsythe@bloomberg.net
To: Hodge, Julie
Sent: Tue May 16 09:38:25 2006
Subject: RE: PROPOSED STANFORD ARTICLE

Hi Julie. After we received the company response, we took it upon ourselves to
obtain a copy of the genealogical text on which Mr. Stanford bases his claim of
kinship with Leland Stanford. We had that text, plus the genealogical timeline
offered by the company, reviewed by the Stanford University archivist. That, and
 very careful editing and vetting, explains the delay.

Pending approval by the editor-in-chief, we'd expect the story to run at
midnight tonight.

Regards,

Mike Forsythe
Bloomberg News
202 624 1940




----- Original Message -----
From: Julie Hodge  <jhodge@stanfordeagle.com>
At:  5/15 20:09:00

Mike

Has anything been run?

Please advise if and when you do run something.  Thanks.

Julie

-----Original Message-----
From: mforsythe@bloomberg.net [mailto:mforsythe@bloomberg.net]
Sent: Thursday, May 11, 2006 3:06 PM
To: Hodge, Julie
Subject: Re: PROPOSED STANFORD ARTICLE

RECEIVER527-00280260

Julie, there will be no story until Sunday at midnight at the
earliest./Mike
Forsythe
----- Original Message -----
From: Julie Hodge  <jhodge@stanfordeagle.com>
At:  5/11 13:54:53

Mike


By now, you would have received the package sent to you via Fedex
yesterday with the response from Stanford to your inquiry of May 5.


Further to our response yesterday, we wish to advise that we have our
own in-house advertising company, Idea Advertising which has done our
marketing and promotion now for over 15 years.  We have gone back and
looked through a vast majority of our marketing pieces, including
brochures, magazines, advertisements, corporate communications etc that
have been produced over the years and identified well over 30 pieces
that mention Lodis Stanford, his heritage and origin of our company.  In
all of these pieces, there has not ever been any mention of Leland
Stanford or any ties to the Stanford family from California whatsoever,
with the exception of the 2 pieces that you have already identified, the
Eagle Magazine and Corporate Video from 2001/2 which highlight the
donation made to the Stanford Mansion restoration project at that time.
From the volume of this material, and the only reference to Leland
Stanford being mentioned briefly when talking about our donation, it is
clear that Stanford Financial Group has not tried to use a family link
to Leland Stanford to promote the image of the company, nor do we wish
to do so.


If there are any further questions you wish to ask please put them in
writing to Suzanne Hamm at shamm@stanfordeagle.com
<mailto:shamm@stanfordeagle.com> .


Yours truly,


Julie Hodge

Exec. Asst.

Tel:  (305) 960-8531

Fax: (305) 347-9141

CONFIDENTIAL

RECEIVER527-00280261

# EXHIBIT KVT-51

**From:** Hamm, Suzanne [shamm@StanfordEagle.com]
**Sent:** Monday, May 08, 2006 5:35 PM
**To:** Hodge, Julie
**Subject:** RE: BLOOMBERG REPORTER

Julie --

The reporter has called the following:

(1)  John Santi (he let Danny Bogar know of the call)
(2)  Christy Cornell (she was a hire of John Santi's and he let her go after about 9 months)
(3)  Rocky Stein (he communicated with Rocky via email, a rather odd inquiry asking Rocky to confirm if he was related to Meyer Lansky.)  Rocky called me and we agreed it was an inappropriate question and he did not respond.
(4)  Paul Preisser -- employee of Rich Parker (NYC office) who referred the reporter to Rich.  Reporter did not respond to Rich's follow-up call.
(5)  There has also been calls made to Baldwyn High School (where Laura Pendergest graduated) asking numerous questions about Laura as well as Mr. Davis.  The receptionist at the School is Mary-Grace Gentry's Aunt Roberta McKay. (Mary-Grace works for me) and she said that the reporter wanted to know if Mr. Davis taught Laura at school.  He also asked her "don't' you think Laura is young to be the Chief Investment Officer of Stanford."  Aunt Roberta told her she graduated as valedictorian and any other questions to call Stanford.  Reporter seemed to know a lot about Laura's personal life and Laura confirmed to me that Christy Cornell (noted above) was one of the few people that had the details.  Laura has not spoken to Christy in quite awhile.

Reporter is doing a lot of "fishing" and seems to be targeting ex-employees who may provide leads to continue the fishing expedition.  I notified Yolanda of all of these calls and we looped Lisa Williford in from RLM and she called the reporter. During this conversation, he noted that he was just "fishing" but was interested in Stanford.  He characterized us an "offshore company making a move domestically."

I think the connection to Stanford University is the "worst" he could dig up.  I spoke with Mr. Davis about this on Friday and told him that if we can show even a remote connection then the story is dead.  We do not solicit business or profit by promoting a relationship and this is the basis of this so-called story.  If we can disprove his assumption that we are promoting a false claim, then any editor will kill the story.  Mr.Davis mentioned the idea of having Ben Barnes contact Michael Bloomberg and having him kill the story.  If this happens, then it could possibly communicate to the editor and this reporter that we do have something to hide.

Let me know how else I can help.

Thx
Suzanne

-------------------------------------------------------------------------------------------

**From:** Hodge, Julie [mailto:jhodge@stanfordeagle.com]
**Sent:** Monday, May 08, 2006 9:15 AM
**To:** Hamm, Suzanne; Hawkins, Kelley
**Subject:** BLOOMBERG REPORTER

Suzanne/Kelley

Can you please send me as soon as possible a list of our employees both current and former whom you are aware were contacted by Bloomberg reporters this year.

Thanks

Julie Hodge
*Exec. Asst.*
*Chairman's Office*
*Miami, FL*
*Tel: (305) 960-8531*
*Fax: (305) 347-9141*

CONFIDENTIAL

RECEIVER527-00280283

# EXHIBIT KVT-55

**From:** Susan Martin [smartin@benbarnesgroup.com]
**Sent:** Tuesday, October 16, 2007 9:57 PM
**To:** Stanford, Allen
**Cc:** Hodge, Julie
**Subject:** A Note from Ben Barnes

Allen –

I hope you are doing well.   I have a few things I'd like to discuss with you.

When you do an Internet search of your name, the majority of the stories that pop up are very positive.  However, on Google, a few of the stories have a negative connotation.  I have spoken to you in the past about a company (Visible Technologies) that has developed algorithms, which push negative stories down and pull positive stories up.  With your permission, I would like to have them contact you again, so you can enlist these services.  I think this would go a long way in helping us with our political giving.

I also would like to discuss with you the possibility of hiring a law firm that specializes in federal elections.  This representation can ensure that only true information is used in the vetting process.  We need to go through the stories line by line to determine fact from fiction.  John Rafaelli, Mitch Delk, Wyeth Wiedeman and the other members of the team agree that this is a good strategy.

There are two upcoming fundraisers that I want to talk to you about.  The first one is for Senator Kay Bailey Hutchison, which is scheduled at my DC office Monday, October 22.  I have talked Yolanda into attending this event, and a meeting with the team will follow to discuss current giving issues and the VI legislation.  The second one is for Speaker Nancy Pelosi, which is scheduled at my Austin home Sunday, October 28.  I would like to visit with you further about this by telephone.

I've heard that Charlie Rangel has passed the VI legislation out of committee, but George Bush plans to veto it.  I have some strategic ideas that I'd like to run by you.

Currently, I am in my Austin office (512-322-0128), I'll be in my DC office tomorrow (202-467-4141), or you can reach me by cell phone (512-415-1414).

Best regards,

Ben

CONFIDENTIAL

RECEIVER527-00278909

# EXHIBIT KVT-83

**DRAFT—PRIVILEGED AND CONFIDENTIAL**

**OUTLINE FOR DISCUSSION WITH DEMOCRATIC
SENATE LEADERSHIP AND STAFF RE
STANFORD FINANCIAL**

**I.    Context—Reason for meeting**

- Allen Stanford is a successful Houston businessman, recently listed in the Forbes 400,  who has contributed substantially to Democratic candidates and party committees consistently over the last 15 years.

- He wants to continue to be helpful in contributing and raising funds for the DSCC and Senate candidates in this critical cycle.

- We have been told by DSCC Finance that he does not "vet" for reasons that, based on discussions between our counsel and counsel for DSCC, appear to be linked to the perception that his company, Stanford Financial, which owns 2 major banks in Antigua among many other business interests around the world, has lobbied for weakening of US money laundering laws and regulation of offshore banking.

- That perception is completely inaccurate.  The notion that Allen or his company are perceived this way in political circles in D.C. is of great concern, not merely because it prevents Allen from helping retain and build the Democratic majority in the Senate and House but more critically, because of the reputation for integrity, charitable works and upholding the highest standards of ethics and the public interest that Allen has spent a lifetime building.

- We want to set the record straight and ask for reconsideration of the policy of the DSCC with respect to accepting personal contributions from Allen.

**II.    Stanford Financial Background (brief)**

A.    Business interests & holdings in the U.S. worldwide

B.    Number of employees in U.S. and where

**III.    Stanford Investment in Antigua**

A.    Stanford has invested heavily in Antigua in resorts, banking, real estate, etc creating thousands of jobs and helping lift the standard of living for the entire island

B.    Invested in financial services so the island wouldn't be so dependent on tourism—Stanford International Bank

RECEIVER527-00224759

      C.     Direct public investment and charitable contributions by Stanford in Antigua
- Secondary School of Excellence
- Revolving loan fund for small business
- Public library
- Other

## IV.    Stanford Position/Activity on Regulation of Offshore Banking/Money Laundering

      A.     The impression that the DSCC staff obviously has obtained was created by a handful of articles back in  2000-2002 giving the mis-impression that Allen Stanford and his company were contributing, particularly to Sen. Daschle's leadership PAC and two Senate-linked 527's, in order to influence money laundering legislation, including the Patriot Act.

      B.     The reality is exactly the opposite-- Stanford was pushing to clean up and tighten the banking laws in Antigua at least 5 years *before* 9/11:

- In 1996 the government of Antigua asked Stanford to help rewrite the country's banking laws to tighten them and thereby restore the reputation of Antigua's offshore banking sector in the international community.

- The result of that effort was a series of new laws enacted in 1998 that were largely applauded by US regulators at the time.

- The new laws created an agency to regulate offshore banking in the country; Stanford was appointed to that agency's board; one US official objected because Stanford's bank was regulated by that Board; so he stepped down.  US officials also objected to a provision banning bank employees from releasing information about bank customers without a court order.

- That new agency set up by the very laws Stanford helped create and get enacted, actually cracked down on shaky offshore banks and those engaged in money laundering—shutting down 39 of 57 offshore banks.

- Also during this period Stanford learned that a Mexican drug cartel had deposited $3 million in his bank; at personal risk to his own safety Stanford personally handed the funds over to the US DEA which credited Stanford with the first successful seizure of drug assets in Antigua.

[APG]

RECEIVER527-00224760

- In the spring of 2000 Antigua became the first offshore banking center to adopt US-proposed standards to combat money laundering—a move applauded by the US State Dept. and then an international task force charged with rating the cooperation of various countries in combating money laundering.

- Describe additional recent efforts by Stanford re tightening Antigua banking/money laundering regulation.

C.    Stanford *never* lobbied against the money-laundering legislation proposed pre-/11 by the Clinton Administration.  Its position was that the US Government should have principal responsibility for certain policing functions rather than the banks themselves.

D.    Stanford *never* lobbied against any of the money laundering related provisions of the Patriot Act in 2001-02.

E.    The tightening of regulation of offshore banking laws by the US in cooperation with its allies has been greatly beneficial to the offshore banking operations that are clean and run in accordance with the highest standards, like Stanford International—it has prospered under this tighter regulation while its competitors have been hurt by the tightening of regulations both pre and post 9/11  [Describe]

F.    Describe *current* legislative interests and positions –what Stanford is lobbying on in this Congress--AND identify exactly who has been retained to lobby for the company.

**V.    Wrap –up**:  Offer Allen's help again in fundraising and hosting events for DSCC and Senate candidates this cycle and ask for reconsideration of DSCC's position.

[APG]

CONFIDENTIAL

RECEIVER527-00224761

# EXHIBIT KVT-93

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS | ) | |
| CAPACITY AS COURT-APPOINTED | ) | |
| RECEIVER FOR THE STANFORD | ) | |
| INTERNATIONAL BANK, LTD., | ) | |
| et al, | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO. |
| | ) | 3:10-cv-527 |
| BEN BARNES and BEN BARNES | ) | |
| GROUP, L.P., | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| BEN BARNES GROUP, L.P., | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| CAPITAL COUNSEL, LLC, et al, | ) | |
| Third-Party Defendants. | ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL AND VIDEOTAPED RULE 30(b)(6)DEPOSITION OF

BEN BARNES GROUP, L.P.

KENT CAPERTON

DECEMBER 22, 2014

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Draft Copy

1              ORAL AND VIDEOTAPED DEPOSITION OF KENT

2    CAPERTON, produced as a witness at the instance of the

3    Plaintiff The Official Stanford Investors Committee, and

4    duly sworn, was taken in the above-styled and numbered

5    cause on the 22nd of December, 2014, from 2:05 p.m. to

6    5:37 p.m., before KIMBERLY G. KEEPER, Certified

7    Shorthand Reporter in and for the State of Texas,

8    reported by machine shorthand, at the Offices of

9    Winstead P.C., 401 Congress Avenue, Suite 2100, Austin,

10   Texas, pursuant to the Federal Rules of Civil Procedure

11   and the provisions attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                A P P E A R A N C E S

2   FOR THE PLAINTIFF THE OFFICIAL STANFORD GROUP, L.P.:

3       MR. JESSE R. CASTILLO
        CASTILLO SNYDER P.C.
4       Bank of America Plaza, Suite 1020
        San Antonio, Texas  78205
5       (210) 630-4200
        (210) 630-4210 (fax)
6       jcastillo@casnlaw.com
             -AND-
7       MR. JOSHUA E. ABRAHAM
        BUTZEL LONG, PC
8       230 Park Avenue, Suite 850
        New York, New York  10169
9       (212) 818-1110
        (212) 818-0494 (fax)
10      ABRAHAM@butzel.com

11

    FOR THE PLAINTIFF RALPH S. JANVEY, IN HIS CAPACITY AS
12  COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL
    BANK, LTD.:
13

        MR. DAVID T. ARLINGTON
14      BAKER BOTTS, LLP
        1500 San Jacinto Center
15      98 San Jacinto Boulevard
        Austin, Texas  78701
16      (512) 322-2553
        (512) 322-8301 (Fax)
17      david.arlington@bakerbotts.com

18

    FOR THE DEFENDANT BEN BARNES AND DEFENDANT AND
19  THIRD-PARTY PLAINTIFF BEN BARNES GROUP:

20      MR. JAY J. MADRID
        WINSTEAD, P.C.
21      500 Winstead Building
        2728 N. Harwood Street
22      Dallas, Texas  75201
        (214) 745-5709
23      (214) 745-5390 (fax)
        jmadrid@winstead.com

24

25

Draft Copy

1   ALSO PRESENT:

2       Mr. Mark Wolfington, Videographer

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Draft Copy

Page 5

```
 1                          INDEX

 2                                              PAGE

 3   Appearances......................................   2

 4

 5   KENT CAPERTON

 6       Examination by Mr. Castillo..................   7

 7

 8   Changes and Signature........................... 146

 9   Reporter's Certificate ......................... 148

10

11                        EXHIBITS

12   NUMBER   DESCRIPTION                           PAGE

13     39    E-Mail Chain 5/8/06 to Hodge From Hamm   135

14     40    E-Mail Chain 5/16/06 to Hodge From Reed  135

15     56    E-Mail 12/6/06 to Stanford and Hodge      63
             From Martin
16
       59    E-Mail 2/22/07 to Martin From Hodge      135
17           With Attachment

18     81    Draft Outline for Discussion with        108
             Democratic Senate Leadership and Staff
19           Re Stanford Financial

20    107    E-Mail 8/8/05 to Caperton From Reed       54

21    112    E-Mail 2/19/09 to Caperton From Delk      98
             With Attachment
22
      115    E-Mail Chain 2/17/09 to Caperton From     95
23           Sandlin

24    177    Agreement 8/1/07 Between Ben Barnes       83
             Group, L.P. and Cauthen Forbes &
25           Williams
```

Draft Copy

Page 6

1                          EXHIBITS - (Cont'd)

2     NUMBER      DESCRIPTION                              PAGE

3      178      English Translation of Reforma Article      128

4      179      Stanford Internation Bank, Ltd.              70
                Quarterly Update October 1, 2006 -
5               December 31, 2006

6      180      Stanford Asset Management Report             70
                February 2007
7
       181      Stanford International Bank, Ltd.            70
8               Quarterly Update January 1, 2006 -
                March 31, 2006
9
       182      Eagle Report of Stanford Financial          69
10              Group

11     184      E-Mail 10/21/05 and Reforma Article          114

12     185      E-Mail Chain 6/23/05 to Martin From          76
                Hodge
13
       186      Accounting Notes on Kerri's Computer         84
14
       188      E-Mail Chain 2/16/09 to Rogers, et al        77
15              From Caperton

16     193      Letter 9/12/05 to Comeaux From SEC           64

17     194      Letter 9/27/06 to Stanford Group             66
                Company From NASD
18
       195      Stanford List                               129
19
       196      Defendants' Responses to Plaintiffs'         100
20              First Set of Interrogatories

21

22

23

24

25

1          THE VIDEOGRAPHER:   Today is December the

2    22nd, 2014.   The time is 2:05.   We're on the record.

3                    KENT CAPERTON,

4    having been first duly sworn, testified as follows:

5                      EXAMINATION

6    QUESTIONS BY MR. CASTILLO:

7       Q.    Sir, would you state your full name.

8       A.    Kent Caperton.

9       Q.    Mr. Caperton, how are you employed?

10      A.    I'm a member of the Ben Barnes Group.

11      Q.    Now -- and do you office here in the Austin

12   office?

13      A.    I do here and in D.C. both.

14      Q.    Okay.

15      A.    Go back and forth.

16      Q.    How much of your time do you spend in Austin

17   versus Washington?

18      A.    Oh, I probably spend 25 to -- percent to a

19   third of my time in Austin and the rest either in D.C.

20   or other places where we might have an ongoing project.

21      Q.    Okay.   Does the Ben Barnes Group have offices

22   in any location other than in Austin or Washington,

23   D.C.?

24      A.    Only those two.

25      Q.    And do you have a particular title within the

Page 8

1   Ben Barnes Group?

2       A.   Well, I'm an attorney, so that goes after my

3   name generally, but we're a very small organization and

4   are not -- not highly structured.

5       Q.   And the little structure that you may have, are

6   you in charge of a particular aspect of the Ben Barnes

7   Group?

8       A.   Well, I try to see most contracts that come

9   through the office and review those.  I'm involved in

10  some way or form in almost every client that we have.  I

11  don't service each and every client, but I am aware of

12  what the activity is.

13      Q.   And what activity would you do for the client?

14  You're not providing legal services, are you?

15      A.   No.

16      Q.   All right.  So what activity for clients do you

17  do?

18      A.   We do -- I do, as does the Ben Barnes Group,

19  provide counseling, strategic advice, lobbying services

20  on occasion.  We interact with other members of the

21  client's team, if we they have one, to try to develop a

22  cohesive, thoughtful strategy for dealing with whatever

23  particular problem that client's confronting, and our

24  clients have a myriad of problems.

25      Q.   I guess I'm trying to figure out if you're a

Page 9

1    part of the Ben Barnes Group providing services to your

2    clients how you fit in with that client so that you

3    don't overlap between other members of the Ben Barnes

4    Group.

5         A.    Because we're so small, it's easy to

6    communicate and easy to make sure that there is not a

7    duplication of services, because we talk to one other

8    multiple times a day.  Invariably that may happen once

9    or twice that -- that we'll both do the same thing for

10   the client, but we generally try to have a pretty clear

11   view about what I'm going to do versus what Ben's going

12   to do versus what Wyeth is going to do.  We each kind of

13   have our area of expertise.

14        Q.    All right.  So what is your area of expertise?

15        A.    My area of expertise is to provide legal

16   analysis, to provide a legal perspective on the -- on

17   the clients' problems, to try to ensure that the

18   solutions that we suggest or identified or implement

19   are, you know, within the confines of the legal

20   principles that need to be -- need to be followed.

21   You'd almost have to talk about the individual problem

22   to get a more specific answer, but -- but I -- I -- I

23   guess the best way to put it is I provide a legal

24   perspective on the services that we -- that we render.

25        Q.    All right.  All right.  Which I guess let's

Page 10

1    talk a little bit about your educational background.

2    Undergraduate?

3         A.   Texas A&M.

4         Q.   Okay.  What year?

5         A.   '71.

6         Q.   Any gap between that and your professional

7    education?

8         A.   Yes, I worked as assistant to the president at

9    Texas A&M for two years in between undergraduate school

10   and the time I started law school.

11        Q.   And what was your undergraduate degree in?

12        A.   Finance.

13        Q.   That was your major?

14        A.   Correct.

15        Q.   And minor?

16        A.   I don't think I had a minor.

17        Q.   All right.  Were you a member of the corps?

18        A.   I was not.  I was the first student body

19   president not to be in the corps.

20        Q.   Okay.  And so two years as assistant to the

21   president?

22        A.   Correct.

23        Q.   All right.  And then what law school did you go

24   to?

25        A.   University of Texas.

Page 11

1    Q.    And what year did you graduate?

2    A.    '75.

3    Q.    What did you do after you graduated from UT?

4    A.    I immediately -- I had been clerking in the

5    Attorney General's office and for a short time I was an

6    assistant attorney general under General John Hill, and

7    then -- let's see, I took the bar in July of '75 and in

8    '76 I moved to Bryan, Texas and opened a law office in

9    Bryan, Texas and Caldwell, Texas, where my family was

10   from Caldwell.

11            My brother, an attorney, had just been

12   named county judge in Burleson County, so he got out of

13   the law practice, I stepped into more or less his

14   practice and a firm that had been Towslee & Caperton,

15   two-man firm with offices in Caldwell, Bob Towslee, and

16   me in Bryan.  So I did that in -- in January of '76, I

17   think.

18   Q.    Okay.  How long did you -- were you there with

19   that firm?

20   A.    Well, we -- we -- we continued for, you know, a

21   couple of years and then I grew the Bryan part of it and

22   started a small firm and we went through several

23   iterations after that.  It was McVey, Gandy, Caperton &

24   Morrow, and then it was Gandy, Caperton & Morrow it

25   ultimately became Caperton, Rogers & Miller.

Page 12

1      Q.   And that takes us through what year?

2      A.   Well, it takes us through 1992 or '93.

3      Q.   All right.  Up until -- from '76 through 1992

4  what areas of -- did you practice in?

5      A.   Primarily civil litigation.

6      Q.   And in the Bryan and Caldwell offices, what

7  type of civil litigation did you handle?

8      A.   Well, in a small town practice, you pretty much

9  do what comes in the door.  So I did everything from a

10  will con -- will contests to contractual disputes,

11  boundary disputes.  You know, you name it and we did it,

12  and you learn the ability to -- you develop the ability

13  to -- to learn a lot about a lot of different kinds of

14  law.  It was -- it was truly a general practice, a

15  general litigation practice.

16      Q.   Okay.  When you were with the Attorney General

17  clerking, were you ever involved in any legal work in

18  the securities area?

19      A.   No.

20      Q.   Or regulation of -- of banking?

21      A.   No.

22      Q.   How about while you were in private practice

23  between '76 and '92ish, involved in any securities

24  litigation?

25      A.   Yeah.  There was a case involving some oil and

Page 13

1    gas interests that there was a security angle to it that

2    was -- we -- we -- I think I was representing the

3    defendant in that case.

4         Q.    Somebody peddling interests?

5         A.    Yeah, correct.

6         Q.    Through a -- some type of prospective or

7    private placement memoranda or something?

8         A.    You know, it wasn't the primary thrust of the

9    plaintiff's claim, but it was a tangential issue, so I

10   had to learn about it, and it didn't -- that part of the

11   case didn't go anywhere.

12        Q.    Okay.  What about I guess during that '76-'92

13   era where we went through the banking and lender

14   liability craze, were you involved in any case like

15   that?

16        A.    Well, I was involved in some litigation that

17   arose from that.  I was part of a group that owned a

18   bank in Caldwell.  I divested myself of that interest

19   when I ran for the state senate, and -- and then the

20   bank went on and was successful, very successful.  So

21   even though I didn't have an ownership interest in the

22   bank, we -- we -- I followed the bank pretty closely; my

23   brother was very involved in it, and -- and they

24   actually survived all of that turmoil and all those

25   regulatory uncertainties and -- and did very well.

1    Q.   Were you a member of the board at that bank?

2    A.   No.

3    Q.   Okay.  What -- did you have any -- other than

4    an ownership interest, did you have any role --

5    A.   No.

6    Q.   -- in the bank?  No.

7              And was that a state bank?

8    A.   It was.

9    Q.   It never was taken over by any regulatory

10   agency?

11   A.   It was not.

12   Q.   Were you involved in ensuring that that bank

13   was in compliance with regulatory agencies?

14   A.   No, I -- I -- I simply witnessed it, you know,

15   from afar.  Or -- I was not the lawyer representing

16   them, I wasn't involved in any of the decision-making, I

17   simply was interested in the welfare of the bank as part

18   of the community I grew up in.

19   Q.   All right.

20   A.   My brother had a financial interest ongoing.

21   Q.   Did you receive financial reports?

22   A.   You know, I did from time to time, but it

23   wasn't a -- I don't want to overstate my role in it; it

24   was really just a interested party, you know.

25   Q.   Okay.  Up until the '93 era when you were

Page 15

1    practicing law, ever exposed to what was termed a Ponzi

2    scheme?

3         A.    No.

4         Q.    Ever involved in any litigation involving a

5    Ponzi scheme?

6         A.    Well, you know, now that I think about it,

7    there was an oil and gas promoter in around the Burleson

8    County area in the early '80s, and under the state

9    statute, the judge appointed a receiver.  The receiver

10   hired me as his lawyer.  So we -- you know, we were

11   tasked with, you know, what receivers do, trying --

12        Q.    Right.

13        A.    -- to marshal the assets and assess the debts

14   and see what was real and what wasn't.  And so I

15   assisted a gentleman named Walter Kellogg in those

16   efforts.  That was back I think the early '80s, mid '80s

17   maybe.

18        Q.    Okay.  Was -- was he promoting interests in the

19   Austin chalk?

20        A.    Yeah.

21        Q.    Yeah.  And do you remember the number of

22   investors that were affected by this person's scheme?

23        A.    I don't remember the number.  It was -- you

24   know, for a community the size of Burleson County and

25   Caldwell, it seemed like a large number; in the grand

Page 16

1    scheme of things, it probably wasn't.

2        Q.    Yes, sir.  Do you remember the -- the size of

3    the loss?

4        A.    I don't.

5        Q.    But what became of that receivership?

6        A.    You know, it went on for a couple of years and

7    my recollection is the receiver was finally discharged.

8    The task was completed.

9        Q.    Any distribution to the investors?

10       A.    Yeah, but it was pretty minuscule.

11       Q.    Okay.  Do you know whether the receiver brought

12   any claims against any potentially liable third parties?

13       A.    I don't recall.

14       Q.    Do you know whether the receiver brought any

15   claims such as fraudulent transfer clawbacks?

16       A.    I don't recall.

17       Q.    You weren't involved in any of those?

18       A.    No.

19       Q.    Okay.  Any others that might have involved --

20   or could be characterized as a Ponzi scheme?

21       A.    No, that's all I can think of.

22       Q.    Okay.  What did you do in '93?

23       A.    I -- I left my firm Caperton Rogers & Miller, I

24   moved to Austin and I joined the Winstead law firm.

25       Q.    Okay.  At that time it was Winstead, Secrest --

Page 17

1          A.    And Minnick, correct.

2          Q.    And in what capacity did you join that firm?

3          A.    I was a shareholder.

4          Q.    Okay.  And from what period of time to what

5     period of time?

6          A.    If I -- if my memory serves me correctly, I

7     joined in '93 and left in 2000.

8          Q.    Okay.  Always in the Austin office?

9          A.    Yes.

10         Q.    And so you would have been partners with

11    Mr. Madrid, who is sitting at your right.

12         A.    Yes.

13         Q.    Okay.  And in what area of practice?

14         A.    I did civil litigation and government

15    relations.

16         Q.    Okay.  Between '93 and 2000 was the firm

17    structure wherein you were a part of a particular group

18    within Winstead?

19         A.    Well, we had practice groups, so I was part of

20    the litigation practice group and the government

21    relations practice group.

22         Q.    Okay.  Was it further defined other than that?

23    Other than litigation group, was there subgroups within

24    the litigation?

25         A.    No, not that I recall.

Page 18

1      Q.    And you continued doing litigation.  Become

2   more a complex litigation practice?

3      A.    Yes.

4      Q.    Types of cases?

5      A.    Again, it was a pretty -- pretty varied

6   practice.  I represented the Boy Scouts on a major will

7   contest that ended up going to the Court of Appeals

8   twice and the Supreme Court once, straightforward

9   contractual disputes --

10     Q.    Okay.

11     A.    -- some construction litigation.  It was a --

12  it was, once again, a varied docket that didn't really

13  focus on any particular part of the law.

14     Q.    Any case which you would -- you would say had

15  some flavor of a Ponzi scheme?

16     A.    No.

17     Q.    Okay.  Or an investment fraud?

18     A.    I don't think so.  I can't remember any of the

19  cases that I had that were involved in that.

20     Q.    Okay.  And maybe it was too broad, but where an

21  investor lost money when he -- whether it was in a Ponzi

22  scheme or not?

23     A.    I don't believe I had any of those cases.

24     Q.    And -- and when you were doing litigation, were

25  you ever involved in doing any transactional work?

1    A.    No.

2    Q.    Okay.  And what role did you play in the

3  government affairs or government regulatory --

4    A.    We --

5    Q.    -- practice?

6    A.    We had a -- a robust government relations

7  practice that dealt with -- we handled clients who had

8  an interest primarily at the state capitol, but at other

9  levels of government as well.  In the -- between '81 and

10  '91 I had served in the Texas Senate and had obviously

11  gained some insights into the way government works.

12    Q.    So what was your -- what was your role within

13  the firm in government relations or government

14  regulation?

15    A.    Well, in government relations we -- we had a

16  relatively small group who did that kind of work.  I was

17  the primary person to do it and I was -- I don't

18  remember if I had a special title or not, but it was --

19  it was pretty much my shop.  Winstead didn't have much

20  of a government relations practice as it pertained to

21  the -- to the state government.  We, at that time, did a

22  lot at the municipal government, county government, at

23  those levels of government, but not much at the capitol.

24    Q.    When you do -- when you're talking about local

25  government, what type of work would the firm do for --

Page 20

1    in connection with local government?

2         A.    City council.

3         Q.    Representing city councils?

4         A.    Representing persons, entities with interests

5    before the city council.

6         Q.    Would that be characterized as lobbying?

7         A.    Some of it would be, yeah.

8         Q.    Okay.  So did the firm register certain

9    individuals --

10        A.    I'm sure they --

11        Q.    -- as lobbyists in local government?

12        A.    I'm sure they did, yeah.

13        Q.    And including city and counties, correct?

14        A.    Yes, yes.

15        Q.    And then what about before the state

16   legislature?

17        A.    Well, like I said, I -- I did most of that.  Of

18   course we complied with the registration requirements.

19        Q.    While you were a state senator, you were

20   elected in '81?

21        A.    Correct.

22        Q.    Okay.  From what district?

23        A.    The 5th Senatorial District, it includes 19

24   counties, the center of which was Brazos County, which

25   was where I resided.

1      Q.    While you were a senator, were you appointed to

2    any particular committees or head of any committees?

3      A.    Yes, I served as chairman of the Criminal

4    Justice Committee in 1983 to 1985, chairman of the Civil

5    Jurisprudence Committee from '87 -- no, from '85 to '87,

6    and my last term I was chairman of the Senate Finance

7    Committee.

8      Q.    From '87 to '91ish?

9      A.    '91, yeah.  I may have my years wrong, it

10   may have -- Senate Finance may have been '89 to '91, now

11   that I about it.  Jurisprudence was maybe '85 to '89.

12   And then I did that four years, I guess.  And civil --

13   and the Criminal Justice was -- was a new committee

14   Governor Hobby created, and if I'm not mistaken, I was

15   appointed chair of that in '83.

16     Q.    Okay.  And so for someone that doesn't

17   understand what a senate committee does, what types of

18   things would the committee on criminal justice do?

19     A.    Well, we -- we would hear all legislation

20   concerning the criminal justice code, prisons, anything

21   to do with law enforcement, DPS, sheriffs' offices, and

22   we -- I had a staff and the staff would, you know,

23   analyze legislation that was introduced and referred to

24   the committee, we would conduct hearings on those bills,

25   we would then, you know, go through the various

1   parliamentary steps that, you know, sometimes you

2   referred a bill to a subcommittee, sometimes you

3   rewrote, sometimes you amended it, and then it -- it

4   would get voted out and then proceed to -- to the floor

5   for consideration by the entire senate.

6                    I had legislation of course that I

7   sponsored, and then as chairman of the committee I

8   Sheparded the bills that came through the committee and

9   was usually asked to comment upon them when they came

10  before the floor for consideration.  That was the Senate

11  part of the process; then of course you had to repeat

12  the process in the House.

13      Q.   Yes, sir.

14      A.   And if there was a difference between the

15  senate bill and the house bill, the conference committee

16  was appointed to adjust the differences between the two.

17      Q.   All right.  And I think you -- you mentioned

18  that in one of the last committees you were in involved

19  finance.

20      A.   Correct.

21      Q.   What types of issues were coming before the

22  Texas legislature during that period?

23      A.   The Senate Finance Committee is charged with

24  writing the budget for the State of Texas.  We have a

25  two-year budget cycle in Texas, so it was our job to

Page 23

1    sift through the various budget requests, I had quite a

2    large staff, and conduct hearings on all the agencies

3    that are funded by state government, and to write a

4    budget, and -- and that was our primary job.

5              In addition, in the Senate the finance

6    committee is charged with considering revenue measures,

7    any measures that raise taxes or deal with taxes.  Those

8    bills also come before the Senate Finance Committee.  So

9    it was a pretty -- pretty encompassing job.

10   Q.   Okay.  During any of -- during your time at the

11   legislature as a senator, were you ever a part of a

12   committee that was dealing with the savings and loan

13   crisis or the banking crisis in the '80s?

14   A.   You know, I served on State Affairs Committee,

15   and if I'm not mistaken, we dealt with some of those

16   issues.  I don't think I carried any pieces of

17   legislation.  You know, the State was remarkably

18   inactive at the state level in -- in that -- in that

19   time.

20   Q.   Okay.  In that arena?

21   A.   Yeah, in that arena.

22   Q.   Okay.  During that time when -- when you were

23   state senator did you have any role vis-a-vis the

24   federal government and the federal legislation?

25   A.   No, I did not.

Page 24

1      Q.    Okay.  Or any interaction between Texas and the

2   national level?

3      A.    Well, the -- you know, the Texas congressional

4   delegation communicated with us, especially around

5   redistricting time.

6      Q.    For obvious reasons.

7      A.    Right.

8      Q.    Okay.

9      A.    But there was no formal -- I mean, I'd go to

10  Washington and appear before committees at the request

11  of certain members, but there was no ongoing role in --

12  in -- in my job as state senator.

13     Q.    Okay.  And -- and from what period of time to

14  what period of time were you at Winstead?

15     A.    You know, I think it was '93 to 2000.

16     Q.    All right.  And then what happened --

17     A.    Or 2001 maybe.

18     Q.    Okay.

19     A.    And then I joined a firm called Public

20  Strategies, and I was responsible at Public Strategies

21  primarily for handling government relations for SBC

22  Corporation at the time based in San Antonio.  And SBC

23  at that time had a presence in 13 different states and I

24  was responsible for managing the government relations in

25  those 13 states.

Draft Copy

Page 25

1       Q.    Vis-a-vis state or national level?

2       A.    State primarily.  We did get involved in the

3   telecommunications act and -- but I -- I didn't -- you

4   know, I didn't register to lobby at the federal level.

5   I did not -- I was involved as to how it impacted our 13

6   states.

7       Q.    Okay.  And from what period of time to what

8   period of time were you at Public Strategies?

9       A.    Well, I think I was there about four years and

10  then I joined Ben's group, Ben Barnes Group.  So I think

11  I joined Ben Barnes Group in August of 2005.  I -- I may

12  be off on my years a little bit.

13      Q.    All right.  You obviously knew Ben Barnes

14  before August of 2005.

15      A.    Yes.

16      Q.    And what prompted you to make the change from

17  Public Strategies to Ben Barnes Group?

18      A.    Well, Ben had been a friend of mine; I'd gotten

19  to know him when I was in the Senate.  We -- we never

20  served together, he had left public office when I was

21  elected, but I dealt with him as chairman of the finance

22  committee.  He had a role in the effort to start a high

23  speed train in Texas and I got to know him as a result

24  of that effort that he had -- that he was a part of,

25  and -- and then when I left the Senate and had my own --

Page 26

1   still was at Caperton, Rogers & Miller, he and I worked

2   on a couple of projects together, lobby projects, and

3   got to, you know, liking one another and liked the way

4   each of us did business, and the truth of the matter is

5   he started hounding me to come to work with him about

6   that time.

7        Q.   All right.

8        A.   And I -- I had a daughter who still was at home

9   and I -- I had a sense of knowing Ben that if I -- if I

10  joined his group, I would likely lose control over a

11  whole lot of my life and not know from time to time of

12  what city I was going to be in or where my head was

13  going to rest.  So I declined for a long time.  Ben and

14  I remained friends, social friends, business friends

15  throughout those years, and after my daughter went on to

16  college and got out of college, he said, "Okay, I think

17  you put me off long enough."

18       Q.   All right.

19       A.   And so that's -- that's kind of a long version.

20       Q.   Okay.  Before August of 2005 did you know

21  anything about Allen Stanford?

22       A.   I was on the Commission For Lawyer Discipline

23  back in the -- let's see, I was out of the Senate -- I

24  guess it would have been the early '90s and there was a

25  gentleman, a citizen member of the Commission For Lawyer

Page 27

1    Discipline whose name I can't remember who worked for

2    the Stanford entities.  That was the first time I knew

3    anything about Stanford, and it was only through him.

4              Ben told me about --

5              MR. MADRID:  You're not getting into any

6    privileged matters, I assume.

7              THE WITNESS:  No, no.

8              MR. MADRID:  Okay.

9    A.   I think I learned about Stanford before I came

10   to work with Ben and -- but, you know, I -- when I

11   joined the Ben Barnes Group, Stanford was a client.

12   Q.   (By Mr. Castillo)  All right.  Go back -- going

13   back to this individual -- or the citizen who was a

14   member of the Committee For Lawyer Discipline in the

15   early '90s, I know you can't recall his name, but

16   anything of the conversations with him that stick out

17   and say this is what I learned about Allen Stanford in

18   the early '90s?

19   A.   No, I -- you know, I -- I knew committee -- you

20   know, it was probably nine people, 12 people, and we had

21   incredibly long meetings, so during a break you just get

22   a know folks that you're serving with.  I asked him, you

23   know, what he did and he told me what he did.

24              And I remember the Stanford office as I

25   recall being in the Galleria down in Houston and, you

1   know, I'd see the name on -- on the elevator bank, but

2   no, I didn't know anything other than that.

3        Q.   Okay.  Nothing that sticks out from your

4   conversations with this citizen that was a member of the

5   committee about what Stanford did or didn't do?

6        A.   No.

7        Q.   And then on occasion I guess you would go to

8   Houston and you would be exposed to where Stanford had

9   its offices in the Galleria area.

10       A.   Yeah, as I recall, they were in the Galleria

11  and I think later they had a free-standing business, if

12  I'm not mistaken.

13       Q.   Did you ever go in there?

14       A.   No.

15       Q.   Talk to anybody with the Stanford Financial

16  Group?

17       A.   No.

18       Q.   Ever place any investment in the Stanford

19  Financial Group?

20       A.   No.

21       Q.   Any buy -- ever buy any of the product from the

22  Stanford Financial Group?

23       A.   I did not.

24       Q.   Okay.  After you joined the Ben Barnes Group in

25  August of 2005, did you ever buy any of the Stanford

Page 29

1    financial products?

2         A.    I did not.

3         Q.    Why?

4         A.    I never really -- I mean, nobody ever suggested

5    I do it and I never I did it on my own.

6         Q.    The only reason I ask you that, I think at

7    the -- in the -- early 2009ish there was an internal

8    e-mail that says, "I hope you guys got your CDs out

9    before everybody else."  Do you remember that e-mail?

10        A.    I do.

11        Q.    All right.  Was that just in jest?

12        A.    Yes.

13        Q.    All right.  So you never purchased any CDs

14   or --

15        A.    No.

16        Q.    -- had any investment in Stanford Financial

17   Group.

18        A.    That particular e-mail came from a former

19   congressman named Max Sandlin, who is a good friend of

20   mine, and he -- Max, you know, had been on the Financial

21   Services Committee when he was a member of Congress and

22   had gotten to know the Stanford entities somehow, and

23   it -- it was an effort at humor.

24        Q.    Shifting over to what Mr. Barnes might have

25   told you about Allen Stanford before you joined the Ben

Page 30

1    Barnes Group, what do you remember him telling you?

2        A.    Just that he was a -- a major player, that

3    he -- he had a grand vision for the Caribbean, and that

4    he was a person of import and seemed very successful.

5        Q.    These were conversations that you and

6    Mr. Barnes had prior to August of '05?

7        A.    Yes, casual conversations.

8        Q.    Okay.  Anything specific when -- you know, the

9    last part of the courting days, because I know he had

10   been courting you for a while, but when he renewed

11   the -- the more intense efforts to court you to join Ben

12   Barnes prior to August of 2005, anything you can recall

13   of Mr. Barnes telling you about Allen Stanford?

14       A.    No.

15       Q.    When did you become aware that he was a client,

16   Mr. Stanford was a client of the Ben Barnes Group?

17       A.    There was a period of time when I had given

18   notice at Public Strategies and Ben asked me to join a

19   conference call that was involved, as I recall, in the

20   early stages of the planning for the initiatives on tax

21   changes in the Caribbean.  So that was really the first

22   time that I -- you know, I think I listened in on the

23   conference call; I announced my presence and then simply

24   was trying to learn what the issues were.  And I don't

25   remember who was on the call, it was a multitude of

1    people, but that -- that's really the first time I had

2    exposure to Stanford.

3        Q.   Can't place a date?

4        A.   Well, my guess is it would be in July of --

5        Q.   '5?

6        A.   -- '5, the year I joined Ben.

7        Q.   Okay.

8        A.   But that's -- that's a guess.

9        Q.   All right.  When you came in with the Ben

10   Barnes Group, did you become a member of the Ben Barnes

11   Group?

12       A.   An employee.

13       Q.   Okay.  Did you have any ownership interest?

14       A.   No.

15       Q.   Did you eventually get any ownership interest?

16       A.   You know, not really.  We have a -- kind of a

17   loose compensation structure that when we do well, the

18   firm does well, everybody does well.

19       Q.   So do you have any ownership --

20       A.   I do not.

21       Q.   -- interest in the Ben Barnes Group?

22       A.   I'm sorry, I do not, no.

23       Q.   Do you have a written contract within the Ben

24   Barnes Group detailing your terms of your employment?

25       A.   I do not.

Draft Copy

1      Q.    And so you have a method of compensation that's

2  based on whether the comp -- the group does well.

3      A.    Well, I have a base pay, I have a base salary.

4      Q.    Okay.  In addition to the base salary, do you

5  get compensated based on the results of the firm?

6      A.    It's a very loose system.  There is not a

7  formula, there is not a strict compensation structure

8  that -- that calls for you hit certain triggers, you get

9  certain amounts of money.  It's a -- it's a pretty

10 collaborative group.

11     Q.    Okay.  Are there any members of Ben Barnes

12 Group, L.L.P. other than -- other than Ben Barnes?

13           Wait, let me ask you this:  Does it have

14 limited partners?

15     A.    You know, I think it does.  I didn't create any

16 of the entities; that -- that happened before my time.

17 And I probably wouldn't have done it anyway, to tell you

18 the truth, that transactional work, we would have gotten

19 a transactional lawyer to do that.

20     Q.    Are you aware of whether or not there are any

21 limited partners other than Mr. Barnes?

22     A.    I'm not.

23     Q.    And --

24     A.    I -- I always have to go back and refresh my

25 memory about the -- the corporate structure.

Page 33

1      Q.   All right.  Well, when you've gone back to

2   refresh your memory about the corporate structure, do

3   you remember seeing who the limited partners were?

4      A.   I don't recall.

5      Q.   Okay.

6      A.   I'm not -- I'm not a limited partner.

7      Q.   Okay.  Do you know if Mr. Barnes is a limited

8   partner?

9      A.   I honestly don't know.  I'd just have to go

10  back and look.

11     Q.   And do you know whether there -- there is a

12  general partner?

13     A.   There is -- there certainly must be and I think

14  the general partner may be Entrecorp, which was the name

15  of the company, the entity that Ben used for a long

16  time.

17     Q.   And who owns interest in Entrecorp?

18     A.   I don't know.

19     Q.   Okay.  Do you have any ownership interest in

20  it?

21     A.   I do not.

22     Q.   You were talking about the loose method of

23  determining compensation above base salary.  Does

24  everybody get an equal vote?

25     A.   Well, Ben has the most equal vote.

Page 34

1      Q.    Do you have a voice, I guess?

2      A.    Yes.

3      Q.    Is there actually a formal vote or is it Ben

4   makes a determination and -- and passes it by you guys?

5      A.    We talk about how well we've done and whether

6   we've had a good year or a bad year.  It's -- like I

7   say, it's pretty collaborative.

8      Q.    I know, but what's the collaborative part?

9      A.    Well, we -- you know, we look at the books and

10   we look at the numbers and we look at the -- we talk in

11   a open fashion about who did what and try to come up

12   with a fair method, and it doesn't happen every year,

13   And --

14      Q.    If somebody thinks it's too unfair, I guess

15   they can pick up and leave.

16      A.    Sure.

17      Q.    Okay.

18      A.    But it's never been a source of friction or a

19   contest between any of the members of the firm.

20      Q.    Now, one of the things that you said that you

21   did was you reviewed contracts that the Ben Barnes Group

22   might have with clients, correct?

23      A.    Correct.

24      Q.    When you came in in August of 2005, did you

25   undertake an analysis or reviewing the existing

Page 35

1    contracts?

2        A.    No.

3        Q.    Do you know whether or not there was a written

4    contract between the Ben Barnes Group and Stanford

5    Financial?

6        A.    I don't know of any such contract, written

7    contract.

8        Q.    Do you know if there was any type of a

9    handshake contract or agreement between Ben Barnes Group

10   and Stanford Financial?

11       A.    I was not a witness to it or a party to it, but

12   I have assumed that yes, there has always been hand --

13   was always a handshake agreement.

14       Q.    And do you know between Ben Barnes Group and

15   what entities was the agreement?

16       A.    Well, it would have been the Stanford Financial

17   Group, as I recall the name of it, and I don't know if

18   Ben entered into those agreements with Allen Stanford on

19   behalf of Stanford Financial Group or Jim Davis or

20   Yolanda Suarez or -- or who; I just don't know the

21   details of that.  I know what the billing practices were

22   at different -- you know, at different times.

23       Q.    Okay.  A little bit about the -- the agreements

24   between Ben Barnes Group and its clients, does it

25   provide for a lump sum compensation as determined by Ben

Page 36

1    Barnes Group or the clients, hourly, how is that

2    determined?

3        A.   We do not bill on an hourly basis.  It's

4    normally a monthly retainer, and, you know, we'll define

5    the scope of our work and say for X number of dollars

6    per month, you know, we'll perform these services.

7                MR. MADRID:  Are we -- we sticking to the

8    script or are we get into other areas here?

9                MR. CASTILLO:  I don't know about a

10   script.  There are certainly broad areas of -- areas

11   where Mr. Caperton might have knowledge of, I think.

12               MR. MADRID:  Well, I don't mind

13   exploratory stuff, but we're presenting him on specific

14   topics that you have designated, so I just want you

15   to --

16               MR. CASTILLO:  Wasn't there a broad

17   category that says everything that Ben Barnes Group

18   sent -- said that Mr. Caperton would know?

19               MR. MADRID:  He said to ask you, I think.

20               MR. CASTILLO:  To ask him.  He was

21   pointing at Mr. Caperton, or Senator Caperton.

22       Q.   (By Mr. Castillo)  Well, I think -- to satisfy

23   your lawyer, I think we're going into areas of what

24   services Ben Barnes Group provided to the Stanford

25   Financial entities, and I think you're the person that

1    would know that.  Right?

2        A.    Okay, sure.

3        Q.    Because weren't you the person that kind of put

4    together the information in response to the receivership

5    request -- receiver's request for what did you do for

6    Stanford Financial in exchange for the money, right?

7        A.    I did, I did.

8        Q.    All right.  And that's what I'm -- I'm trying

9    to get into.

10                On these agreements where Ben Barnes Group

11   is -- was agreeing to provide services for Stanford

12   Financial, before August of 2005 I guess it was

13   Mr. Barnes that set both the fee and what Ben Barnes

14   Group was going to provide, correct?

15       A.    Correct.

16       Q.    Okay.  And do you know what type of services

17   the Ben Barnes Group was providing to Mr. Stanford prior

18   to June of 2005?

19       A.    I don't know specifically, no.

20       Q.    Or what services the Ben Barnes Group provided

21   to Stanford Financial through June of 2005 in exchange

22   for the million dollars?

23       A.    I do not know.

24       Q.    And you were here during Mr. Barnes's

25   deposition where he said that that payment of June 30,

Page 38

1    2005 in the amount of a million dollars was for services

2    that had been rendered prior to June 30, 2005, correct?

3         A.    Yes.

4         Q.    Have you gone back to look at any records or

5    history of billing or collections to determine whether

6    or not that's accurate?

7         A.    I have not.

8         Q.    Do you know one way or the other whether --

9    whether that statement that Mr. Barnes made concerning

10   the June 30, 2005 payment of a million dollars was

11   accurate or not?

12        A.    Well, I think it was accurate; I don't think he

13   would have said it otherwise.

14        Q.    Okay.  So up until June 30, 2005, when you came

15   in August of 2005, the firm would have been current on

16   its payment for its services.

17        A.    I don't really know that.

18        Q.    All right.  Who would know that?

19        A.    Well, you know, I guess we could re -- I don't

20   think anybody is with the Ben Barnes Group today who

21   would have handled those issues.

22        Q.    Because it was prior to Kerri's time.

23        A.    Prior to Kerri's time, so it would probably

24   require Kerri to go back and make a determination.

25        Q.    And do you know what the -- the method of

Page 39

1    compensation was agreed to between Ben Barnes and Allen

2    Stanford?

3        A.    I don't.

4        Q.    Okay.   Other than to invoice as it came up.

5    Correct?

6        A.    Now, what time frame are you talking about?

7        Q.    2005.

8        A.    I -- I don't have any idea what their -- what

9    the arrangement was in terms of compensation prior to

10   2005.

11       Q.    How about August of 2005 what was -- what was

12   your understanding of the agreement between Ben Barnes

13   Group and Stanford Financial?

14       A.    Well, I'm -- I'm not sure that I had a real

15   clear understanding in August of 2005.   I knew that --

16   that the Stanford entities were clients, I knew that we

17   were beginning to talk about a major project involving

18   the Caribbean and the tax structure in the Caribbean, I

19   knew that Stanford and his various companies had -- had

20   used Ben and the Ben Barnes Group for a variety of

21   services, so -- but I was not involved in the

22   negotiation of the -- of the specific terms of

23   compensation.

24       Q.    Yes, sir, I'm aware of that, but I guess my

25   question was -- to you was what was your

1   understanding -- once you got here in 2005, one of your

2   clients is Stanford, what do we do for them and how much

3   do we get paid.

4        A.   Well, what we did for them was what -- you

5   know, kind of whatever they requested.  There was a lot

6   of troubleshooting, is what I would call it, kind of

7   work that -- that would come up from time to time.  You

8   know, the Ben Barnes Group is -- is something of a

9   all-purpose problem-solver for however -- our various

10  corporate clients, and in addition to being available to

11  address those issues as they arose, we also were

12  beginning to plan the major effort to address what we

13  believed to be some of the inequities in the tax

14  structure surrounding the Caribbean and the U.S. Virgin

15  Islands.

16       Q.   Okay.  Is there any type of written policy

17  within Ben Barnes Group about how it's going to operate?

18       A.   If there is, there may be an employee handbook,

19  but I don't know that for a fact.

20       Q.   How about something they have in writing about

21  the information about clients that you're going to take?

22       A.   I don't believe there is a written policy.

23       Q.   Or any type of requirement to kind of vet

24  particular clients on whether or not it's somebody you

25  would want to represent or not?

1      A.    Well, we do that as a matter of course.  We --

2      Q.    Why?

3      A.    -- we have a -- well, we have our own internal

4   due diligence.  We want to make sure the people we

5   represent are quality people who have, you know, certain

6   legitimate business operations, that they're -- that

7   they're the real deal.

8      Q.    Was that in place before you got here in August

9   of 2005?

10      A.    Yeah.

11      Q.    What was your understanding of what the vetting

12   process was to make sure the client was the real deal?

13      A.    Well, you talk to people who knew them, you did

14   research about their -- you know, what their record

15   looked like, you saw what had been written about them,

16   you used whatever resources were available to try to

17   familiarize yourself with the particular client.

18             In this instance, Larry Temple was the

19   introducer and, you know, that's -- to anybody who knows

20   Mr. Temple, that's kind of a Good Housekeeping seal of

21   approval.  Mr. Temple had represented -- my

22   understanding is that he had represented the Stanford

23   entity in some issues here, and, you know, if -- if

24   Larry vouched for them, that was pretty good -- pretty

25   good -- pretty good credibility builder.

Page 42

1      Q.   All right.  And that's something that you --

2    you gathered from Mr. Ben Barnes, correct?

3      A.   And from talking to Larry.

4      Q.   But subsequent to August of 2005?

5      A.   Yes.

6      Q.   All right.

7      A.   Well, you know, it might have been around that

8    time, you know.

9      Q.   In connection --

10     A.   Larry -- Larry is a friend, and so...

11     Q.   In connection with you joining the Ben Barnes

12   Group, you heard some things about how Stanford

13   Financial became a client of Ben Barnes Group?

14     A.   Yes.

15     Q.   And one of the things you heard was that

16   Mr. Temple had introduced him to Mr. Barnes, correct?

17     A.   That's correct.

18     Q.   And in your mind that was a seal of approval,

19   correct?

20     A.   Correct.

21     Q.   And did you have any discussions with

22   Mr. Temple about Stanford Financial as a client?

23     A.   You know, it was -- I think it was in a very

24   vague way.  It was not -- I mean, Stanford was already a

25   client when I came on board, so I was not involved in,

Page 43

1    you know, the due diligence of -- of ascertaining

2    Mr. Stanford's status, if you will, but I know that, you

3    know, Larry and I talked about me joining Ben.  And I

4    can't recall a specific conversation we had about

5    Stanford, but I feel sure that we did, and I knew -- I

6    knew that Larry -- you know, Larry was pleased to

7    represent them.

8         Q.   You sat through Mr. Barnes's deposition,

9    correct?

10        A.   Yes.

11        Q.   And you -- you heard the things that he said he

12   did to vet Stanford Financial, correct?

13        A.   I did.

14        Q.   And other than that, do you know anything about

15   what the Ben Barnes Group did to vet Stanford Financial

16   as a client?

17        A.   No.

18        Q.   Okay.  Don't know what was read about what was

19   out there, correct?  You don't know what the Ben Barnes

20   Group read that was publicly available about Stanford

21   Financial before Stanford Financial was signed on as a

22   client?

23        A.   Correct.

24        Q.   Okay.  Or what other investigative work, if

25   any, Ben Barnes Group did to vet Stanford Financial as a

Page 44

1    client, correct?

2         A.    Correct.

3         Q.    Okay.  The only thing you know is what Ben

4    Barnes told you as he said in his deposition, correct?

5         A.    And what Larry Temple told me.

6         Q.    And what Larry -- but you can't remember what

7    Larry Temple told you.

8         A.    Well, I remember he told me that Stanford was a

9    reputable, large, successful operation.  Now -- now,

10   were those words used?  I can't recite the specific

11   conversation, but -- but it was very clear from -- from

12   my conversation with Larry Temple that he had a high

13   regard for the Stanford entities and that he had a

14   belief and an impression that they were the real deal,

15   that they had a very viable ongoing business operation

16   that was successful and that they would be a good client

17   that anybody would want.

18        Q.    Anything else other than that --

19        A.    No.

20        Q.    -- those general impressions of what Mr. Temple

21   told you?

22        A.    Yes, sir.

23        Q.    Okay.  Did he tell you the same thing about any

24   other client or was it just Stanford Financial?

25        A.    Oh, I'm sure we talked about the clients

Page 45

1    that -- that -- that Ben Barnes Group had at that time,

2    but I can't remember the specifics.  I obviously

3    associate Stanford with -- with Larry because of the

4    introduction and -- and, you know, I read about the

5    Stanford group.  I mean --

6        Q.    Prior to joining?

7        A.    Around that time.

8        Q.    Okay.

9        A.    You know, and as -- as anybody can go back and

10   look at the press, it was glowing.

11       Q.    All right.

12       A.    I mean, it wasn't just good, it was real good.

13       Q.    All right.  Tell me what you read about

14   Stanford Financial that kind of satisfied yourself that

15   you would want to be associated with the Ben Barnes

16   Group who had Stanford as a client.

17       A.    Well, can you repeat the question?  I want to

18   make sure I...

19       Q.    I'll try to say it again.  How's that?  Tell me

20   what you read that satisfied yourself that you would be

21   glad to join the Ben Barnes Group having Stanford

22   Financial as a client.

23       A.    Well, I joined the Ben Barnes Group because of

24   Ben, you know.

25       Q.    Regardless of whether Stanford Financial was a

Page 46

1    good or bad client.

2        A.   Well, I mean, I looked at -- I looked at all

3    the clients Ben had.

4        Q.   All right.

5        A.   I determined that I didn't have any

6    reservations about representing any of those clients.

7    Stanford didn't stand out any more than any other

8    client, but he was one of the clients -- the Stanford

9    entities were one of the clients that I -- you know, I

10   read about, I went online and tried to check out, I

11   tried to see what articles had been written in Fortune

12   and Forbes and elsewhere about -- about Stanford, and

13   they were, without exception, very, very positive.

14       Q.   And these articles that you read, were they

15   prior to you joining Ben Barnes Group or right at that

16   time frame?

17       A.   You know, on or about that time.

18       Q.   Did you print any of those to keep them in your

19   files?

20       A.   No.

21       Q.   These are just things that you now can recall

22   that you did --

23       A.   Right.

24       Q.   -- about Stanford Financial in 2005ish, the

25   summer of 2005.

Draft Copy

1      A.    Correct.

2      Q.    Did you continue to review articles about

3  Stanford Financial or Allen -- Sir Allen Stanford after

4  August of 2005 but before February of 2009?

5      A.    You know, we -- did I get up in the morning and

6  say I'm going go check online to see what was written

7  about Stanford, no; but from time to time we would get

8  his annual reports, we would look at the various -- some

9  of the publicity that he received, I think he was listed

10  on the Forbes, you know, wealthiest individuals one

11  year.  And so from -- so from time to time, periodically

12  we read about what -- what was being said about

13  Mr. Stanford and the Stanford entities.

14      Q.    Any internal operating procedures about vetting

15  clients after they become members of the firm to make

16  sure they're somebody that you want to be associated

17  with?

18      A.    Not a formal process, no.

19      Q.    How about an informal process?

20      A.    Well, yeah.  I mean, again, we're small; we

21  talk about whether these are people we want to

22  represent.

23      Q.    Anything that stuck -- sticks out in your mind

24  between August of '05 and February '09 where a

25  discussion was internally and formally held where there

Page 48

1    was any concern about Stanford as a client?

2        A.    No.

3        Q.    Any articles that were out there that caused

4    you a concern during that same time frame, August of '05

5    and February '09, about having Stanford as a client?

6        A.    No.  Now, let me say I don't remember exactly

7    when the articles -- negative articles started.  It was

8    in that '09 time frame.  I mean, it might have been end

9    of January, but --

10       Q.    Was it when you got an e-mail saying the SEC,

11   the FBI, and the IRS are investigating Allen Stanford,

12   prior to that time?

13       A.    Well, I don't remember getting any such e-mail.

14       Q.    Okay.  Well, we'll see that in a little bit.

15              MR. CASTILLO:  Why don't we take about a

16   five-minute break.

17              THE WITNESS:  Yeah, sure.

18              THE VIDEOGRAPHER:  Off the record at 2:59.

19              (Break taken from 2:59 p.m. to 3:06 p.m.)

20              THE VIDEOGRAPHER:  We're back on the

21   record at 3:06.

22       Q.    (By Mr. Castillo)  In agreeing to represent a

23   client, the Ben Barnes Group, is there a form internally

24   where information about that client is captured and

25   distributed to the other members within the group to

Page 49

1    kind of review and -- and get their thoughts?

2         A.    There is no form.

3         Q.    Okay.  Is that information kind of shared with

4    each other?

5         A.    It is.

6         Q.    How is that?

7         A.    Well, it can be accomplished through a number

8    of -- of ways.  If we're all in the same town, we'll sit

9    down and talk about it or we will have a conference call

10   about it or each of us will talk with the other

11   principal about it, we might e-mail about it.

12        Q.    Okay.  Well, you -- you've been a member of

13   a -- of a large firm, correct?  Legal -- a law firm,

14   correct?

15        A.    Right.

16        Q.    And -- and I imagine in a large law firm they

17   would have a conflicts check, right?

18        A.    Correct.

19        Q.    Whether it's a legal ethical conflict or a

20   business conflict, correct?

21        A.    That's correct.

22        Q.    All right.  You want to make sure that the

23   interests of one client aren't -- aren't conflicting

24   necessarily with the business interests of another

25   client, correct?

Page 50

1    A.    That's correct.

2    Q.    All right.  Anything kind of similar to that

3    within the Ben Barnes Group to say well, I'm going to

4    take a client that wants me to pursue this objective but

5    it might be in conflict with the business objective of

6    another client?

7    A.    We do not have a -- a conflict sheet that goes

8    around like the big firms do.  We have an informal

9    method, system of assessing potential conflicts.

10   Usually those end up in -- with me and it's -- you know,

11   it's just something we deal with on a case-by-case

12   basis.

13   Q.    Yes, sir.  And I guess I'm trying to figure out

14   is there something that would capture that, the fact

15   that you've done that legal -- or mental gyrations about

16   okay, well, the interests of this client don't conflict

17   with my business interests of my other client?

18   A.    Is there a document?

19   Q.    No, something that captures that mental

20   gyration that you go through.

21   A.    Well, other than, you know, me explaining to

22   you the process that I use -- or that we use.  I mean,

23   again, I -- because I'm a lawyer, it -- and we're not a

24   law firm, but if we see business conflicts potentially,

25   we'll talk them through internally, determine whether we

Page 51

1    want to raise that issue with the potential client or

2    with the -- and/or with the existing client to ensure

3    that there is not a problem with us going forward.

4    It's -- again, we're a small firm and, you know, I'm

5    pleased to report that conflicts have not been a

6    problem.

7        Q.    What I hear you saying is that you're relying

8    on your memory of what your clients do and what you're

9    doing for them to resolve whether or not there is a

10   conflict.

11       A.    Well, I don't know if it's just my memory,

12   it's -- it's a collective assessment of what we're doing

13   for existing clients and what, you know, those clients'

14   issues are, and we look at that in comparison to what

15   the new prospective client wants us to do.  So I don't

16   know that it's just memory.

17       Q.    Well, because you say we look at that, but

18   there is nothing in writing that you're looking at.

19       A.    Well, we -- we -- we talk the potential --

20       Q.    Or is there?

21       A.    There is --

22            MR. MADRID:  Objection, form.  Go ahead.

23       A.    No, there is nothing in writing.

24       Q.    (By Mr. Castillo)  Okay.  So in other words, if

25   a new client comes in and they want you to pursue

Page 52

1    legislation, you know, that's maybe against legislation

2    that another client wants, how do you resolve that?

3        A.   Because we're a small firm, we know what

4    clients we have, we're aware of what those clients'

5    issues are, and we make that determination on a

6    case-by-case basis.

7        Q.   Yes, sir, and that's why I said your memory,

8    because you're having to know what each client is doing

9    in your mind.

10       A.   It's my memory and the current awareness of

11   what those clients want us to do.

12       Q.   Got it.  And collectively everybody else has

13   some input in it; they might remember what the clients'

14   objectives are, correct?

15       A.   Correct.

16       Q.   Okay.  You -- you mentioned a little bit about

17   you came in and -- and whether or not there was a con --

18   a contract -- a written contract between Ben Barnes

19   Group and Stanford, and there isn't, correct?

20       A.   That is correct.

21       Q.   And after you came in in August 2005, you never

22   did anything to ensure that there was a written

23   contract.

24       A.   That's correct.

25       Q.   Did you make a determination of how the fees

Page 53

1    were set between one client and another client?

2         A.   I'm not sure I understand your question.

3         Q.   Yeah.  For a law firm, it's easy, you know, you

4    bill your hourly rates or maybe do contingency stuff;

5    but within your practice, the Ben Barnes Group, how do

6    you determine whether you're going to charge me $10,000

7    a month and, you know, Mr. Arlington $50,000 a month?

8         A.   It's fairly subjective.  We look at the nature

9    of the client's problem, we try to estimate the amount

10   of time that the client is going to demand, require, we

11   look to see if there's a large team involved where we

12   wouldn't be doing all the lifting, we try to have a

13   sense of what the market will bear so that we don't

14   price ourselves out --

15        Q.   Yes, sir.

16        A.   -- or alternatively price under.  So it's -- it

17   is fairly subjective.  There is not a strict guideline

18   where I charge -- we charge hourly fees, you know.  We

19   don't have that kind of -- those kinds of limitations in

20   what we do.

21        Q.   Do you know how any of the fees that were being

22   charged to the Stanford Financial Group were sent?

23        A.   I really don't.

24        Q.   And who would have sent those?

25        A.   Ben.

Page 54

1      Q.   Were you involved in any discussions with

2    Mr. Barnes prior to him agreeing to what fees would be

3    charged after August of '05?

4      A.   I don't recall any.

5      Q.   Okay.  Let's talk a little about your first

6    involvement in some of the Ben Barnes-Stanford Financial

7    stuff.  Let me show you Plaintiff's Exhibit 107.

8              (Plaintiff's Exhibit No. 107 previously

9    marked)

10             MR. MADRID:  Jesse, you need a new

11   paralegal.  I'm kidding.  There are too many documents,

12   one of the two.

13     A.   Okay.

14     Q.   (By Mr. Castillo)  It appears that Plaintiff's

15   Exhibit No. 107 is an e-mail from yourself to a number

16   of people on August the 5th of 2005, correct?

17     A.   Correct.

18     Q.   And it appears -- you know, I guess that's

19   right when you joined Ben Barnes Group?

20     A.   Yeah, this makes me think my memory might be

21   off a little bit.  This is August 8th.  I -- you know, I

22   could have -- I could have written it in that first --

23   first week, you know.

24     Q.   Okay.  And it appears that you already are

25   having discussions with someone at -- is that Scott

Page 55

1    Reed?

2        A.    Scott Reed.

3        Q.    Okay.  And do you know what his role was and

4    why you were communicating with him?

5        A.    Scott Reed has a expertise in both political

6    campaigns and issue campaigns.  Scott was Bob Dole's

7    campaign manager when he ran for president.  Scott is

8    currently director of policy or something like that at

9    the U.S. Chamber of Commerce.

10             The issue as I recall it here was Scott

11   was on retainer to -- I think through the Ben Barnes

12   Group or either he was talking about going to work at

13   the -- on behalf of Stanford.  Stanford had -- had an

14   issue in Antigua, if -- if my memory serves me, that he

15   wanted to see -- to gauge the public opinion in Antigua

16   and to help shape the perception of the Stanford

17   presence in Antigua.

18             There was some concern, I think, that some

19   of the newspaper articles had talked about the corporate

20   takeover, you know, and the natives -- the native

21   culture being interrupted somehow and that Allen was

22   bringing -- and the Stanford group were bringing a --

23   kind of a corporate mentality to a fairly pristine

24   setting, and there was some concern about that.  The

25   Stanford people wanted to get ahead of that.

Page 56

1          The Luntz person, who is referred to here,

2   is a guy who specializes in political issues and

3   polling, assessing public opinion, shaping public

4   opinion.  I think his name is Frank Luntz, if I'm not

5   mistaken.  And Scott Reed knew him and thought he would

6   be a good person for Stanford -- the Stanford group to

7   talk to about dealing with that particular problem.

8          The purpose of this e-mail was to get -- I

9   believe planned a trip that Scott Reed and I and Yolanda

10  Suarez, and maybe with Luntz, to actually go to Antigua.

11  That's -- that's what this -- this tells me.

12  Q.   Okay.  And that was to deal with the perception

13  that you just articulated that the Antigua sentiment had

14  about Allen Stanford.

15  A.   There were concerns about that on behalf of the

16  Stanford group.

17  Q.   Okay.  Anything else that you can remember was

18  the concern that you were trying to address?

19  A.   No.  I mean, I think that was -- I think I

20  summarized it.

21  Q.   Okay.  Prior to this August 5th, 2005 e-mail,

22  had you learned of Stanford's business interests in

23  Antigua?

24  A.   Oh, I think I knew generally.

25  Q.   What -- what did you know generally?

Page 57

1     A.    That he had a presence there.

2     Q.    What type of presence?

3     A.    I think it was pretty varied.  I think he made

4  several significant investments and had a banking

5  operation there, I believe had a restaurant there, I

6  think had a -- maybe had an FBO, a fixed base operation

7  for airplanes, I think he had built or bought some real

8  estate, some office buildings.

9     Q.    Okay.  There seems to be a knowledge of a lot

10  of the things that Mr. Stanford was doing in Antigua.

11  Did you have that knowledge by August of 2005 or is it

12  something you learned subsequent?

13     A.    It may have been gleaned more fully when I went

14  down there and -- and made the trip.  So I can't tell

15  you that I knew that specifically, other than the fact

16  that he had a presence there.

17     Q.    Okay.  Do you remember -- how many times do you

18  think you met with Allen Stanford individually?  Seeing

19  him face-to-face.

20     A.    Three or four --

21     Q.    How many --

22     A.    -- at the most.

23     Q.    Where -- where would those occur?  Or where did

24  they occur?

25     A.    Would have been -- you know, now that I think

Page 58

1    about it, it might have just been twice.  If -- I'd say

2    three or four, because there were like social occasions

3    when he would be getting an award of some kind --

4        Q.    Uh-huh.

5        A.    -- and we'd go to the event and I'd shake his

6    hand, and, "Oh, yeah, you're on the guy on the phone,"

7    you know.  But I -- I was not -- I was not exposed much

8    to Allen Stanford, very, very little.  I dealt almost

9    exclusively with Yolanda Suarez.

10       Q.    Okay.  So the two times that you might have met

11   with Mr. Stanford, were -- were those the two times that

12   you might have met with him on a business -- on a

13   business occasion?

14       A.    If they were on a business occasion, it would

15   have been he was -- he would have been in the office and

16   I would have shaken his hand.  I did not sit down

17   with -- with Stanford in any kind of planning meetings

18   or strategy sessions.  He delegated that to Yolanda.

19   And to some extent Jim Davis.  I did meet with Jim

20   Davis.  He would dispatch Jim to -- to Washington, D.C.

21   from time to time.

22       Q.    Trying to limit our subject just to Allen

23   Stanford.

24       A.    Okay.

25       Q.    Anything in particular you remember of those

Page 59

1    two meetings with Allen Stanford?

2         A.    No.

3         Q.    Okay.  Do you remember what was done after

4    August of 2005 to mount a campaign for Allen like if he

5    was running for office?

6         A.    My memory is that we -- Yolanda, Scott and I

7    went to Antigua.  I think we met in Miami and flew from

8    Miami to Antigua.  If I'm not mistaken, Luntz then did a

9    poll and I think went into the field and -- and -- and

10   did an actual poll to -- to gauge the sentiments about

11   the Stanford operations in Antigua.

12               The -- the trip was also designed to I

13   guess help Scott and me understand more what -- what

14   Stanford's presence in Antigua really was.  And we spent

15   all day down there, visited with some of the employees.

16   I don't remember much of the details.

17        Q.    Employees of what?

18        A.    Of Stanford, one of the Stanford entities.

19        Q.    Did you go to the physical presence of the

20   Stanford entity in Antigua?

21        A.    We did.  I don't remember if we went to the

22   bank, but we went to some office in which Stanford has a

23   presence and he had one of his employees accompany us

24   that day, and I remember he was a -- you know, an MBA

25   from a good school.  He was an impressive young man.

Page 60

1      Q.    Did you see a bank that's equivalent to what a

2    jury member might see in Dallas or Houston --

3      A.    Well --

4      Q.    -- in the island of Antigua?

5      A.    Sorry.  It wasn't a high-rise; you know,

6    their -- their architecture is different.

7      Q.    Did you see a bank?

8      A.    I did see a bank.

9      Q.    With tellers and an operation?

10      A.    I don't remember the details.

11      Q.    Did you go to any other Stanford entity in the

12    United States where you visited the entity and thought

13    it was a bank?

14      A.    No.

15      Q.    Did you visit any of the Stanford offices in

16    the United States?

17      A.    No.

18      Q.    Do you know whether or not Stanford entity

19    banks in the United States?

20      A.    I don't.

21      Q.    One way or the other?

22      A.    No.

23      Q.    Did he have any banks anywhere other than the

24    island of Antigua?

25      A.    I don't know.

Page 61

1       Q.    To this day you don't know that.

2       A.    No.  And when I say the word bank, I mean it's

3   a financial institution of some kind.  I don't mean to

4   get into the strict definition of what a bank is or

5   not -- isn't.

6       Q.    Because I thought you said you went to the bank

7   in Antigua.

8       A.    Well, that's what I called it.  I should have

9   called it the --

10      Q.    Financial institution?

11      A.    Financial institution.

12      Q.    All right.  So I don't want to mince words with

13  you.  So did you go to any -- any building in the United

14  States where you thought it was a Stanford financial

15  institute?

16      A.    No.

17      Q.    Okay.  What did the poll that Luntz conducted

18  reveal?

19      A.    Well, I think there was misgiving about not so

20  much Stanford individually as the notion of a -- of a

21  large corporate presence coming into Antigua.  I -- I

22  think that's -- that -- that's my impression of what the

23  poll yielded.

24      Q.    There was a concern of a large institution

25  coming to the island of Antigua.

Page 62

1       A.    The notion of a corporate presence --

2       Q.    Corporate presence.

3       A.    -- disrupting the -- you know, the rather laid

4    back lifestyle that Antigua had -- that Antigua -- that

5    was part of their culture.

6       Q.    Did it cause you any concern that you were

7    visiting a Stanford Financial entity in the form of a

8    bank in the island of Antigua?

9       A.    No.

10      Q.    Do you know whether or not the Stanford

11   Financial institute or bank or whatever presence it had

12   in Antigua was regulated by any governmental agency?

13      A.    I don't know.

14      Q.    To this day do you know that?

15      A.    I'm not sure what regulatory framework they

16   were subjected to.

17      Q.    Do you know whether Stanford Financial or any

18   of the entities were regulated by any U.S. government

19   agency?

20      A.    I don't.

21      Q.    Okay.  Did you ever have any discussions within

22   the Ben Barnes Group about the SEC investigating

23   Stanford?

24      A.    No.  I think I recall that Stanford and Yolanda

25   wanted an SEC lawyer and that Ben may have made

Page 63

1    inquiries on their behalf about law firms who

2    specialized in that area.  I don't know what became of

3    that.

4        Q.    Do you know when that was?

5        A.    No.

6        Q.    After August of '05 but before '09, correct?

7        A.    Yes, sir.

8        Q.    Did you have any discussions with anyone,

9    either Jim Davis or Yolanda Suarez, about that inquiry

10   by Mr. Stanford to Ben Barnes about an SEC lawyer?

11       A.    No.

12       Q.    Any other --

13       A.    Not that I -- not that I recall.

14       Q.    Any other involvement that you might have had

15   in connection with that request from Mr. Stanford about

16   an SEC lawyer?

17       A.    No.

18             (Plaintiff's Exhibit No. 56 previously

19   marked)

20       Q.    (By Mr. Castillo)  Let me show you Plaintiff's

21   Exhibit 56.  It appears on Plaintiff's Exhibit No. 56

22   that it's Susan Martin is sending an e-mail to Allen

23   Stanford and Julie Hodge concerning a note from Ben

24   Barnes, right?

25       A.    Correct.

Page 64

1    Q.    And that Ben has some important thoughts about

2    the SEC matter that he needed to discuss with

3    Mr. Stanford at his earliest convenience, correct?

4    A.    Correct.

5    Q.    Did you have any discussions with Mr. Barnes in

6    the December 2006 time frame concerning an SEC matter?

7    A.    I did not.

8    Q.    In looking to see what was publicly available,

9    do you know whether or not the Ben Barnes Group looked

10   at information at the SEC concerning Stanford?

11   A.    Whether the Ben Barnes Group --

12   Q.    Yes, sir.

13   A.    -- looked at the SEC --

14   Q.    Yes, sir.

15   A.    -- filings?  No, I don't remember.

16   Q.    You think I remember you said earlier that you

17   looked at whatever might be publicly available, so

18   that's -- that was the question; did you -- did the Ben

19   Barnes Group look at anything that was available at the

20   SEC?

21   A.    I -- I did not.  I don't know whether anybody

22   else did or not.

23                (Plaintiff's Exhibit No. 193 previously

24   marked)

25   Q.   (By Mr. Castillo)  Let me show you Plaintiff's

Page 65

1    Exhibit No. 193.   When I --

2         A.    Okay.

3         Q.    Have you ever seen Plaintiff's Exhibit No. 193?

4         A.    I have not.

5         Q.    Do you know whether anyone at the Ben Barnes

6    Group has seen anything -- has seen Plaintiff's Exhibit

7    No. 193?

8         A.    I don't know.

9         Q.    Do you know whether anybody within the Ben

10   Barnes Group looked at any of the information that was

11   available at the SEC concerning Stanford?

12        A.    No, I don't know whether anybody did or not.

13        Q.    Okay.   Do you know whether Mr. Barnes' e-mail

14   in December of 2006 concerned the SEC investigation of

15   Stanford as you see in Plaintiff's Exhibit No. 193?

16        A.    I don't know.

17        Q.    Who would know that?

18        A.    Mr. Barnes.

19        Q.    Do you remember any discussion internally when

20   you guys got together for collaborative reasons about

21   what Mr. Barnes was trying to help Mr. Stanford on

22   concerning the SEC?

23        A.    No.

24        Q.    Would there have been somebody else within the

25   Ben Barnes Group other than yourself that might have

Page 66

1    assisted Ben Barnes concerning the SEC matter?

2        A.   No.

3        Q.   If there would have been anybody, it would have

4    either you or he?

5        A.   I would think so.

6        Q.   And he never asked you, "Kent, there is an SEC

7    matter I want to talk to Allen Stanford about, would you

8    check into the SEC stuff?"

9        A.   No, he did not.

10       Q.   Before or after Plaintiff's Exhibit No. 56.

11       A.   No.

12            (Plaintiff's Exhibit No. 194 previously

13   marked)

14       Q.   (By Mr. Castillo)  Let me show you Plaintiff's

15   Exhibit 194.  Have you ever seen Plaintiff's Exhibit 194

16   before?

17       A.   I have not.

18       Q.   Do you remember whether there was any

19   discussion within the Ben Barnes Group concerning any

20   investigations by NASD?

21       A.   I don't recall any conversation about that.

22       Q.   Or any concern that the NASD might have had

23   concerning the Stanford operations?

24       A.   No, I don't recall.

25       Q.   Do you remember any discussion within the Ben

1    Barnes Group concerning the products that the Stanford

2    Financial Group was offering in the form of certificates

3    of deposit?

4         A.    No.  I mean, I think there was a general

5    awareness that he was, you know, in the CD business.

6         Q.    Was there any --

7         A.    But --

8         Q.    -- more than a general awareness that he was in

9    the CD business?

10        A.    No.

11        Q.    I thought -- well, do you remember receiving

12   financial reports that Stanford published?

13        A.    Yes, we would get those annually.

14        Q.    Okay.  And who was in charge of reviewing them

15   to see what it might have contained?

16        A.    I don't think anyone was in charge of reviewing

17   them.

18        Q.    Who did review --

19        A.    They were -- they were a matter of -- of -- it

20   was an annual report that, you know, we get them from

21   our clients from time to time, but it's primarily

22   informational.  It's not to act upon anything.

23        Q.    Right, but it's something that you would

24   review?

25        A.    Oh, I may or may not.  It depends how busy I

Page 68

1    was.

2        Q.    Do you remember reviewing any Stanford

3    Financial report?

4        A.    No.

5        Q.    Do you know whether there was any discussion

6    within the Ben Barnes Group concerning any of the

7    Stanford Financial reports?

8        A.    Well, I think there may have been a comment

9    about "I saw the Stanford annual report, it's a nicely

10   done document and it's a impressive publication," and,

11   you know, obviously if you -- if you glanced at it, it

12   certainly all appeared to be in order, in keeping with

13   any other annual report of a major corporation that we

14   might represent.

15       Q.    So I -- I want to make sure that I understand

16   this.  You received financial reports, glanced at them

17   but didn't take note of any of the stuff in there?

18              MR. MADRID:  Objection, form.  Go on.

19       A.    We received an annual report of the Stanford

20   entities.  It's a bound document that is distributed

21   at -- to, it was my understanding, a fairly general

22   population, and it's an informational document that

23   summarizes what the Stanford entities did during the

24   prior year.  And did I study it or review it, no; did I

25   look at it, did I glance at it, yes.

1        Q.    (By Mr. Castillo)  Okay.  And that would have

2   included the Stanford International Bank annual reports?

3        A.    I assume so.

4        Q.    Well, who would know that, whether you received

5   it?

6        A.    Well, the report -- the report would say it.

7        Q.    And did you get any -- did you use any of that

8   information that you received from Stanford vis-a-vis

9   your lobbying efforts with any legislators?

10       A.    No.  Not specifically, I don't think.

11       Q.    Do you remember providing any of the Stanford

12  information to legislators?

13       A.    I don't recall doing that, no.

14       Q.    Okay.  I think -- and you were here during Ben

15  Barnes's deposition where I asked him, you know, he had

16  been wanting copies of the Stanford Eagle to provide to

17  select members of the legislature.  Do you remember

18  that?

19       A.    Well, I don't remember everything Ben testified

20  to, but I kind of recall that, yeah.

21              (Plaintiff's Exhibit No. 182 previously

22  marked)

23       Q.    (By Mr. Castillo)  Okay.  Well, let me show you

24  Plaintiff's Exhibit No. 182.  Again, this is a document

25  within you all's files.

Draft Copy

Page 70

1          MR. CASTILLO:  Here you go.

2     Q.   (By Mr. Castillo)  Do you remember ever

3  reviewing that?

4     A.   I don't remember this specific Exhibit 182, but

5  this is representative of the kind of publication that

6  we would receive from time to time.

7          (Plaintiff's Exhibit Nos. 179, 180, and

8  181 previously marked)

9     Q.   (By Mr. Castillo)  All right.  Well, let me

10  show you some others and then we'll talk about them

11  collectively, 179 -- Plaintiff's Exhibit 179, 180, and

12  181.  Again, those are documents from you all's files.

13          MR. MADRID:  What were those numbers?

14          MR. CASTILLO:  179, 180, and 181.

15          MR. MADRID:  Do you have those available?

16          MR. ABRAHAM:  Yeah.  You mean this?

17          MR. CASTILLO:  The others ones.  179, 180,

18  181.

19          MR. ABRAHAM:  I'm sorry.

20          MR. MADRID:  Thank you.

21          MR. ABRAHAM:  I was still looking at the

22  old one.

23          MR. MADRID:  Huh?

24          MR. CASTILLO:  He was still looking at the

25  old one.

Draft Copy

Page 71

1          MR. MADRID:  Still looking at these.

2   Thank you.

3      A.   Okay.

4      Q.   (By Mr. Castillo)  Have you seen Plaintiff's

5   Exhibit No. 179, 180, and 181 before?

6      A.   Not that I recall.  I may have.

7      Q.   Okay.  And these were again documents that were

8   produced by Ben Barnes Group in connection with this

9   litigation.

10     A.   Okay.

11     Q.   Anybody within the Ben Barnes Group review some

12  of the financial performance of the Stanford

13  International Bank?  For instance, Plaintiff's Exhibit

14  No. 179.

15     A.   I don't know that anybody in the Ben Barnes

16  Group reviewed it, studied it, analyzed it, did anything

17  other than receive it and read it.

18     Q.   Okay.  And earlier in your testimony you talked

19  about even after you sign on a client, you read what's

20  publicly available, you look at whatever might be out

21  there concerning your client, correct?

22     A.   Sure, we try to stay informed about what our

23  clients are up to.

24     Q.   And if you -- if someone would look at

25  Plaintiff's Exhibit 179, the last page kind of sets

Page 72

1    forth kind of what the rates of return of Stanford

2    International Bank flex CD rates were.  See that?

3        A.    I do.

4        Q.    Okay.  Anything with Stanford's description of

5    what was it was able to pay on certificates of deposit

6    that came to your attention?

7        A.    No.

8        Q.    That raised a concern?

9        A.    No.

10       Q.    That made you think how can Stanford provide

11   these rates of return in 2006 compared to what U.S.

12   companies could do on rates of return?

13       A.    No.

14       Q.    Do you know whether it was higher or lower than

15   the U.S.?

16       A.    I don't know.

17       Q.    Nobody ever made a determination -- I mean,

18   nobody even looked at it within the Ben Barnes Group?

19       A.    I don't know if anybody --

20            MR. MADRID:  Objection, form.  Go ahead.

21       A.    I don't know if anybody did or not; I did not.

22       Q.    (By Mr. Castillo)  Did you -- anybody within

23   the Ben Barnes Group look at what Stanford International

24   Bank was doing in order to be able to pay these rates of

25   return in 2006?

Page 73

1      A.    I don't know.

2      Q.    Did you have an understanding of what type of

3   investment the Stanford International Bank had in the

4   2006 -- 2006-2007 time frame?  Did you have an

5   understanding?  I know what it says on paper.

6      A.    No, I -- is what investments the Stanford group

7   had?  No, I don't -- I didn't -- didn't do a study of

8   that or...

9      Q.    And do you know why Stanford International Bank

10  was providing reports such as this to the Ben Barnes

11  Group 2006 and 2007?

12     A.    I think it was simply a matter of course that

13  they provided to a whole lot of people, was my

14  impression.  That this was widely -- you know, this

15  information was widely disseminated and that we were on

16  the -- on the mailing list, if you will.

17     Q.    Why?

18     A.    I don't know that, but, I mean, that's just

19  kind of my impression.

20     Q.    Why would they send it to the Ben Barnes Group?

21     A.    Because they were a client of ours.  And

22  they -- you know, I'm sure -- you know, why -- why would

23  they send it to anybody other than to talk about what

24  they had been doing and what they were up to and to

25  provide their analysis.

Page 74

1    Q.   Okay.  Well, I could understand why they would

2    send it to investors, that's to get them to send their

3    money in, but why would they send it to the Ben Barnes

4    Group?

5    A.   Because --

6              MR. MADRID:  Objection, form.

7    A.   Because they were our client and --

8    Q.   (By Mr. Castillo)  And?

9    A.   I'm sure they wanted us to know what they were

10   doing.  I -- I don't know -- I mean, I didn't ask

11   anybody, "Why did you send it to us," that's just my

12   impression.

13   Q.   Impression was that they wanted you to know

14   what they were doing.

15   A.   Yeah.

16   Q.   Okay.  Did anybody look at this information in

17   order to use it vis-a-vis the lobbying efforts?

18   A.   Not that I know of.

19   Q.   What -- look at the Stanford Eagle -- you have

20   that in front, the thick one.

21   A.   Uh-huh.

22   Q.   Plaintiff's Exhibit No. 179?  I mean 182.

23   A.   182?

24   Q.   Yes, sir.

25   A.   Uh-huh.

Page 75

1    Q.    Do you remember receiving this, reviewing

2    this -- or receiving this first?

3              MR. MADRID:  Objection, asked and

4    answered.  Go ahead.

5    A.    Yeah, I don't -- I don't recall.  This looks

6    like the kind of document that was annually distributed

7    by the Stanford entities.

8    Q.    (By Mr. Castillo)  Did you use it for any

9    purpose?

10   A.    I did not, no.

11   Q.    Do you remember even reviewing it?

12   A.    I remember -- yeah, I remember looking at it

13   when it came in the office.

14   Q.    Okay.  I got the impression that Mr. Barnes is

15   not the detail person within the Ben Barnes Group; is

16   that accurate?

17   A.    I think that would be a fair statement.

18   Q.    So if someone were to look at this to digest

19   some of the information, who would that fall on?

20             MR. MADRID:  Objection, form.

21   A.    It would --

22   Q.    (By Mr. Castillo)  Within the Ben Barnes Group.

23   A.    It would -- it would -- it would go to me or we

24   have interns from time to time who do research projects

25   for us.  We might have asked that -- that person -- that

Page 76

1   task may have fallen to that person.

2       Q.   Do you remember anybody getting the task of

3   reviewing the information in order to give Mr. Barnes a

4   synopsis?

5       A.   No, I don't recall us doing that.

6       Q.   Plaintiff's Exhibit No. 181 --

7            (Plaintiff's Exhibit No. 185 previously

8   marked)

9            MR. MADRID:   Let me see that.   Okay.

10      Q.   (By Mr. Castillo)   Do you remember seeing that

11  e -- that e-mail before?

12      A.   I don't.

13      Q.   Okay.   And it looks like it predates your

14  coming to the Ben Barnes Group.

15      A.   Yes.

16      Q.   Do you know why Ben was providing the

17  information -- company brochures to the Cohen Group?

18      A.   The Cohen Group is a well-known strategic

19  consulting firm in D.C., has a -- kind of a who's who

20  roster on their team.   My impression is that Ben was --

21  was talking to them about possibly representing the

22  Stanford entities.   I don't know that, but that's what

23  it sounds like from reading the -- reading the e-mail.

24      Q.   And -- and what does the Cohen Group do?

25      A.   Well, they do a lot of international analysis

Page 77

1    and strategy.  A former Secretary of State as I recall

2    named Cohen is part of group, several former high

3    ranking State Department officials.  I -- I can't

4    remember who all is affiliated with them, but they're a

5    well-known entity in D.C..

6        Q.    So why was -- why was Ben Barnes talking to the

7    Cohen Group in connection with Stanford?

8        A.    I -- I don't know.

9              (Plaintiff's Exhibit No. 188 previously

10   marked)

11       Q.    (By Mr. Castillo)  Let me show you Plaintiff's

12   Exhibit No. 188.  I know we were flipping around just a

13   little bit, but just -- I told you earlier that I would

14   show you an e-mail about the IRS and the FBI and the SEC

15   investigating.

16       A.    Uh-huh.

17       Q.    Have you seen Plaintiff's Exhibit No. 188

18   before?

19       A.    I don't remember it.  It's certainly addressed

20   to me.  I have no reason to doubt that it's -- I know

21   the writer, Mr. Rogers.

22       Q.    Okay.  Prior to February 15, 2009 were you ever

23   aware that the SEC was investigating Stanford?

24       A.    No.  I -- I mean, I -- I think I knew about it

25   when the whole world knew about it, when it was in the

Page 78

1    newspaper, when it was first reported.  I don't think we

2    knew about it before that -- or I didn't know about that

3    before that.

4        Q.   Other than that e-mail where you saw that Ben

5    Barnes was asking Allen Stanford to talk to him about

6    the SEC matter, anything else within the Ben Barnes

7    Group that shows that Ben Barnes knew about the SEC's

8    investigation of Stanford Financial?

9             MR. MADRID:  Objection, form.

10       A.   I'm going to have to get you repeat that.

11       Q.   (By Mr. Castillo)  All right.  We saw the one

12   e-mail where Mr. Barnes was wanting Allen Stanford to

13   call him concerning the SEC matter, correct?

14       A.   Correct.

15       Q.   Anything else within the Ben Barnes Group

16   concerning the SEC?  Any other document that you

17   remember seeing?

18       A.   No.

19       Q.   Okay.  Were you -- were you involved in the

20   production of documents that were requested by the

21   receiver?

22       A.   Yes.

23       Q.   And was there a search made of all of the Ben

24   Barnes Group computers?

25       A.   Yes.

Page 79

1      Q.    Okay.   Were there any documents that were

2   destroyed prior to February 2009?

3                MR. MADRID:   We are getting far afield of

4   the topics, Jesse, for which he has been designated.

5   Now, this is a general -- you're get into a general

6   deposition now that goes way beyond these seven or eight

7   areas there.

8                MR. CASTILLO:   You don't think I -- I'm

9   tying it to something?

10               MR. MADRID:   No, you're -- you're on a

11  fishing expedition and, you know, I mean, while I'm

12  happy to tolerate some of this, you know, we've tried to

13  accommodate.   So if you would, let's stick as best we

14  can to these.

15               MR. CASTILLO:   Well, I think I am.   If you

16  want to object and tell him not to answer.

17               MR. MADRID:   I'm object -- I'm not going

18  to tell him not to answer yet, but...

19               MR. CASTILLO:   Yet, okay.   Well, maybe

20  I'll --

21               MR. MADRID:   Okay.

22               MR. CASTILLO:   -- I'll get to the point

23  where I won't test your patience.

24      Q.    (By Mr. Castillo)  Now, Wayne Rogers, that

25  wrote this -- this e-mail to you, was he a subcontractor

1    of the Ben Barnes Group?

2         A.   He was for a period of time.

3         Q.   And what was Wayne Rogers' company?

4         A.   He had an alternative energy business and my

5    memory is that Stanford was interested in starting an

6    alternative energy business in the Caribbean.  But, now,

7    that's about as much as I know.

8         Q.   Was Allen Stanford interested in investing in

9    Wayne Rogers' company?

10        A.   I don't know.

11        Q.   Was there an agreement between Ben Barnes Group

12   and Wayne Rogers' company?

13        A.   Well, there wasn't a written agreement that

14   I -- I recall.  I think that -- that Wayne was paid to

15   go evaluate, you know, the possibility of doing some

16   kind of -- taking his wind energy business to -- to

17   Antigua, and I -- I don't recall what all Wayne was

18   supposed to do.

19        Q.   Okay.

20        A.   That was -- that was really between Ben and

21   Wayne.

22        Q.   I was looking at the chart that Kerri performed

23   and I did ask her about one contract, and that was the

24   Cauthen Forbes & Williams.

25        A.   Right.

Page 81

1       Q.   And that was the only contract that I was able

2    to see in the documents that you provided.  Do you know

3    whether or not there was a written contract with

4    Synergenics (phonetic) Energy?

5       A.   I don't recall there being one.

6       Q.   How about with Capitol consult -- Consulting?

7       A.   I don't recall there being one.

8       Q.   How with Chesapeake Enterprises?

9       A.   No.

10      Q.   How about with Mitch Delk?

11      A.   No.

12      Q.   How about with Sharp & Barnes?

13      A.   No.

14      Q.   Why is that?

15      A.   Well, these were handshake deals.  In the case

16   of John D. Raffaelli of Capitol Counseling or whatever

17   the company, Capitol Consulting, we've known John D. for

18   years.  He's a well-known expert in tax policies, was

19   Lloyd Bentsen's tax counsel when he was on the United

20   States Senate and chairman of the Senate Finance

21   Committee, and we needed tax expertise, so we hired

22   John D..

23            Jeff Forbes was an expert in the Senate

24   policies, a former staffer to then chairman Max Baucus,

25   and we thought he could provide us insights and

Page 82

1    help in analyzing the different tax proposals that we

2    had.  So Jeff decided to submit a written contract.  We

3    really didn't know Jeff that well, Jeff Forbes.  So I

4    assume he did things on a more -- on a more formal

5    basis.

6                  Scott Reed of Chesapeake Enterprises --

7    Scott Reed is Chesapeake Enterprises.

8         Q.    Yes, sir.

9         A.    Scott's a friend, business associate, he

10   currently subleases a floor from us in our Washington,

11   D.C. office and I don't think Scott, you know, saw the

12   need to have a written contract.

13                 So there wasn't a written agreement

14   because we knew those folks, and they trusted us and we

15   trusted them and didn't see the need for one.

16        Q.    Okay.  Same thing with Sharp & Barnes?

17        A.    Yeah, that's Jim Sharp, who is a partner with

18   Ben in various enterprises.  Jim's a former U.S.

19   attorney who -- who has some expertise in a variety of

20   fairly arcane matters, including representing baseball

21   players who are in trouble.

22        Q.    Okay.  But we -- you know, you were talking

23   about the reason that you didn't have written contracts

24   with these individuals other than with Cauthen Forbes.

25   In the Cauthen Forbes, at least we could see what

Page 83

1   services they were providing to the Ben Barnes Group,

2   correct?

3       A.   Right.

4       Q.   Were any of those ever passed by Stanford to

5   approve before you entered into them?

6       A.   I'm sure we told somebody at the Stanford

7   entities, more than likely Yolanda, that we were about

8   to hire Jeff Forbes.  Yolanda may have interviewed Jeff

9   Forbes before we did so; I don't know that.  She's

10  pretty thorough and -- and I -- I'm -- while I don't

11  have independent recall of that going on, I'm -- I'm

12  sure that we just didn't do that on our own.

13      Q.   Let me -- let me try my question again.

14      A.   Okay.

15      Q.   Do you know whether any of these agreements

16  were approved by Stanford before these contractors were

17  hired?

18      A.   I do not know.

19              (Plaintiff's Exhibit No. 177 previously

20  marked)

21      Q.   (By Mr. Castillo)  Do you know whether the

22  contract, Plaintiff's Exhibit No. 177, was provided by

23  Ben Barnes Group to Stanford before Ben Barnes Group

24  signed it?

25      A.   It -- what is 177?

Page 84

1      Q.    The Forbes contract.

2      A.    I -- I don't know.

3            (Plaintiff's Exhibit No. 186 previously

4   marked)

5      Q.    (By Mr. Castillo)   Okay.   Pull Plaintiff's

6   Exhibit 186.   It's the one that's Kerri's notes.   I'm

7   sure way in the bottom, sir.   Near the bottom.

8      A.    I don't think I have that one.   Okay.   Now I

9   have it.

10     Q.    We're going to cover some of the payments and

11  what Ben Barnes Group did to -- to earn those fees.

12     A.    Okay.

13     Q.    And I think I heard you testify earlier you

14  don't know what was done before June 30, 2005 for the

15  million dollars, correct?

16     A.    Correct.

17     Q.    According to this, the next payment was in

18  January of '06 of $20,000 and it seemed to be right

19  there -- it's annotated that it was for the Third Border

20  Report, correct?

21     A.    Yes.

22     Q.    How about February of '06, a payment of half a

23  million dollars, 500,000, February 28, 2006?   What was

24  done between June '05 and February '06 for the $500,000?

25     A.    Well, I don't know the specific activity during

1    that specific time.  We were on a general retainer

2    agreement that called for us to assist the Stanford

3    entities when problems arose.  I think it was during

4    that period of time that -- and -- and I'm not positive

5    about the calendar, but -- but we did a variety of

6    things including helping Stanford acquire an airline.

7    We worked with him on the -- this huge international

8    cricket tournament that he had.  He wanted it to be

9    televised, and we introduced him to the ESPN executives

10   who Ben knew from a prior life.  That resulted in kind

11   of a bidding war, if you will, between Skype and ESPN

12   and Skype ended up -- I think it was Skype -- Sky, I

13   think, not -- Skype is the telephone service.  Sky is

14   the international broadcasting company.  So it was

15   broadcast internationally.

16            Stanford wanted the Cuba cricket team to

17   be able to participate, and there was a ban under the

18   old fact regulations for getting -- allowing the Cuban

19   team to come participate, and we tried to get that

20   waived, unsuccessfully I might add.  So we did a variety

21   of things to -- to represent the Stanford group.

22            At this time we were also beginning this

23   major effort to -- to deal with the tax policies, and

24   any time you are talking about changing tax policies in

25   Congress, it's a heavy lift.  And so the Third Border

Page 86

1    Report served as the underpinning, if you will, the

2    basis to help us lay the groundwork to focus on the

3    importance of the Caribbean to the United States.  And

4    after 9/11 there was a lot of emphasis on the south

5    border and the north border, but very little about the

6    Caribbean, and we used that report as -- which we felt

7    was pretty intellectually solid and fairly academically

8    pure to -- to lay the foundation for some of those

9    proposed changes.  So we did a variety of things during

10   that period of time.

11        Q.   All right.  And my question was very specific,

12   it was between June of '05 and February of '06.

13        A.   I'll --

14        Q.   Are you say -- hold on.  That was my question.

15   And so the question again is are you saying that

16   everything you just described occurred between June of

17   '05 and February of '06?

18        A.   No, I'm sorry, I thought I was clear that I

19   didn't have a calendar in front of me to be able to

20   pinpoint the exact -- exact things, but that's the

21   nature of what we did for the Stanford group regardless

22   of the time frame.

23        Q.   Okay.  But I'm -- my question is specific.  Is

24   there anybody that can tell us what was done between

25   June of '05 and February '06 for the invoice for

Page 87

1    $500,000?

2        A.   Yes, I could tell you that.  I'd have to go

3    look at the documents, I'd have to study them, I'd have

4    to look at the dates they were generated, and I'd have

5    to look at -- look at the calendars to the extent that

6    they might tell us something.  I'd have to piece back

7    together, reconstruct if you will --

8        Q.   Right.

9        A.   -- exactly when those services were rendered to

10   be able to put them in the --

11       Q.   Have you been able to do that to date?

12       A.   I have not.

13       Q.   Have you been asked to do that?

14       A.   I have not.

15       Q.   Up until the minute I asked you right now

16   whether or not anyone could testify about what was done

17   between June of '05 and February '06, no one has ever

18   asked you that?

19       A.   No.

20       Q.   And so you would -- you would have to look at

21   all of the documents within the Ben Barnes Group to be

22   able to reconstruct that?

23       A.   Yeah, I'd want to -- I'd want to create a

24   chronology.

25       Q.   And do you remember what the arrangement was --

Page 88

1    strike that.

2              Was there a new arrangement after

3    January 5th, 2005, after the million dollars was paid,

4    on what would be charged going forward?

5    A.   Not that I'm familiar with.

6    Q.   So what did you understand was the payment

7    arrangement between Stanford and Ben Barnes Group?

8    A.   You know, I -- I will admit that I was less

9    informed about the arrangements -- the financial

10   arrangements between the Stanford groups and -- and the

11   Ben Barnes Group than I normally am.  Those were done by

12   Allen Stanford and Ben and Yolanda, and for whatever

13   reason I was not a part of that negotiation.  Normally I

14   am -- or I am now.  I guess I wasn't at the time; I was

15   still fairly new.

16   Q.   Have you come to learn what that arrangement

17   was of what was going to be billed to Stanford in '05?

18   A.   Well, I can, you know, reconstruct it by

19   looking at the -- at the documents, this -- at this --

20   at this Exhibit 186.

21   Q.   Okay.  What was the deal between Allen Stanford

22   and Ben Barnes in '05?

23   A.   Well, based upon -- on these documents, Ben had

24   done -- the Ben Barnes Group had done work prior to June

25   of '05.

Draft Copy

Page 89

1      Q.    Got that.

2      A.    And then after June of '05 I don't know what

3    the specific arrangements were.

4      Q.    Monthly fee, fixed fee?

5      A.    I don't -- don't know.

6      Q.    Who would know?

7      A.    Ben or Kerri.  But Kerri wasn't there at the

8    time, as you know, so she'd have to try to reconstruct

9    it.

10     Q.    Because there is nothing in writing.

11     A.    I assume there would be, that's correct,

12    nothing in writing.

13     Q.    And do you have -- you can't tell us what the

14    arrangement was in '05 between Ben Barnes Group and

15    Stanford Financial.

16     A.    No.

17     Q.    How about between February '06 and February

18    '07?  Because we see the 500,000-dollar payment on

19    February of '06 and then we see the monthly billing

20    starting at the top of Kerri's chart, Plaintiff's

21    Exhibit 186, of 325,000 billed February '06.  Do you see

22    that?

23     A.    Yes.

24     Q.    What was the arrangement between February '06

25    and February '07?

Page 90

1     A.    I don't know the specific terms of the

2  arrangement.

3     Q.    Or what was done in that one year?

4     A.    I -- I can't allocate.  I know we worked on the

5  tax initiative, that was front burner, occupied a lot of

6  time, a lot of attention, a lot of analysis.  We worked

7  very closely with the law firm of Winston & Strawn who

8  represented the U.S. Virgin Islands, and we worked with

9  their tax counsel and their consultants and their

10  lawyers.  It was a massive undertaking.

11     Q.    Okay.  How much of the amount billed between

12  February '06 and February '07 was attributed to the tax

13  issue?

14     A.    I can't give you a specific.

15     Q.    Who would know?

16     A.    I mean, we -- we were on, again, a general

17  retainer.  We didn't allocate our time.  When -- when

18  the Stanford group -- if Yolanda called us and said she

19  had a problem, we -- we tried to solve it for her or

20  tried to find a solution.  So I would say that the --

21  the predominant amount of time was devoted to the tax

22  issue.  It was a heavy lift.

23     Q.    Okay.  Can you tell us what the fee arrangement

24  was between that time period?

25     A.    No.

1      Q.    Okay.  Can you attribute how much of that fee

2    that was paid was to the cricket tournament, to the tax

3    planning, to the airline?

4      A.    No, we didn't break it down.

5      Q.    Who would be able to tell us that?

6      A.    I don't think anybody would, because we did not

7    break our -- again, maybe I'm not expressing myself

8    clearly.  We were on a general retainer.  That meant

9    when they had an issue that involved a problem of some

10   kind that dealt with some aspect of -- of government or

11   kind of the public sector, if you will, we were one of

12   the people, if not the person, that -- that -- that the

13   Stanford entities called.

14              So when it became apparent that Stanford

15   wanted an airline, in talking with Ben he learned that

16   Ben had been on the board of -- TTI, I think was the

17   name of the airline that preceded Continental Airlines,

18   and Ben was on the board of Continental Airlines for a

19   while and Ben had expertise -- some expertise in that

20   area.  And so I think -- my understanding is that even

21   though I wasn't involved in the airline negotiations was

22   that Ben spent a good deal of time helping Stanford

23   acquire those airlines.  That's an example.  That 's not

24   the -- exhaustive by any stretch, but it's an example of

25   what we were on a retainer to do.

Page 92

1      Q.   Okay.  So I get -- I get from your answer that

2   the Ben Barnes Group was on a retainer, the terms of

3   which you really don't know.

4      A.   I don't know the specific dollar amounts.  I

5   know -- I know that the scope of work was pretty all

6   encompassing.

7      Q.   Okay.  That wasn't my question.  My question

8   was you don't know what the terms of the monthly

9   retainer were.

10      A.   I don't know what the terms of the monthly

11   retainer were other than by looking at the records of

12   payment.

13      Q.   Well, it doesn't show anything between

14   February '06 and February '07 --

15      A.   Okay.

16      Q.   -- other than a lump sum bill, right?

17      A.   Yeah, that's right.  I --

18      Q.   And what I hear you saying is that your

19   understanding was that the Ben Barnes Group was on a

20   retainer to deal with whatever problems Allen Stanford

21   brought to the Ben Barnes Group that were within the

22   area of expertise of the Ben Barnes Group.

23      A.   Correct.

24      Q.   If he didn't have that problem, you still had

25   your retainer that month.

Page 93

1      A.    Correct.

2                  MR. CASTILLO:  Why don't we take about a

3      five-minute break.  We have been going about an hour.

4                  THE VIDEOGRAPHER:  Off the record at 4:07.

5                  (Break taken from 4:07 p.m. to 4:18 p.m.)

6                  THE VIDEOGRAPHER:  We're back on the

7      record at 4:18.

8      Q.    (By Mr. Castillo)  I had asked you about

9      Plaintiff's Exhibit 56, and that was that e-mail that

10     Mr. Barnes was sending Mr. Stanford concerning he had

11     some important thoughts regarding an SEC matter.  Do you

12     remember that?

13     A.    I do.

14     Q.    And is it your understanding that -- or what

15     was your understanding of what Mr. Barnes was talking to

16     Mr. Stanford about?

17     A.    I don't have any -- any -- any understanding of

18     that.

19     Q.    I thought --

20     A.    I don't --

21     Q.    I thought you said something about he wanted an

22     SEC lawyer.

23     A.    Well, I think that there was a time, I don't

24     know that this was the time, that Ben either recommended

25     or talked to some lawyers with expertise in SEC matters,

Page 94

1    but I know there was a period of time when -- when that

2    topic was discussed about Yolanda telling Ben, and I may

3    been in the room, that, you know, "We -- we need good

4    SEC representation and don't feel like we have it right

5    now."  And -- or something to that effect.  But I don't

6    remember if it was specifically at this time or not

7    (indicating), the time of -- of December of 2006.

8         Q.    Okay.  Do you remember anything else that

9    Yolanda might have said in that context where you heard

10   her saying, "I need an SEC representation"?

11        A.    No.

12        Q.    Did you ask for anything about why you need an

13   SEC lawyer?

14        A.    No.  I was -- I was more a bystander, if you

15   will.  Those conversations took place between Yolan --

16   Yolanda and Ben and perhaps Allen Stanford it would be.

17        Q.    Do you know if Ben asked, "What do you need an

18   SEC lawyer for?"

19        A.    I -- I don't know.

20        Q.    Did he ask, "Are you regulated by the SEC?"

21        A.    I don't know.

22        Q.    "Are you registered with the SEC?"

23        A.    I don't know.

24        Q.    You don't remember anything -- anything that

25   Ben might have said other than recommendation of an SEC

Page 95

1   lawyer?

2       A.   I think -- all I know about it is that I think

3   Ben mentioned to me, maybe in Yolanda's presence, maybe

4   as they were leaving, maybe as Yolanda was leaving the

5   office and I was coming down from my office -- like I

6   said, it was a passing deal, you know, "We're looking --

7   looking for -- for good SEC representation."  And that's

8   really the extent of what I know about it.

9       Q.   Okay.  My question was you didn't hear anybody

10  else did anything about the SEC and why they needed

11  representation.

12      A.   No.

13      Q.   And no one asked you to look -- follow up on

14  that to look for an SEC lawyer?

15      A.   No.

16      Q.   No one asked you to look at the SEC publicly

17  available documents to determine what was going on with

18  your client Stanford?

19      A.   No.

20               (Plaintiff's Exhibit No. 115 previously

21  marked)

22      Q.   (By Mr. Castillo)  Let me show you Plaintiff's

23  Exhibit 115.  Do you have that in front of you?

24      A.   I do.

25      Q.   What did you mean by where -- your response in

Page 96

1    that e-mail?

2        A.   By my response?

3        Q.   Yes, sir.  This is February 17, 2009 --

4        A.   Right.

5        Q.   -- when the agents are already targeting

6    Stanford Financial Houston, correct?

7        A.   Yeah.  It had to be after that.

8        Q.   That's what it says at the bottom.

9        A.   Oh, I got you, yeah.  Okay.

10       Q.   And then you're talking -- you're sending an

11   e-mail to Max Sandlin.  We talked earlier about Max

12   Sandlin, correct?

13       A.   Well, I think Max e-mailed me first --

14       Q.   Right.

15       A.   -- and then I responded.

16       Q.   Okay.  And your response was, I know -- it

17   says, "Needs legal/crisis

18   management/communication/government team."  "Ouch" - now

19   Stanford -- "now apparently in receivership," and your

20   response is, "I know - we have been more involved than

21   you can imagine."

22            What did you mean by that?

23       A.   Well, at that time, if -- if my memory serves

24   me correctly, we were concerned that -- that Stanford

25   was getting way outmaneuvered in the press, and frankly,

1    we believed he was innocent.  We didn't have any

2    knowledge that he had done anything wrong, and we were

3    operating under the belief that he was getting a bum

4    rap, and Max Sandlin thus suggested that his firm would

5    be a good firm to work on the crisis management part

6    of -- of the issue.

7               So when I said "we have been more involved

8    than you can imagine," that's mostly us talking to

9    Yolanda and to Jim Davis and some to Stanford himself,

10   although I didn't do it, but I know Ben had one or two

11   conversations.  And if I'm not mistaken, I think -- I

12   think Allen Stanford came to our office.  So -- about

13   this time.  And so that's what I meant by "we have been

14   more involved that you can imagine."

15   Q.    More involved in the crisis management?

16   A.    Correct.

17   Q.    Did Ben Barnes Group make any efforts to kind

18   of step aside or step back from the Stanford Financial

19   Group?

20   A.    Well, yeah.  I mean, you know, shortly after

21   the -- Allen was I guess arrested, we, I believe -- I

22   think an FBI agent came to see us.  I visited with him

23   and gave him all our documents and I think I gave him

24   access to our computers or something.  I mean, I

25   remember meeting with the FBI guy and -- or fellows in

Page 98

1    our office.

2         Q.    About vis-a-vis, you know, the public

3    perception of the Ben Barnes Group?

4         A.    What about it?

5         Q.    Make any efforts to distance Ben Barnes Group

6    from Stanford?

7         A.    We didn't publicly disavow the Stanford

8    Financial Group, issue a statement of any kind.

9         Q.    Other than Ben Barnes issuing the Houston

10   press, correct?

11        A.    Yeah, I don't remember what he said.

12        Q.    Were you involved in arranging to get Jim Davis

13   to sign an affidavit about what the Ben Barnes Group did

14   or did not know?

15        A.    I was not.

16        Q.    Do you know who did --

17        A.    I don't --

18        Q.    -- on behalf of the Barnes group?

19        A.    I don't.

20               (Plaintiff's Exhibit No. 112 previously

21   marked)

22        Q.    (By Mr. Castillo)  Let me show you Plaintiff's

23   Exhibit 112.

24        A.    Okay.

25        Q.    Have you seen Plaintiff's Exhibit 112 before?

1    A.    You know, I saw it -- yes, I have seen it.

2    Q.    Okay.  And why was Mitch Delk writing points

3   for Ben to address in response to press inquiries?

4    A.    My recollection is that Mitch was concerned

5   about the spillover effect on the Ben Barnes Group and

6   he in a proactive way -- I don't think anybody asked him

7   to do it -- developed this Exhibit 112.

8    Q.    Okay.  Do you remember using this for any

9   purpose?

10    A.    I don't.

11    Q.    Do you remember doing anything in response to

12   it?

13    A.    I remember getting it, you know, receiving it.

14   I may have talked to Mitch about it some; I talked to

15   Mitch a lot back in those days.

16    Q.    Do you remember talking to him after receiving

17   Plaintiff's Exhibit 112?

18    A.    I don't have a specific recollection.  I may

19   have talked to him about it.

20    Q.    Now, did you -- do you -- well, did you review

21   the document that he prepared that is attached to

22   Exhibit 112?

23    A.    At the time I looked at it, yes.

24    Q.    Anything that you remember in his description

25   of Barnes' roles and responsibilities that you thought

Page 100

1    was inconsistent with what the Ben Barnes Group actually

2    did?

3         A.    I don't recall that being the case.

4         Q.    About any things that the Ben Barnes Group did

5    that are not included in the Ben Barnes roles and

6    responsibilities?

7         A.    I don't think I did that kind of exhaustive

8    study.  So no, I -- I didn't do -- I didn't do an

9    analysis of the document that Mitch prepared to see if

10   it squared up with what we had really done or if he

11   missed anything that -- that we didn't do.  I just

12   didn't do that.

13        Q.    Was Plaintiff's Exhibit 112 and the points that

14   Mitch Delk prepared for you -- for Ben Barnes Group used

15   in responding to any of the interrogatories in this

16   case?

17        A.    Not that I recall.

18              (Plaintiff's Exhibit No. 196 previously

19   marked)

20        Q.    (By Mr. Castillo)  Let me show you Plaintiff's

21   Exhibit No. 196.  Make sure I don't give you anything

22   else, sir.

23        A.    Okay.

24        Q.    Did you have any role in providing the

25   information that's included in the responses to

Page 101

1    interrogatories, Plaintiff's Exhibit 196?

2         A.    Yes, I'm sure I did.

3         Q.    And if you'll look at response to Interrogatory

4    No. 3 that begins on Page 3.

5         A.    Okay.

6         Q.    And compare that to Plaintiff's Exhibit 112.

7    Seems that those track word for word, don't they?

8         A.    It does, yes.  You're right.

9         Q.    Okay.  And then Ben Barnes is the one that

10   verified that the information is true and correct to the

11   best of his knowledge, correct?

12        A.    Correct.

13        Q.    So I guess I'm trying to figure out is there

14   anything in there on Barnes' roles or responsibilities

15   either on Plaintiff's Exhibit No. 112 or Plaintiff's

16   Exhibit No. 196 that is incorrect, didn't do it?

17        A.    That we didn't do?

18        Q.    Yes, sir.

19        A.    Not that I know of, no.

20        Q.    Any of those 14 areas of things that -- the

21   consulting services that you provided to the Stanford

22   parties that are not included in here, that are omitted,

23   that you need to add?

24        A.    I would -- I would have to look at them in some

25   detail, but I -- I'm sure we tried to be as complete as

Page 102

1    we could in answering the interrogatories.

2        Q.    Okay.  Well, it seems to me you took them from

3    this Exhibit No. 112 that was done by Mitch Delk.

4    Right?

5        A.    Well, yeah.  I mean --

6                    MR. MADRID:  Objection, form.

7        A.    -- Mitch -- Mitch knew what we were doing.

8    Mitch was intimately involved in the representation of

9    the client.

10       Q.    (By Mr. Castillo)  But he is not an employee of

11   the Ben Barnes Group?

12       A.    No.  He was officing at the time in our office

13   and was there on a daily basis.

14       Q.    That was a different question.  The question

15   was was he employed by the Ben Barnes Group?

16       A.    He was a subcontractor.

17       Q.    Subcontractor.  Have you made an analysis of

18   what value any of these 14 items had for the Stanford

19   Financial Group investors?

20       A.    No.

21       Q.    How about for Stanford Financial?

22       A.    No.

23       Q.    Any determination of what value you would place

24   on any of these items --

25       A.    No.

Page 103

1    Q.    -- if Ben Barnes was to sell those services?

2    A.    Have I done that evaluation, no.

3    Q.    Yes, sir.  All of these items No. 1 through 14

4    were services provided under the retainer, correct?

5    A.    Correct.

6    Q.    Whatever that retainer agreement was, right?

7    A.    That's correct.

8    Q.    Okay.  And in addition to Mr. Barnes pointing

9    the finger at you saying you would know the answer to a

10   lot of these questions, we issued a deposition notice.

11                 MR. MADRID:  No, I object to the sidebar

12   comments.

13   A.    I'm sorry, what was the question?

14   Q.    (By Mr. Castillo)  Well, I won't make the

15   sidebar comment again, but you have already heard it.

16                 You are here as a representative of the

17   Ben Barnes Group, correct?

18   A.    That is correct.

19   Q.    And you are designated to respond to certain

20   items in the 30(b)(6) notice, correct?

21   A.    Yes, sir.

22   Q.    Do you know which items you are designated to

23   testify about?

24   A.    I believe 3 through 9.

25   Q.    Okay.  And one of the things that you -- Item

Page 104

1    No. 3 is the services that Ben Barnes Group provided to

2    the Stanford parties.  Any knowledge of that other than

3    what's in Plaintiff's Exhibit 112 and Plaintiff's

4    Exhibit 196?

5        A.    There was --

6        Q.    Anything else?

7        A.    Well, there was a document that we prepared for

8    Mr. Sadler early on, which I believe was before the

9    litigation started, and it was a letter, as I recall I

10   think a 22-page letter, and it detailed a little bit of

11   the -- again, it was not an exhaustive listing, but it

12   was illustrative of some of the things that we -- we had

13   done for the Stanford group.  So that -- that would be

14   another source of that information.

15       Q.    Anything else other than what might be on that

16   letter and Plaintiff's Exhibit 196 and Plaintiff's

17   Exhibit 112?

18       A.    In terms of --

19       Q.    Things that Ben Barnes did for Stanford.

20       A.    In terms of a document that I could point to --

21       Q.    No, sir.

22       A.    -- or just -- maybe sure -- maybe I don't

23   understand the question, I'm sorry.

24       Q.    Is there anything else that the Ben Barnes

25   Group did --

Draft Copy

1     A.    Not --

2     Q.    -- other than what's listed on Exhibit 112,

3  Exhibit 196, and the letter to Mr. Sadler?

4     A.    Not that I can think of, no.

5     Q.    Now, Item No. 4 is the services provided by

6  Capitol Counsel, L.L.C..

7     A.    Okay.

8     Q.    What services did they provide?

9     A.    John D. Raffaelli is the principal, I think the

10  founder of Capitol Counsel.  As I testified before, he

11  is an expert in tax policy, he has an LLM in tax, he

12  served as Lloyd Bentsen's tax counsel, may have gone

13  with Senator Bentsen when he went to the Secretary of

14  the Treasury and is widely perceived as a expert on tax

15  policy, how tax policy is made and legislation

16  concerning tax policy.  He is, as I said, widely

17  respected and knows a lot about both the international

18  aspects as well as the domestic tax policy issues.

19     Q.    All right.  So those --

20     A.    So he -- he -- Capitol Counsel, particularly

21  John D..  Now, John D. had some people working with him

22  who also were tax experts.  There was guy named Jim

23  Gould, J-o-u-l-d [sic], who was a -- was -- he was -- he

24  was really a tax expert, and they were, you know,

25  intimately involved in the discussions, the analysis,

Page 106

1    reviewing the options, trying to articulate the

2    underlying policy, and -- and actually deal with a very

3    arcane part of the tax code that applied particularly to

4    the U.S. Virgin Islands.  So John D. was an invaluable

5    member of the team in -- in rendering those services.

6        Q.    And the terms of his compensation, was it

7    monthly fixed fee?

8        A.    Yes.  I think it was 20 a month, but I'm not

9    sure.

10       Q.    Was it only in connection with the U.S. Virgin

11   Island tax initiative?

12       A.    He worked exclusively on the tax issues.

13       Q.    Okay.  And when did the tax issues end when it

14   didn't look like that bill was going to get anywhere?

15       A.    Well, as is often the case in formulation of

16   legislation, they have several lives and several

17   iterations.  So we had had hopes at one point in the

18   process that the regulation would be changed, and it was

19   not, and so we went back to the drawing board, if you

20   will, to -- to -- to try to find a legislative solution,

21   building a coalition with some of the other Caribbean

22   countries, the -- there is a Caribbean economic

23   development group, the U.S. Virgin Islands, working with

24   them and their lawyers.  So, you know, I don't know that

25   it ever really died in terms of Mr. Stanford and the

1    Stanford entities wanting to change it.  I mean, I think

2    that was still on our agenda when all these troubles

3    began for him.

4        Q.   So your understanding was that tax initiative

5    was still on the agenda all the way through February

6    '09?

7        A.   I believe that's correct, yes, sir.

8        Q.   You haven't seen anything internally where

9    Mr. Stanford had already given up on that issue in 2007?

10       A.   No.

11       Q.   Okay.  So your testimony is that work, whatever

12   Capitol Counsel was doing, continued on the tax

13   initiatives all the way -- for each of its payments?

14       A.   Yes.

15       Q.   All right.  Did you ever learn of any concern

16   that was expressed internally that Stanford did not vet

17   for contributions, political contributions?

18       A.   We had an issue where one of the committees --

19   one of the political committees didn't want to take a

20   Stanford contribution because of the fact that he had an

21   offshore business and we retained an election expert to

22   help advise him on that.  I honestly don't recall the

23   outcome.

24       Q.   Any of the work that the Ben Barnes Group did

25   in exchange for the retainer involve that effort?

Page 108

1        A.    Yeah, we worked with that lawyer to try to

2    explain the facts to him to -- to try to help understand

3    the situation, had several meetings with him, expedited

4    him talking -- that lawyer talking to the Stanford

5    personnel; I believe it was Yolanda.  So we were -- we

6    were involved in -- in helping get that service

7    rendered.

8              (Plaintiff's Exhibit No. 81 previously

9    marked)

10       Q.   (By Mr. Castillo)  Okay.  Let me show you

11   Plaintiff's Exhibit 81.

12       A.    Okay.

13       Q.    Do you recall seeing that?

14       A.    I don't.

15       Q.    Do you remember -- let me get Mr. Madrid his

16   copy.

17              MR. MADRID:  Here, I'll look over your

18   shoulder.

19              MR. ABRAHAM:  Here you go.

20              MR. MADRID:  Thank you.

21       Q.   (By Mr. Castillo)  Any discussions concerning a

22   need to discuss Stanford Financial with the Democratic

23   senate leadership and staff?

24       A.    I believe this -- this is the -- the issue that

25   I was talking about --

Page 109

1      Q.    Okay.

2      A.    -- that I was referring to just -- just now.

3      Q.    Yes, sir.  That's why I showed you Plaintiff's

4  Exhibit 81.

5      A.    And, okay, your question is?

6      Q.    Do you remember having discussions concerning

7  having to talk with the Democratic senate leadership

8  within the Ben Barnes Group, discussions within the Ben

9  Barnes Group about that?

10     A.    Yes.

11     Q.    Okay.  And with whom?

12     A.    That would have been Wyeth Wiedeman, who is

13 part of the Ben Barnes Group, Ben, and me.  More Wyeth

14 probably because Wyeth deals with the political end more

15 of what we do; he participates in fundraising, political

16 events.  So that -- that would have been what we did.

17     Q.    Okay.  And obviously Plaintiff's Exhibit 81

18 speaks for itself, and it first talks about the context,

19 the reason for meeting, correct?

20     A.    Correct.

21     Q.    And apparently -- do you know who the "we" is

22 when it says, "We have been told by DSCC Finance that he

23 does not 'vet' for reasons that" -- appear to be linked

24 to the perception of his company, owns two major banks

25 in Antigua, and it goes on, among other business

Page 110

1    interests around the world, has lobbied for weakening of

2    US money laundering laws and regulation of offshore

3    banking.

4              That's the third bullet point.  Who is the

5    "we"?

6        A.   I don't know.

7        Q.   And do you know who had the concern that

8    political circles that Allen or his companies weren't

9    going to be able to contribute?

10       A.   Well, I think Allen wanted to participate.

11   Yolanda wanted the Stanford group to participate, and as

12   reflected in this Plaintiff's Exhibit 81, there was some

13   reluctance on behalf of the Democratic Senatorial

14   Campaign Committee to accept his contribution.

15       Q.   And what was your understanding of what that

16   reluctance was?

17       A.   This perception that -- that he had this

18   offshore business.  I don't know that he had ever

19   lobbied for weakening of U.S. money laundering laws.

20   The next -- the next bullet says, "That perception is

21   completely inaccurate."  Notice that it says Allen has a

22   reputation for integrity, charitable works and upholding

23   the highest standards of ethics and the public interest

24   that Allen has spent a lifetime building.  So I think we

25   believed there was a misperception --

Page 111

1      Q.    Okay.

2      A.    -- at the DSCC about whether they should or

3   could take the contribution.

4      Q.    The DSCC had this perception about Allen

5   Stanford, correct?

6      A.    I think they -- yeah, they -- they -- they were

7   reluctant to take the contribution.

8      Q.    Because they had a perception about

9   Mr. Stanford, right?

10     A.    Yes, as reflected in the bullet No. 3.

11     Q.    And your group was saying that that perception

12  was completely inaccurate.

13     A.    Our group --

14            MR. MADRID:  Objection, form.

15     A.    -- as well as I think the lawyer that was

16  retained to -- to advise us on this.

17     Q.    (By Mr. Castillo)  And what was done within the

18  Ben Barnes Group to determine that that perception was

19  completely inaccurate?

20     A.    Well, we -- we -- again, we hired this lawyer

21  to see if there was anything about the campaign laws

22  that because of the fact that Stanford had the banks in

23  Antigua that would prevent -- cause the DSCC not to take

24  that contribution, and I believe it was concluded that

25  there was no reason for the DSCC to have that concern.

Page 112

1    And as you can see in -- again, I -- I think this memo

2    fairly clearly speaks for itself.

3        Q.    My question to you, sir, when we started on

4    this path is what did the Ben Barnes Group do to arm

5    itself with facts to go to the DSC and show them that

6    they had a misperception.

7        A.    We -- we worked with our outside counsel to

8    determine exactly what the facts were about Stanford's

9    operations and to ensure that there was no legal or

10   ethical reason for the DSCC not to take that

11   contribution.

12       Q.    Okay.  So let's flip to the second page of

13   Plaintiff's Exhibit 81.  Maybe you can help me with

14   that.  What did Ben Barnes Group do to determine that in

15   1996 the government at Antigua asked Stanford to help

16   rewrite the country's banking laws?

17       A.    What did we do?  We determined that the

18   government of Antigua had asked Stanford to -- to

19   strengthen the banking laws.

20       Q.    How did you do that?

21       A.    We did that through a variety of -- of methods;

22   I think we looked at correspondence, we talked to

23   Ms. Suarez, you know, Yolanda Suarez, and, you know,

24   looked at the record, whatever the record was.

25       Q.    Would you have kept copies of whatever you did

Page 113

1    in connection with the inquiry concerning the 1996

2    government of Antigua --

3        A.   We --

4        Q.   -- asking Stanford?

5        A.   We might have, but -- but it also could have

6    been with that -- that firm that -- that did this work.

7        Q.   If you had it, we should be able to have it in

8    the documents.

9        A.   Correct.

10       Q.   All right.  What about the last bullet point on

11   page -- on the second page, about Stanford learning that

12   a Mexican drug cartel had deposited 3 million in his

13   bank?  Where did you get that information?

14       A.   I'm not familiar with that particular bullet

15   part of those facts.

16       Q.   Were you ever provided an article from the

17   Mexican press where someone was detained carrying large

18   amount of checks in Mexico that were destined for

19   Stanford International Bank in Antigua?

20       A.   I don't remember any such article.

21       Q.   I guess do you remember doing anything if you

22   had seen something like that?

23       A.   I did not.

24       Q.   So what was the -- the result of this effort,

25   Plaintiff's Exhibit 81, vis-a-vis vetting Stanford?

Page 114

1      A.    I honestly am going to have to refresh my

2    memory to determine whether the DSCC took the

3    contribution or not.

4                 (Plaintiff's Exhibit No. 184 previously

5    marked)

6      Q.   (By Mr. Castillo)  Let me show you Plaintiff's

7    Exhibit 184.  Do you remember seeing -- have you ever

8    seen Plaintiff's Exhibit 184?

9      A.    Not that I recall.

10     Q.    Okay.  And this is an October 2005 article that

11   comes out of the Mexican newspaper called Reforma,

12   R-e-f-o-r-m-a.  You are aware of that, aren't you?

13     A.    I see this, yes.

14     Q.    Okay.  And was it ever brought to your

15   attention that the Stanford people were sending this to

16   the Ben Barnes Group?

17     A.    Was it brought to my attention that this had

18   been sent?  No, it was not brought to my attention.

19     Q.    And do you know whether or not there was any

20   discussion within the Ben Barnes Group about this

21   article that appeared in the Mexican newspaper in 2005

22   about someone getting caught with a large number of

23   checks destined?

24                 MR. MADRID:  Now, that's no fair; you're

25   the only one who can read this.

Page 115

1      Q.   (By Mr. Castillo)  Oh, it was translated --

2      A.   I was not.

3      Q.   You're not aware that it was translated in

4   English --

5      A.   Mine is not.

6      Q.   -- at Ben Barnes Group?

7      A.   My copy is not translated into English.

8      Q.   Right.  I wanted to show you the Reforma

9   article, and there is a translation within the Ben

10   Barnes Group of this article.

11            MR. MADRID:  Who is testifying, you or

12   him?

13      Q.   (By Mr. Castillo)  A question.

14      A.   I don't know.

15      Q.   Are you aware of that?

16      A.   I don't.

17      Q.   Okay.  And so I take it you don't remember

18   whether Ben Barnes did anything -- Ben Barnes Group did

19   anything in -- in connection with this October 2005

20   article about an employee getting caught with checks?

21      A.   I don't remember if we did anything about the

22   article.

23      Q.   Any concerns --

24      A.   I don't --

25      Q.   -- about the Mexican government detaining

Page 116

1    someone --

2         A.   Again, I --

3         Q.   -- that you can remember discussion within the

4    Ben Barnes Group?

5         A.   I have -- no, I don't -- I don't remember this

6    particular fact.  I do know there was a time when Ben

7    and Jim Sharp went to Mexico to hire a lawyer to help an

8    employee of Stanford, and -- and that's all I know.  I

9    know Ben and Jim went to Mexico to hire a lawyer to help

10   some -- one of the Stanford employees.

11        Q.   Did Ben Barnes Group bill for that separately

12   or was that part of the retainer --

13        A.   Part of the retainer.

14        Q.   -- deal?

15        A.   I'm sorry, I don't mean to speak over you.  It

16   was part of the retainer.

17        Q.   Maybe I got off on this.  You don't know

18   whether Stanford ever vetted then in order to be able to

19   accept contribution -- the Democratic senate leadership

20   was willing to accept Stanford's contributions?

21        A.   I don't recall whether they accepted it or not,

22   no, sir.

23        Q.   Do you know whether the Ben Barnes Group ever

24   facilitated donations to members of the legislature?

25        A.   I think we gave Stanford political advice from

1    time to time, made recommendations about contributions

2    that could be made.  We gave -- you know, we gave them

3    political advice.

4         Q.    What about facilitate in the sense that money

5    was funneled through the Ben Barnes Group?

6         A.    No.

7         Q.    Okay.  Of the amount that was being paid on

8    a -- on a retainer, whatever it is and for whatever

9    services were being provided, was there a responsibility

10   within the Ben Barnes Group to attribute some of that to

11   lobbying versus consulting?

12        A.    I don't recall if we had to break that down or

13   not.

14        Q.    You're aware that the Ben Barnes Group has to

15   report the amount of money it receives for lobbying

16   efforts from a particular client, correct?

17        A.    Correct.

18        Q.    And do you know who was responsible within the

19   Ben Barnes Group to attribute X amount to lobbying and Y

20   to consulting?

21        A.    Susan Martin, Ben's assistant, fills out those

22   forms.

23        Q.    Uh-huh.

24        A.    She makes a determination about the allocation

25   speaking -- after speaking with the person responsible

Page 118

1    for that client.  In this instance she probably would

2    have talked to me, to Ben, and to Wyeth.

3        Q.   Okay.  And how would you have broken that down?

4        A.   I'd have to go look at the records.

5        Q.   I know, but how would -- you would mentally go

6    through that process?  Since you don't keep time, you

7    don't keep track of efforts --

8        A.   It --

9        Q.   -- how do you do it?

10       A.    It is an inexact science and the reporting

11   is -- again, we have on retainer the -- the law firm

12   that specializes in Lobby Disclosure Act and they advise

13   us about how to file our papers.

14       Q.   Do you have to coordinate that with the client?

15       A.   We do.  You have to tell the client, I think.

16   I think I'm right.

17       Q.   Because they have to make a report as well?

18       A.   I think that's right, yeah.

19       Q.   And their report of lobbying fees should match

20   your lobbying income.

21       A.   Yes.

22       Q.   Okay.  Now, I think we were going through

23   the -- your responses to interrogatories -- or your

24   designation of you as a witness and I think we -- I can

25   understand what -- or Item No. 4, the services provided

1   by the following subcontractors, we talked about Capitol

2   Counsel, we have spoken a little bit about Cauthen

3   Forbes and Chesapeake and Mitch Delk and Synergic

4   Energy.  Anything other than what's in the document that

5   show how they were involved that you can describe were

6   the services these people provided?

7        A.   Well, I don't think the documents fully reflect

8   everything that those particular individuals did.

9        Q.   Okay.

10       A.   A lot of -- a lot of the process of

11  representing someone in these circumstances involve

12  strategic meetings and trying to analyze different

13  options that aren't necessarily reduced to writing.

14  So -- I mean, I can give you, if you like, a fairly

15  detailed description of what I think Mitch did, what I

16  think Jeff Forbes did, what I think Scott Reed did, and

17  what I think John D. did.

18       Q.   And can you tie that to a particular payment?

19       A.   Other than in -- reflected in the payments that

20  they received, to my knowledge they -- those guys didn't

21  keep time -- keep time either.

22       Q.   All right.  So they get a monthly retainer.

23       A.   Right.

24       Q.   Right?  And they are going to provide the

25  service that you're Draft to tell us in exchange for all

Page 120

1    those lump sum payments -- I mean those payments as you

2    add them up.

3         A.   Correct.

4         Q.   All right.

5         A.   That's correct.

6         Q.   But you can't tell me specifically on any

7    particular month what they did for that service.

8         A.   No.

9         Q.   Now, one of the areas that you were supposed to

10   be designated to testify about is the services that the

11   Ben Barnes Group provided were of reasonably equivalent

12   value to the creditors and victims of the Stanford

13   parties' Ponzi scheme.

14        A.   (Moved head up and down).  Okay.

15        Q.   Okay?  What was the -- the reasonably

16   equivalent value for the million dollars that was paid

17   June 30, 2005?

18        A.   Well, I think it was reflected in the fact

19   that -- that Stanford and the Stan -- Stanford group had

20   a variety of concerns in the public policy arena.  You

21   hire consultants to give you advice about how to deal

22   with those policy matters.  As we've testified, I

23   believe, I don't know everything that the Ben Barnes

24   Group did prior to the 2005 payment.  I know there was

25   something done that was important or Stanford wouldn't

Page 121

1   have paid it, he wouldn't -- frame of mind to go around,

2   you know, giving money away.

3              MR. CASTILLO:  Oh, I'll object to that

4   answer as non-responsive.

5   Q.   (By Mr. Castillo)  He gave away a bunch of

6   money, but --

7   A.   Well, I mean --

8              MR. MADRID:  Object to the sidebar.

9              MR. CASTILLO:  Yeah.

10  A.   Sorry, I -- he wanted -- he wanted -- he wanted

11  the representation.  He wanted to know that when he had

12  an issue in the Washington arena or in the public policy

13  arena that he had an expert on hand to -- to be

14  available to him, and he, as I've testified, has then

15  called upon the Ben Barnes Group to render those

16  services throughout the period of the representation.

17             So I would think if you compare the amount

18  of money that the Ben Barnes Group was paid over the

19  course of the representation for the services that were

20  rendered and compare that to the rates and payments that

21  are traditionally made for people with commensurate

22  skill and experience that you would find that there was

23  a reasonably equivalent value or -- or whatever the term

24  is.

25  Q.   (By Mr. Castillo)  Okay.  So I hear you saying

Page 122

1    you're -- you're equating the value that you got with

2    what another consulting firm would have gotten paid.

3        A.   I -- I think that's right, yeah.

4        Q.   Okay.  What value did that give to the

5    creditors of the Stanford Financial Group?

6        A.   Well, I think that it inured to the benefit

7    of -- of the Stanford Financial Group, and therefore to

8    the creditors, in that it guided them through some of

9    these public policy problems that they had and helped

10   maintain the value of -- of Stanford Financial.

11               The fact that Stanford, you know, wanted

12   an airline -- now, I think it ultimately failed because

13   Caribbean airlines are notoriously difficult to make

14   money at, but that was -- that was a plus for the

15   Stanford group and for the Stanford creditors.  The

16   cricket -- successful cricket tournament I think was a

17   plus for both the Stanford entity as well as its

18   creditors.  I think it enhanced, you know, the

19   visibility and reputation of Stanford as well as

20   contributed to the bottom line.  So I think all of

21   those, all of those services that we rendered throughout

22   our representation helped the Stanford Financial Group

23   and -- and also helped the creditors.

24       Q.   Now, can you tie any of what you've just said

25   to an actual dollar coming in from any of those business

Page 123

1    ventures into Stanford Financial?

2        A.   No.

3        Q.   Are you aware of whether or not that led to any

4    other increased business opportunities other than taking

5    other victims' money?

6        A.   I don't know how the Stanford finances were

7    conducted.

8        Q.   Even up to this day?

9        A.   I -- I mean, I know what I've read about the

10   Ponzi scheme, but do I know where the proceeds from the

11   cricket tournament went?

12       Q.   If there were any proceeds.

13       A.   No.  But the proceeds --

14       Q.   Well, did Stanford get the proceeds?

15       A.   But the proceeds from --

16            MR. MADRID:  Were you answering his

17   question or were you answering your rhetorical question

18   just now?

19            MR. CASTILLO:  I like his rhetorical

20   question better because it gives you an answer, doesn't

21   it?

22       A.   What is the question?

23       Q.   (By Mr. Castillo)  The question is do you know

24   whether or not there was any benefit received by

25   Stanford Financial Group of the cricket tournament.

Page 124

1          A.    Do I know a dollar and cent amount?

2          Q.    Any -- any dollar and cent.

3          A.    No, I don't.  I do not do --

4          Q.    Any benefit.

5          A.    Yeah.  Yeah, sure.  It -- it -- it enhanced the

6    visibility and reputation of Stanford Financial Group.

7          Q.    That allowed him to prey on other victims,

8    right?

9                MR. MADRID:  This is argumentative.

10         A.    I don't know what it allowed him to do or not

11   to do.

12         Q.    (By Mr. Castillo)  Well, what are the business

13   opportunities came as a result of the increased standing

14   of Stanford Financial Group as a result of the cricket

15   tournament?

16         A.    I don't know.

17         Q.    What about because of the airlines, what other

18   financial opportunity came to Stanford?

19         A.    I have no idea.

20         Q.    How much value did Stanford Financial Group get

21   monetarily as a result of any of those operations?

22         A.    I don't -- I have not done that analysis; I

23   don't have access to those figures.

24         Q.    Your testimony about reasonably equivalent

25   value is you provided the services, Allen Stanford paid

Page 125

1    you for it, so he got what he wanted.

2              MR. MADRID:  Objection, form.

3        A.    I think my answer speaks for itself actually.

4    What's not exactly what I said.

5        Q.    (By Mr. Castillo)  Anything else that you can

6    add to your testimony concerning the reasonably

7    equivalent value that the Ben Barnes Group transferred

8    to Stanford Financial other than the consulting

9    services?

10             MR. MADRID:  Objection, form.

11       A.    Other than the testimony I've offered and the

12   documentation that we provided, that's correct.

13       Q.    (By Mr. Castillo)  That's what I said, anything

14   else.

15       A.    No, I can't think of anything else.

16       Q.    Any testimony about how any of the efforts that

17   the Ben Barnes Group was involved in contributed to the

18   bottom line of Stanford Financial Group?

19       A.    No.

20       Q.    Now, how do you -- tell me how you're

21   determining that whatever the Ben Barnes Group did was a

22   reasonably equivalent value to the dollars paid.

23             MR. MADRID:  Objection, form --

24       A.    Well --

25             MR. MADRID:  -- asked and answered.

1       A.    -- I think I've -- I think I've answered that.

2    I'll be happy to take another stab at it.

3       Q.    (By Mr. Castillo)  Maybe I can understand it.

4       A.    Well, you don't -- you don't hire a consultant

5    or a lobby group in Washington, D.C. to do necessarily

6    job specific tasks.  You hire them to be there, you hire

7    them to be your go-to person when those issues arise.

8    From time to time those issues did arise with Stanford,

9    as we've talked about, and so retainers are paid to have

10   quality people with good reputations and good experience

11   available to you when you need them, and you call upon

12   those people when you need them and if you need them,

13   and Stanford needed us a lot.

14              The work on the tax initiative alone, that

15   alone would have justified the fees paid, because had

16   those tax issues come to fruition, clearly there would

17   have been a great benefit.

18      Q.    To whom?

19      A.    To Stanford and to its creditors.

20      Q.    I represent 300 Mexican nationals that invested

21   hundreds of millions of dollars.  How did any of those

22   efforts impart a value to them?

23      A.    The -- I -- I don't know how they did to the

24   Mexican nationals.  I know that we were hired by the

25   Stanford Financial Group to perform a service.  It was

Page 127

1    an arm's length agreement.  We performed the services,

2    you know, out in the open and we rendered services, we

3    were paid for the services.  I think any experienced

4    person who analyzes the amount of work, the subject

5    matter, the difficulty of the issues, the tasks that we

6    did would agree that there was reasonably equivalent

7    value for the services rendered.

8         Q.    To whom?

9         A.    To the client.

10        Q.    Stanford Financial.

11        A.    Correct.

12        Q.    But my question was very different.  How was

13   that -- how did you impart a reasonably equivalent value

14   to an investor who bought a CD?

15        A.    I don't know exactly how we did that other than

16   the fact that we I think made the contribution to

17   Stanford and Stanford Financial groups then would have,

18   you know, improved their bottom line and the -- their

19   business.  Now, again, how that specifically inured to

20   the benefit of your Mexican national clients I can't

21   tell you, because I don't know the facts of that.

22              MR. CASTILLO:  I'll object to your answer

23   as non-responsive.

24        Q.    (By Mr. Castillo)  You know, you're -- you're

25   experienced in commercial litigation.  Let me try my

Page 128

1    question again.

2                    MR. MADRID:  No, no, listen, all you're

3    doing is -- now you're arguing.  You're picking a fight.

4                    MR. CASTILLO:  No, I'm not.

5                    MR. MADRID:  You're picking fights.  So

6    we're going to take a break.

7                    MR. CASTILLO:  He says "I do not know" and

8    then he adds --

9                    MR. MADRID:  We're going to take break.

10   Jesse, you're just trying to pick a fight with --

11                   MR. CASTILLO:  Oh, I would never try to

12   pick a fight with Senator Caperton --

13                   MR. MADRID:  Sure you would.

14                   MR. CASTILLO:  -- he's too smart for me.

15                   MR. MADRID:  Well, we'll take a quick

16   break here.

17                   THE VIDEOGRAPHER:  Off the record at 5:08.

18                   (Break taken from 5:08 p.m. to 5:14 p.m.)

19                   (Plaintiff's Exhibit No. 178 previously

20   marked)

21                   THE VIDEOGRAPHER:  We're back on the

22   record at 5:14.

23      Q.   (By Mr. Castillo)  Let me show you Plaintiff's

24   Exhibit 178.  This is a internal translation of that

25   article that we showed you earlier that apparently was

Page 129

1  done within the Ben Barnes Group.  Can you identify

2  that?  Can you see that?

3      A.   I see it.

4      Q.   Have you read that before?

5      A.   I don't recall ever reading this before.

6      Q.   And any role that the Ben Barnes Group did in

7  investigating what happened in Mexico?  Other than what

8  you talked about that Mr. Barnes and Mr. Sharp went to

9  help an employee.

10     A.   Yeah, that's -- that's all I know of it.

11     Q.   Do you know why you were being -- why the Ben

12 Barnes Group was being given a copy of this article?

13     A.   I don't.

14     Q.   And you don't recall whether the Ben Barnes

15 Group did anything in response to this.

16     A.   I don't.

17     Q.   Or asked any questions.

18     A.   I -- I -- like I said, I wasn't involved in

19 this.

20              (Plaintiff's Exhibit No. 195 previously

21 marked)

22     Q.   (By Mr. Castillo)  Okay.  Plaintiff's Exhibit

23 195.  This appear -- this is something that Mr. Madrid

24 was kind enough to send me last Friday so I could work

25 over the weekend.  It appears -- he indicated that it

Page 130

1    was a compilation of meetings between certain people on

2    a chronological basis.  Did you have any role in

3    preparing this?

4         A.   I asked the office staff to -- to do the best

5    they could to try to, you know, reconstruct some of the

6    different discrete items that we did.

7         Q.   Yes, sir.  And is this coming off of reviewing

8    all of the documents that you provided in this case or

9    what?

10        A.   I would have to -- this -- this document was

11   handed to me, given to me by Susan Martin.

12        Q.   Okay.

13        A.   I -- I didn't ask her everything she did to try

14   to -- to piece it together.  I know she talked to Kerri

15   about it.  She may have talked to my assistant about it,

16   but I...

17        Q.   And all I'm asking is to make sure that there

18   is not something within the Ben Barnes Group that they

19   went and looked at, either calendars or things that have

20   not been provided.

21        A.   No.

22        Q.   Okay.

23        A.   At least not to my knowledge.  I --

24        Q.   The -- going back to your deposition, the

25   30(b)(6) notice, Item No. 7 was your contention, Ben

1    Barnes Group, that the Ben Barnes Group, L.P. and

2    Mr. Barnes acted with objective good faith in providing

3    services to the Stanford parties.

4         A.   Okay.

5         Q.   Tell me why you contend that.

6         A.   Well, to the world Allen Stanford was an

7    accomplished, successful business person who built a

8    huge successful enterprise.  We dealt at arm's length

9    with Stanford and his professional employees, including

10   Yolanda Suarez, and believed, you know, until the facts

11   revealed otherwise, that -- that -- that his operation

12   was totally legitimate.  Anyone who would have, you

13   know, looked at the way he conducted his business, it

14   was -- it was truly professionally run with professional

15   personnel, you know, well educated, well trained, well

16   certified, and we dealt with real problems that the

17   Stanford Financial Group had.

18              I -- I remember a meeting, a long meeting

19   that we had in the conference room in the basement of

20   our building involving several of the accountants, the

21   lawyers, both internal and external, to talk about the

22   tax policies, the tax alternatives, the -- it was a

23   day-long meeting and it was way more arcane than I, you

24   know, cared to really participate in because it was

25   talking about this provision of the tax code and that

Page 132

1    provision of the tax code, and it was a -- you know, a

2    genuine academic discussion about -- about tax policy.

3    So there was no indication of -- of anything that we

4    could see to believe that anything -- anything was

5    wrong.  I hope that's responsive.

6         Q.   Well, anything else that you used to make the

7    contention that you acted in good faith?

8         A.   Well, we -- you know, again, we -- we -- we

9    worked with his -- with Stanford's designated

10   professionals and found them to be professional and

11   truthful and honest, forthright in -- in their trying to

12   tackle these problems that confronted the different

13   Stanford entities, and so there was nothing that, you

14   know, set off an alarm and nothing that -- that would

15   have suggested to us that this was anything other than a

16   very legitimate, successful business.  And then you

17   couple that with, you know, his being -- having these

18   awards and honors and being knighted and all of the

19   different trappings of success that he enjoyed, and it

20   presented a pretty compelling picture.

21        Q.   Okay.  Anything else?

22        A.   Not that I can think of, no.

23        Q.   Okay.  Because I -- because I -- I think there

24   is two parts to your answer, and one -- and one part I

25   lump it together as you judged -- judged him by the

Page 133

1   company he kept.

2        A.   Okay.

3        Q.   Right?

4        A.   I mean, I -- the --

5        Q.   One, Larry Temple.

6        A.   The -- the -- the people he hired, the people

7   who vouched for him, yeah.

8        Q.   Okay.  He was hanging around with John Cornyn.

9        A.   Right.

10       Q.   He was at the Democratic National Convention in

11   Denver, correct?

12       A.   That's -- I was not there, but I think he was.

13       Q.   He was.

14       A.   Yeah.

15       Q.   And you said that you met with his accountants.

16   Do you remember who it was that you met that -- that

17   constituted his accountants?

18       A.   No, I don't recall.  I just -- Jim Gould was in

19   the meeting.  Jim Gould is a Capitol Counsel consultant,

20   works with Mr. Raffaelli, and Jim is -- and I don't mean

21   this disrespectfully, but he's a true tax nerd and --

22   and knows the tax code in and out.  I know Jim was in

23   the meeting.

24       Q.   Okay.  But somebody that you would attribute to

25   be an accountant within Stanford?

Page 134

1    A.    Other than -- other than Mr. Gould or -- or --

2    no.  I mean -- well, we have a big conference table kind

3    of like this, and -- and I -- and I don't remember the

4    names of who was there, but -- but it was -- it was a

5    large group and they were clearly accountants and

6    lawyers.

7    Q.    We talked about the Mexican newspaper article,

8    talked about the vetting problem, talked about Ben

9    Barnes' memo concerning the SEC, and we've talked about

10   the discussion you might have had with Yolanda talked

11   about SEC as well.

12   A.    Now, the memo concerning the SEC about wanting

13   to talk to Stanford?

14   Q.    Yes.

15   A.    Is that what you're talking -- okay.

16   Q.    Plaintiff's Exhibit 56.

17   A.    Okay, okay.

18   Q.    Do you remember getting involved in trying to

19   do some damage control in an article that was going to

20   come out in Bloomberg?

21   A.    I was not involved in that.  I think I remember

22   hearing about it, but -- I just remember there was a

23   Bloomberg article and a Bloomberg issue.

24             (Plaintiff's Exhibit Nos. 39, 40, and 59

25   previously marked)

Draft Copy

Page 135

1       Q.    (By Mr. Castillo)   Okay.  Let me show you

2   Plaintiff's Exhibit 39, 40 and 59.  Do you remember what

3   the issue was in the Bloomberg Reporter article?

4       A.    This refreshes my -- my memory that -- that I

5   believe it involved the relationship between the

6   Stanford family and Stanford University.

7       Q.    And look at Plaintiff's Exhibit 59.  I think

8   that's more descriptive.

9       A.    Okay.  Okay.

10      Q.    It appear -- appears that this is the article

11  that finally came out.  Right?  Plaintiff's Exhibit 59?

12      A.    Yeah, that -- yes, that's correct.

13      Q.    And if you look at the highlighted part on the

14  second page of Plaintiff's Exhibit No. 59, there is a

15  lawyer in Washington, D.C. who specializes in overseas

16  financial transactions.  He said when you're an offshore

17  banker, you want to make sure that you're not perceived

18  as a villain and that Allen Stanford has been very

19  aggressive to tell everybody what a good guy he is.

20            Did you have any concerns prior to

21  February '07 because of Stanford's offshore banking

22  activities?

23      A.    No.

24      Q.    When you went to the bank in Antigua, do you

25  remember who you spoke to?

1      A.   I don't remember the names.  I mean, it was

2  very -- you know, it looked like a totally, you know,

3  legitimate operation; everybody was well dressed,

4  well -- well groomed, polite, articulate.  You know, no,

5  I didn't -- I don't remember the names, I'm sorry.

6      Q.   Okay, that was the question, sir.

7           And then if you keep looking at

8  Plaintiff's Exhibit 59, the article, at the bottom where

9  it says that he had ran in -- run into problems with

10  U.S. investigators because he had the bank in the island

11  of Montserrat, do you see that?

12      A.   I -- I don't see a reference to Montserrat in

13  here.

14      Q.   Well, right, like I said, underneath where it

15  says Texas Roots.  That first paragraph.

16      A.   Oh, okay.  Yeah.  Yeah, okay.

17      Q.   Did that cause you any -- well, did you ever

18  read this article?

19      A.   No.  I don't recall reading it.

20      Q.   Do you know of anything -- anything that Ben

21  Barnes Group did after this article came out?

22      A.   I don't know in specific.  It looks like, from

23  these other e-mails, that we talked to Scott Reed, who I

24  think had a relationship with Bloomberg or somebody at

25  Bloomberg, but I -- I don't know exactly.  I was not

Page 137

1    involved.

2        Q.   Because this was two years before SIB became

3    crashing down, correct?

4        A.   That's correct, February of --

5        Q.   From May of '07 to February '09?

6        A.   Yeah.

7        Q.   And you -- you don't -- other than Scott Reed,

8    was there anything else that Ben Barnes Group did to

9    maybe address some of the things that were being printed

10   about Mr. Stanford?

11       A.   I think this article may have been in -- was

12   this in May of '06?

13       Q.   According to the -- it says -- look at the

14   first page of Exhibit No. 59.  It's February '07.

15       A.   Yeah, I think --

16       Q.   Might have been May of '06 when it was printed.

17       A.   I think that's when -- I think if you look at

18   the end of the article, it appears it was -- it says

19   last updated May 17, 2006.

20       Q.   Right.  Anything that you can recall that Ben

21   Barnes Group did?

22       A.   No.

23       Q.   Because one of the things that Mr. Barnes was

24   involved in was trying to help Mr. Stanford with

25   perception issues.

Draft Copy

Page 138

1          MR. MADRID:  Objection, form.

2      A.   I'm not sure I would agree with that.  I

3  mean --

4      Q.   (By Mr. Castillo)  Perception in front of the

5  DSCC, right?

6      A.   Certainly in the DSCC in -- case, that's

7  correct.

8      Q.   Certainly Mr. Barnes would want to make sure

9  that if he's conveying information to members of the

10  legislature who he considers friends and hopefully have

11  some influence over that he's portraying accurate

12  information about his client.

13      A.   Correct.

14      Q.   And that he doesn't get dirty in the process,

15  meaning --

16          MR. MADRID:  Objection, form.

17      Q.   (By Mr. Castillo)  -- he provides information

18  and then it turns out that it's not accurate?

19      A.   Our credibility is very important in your

20  business, correct.

21      Q.   Yes, sir, you want to maintain your

22  credibility.  So perception of your client is important,

23  correct?

24      A.   Sure.

25      Q.   An article like this concerning Mr. Stanford

Page 139

1   would be important in maintaining the credibility of Ben

2   Barnes Group representing Stanford, wouldn't it?

3        A.   I'm not sure that a single article like this

4   would represent a threat, you know, to our credibility.

5   It certainly -- it's a -- it's a -- it's a negative

6   article, there is no question, but when you're dealing

7   with the public arena, you see a lot of negative

8   articles about a lot of good people who don't do

9   anything wrong.

10       Q.   And you had already made a determination that

11  Mr. Barnes -- Mr. Stanford hadn't done anything wrong,

12  right?

13       A.   At that time we -- we -- we believed that he

14  was very legitimate.

15       Q.   And one of the things that it said in this

16  article on the second page way at the bottom, right

17  before it says Warning Lifted, '"The high-powered legal

18  investigative hired guns from the U.S. are likely being

19  tasked with cleansing the files to make sure there is

20  nothing in them that could damage or implicate the

21  American offshore banker,' one cable read."

22            Do you know who they were talking about?

23       A.   I have no idea, and I'm not sure who wrote the

24  cable.  You can't tell from this article.

25       Q.   Right.  And do you know who the investigative

Page 140

1    hired guns from the U.S. were?

2       A.    No.

3       Q.    Did it include anybody from the Ben Barnes

4    Group?

5       A.    No.

6       Q.    Do you know anything that the Ben Barnes Group

7    did in reaction to that comment?

8       A.    No.

9       Q.    Did you ever meet with any of the lawyers at

10   Greenberg in connection with Stanford offshore

11   activities?

12      A.    I don't remember if I did or not.  That's a --

13   you know, he had a lot of -- a lot of law firms

14   representing him.

15      Q.    Do you remember meeting with them?

16      A.    I don't recall meeting with the Greenberg

17   lawyer.

18      Q.    Was the Ben Barnes Group asked to try to quash

19   the story, the Bloomberg article?

20      A.    I don't recall that.  I frankly --

21      Q.    Look at Plaintiff's Exhibit 40.

22      A.    So what's the -- I'm sorry.

23      Q.    Whether or not the Ben Barnes Group was ever

24   asked to make sure the story didn't run at all.

25      A.    I don't recall that we were asked to try to

Page 141

1    stop the story.

2        Q.    Because Plaintiff's Exhibit 40, at least there

3    is an e-mail from Julie Hodge to Scott Reed with a copy

4    to Ben May of '06 and, (as read) "Mr. Stanford wants you

5    to follow up with Al Hunt at Bloomberg.  Ideally, we do

6    not want a story -- want a story run at all."

7              I know it's addressed to Scott, but --

8        A.    Right.

9        Q.    -- was the Ben Barnes Group involved in any of

10   those efforts?

11       A.    I'm sure we talked about to Scott about the

12   story and about the...

13       Q.    To do what?

14       A.    Well, to try to -- to try to manage it.  You

15   know, nobody wants a negative story written on them, and

16   that's not uncommon in the business that we're in, to

17   try to dialogue with the press or to -- to go to people

18   who do have that relationship with the press.

19       Q.    Do you know whether the Stanford -- I mean

20   whether Ben Barnes Group was hired to do some damage

21   control after the article ran?

22       A.    I don't.

23       Q.    I already asked you about No. 9.  Do you know

24   who between the Ben Barnes Group and James Davis, any

25   communications in connection with James Davis executing

Page 142

1    an affidavit?

2         A.    I don't.

3                   (Interruption)

4         Q.    (By Mr. Castillo)  And I guess the last area

5    that I'll ask you about, I'm almost done, is facts which

6    demonstrate that the Barnes defendants did not know or

7    could not have known that the Stanford parties were in

8    fact a Ponzi scheme.

9         A.    (Moved head up and down).  Well, I don't

10   think -- I don't know, you know, in addition to what

11   I've already testified to about the display of integrity

12   and accomplishment that -- that Stanford represented how

13   we -- we -- how we could have known.  I mean, we -- we

14   went about our job to -- to represent them and do the

15   task that we were asked and -- and I don't know of

16   anything that -- that would have tipped us off that

17   there was a Ponzi scheme going on, you know, as I think

18   back over my discussions with the Stanford employees and

19   Stanford representatives.

20        Q.    Anything else?

21        A.    Not that I can think of, no.

22             MR. CASTILLO:  Senator Caperton, I think

23   those are all the questions that I have today.  We'll

24   reserve the rest of them when I see you at trial.

25             THE WITNESS:  Thank you.

Page 143

1              MR. MADRID:  And we too reserve for trial.

2              MR. ARLINGTON:  If I may, I don't -- I

3    want to reserve my questions for the receiver until the

4    time of trial, but I would just like to state on the

5    record the receiver's objection that I don't believe

6    this witness was fully prepared to answer several topics

7    that were contained in the notice of deposition.  Just

8    by way of example, the witness was unable to testify

9    about what Ben Barnes Group knew about the SEC

10   investigation, that goes to topics 7 and 8, was unable

11   to testify about whether anyone had looked into the

12   rates of return paid on the CDs from SIB, also topics 7

13   and 8.

14             MR. MADRID:  Where -- where is that --

15   where is that specifically noted in here?  The two items

16   you just mentioned, where is it specifically noted?

17             And by the way, one plaintiff -- you have

18   got one plaintiff in this case whether you have two

19   different parties in there.  This is not going to be a

20   split them up and you guys get two -- two bites at the

21   apple on every witness.

22             MR. ARLINGTON:  I'm not asking any

23   questions, I'm stating the receivers's objection.  Can I

24   finish?

25             MR. MADRID:  I think the -- my

Page 144

1  recollection is that the receiver has yielded to the

2  investor's committee to take prosecution of this case.

3              MR. CASTILLO:  I don't think that's an

4  adequate description, but we don't -- we can argue about

5  that.

6              MR. ARLINGTON:  Yeah.

7              MR. CASTILLO:  Let's let him put his

8  objection on the record and we can all go home.

9              MR. ARLINGTON:  Yeah.  The -- the witness

10  is unable to testify as to whether or not Ben Barnes

11  Group looked into how SIB was paying the rates of

12  returns it was paying, and that goes to topics 7 and 8;

13  the witness was unable to tell specifically what

14  services were performed for specific payments, topic 3;

15  he was unable to testify about the fee structure that --

16  or how much the retainer was for Ben Barnes Group,

17  topic 3; said he had no idea what Barnes was talking to

18  Allen Stanford about concerning the SEC investigation,

19  topics 7 and 8; and I think did not know who -- did not

20  know anything about the communications concerning the

21  declaration referenced in topic 9.  And those are just

22  examples, but that is the receiver's objection.

23              MR. MADRID:  We will reserve to the time

24  of trial.

25                    Draft Copy

1                THE VIDEOGRAPHER:  Off the record at 5:37.

2                (Proceedings concluded at 5:37 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Draft Copy

Page 146

1                    CHANGES AND SIGNATURE

2    PAGE      LINE       CHANGE                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Draft Copy

Page 147

1            I, KENT CAPERTON, have read the foregoing

2      deposition and hereby affix my signature that same is

3      true and correct, except as noted above.

4

5                          _____

6                          KENT CAPERTON

7      STATE OF TEXAS      )

8      COUNTY OF TRAVIS    )

9

10           Before me _____ on this day

11     personally appeared KENT CAPERTON, known to me or proved

12     to me under oath or through _____

13     (description of identity card or other document) to be

14     the person whose name is subscribed to the foregoing

15     instrument and acknowledged to me that they executed the

16     same for the purposes and consideration therein

17     expressed.

18           Given under my hand and seal of office this

19     _____ day of _____, 2014.

20

21

22

23                          _____

                            NOTARY PUBLIC IN AND FOR
24                          THE STATE OF TEXAS

25

Page 148

```
 1        R E P O R T E R ' S   C E R T I F I C A T E

 2

    THE STATE OF TEXAS )
 3
            I, KIMBERLY G. KEEPER, Certified Court Reporter
 4  in and for the State of Texas, hereby certify that this
    deposition transcript is a true record of the testimony
 5  given by the witness named herein, after said witness
    was duly sworn or affirmed by me.
 6
            I further certify that I am neither attorney
 7  nor counsel for, related to, nor employed by any of the
    parties to the action in which this testimony was taken.
 8  Further, I am not a relative or employee of any attorney
    of record in this cause, nor do I have a financial
 9  interest in the action.

10          I further certify that the total cost for the
    preparation of this Reporter's Record is $_____
11  and was/will be paid by attorney for the Plaintiff, the
    Official Stanford Investors Committee.
12
            Subscribed and sworn to on this the 31st day of
13  December, 2014.

14

15                          _____
                            KIMBERLY G. KEEPER, Texas CSR 2162
16                          Expiration Date:  12/31/15
                            Lindi S. Roberts & Associates
17                          Firm Registration No.: 558
                            P.O. Box 311905
18                          New Braunfels, Texas 78131

19

20

21

22

23

24

25
```

Draft Copy

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3   RALPH S. JANVEY, IN HIS CAPACITY AS)
     COURT-APPOINTED RECEIVER FOR THE   )
 4   STANFORD INTERNATIONAL BANK, LTD., )
     ET AL., AND THE OFFICIAL STANFORD  )
 5   INVESTORS COMMITTEE,               )
                     Plaintiffs,        )Case No. 3:10-CV-0527-N-BG
 6                                       )
     v.                                  )
 7                                       )
     BEN BARNES and BEN BARNES GROUP,    )
 8   L.P.,                               )
                     Defendants.         )
 9

10

11           *******************************

12           ORAL VIDEOTAPED DEPOSITION OF

13                  BENNY FRANK BARNES

14           *******************************

15

16

17           ORAL DEPOSITION OF BENNY FRANK BARNES, produced as

18   a witness at the instance of the Plaintiff, Official Stanford

19   Investors Committee, and duly sworn, was taken in the

20   above-styled and numbered cause on the 28th day of October,

21   2014, from 10:02 a.m. to 1:50 p.m. before LINDI S. ROBERTS,

22   Certified Shorthand Reporter in and for the State of Texas,

23   reported by machine shorthand, at the offices of Winstead, PC,

24   401 Congress Avenue, Suite 2100, Austin, Texas  78701,

25   pursuant to the Federal Rules of Civil Procedure.
```

1                        APPEARANCES

2

3    FOR THE PLAINTIFF, OFFICIAL STANFORD INVESTORS COMMITTEE:
          Mr. Jesse R. Castillo
          CASTILLO SNYDER, PC
4         300 Convent Street, Suite 1020
          San Antonio, Texas
5         Telephone: (210) 630-4200 - Fax: (210) 630-4210

6         - and -

7    FOR THE PLAINTIFF, OFFICIAL STANFORD INVESTORS COMMITTEE:
          Mr. Joshua E. Abraham
8         BUTZEL, LONG, PC
          230 Park Avenue, Suite 850
9         New York, New York 10169
          Telephone: (212) 818-1110 - Fax: (212) 818-0494

10

11   FOR THE DEFENDANTS:
          Mr. Jay J. Madrid
12        WINSTEAD, PC
          500 Winstead Building
13        2728 N. Harwood Street
          Dallas, Texas  75201
14        Telephone: (214) 745-5709 - Fax: (214) 745-5390

15

16   ALSO PRESENT:  Nancy Martin, Videographer
                    Kent Caperton

17

18

19

20

21

22

23

24

25

Case 3:10-cv-00527-N-BG Document 91-1 Filed 03/03/15 Page 252 of 304 PageID 4520

Oral Videotaped Deposition Benny Frank Barnes
October 28, 2014

```
 1                              INDEX

 2                                                  PAGE

 3      BENNY FRANK BARNES

 4      Examination by Mr. Castillo ......................6

 5

 6                            EXHIBITS

 7      EXHIBIT              DESCRIPTION              PAGE

 8      1            List showing Learjet usage        34

 9      2            List of Venezuela Bank            35
                     Reference Letters and List of
10                   Pending list

11      3            Letter from Ben Barnes to         35
                     Dr. Tino Alcides Diaz, dated
12                   September 30, 2004

13      5            Email chain between Yolanda       82
                     Suarez and Carlos Loumiet
14

15      9            Email chain between Susan         97
                     Martin and Julie Hodge, et al;
16                   dated June 23, 2005

17      10           Email chain between Susan         41
                     Martin and Julie Hodge, dated
18                   June 23, 2005

19      11           Invoice from Ben Barnes Group,    41
                     L.P. to Stanford Financial for
20                   $1 million; dated 6/2/2005

21      12           Email chain Julie Hodge,         100
                     Aymeric Marinoia, et al
22
        13           Email chain between Susan        100
23                   Martin and Julie Hodge; dated
                     June 23, 2005
24

25
```

Lindi S. Roberts & Associates
(830) 228-4634/(830) 609-0266

4

Case 3:10-cv-00527-N   Oral Videotaped Depo of 03/15   Benny Frank Barnes D24521
Document 191   Filed 03/03/15   Page 253 of 304   PageID 4521
October 28, 2014

```
 1                        EXHIBITS (cont.)

 2     EXHIBIT              DESCRIPTION                PAGE

 3     15          Agenda: Tuesday, June 28th          102
                   through Thursday, June 30th,
 4                 2005

 5     21          Email chain between James            84
                   Miller and Yolanda Suarez, et
 6                 al; dated August 18, 2005

 7     24          "America's Third Border," dated     105
                   9/26/2005
 8
       50          Document entitled "Action            52
 9                 Plan," Bates No. 651, 652 and
                   653
10
       51          Travel Itinerary (Washington,        39
11                 D.C.; Oklahoma City; Austin)
                   November 3-12, 2003
12
       75          Memorandum from Larry Campagna      118
13                 and Jaremi Chilton to Jim Davis
                   and Yolanda Suarez, dated
14                 1/8/2008

15     76          Email chain between Allen           119
                   Stanford, Yolanda Suarez, et
16                 al; dated January 15-16, 2008

17     83          Email chain between Yolanda         113
                   Suarez and Susan Martin; dated
18                 May 6, 2008

19     101         Internet Article from              119
                   Chron.com, "Barnes again moves
20                 into spotlight"

21     103         Email from Allen Stanford to       119
                   Yolanda Suarez; dated December
22                 7, 2007

23

24

25
```

Lindi S. Roberts & Associates
(830) 228-4634/(830) 609-0266

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 110 | "America's Third Border," dated November 2005 | 109 |
| 111 | Documents reflecting transactions between Ben Barnes Group, L.P. and Stanford Financial | 78 |
| 116 | Ben Barnes Group, L.P. Transaction List from January 2008 through March 2009 | 115 |

Benny Frank Barnes - Videotaped Deposition
Examination by Mr. Castillo

```
 1              THE VIDEOGRAPHER:  This is the videotaped

 2   deposition of Ben Barnes; In the Matter of Ralph S. Janvey, et

 3   al versus Ben Barnes and Ben Barnes Group, L.P.; Civil Action

 4   No. 3:10-CV-0527-N-BG; for the U.S. District Court, Northern

 5   District of Texas, Dallas Division; held in the Offices of

 6   Winstead, P.C. at 401 Congress Avenue, Suite 2100, Austin,

 7   Texas.

 8              This is the beginning of Tape One.  Today's date

 9   is October 28, 2014.  We are on the record at approximately

10   10:02 a.m.

11                     BENNY FRANK BARNES,

12   having been first duly sworn, testified as follows:

13                         EXAMINATION

14       Q.   (BY MR. CASTILLO) Sir, would you state your full

15   name.

16       A.   Benny Frank Barnes.

17       Q.   And Mr. Barnes, when were you born?

18       A.   April 17th, 1938.

19       Q.   Where?

20       A.   Gorman, Texas.

21       Q.   Okay.  And have you ever had your deposition taken

22   before?

23       A.   Yes, sir, I have.

24       Q.   On how many occasions?

25       A.   On several occasions.  A lot -- a lot of times when I
```

1     financial institution law practice and he was chairman of the

2     coordinating board, chairman on the Committee of 125 (sic),

3     had -- vice chairman of the Committee on 125 (sic) to evaluate

4     the future of the University of Texas.  He's been -- he's

5     president of the Lyndon B. Johnson Library and Foundation.

6             He's a -- I've known Larry since he went to work

7     for John Connally when I was 23 and he was 25 or 26.  It's

8     been a lifetime friendship.

9     Q.   All right.  And sometime in the early 2000s --

10    A.   Yeah.

11    Q.   -- is your memory of when Mr. Temple --

12    A.   Yeah.

13    Q.   -- recommended him?

14    A.   Yes.  It may have been 2000.  It may have been 2001.

15    I'm not -- I'm not exactly -- I don't -- I don't remember

16    when.

17    Q.   And when did you first meet Mr. Stanford after that

18    recommendation by Larry Temple?

19    A.   His -- a lawyer that worked for him, Lawanda --

20    Lawanda Suarez -- Yolanda Suarez, came to see me and then

21    sometime after that I met Mr. Stanford.  I don't know whether

22    he came to Austin to see me or whether I saw him when I was in

23    Houston.  I don't remember the first meeting.

24    Q.   All right.  And do you remember what the subject

25    matter was of the first meeting?

Examination by Mr. Castillo

1   represented that would have benefited by it, if -- if the law

2   had been change, but I don't -- I don't recall.

3      Q.    Okay.  All right.  So we were talking a little bit

4   about whether you were doing any investigation.  And I think

5   you've described for the jury why you felt comfortable with

6   Stanford, correct?

7      A.    Yes.

8      Q.    Anything else that gave you that comfort?

9      A.    No.  I had been around the company, as a client

10  relationship, that I had -- I had seen -- I had seen no signs

11  of -- that any red lights ought to be going off.

12     Q.    Okay.  "Anything else that you did to give you the

13  comfort?" was the question.

14     A.    I think probably the fact that Tom Delay and Pete

15  Sessions and a group of Republican legislators that he -- that

16  John Cornyn had been to Antigua, our United States Senator,

17  and spent the weekend with Mr. Stanford.

18           That -- I just saw things happening.  Tom Delay

19  was ready to work as hard as he could on this legislation.  I

20  assumed that people who had political careers were probably

21  doing a little bit more due diligence than law firms were

22  doing and that firms like ours were doing, so that gave me

23  some degree of comfort.

24     Q.    Anything else other than you judged him by the

25  company he kept?

**From:** Hodge, Julie
**Sent:** Tuesday, April 18, 2006 6:00 PM
**To:** Hughes, Kay-La
**Subject:** GIFT FOR BOOK LAUNCH
Kay-La, my lady of corporate gift-giving.

We have a business associate and friend of Mr. Stanford's....Mr. Ben Barnes, whose book "Barn Burning, Barn Building – Tales of a Political Life from LBJ to George W. Bush and Beyond" is launching on April 27.

Any ideas as to what we can get as a congratulatory gift to him?  He and RAS go way back and are always joking around.

Any thoughts?

CONFIDENTIAL

RECEIVER527-00282362

# BEN BARNES GROUP

September 30, 2004

Dr. Tino Alcides Díaz
Despacho del Superintendente
Superintendencia de Bacos y Otras Instituciones Financieras
Av. Universidad, Esquina Traposos, Edificio SUDEBAN
Apartado Postal 6761 Codigo Postal 1010
Caracas, Venezuela


Dear Sir:

I have been asked to write this letter of recommendation in support of
Mr. R. Allen Stanford and his application to SUDEBAN for approval of Stanford
Holdings Venezuela as the acquiring shareholder of a commercial bank in
Venezuela.

I have known Mr. Stanford for more than 25 years on both a personal and
professional level. Mr. Stanford is a highly successful individual and known to be
a man of strong character and integrity. All of his business dealings have always
been conducted to the highest possible standards, and I have no doubt that the
approval of this application would result in a positive addition to the financial
services industry in Venezuela.

I have no reservation in recommending that R. Allen Stanford and his companies
be given every possible courtesy and consideration.

Regards,

Ben Barnes

Ben Barnes

CHICAGO
123 North Wacker Drive, Suite 1800 | Chicago, IL 60606
PHONE 312.474.7943 · FAX 312.474.7898

TEXAS
98 San Jacinto Boulevard, Suite 250 | Austin, TX 78701
PHONE 512.322.0128 · FAX 512.322.0106

WASHINGTON, DC
1215 19th Street, NW | Washington, DC 20036
PHONE 202.467.4141 FAX 202.467.1676

CONFIDENTIAL

**From:** Hamm, Suzanne [shamm@StanfordEagle.com]
**Sent:** Friday, March 03, 2006 9:51 PM
**To:** Suarez, Yolanda
**Cc:** Hodge, Julie
**Subject:** Univ of Houston/Meeting Recap

Hello,

I met with the folks at the University of Houston yesterday morning for about two hours. Attendees included Bob Casey, John O'Dell as well as Kelley Hawkins and Marlene Weyand.

I had requested this meeting in order to understand what, if any, structure had been put in place by the Univ. of Houston with regards to our commitment and the campaign specifics needed to achieve the overall goal to "transform the Bauer College.

Current Status:
They spent a lot of time explaining why you had committed to the University that your entrepreneurial vision mirrored that of the Bauer College, and that much of the decisions with regards to moving forward was up to Stanford.

I have explained that while you have expressed your overall goal and vision for the project, we (The Foundation) is charged with ensuring Stanford interests are clearly communicated and that we reap sales and marketing goals beyond a bricks and mortar gift." In addition, every sales call made to corporate leaders and HNW individuals is another opportunity for us to communicate a piece of the "Stanford Story.  The brand characteristics of leadership, innovation and community commitment are all illustrated in each donor engagement.

Specifically, I have requested the following from them:

(1)   A commitment letter that outlines our cash and in-kind contribution.  This document will also specify the total amount they intend to raise and will provide an exit clause that provides Stanford the option to withdraw from the project, should the additional funds to complete the project not materialize.  We do not want them coming to us "a few million short" and ask us to fund the gap.  We will also specify timing of our payments in this document, and whether this is a gift with naming rights in perpetuity.  We also need to consider our lead gift as a challenge gift with a deadline -- this leverages other large gifts as these leaders understand that their gift activates your gift.  Illustrates a true partnership among leaders in the Houston business community.

(2)   A case statement (statement of need) this is a "macro message" of why the University is embarking on this endeavor.  It will also include language about why Stanford (specifically, you) has stepped forward to lead the campaign.  This language will reinforce our key community investment messages.

(3)   Donor gift Chart - simple rule of thumb in planned giving is that you receive 80% of your total from top 20% of your donor list.  We need to see this chart and donor target list.  This 20% group is our potential client.  It may make sense to have Jay or other market managers accompany Bauer representatives as they make these calls and directly explain why Stanford has stepped forward.  Kelley had a good idea to poll our Houston staff and see how many are grads of University of Houston, as some of them may participate in this process at some level.

(4)   Rules of Engagement:  You do not ask for the big dollars on the first call.  We need to understand the elements of their engagement process.  Typically do not make the "ask" until you have made the effort to listen and learn from your prospect – and started a dialogue/relationship "what challenges does your business face, how can the University help you??"  Bob and John both indicated that they had been talking to some big prospects, and that they were ready to meet Mr. Stanford.  This cannot happen until they have been qualified -- are they going to give and how much?  A meeting with Mr. Stanford in not the first engagement point, etc.

They should have at least 75% of their total goal raised in the quiet phase of this

RECEIVER527-00280362

campaign.  We cannot go public until we have true success to point to and then engage individual donors for the $100, 500 and "buy a brick" grassroots phase.

(5)    Specifics of our the campaign: I have heard $100 million as an overall goal, but no one can tell me if this is physical assets (buildings) and programming (faculty, endowments,) is included or if the programming needs will form the basis for a  second phase of funding requests.

(6)    Other donors/their recognition: Kelley forwarded donor materials that they have presented to individuals such as David Sapperstein.  This specific request was to fund the Center for Innovation for $25 million.  We need to understand where and how any recognition is given to other donors in relationship to our gift.  I do not get a sense that they have thought through the potential sponsorship properties to carve up among other donors and the protocol needed to ensure our gift remains the lead.   They admitted much of this will be informed by the final plan presented by Cooper and Roberts, however they are currently out there pitching a $25 million gift to Sapperstein, $2 million to Houston Port Authority, etc.

(7)    Bottom line: Other than Ted Bauer, this group is not accustomed to receiving such large commitments. .  And Mr. Bauer's gift was straightforward -- $40 million and his name went on the building.  Mr. Stanford has challenged them in a much more complex way -- to go beyond endowing a building and to consider the transformation of the campus.

(8)    Next Steps:  Review the commitment letter and draft of campaign materials Review and build consensus on the final design as this will inform much of the campaign elements including NGOs (named gift opportunities) for additional gifts.
At your suggestion, I have contacted Ben Barnes to get his input and suggestions for campaign success.  The University needs to provide the basic information (total campaign goal, gift table, etc.) before Ben can offer his advice and counsel.

(9)    These are genuine people and they want to do right by Stanford and this School is filling a big need in the community -- especially as Houston continues to grow and prosper.   We will need to work closely with them to ensure success.

Let me know any comments or questions.

Thx
Suze

CONFIDENTIAL

**From:** Hamm, Suzanne
**Sent:** Tuesday, February 14, 2006 9:33 PM
**To:** Suarez, Yolanda
**Subject:** RE: UNIVERSITY OF HOUSTON

Good idea. One thought is to have Stanford's $25 million treated as a challenge gift – they raise $50 million and receive our $25 million. Getting to the $75 million level in the "quiet phase" of this campaign is key. Also, it allows other execs who we want to engage in the initiative to understand that their donation has a double return. Every time a presentation is made to a large, potential donor – the U of H development group leads with Stanford, why we stepped up to support the school, our vision, etc,. then the lead-in to the request for support.

In terms of planned giving, I have requested case statement and any supporting materials the Development department may have developed for past campaigns or this one. I understand the Bauer family gave $40 million but the funds are separate from this initiative. I would like to understand what they received for the gift besides naming rights to the College. We should request bricks and mortar as well as programming benefits.

When we go public – Stanford stands in the leadership role, and then they use the public phase to raise the remaining $25 million usually through foundations (who like to see you have raised the bulk of it thru private donations, etc.)

Am available for a call with Ben – let me know.
Thx
Suzanne

---

**From:** Suarez, Yolanda [mailto:ysuarez@stanfordeagle.com]
**Sent:** Tuesday, February 14, 2006 3:16 PM
**To:** Hamm, Suzanne
**Subject:** Re: UNIVERSITY OF HOUSTON


Suzanne

Ben will be speaking with Mr. Stanford regarding local sources for matching donations that we need to coordinate. I would strongly recommend that we get his input to structure gift and develop plan to rollout. Let me know.
YS

-----Original Message-----
From: Hamm, Suzanne
To: Hodge, Julie; Suarez, Yolanda
Sent: Tue Feb 14 12:49:05 2006
Subject: RE: UNIVERSITY OF HOUSTON

I will follow up with you once I speak with Mr. Barnes.


In addition, I will be developing a communication plan for Mr. Stanford that provides a strategy and set recommendations to accomplish the following: Positioning our gift and leadership role in this project on local and national platforms; Engaging the Houston business community to raise the additional funds and; planning the announcement event/surrounding PR for the public phase of this initiative.


Currently, Kelley and Marlene contacted the U of H PR department to develop a tactical list of media activities. I have explained that we cannot "jump" to the PR/media relations as we have not clearly identified the message and goals we want to accomplish with the endowment. In addition, we would not allow a nonprofit organization to develop the communication strategy with any community investment, much less one of this magnitude.


Will provide copy to you once finalized early next week.


Best,


CONFIDENTIAL

RECEIVER527-00261635

# The Daily OBSERVER

*"Let there Be Light"*

Vol. 14  No.46      St. John's, Antigua    Friday February 23, 2007        Price: $2.00

| | |
|---|---|
| **Mum's The Word On Hadeed** | **26** |
| **Police Raid Nets Stolen** | **22** |
| **Bird & Browne To Make Bailout Plea To Stanford** | **26** |

# PM: Sir Allen Haughty, Arrogant Obnoxious



## Racing Against Time

*Workmen are feverishly racing against time to complete refurbishing work on the VC Bird International Airport in time for the first visitors for the Cricket World Cup. Officials say all will be ready in time. (Photo by Gemma Hazelwood)*

He maintained his silence on what has seemed to be political inclinations by investor R Allen Stanford, but when he broke it last night, Prime Minister Baldwin Spencer held no punches, calling the Texan's behaviour "haughty, arrogant and obnoxious."

Spencer also had a word of advice for Sir Allen, whom he indicated might be time warped — and it was that the government has changed.

"No doubt his utterances and strutting around the countryside has caused a bit of concern among United Progressive Party supporters and others, and has caused us all some unease. His haughty, arrogant and obnoxious behaviour since his elevation to knighthood by the former prime minister and leader of the Antigua Labour Party, Mr Lester Bird, has evidently gone to his head and makes him believe that he is still dealing with Mr Lester Bird as prime minister," Spencer said last in his press release.

After promising, on
*Continued on page 25*

CONFIDENTIAL

RECEIVER527-00281731

**STELLA WILDER**

# YOUR BIRTHDAY

Born today, you have great personal style and dramatic flair, and you pursue every goal and engage in every endeavor with a unique brand of enthusiasm that others envy. You enjoy exploring all kinds of outlets for your creative energy, but you will always come home to that one thing which allows you to use your talents to their fullest. You have grace and strength and a great deal of stamina that will serve you well at all times. You have a knack for overcoming the odds and turning in a winning performance even under the most adverse of circumstances.

Of course, there is a downside to your brave, even adventurous nature, and should you ever have a yearning for a more stable, settled kind of life you must be willing to sacrifice much that you had, in the past, held dear.

Also born on this date are: Peter Fonda, actor; Naruhito, Crown Prince of Japan; George Frideric Handel, composer;

To see what is in store for you tomorrow, find your birthday and read the corresponding paragraph. Let your birthday star be your daily guide.

## SATURDAY, FEBRUARY 24

**PISCES (Feb. 19-March 20)** — Know when to keep your hands off someone else's work; your assistance is not always welcome, as valuable as it may prove to be.

**ARIES (March 21-April 19)** — Make no mistake: you are not about to improve anyone merely by insisting that he or she modify his or her behavior to suit you. Back off!

**TAURUS (April 20-May 20)** — Someone close to you may become distracted and dissuaded from pursuing his or her primary goals. It's up to you to get him or her back on track.

**GEMINI (May 21-June 20)** — The frivolity and casual attitude of those around you is not for you. You're more interested in the serious side of life.

**CANCER (June 21-July 22)** — You are, as the song says, in the mood for love — but not because that particular person is near you. You may be after something new!

**LEO (July 23-Aug. 22)** — You mustn't make decisions too quickly — or expect to remain firm in those decisions for long. Things are dramatically in flux.

**VIRGO (Aug. 23-Sept. 22)** — You're in the mood to play some games in order to add spice and adventure to those things that have recently become routine.

**LIBRA (Sept. 23-Oct. 22)** — You are after more than pleasure — and indeed, you can have more than your share of true contentment if you play your cards right!

**SCORPIO (Oct. 23-Nov. 21)** — You may be frustrated by a current limitation, but you can make up for it by focusing more strongly on other unique creative contributions.

**SAGITTARIUS (Nov. 22-Dec. 21)** — You're likely not to react well to any kind of negative input — and even constructive criticism may rub you the wrong way.

**CAPRICORN (Dec. 22-Jan. 19)** — Your daily routine may be upset somewhat by an unexpected arrival. See to it that you don't let others intrude simply for the sake of taking part.

**AQUARIUS (Jan. 20-Feb. 18)** — Your drive and enthusiasm are sure to prove contagious. Others will thank you for pointing the way to greater pleasure and profit.

*Copyright 2007, United Feature Syndicate, Inc.*

From page 1

Independence Day last year, to mount a 17 constituency campaign, to take his development plans to the people, Sir Allen got off the mark in January.

He first attended the weekday, noontime birthday bash for a centenarian in Willikies in January, and since then, the investor and his agents have been ubiquitous.

The promises have included a home for senior citizens in English Harbour and the rebuilding of Gray's Farm and the establishment of an office in the same community, which is the heart of PM Spencer's constituency.

Sir Allen's move has garnered support in some quarters, particularly from the ALP, which has endorsed his plans, and concern in others, from people who argued that there seems an overt attempt at re-colonization.

It was with the latter school of thought that the prime minister agreed.

"I am sure Antiguans and Barbudans are aware of the many stories related by our first prime minister, the Rt Hon Dr Sir Vere Cornwall Bird, of our colonial past, he said. "...We cannot go down that road again. Our ancestors would turn in their graves if such were the case."

The PM's statements came 16 days after Sir Allen met with members of Cabinet, to outline his latest plans for Antigua in a session chaired by Deputy Prime Minister Wilmoth Daniel. Spencer was not present, as he was in Barbuda, tending to the needs of the sister isle.

General Council members were called to arms last night, and told to stand prepared to discuss the matter at this Sunday's meeting.

*We publish the full text of the prime minister's press release below.*

Sir Allen's recent machinations as covered in the news of the past two weeks makes for interesting reading and investigation.

No doubt his utterances and strutting around the countryside has caused a bit of concern among United

Progressive Party supporters and others and has caused us all some unease. His haughty, arrogant and obnoxious behaviour since his elevation to knighthood by the former prime minister and leader of the Antigua Labour Party, Mr Lester Bird has evidently gone to his head and makes him believe that he is still dealing with Mr Lester Bird as prime minister.

However, it is about time that Allen Stanford faces the reality that the government changed from the ALP to the United Progressive Party on 23 March 2004. We have tried our best to work with Allen Stanford as an investor just as we have done with others. As your government, we have experienced noting but threats, innuendos and now, downright political interference in our nation's affairs, from Allen Stanford, for our efforts on your behalf.

As members of the United Progressive Party know, we are having a General Council meeting on Sunday 25 February 2007, and I propose discussing the matter in that meeting before making any pronouncement to the nation.

I am sure Antiguans and Barbudans are aware of the many stories related by our first prime minister, the Rt Hon Dr Sir Vere Cornwall Bird, of our colonial past.

Many are stories he told of our womenfolk taking their men to the manager of the Antigua Sugar Factory and giving him permission to administer corporal punishment to their men folk on the condition that he would re-employ him so that the children would have some way of being assured of food.

We cannot go down that road again. Our ancestors would turn in their graves if such were the case.

General Council members are requested to make a special effort to be present at the meeting on Sunday as Convention matters will be addressed

Baldwin Spencer,
Political Leader UPP

**(FINAL FINAL)**

February 23, 2007

Prime Minister Spencer,

I was shocked and dismayed today when I read a press release supposedly written under your authorship. The very personal and un-statesmanlike manner in which you railed out at me is something I have never experienced before in my life. To say I am dumbfounded would be an enormous understatement.  I must therefore give a public response to your badly misguided and deceitful statements.

Mr. Prime Minister, you have stated and I quote: "We have tried our best to work with Allen Stanford as an investor just as we have done with others. As your government, we have experienced nothing but threats, innuendos and now, downright political interference in our nation's affairs, from Allen Stanford, for our efforts on your behalf."

I take great personal offense to this statement which is nothing short of an outright lie.  It is I and others in the Stanford Group of companies who have done their best to work with you and your Government for the greater good of Antigua and Barbuda.  Since you came into power Mr. Prime Minister, everything that you have asked me to do, and the list is long, I have complied with.  If you interpret my "strutting around" the Grays Green community as interfering with your governmental responsibilities then might I suggest that you follow my lead and do some "strutting around" Grays Green yourself and see first hand how deplorable conditions really are there.  As far as our establishing Stanford Community Development offices around Antigua and Barbuda, if you would recall, it was your suggestion that I take our proposed Islands Club development in the North Sound to the grass roots, as you seem incapable of making a decision as to whether this project is one you endorse or not, despite the previous "green light" that your administration had given us and the many meetings that you and I have had on this subject with my full explanation to you of the economic benefits that this would bring to the nation.  Therefore, we have begun our "I Believe" campaign to let the citizens of Antigua and Barbuda decide whether this is something that, as a majority, they will endorse and instruct their elected public servants, such as yourself, to truly once and for all give us the green light to proceed with.

However, what I am most appalled and sickened to the core of my soul over, is the manner in which you attempted to paint a picture of myself as a new colonial master and all of those in the Stanford organization as subservient to me by stating, and I quote: "I am sure Antiguans and Barbudans are aware of the many stories related by our first prime minister, the Rt Hon Dr Sir Vere Cornwall Bird, of our colonial past.  Many are stories he told of our womenfolk taking their men to the manager of the Antigua Sugar Factory and giving him permission to administer corporal punishment to their men folk on the condition that he would re-employ him so that the children would have some way of being assured of food."

RECEIVER527-00281725

**(FINAL FINAL)**

Prime Minister Spencer, you owe every Stanford employee in Antigua and Barbuda, whom you have offended in such an insulting and degrading manner, an apology. These are honest, hardworking individuals who do not deserve the disrespect that the leader of our nation has shown them.

I can only come to one conclusion for you issuing such vile and slanderous statements and that is you are attempting to deflect the attention of the citizens of our nation away from your inept leadership, by creating conflict and controversy with the nation's largest private employer and contributor to the economy.

I have given my heart and soul to Antigua and Barbuda, committed myself to excellence, and provided countless opportunities for our citizens. You can rest assured I will continue this long into the future.


Sir Allen Stanford

CONFIDENTIAL

# Talking Points

1. I want to personally apologize to Prime Minister Spencer for my offensive and inappropriate response to an article that recently appeared in the newspaper. I have personally called and expressed my regret to the Prime Minister.

2. Such behavior was inconsistent with the motivations and intentions that have guided my business practices since coming to the island over two decades ago and will serve as a guidepost for future actions – to foster economic activity, to create jobs and to improve the quality of life for everyone on the island.

3. Clearly arguing with our Prime Minister in public was wrong, and I also apologize to the people of Antigua.

4. I am committed to making life better for all on the island and in the future my words and actions will reflect that sentiment.

CONFIDENTIAL

RECEIVER527-00279349

**From:** Hodge, Julie
**Sent:** Thursday, March 15, 2007 6:13 PM
**To:** Stanford, Allen
**Subject:** From Visible Technologies, Ben Barnes

**Attachments:** Allen Stanford.ppt; TruView Customer Contract.DOC

FYI. I have printed a copy here as well.

---

**From:** Dean Graziano [mailto:dean@visibletechnologies.com]
**Sent:** Thursday, March 15, 2007 11:44 AM
**To:** Hodge, Julie
**Cc:** smartin@benbarnesgroup.com
**Subject:** Hi Julie, from Visible Technologies, Ben Barnes

Hello Julie, my name is Dean Graziano and I am Founder and EVP of Business Development for Visible Technologies. Per our conversation with Mr. Ben Barnes and Susan Martin we wanted to send over information on our Online Reputation Management service called TruView. I have attached a small presentation/research deck on Allen Stanford as well as the contract for the service.

If you have any questions or need anything please let me know. My contact info is below.

Thanks and have a great day,

Dean

**Dean Graziano**
Executive Vice President          direct    206.838.1188
Court in the Square               cellular  206.234.8123
401 Second Ave. S.               email     dean@visibletechnologies.com
Seattle, WA  98104               website   Visible Technologies

image002

CONFIDENTIAL

RECEIVER527-00281644

# Online Reputation Management
# Recommendations for
# Allen Stanford



APP 266



The most effective service for individuals and companies to **manage their reputations** in the top search engines

2

# Managing Reputations Online

- When people search for information about you and your company they should find fair and balanced results ranked in the top 20 positions

- We focus on Google, Yahoo!, MSN and AOL, which represent over 90% of all searches conducted on the Web, because the right content and links will impact your bottom line

- We target the top 20 results of each search engine as 93% of people searching do not go past the first two pages









3

# Top 20 Rankings for Allen Stanford

Top 20 Rankings for:
* **Allen Stanford**
* **R. Allen Stanford**
* **Sir Allen Stanford**

| Site | Negative/Unrelated | Positive |
|---|---|---|
| Google | 19 | 41 |
| YAHOO! | 18 | 42 |
| msn | 38 | 22 |
| AOL | 20 | 40 |
| **TOTAL** | **95** | **145** |



**Negative/Unrelated**

**38%**

**Positive**

**62%**

Allen Stanford Keywords are searched for more than 118,000 times per year!

4

# Sample Results for Allen Stanford



**Stanford Speaks Out on Bribery Allegations**

Google™ **Number 1**

**Antigua in the Shadow of R. Allen Stanford**

This sun-drenched Caribbean island…is fast gaining another reputation: as the personal fief of R. Allen Stanford, a Texas developer and international banker.

YAHOO! **Number 4**

*His business dealings with the Antigua Government of Lester Bird have been getting him more attention than he had bargained for, fuelling <u>reports of influence peddling and campaign contributions, among other things.</u>*

 **Number 4**

5

# Insights for Allen Stanford

- When searchers look for information on Allen Stanford they will find a number of negative results including information on his opposition to unions, individuals who opposed his knighthood, people who deny his relation to the Stanford family, allegations of bribery, influence peddling, and campaign contributions, and people who feel that he has too much control over Antigua and Barbuda as a result of his close ties to the Government.

- These negative allegations are highly ranked and threaten to overshadow Mr. Stanford's positive accomplishments and initiatives including the Stanford 20/20 Cricket Competition, his founding and leadership of the Stanford Group, and his frequent donations to several charities.

# Methods

**Web Development:** Original content will be created to serve as a foundation for the brand management campaign.  The original content needs to be placed across a variety of existing and yet-to-be created domains.  Examples of content for the proposed domains to be created include:

**Allen Stanford's Statements:** Web sites containing transcripts of speeches, interviews, and letters that Mr. Stanford has made public but which are not currently available on the Web.

**Republish Copies of Press Releases:** Web sites republishing previously distributed press releases and/or informational announcements made on behalf of Mr. Stanford and his business associates that promote positive aspects of his operations.

**New Web Content:** New Web sites will be created with new content developed specifically about positive or neutral content acceptable to Mr. Stanford.

# Method's Continued

## Linking

Visible Technologies will place links on corporate Web sites and partner Web sites to help boost the importance of positive content.  Additional links will be placed in new content to reinforce the value conferred by the first group of links.  It will be beneficial if Mr. Stanford's Internet assets are utilized in the linking campaign.  For example, if there are current corporate Web sites that include public statements and/or press releases relevant to Mr. Stanford's name, links can be placed in those Web documents to help boost the importance of the positive content articles.

## Content Requirements

Visible Technologies and Mr. Stanford's representatives will identify as much existing positive or neutral content as possible.  This content will be evaluated for usefulness in the promotional campaign.  From time to time, it may be necessary for Visible Technologies to create new content to be placed on new or existing Web sites.  Ideally, content from 20 separate domains will be promoted to achieve the highest possible visibility.

# Recommendations for Allen Stanford

- Build upon Allen Stanford's online reputation by securing additional positive listings for his name

- Analyze Allen Stanford's existing positive results and protect those listings from future changes and unwarranted attacks by competitors

- Identify new partnership linking opportunities to further enhance Allen Stanford's online profile and visibility



9

# Pricing

- $50,000 for three key phrases with a one year contract

10



*Building Brands Online.*

## New York

1185 Avenue of the
Americas
Suite 2250
New York, NY  10036

(212) 371-5204

## Seattle

Court in the Square
401 2nd Ave S
Suite 101
Seattle, WA  98104

(206) 838-1188

## Washington, DC

1215 19th Street NW
Washington, DC  20036

(703) 406-3820

## Boston

188 Cain Ave.
Braintree, MA 02184

(617) 510-5029

```
                  UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF TEXAS

                       DALLAS DIVISION

      --------------------------------X
      RALPH S. JANVEY, IN HIS CAPACITY )
      AS COURT-APPOINTED RECEIVER FOR  )
      THE STANFORD INTERNATIONAL BANK, )
      LTD., et al.,                    )
                                       )
            Plaintiff,                 )
                                       )
       v.                              ) Civil Action No.
                                       ) 3:10-cv-527
      BEN BARNES and                   )
      BEN BARNES GROUP, L.P.,          )
                                       )
            Defendants.                )
                                       )
      --------------------------------X
      BEN BARNES GROUP, L.P.,          )
                                       )
            Third-Party Plaintiff,     )
                                       )
       v.                              )
                                       )
      Capitol Counsel, LLC, et al.,    )
                                       )
            Third-Party Defendants.    )
                                       )
      --------------------------------X



              VIDEOTAPED DEPOSITION OF
                 ROBERT MITCHELL DELK
            Washington, District of Columbia
               Monday, September 29, 2014
```

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR,
CLR, RSA, LiveDeposition Authorized Reporter
Job No. 12469

 1

 2                    September 29, 2014

 3                       11:16 A.M.

 4

 5        Videotaped deposition of ROBERT MITCHELL

 6   DELK, taken by the Plaintiffs, held at the law

 7   offices of Butzel Long, 1747 Pennsylvania Avenue,

 8   Northwest, Washington, D.C. 20006, before Cindy L.

 9   Sebo, Registered Merit Court Reporter, Certified

10   Real-Time Reporter, Registered Professional

11   Reporter, Certified Shorthand Reporter, Certified

12   Court Reporter, Certified LiveNote Reporter,

13   Real-Time Systems Administrator, LiveDeposition

14   Authorized Reporter and Notary Public in and for

15   the District of Columbia, beginning at approximately

16   11:16 a.m., when were present on behalf of the

17   respective parties:

18

19

20

21

22

23

24

25

Page 3

```
 1                 A P P E A R A N C E S:

 2

 3      Attorney for Plaintiffs:

 4           BUTZEL LONG

 5           JOSHUA E. ABRAHAM, ESQ.

 6           Suite 850

 7           230 Park Avenue

 8           New York, New York 10169

 9           212.374.5370

10           abraham@butzel.com

11                   -and-

12           BUTZEL LONG

13           AGHOGHO EDEVBIE, ESQ.

14           Suite 100

15           150 West Jefferson

16           Detroit, Michigan 48226

17           313.983.6950

18           edevbie@butzel.com

19

20

21

22

23

24

25
```

Page 4

```
 1          A P P E A R A N C E S (Continued):

 2

 3     Attorney for Defendants/Third-Party Plaintiff:

 4          WINSTEAD PC

 5          JAY J. MADRID, ESQ.

 6          500 Winstead Building

 7          2728 N. Harwood Street

 8          Dallas, Texas 75201

 9          214.745.5709

10          jmadrid@winstead.com

11

12     Attorney for Third-Party Defendants:

13          NEALON & ASSOCIATES, P.C.

14          JAY IAN IGIEL, ESQ.

15          119 North Henry Street

16          Old Town

17          Alexandria, Virginia 22314

18          703.684.5755

19          jigiel@nealon.com

20

21

22     ALSO PRESENT:

23          RICK SANBORN, Videographer

24

25
```

 1                    INDEX OF EXAMINATION

 2

 3   ROBERT MITCHELL DELK

 4   EXAMINATION BY                               PAGE

 5     Mr. Abraham                                 10

 6     Mr. Madrid                                 211

 7                       -   -   -

 8                  INDEX TO EXHIBITS

 9                       -   -   -

10    (Exhibits Attached to the Original Transcript.)

11      DELK

12     EXHIBIT        DESCRIPTION                PAGE

13

14    Number 1        Third-Party Defendant Robert

15                    Mitchell Delk's Responses to

16                    Plaintiff's First Request for

17                    Production of Documents        16

18

19    Number 2        Third-Party Defendant Robert

20                    Mitchell Delk's Responses to

21                    Plaintiff's First Set of

22                    Interrogatories              109

23

24

25

Page 6

| | | | |
|---|---|---|---|
| 1 | Number 3 | E-mail, Martin to Miller, cc: | |
| 2 | | Stanford, Suarez, Razook, | |
| 3 | | Loumiet, Delk, Reed and Caperton, | |
| 4 | | August 22, 2005 | 120 |
| 5 | | | |
| 6 | Number 4 | E-mail with attachment, | |
| 7 | | Martin to Stanford, | |
| 8 | | September 27, 2005 | 140 |
| 9 | | | |
| 10 | Number 4-A | E-mail string | 212 |
| 11 | | | |
| 12 | Number 5 | E-mail with attachment, | |
| 13 | | Martin to Stanford, cc: | |
| 14 | | Tello, January 27, 2006 | 154 |
| 15 | | | |
| 16 | Number 5-A | E-mail, Delk to Martin, | |
| 17 | | January 27, 2006 | 212 |
| 18 | | | |
| 19 | Number 6 | E-mail with attachment, | |
| 20 | | Delk to Suarez, September | |
| 21 | | 12, 2006 | 170 |
| 22 | | | |
| 23 | Number 7 | E-mail string | 175 |
| 24 | | | |
| 25 | | | |

Page 7

```
 1    Number 8         E-mail with attachment,
 2                     Delk to Caperton, cc: Martin,
 3                     February 19, 2009              184
 4
 5    Number 9         E-mail string                 195
 6
 7    Number 10        E-mail string                 199
 8
 9    Number 11        E-mail string                 201
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1              ROBERT MITCHELL DELK
 2              P R O C E E D I N G S
 3
 4              Washington, D.C.
 5      Monday, September 29, 2014; 11:16 a.m.
 6
 7              THE VIDEOGRAPHER:  This is the --
 8      Tape Number 1 of the videotaped deposition
 9      of Robert Mitchell Delk in the matter of
10      Ralph S. Janvey, et al. versus Ben Barnes,
11      et al.; and Ben Barnes Group, L.P. versus
12      Capitol Counsel, LLC, et al. filed in the
13      United States District Court for the
14      Northern District of Texas, Dallas
15      Division, Case Number 3:10-cv-527.
16              This deposition is being held at the
17      offices of Butzel Long, 1747 Pennsylvania
18      Avenue, Northwest, Washington, D.C. on
19      September 29th, 2014.
20              The time on the video monitor is
21      11:16 a.m.
22              My name is Rick Sanborn from the
23      firm of TransPerfect Deposition Services,
24      and I'm the legal video specialist.  The
25      court reporter is Cindy Sebo, also in
```

```
 1              ROBERT MITCHELL DELK

 2        association with TransPerfect.

 3              Will counsel please introduce

 4        themselves and state whom they represent?

 5              MR. ABRAHAM:  Joshua Abraham for the

 6        Official Stanford Investors Committee.

 7              MR. EDEVBIE:  Aghogho Edevbie for

 8        the Official Stanford Investors Committee.

 9              MR. MADRID:  Jay Madrid representing

10        Ben Barnes Group, L.P. and Ben Barnes,

11        individually.

12              MR. IGIEL:  Jay Igiel on behalf of

13        the former Third-Party Defendants,

14        including the deponent, Mitchell Delk.

15              THE VIDEOGRAPHER:  Thank you.

16              Will the court reporter please swear

17        in the witness?

18                    -  -  -

19              ROBERT MITCHELL DELK,

20     after having been first duly sworn, was

21        examined and testified as follows:

22                    -  -  -

23

24

25
```

Page 99

1                    ROBERT MITCHELL DELK

2    Stanford Financial?

3          A.    Well, I know he was retained to work

4    on this tax issue.  Other issues, I don't know if

5    he was -- you know, what -- what his involvement

6    was, to be honest with you.

7                When I started helping Ben on the

8    Stanford issue, it was specifically the tax

9    issue.

10         Q.    So you believe Ben Barnes was

11   retained specifically for a tax issue?

12         A.    At a minimum.

13         Q.    What is this tax issue?

14         A.    The USVI, United States

15   Virgin Islands, has a tax break, and products and

16   services that emanate from the Virgin Islands

17   enjoy a much lower corporate tax rate, 10 percent

18   versus 30 percent.

19                I'm sure we'll get into this, but as

20   you look at the issue, there are a couple of

21   things, in fact, that drove this issue.  Congress

22   got involved in and regulations were passed

23   regarding the issue.  And to take advantage of

24   the tax break, the entity had to be in the USVI

25   183 days.  There was a residence requirement, and

Page 131

```
 1                    ROBERT MITCHELL DELK

 2    obviously had offices in Houston and other places

 3    that was -- you know, but they -- they had a --

 4    an entity out of Antigua.

 5                    And the issue was, one, did

 6    Allen Stanford reside 183 days in the USVI; and,

 7    secondly, did the income that was produced by the

 8    company, did it emanate out of the USVI?

 9         Q.    Why was it a question as to where

10    Allen Stanford, himself, personally resided, as

11    opposed to the headquarters of the corporation?

12         A.    It was the tax opinion of -- of the

13    tax experts that, in fact -- that he was, in

14    fact, the corporation himself; and, therefore,

15    where he resided was important.

16                    But having said that, it was clear

17    that, you know, the corporation itself or the

18    entity that was the financial corporation --

19    financial services corporation, likewise, would

20    have to be in the USVI.

21         Q.    And what advice did your group --

22    you and/or your group --

23         A.    The -- the --

24         Q.    -- ultimately give to

25    Allen Stanford?
```

```
 1                ROBERT MITCHELL DELK

 2   real tickler in the legi- -- in -- in -- in the

 3   law, because it was ambiguous as about what

 4   sourcing income was.  And what eventually was

 5   going to -- would -- preferred was be the law

 6   read that, in fact, if the income is sourced from

 7   a location in the USVI, despite the fact that

 8   income -- if it came back into the USVI,

 9   regardless of its loc- -- origination, in fact,

10   it would be sourced in the USVI.

11               That became the real issue for

12   Stanford.

13        Q.    Sorry.  Can you explain that again?

14        A.    If -- if, in fact, Allen Stanford

15   moved himself and the corporation, he would meet

16   the residency requirement.

17               The fact that he had brokers, let's

18   say, in Houston and in Atlanta, the fact that the

19   money came back to the entity in the USVI, if the

20   sourcing language was broad enough, it would, in

21   fact, include that income.

22               And so they were trying to make sure

23   that the income -- or the sourcing requirement

24   was sufficiently broad that it would, in fact,

25   entail those dollars that had really, I guess,
```

```
 1                   ROBERT MITCHELL DELK

 2    emanated from Houston and Atlanta but,

 3    ultimately, were parked in the USVI --

 4            Q.    So --

 5            A.    -- the decision --

 6            Q.    -- if I'm understanding this

 7    correctly, the residency and the sourcing prongs

 8    would be met by having Allen Stanford resi- --

 9    reside for 100 and something bed nights in the

10    USVI.

11                 In other words, his residency --

12            A.    The -- the residency would be --

13    residency require- --

14            Q.    -- would be sufficient for both

15    prongs --

16                 THE COURT REPORTER:  Wait, wait,

17            wait.  One person at a time.

18                 His residency what?

19    BY MR. ABRAHAM:

20            Q.    -- would be sufficient for both

21    prongs of the test?

22            A.    No --

23            Q.    Okay.

24            A.    -- no.  He could meet the residency

25    requirement by either a way that you've
```

**From:** Hodge, Julie
**Sent:** Thursday, August 09, 2007 8:32 PM
**To:** Walker, Kye
**Subject:** FW: B's 90th Birthday Bash

**Attachments:** Sir Allen Stanford.pdf
I gave this to RAS last week but he paid no attention to it.  I don't think he remembered committing to Ben that he would do this.  But attached is an invoice that he pledged to pay, so needs to be added to his list of payments to be made.  Ben's office is following up.

---

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** Tuesday, July 31, 2007 5:53 PM
**To:** Hodge, Julie
**Subject:** B's 90th Birthday Bash

Julie, please find attached correspondence regarding Sir Allen's commitment to B's 90th Birthday Bash.  Mr. Rapoport and the Texas Observer and us, of course, really appreciate Sir Allen's commitment.

If you need anything else, please let us know.

Thanks

pt


Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

CONFIDENTIAL

RECEIVER527-00281457

# The Texas Observer

SHARP REPORTING FROM THE STRANGEST STATE IN THE UNION

**www.texasobserver.org**

Sir Allen Stanford
Stanford Financial
5050 Westheimer
Houston, TX 77056

July 30, 2007

Dear Sir Allen,

Thank you for your generous pledge to the Texas Democracy Foundation for "B's 90th Birthday Bash." We appreciate your participation in the evening and your commitment to The Texas Observer in honor of B.

From the Board of the Texas Democracy Foundation, and the staff of *The Texas Observer,* thank you for your generous support.

Sincerely,

Charlotte McCann
The Texas Observer
307 West 7th Street
Austin, TX 78701

---

The Texas Democracy Foundation (dba *The Texas Observer,* EIN 74-2619883) is a 501(c)(3) non-profit organization.

Your donation is tax-deductible to the extent permitted by law.

Pledge Amount: $30,000

____ My Check is enclosed

____ Please charge my contribution to my credit card

Credit card # _____ expires ____/____

Name on Card _____

Billing Phone _____(required)

307 W. 7TH ST. AUSTIN, TX 78701   PHONE 512.477.0746   TOLL-FREE 800.939.6620   FAX 512.474.1175

CONFIDENTIAL

**From:** Hodge, Julie
**Sent:** Thursday, July 12, 2007 10:23 PM
**To:** Walker, Kye
**Subject:** FW: B Rapoport 90th birth day dinner

**Attachments:** B invite final.pdf; B reply card final.pdf; Program - draft (6) (4) (3).doc
See attached and below.  Like I said there is a table for 10 if Mr. Stanford wants to have anyone go with him , if not, then Ben's office will make sure the table is filled with people in Congress most beneficial for him to be with, but we need to let them know so they can arrange the seating.  They are still working on the guest list.

---

**From:** Patsy Thomasson [mailto:pthomasson@benbarnesgroup.com]
**Sent:** Thursday, July 12, 2007 5:02 PM
**To:** Hodge, Julie
**Subject:** FW: B Rapoport 90th birth day dinner


Julie, I have attached a copy of an invitation and reply card.  The benefiting organization is a 501 c (3); therefore, the contribution is tax deductible.

Attached to is a draft program; it is still a little in flux but this will pretty much be it.  Am still working on list of members who will be attending; will get it to you as soon as possible.


Let me know what else you need.

Thanks

pt


Patsy L. Thomasson
Ben Barnes Group
1215 19th Street, NW
Washington, DC  20036

202-467-1613 voice line
202-467-1625 fax line
202-297-8723 cell

CONFIDENTIAL

RECEIVER527-00281471

**From:** Hodge, Julie
**Sent:** Thursday, February 22, 2007 9:55 PM
**To:** 'Susan Martin'
**Subject:** Bloomberg Article for Ben Barnes

**Importance:** High

**Attachments:** Bloomberg Article May 17 Highlighted.doc

Susan

Mr. Stanford has requested that you forward the attached article to Ben as soon as possible.  He'll know what it's regarding.  I have highlighted the section that's relevant to Jonathan Winer as requested.

Please confirm.

Thanks

Julie Hodge
Executive Assistant
Stanford Financial Group
Miami, FL
(305) 960-8531 Ofc. Tel.
(305) 666-7188 Fax
(954) 235-7411 Cell
jhodge@stanfordeagle.com

CONFIDENTIAL

RECEIVER527-00281736

**Bloomberg.com**

# Stanford Financial's `Family' Tie Fails to Impress University

May 17 (Bloomberg) -- R. Allen Stanford, chairman of Stanford Financial Group, has donated $2.5 million to restore the home of Stanford University's founder, whom he describes in the company magazine as a relative.

If there is a blood connection, though, the California university doesn't know it. ``We are familiar with Stanford Financial but are not aware of any genealogical relationship between Allen Stanford and Leland Stanford,'' says Susan Weinstein, director of business development and guardian of the use of the university's name.

The claimed ties are only one way the Houston-based company, which says it helps manage and advise on $30 billion in investments, has burnished its image among investors and in Washington.

Among other things, the firm has contributed millions of dollars to politicians of both parties and allowed them use of its jets at cut-rate fares. It acquired a Washington research group employing a former Federal Reserve governor, and high- yielding certificates of deposit issued by its Antiguan bank have attracted increasing numbers of affluent U.S. buyers.

Such steps have helped the firm prosper in the wake of a run-in with U.S. government officials, who complained that the firm has exerted too much control over Antiguan regulators.

``When you're an offshore banker, you want to make sure that you're not perceived as a villain,'' said Jack Blum, a lawyer at Lobel, Novins & Lamont in Washington who specializes in overseas financial transactions. Allen Stanford ``has been very aggressive, not only in the political arena but also in hiring people to tell everybody what a good guy he is.''

Texas Roots

Stanford, 56, traces his company's roots to his grandfather's insurance company, founded in the central Texas town of Mexia in the 1930s. U.S. court records show that his core business -- the offshore bank -- was formed in 1985 on the Caribbean island of Montserrat and moved to Antigua in 1990.

That's where he ran into problems with U.S. investigators. In 1999, Stanford Financial tried to take over Antiguan International Business Corp., which regulated offshore companies on the island, said Jonathan Winer, who was then a deputy assistant secretary of State. State Department cables sent from the U.S. Embassy described a ``power grab'' and criticized the company's hiring of U.S. consultants to revise Antigua's offshore-banking rules.

``The high-powered legal and investigative hired guns from the U.S. are likely being tasked with cleansing the files to make sure there is nothing in them that could damage or implicate the American offshore banker,'' one cable read.

Warning Lifted

The U.S. advised financial institutions to be suspicious of transactions with Antigua banks, a warning that was lifted in August 2001 after Antigua took steps to fight money laundering. The warning didn't specifically mention Stanford Financial's bank.

RECEIVER527-00281737

Stanford Financial says Allen Stanford ``was asked to serve in an advisory capacity to the government of Antigua and Barbuda'' and hired a ``top-notch team of former U.S. legal and regulatory professionals'' that helped that country adopt anti- money-laundering rules.

That team included several lawyers from the Miami offices of Greenberg Traurig LLP, which represented Stanford Financial at the time.

Since then, Stanford Financial's U.S. business has surged, helped by a team in Baton Rouge, Louisiana, that sells the Antiguan CDs to affluent Americans such as doctors. The company says the team added about $17 million in new deposits in 2003, $150 million in 2004 and had a goal of $250 million for last year, according to a 2004 company video.

Additional Cachet

In Washington, meanwhile, the company gained additional cachet last year by acquiring Charles Schwab & Co.'s Washington research team, now called Stanford Washington Research Group. The group employs former Federal Reserve Governor Lyle Gramley as senior economic adviser.

In the past six years, Stanford Financial and its employees have made more than $2 million in donations to U.S. political candidates and parties, according to the Federal Election Commission and congressional and Internal Revenue Service records.

Stanford gives to both Democrats and Republicans. Among its top beneficiaries have been former Senator Robert Torricelli, a New Jersey Democrat who left office in 2003 amid ethics allegations, and Republican Representatives Tom DeLay of Texas, who is resigning from Congress next month after having been indicted in a Texas election-fundraising case, and Bob Ney of Ohio, who's under investigation in the scandal involving lobbyist Jack Abramoff. Stanford Financial or its employees have contributed to the legal defense funds of the three lawmakers.

Company Jets

DeLay's committees paid for flights on Stanford's jets at least 16 times since 2003, including on Oct. 20, the day the former House majority leader was booked in a Houston courthouse on money-laundering charges. Shannon Flaherty, a spokeswoman for DeLay, didn't respond to a request for comment.

Members of the House Caribbean Caucus take annual trips to the region on Stanford's jets. Lawmakers are required to reimburse companies at a first-class commercial rate, which is often a fraction of the actual cost.

``Our relationship with political leaders is and always will be proper, bipartisan and fully disclosed,'' Stanford Financial said in a written response to questions.

The company's in-house magazine, the Stanford Eagle, raises a different sort of relationship with another political leader: Leland Stanford, the 19th century California governor and U.S. senator who, with his wife, founded the university in memory of their only child, Leland Jr., who died at the age of 15 in 1884.

Family Ties

The company's magazine, published in 2001, quoted Allen Stanford as saying that his great-great-great-grandfather was ``closely related to'' Josiah Stanford, Leland's father, who was born in 1795 and lived near Albany, New York. The magazine's cover featured a photo of Allen Stanford, his father, James, and former California Governor Gray Davis standing on the steps of the Stanford Mansion, Leland Stanford's Sacramento home, now part of a state park used for official functions.

CONFIDENTIAL

On a promotional video distributed in 2004 as a sales and information tool for its advisers, Allen Stanford says, ``I am proud to say that we have been a major financial supporter for the restoration of the Leland Stanford Mansion in Sacramento, helping to preserve an important piece of California, and Stanford family, history.''

The company, in a written response to questions, said, ``It is clear that Stanford Financial Group has not tried to use a family link to Leland Stanford to promote the image of the company.'' It added, ``Our clients are sophisticated, affluent investors who make their investment decisions based on our company's current performance, not because of the kinship between Mr. R. Allen Stanford's great-great-great grandfather and Leland Stanford's father.''

`Of Swiss Descent'

In its statement, the company cited a book called ``The History of Stewart County Georgia -- Volume II'' by Sara Robertson Dixon to establish the family link. In the book, available at the Library of Congress, Dixon, who died in 1967, described R. Allen Stanford's great-great-great grandfather Thomas as being ``closely related'' to Josiah Stanford, though without saying how. The book said the family ``is said to be of Swiss descent'' and was named St. Anford, moving to the U.S. before the American Revolution.

Stanford University archivist Margaret Kimball said Leland Stanford's family traces its origins to New York and Massachusetts, where family members settled after migrating from England, not Switzerland.

``I would probably argue that if the Stanfords, to whom R. Allen Stanford lays his heritage, are indeed descended as outlined, then there is probably little connection to our Stanford and those who hail from Massachusetts and New York,'' Kimball said.

To contact the reporters on this story:
Mike Forsythe in Washington  mforsythe@bloomberg.net
Alison Fitzgerald in Washington at  afitzgerald2@bloomberg.net.
Last Updated: May 17, 2006 00:03 EDT

RECEIVER527-00281739

# McClatchy DC

# Ponzi artist investigated ex-State Dept. official, records show

By Murray Waas

Special to McClatchy NewspapersNovember 29, 2012

- Facebook

  - 
- Twitter
  - 
  - 
- Google Plus
- More
  - Linkedin
  - Reddit
  - YouTube
  - 
  - E-mail
  - Print
  - 
  - 

WASHINGTON — In 2006, Allen Stanford had yet to be identified as the mastermind of one of the largest and longest-running Ponzi schemes in U.S. history, but he faced mounting pressure.

Federal securities examiners were pushing for an investigation into his investment operation, which tens of thousands of soon-to-be victims had entrusted with nearly $7 billion. Some of the Texas financier's own employees were threatening to tell authorities what they knew about his fraud.

Stanford was so concerned that a former senior State Department official named Jonathan Winer might expose his colossal con game that he ordered an investigation into Winer's private life, according to Stanford's previously secret records obtained by McClatchy.

Kroll Inc., an international corporate intelligence firm that Stanford had retained for over a decade, obliged. Tom Cash, a Miami-based a managing director of Kroll, soon informed Stanford in an email that he was looking into whether Winer's ex-wife was a lesbian, according to the internal documents obtained by McClatchy.

Winer "is pure cockroach," Stanford emailed back, encouraging Cash to try to unseal Winer's divorce records. "Go after him as hard on as many fronts as possible."

Winer, who said in an interview that Kroll's characterization of his ex-wife was "patently absurd," wasn't the company's only target.

The documents show that Kroll also investigated and passed to Stanford personal information about several of his former employees, his defrauded investors, other U.S. government officials and journalists who were questioning his bank's financial stability. Stanford used the information to silence and discredit several of them.

Stanford is serving a 110-year jail sentence after having been found guilty in March of 13 federal fraud charges related to the scheme he ran from his offshore bank, Stanford International Bank, once located on the Caribbean island of Antigua.

The newly obtained documents shed light on some of the steps Stanford took to elude law enforcement officials for years. By the time his scheme was uncovered in 2009, nearly all of the cash that he fleeced from investors had disappeared. The records also show how Kroll stepped into ethically questionable territory as it foraged for damaging or embarrassing information that might be used to intimidate or smear Stanford's perceived adversaries.

Kroll, which has been referred to as Wall Street's "private eye," says its employees had no clue they were helping to conceal the second-biggest Ponzi scheme in U.S. history.

The disclosures regarding Kroll's work for Stanford come as a string of governmental investigations and private lawsuits surrounding those who allegedly aided Stanford's Ponzi scheme heat up. Even though Stanford is in jail, the Justice Department and Securities Exchange Commission are still investigating the conduct of other lawyers and accounting firms who worked for Stanford, according to people close to the inquiries. A federally appointed court receiver also has been attempting to claw back money for defrauded investors, suing several law firms and accounting firms for work they did for Stanford.

SEC examiners concluded as early as 1997 that Stanford was running a massive Ponzi scheme, agency records show. But Stanford was able to stall the opening of any formal inquiry for a full decade, much like the man behind the only bigger U.S. Ponzi scheme, Bernard Madoff.

Federal law enforcement officials, private lawyers seeking to recover money for victims and even some of Stanford's former aides say that his fraud likely would have been discovered years earlier if it hadn't been for the collective assistance of respected law firms, accountants and Kroll.

Kroll, the law firms and accountants have said they acted in good faith, but were duped themselves.

Citing "legal reasons," Kroll said it could not comment on "these specific events," but added that "none of the individuals associated with the investigation six years ago are currently employees of Kroll."

Cash, a former special agent in charge of the DEA's Florida and Caribbean Division, left Kroll in 2009.

The firm said it "takes active steps to ensure that the company conducts its business activities in compliance with the laws of the countries in which it operates."

Stanford considered Winer one of the most serious threats to unmask his Ponzi scheme as early as the late 1990s, during Winer's service as deputy assistant secretary of state for law enforcement. Among Winer's responsibilities was to combat international money laundering and encourage greater regulation of offshore banks, such as those headquartered in Antigua.

By locating his bank there, Stanford was able to evade regulation and oversight from U.S. authorities, while Antiguan banking regulators allegedly took bribes and other favors to turn a blind eye to his activities.

Over several years, Winer joined federal regulators and members of Congress, including then-Democratic Sen. Barack Obama of Illinois, in calling for legislation that eventually limited U.S. operations of countries that permit bank secrecy, perhaps indirectly leading to the exposure of Stanford's fraud.

What provoked Stanford to ask Kroll to investigate Winer for a second time was a May 2006 article about Stanford by Bloomberg news service. Bloomberg reported that Stanford had falsely claimed, in donating $2.5 million to restore the home of Stanford University founder Leland Stanford, that he was a relative of the late Leland Stanford. In a statement to Bloomberg, university officials denied any such "genealogical relationship between Allen and Leland Stanford."

The story quoted Winer by name, leading Stanford to believe that Winer was behind it, according to correspondence obtained by McClatchy.

But what upset Stanford the most was something not contained in the story, but in questions that Bloomberg reporters posed to him. They suggested that the returns Stanford's bank promised investors were implausibly high or that Stanford was even running a Ponzi scheme, according to the correspondence between the reporters and Stanford aides.

Worried that someone might raise those questions in print, Stanford emailed Cash about Winer on June 8, 2006: "Tom, I want an in depth profile, credit history, marriage, kids, work personal quirks."

"We are presently doing just that," Cash emailed back.

Stanford followed up the next day: "Do whatever it takes to zero in… I bet you can find a way to get Winer's divorce decree unsealed. The guy is pure cockroach and he keeps surfacing and saying all this insane BS to whoever will listen."

Cash emailed back that he was "exploring contacting the judge" about the divorce records or filing a freedom of information lawsuit.

Before the day was over, Cash triumphantly emailed: "Our info is wife by whom he had two children divorced him and ran off with another woman. Wife also was a lesbian."

Winer, now a senior director of the international consulting company APCO, said in an interview that the allegations regarding him and his wife were "laughable" and that there was nothing derogatory in his divorce records. "As to my ex-wife, one or both of us would have known if she was ever a lesbian. The most accurate information in the emails is my wife and I have two children. The actual number is three. Other than that, everything was wrong."

Records indicate that Cash ultimately discovered no derogatory information regarding Winer's divorce or his wife.

FBI agents seized copies of the emails between Stanford and Cash during a raid on the U.S. brokerage offices of Stanford's bank. McClatchy recently obtained copies of the emails and other records.

During the same period in which it targeted Winer, Kroll also tried its tactics on two former Stanford employees who sued him and threatened to talk to the Securities and Exchange Commission, the emails showed.

"I think we might be able to assist in this investigation which could get very significant unless we can discredit the accusers," Cash wrote Stanford.

Earlier, after the newspaper Caribbean Week published an article critical of Stanford in 1996, Stanford directed Cash to "go for … the jugular" in investigating the story's author.

Cash assured Stanford that Kroll had "three people working full time in developing information in the United States." The newspaper soon published a retraction of the article.

An expatriate Antiguan, McChesney Emanuel, also was a thorn in Stanford's side, the emails indicate.

Emanuel was the principal of the St. Pius V Parish Elementary School, a private Catholic school in New York City, where he sometimes held meetings with other dissidents to protest the Antiguan regime and Stanford's outsized influence over it.

In 2004, Kroll had undercover agents infiltrate their meetings and then sent Stanford detailed reports.

Cash's departure from Kroll came after it was discovered that he'd recommended that a company client, the National Electrical Contractors Association, invest with Stanford. Relying on Cash's report giving Stanford's bank a clean bill of health, the association bought $2.5 million of Stanford's worthless certificates of deposits, the group said in a 2007 lawsuit accusing Kroll of "gross negligence."

The suit alleged that Kroll "never disclosed" Cash's or Kroll's relationship to Stanford "before submitting a

falsely positive report.

The parties later settled the suit for terms that have not been disclosed.

- Facebook

  - 
- Twitter
  - 
  - 
- Google Plus
- More
  - Linkedin
  - Reddit
  - YouTube
  - 
  - E-mail
  - Print
  - 
  - 

# Join The Conversation

McClatchy Washington Bureau is pleased to provide this opportunity to share information, experiences and observations about what's in the news. Some of the comments may be reprinted elsewhere in the site or in the newspaper. We encourage lively, open debate on the issues of the day, and ask that you refrain from profanity, hate speech, personal comments and remarks that are off point. Thank you for taking the time to offer your thoughts.

Commenting FAQs | Terms of Service

Email Newsletters >
Manage newsletter subscriptions
Tablets >
Apps and services for tablet devices
Mobile >

Case 3:10-cv-00527-N-BQ   Document 131-1   Filed 03/03/15   Page 304 of 304   PageID 6572

Apps and services for your mobile phone
Social Media >
Get updates via Facebook and Twitter
Digital Subscriptions >
Manage your online subscriptions

© 2015 www.mcclatchydc.com and wire service sources. All Rights Reserved. http://www.mcclatchydc.com