IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0527-N |
| | § | |
| BEN BARNES, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>AFFIDAVIT OF KENT CAPERTON</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the aforesaid county and state on this day personally appeared Kent Caperton, known to me to be the person whose name is subscribed hereto and did depose and say:

1.      My name is Kent Caperton.  I am over the age of 21 years, and have never been convicted of a felony, and am competent to testify to the matters set forth in this Affidavit and I have personal knowledge of the facts set forth herein.

2.      I am a Corporate Representative of Ben Barnes Group, L.P. ("BBG"), and I make this Affidavit in support of a Response to Plaintiffs' Motion for Summary Judgment filed on behalf of BBG in the above referenced lawsuit.

3.      BBG entered into an arms' length oral contract with R. Allen Stanford and his associated companies ("Stanford") as early as 2002 for the provision of government-relations

AFFIDAVIT OF KENT CAPERTON                                                      Page 1

**Exhibit A**

consulting and lobbying services. There is no allegation in this case that this business relationship was void or illegal, nor is there any evidence that it was anything other than a normal business arrangement.

4. BBG provided its services to Stanford in the ordinary course of BBG's business. BBG provided the same types of services for Stanford that it routinely provided for other clients.

5. BBG fully performed its obligations under its contract with Stanford by providing over five years' worth of government-relations consulting and lobbying services to Stanford. Stanford set the goals to be attained and directed, guided, and authorized the services that BBG actually provided. BBG provided the following categories or examples of services:

6. BBG engaged in a multi-year legislative and regulatory effort to clarify the federal tax code provisions related to tax incentives for businesses and investors in the United States Virgin Islands ("USVI"). Specifically, Stanford directed BBG to work on clarifying the sourcing and residency regulations so that non-U.S. income would be taxed as domestic USVI income. Had BBG's efforts come to fruition, Stanford would have booked tax savings of at least $12.5 million per year and as much as $50 million per year, and the economy of USVI and the Caribbean region would have attracted more investment.

7. BBG worked for Stanford on a contract basis. BBG, at Stanford's direction and with Stanford's approval, arranged meetings with various elected officials who were involved in oversight, drafting, and enactment of federal tax laws and cross-border tax issues.

8. BBG facilitated a business relationship between Stanford and ESPN and assisted Stanford in negotiating television broadcast rights for its Stanford 20/20 Caribbean Cricket Tournament. As a result of BBG's introduction and involvement in contract negotiations,

AFFIDAVIT OF KENT CAPERTON                                                      Page 2

Stanford and ESPN entered into an initial television contract of $3.5 million, with a five-year extension with an annual increase of 25%. Over the six-year period, the contract was expected to be worth approximately $40 million to Stanford.

9.      BBG, which has experience in the airline industry, assisted Stanford over several years in selling two regional airlines (Caribbean Sun Airlines and Caribbean Star Airlines). BBG also helped Stanford explore several options to return those airlines to profitability, including a purchase of or merger with American Eagle, code-sharing arrangements with US Airways, establishing a business relationship with Sabre Airline Solutions to upgrade passenger reservations and check in, and establishing a business relationship with LIAT airlines, which ultimately brought a majority stake in the two airlines for several million dollars.

10.     BBG assisted Stanford in opening its own Washington, D.C. government relations and lobbying office in 2008 by making staffing suggestions and providing other logistical advice.

11.     BBG provided its services to Stanford at or below market rates. Those services have an objective value in the marketplace and conferred an economic benefit on Stanford. They also either created tangible value or have the potential to create tangible value for Stanford. Very few persons or companies have the expertise and experience to provide the kinds of services that BBG provided to Stanford.

12.     The compensation that BBG received from Stanford was in line with—if not less than—the compensation typically received by BBG's peer-group competitors in rendering similar services. It was also commensurate with the compensation paid to BBG by other clients for similar services.

Further affiant saith not.



KEN CAPERTON

SUBSCRIBED AND SWORN TO BEFORE ME this ⁄6th day of March 2015, to certify which witness my hand and official seal.

_____
Notary Public in and for the State of Texas

My Commission Expires:

6-5-2016

6485491v.2

JEAN HAYDON
Notary Public
STATE OF TEXAS
My Comm. Exp  June 05, 2015

AFFIDAVIT OF KENT CAPERTON                                              Page 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0527-N |
| | § | (JURY TRIAL DEMANDED) |
| BEN BARNES, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF JAY J. MADRID

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority on this day personally appeared Jay J. Madrid, known to me to be the person whose name is subscribed hereto and under oath did depose and say:

1.      My name is Jay J. Madrid. I am an attorney at law, employed by the Winstead PC law firm as a shareholder. I am over the age of twenty-one (21) years, have never been convicted of a felony, and am fully competent to testify to the matters set forth herein and I have personal knowledge of the facts set forth.

2.      I make this Affidavit in support of Defendant Ben Barnes Group, L.P.'s ("BBG") Response to the Motion for Summary Judgment filed by Plaintiffs in the above referenced matter.

3.      Attached hereto as Exhibit B-1 is a true and correct copy of the Deposition of James M. Davis which was taken by an official court reporter on October 24, 2014.

---

AFFIDAVIT OF JAY J. MADRID                                                                 Page 1

**Exhibit B**

4.      Attached hereto as Exhibit B-2 is a true and correct copy of the deposition of Benny Frank Barnes, taken on October 28, 2014.

5.      Attached hereto as Exhibit B-3 is a true and correct copy of a report entitled "America's Third Border", dated September 26, 2005.

6.      Attached hereto as Exhibit B-4 is a true and correct copy of the Report of James C. Langdon, Jr., Esq., a retained expert on behalf of Defendants in this case.

Further affiant saith not.

_____
Jay J. Madrid

SUBSCRIBED AND SWORN TO BEFORE ME this 6th day of March 2015, to certify which witness my hand and official seal.

_____
Notary Public in and for the State of Texas

JEAN HAYDON
Notary Public
STATE OF TEXAS
My Comm. Exp June 05, 2016

6485944v.1

AFFIDAVIT OF JAY J. MADRID                                                          Page 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, IN HIS        )
CAPACITY AS COURT-             )
APPOINTED RECEIVER FOR THE)
STANFORD INTERNATIONAL         )
BANK, LTD., et al. And the)
OFFICIAL STANFORD              )
INVESTORS COMMITTEE,           )
                               )
                               )
        Plaintiff,             )
                               )
VS.                            )    NO. 3:10-cv-527
                               )
                               )
BEN BARNES AND BEN BARNES )
GROUP, L.P.,                   )
                               )
                               )
        Defendants.            )


DEPOSITION OF

JAMES MILTON DAVIS

October 24, 2014


Reported by:

Valerie Hall Gilliam, LCR

Job no: 12770

**Exhibit B-1**

Page 2

1           The Deposition of JAMES MILTON DAVIS is taken

2    on this, the 24th day of October 2014, on behalf

3    of the Defendant, pursuant to notice and consent

4    of counsel, beginning at approximately 10:30 a.m.

5    in the Federal Prison Camp, Millington, 6696 Navy

6    Road, Millington, Tennessee.

7           This deposition is taken pursuant to the

8    terms and provisions of the Federal Rules of

9    Civil Procedure.

10           All forms and formalities are waived.

11   Objections are reserved, except as to form of the

12   question, to be disposed of at or before the

13   hearing.

14           The signature of the witness is waived.

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
1                A P P E A R A N C E S

2

    FOR THE PLAINTIFF:
3
                    JOSHUA E. ABRAHAM, ESQ.
4                   BUTZEL LONG
                    230 Park Avenue, Suite 850
5                   New York, New York 10169
                    212-374-5370
6                   abraham@butzel.com

7                   JESSE CASTILLO, ESQ.
                    CASTILLO SYNDER, PC
8                   300 Convent, Suite 1020
                    San Antonio, Texas 78705
9                   210-630-4200

10

11  FOR THE DEFENDANT:

12                  JAY MADRID, ESQ.
                    STEPHEN R. CLARKE, ESQ.
13                  WINSTEAD, PC
                    500 Winstead Building
14                  2728 North Harwood Street
                    Dallas, Texas 75201
15                  214-745-5709
                    jmadrid@winstead.com
16                  sclarke@winstead.com

17

    FOR THE WITNESS:
18
19                  DAVID FINN, ESQ.
                    MILNER FINN PRICE
20                  2828 North Harwood Street,
                    Suite 1950
21                  Dallas, Texas 75201
                    214-651-1121
22                  david@milnerfinn.com

23  COURT REPORTER:

24           Valerie Hall Gilliam, LCR

25
```

```
                                                          Page 4

 1              I N D E X

 2            EXAMINATION INDEX

 3

      JAMES MILTON DAVIS
 4        BY MR. MADRID . . . . . . . . . . . . . . 6
          BY MR. ABRAHAM . . . . . . . . . . . . . 47
 5

 6                EXHIBIT INDEX

 7    EXHIBIT NO.         DESCRIPTION              PAGE
          EXHIBIT NO. 1  Notice of Deposition       14
 8
          EXHIBIT NO. 2  Affidavit                  28
 9
          EXHIBIT NO. 3  America's Third Border     20
10
          EXHIBIT NO. 4  E-mail                     52
11
          EXHIBIT NO. 5  Letter                     61
12
          EXHIBIT NO. 6  E-mail                     64
13

14               OBJECTION INDEX

15        BY MR. ABRAHAM . . . . . . . . . . . . . 14
          BY MR. ABRAHAM . . . . . . . . . . . . . 16
16        BY MR. ABRAHAM . . . . . . . . . . . . . 19
          BY MR. ABRAHAM . . . . . . . . . . . . . 21
17        BY MR. ABRAHAM . . . . . . . . . . . . . 25
          BY MR. ABRAHAM . . . . . . . . . . . . . 26
18        BY MR. ABRAHAM . . . . . . . . . . . . . 27
          BY MR. ABRAHAM . . . . . . . . . . . . . 27
19        BY MR. ABRAHAM . . . . . . . . . . . . . 28
          BY MR. ABRAHAM . . . . . . . . . . . . . 31
20        BY MR. ABRAHAM . . . . . . . . . . . . . 34
          BY MR. ABRAHAM . . . . . . . . . . . . . 36
21        BY MR. ABRAHAM . . . . . . . . . . . . . 38
          BY MR. ABRAHAM . . . . . . . . . . . . . 38
22        BY MR. ABRAHAM . . . . . . . . . . . . . 38
          BY MR. ABRAHAM . . . . . . . . . . . . . 39
23        BY MR. ABRAHAM . . . . . . . . . . . . . 40
          BY MR. ABRAHAM . . . . . . . . . . . . . 40
24        BY MR. ABRAHAM . . . . . . . . . . . . . 41
          BY MR. ABRAHAM . . . . . . . . . . . . . 43
25        BY MR. ABRAHAM . . . . . . . . . . . . . 43
```

1

INDEX CONTINUED

2

        BY MR. ABRAHAM . . . . . . . . . . . . . 44
3       BY MR. ABRAHAM . . . . . . . . . . . . . 44
        BY MR. ABRAHAM . . . . . . . . . . . . . 45
4       BY MR. ABRAHAM . . . . . . . . . . . . . 46
        BY MR. ABRAHAM . . . . . . . . . . . . . 47
5       BY MR. MADRID  . . . . . . . . . . . . . 49
        BY MR. MADRID  . . . . . . . . . . . . . 49
6       BY MR. MADRID  . . . . . . . . . . . . . 50
        BY MR. MADRID  . . . . . . . . . . . . . 50
7       BY MR. MADRID  . . . . . . . . . . . . . 51
        BY MR. FINN   . . . . . . . . . . . . . 51
8       BY MR. MADRID  . . . . . . . . . . . . . 53
        BY MR. MADRID  . . . . . . . . . . . . . 54
9       BY MR. MADRID  . . . . . . . . . . . . . 54
        BY MR. FINN   . . . . . . . . . . . . . 55
10      BY MR. MADRID  . . . . . . . . . . . . . 55
        BY MR. FINN   . . . . . . . . . . . . . 55
11      BY MR. MADRID  . . . . . . . . . . . . . 55
        BY MR. MADRID  . . . . . . . . . . . . . 59
12      BY MR. MADRID  . . . . . . . . . . . . . 59
        BY MR. FINN   . . . . . . . . . . . . . 62
13      BY MR. MADRID  . . . . . . . . . . . . . 62
        BY MR. FINN   . . . . . . . . . . . . . 62
14      BY MR. MADRID  . . . . . . . . . . . . . 63
        BY MR. MADRID  . . . . . . . . . . . . . 63
15      BY MR. MADRID  . . . . . . . . . . . . . 64
        BY MR. MADRID  . . . . . . . . . . . . . 65
16      BY MR. MADRID  . . . . . . . . . . . . . 66
        BY MR. MADRID  . . . . . . . . . . . . . 67
17      BY MR. MADRID  . . . . . . . . . . . . . 68
        BY MR. MADRID  . . . . . . . . . . . . . 69
18      BY MR. MADRID  . . . . . . . . . . . . . 69
        BY MR. MADRID  . . . . . . . . . . . . . 69
19      BY MR. MADRID  . . . . . . . . . . . . . 70

20

21

22

23

24

25

Page 6

1              JAMES MILTON DAVIS,

2    having been called as a witness, was duly sworn

3    and testified as follows:

4                   EXAMINATION

5    BY MR. MADRID:

6       Q.   Good morning, sir.  Would you give us

7    your full name.

8       A.   Yes.  James Milton Davis.

9       Q.   Mr. Davis, what age man are you, please?

10      A.   Growing old isn't for sissies.  I'm 66.

11      Q.   You're a young man, according to my

12   book.

13      A.   Okay.  Well, thank you very much.

14      Q.   Sir, we are here at -- I think I've got

15   this right -- the Federal Correctional

16   Institution Camp in Millington, Tennessee.  Is

17   that correct, sir?

18      A.   Yes.  Federal Prison Camp Millington.

19      Q.   Federal Prison Camp.  Thank you.

20           And am I correct that you are currently

21   serving time here --

22      A.   Yes.

23      Q.   -- in this camp?

24      A.   Yes, sir.

25      Q.   And was that or -- should I say, was the

Page 7

1    sentence that you are serving here the result of

2    a plea, a guilty plea that you entered resulting

3    from some allegations relating to Stanford

4    Financial Group?

5         A.   Yes.

6         Q.   Okay.  First of all, thank you very much

7    for giving us the opportunity to chat with you

8    today.

9         A.   You're welcome.

10        Q.   I should have mentioned at the outset, I

11   represent Mr. Ben Barnes and the Ben Barnes

12   Group, both of whom are named as defendants.

13   They've been sued by the receiver for Stanford

14   Financial Group and all of the Stanford companies

15   and the investors committee, who are represented,

16   of course, by Mr. Abraham and Mr. Castillo.

17             First, do you know Mr. Ben Barnes?

18        A.   Yes, I do.

19        Q.   Do you recall when you met him, please?

20        A.   10 to 12 years ago.

21        Q.   Okay.  And what were the circumstances

22   under which you met him?

23        A.   I was introduced to him by the CEO of

24   Stanford, Allen Stanford.

25        Q.   Allen Stanford?

Page 8

1        A.    And that was in Houston, Texas, I

2    believe.

3        Q.    All right, sir.  What -- was there any

4    working relationship at that time, to your

5    knowledge, between Mr. Barnes' company, Ben

6    Barnes Group, and the Stanford Financial Group?

7        A.    Not to my knowledge.

8        Q.    Okay.  What were the circumstances under

9    which Mr. Barnes was introduced to you?

10       A.    He was doing business with Allen

11   Stanford.  I don't know -- I don't know the

12   nature of it.

13       Q.    Okay.  And again, you don't recall when

14   that would have been in terms of the year?

15       A.    In the area of 2004.

16       Q.    Okay.  All right.  While I'm at it, was

17   there any other representative of Ben Barnes

18   Group present at the time you met Mr. Barnes

19   himself?

20       A.    No, sir.

21       Q.    Okay.  Did you gain an understanding of

22   the type of work that the Ben Barnes Group was

23   engaged to do for the Stanford Financial Group?

24       A.    Over time, yes, sir.

25       Q.    Okay.  And what did you understand that

Page 9

1      to be, please?

2          A.    The Barnes Group provided advice and

3      counsel on matters that pertain to business.   In

4      that capacity, it was my understanding that he

5      built advisory relationships for the Stanford

6      companies.

7          Q.    Okay.

8          A.    There was specifics such as

9      communication assistance with certain business

10     leaders.   There was communications established, I

11     believe, with lawmakers in terms of lobbying

12     efforts.   That is to say, as an example, a

13     Caribbean caucus of Congress connections --

14     communication connections there.   He also kept

15     the Stanford companies aware of legislation that

16     impacted financial institutions.

17         Q.    Okay.

18         A.    I think also which would have been

19     matters that I liaised with Mr. Barnes on

20     occasionally, and that is private equity

21     opportunities, seeking those out and also

22     relationships.

23              And finally, I know that Mr. Barnes did

24     a lot of traveling to accomplish the goals that

25     were laid out, I know, between he and

Page 10

1    Mr. Stanford for the relationship they had an

2    agreement.

3        Q.   All right, sir.  Anything else that you

4    can recall just in general terms?

5        A.   I think that pretty well sums it up --

6        Q.   Okay.

7        A.   -- from my perspective.

8        Q.   Yes, I understand.

9             By the way, what office did you hold

10   with the Stanford Financial Group, please?

11       A.   I was chief financial officer.

12       Q.   Okay.  And can you give us an idea of

13   the period of time during which you served in

14   that capacity?

15       A.   From the early '90s, I would say.  The

16   end of '92 or sometime in 1992 forward --

17       Q.   Okay.

18       A.   -- to the end of the company's life.

19       Q.   And the end was at sometime in 2009.  Is

20   that your understanding?

21       A.   Yes.  It ended the 17th of February.

22       Q.   Of 2009?

23       A.   2009.

24       Q.   Okay.  Let me go back here.  You

25   mentioned a couple of things, please, about the

1    type of work that the Ben Barnes Group was

2    engaged to do.

3            First of all, do you know who within

4    Stanford Financial actually engaged Ben Barnes

5    Group?  Was it Mr. Stanford himself or was it

6    somebody else, to your understanding?

7        A.    The introduction to our group of

8    companies and the leaders within the company

9    would have been made by Mr. Stanford through his

10   lieutenants.  The agreements would have been

11   drawn up by the legal department --

12       Q.    Okay.

13       A.    -- or vetted by the legal department

14   under Mauricio Alvarado, who was general counsel.

15       Q.    And do you recall the name Yolanda

16   Suarez, by any chance?

17       A.    Yes, I do.

18       Q.    Can you tell us what -- if you recall,

19   what role she played in connection with engaging,

20   if any, the Ben Barnes Group?

21       A.    Ms. Suarez through the best of my memory

22   introduced the Barnes Group to a group of

23   companies -- actually to Mr. Stanford.  Her

24   capacity when she left the company, she was the

25   director of public relations and dealt in the

Page 12

1    marketing area as well.

2         Q.   Was she a lawyer or is she a lawyer, to

3    your knowledge?

4         A.   Yes.

5         Q.   Okay.  You mentioned that -- as you were

6    listing some of the areas that you told us based

7    on your understanding --

8         A.   Yes.

9         Q.   -- the Ben Barnes Group was engaged to

10   do, I wrote down advice and counsel regarding

11   business --

12        A.   Yes.

13        Q.   -- matters.

14        A.   Yes.

15        Q.   Can you expand on that just a little bit

16   perhaps by way of an example that you might give

17   us?

18        A.   Well, the board of directors of the

19   Stanford Group was always looking for new

20   opportunities private equity-wise, liaising with

21   other businesses that would be in the same line

22   of product delivery, so introductions to

23   like-minded executive CEOs, et cetera, in our

24   financial sector.  Also on a broader scale, the

25   economic activity that was going on worldwide and

1    especially in the United States and United

2    States' trading partners.

3         Q.   Okay.  And by the way, when you talk

4    about private equity, are you talking about

5    parties who might perhaps infuse some capital

6    into Stanford Financial or was there --

7         A.   The reverse.

8         Q.   The reverse?

9         A.   Yes, sir.

10        Q.   Investment opportunities for the

11   Stanford Group?

12        A.   Yes, sir.

13        Q.   Okay.  Also you mentioned advisory

14   relationships for setting up or establishing or

15   assisting with perhaps, the way you said it,

16   advisory relationships for the Stanford Group.

17   What do you mean by that, please?

18        A.   Well, there are -- it's my understanding

19   that during the -- especially during the earlier

20   part of this millennia, as the companies grew,

21   Stanford grew, there was a need for relationships

22   as I hinted at earlier with like-minded

23   entrepreneurs, boards of directors in the

24   financial sector.

25        Q.   Certainly.

1      A.    So the Barnes Group would assist and

2   consult and referrals and introducing

3   relationships in the financial sector in the

4   United States primarily --

5      Q.    Okay.

6      A.    -- and some in Latin America.

7      Q.    Did you have any dealings with anybody

8   other than Mr. Barnes himself during the time

9   that the Ben Barnes Group actually provided

10  services to the Stanford Financial Group?

11          MR. ABRAHAM:   Object to the form.

12          THE WITNESS:   In a minor capacity, Mitch

13  Delk, also Jim Sharpe, an attorney.

14  BY MR. MADRID:

15     Q.    Okay.   Anybody else that you can recall

16  with the Ben Barnes Group?

17     A.    Yes.   I communicated or my executive

18  assistant communicated directly on occasions with

19  his executive assistant, Patsy Tomlinson.

20          (WHEREUPON, THE BELOW-MENTIONED DOCUMENT

21  WAS MARKED AS EXHIBIT NO. 1 TO THE TESTIMONY OF

22  THE WITNESS AND IS HERETO ATTACHED.)

23  BY MR. MADRID:

24     Q.    Okay.   All right, sir.   Let me -- let me

25  show you what we've marked Davis Exhibit Number

Page 15

1    1.

2              I don't know if you've seen Exhibit

3    Number 1.  But do you recognize this to be the

4    notice for taking of your deposition, Mr. Davis?

5         A.   Take 10 seconds here.

6         Q.   Sure.  You bet.

7              MR. FINN:  This sets out the parameters

8    of the deposition.  I think we got this a couple

9    days ago.

10   BY MR. MADRID:

11        Q.   Are you able to recognize that,

12   Mr. Davis --

13        A.   Yes, sir.

14        Q.   -- as the notice for taking -- let's

15   turn to Exhibit B.  That's the last page there,

16   okay?

17        A.   Okay.

18        Q.   That's pretty much the road map that I

19   intend to try to go down here with you.

20              And in connection with the hiring of the

21   Ben Barnes -- by the way -- I'm sorry.  Strike

22   that.

23              Was there ever, to your knowledge, a

24   written engagement letter of some sort that

25   engaged the Ben Barnes Group on behalf of

Page 16

1    Stanford Financial, to your knowledge?

2         A.   It would have been according --

3    according to operating procedure to have one.  I

4    did not see it.

5         Q.   Okay.  Who would have been responsible

6    for overseeing a written engagement letter on

7    behalf of Stanford?

8         A.   Certainly our general counsel would,

9    Mauricio Alvarado --

10        Q.   Okay.

11        A.   -- very possibly Yolanda Suarez in this

12   particular case.

13        Q.   Okay.  With respect to that item Number

14   1 on exhibit -- Davis Exhibit 1, share with us,

15   if you would, please, what reasons existed for

16   the hiring of the Ben Barnes Group by any of the

17   Stanford entities --

18             MR. ABRAHAM:  Objection, form.

19   BY MR. MADRID:

20        Q.   -- if you know.

21        A.   Well, I was told by Mr. Stanford that at

22   the time he introduced Barnes Group to me that it

23   was the depth of experience, Mr. Barnes'

24   curriculum vitae and the location of his main

25   offices and his -- as a consequence of those

1    things, his ability to assist in those areas that

2    I mentioned to you when we first sat down, first

3    question.

4        Q.   Okay.  What plans, if you know, did the

5    Stanford Financial Group have in the making that

6    warranted or that would have been assisted by the

7    hiring of Ben Barnes Group?

8        A.   Well, there was a huge effort made to

9    study the Caribbean basin area and its

10   connectivity to the United States in terms of

11   trading partner, but maybe more importantly

12   connectivity from a legal basis including tax

13   issues.

14       Q.   Okay.

15       A.   There was a search made.  I recall

16   vaguely, there was a search made in those earlier

17   years to find someone that could assist in a very

18   big way --

19       Q.   Okay.

20       A.   -- in that area.

21       Q.   As it related to tax laws that affected

22   the Caribbean, is that --

23       A.   That was the really big item, yes.

24       Q.   Okay.  Why was that a big item, if you

25   recall?

Page 18

1      A.    Sometime ago, the United States --

2      Q.    She's not picking that conversation up.

3      A.    Sometime ago, there was an effort made

4  by the United States and the US Virgin Islands to

5  create, for lack of a better description, an

6  enterprise zone, an effort to bring in investment

7  to lift up this region, which has historically

8  been pretty well forgotten economically and so --

9  insofar as the welfare of the population in that

10  area.

11         So with that development, ultimately

12  laws were passed to give favored status to

13  certain investors in the US Virgin Islands,

14  especially from a tax perspective and other --

15  it's a myriad of good reasons for certain

16  qualified investors to come and establish a

17  business, live in the indigenous area and carry

18  out their business.

19         The Stanford companies had large beach

20  head in certain other island nations of the

21  Caribbean, especially the eastern Caribbean.  And

22  there was a need really to address the fact that

23  the US Virgin Islands is only one locale with

24  this favored status --

25      Q.    In the Caribbean?

Page 19

1        A.    -- in the Caribbean.  How could we

2    expand -- how could the United States' Congress

3    expand legislation to include other island

4    nations that would qualify for favored status?

5        Q.   I see.

6        A.   And this was in -- this was the impetus

7    for the Barnes Group to do work.

8        Q.   Okay.

9        A.   Actually, it was a lot of work.  It took

10   a long time.  It was a several-year effort, but

11   the resultant was a white paper that was produced

12   as a -- as a product of the research and the

13   effort made by the Barnes Group --

14       Q.   Okay.

15       A.   -- to address this issue.

16       Q.   We'll get to that in just a moment,

17   Mr. Davis.

18            Tell us this, had the -- by the way, did

19   the Barnes Group ultimately make recommendations

20   to either the Stanford Financial Group or to any

21   other body that you're aware of regarding tax

22   laws as it related to the Caribbean?

23            MR. ABRAHAM:  Objection.  Form.

24            THE WITNESS:  Explain further.

25   BY MR. MADRID:

Page 20

1      Q.    Sure.

2      A.    I'm not following you.

3      Q.    Well, I tell you what, let's just go to

4  Exhibit Number 3.  I'm going to hop out of -- I'm

5  going to hop out of sequence here for just a

6  minute.

7      A.    Okay.

8            (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

9  WAS MARKED AS EXHIBIT NO. 3 TO THE TESTIMONY OF

10  THE WITNESS AND IS HERETO ATTACHED.)

11  BY MR. MADRID:

12      Q.    Exhibit Number 3.  You had mentioned a

13  white paper.  And take your time to review that,

14  Mr. Davis.  But my question is whether Exhibit

15  Davis Number 3 is a copy of that white paper that

16  you had referenced here?

17      A.    Yes, sir.

18      Q.    Okay.  Do you know how much time and

19  effort undertaken by the Ben Barnes Group or

20  anybody working with the Ben Barnes Group, went

21  into the creation of this document?

22      A.    I do not know definitively.  I would

23  venture to say months, if not years.

24      Q.    Okay.  Did you have a chance to review

25  this after it was prepared?

1      A.   Years back, yes.

2      Q.   Okay.  Let me talk you through a couple

3   of items in here.

4           Let me turn your attention, if I may, to

5   Page 5 for just a moment, of Exhibit 3.  Let's

6   see here.  Let me get it.

7           There's a section here that's entitled,

8   The United States Has a History of Trade, Aid and

9   Private Investment in the Caribbean Basin.

10          Forgive me if I'm mispronouncing that,

11   okay?

12          But and then, there's a sub heading,

13   Trade Preferences Benefit the United States.

14          What can you tell us, Mr. Davis, about

15   the effort being undertaken by the Ben Barnes

16   Group as it related to United States Virgin

17   Island taxes that ties in or that were intended

18   to tie into economic prosperity in that region?

19          MR. ABRAHAM:  Object to the form.

20          THE WITNESS:  Well, I'm not a tax

21   specialist.  However, my understanding at the

22   time in the tax area and something that the

23   Barnes Group was working over a long period of

24   time on, i.e., the white paper and its detail,

25   one area was easing the tax burden for those who

Page 22

1    would venture in with investment into the

2    indigenous area of the Caribbean, specifically

3    the Saint Croix area and the island, the leeward

4    islands, for example.

5            As all of this table are probably aware

6    of the tax law -- well, it's been in the papers

7    recently -- the tax laws are quite punitive for

8    entrepreneurs in the United States who wish to do

9    business overseas.  That is to say, if I invest

10   in -- in Ecuador and my company's doing very

11   well, even though I do not receive any cash out

12   of that company in Ecuador making profit hand

13   over fist, even though I receive no cash dollars,

14   the income reported in the company's financial

15   statement is fully taxable as ordinary income to

16   me as a US citizen.

17           So that's really the backbone of the

18   whole issue that was addressed in the Caribbean.

19   And Ben Barnes Group, as I understand it, were

20   working with their teams of advisors and liaising

21   with our legal department and with Mr. Stanford

22   and the board.  I presume they were hammering out

23   something that would be beneficial.

24   BY MR. MADRID:

25       Q.   How much of the focus, to your

1    knowledge, was on creating economic growth and

2    prosperity in that region that tied into the

3    study of the tax issue?

4         A.   It was a multifaceted program as

5    evidenced by the length of this paper and the

6    footnoting.  It was -- it was said over and over

7    again in the few times that I had -- I was privy

8    to certain meetings with the Barnes Group or

9    Mr. Stanford and the board and reporting from the

10   Barnes Group activity, it was significant that in

11   the area, for example, of security, the security

12   of our nation, when we have a good neighbor

13   relationship especially with those that are our

14   third border right at our doorstep, we had a good

15   relationship, that is to say a give-and-take

16   relationship whereby their indigenous area and

17   people are enhanced by the activity, what they're

18   giving up, preferences.  Preferences on tax.

19   Preferences on real estate holdings.  Preference

20   maybe on citizenship.  Preferences on import and

21   export.

22             If that happens, they tend to be a

23   better neighbor than just ignoring them or having

24   old laws unaddressed or even so much as punitive

25   embargoes, et cetera.  So there's the -- overall

Page 24

1    security enhancement for the United States to

2    have state-of-the-art, workable, reasonable tax

3    law, import/export law, residence law,

4    citizenship law.  And as a consequence of all of

5    that, investment pours into these indigenous

6    island nations in this example and people get

7    jobs and they're no longer selling bananas on the

8    street corner.  They're making things and they're

9    working in retail/wholesale businesses and

10   factories and tourism starts going up instead of

11   down.

12        Q.   All of --

13        A.   If you'll recall -- if you'll recall in

14   the Saint Croix area, for example, they had that

15   machete killing many years ago which absolutely

16   killed the tourism business.  And then, we had

17   Hurricane Hugo in 1989, September, smashed the

18   island.  So as an example, that -- but not

19   exclusively Saint Croix.  Those island nations

20   were hammered several times.

21             So in a general sense, this is what was

22   going on with the Barnes Group.  It was

23   intensive.  It was -- I knew it was going a long

24   time.  Naturally, I'm not -- I was not involved

25   in the thick of the detail, but enough of it to

Page 25

1    know that he was addressing the needs of the

2    company at that time.

3        Q.   And you had high-level knowledge of that

4    activity.  Is that a fair statement?

5        A.   Yes, sir.

6             MR. ABRAHAM:  Objection, form.

7    BY MR. MADRID:

8        Q.   By the way, who would have -- within the

9    Stanford Financial Group, who would have had more

10   frequent contact with the actual work that was

11   being performed, if you know?  Than you, I should

12   say.

13       A.   Other than myself?

14       Q.   Yes.

15       A.   Well, certainly, Mr. Stanford.

16       Q.   Okay.

17       A.   And his internal CEO mechanism.  Also

18   I'm sure Mauricio Alvarado.  Obviously, the

19   legalities here are intensive as all legalities

20   are.  If the paper is not correct, it doesn't

21   happen.  And there was a lot of paper.

22       Q.   I understand.  All right.  You mentioned

23   some of the folks who were working with the

24   Stanford group.  Did you -- and I think you

25   mentioned the name of Mitch Delk, D-E-L-K?

Page 26

1       A.    Yes, sir.  I met Mr. Delk there in

2   Washington.

3       Q.    Do you recall meeting anybody else who

4   served as sort of a specialized contractor to the

5   Barnes Group in connection with work being done

6   for the Stanford Financial Group?

7           MR. ABRAHAM:  Object to form.

8           THE WITNESS:  Off the top of my head, I

9   can't recall at this time.  You might refresh my

10  memory somewhat.

11  BY MR. MADRID:

12      Q.    Sure.  How about a man named Scott Reed?

13  Do you recall ever meeting Mr. Reed?

14      A.    I believe I did meet a Mr. Reed.  I

15  don't recall where.  The name -- the name rings

16  true.

17      Q.    Mr. Jeff Forbes; do you recall that

18  gentleman?

19      A.    No, sir.

20      Q.    How about Wayne Rogers?

21      A.    The name's familiar, but I don't know

22  that I met him.

23      Q.    Okay.  Are you familiar with the

24  process, Mr. Davis, that Stanford Financial went

25  through to authorize the Ben Barnes Group to go

Page 27

1    out and hire other specialists for work done for

2    Stanford Financial?

3              MR. ABRAHAM:  Object to the form.

4              THE WITNESS:  Excuse me?

5    BY MR. MADRID:

6        Q.    That is for the record.

7              You want me to restate that question for

8    you?

9        A.    That would be nice.

10       Q.    Sure.  How was it that Mr. -- that the

11   Ben Barnes Group was -- was able to go about

12   hiring other people to work on Stanford Financial

13   Group matters?

14       A.    It would have been a product of the

15   agreement between the companies and the Ben

16   Barnes Group.

17       Q.    Is it your understanding that each of

18   these specialists was authorized by Stanford

19   Financial at -- was authorized by Stanford

20   Financial?  In other words --

21       A.    Absolutely.

22             MR. ABRAHAM:  Objection, form.

23   BY MR. MADRID:

24       Q.    That's better than an objection.

25             MR. FINN:  I tried, but they said they

Page 28

1    can't turn it off.

2            MR. MADRID:  No, no, no.  I understand.

3    BY MR. MADRID:

4       Q.   All right, sir.  How would you describe

5    the dealings that went on between the Ben Barnes

6    Group and the Stanford Financial, specifically?

7    Were these arms-length transactions as you

8    understand that term?

9            MR. ABRAHAM:  Object to the form.

10           THE WITNESS:  Well, they're absolutely

11   arms-length transactions, but there was a

12   cordiality.  There was times of tense

13   communication and back and forth, had discussions

14   pro and con that maybe got a little heated

15   sometime, but it was arms length.

16   BY MR. MADRID:

17      Q.   Okay.

18      A.   But at the end, final analysis, cordial

19   and relationship was a pretty firm one, getting

20   results.

21      Q.   Good.

22      A.   Products were coming.  That is to say,

23   results of the anticipated items on the agreement

24   were being delivered.

25           (WHEREUPON, THE BELOW-MENTIONED DOCUMENT

Page 29

1    WAS MARKED AS EXHIBIT NO. 2 TO THE TESTIMONY OF

2    THE WITNESS AND IS HERETO ATTACHED.)

3    BY MR. MADRID:

4        Q.    Okay.  Well, let me go on to Exhibit

5    Number 2, Mr. Davis.  That's the one that I took

6    out of -- let's see.  Take your time and review

7    that, Mr. Davis, if you would.

8             Do you recognize Exhibit 2, please, sir?

9        A.    Yes, I do.

10       Q.    And is that an affidavit that bears your

11   signature?

12       A.    Yes, sir.

13       Q.    With a date of March 12, 2010?

14       A.    Yes, sir, it is.

15       Q.    Do you recall the purpose for which this

16   document was prepared and signed by you?

17       A.    Purpose?

18       Q.    Yes.

19       A.    I was asked to share what I knew of the

20   relationship of the Barnes Group and Stanford

21   Group.

22       Q.    Okay.

23       A.    And I attested to it, signed it.

24       Q.    Yes, sir.

25             May I draw your attention, please, to --

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

1   let's start with Paragraph 2 on the first page,

2   please, sir.  And I note here -- this affidavit

3   says, I met Mr. Ben Barnes and certain of his

4   colleagues who worked either for him or within

5   his government relations and lobbying group.

6           Is that a correct description of how you

7   would describe the Ben Barnes Group; that is,

8   government relations and lobbying?

9       A.   Yes, sir.

10      Q.   Okay.  The third line down says,

11   additionally, Mr. Stanford relied on the business

12   relationships and acumen of Mr. Barnes.

13          Is that what you meant when you were

14   talking about a resume, a curriculum vitae of

15   Mr. Barnes?

16      A.   Yes, sir.

17      Q.   Okay.  And then, you go into some

18   examples here.  You say in no order of priority

19   or representation of totality, one was the

20   efforts to improve the tax treatment of US

21   companies who made substantial business

22   investments in the Caribbean.

23      A.   Yes, sir.

24      Q.   Have I read that correctly?

25      A.   Yes, sir.

Page 31

1      Q.   And that's what you've just described to

2  us, correct, sir?

3      A.   In a general way, yes.

4      Q.   Okay.  And am I correct that one product

5  of that effort was this white paper?

6      A.   Here, yes, sir.

7      Q.   The white paper.

8      A.   Yes, sir.

9      Q.   I'm sorry.  I cut you off there.

10     A.   I was going to say that, yes.  The

11 answer is yes, but in a general answer that I

12 gave.  There are other details.

13     Q.   Sure.  Do you recall what other work was

14 actually done by the Ben Barnes Group or any of

15 the contractors who worked with the Ben Barnes

16 Group as it related to that effort, that taxation

17 effort that you described?

18          MR. ABRAHAM:  Object to the form.

19          THE WITNESS:  Well, such things as

20 treatment of income coming out of other than the

21 US Virgin Islands business activity that -- as I

22 mentioned earlier, the concept was to gather up

23 more participating island nations and put them

24 into this -- this tax -- tax preference, if you

25 want to call it basket, whereby say in the lower

Page 32

1    leeward islands, for example, maybe even that

2    Guadeloupe, Martinique, Antigua, Montserrat, they

3    would if receiving the investment help from

4    investors in the United States would also be able

5    to have preferred tax treatment just as the US

6    Virgin Islands had.  So expansion there.

7            And I mentioned earlier residency

8    requirements, changing those to be conducive to

9    those investors who --

10   BY MR. MADRID:

11       Q.    Okay.

12       A.    -- wish to participate.  That is to say,

13   shortening it and allowing them to qualify --

14       Q.    Okay.

15       A.    -- for a special status.

16       Q.    If that work had resulted in an

17   expansion of those tax benefits, to whose benefit

18   would that have been?

19       A.    It would be to everyone's benefit.  It

20   would be the benefit of an indigenous area,

21   certainly enhanced economic environment.  But it

22   would be very advantageous, I would think -- and

23   I may be naive -- but advantageous to the United

24   States and its security based on a favored

25   relationship with those island nations in their

Page 33

1    third border.  It's just a stone's throw off the

2    coast.

3        Q.   Right.

4        A.   Instead of a stepchild, it should be a

5    partnership.

6        Q.   Almost as close as Cuba?

7        A.   Yeah.  Yeah.  90 miles.

8        Q.   If you'll look again at Exhibit 2 there

9    for a moment.

10            Continuing to read here, four lines from

11   the bottom of that first page, there's a phrase

12   that begins "efforts to acquire license and

13   operate two small, regional airlines within the

14   Caribbean and subsequently to dispose of those

15   enterprises".

16            What can you tell us about that effort,

17   please?

18       A.   Stanford companies, Mr. Stanford

19   primarily, wished to establish an airline that

20   had a better line of equipment, higher level,

21   higher standard of air service to the islands in

22   the indigenous area.  And that would have been a

23   first-time effort in that particular sector.  He

24   needed help and sought help.  Barnes Group

25   offered assistance in the process of taking the

Page 34

1    desire and the idea, the initial think-tank plan

2    all the way up to and including successful

3    licensing, which was pretty rigorous -- pretty

4    rigorous effort and time and energy.

5        Q.    And was the Ben Barnes Group, to your

6    knowledge, successful in achieving that

7    licensing?

8        A.    Stanford ended up with two airlines that

9    were operating.

10       Q.    Okay.  Were they successful?

11           MR. ABRAHAM:  Object to the form.

12           THE WITNESS:  That depends on how you

13   define success.

14   BY MR. MADRID:

15       Q.    Are they still flying today?

16       A.    No.  Well, in -- in very possibly in

17   their grandchild, great grandchild status; that

18   is to say, assets being taken over by other

19   companies and expanding.  They went belly up

20   financially.  But in terms of operation, they

21   operated for some time.

22       Q.    Okay.  Was the Ben Barnes Group at all

23   instrumental in assisting in liquidating those

24   airlines once they went belly up?

25       A.    I'm not familiar with that process.

Page 35

1      Q.   All right.  You then mention in here --

2   the next phrase is "securing TV network coverage

3   for the 20/20 Cricket Tournaments sponsored by

4   Mr. Stanford".

5           Tell us what that is about, please.

6      A.   Mr. Stanford had a one-of-a-kind sport

7   established called 20/20 in the cricket area.

8   And he thought as those in his area such as the

9   board of directors, he convinced that it would be

10  a boom to the economy of the Island and it would

11  be a good marketing tool.  And having not been a

12  cricketer, not having much very much knowledge of

13  that very elusive sport, he asked for help and

14  got help.

15     Q.   Okay.

16     A.   And relationships with certain media

17  were established, and cricket had a life for a

18  while.

19     Q.   Do you know more precisely what work the

20  Ben Barnes Group actually did?

21     A.   No.  I don't know the details of it.

22     Q.   Who would have been the point person at

23  Stanford Financial on that issue; that is,

24  relating to the 20/20?

25     A.   Mr. Stanford had a lieutenant who was

Page 36

```
 1   bird dogging the cricket effort.  And I'm trying

 2   to think of -- I don't know the person's name,

 3   but it would have been a direct report to

 4   Mr. Stanford.  And they would have handled all

 5   the liaison efforts directly with outside

 6   consulting.

 7       Q.   Okay.  Had those airlines -- I'm sorry.

 8   I'm getting ahead of myself here.

 9            Had the cricket tournament -- I'm sorry.

10   Strike that.

11            Was the cricket tournament, to your

12   knowledge, successful?

13            MR. ABRAHAM:  Object to the form.

14            THE WITNESS:  In some respects, it was

15   successful.

16   BY MR. MADRID:

17       Q.   Okay.  Had it continued, what benefit,

18   if any, do you see that would have accrued to the

19   region, to the Caribbean region, that you've

20   described?

21       A.   The direct beneficiary would be the

22   tourism business and good public relations for

23   them, the island nations as a whole.

24       Q.   And why did that cricket tournament not

25   continue?
```

Page 37

1      A.    The demise of Stanford.

2      Q.    Let me ask you to turn the page, please,

3   and go to Paragraph 3.

4          You see where you say in there,

5   Mr. Barnes and BBG also introduced Mr. Stanford

6   and others within the Stanford group to TV

7   broadcast executives, an introduction that led to

8   a broadcast contract to assure coverage of the

9   cricket -- of Mr. Stanford's cricket tournament.

10         Do you know -- were you involved in

11  the -- in the particulars of that introduction?

12     A.    Not the particulars, no.

13     Q.    What is your level of knowledge of that;

14  that is --

15     A.    Very slim.  But there were relationships

16  established with local, that is to say,

17  indigenous area media as well as media outlets

18  and producers in the United States, say Cable

19  Vision, networks and other nontraditional

20  networks, but very active in -- in the sports

21  sector --

22     Q.    Okay.

23     A.    -- in media.

24     Q.    Was the work done by the Ben Barnes

25  Group on that cricket tournament of value to

Page 38

1    Stanford Financial?

2         A.   Yes, sir.

3              MR. ABRAHAM:  Object to form.

4              THE WITNESS:  I would say so.

5    BY MR. MADRID:

6         Q.   Okay.  Was the work that the Ben Barnes

7    Group did for Stanford Financial on all of these

8    projects, in your view, valuable to the Stanford

9    Financial Group?

10             MR. ABRAHAM:  Object to form.

11             THE WITNESS:  Yes, sir.

12   BY MR. MADRID:

13        Q.   You've already mentioned the tax

14   incentive issue.  Let's use that as an example,

15   Mr. Davis.  Had that been carried through

16   successfully, would there have been ultimate

17   benefit to the creditors of the Stanford

18   Financial Group --

19             MR. ABRAHAM:  Object to form.

20   BY MR. MADRID:

21        Q.   -- as well as to the indigenous

22   population?

23        A.   That's possible, very possible.

24        Q.   Okay.  Prosperity --

25        A.   Yes, sir.

1      Q.    -- presumably would have -- would have

2    been broadened.  Is that your understanding?

3      A.    Yes, sir.

4      Q.    Okay.  Let me finally go to Paragraph 4.

5    You have a citation or a note here that you're

6    also aware that Mr. Barnes and BBG worked closely

7    with an international law firm that represented

8    the US VI government regarding tax and trade

9    issues in the Caribbean basin.

10          Do you know the name of that

11   international law firm?

12     A.    I should, but being an old man, my

13   memory's fading.  Out of Miami and Washington.

14     Q.    That's okay if you can't --

15     A.    All right.

16     Q.    -- recall it to mind.  No problem.

17     A.    It can't pop into my mind at the moment.

18     Q.    And you're making me nervous with your

19   references to the old man.

20     A.    Hey, it happens.

21     Q.    How do you understand the Ben Barnes

22   Group worked in conjunction with the, I'll call

23   them the contractors, the specialists --

24          MR. ABRAHAM:  Object to form.

25   BY MR. MADRID:

Page 40

1      Q.    -- who were -- who were brought in for

2    working on the Stanford group?  How do you

3    understand they interfaced?

4           MR. ABRAHAM:  Object to form.

5           THE WITNESS:  Well, the ultimate goal

6    was fairly evident to me at least through casual

7    conversations and the few meetings that I was a

8    part of that involved the Ben Barnes Group and

9    Stanford that deliverables were addressed by the

10   Barnes Group with these outside folks and those

11   deliverables were monitored.  And if the --

12   strayed from those deliverables, I'm sure they

13   were cinched back in and put back on track or

14   they weren't utilized.

15           So it's a matter of contractual

16   defineables.  We need this and it needs to be

17   done at this date and they liaised with those

18   people --

19   BY MR. MADRID:

20      Q.   How would you --

21      A.    -- and made it happen.

22      Q.   I'm sorry.  I didn't mean to interrupt

23   you there.

24           How would you define the role of the Ben

25   Barnes Group related -- as it related to these

Page 41

1    various specialists?

2         MR. ABRAHAM:  Object to the form.

3         THE WITNESS:  They -- they would have

4    been in the director's seat.  They would have

5    been a monitor.  They would have been the team

6    leader.

7    BY MR. MADRID:

8         Q.   The coordinator, would that be a fair --

9         A.   Team leader, coordinator, monitor, yes,

10   sir.

11        Q.   Okay.  Do you know how payments were

12   actually made to these other specialists?

13        A.   I don't know the detail of the payment

14   stream.  That would have been handled probably by

15   the general accounting under Mr. Gilbert Lopez's

16   group.  He was the chief accounting officer.

17        Q.   Okay.  Do you know if Ms. Suarez had

18   anything to do with that process; that is, the

19   payment of these other specialists?

20        A.   No, sir, I don't know any detail on

21   that.

22        Q.   Are you able to tell us, sir, whether

23   the Ben Barnes Group would actually bill the

24   Stanford Financial Group for services performed

25   by these specialists and then turn around on

1    payment of that and pay these specialists?

2            MR. ABRAHAM:  Object to the form.

3            THE WITNESS:  I was not in the loop, but

4    it would not surprise me if that happened.

5    BY MR. MADRID:

6        Q.   Okay.  All right.

7        A.   Pretty good bookkeeping method.

8        Q.   And I apologize if I've asked you this.

9    Do you know if Ms. Suarez was involved in that

10   process at all?

11       A.   Yeah, you did ask me.

12       Q.   Okay.

13       A.   But I don't know what part, if any, she

14   played in that.

15       Q.   All right, sir.  Now, Mr. Davis, as I

16   understand the allegations made by the receiver

17   and by the investors committee, the -- there is

18   this contention that the Stanford Financial Group

19   was a Ponzi scheme.  Is that your understanding?

20       A.   Yes, sir.

21       Q.   Okay.  And am I further correct that the

22   Ponzi scheme as alleged had something to do with

23   the sale of certificates of deposit?

24       A.   Yes, sir, it did.

25       Q.   Is that correct?

Page 43

1           Are you able to tell us, sir, if anybody

2    in the Ben Barnes Group had anything whatsoever

3    to do with the sale or promotion of any

4    certificates of deposit issued by a Stanford

5    entity?

6           MR. ABRAHAM:  Object to the form.

7           THE WITNESS:  No, sir.  No, sir.

8    BY MR. MADRID:

9      Q.   Sorry.  How about Ben Barnes, himself?

10   Did he have anything to do with that?

11     A.   Not to my knowledge.

12     Q.   Okay.  Are you aware of any information

13   that was ever given to Mr. Barnes or any of the

14   Ben Barnes Group individuals that would have

15   suggested that the Stanford Financial Group was a

16   Ponzi scheme?

17     A.   No, sir.

18          MR. ABRAHAM:  Object to form on that.

19   BY MR. MADRID:

20     Q.   You didn't give him any such

21   information, did you?

22     A.   I did not.

23          MR. MADRID:  We've been going a little

24   bit over an hour.  Shall we take a quick break,

25   just a stretch?  Is that okay?

Page 44

1            MR. FINN:  Sure.

2            (WHEREUPON, A RECESS WAS TAKEN FROM

3     11:32 A.M. UNTIL 11:37 A.M., AT WHICH TIME THE

4     DEPOSITION CONTINUED AS FOLLOWS:)

5     BY MR. MADRID:

6        Q.   Mr. Davis, let me clarify one thing.  I

7     may have asked a confusing question.

8            Is it your testimony that nobody

9     employed by the Ben Barnes Group had anything to

10    do with the facts that allegedly formed this

11    Ponzi scheme that is alleged against the Stanford

12    Financial Group?

13           MR. ABRAHAM:  Objection.

14           THE WITNESS:  No.

15    BY MR. MADRID:

16       Q.   Okay.  They had nothing to do with it?

17       A.   Nothing to do with it.

18       Q.   Same with respect to Mr. Barnes

19    individually?

20       A.   Nothing to do with it.

21       Q.   Okay.  Can you tell us whether, to your

22    knowledge, anybody at the Ben Barnes Group knew

23    anything about the so-called Ponzi scheme?

24           MR. ABRAHAM:  Objection.  Form.

25           THE WITNESS:  No, they did not know.

Page 45

1   BY MR. MADRID:

2        Q.   Same as to Ben Barnes?

3             MR. ABRAHAM:  Object to form.

4             THE WITNESS:  Same as Ben Barnes.

5   BY MR. MADRID:

6        Q.   Okay.  Now, sir --

7        A.   Same as everybody.

8        Q.   I understand.  Even the SEC?

9             Well, that wasn't a question, so let me

10  go on here.

11            MR. CASTILLO:  There's a reason for

12  that.

13            THE WITNESS:  That's another story.

14            MR. CASTILLO:  Yep.

15  BY MR. MADRID:

16       Q.   How did -- well, let me back up.  Did

17  you have anything to do with the hiring of

18  professionals who actually performed services on

19  behalf of the Stanford Financial Group?

20       A.   On occasions.

21       Q.   Law firms, for example?

22       A.   No, sir.

23       Q.   What types of firms did you have

24  anything to do with hiring, please?

25       A.   Strategic planning consultants.

Page 46

1       Q.   Do you recall the names of any of the

2   folks that you might have had --

3       A.   No.

4       Q.   -- responsibility for?

5            Did you become familiar with the charges

6   they were charging, they were actually sending

7   for the services that those people --

8       A.   That I hired?

9       Q.   Yes.

10      A.   Yes.

11      Q.   Okay.  In terms of reasonableness of

12  billings, can you tell us how the Ben Barnes

13  Group billings compared with some of the

14  professionals that you hired?

15           MR. ABRAHAM:  Objection.  Form.

16           THE WITNESS:  I think they were

17  comparable in terms of per hourly charges, if you

18  wanted to break that down per day, travel, per

19  diem --

20  BY MR. MADRID:

21      Q.   Okay.

22      A.   -- depending on the level of assistance

23  that the firm would pull from outside sources.

24  It's quite a variable business out there, but

25  it's expensive.

1      Q.   Right.   Do you have an opinion as to

2    whether the Barnes -- Ben Barnes Group charges

3    were reasonably equivalent to the money that was

4    actually paid?

5           MR. ABRAHAM:   Object to the form.

6           THE WITNESS:   My feeling is that it was

7    reasonable.

8    BY MR. MADRID:

9      Q.   Okay.

10          MR. MADRID:   I thank you, sir.   I have

11   no further questions, Mr. Davis.   And I thank you

12   for your time.

13          Pass the witness.

14          THE WITNESS:   Yes, sir, Mr. Madrid.

15          MR. ABRAHAM:   Let's take a two-minute

16   break.

17          (WHEREUPON, A RECESS WAS TAKEN FROM

18   11:41 A.M. UNTIL 11:46 A.M., AT WHICH TIME THE

19   DEPOSITION CONTINUED AS FOLLOWS:)

20          MR. ABRAHAM:   I just want to note for

21   the record that there's a lot of chatter over

22   speakers going on and that's been somewhat

23   disruptive.

24          MR. FINN:   Yeah.   I spoke with them and

25   they can't turn it off.

Page 48

                              EXAMINATION

1

2    BY MR. ABRAHAM:

3         Q.    Okay.  Do you recall, Mr. Davis, when

4    Ben Barnes and the -- or the Ben Barnes Group was

5    retained by the Stanford group companies?

6         A.    I thought it was 10 or 12 years ago,

7    around 2004.  It could have been a different time

8    because of who actually put -- put the agreement

9    together with the group.

10        Q.    And do you recall what the Ben Barnes

11   Group was paid in 2004?

12        A.    No, sir.

13        Q.    And do you recall what the Ben Barnes

14   Group was paid in 2005?

15        A.    No, sir.

16        Q.    Do you recall what the Ben Barnes Group

17   was paid in 2006?

18        A.    No, sir.

19        Q.    What about 2007?

20        A.    No, sir.  I don't know the details of

21   those charges that those -- that -- in those

22   years.

23        Q.    Understood.  And I assume you also don't

24   know what they were paid, if anything, in 2008 or

25   2009?

Page 49

1       A.    No, sir.

2       Q.    Okay.   You testified earlier that you

3   were introduced to Ben Barnes by Allen Stanford;

4   is that correct?

5       A.    Yes, sir.

6       Q.    Is it your understanding that the

7   relationship between Allen Stanford and Ben

8   Barnes preceded your relationship with Ben

9   Barnes?

10          MR. MADRID:   Object to the form.

11          THE WITNESS:   It's my understanding.

12  BY MR. ABRAHAM:

13      Q.    Do you have any idea as to how long that

14  relationship preceded your relationship with Ben

15  Barnes?

16      A.    No, sir.

17      Q.    Would you describe them as good friends?

18          MR. MADRID:   Objection.   Form.

19          THE WITNESS:   I would say they were

20  friends, yes.

21  BY MR. ABRAHAM:

22      Q.    Do you have an understanding as to how

23  their friendship began?

24      A.    It's my understanding that he was --

25  Mr. Stanford was introduced to Mr. Barnes by

Page 50

1    Yolanda Suarez.  I don't know when.

2         Q.   Do you have any understanding as to how

3    often Ben Barnes and Allen Stanford communicated?

4         A.   Often.

5         Q.   And would that be weekly?  Monthly?

6              MR. MADRID:  Objection.  Form.

7              THE WITNESS:  I wasn't a party to their

8    communication, but I would say that they

9    communicated often.

10   BY MR. ABRAHAM:

11        Q.   If you had to estimate, how often do you

12   believe they communicated?

13             MR. MADRID:  Objection.  Form.

14             THE WITNESS:  Estimate, say monthly,

15   maybe quarterly at the outside.

16   BY MR. ABRAHAM:

17        Q.   And do you have any understanding as to

18   topics they communicated during those

19   conversations?

20        A.   Say again, please.

21        Q.   Were you privy to those conversations?

22        A.   No, sir.

23        Q.   So you have no idea what they spoke

24   about during those conversations; is that

25   correct?

Page 51

1        A.   Well, I have an idea.  They had an

2    agreement for services to be provided.  I have no

3    reason to doubt as to their sticking to their

4    agreement and talking business, talking about

5    issues in the Caribbean, et cetera, talking about

6    tax, legislative issues, et cetera.

7        Q.   And you testified that Allen Stanford

8    and Ben Barnes were friends; they were old

9    friends?  Is that correct?

10           MR. MADRID:  Objection.  Form.

11   BY MR. ABRAHAM:

12       Q.   They were friends?

13       A.   I said they were friends.  I would

14   classify them as friends after a period of time.

15       Q.   And you were also friends with Allen

16   Stanford, correct, at a certain time?

17       A.   At a certain time, I was -- I felt I was

18   his friend.

19       Q.   And during your friendship, did Allen

20   Stanford confide in you anything with respect to

21   his fraudulent activities?

22           MR. FINN:  Listen, don't answer that.

23           MR. MADRID:  Object to the form.

24           MR. FINN:  This is about Ben Barnes.

25           MR. ABRAHAM:  I agree.

Page 52

1          MR. FINN:  When I say don't answer it, I

2     mean don't answer it.  So if he tries to take

3     another bite at the apple, you know, just wait

4     for me to object if I'm going to object.

5          MR. ABRAHAM:  I would like to mark this

6     exhibit as Exhibit 4.

7          (WHEREUPON, THE ABOVE-MENTIONED

8     EXAMINATION INDEX DOCUMENT WAS MARKED AS EXHIBIT

9     NO. 4 TO THE TESTIMONY OF THE WITNESS AND IS

10    HERETO ATTACHED.)

11    BY MR. ABRAHAM:

12       Q.   I'm placing before you what we've marked

13    as Exhibit 4.  This is an e-mail between Julie

14    Hodge and Kayla Hughes dated April 18th, 2006.

15          Who's Julie Hodge?

16       A.   An assistant to the office of the CEO,

17    Mr. Stanford.

18       Q.   Do you know who Kayla Hughes is?

19       A.   I believe Ms. Hughes was part of the --

20    part of the department that handled the media as

21    well as documentation that the company produced.

22       Q.   So this was a communication between one

23    Stanford employee to another Stanford employee?

24       A.   Yes.

25       Q.   And in this e-mail, Julie Hodge writes,

Page 53

1    we have a business associate and friend of

2    Mr. Stanford's, Mr. Ben Barnes, whose book Barn

3    Burning, Barn Building, Tales of the Political

4    Life From LBJ to George W. Bush and Beyond is

5    launching on April 27th.  Any ideas as to what we

6    can get as a congratulatory gift to him?  He and

7    RAS go way back and are always joking around.

8           What does "RAS" stand for, to the best

9    of your knowledge, in this e-mail?

10          MR. MADRID:  So that I don't waive it.

11   I'm going to object to form to the document.

12          Go ahead, please.

13          THE WITNESS:  Robert Allen Stanford.

14   BY MR. ABRAHAM:

15      Q.   And was Robert Allen Stanford commonly

16   referred to as RAS in internal communications?

17      A.   Many times.

18      Q.   And was it well known within the

19   Stanford organization that Robert Allen Stanford

20   and Ben Barnes, quote, go way back?

21      A.   I don't know.

22      Q.   All right.  You testified earlier that

23   you were responsible for retaining certain

24   outside professionals or consultants; is that

25   correct?

Page 54

1        A.    Very few, but I did.

2        Q.    Was it ever the purpose, to the best of

3    your recollection, in retaining certain outside

4    consultants or professionals to lend a certain

5    legitimacy to Allen Stanford's operations?

6              MR. MADRID:  Objection.  Form.

7              THE WITNESS:  Mr. Stanford was known for

8    having relationship building for a multitude of

9    purposes, and he liked to be associated with

10   people of stature in their field.

11   BY MR. ABRAHAM:

12       Q.    And why did he like to be associated

13   with people of stature in the field?

14       A.    Good for business.

15       Q.    Was it also good for his reputation?

16             MR. MADRID:  Objection.  Form.

17             THE WITNESS:  Yes.  That's part of it.

18   BY MR. ABRAHAM:

19       Q.    And to the best of your recollection,

20   was Ben Barnes someone of high stature at the

21   time that he was retained by the Stanford

22   companies?

23       A.    I believe he was considered a leader in

24   his field, yes.

25       Q.    And do you believe that Stanford

Page 55

1    retained the services of Ben Barnes or Ben Barnes

2    Group to --

3              MR. FINN:  Don't answer that.  He's

4    asking you to speculate as to what was in Allen

5    Stanford's mind.

6              So ask another question.

7    BY MR. ABRAHAM:

8        Q.   I am asking you to speculate as to

9    what --

10             MR. FINN:  No.  Don't do that.

11             MR. MADRID:  Objection.

12             MR. FINN:  Ask Allen.

13   BY MR. ABRAHAM:

14       Q.   Well, you testified that it was your

15   understanding that Allen Stanford's practice was

16   to retain outside professionals for the purposes

17   of burnishing his reputation; is that correct?

18             MR. FINN:  Wait a second.  Objection.

19   That's not what he said.  That's what you said.

20   Next question.

21   BY MR. ABRAHAM:

22       Q.   Do you believe that the retention by the

23   Stanford organization of Ben Barnes or the Ben

24   Barnes Group was helpful in burnishing the

25   reputation of Stanford Financial Group?

Page 56

1          MR. MADRID:  Objection.  Form.

2          THE WITNESS:  Well, the Barnes Group was

3     a behind-the-scenes engine, workhorse to get a

4     job done.  I don't know that they had much

5     visibility in that respect.

6     BY MR. ABRAHAM:

7          Q.   I would like to discuss some of the work

8     that the Ben Barnes Group did for the Stanford

9     group of companies.  We saw earlier what's been

10    marked as Exhibit 3.  Would you please take a

11    look at Exhibit 3?

12          And you testified earlier that you

13    reviewed this document; is that correct?

14          A.   Yeah.  Eight years ago or whenever it

15    was produced, yes.

16          Q.   And you also testified that this was

17    part of -- this document was a white paper, which

18    was part of an initiative to improve economic

19    conditions in the Caribbean; is that correct?

20          A.   One of the spill-over effects, if not

21    one of the direct results, yes.

22          Q.   And that was the primary purpose of this

23    document; isn't that correct?

24          A.   Well, it was really a two-prong purpose.

25    One was to enhance the indigenous area and the

1  peoples there and the economic benefit that they

2  would receive.

3        Second purpose was -- actually, as odd

4  as it may sound was to increase the security of

5  the United States so that those two goals being

6  achieved, everybody wins.  All the companies in

7  the indigenous area win, the people that work for

8  those companies, standard of living goes up.  And

9  that was the target.

10     Q.   Is there anything in this document that

11  speaks about increasing or benefiting anybody who

12  invested in any financial products sold by the

13  Stanford organization?

14     A.   If you could give me a few minutes, I'll

15  read the document and --

16     Q.   Please do.

17     A.   -- refresh my memory because I don't

18  know the answer to that.

19        MR. MADRID:  Could you read that

20  question back while he's reading, please.

21        (WHEREUPON, THE REQUESTED PORTION WAS

22  READ BY THE COURT REPORTER.)

23  BY MR. ABRAHAM:

24     Q.   Let me strike that question.

25        To the best of your recollection, was

Page 58

1    the primary purpose of this document to benefit

2    investors in Stanford Financial?

3        A.   It might have been the ultimate -- one

4    of the ultimate results, yes.

5        Q.   And how would that be?

6        A.   Well, as a participant in the indigenous

7    area as a company, it benefits with accrued to

8    the Stanford Company just as everyone else

9    covered under the document.

10       Q.   And were the proposals presented in this

11   white paper ever implemented by the US

12   government, to the best of your knowledge?

13       A.   I don't know the answer to that.

14       Q.   Okay.  I would like to turn to Exhibit

15   Number 2, which was the affidavit that you

16   signed.

17            Who asked you to sign this affidavit?

18       A.   I don't remember who asked me to sign

19   that.  I believe it was an attorney.  I'm not

20   sure.

21       Q.   Do you remember the name of the

22   attorney?

23       A.   I'm not sure who I liaised with back --

24   it was three or four years ago, a very brief --

25       Q.   Do you recall why you were asked to sign

Page 59

1      this affidavit?

2           A.   I was asked to tell what I knew of the

3      relationship of Stanford and the Ben Barnes Group

4      in a general way.  I didn't know a lot of the

5      specifics.

6           Q.   Do you recall who asked you to give

7      those details or that information?

8                MR. MADRID:  Objection.  Asked and

9      answered.

10               THE WITNESS:  A third time, I don't

11     recall who that was.

12     BY MR. ABRAHAM:

13          Q.   Do you recall why you signed this

14     affidavit?

15               MR. MADRID:  Objection.  Asked and

16     answered.

17               THE WITNESS:  I knew of the Ben Barnes

18     Group being part of the Stanford group of

19     companies' consultants.  I knew Ben Barnes.  And

20     at the time, I was involved in being very

21     transparent with the government and other people.

22     And I still am on the truth serum, and I was

23     willing to help out.

24     BY MR. ABRAHAM:

25          Q.   And what did you do to prepare for your

Page 60

1    testimony today?

2        A.    Testimony for when?

3        Q.    For your testimony today.

4        A.    Excuse me.

5        Q.    I'll try and speak a little louder so

6    that you can hear.

7        A.    Sorry.

8              MR. FINN:  You want to ask that again?

9              THE WITNESS:  Please.

10   BY MR. ABRAHAM:

11       Q.    What did you do to prepare for your

12   testimony today?

13       A.    I didn't have any preparation.

14       Q.    Did you speak with anybody in preparing

15   for your deposition today?

16       A.    No.

17       Q.    And when was the last time you spoke

18   with Ben Barnes?

19       A.    February.  I believe February 18th,

20   2009.  I believe that was it.

21       Q.    And do you recall what you discussed at

22   that time?

23       A.    I passed by his office on the way out

24   the door.  And I shook his hand and I said, good

25   luck.

Page 61

1          MR. ABRAHAM:  Let's mark this exhibit.

2          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

3    WAS MARKED AS EXHIBIT NO. 5 TO THE TESTIMONY OF

4    THE WITNESS AND IS HERETO ATTACHED.)

5    BY MR. ABRAHAM:

6      Q.   I placed before you what has been marked

7    Exhibit 5.

8          Does this document look familiar to you?

9    Take a moment and look at it.

10         MR. FINN:  His question was, does this

11   look familiar to you?

12         THE WITNESS:  Not really.

13   BY MR. ABRAHAM:

14     Q.   Okay.  Do you recall or do you have any

15   knowledge as to who was involved in drafting this

16   letter?

17     A.   Was I involved?

18     Q.   Were you involved in drafting this

19   letter?

20     A.   No, I was not.

21     Q.   Do you have any idea as to who was

22   involved in drafting this letter?

23     A.   Mr. Allen Stanford.

24     Q.   Anyone else, to the best of your

25   recollection?

Page 62

1        A.    I have no idea.

2        Q.    Do you recall a time in November 2008

3   when Allen Stanford was traveling around the

4   country on his airplane and he demanded that no

5   one know his whereabouts?

6              MR. FINN:  Don't answer that.  It's off

7   the reservation.

8              MR. MADRID:  Objection.  Form.

9              MR. FINN:  You can tie that into Ben

10  Barnes or --

11             MR. ABRAHAM:  Yeah.  Yeah.  Of course.

12             MR. FINN:  Tie it in then.

13  BY MR. ABRAHAM:

14       Q.    Do you generally recall that period?

15             MR. FINN:  Don't answer that.

16             Next question.

17  BY MR. ABRAHAM:

18       Q.    Do you recall Ben Barnes traveling with

19  Allen Stanford in November 2008 on his private

20  jet?

21       A.    No, sir.

22       Q.    Okay.  Do you recall a trip to -- that

23  Allen Stanford took to Washington DC in February

24  2009 to meet with a lawyer named James Sharp?

25       A.    Yes.

Page 63

1        Q.    And was Ben Barnes involved in that

2    meeting?

3        A.    Not to my knowledge.

4        Q.    Do you recall any discussion within the

5    Stanford organization as to there being a

6    question as to the value of Ben Barnes' services?

7              MR. MADRID:  Objection.  Form.

8              THE WITNESS:  Excuse me.  Can I ask this

9    question?  When you speak up, am I --

10             MR. MADRID:  No.  I'm sorry.  That's for

11   the record.  Lawyers make these noises called

12   objections.

13             MR. FINN:  Just ignore it.

14             THE WITNESS:  Okay.  I'm just asking the

15   question.

16             Would you repeat the question, please?

17   BY MR. ABRAHAM:

18       Q.    Do you recall there being internally

19   within the Stanford organization as to -- do you

20   recall there being a question as to whether there

21   was a return being received on the work that Ben

22   Barnes was doing?

23             MR. MADRID:  Objection.  Form.

24             THE WITNESS:  I don't recall.

25   BY MR. ABRAHAM:

Page 64

1        Q.   Do you recall Allen Stanford ever

2    raising any doubts that Ben Barnes was providing

3    any value for his services?

4              MR. MADRID:  Objection.  Form.

5              THE WITNESS:  No, sir.

6              MR. ABRAHAM:  Let's mark this Exhibit 6.

7              (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

8    WAS MARKED AS EXHIBIT NO. 6 TO THE TESTIMONY OF

9    THE WITNESS AND IS HERETO ATTACHED.)

10   BY MR. ABRAHAM:

11       Q.   Please read this and let me know when

12   you've had a chance to read it.

13       A.   Okay.

14       Q.   This is an e-mail from Allen Stanford to

15   Yolanda Suarez and you dated December 7th, 2007.

16            This e-mail discusses negotiating a

17   success fee for getting new VI legislation passed

18   in 2008 with Ben Barnes.

19            Does this e-mail look familiar to you?

20       A.   Say that again.

21       Q.   Does this e-mail look familiar to you?

22       A.   It really doesn't.

23       Q.   Do you have any doubt that you received

24   this e-mail?

25       A.   My assistant worked with my e-mails,

Page 65

1    filtering them.  I just don't recall this

2    particular e-mail.  It doesn't register with me.

3    I'm not saying it didn't happen.

4        Q.   Okay.  Do you recall any discussions

5    about negotiating a success fee with Ben Barnes?

6        A.   No, sir.

7        Q.   Do you recall any discussions about not

8    believing that Ben's work was, quote, achievable

9    at the time?

10           MR. MADRID:  Object to the form.

11           THE WITNESS:  No, sir.

12   BY MR. ABRAHAM:

13       Q.   The e-mail says that Yolanda and I have

14   been personally paying Ben $265,000 each month

15   this year.

16           Do you recall Allen Stanford or Yolanda

17   Suarez making personal payments to the Ben Barnes

18   Group?

19           MR. MADRID:  Correction.  It doesn't

20   say, Yolanda and I.  It says, Yolanda, I have.

21   BY MR. ABRAHAM:

22       Q.   Yolanda, I've been making personal

23   payments.  Do you have a recollection of Allen

24   Stanford making any personal payments to the Ben

25   Barnes Group?

Page 66

1      A.    No, sir.

2      Q.    E-mail says, I think the world of Ben

3  and know he is very capable, but this is too much

4  for what we are getting in return.

5          Do you believe there -- do you recall

6  there being any question or doubt as to the

7  return on investment in Ben Barnes at the time?

8          MR. MADRID:  Objection.  Form.

9          THE WITNESS:  No, sir.  This is a --

10  while I don't remember the e-mail, this is

11  indicative of how Mr. Stanford worked,

12  manipulation and pressure tactics and when he

13  wanted something, he wanted it right now and

14  stirring up the -- stirring up that guilt feeling

15  that he used to manipulate people.  That is what

16  it's reminiscent of.  But I don't remember the

17  particular e-mail.

18          What I do remember is what I already

19  testified.  The relationship was sound and not to

20  say that there weren't opposing opinions.  But

21  this is a classic, vintage Allen Stanford mode of

22  operandi.

23  BY MR. ABRAHAM:

24      Q.    Do you recall someone named Jonathan

25  Winer, W-I-N-E-R?

Page 67

1        A.    I remember the name, yes.

2        Q.    Do you recall anything about him?

3        A.    Regulatory, Washington.  I don't recall

4    his position other than regulatory.

5        Q.    Do you recall Ben Barnes being asked to

6    look into inquiries being made by Jonathan Winer

7    into Stanford's operations?

8        A.    No, sir.

9        Q.    I want to go back to Exhibit Number 2,

10   which is before you.

11       A.    All right.

12       Q.    In Paragraph 4, you state that as an

13   example of one of the issues that Ben Barnes

14   worked on was the efforts to acquire license and

15   operate two small regional airlines within the

16   Caribbean.

17       A.    You said Paragraph 4.  You meant

18   Paragraph 2?

19       Q.    Yeah.

20       A.    Okay.

21       Q.    Do you see that language?

22       A.    Yes.

23       Q.    Do you believe that Ben Barnes at that

24   time had any expertise in terms of operating

25   airlines in the Caribbean?

Page 68

1          MR. MADRID:  Objection.  Form.

2          THE WITNESS:  I have no knowledge of

3     that particular time making that judgment.

4     BY MR. ABRAHAM:

5          Q.   One of the other issues is, quote,

6     securing TV network coverage for the 20/20

7     Cricket tournament sponsored by Mr. Stanford.

8          Did you believe at that time that Ben

9     Barnes had any experience in the business of

10    sports or sports sponsorship or marketing?

11         A.   I didn't question his experience in

12    television media.  That was not my

13    responsibility.  I had full confidence in the

14    people that were involved under Mr. Stanford's

15    direction.

16         Q.   You also testified that there was an

17    initiative involving Ben Barnes to expand the tax

18    status of the Caribbean basin.  Isn't that

19    correct?

20         MR. MADRID:  Objection.  Form.

21         THE WITNESS:  Yes, sir.

22    BY MR. ABRAHAM:

23         Q.   And you also testified that Ben Barnes

24    and perhaps others were involved in thinking

25    about that issue; is that correct?

Page 69

1          A.     To my understanding, yes.

2          Q.     Wasn't the ultimate beneficiary of that

3    legislation Allen Stanford?

4               MR. MADRID:   Objection.   Form.

5               THE WITNESS:   Stanford and the Stanford

6    companies would have benefited.

7    BY MR. ABRAHAM:

8          Q.     Who was the sole shareholder of the

9    Stanford companies?

10         A.     Allen Stanford.

11         Q.     So isn't it true that he would have

12   primarily benefited from that change in tax

13   status?

14              MR. MADRID:   Objection.   Form.

15              THE WITNESS:   He would have been one of

16   the beneficiaries, yes.

17              MR. ABRAHAM:   Let's take a five-minute

18   break.

19              (WHEREUPON, THERE WAS A RECESS FROM

20   12:20 P.M. TO 12:26 P.M., AT WHICH TIME THE

21   DEPOSITION CONTINUED AS FOLLOWS:)

22   BY MR. ABRAHAM:

23         Q.     Do you recall a Bloomberg reporter

24   investigating your background in or about 2006?

25              MR. MADRID:   Objection.   Form.

Page 70

1    BY MR. ABRAHAM:

2        Q.   Making phone calls to Baldwin High

3    School?

4            MR. MADRID:  Object to the form.

5            THE WITNESS:  You know, it seems like I

6    vaguely remember that.  Yeah.

7    BY MR. ABRAHAM:

8        Q.   What do you remember about that?

9        A.   What you just told me.

10       Q.   That's it, but you remember it?

11       A.   Yeah.  I do remember it because a -- my

12   sister used to teach there, and I think she

13   mentioned it to me.

14       Q.   Do you remember Ben Barnes being asked

15   to deal with that reporter?

16       A.   No, sir.

17       Q.   Do you recall Allen Stanford alleging

18   that he was connected or related to the founder

19   of Stanford University?

20       A.   Yes, sir.

21       Q.   And do you recall any reporters looking

22   into that question, looking into that issue?

23       A.   There were -- yes, there were -- there

24   was an article -- at least an article written

25   regarding that, to the best of my recollection.

Page 71

1       Q.   And you recall Ben Barnes being asked to

2   contact the author of that article?

3       A.   No, sir.

4       Q.   Okay.  Do you recall Ben Barnes being

5   asked to deal in any way with that question or

6   that issue of Mr. Stanford being related --

7       A.   I'm sorry.

8       Q.   -- to the founder of Stanford

9   University?

10      A.   No, sir.

11           MR. ABRAHAM:  Okay.  No further

12  questions.

13           MR. MADRID:  I have no further

14  questions, Mr. Davis.

15           (WHEREUPON, THE DEPOSITION WAS CONCLUDED

16  AT 12:28 P.M.)

17

18           _____
                 JAMES MILTON DAVIS
19

20  Signed and subscribed to before me

21  this_____day of_____, 2014

22

23

24  _____

25  Notary Public

Page 72

1

2

3                    C E R T I F I C A T E

4    STATE OF TENNESSEE      )
                             )
5    COUNTY OF SHELBY        )

6

7          I, Valerie Hall Gilliam, LCR #456,
     Licensed Court Reporter, in and for the State of
     Tennessee, do hereby certify that the above
8    deposition was reported by me, and the transcript
     is a true and accurate record to the best of my
9    knowledge, skills, and ability.

10         I further certify that I am not related
     to nor an employee of counsel or any of the
11   parties to the action, nor am I in any way
     financially interested in the outcome of this
12   case.

13         I further certify that I am duly licensed
     by the Tennessee Board of Court Reporting as a
14   Licensed Court Reporter as evidenced by the LCR
     number and expiration date following my name
15   below.

16         I further certify that this transcript is
     the work product of this court reporting agency
17   and any unauthorized reproduction and/or transfer
     of it will be in violation of Tennessee Code
18   Annotated 39-14-104, Theft of Services.

19

20                    _____
                      Valerie Hall Gilliam, LCR 456
                      Expiration Date June 30, 2016
21

22

23

24

25

Page 73

1              *** ERRATA SHEET ***
          TRANSPERFECT DEPOSITION SERVICES
2              216 E. 45th Street, Suite #903
               NEW YORK, NEW YORK 10017
3                  (212) 400-8845

4       CASE: JANVEY v. BARNES
        DATE: OCTOBER 24, 2014
5       WITNESS: JAMES MILTON DAVIS        REF: 12770

6       PAGE   LINE   FROM                 TO

7       ____|_____|_____|_____

8       ____|_____|_____|_____

9       ____|_____|_____|_____

10      ____|_____|_____|_____

11      ____|_____|_____|_____

12      ____|_____|_____|_____

13      ____|_____|_____|_____

14      ____|_____|_____|_____

15      ____|_____|_____|_____

16      ____|_____|_____|_____

17      ____|_____|_____|_____

18      ____|_____|_____|_____

19      ____|_____|_____|_____

20

21      _____

                JAMES MILTON DAVIS
22
        Subscribed and sworn to before me
23
        this ____ day of _____, 20__.
24
        _____
25              Notary Public

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

APP. 079

**A**

**ability** 17:1 72:9
**able** 15:11 27:11
    32:4 41:22 43:1
**ABOVE-MENTI...**
    20:8 52:7 61:2
    64:7
**Abraham** 3:3 4:4
    4:15,15,16,16,17
    4:17,18,18,19,19
    4:20,20,21,21,22
    4:22,23,23,24,24
    4:25 5:2,3,3,4,4
    7:16 14:11 16:18
    19:23 21:19 25:6
    26:7 27:3,22 28:9
    31:18 34:11 36:13
    38:3,10,19 39:24
    40:4 41:2 42:2
    43:6,18 44:13,24
    45:3 46:15 47:5
    47:15,20 48:2
    49:12,21 50:10,16
    51:11,25 52:5,11
    53:14 54:11,18
    55:7,13,21 56:6
    57:23 59:12,24
    60:10 61:1,5,13
    62:11,13,17 63:17
    63:25 64:6,10
    65:12,21 66:23
    68:4,22 69:7,17
    69:22 70:1,7
    71:11
**abraham@butze...**
    3:6
**absolutely** 24:15
    27:21 28:10
**accomplish** 9:24
**accounting** 41:15
    41:16
**accrued** 36:18 58:7
**accurate** 72:8
**achievable** 65:8
**achieved** 57:6
**achieving** 34:6

**acquire** 33:12
    67:14
**action** 72:11
**active** 37:20
**activities** 51:21
**activity** 12:25
    23:10,17 25:4
    31:21
**actual** 25:10
**acumen** 30:12
**additionally** 30:11
**address** 18:22
    19:15
**addressed** 22:18
    40:9
**addressing** 25:1
**advantageous**
    32:22,23
**advice** 9:2 12:10
**advisors** 22:20
**advisory** 9:5 13:13
    13:16
**affidavit** 4:8 29:10
    30:2 58:15,17
    59:1,14
**age** 6:9
**agency** 72:16
**ago** 7:20 15:9 18:1
    18:3 24:15 48:6
    56:14 58:24
**agree** 51:25
**agreement** 10:2
    27:15 28:23 48:8
    51:2,4
**agreements** 11:10
**ahead** 36:8 53:12
**Aid** 21:8
**air** 33:21
**airline** 33:19
**airlines** 33:13 34:8
    34:24 36:7 67:15
    67:25
**airplane** 62:4
**al** 1:6
**allegations** 7:3
    42:16
**alleged** 42:22 44:11

**allegedly** 44:10
**alleging** 70:17
**Allen** 7:24,25 8:10
    49:3,7 50:3 51:7
    51:15,19 53:13,15
    53:19 54:5 55:4
    55:12,15 61:23
    62:3,19,23 64:1
    64:14 65:16,23
    66:21 69:3,10
    70:17
**allowing** 32:13
**Alvarado** 11:14
    16:9 25:18
**America** 14:6
**America's** 4:9
**analysis** 28:18
**and/or** 72:17
**Annotated** 72:18
**answer** 31:11,11
    51:22 52:1,2 55:3
    57:18 58:13 62:6
    62:15
**answered** 59:9,16
**anticipated** 28:23
**Antigua** 32:2
**Antonio** 3:8
**anybody** 14:7,15
    20:20 26:3 43:1
    44:22 57:11 60:14
**apologize** 42:8
**apple** 52:3
**APPOINTED** 1:5
**approximately** 2:4
**April** 52:14 53:5
**area** 8:15 12:1 17:9
    17:20 18:10,17
    21:22,25 22:2,3
    23:11,16 24:14
    32:20 33:22 35:7
    35:8 37:17 56:25
    57:7 58:7
**areas** 12:6 17:1
**arms** 28:15
**arms-length** 28:7
    28:11
**article** 70:24,24

    71:2
**asked** 29:19 35:13
    42:8 44:7 58:17
    58:18,25 59:2,6,8
    59:15 67:5 70:14
    71:1,5
**asking** 55:4,8 63:14
**assets** 34:18
**assist** 14:1 17:1,17
**assistance** 9:9
    33:25 46:22
**assistant** 14:18,19
    52:16 64:25
**assisted** 17:6
**assisting** 13:15
    34:23
**associate** 53:1
**associated** 54:9,12
**assume** 48:23
**assure** 37:8
**ATTACHED**
    14:22 20:10 29:2
    52:10 61:4 64:9
**attention** 21:4
    29:25
**attested** 29:23
**attorney** 14:13
    58:19,22
**author** 71:2
**authorize** 26:25
**authorized** 27:18
    27:19
**Avenue** 3:4
**aware** 9:15 19:21
    22:5 39:6 43:12
**a.m** 2:4 44:3,3
    47:18,18

**B**

**B** 15:15
**back** 10:24 21:1
    28:13 40:13,13
    45:16 53:7,20
    57:20 58:23 67:9
**backbone** 22:17
**background** 69:24
**Baldwin** 70:2

**bananas** 24:7
**BANK** 1:6
**Barn** 53:2,3
**Barnes** 1:11,11
    7:11,11,17 8:5,6,9
    8:17,18,22 9:2,19
    9:23 11:1,4,20,22
    12:9 14:1,8,9,16
    15:21,25 16:16,22
    16:23 17:7 19:7
    19:13,19 20:19,20
    21:15,23 22:19
    23:8,10 24:22
    26:5,25 27:11,16
    28:5 29:20 30:3,7
    30:12,15 31:14,15
    33:24 34:5,22
    35:20 37:5,24
    38:6 39:6,21 40:8
    40:10,25 41:23
    43:2,9,13,14 44:9
    44:18,22 45:2,4
    46:12 47:2,2 48:4
    48:4,10,13,16
    49:3,8,9,15,25
    50:3 51:8,24 53:2
    53:20 54:20 55:1
    55:1,23,24 56:2,8
    59:3,17,19 60:18
    62:10,18 63:1,6
    63:22 64:2,18
    65:5,17,25 66:7
    67:5,13,23 68:9
    68:17,23 70:14
    71:1,4 73:4
**based** 12:6 32:24
**basin** 17:9 21:9
    39:9 68:18
**basis** 17:12
**basket** 31:25
**BBG** 37:5 39:6
**beach** 18:19
**bears** 29:10
**began** 49:23
**beginning** 2:4
**begins** 33:12
**behalf** 2:2 15:25

16:7 45:19
**behind-the-scenes**
56:3
**believe** 8:2 9:11
26:14 50:12 52:19
54:23,25 55:22
58:19 60:19,20
66:5 67:23 68:8
**believing** 65:8
**belly** 34:19,24
**BELOW-MENT...**
14:20 28:25
**Ben** 1:11,11 7:11
7:11,17 8:5,17,22
11:1,4,20 12:9
14:9,16 15:21,25
16:16 17:7 20:19
20:20 21:15 22:19
26:25 27:11,15
28:5 30:3,7 31:14
31:15 34:5,22
35:20 37:24 38:6
39:21 40:8,24
41:23 43:2,9,14
44:9,22 45:2,4
46:12 47:2 48:4,4
48:10,13,16 49:3
49:7,8,14 50:3
51:8,24 53:2,20
54:20 55:1,1,23
55:23 56:8 59:3
59:17,19 60:18
62:9,18 63:1,6,21
64:2,18 65:5,14
65:17,24 66:2,7
67:5,13,23 68:8
68:17,23 70:14
71:1,4
**beneficial** 22:23
**beneficiaries** 69:16
**beneficiary** 36:21
69:2
**benefit** 21:13 32:17
32:19,20 36:17
38:17 57:1 58:1
**benefited** 69:6,12
**benefiting** 57:11

**benefits** 32:17 58:7
**Ben's** 65:8
**best** 11:21 53:8
54:2,19 57:25
58:12 61:24 70:25
72:8
**bet** 15:6
**better** 18:5 23:23
27:24 33:20
**Beyond** 53:4
**big** 17:18,23,24
**bill** 41:23
**billings** 46:12,13
**bird** 36:1
**bit** 12:15 43:24
**bite** 52:3
**Bloomberg** 69:23
**board** 12:18 22:22
23:9 35:9 72:13
**boards** 13:23
**body** 19:21
**book** 6:12 53:2
**bookkeeping** 42:7
**boom** 35:10
**border** 4:9 23:14
33:1
**bottom** 33:11
**break** 43:24 46:18
47:16 69:18
**brief** 58:24
**bring** 18:6
**broadcast** 37:7,8
**broadened** 39:2
**broader** 12:24
**brought** 40:1
**building** 3:13 53:3
54:8
**built** 9:5
**burden** 21:25
**Burning** 53:3
**burnishing** 55:17
55:24
**Bush** 53:4
**business** 8:10 9:3,9
12:11 18:17,18
22:9 24:16 30:11
30:21 31:21 36:22

46:24 51:4 53:1
54:14 68:9
**businesses** 12:21
24:9
**BUTZEL** 3:4

---

## C

**C** 3:1 72:3,3
**Cable** 37:18
**call** 31:25 39:22
**called** 6:2 35:7
63:11
**calls** 70:2
**camp** 2:5 6:16,18
6:19,23
**capable** 66:3
**capacity** 1:4 9:4
10:14 11:24 14:12
**capital** 13:5
**Caribbean** 9:13
17:9,22 18:21,21
18:25 19:1,22
21:9 22:2,18
30:22 33:14 36:19
39:9 51:5 56:19
67:16,25 68:18
**carried** 38:15
**carry** 18:17
**case** 16:12 72:12
73:4
**cash** 22:11,13
**Castillo** 3:7,7 7:16
45:11,14
**casual** 40:6
**caucus** 9:13
**CEO** 7:23 25:17
52:16
**CEOs** 12:23
**certain** 9:9 18:13
18:15,20 23:8
30:3 35:16 51:16
51:17 53:23 54:3
54:4
**certainly** 13:25
16:8 25:15 32:21
**certificates** 42:23
43:4

**certify** 72:7,10,13
72:16
**cetera** 12:23 23:25
51:5,6
**chance** 11:16 20:24
64:12
**change** 69:12
**changing** 32:8
**charges** 46:5,17
47:2 48:21
**charging** 46:6
**chat** 7:7
**chatter** 47:21
**chief** 10:11 41:16
**cinched** 40:13
**circumstances** 7:21
8:8
**citation** 39:5
**citizen** 22:16
**citizenship** 23:20
24:4
**Civil** 2:9
**clarify** 44:6
**CLARKE** 3:12
**classic** 66:21
**classify** 51:14
**close** 33:6
**closely** 39:6
**coast** 33:2
**Code** 72:17
**colleagues** 30:4
**come** 18:16
**coming** 28:22 31:20
**committee** 1:7 7:15
42:17
**commonly** 53:15
**communicated**
14:17,18 50:3,9
50:12,18
**communication** 9:9
9:14 28:13 50:8
52:22
**communications**
9:10 53:16
**companies** 7:14 9:6
9:15 11:8,23
13:20 18:19 27:15

30:21 33:18 34:19
48:5 54:22 56:9
57:6,8 59:19 69:6
69:9
**company** 8:5 11:8
11:24 22:12 25:2
52:21 58:7,8
**company's** 10:18
22:10,14
**comparable** 46:17
**compared** 46:13
**con** 28:14
**concept** 31:22
**CONCLUDED**
71:15
**conditions** 56:19
**conducive** 32:8
**confide** 51:20
**confidence** 68:13
**confusing** 44:7
**congratulatory**
53:6
**Congress** 9:13 19:2
**conjunction** 39:22
**connected** 70:18
**connection** 11:19
15:20 26:5
**connections** 9:13
9:14
**connectivity** 17:10
17:12
**consent** 2:3
**consequence** 16:25
24:4
**considered** 54:23
**consult** 14:2
**consultants** 45:25
53:24 54:4 59:19
**consulting** 36:6
**contact** 25:10 71:2
**contention** 42:18
**continue** 36:25
**continued** 5:1
36:17 44:4 47:19
69:21
**Continuing** 33:10
**contract** 37:8

contractor 26:4
contractors 31:15
    39:23
contractual 40:15
Convent 3:8
conversation 18:2
conversations 40:7
    50:19,21,24
convinced 35:9
coordinator 41:8,9
copy 20:15
cordial 28:18
cordiality 28:12
corner 24:8
correct 6:17,20
    25:20 30:6 31:2,4
    42:21,25 49:4
    50:25 51:9,16
    53:25 55:17 56:13
    56:19,23 68:19,25
Correction 65:19
Correctional 6:15
correctly 30:24
counsel 2:4 9:3
    11:14 12:10 16:8
    72:10
country 62:4
COUNTY 72:5
couple 10:25 15:8
    21:2
course 7:16 62:11
court 1:1,4 3:23
    57:22 72:7,13,14
    72:16
coverage 35:2 37:8
    68:6
covered 58:9
create 18:5
creating 23:1
creation 20:21
creditors 38:17
cricket 35:3,7,17
    36:1,9,11,24 37:9
    37:9,25 68:7
cricketer 35:12
Croix 22:3 24:14
    24:19

Cuba 33:6
currently 6:20
curriculum 16:24
    30:14
cut 31:9

_____
        D
_____
D 4:1
Dallas 1:2 3:14,21
date 29:13 40:17
    72:14,20 73:4
dated 52:14 64:15
DAVID 3:19
david@milnerfin...
    3:22
Davis 1:17 2:1 4:3
    6:1,8,9 14:25 15:4
    15:12 16:14 19:17
    20:14,15 21:14
    26:24 29:5,7
    38:15 42:15 44:6
    47:11 48:3 71:14
    71:18 73:5,21
day 2:2 46:18 71:21
    73:23
days 15:9
DC 62:23
deal 70:15 71:5
dealings 14:7 28:5
dealt 11:25
December 64:15
Defendant 2:3 3:11
defendants 1:13
    7:12
define 34:13 40:24
defineables 40:16
definitively 20:22
deliverables 40:9
    40:11,12
delivered 28:24
delivery 12:22
Delk 14:13 25:25
    26:1
demanded 62:4
demise 37:1
department 11:11
    11:13 22:21 52:20

depending 46:22
depends 34:12
deposit 42:23 43:4
deposition 1:16 2:1
    2:7 4:7 15:4,8
    44:4 47:19 60:15
    69:21 71:15 72:8
    73:1
depth 16:23
describe 28:4 30:7
    49:17
described 31:1,17
    36:20
description 4:7
    18:5 30:6
desire 34:1
detail 21:24 24:25
    41:13,20
details 31:12 35:21
    48:20 59:7
development 18:11
diem 46:19
different 48:7
direct 36:3,21
    56:21
direction 68:15
directly 14:18 36:5
director 11:25
directors 12:18
    13:23 35:9
director's 41:4
discuss 56:7
discussed 60:21
discusses 64:16
discussion 63:4
discussions 28:13
    65:4,7
dispose 33:14
disposed 2:12
disruptive 47:23
DISTRICT 1:1,1
DIVISION 1:2
document 14:20
    20:8,21 28:25
    29:16 52:8 53:11
    56:13,17,23 57:10
    57:15 58:1,9 61:2

61:8 64:7
documentation
    52:21
dogging 36:1
doing 8:10 22:10
    63:22
dollars 22:13
door 60:24
doorstep 23:14
doubt 51:3 64:23
    66:6
doubts 64:2
drafting 61:15,18
    61:22
draw 29:25
drawn 11:11
duly 6:2 72:13
D-E-L-K 25:25

_____
        E
_____
E 3:1,1,3 4:1 72:3,3
    73:2
earlier 13:19,22
    17:16 31:22 32:7
    49:2 53:22 56:9
    56:12
early 10:15
easing 21:25
eastern 18:21
economic 12:25
    21:18 23:1 32:21
    56:18 57:1
economically 18:8
economy 35:10
Ecuador 22:10,12
effects 56:20
effort 17:8 18:3,6
    19:10,13 20:19
    21:15 31:5,16,17
    33:16,23 34:4
    36:1
efforts 9:12 30:20
    33:12 36:5 67:14
Eight 56:14
either 19:20 30:4
elusive 35:13
embargoes 23:25

employed 44:9
employee 52:23,23
    72:10
ended 10:21 34:8
energy 34:4
engaged 8:23 11:2
    11:4 12:9 15:25
engagement 15:24
    16:6
engaging 11:19
engine 56:3
enhance 56:25
enhanced 23:17
    32:21
enhancement 24:1
entered 7:2
enterprise 18:6
enterprises 33:15
entities 16:17
entitled 21:7
entity 43:5
entrepreneurs
    13:23 22:8
environment 32:21
equipment 33:20
equity 9:20 13:4
equity-wise 12:20
equivalent 47:3
ERRATA 73:1
especially 13:1,19
    18:14,21 23:13
ESQ 3:3,7,12,12,19
establish 18:16
    33:19
established 9:10
    35:7,17 37:16
establishing 13:14
estate 23:19
estimate 50:11,14
et 1:6 12:23 23:25
    51:5,6
everybody 45:7
    57:6
everyone's 32:19
evidenced 23:5
    72:14
evident 40:6

**EXAMINATION** 4:2 6:4 48:1 52:8
**example** 9:12 12:16 22:4 23:11 24:6 24:14,18 32:1 38:14 45:21 67:13
**examples** 30:18
**exclusively** 24:19
**Excuse** 27:4 60:4 63:8
**executive** 12:23 14:17,19
**executives** 37:7
**exhibit** 4:6,7,7,8,9 4:10,11,12 14:21 14:25 15:2,15 16:14,14 20:4,9 20:12,14 21:5 29:1,4,8 33:8 52:6 52:6,8,13 56:10 56:11 58:14 61:1 61:3,7 64:6,8 67:9
**existed** 16:15
**expand** 12:15 19:2 19:3 68:17
**expanding** 34:19
**expansion** 32:6,17
**expensive** 46:25
**experience** 16:23 68:9,11
**expertise** 67:24
**expiration** 72:14,20
**Explain** 19:24
**export** 23:21
**e-mail** 4:10,12 52:13,25 53:9 64:14,16,19,21,24 65:2,13 66:2,10 66:17
**e-mails** 64:25

**F**

**F** 72:3
**fact** 18:22
**factories** 24:10
**facts** 44:10
**fading** 39:13

**fair** 25:4 41:8
**fairly** 40:6
**familiar** 26:21,23 34:25 46:5 61:8 61:11 64:19,21
**favored** 18:12,24 19:4 32:24
**February** 10:21 60:19,19 62:23
**Federal** 2:5,8 6:15 6:18,19
**fee** 64:17 65:5
**feeling** 47:6 66:14
**felt** 51:17
**field** 54:10,13,24
**filtering** 65:1
**final** 28:18
**finally** 9:23 39:4
**financial** 7:4,14 8:6 8:23 9:16 10:10 10:11 11:4 12:24 13:6,24 14:3,10 16:1 17:5 19:20 22:14 25:9 26:6 26:24 27:2,12,19 27:20 28:6 35:23 38:1,7,9,18 41:24 42:18 43:15 44:12 45:19 55:25 57:12 58:2
**financially** 34:20 72:11
**find** 17:17
**FINN** 3:19,19 5:7,9 5:10,12,13 15:7 27:25 44:1 47:24 51:22,24 52:1 55:3,10,12,18 60:8 61:10 62:6,9 62:12,15 63:13
**firm** 28:19 39:7,11 46:23
**firms** 45:21,23
**first** 7:6,17 11:3 17:2,2 30:1 33:11
**first-time** 33:23
**fist** 22:13

**five-minute** 69:17
**flying** 34:15
**focus** 22:25
**folks** 25:23 40:10 46:2
**following** 20:2 72:14
**follows** 6:3 44:4 47:19 69:21
**footnoting** 23:6
**Forbes** 26:17
**Forgive** 21:10
**forgotten** 18:8
**form** 2:11 14:11 16:18 19:23 21:19 25:6 26:7 27:3,22 28:9 31:18 34:11 36:13 38:3,10,19 39:24 40:4 41:2 42:2 43:6,18 44:24 45:3 46:15 47:5 49:10,18 50:6,13 51:10,23 53:11 54:6,16 56:1 62:8 63:7,23 64:4 65:10 66:8 68:1,20 69:4,14 69:25 70:4
**formalities** 2:10
**formed** 44:10
**forms** 2:10
**forth** 28:13
**forward** 10:16
**founder** 70:18 71:8
**four** 33:10 58:24
**fraudulent** 51:21
**frequent** 25:10
**friend** 51:18 53:1
**friends** 49:17,20 51:8,9,12,13,14 51:15
**friendship** 49:23 51:19
**full** 6:7 68:13
**fully** 22:15
**further** 19:24 42:21 47:11 71:11,13

72:10,13,16

**G**

**gain** 8:21
**gather** 31:22
**general** 10:4 11:14 16:8 24:21 31:3 31:11 41:15 59:4
**generally** 62:14
**gentleman** 26:18
**George** 53:4
**getting** 28:19 36:8 64:17 66:4
**gift** 53:6
**Gilbert** 41:15
**Gilliam** 1:23 3:24 72:6,20
**give** 6:6 10:12 12:16 18:12 43:20 57:14 59:6
**given** 43:13
**give-and-take** 23:15
**giving** 7:7 23:18
**go** 10:24 15:19 20:3 26:25 27:11 29:4 30:17 37:3 39:4 45:10 53:7,12,20 67:9
**goal** 40:5
**goals** 9:24 57:5
**goes** 57:8
**going** 12:25 20:4,5 24:10,22,23 31:10 43:23 47:22 52:4 53:11
**good** 6:6 18:15 23:12,14 28:21 35:11 36:22 42:7 49:17 54:14,15 60:24
**government** 30:5,8 39:8 58:12 59:21
**grandchild** 34:17 34:17
**great** 34:17
**grew** 13:20,21

**group** 1:11 7:4,12 7:14 8:6,6,18,22 8:23 9:2 10:10 11:1,5,7,20,22,22 12:9,19 13:11,16 14:1,9,10,16 15:25 16:16,22 17:5,7 19:7,13,19 19:20 20:19,20 21:16,23 22:19 23:8,10 24:22 25:9,24 26:5,6,25 27:11,13,16 28:6 29:20,21 30:5,7 31:14,16 33:24 34:5,22 35:20 37:6,25 38:7,9,18 39:22 40:2,8,10 40:25 41:16,23,24 42:18 43:2,14,15 44:9,12,22 45:19 46:13 47:2 48:4,5 48:9,11,14,16 55:2,24,25 56:2,8 56:9 59:3,18,18 65:18,25
**Growing** 6:10
**growth** 23:1
**Guadeloupe** 32:2
**guilt** 66:14
**guilty** 7:2

**H**

**Hall** 1:23 3:24 72:6 72:20
**hammered** 24:20
**hammering** 22:22
**hand** 22:12 60:24
**handled** 36:4 41:14 52:20
**happen** 25:21 40:21 65:3
**happened** 42:4
**happens** 23:22 39:20
**Harwood** 3:14,20
**head** 18:20 26:8

**heading** 21:12
**hear** 60:6
**hearing** 2:13
**heated** 28:14
**help** 32:3 33:24,24
    35:13,14 59:23
**helpful** 55:24
**HERETO** 14:22
    20:10 29:2 52:10
    61:4 64:9
**Hey** 39:20
**high** 54:20 70:2
**higher** 33:20,21
**high-level** 25:3
**hinted** 13:22
**hire** 27:1
**hired** 46:8,14
**hiring** 15:20 16:16
    17:7 27:12 45:17
    45:24
**historically** 18:7
**History** 21:8
**Hodge** 52:14,15,25
**hold** 10:9
**holdings** 23:19
**hop** 20:4,5
**hour** 43:24
**hourly** 46:17
**Houston** 8:1
**huge** 17:8
**Hughes** 52:14,18
    52:19
**Hugo** 24:17
**Hurricane** 24:17

                I
**idea** 10:12 34:1
    49:13 50:23 51:1
    61:21 62:1
**ideas** 53:5
**ignore** 63:13
**ignoring** 23:23
**impacted** 9:16
**impetus** 19:6
**implemented** 58:11
**import** 23:20
**importantly** 17:11

**import/export** 24:3
**improve** 30:20
    56:18
**incentive** 38:14
**include** 19:3
**including** 17:12
    34:2
**income** 22:14,15
    31:20
**increase** 57:4
**increasing** 57:11
**INDEX** 4:2,6,14
    5:1 52:8
**indicative** 66:11
**indigenous** 18:17
    22:2 23:16 24:5
    32:20 33:22 37:17
    38:21 56:25 57:7
    58:6
**individually** 44:19
**individuals** 43:14
**information** 43:12
    43:21 59:7
**infuse** 13:5
**initial** 34:1
**initiative** 56:18
    68:17
**inquiries** 67:6
**insofar** 18:9
**Institution** 6:16
**institutions** 9:16
**instrumental** 34:23
**intend** 15:19
**intended** 21:17
**intensive** 24:23
    25:19
**interested** 72:11
**interfaced** 40:3
**internal** 25:17
    53:16
**internally** 63:18
**international** 1:5
    39:7,11
**interrupt** 40:22
**introduced** 7:23
    8:9 11:22 16:22
    37:5 49:3,25

**introducing** 14:2
**introduction** 11:7
    37:7,11
**introductions**
    12:22
**invest** 22:9
**invested** 57:12
**investigating** 69:24
**investment** 13:10
    18:6 21:9 22:1
    24:5 32:3 66:7
**investments** 30:22
**investors** 1:7 7:15
    18:13,16 32:4,9
    42:17 58:2
**involved** 24:24
    37:10 40:8 42:9
    59:20 61:15,17,18
    61:22 63:1 68:14
    68:24
**involving** 68:17
**island** 18:20 19:3
    21:17 22:3 24:6
    24:18,19 31:23
    32:25 35:10 36:23
**islands** 18:4,13,23
    22:4 31:21 32:1,6
    33:21
**issue** 19:15 22:18
    23:3 35:23 38:14
    68:25 70:22 71:6
**issued** 43:4
**issues** 17:13 39:9
    51:5,6 67:13 68:5
**item** 16:13 17:23,24
**items** 21:3 28:23
**i.e** 21:24

                J
**James** 1:17 2:1 4:3
    6:1,8 62:24 71:18
    73:5,21
**JANVEY** 1:4 73:4
**JAY** 3:12
**Jeff** 26:17
**JESSE** 3:7
**jet** 62:20

**Jim** 14:13
**jmadrid@winste...**
    3:15
**job** 1:24 56:4
**jobs** 24:7
**joking** 53:7
**Jonathan** 66:24
    67:6
**JOSHUA** 3:3
**judgment** 68:3
**Julie** 52:13,15,25
**June** 72:20

                K
**Kayla** 52:14,18
**kept** 9:14
**killed** 24:16
**killing** 24:15
**knew** 24:23 29:19
    44:22 59:2,17,19
**know** 7:17 8:11,11
    9:23,25 11:3 15:2
    16:20 17:4 20:18
    20:22 25:1,11
    26:21 35:19,21
    36:2 37:10 39:10
    41:11,13,17,20
    42:9,13 44:25
    48:20,24 50:1
    52:3,18 53:21
    56:4 57:18 58:13
    59:4 62:5 64:11
    66:3 70:5
**knowledge** 8:5,7
    12:3 15:23 16:1
    23:1 25:3 34:6
    35:12 36:12 37:13
    43:11 44:22 53:9
    58:12 61:15 63:3
    68:2 72:9
**known** 53:18 54:7

                L
**lack** 18:5
**laid** 9:25
**language** 67:21
**large** 18:19

**Latin** 14:6
**launching** 53:5
**law** 22:6 24:3,3,3,4
    39:7,11 45:21
**lawmakers** 9:11
**laws** 17:21 18:12
    19:22 22:7 23:24
**lawyer** 12:2,2
    62:24
**Lawyers** 63:11
**LBJ** 53:4
**LCR** 1:23 3:24
    72:6,14,20
**leader** 41:6,9 54:23
**leaders** 9:10 11:8
**led** 37:7
**leeward** 22:3 32:1
**left** 11:24
**legal** 11:11,13
    17:12 22:21
**legalities** 25:19,19
**legislation** 9:15
    19:3 64:17 69:3
**legislative** 51:6
**legitimacy** 54:5
**lend** 54:4
**length** 23:5 28:15
**letter** 4:11 15:24
    16:6 61:16,19,22
**let's** 15:14 20:3
    21:5 29:6 30:1
    38:14 47:15 61:1
    64:6 69:17
**level** 33:20 37:13
    46:22
**liaised** 9:19 40:17
    58:23
**liaising** 12:20 22:20
**liaison** 36:5
**license** 33:12 67:14
**licensed** 72:7,13,14
**licensing** 34:3,7
**lieutenant** 35:25
**lieutenants** 11:10
**life** 10:18 35:17
    53:4
**lift** 18:7

**liked** 54:9
**like-minded** 12:23
  13:22
**line** 12:21 30:10
  33:20 73:6
**lines** 33:10
**liquidating** 34:23
**Listen** 51:22
**listing** 12:6
**little** 12:15 28:14
  43:23 60:5
**live** 18:17
**living** 57:8
**lobbying** 9:11 30:5
  30:8
**local** 37:16
**locale** 18:23
**location** 16:24
**long** 3:4 19:10
  21:23 24:23 49:13
**longer** 24:7
**look** 33:8 56:11
  61:8,9,11 64:19
  64:21 67:6
**looking** 12:19
  70:21,22
**loop** 42:3
**Lopez's** 41:15
**lot** 9:24 19:9 25:21
  47:21 59:4
**louder** 60:5
**lower** 31:25
**luck** 60:25
**L.P** 1:11

**M**

**machete** 24:15
**Madrid** 3:12 4:4
  5:5,5,6,6,7,8,8,9
  5:10,11,11,12,13
  5:14,14,15,15,16
  5:16,17,17,18,18
  5:19 6:5 14:14,23
  15:10 16:19 19:25
  20:11 22:24 25:7
  26:11 27:5,23
  28:2,3,16 29:3

32:10 34:14 36:16
  38:5,12,20 39:25
  40:19 41:7 42:5
  43:8,19,23 44:5
  44:15 45:1,5,15
  46:20 47:8,10,14
  49:10,18 50:6,13
  51:10,23 53:10
  54:6,16 55:11
  56:1 57:19 59:8
  59:15 62:8 63:7
  63:10,23 64:4
  65:10,19 66:8
  68:1,20 69:4,14
  69:25 70:4 71:13
**main** 16:24
**making** 17:5 22:12
  24:8 39:18 65:17
  65:22,24 68:3
  70:2
**man** 6:9,11 26:12
  39:12,19
**manipulate** 66:15
**manipulation**
  66:12
**map** 15:18
**March** 29:13
**mark** 52:5 61:1
  64:6
**marked** 14:21,25
  20:9 29:1 52:8,12
  56:10 61:3,6 64:8
**marketing** 12:1
  35:11 68:10
**Martinique** 32:2
**matter** 40:15
**matters** 9:3,19
  12:13 27:13
**Mauricio** 11:14
  16:9 25:18
**mean** 13:17 40:22
  52:2
**meant** 30:13 67:17
**mechanism** 25:17
**media** 35:16 37:17
  37:17,23 52:20
  68:12

**meet** 26:14 62:24
**meeting** 26:3,13
  63:2
**meetings** 23:8 40:7
**memory** 11:21
  26:10 57:17
**memory's** 39:13
**mention** 35:1
**mentioned** 7:10
  10:25 12:5 13:13
  17:2 20:12 25:22
  25:25 31:22 32:7
  38:13 70:13
**met** 7:19,22 8:18
  26:1,22 30:3
**method** 42:7
**Miami** 39:13
**miles** 33:7
**millennia** 13:20
**Millington** 2:5,6
  6:16,18
**MILNER** 3:19
**Milton** 1:17 2:1 4:3
  6:1,8 71:18 73:5
  73:21
**mind** 39:16,17 55:5
**minor** 14:12
**minute** 20:6
**minutes** 57:14
**mispronouncing**
  21:10
**Mitch** 14:12 25:25
**mode** 66:21
**moment** 19:16 21:5
  33:9 39:17 61:9
**money** 47:3
**monitor** 41:5,9
**monitored** 40:11
**month** 65:14
**monthly** 50:5,14
**months** 20:23
**Montserrat** 32:2
**morning** 6:6
**multifaceted** 23:4
**multitude** 54:8
**myriad** 18:15

**N**

**N** 3:1 4:1
**naive** 32:23
**name** 6:7 11:15
  25:25 26:15,15
  36:2 39:10 58:21
  67:1 72:14
**named** 7:12 26:12
  62:24 66:24
**names** 46:1
**name's** 26:21
**nation** 23:12
**nations** 18:20 19:4
  24:6,19 31:23
  32:25 36:23
**Naturally** 24:24
**nature** 8:12
**Navy** 2:5
**need** 13:21 18:22
  40:16
**needed** 33:24
**needs** 25:1 40:16
**negotiating** 64:16
  65:5
**neighbor** 23:12,23
**nervous** 39:18
**network** 35:2 68:6
**networks** 37:19,20
**new** 3:5,5 12:19
  64:17 73:2,2
**nice** 27:9
**noises** 63:11
**nontraditional**
  37:19
**North** 3:14,20
**NORTHERN** 1:1
**Notary** 71:25 73:25
**note** 30:2 39:5
  47:20
**notice** 2:3 4:7 15:4
  15:14
**November** 62:2,19
**number** 14:25 15:3
  16:13 20:4,12,15
  29:5 58:15 67:9
  72:14

**O**

**object** 14:11 21:19
  26:7 27:3 28:9
  31:18 34:11 36:13
  38:3,10,19 39:24
  40:4 41:2 42:2
  43:6,18 45:3 47:5
  49:10 51:23 52:4
  52:4 53:11 65:10
  70:4
**objection** 4:14
  16:18 19:23 25:6
  27:22,24 44:13,24
  46:15 49:18 50:6
  50:13 51:10 54:6
  54:16 55:11,18
  56:1 59:8,15 62:8
  63:7,23 64:4 66:8
  68:1,20 69:4,14
  69:25
**objections** 2:11
  63:12
**Obviously** 25:18
**occasionally** 9:20
**occasions** 14:18
  45:20
**October** 1:18 2:2
  73:4
**odd** 57:3
**offered** 33:25
**office** 10:9 52:16
  60:23
**officer** 10:11 41:16
**offices** 16:25
**OFFICIAL** 1:6
**okay** 6:13 7:6,21
  8:8,13,16,21,25
  9:7,17 10:6,12,17
  10:24 11:12 12:5
  13:3,13 14:5,15
  14:24 15:16,17
  16:5,10,13 17:4
  17:14,19,24 19:8
  19:14 20:7,18,24
  21:2,11 25:16
  26:23 28:17 29:4

29:22 30:10,17
31:4 32:11,14
34:10,22 35:15
36:7,17 37:22
38:6,24 39:4,14
41:11,17 42:6,12
42:21 43:12,25
44:16,21 45:6
46:11,21 47:9
48:3 49:2 58:14
61:14 62:22 63:14
64:13 65:4 67:20
71:4,11
**old** 6:10 23:24
39:12,19 51:8
**once** 34:24
**one-of-a-kind** 35:6
**operandi** 66:22
**operate** 33:13
67:15
**operated** 34:21
**operating** 16:3 34:9
67:24
**operation** 34:20
**operations** 54:5
67:7
**opinion** 47:1
**opinions** 66:20
**opportunities** 9:21
12:20 13:10
**opportunity** 7:7
**opposing** 66:20
**order** 30:18
**ordinary** 22:15
**organization** 53:19
55:23 57:13 63:5
63:19
**outcome** 72:11
**outlets** 37:17
**outset** 7:10
**outside** 36:5 40:10
46:23 50:15 53:24
54:3 55:16
**overall** 23:25
**overseas** 22:9
**overseeing** 16:6

**P**

**P** 3:1,1
**page** 4:7 15:15 21:5
30:1 33:11 37:2
73:6
**paid** 47:4 48:11,14
48:17,24
**paper** 19:11 20:13
20:15 21:24 23:5
25:20,21 31:5,7
56:17 58:11
**papers** 22:6
**Paragraph** 30:1
37:3 39:4 67:12
67:17,18
**parameters** 15:7
**Park** 3:4
**part** 13:20 40:8
42:13 52:19,20
54:17 56:17,18
59:18
**participant** 58:6
**participate** 32:12
**participating** 31:23
**particular** 16:12
33:23 65:2 66:17
68:3
**particulars** 37:11
37:12
**parties** 13:5 72:11
**partner** 17:11
**partners** 13:2
**partnership** 33:5
**party** 50:7
**Pass** 47:13
**passed** 18:12 60:23
64:17
**Patsy** 14:19
**pay** 42:1
**paying** 65:14
**payment** 41:13,19
42:1
**payments** 41:11
65:17,23,24
**PC** 3:7,13
**people** 23:17 24:6

27:12 40:18 46:7
54:10,13 57:7
59:21 66:15 68:14
**peoples** 57:1
**performed** 25:11
41:24 45:18
**period** 10:13 21:23
51:14 62:14
**person** 35:22
**personal** 65:17,22
65:24
**personally** 65:14
**person's** 36:2
**perspective** 10:7
18:14
**pertain** 9:3
**phone** 70:2
**phrase** 33:11 35:2
**picking** 18:2
**placed** 61:6
**placing** 52:12
**Plaintiff** 1:8 3:2
**plan** 34:1
**planning** 45:25
**plans** 17:4
**played** 11:19 42:14
**plea** 7:2,2
**please** 6:9 7:19 9:1
10:10,25 13:17
16:15 29:8,25
30:2 33:17 35:5
37:2 45:24 50:20
53:12 56:10 57:16
57:20 60:9 63:16
64:11
**point** 35:22
**Political** 53:3
**Ponzi** 42:19,22
43:16 44:11,23
**pop** 39:17
**population** 18:9
38:22
**PORTION** 57:21
**position** 67:4
**possible** 38:23,23
**possibly** 16:11
34:16

**pours** 24:5
**practice** 55:15
**preceded** 49:8,14
**precisely** 35:19
**preference** 23:19
31:24
**preferences** 21:13
23:18,18,19,20
**preferred** 32:5
**preparation** 60:13
**prepare** 59:25
60:11
**prepared** 20:25
29:16
**preparing** 60:14
**present** 8:18
**presented** 58:10
**pressure** 66:12
**presumably** 39:1
**presume** 22:22
**pretty** 10:5 15:18
18:8 28:19 34:3,3
42:7
**PRICE** 3:19
**primarily** 14:4
33:19 69:12
**primary** 56:22 58:1
**priority** 30:18
**Prison** 2:5 6:18,19
**private** 9:20 12:20
13:4 21:9 62:19
**privy** 23:7 50:21
**pro** 28:14
**probably** 22:5
41:14
**problem** 39:16
**procedure** 2:9 16:3
**process** 26:24
33:25 34:25 41:18
42:10
**produced** 19:11
52:21 56:15
**producers** 37:18
**product** 12:22
19:12 27:14 31:4
72:16
**products** 28:22

57:12
**professionals** 45:18
46:14 53:24 54:4
55:16
**profit** 22:12
**program** 23:4
**projects** 38:8
**promotion** 43:3
**proposals** 58:10
**prosperity** 21:18
23:2 38:24
**provided** 9:2 14:9
51:2
**providing** 64:2
**provisions** 2:8
**public** 11:25 36:22
71:25 73:25
**pull** 46:23
**punitive** 22:7 23:24
**purpose** 29:15,17
54:2 56:22,24
57:3 58:1
**purposes** 54:9
55:16
**pursuant** 2:3,7
**put** 31:23 40:13
48:8,8
**P.M** 69:20,20 71:16

**Q**

**qualified** 18:16
**qualify** 19:4 32:13
**quarterly** 50:15
**question** 2:12 17:3
20:14 27:7 44:7
45:9 55:6,20
57:20,24 61:10
62:16 63:6,9,15
63:16,20 66:6
68:11 70:22 71:5
**questions** 47:11
71:12,14
**quick** 43:24
**quite** 22:7 46:24
**quote** 53:20 65:8
68:5

APP. 086

**R**

R 3:1,12 72:3
raising 64:2
RALPH 1:4
RAS 53:7,8,16
read 30:24 33:10
    57:15,19,22 64:11
    64:12
reading 57:20
real 23:19
really 17:23 18:22
    22:17 56:24 61:12
    64:22
reason 45:11 51:3
reasonable 24:2
    47:7
reasonableness
    46:11
reasonably 47:3
reasons 16:15
    18:15
recall 7:19 8:13
    10:4 11:15,18
    14:15 17:15,25
    24:13,13 26:3,9
    26:13,15,17 29:15
    31:13 39:16 46:1
    48:3,10,13,16
    58:25 59:6,11,13
    60:21 61:14 62:2
    62:14,18,22 63:4
    63:18,20,24 64:1
    65:1,4,7,16 66:5
    66:24 67:2,3,5
    69:23 70:17,21
    71:1,4
receive 22:11,13
    57:2
received 63:21
    64:23
receiver 1:5 7:13
    42:16
receiving 32:3
RECESS 44:2
    47:17 69:19
recognize 15:3,11

29:8
recollection 54:3
    54:19 57:25 61:25
    65:23 70:25
recommendations
    19:19
record 27:6 47:21
    63:11 72:8
Reed 26:12,13,14
REF 73:5
referenced 20:16
references 39:19
referrals 14:2
referred 53:16
refresh 26:9 57:17
regarding 12:10
    19:21 39:8 70:25
region 18:7 21:18
    23:2 36:19,19
regional 33:13
    67:15
register 65:2
regulatory 67:3,4
related 17:21 19:22
    21:16 31:16 40:25
    40:25 70:18 71:6
    72:10
relating 7:3 35:24
relations 11:25
    30:5,8 36:22
relationship 8:4
    10:1 23:13,15,16
    28:19 29:20 32:25
    49:7,8,14,14 54:8
    59:3 66:19
relationships 9:5
    9:22 13:14,16,21
    14:3 30:12 35:16
    37:15
relied 30:11
remember 58:18,21
    66:10,16,18 67:1
    70:6,8,10,11,14
reminiscent 66:16
repeat 63:16
report 36:3
reported 1:22

22:14 72:8
reporter 3:23 57:22
    69:23 70:15 72:7
    72:14
reporters 70:21
reporting 23:9
    72:13,16
represent 7:11
representation
    30:19
representative 8:17
represented 7:15
    39:7
reproduction 72:17
reputation 54:15
    55:17,25
REQUESTED
    57:21
requirements 32:8
research 19:12
reservation 62:7
reserved 2:11
residence 24:3
residency 32:7
respect 16:13 44:18
    51:20 56:5
respects 36:14
responsibility 46:4
    68:13
responsible 16:5
    53:23
restate 27:7
result 7:1
resultant 19:11
resulted 32:16
resulting 7:2
results 28:20,23
    56:21 58:4
resume 30:14
retail/wholesale
    24:9
retain 55:16
retained 48:5 54:21
    55:1
retaining 53:23
    54:3
retention 55:22

return 63:21 66:4,7
reverse 13:7,8
review 20:13,24
    29:6
reviewed 56:13
right 6:15 8:3,16
    10:3 14:24 23:14
    25:22 28:4 33:3
    35:1 39:15 42:6
    42:15 47:1 53:22
    66:13 67:11
rigorous 34:3,4
rings 26:15
road 2:6 15:18
Robert 53:13,15,19
Rogers 26:20
role 11:19 40:24
Rules 2:8

**S**

S 1:4 3:1
Saint 22:3 24:14,19
sale 42:23 43:3
San 3:8
sat 17:2
saw 56:9
saying 65:3
says 30:3,10 65:13
    65:20 66:2
scale 12:24
scheme 42:19,22
    43:16 44:11,23
School 70:3
sclarke@winstea...
    3:16
Scott 26:12
search 17:15,16
seat 41:4
SEC 45:8
second 55:18 57:3
seconds 15:5
section 21:7
sector 12:24 13:24
    14:3 33:23 37:21
securing 35:2 68:6
security 23:11,11
    24:1 32:24 57:4

see 16:4 19:5 21:6
    29:6 36:18 37:4
    67:21
seeking 9:21
seen 15:2
selling 24:7
sending 46:6
sense 24:21
sentence 7:1
September 24:17
sequence 20:5
serum 59:22
served 10:13 26:4
service 33:21
services 14:10
    41:24 45:18 46:7
    51:2 55:1 63:6
    64:3 72:18 73:1
serving 6:21 7:1
sets 15:7
setting 13:14
several-year 19:10
share 16:14 29:19
shareholder 69:8
Sharp 62:24
Sharpe 14:13
SHEET 73:1
SHELBY 72:5
shook 60:24
shortening 32:13
show 14:25
sign 58:17,18,25
signature 2:14
    29:11
signed 29:16,23
    58:16 59:13 71:20
significant 23:10
sir 6:6,14,17,24 8:3
    8:20,24 10:3 13:9
    13:12 14:24 15:13
    20:17 25:5 26:1
    26:19 28:4 29:8
    29:12,14,24 30:2
    30:9,16,23,25
    31:2,6,8 38:2,11
    38:25 39:3 41:10
    41:20,22 42:15,20

42:24 43:1,7,7,17
45:6,22 47:10,14
48:12,15,18,20
49:1,5,16 50:22
62:21 64:5 65:6
65:11 66:1,9 67:8
68:21 70:16,20
71:3,10
sissies 6:10
sister 70:12
skills 72:9
slim 37:15
small 33:13 67:15
smashed 24:17
sold 57:12
sole 69:8
somebody 11:6
somewhat 26:10
47:22
sorry 15:21 31:9
36:7,9 40:22 43:9
60:7 63:10 71:7
sort 15:24 26:4
sought 33:24
sound 57:4 66:19
sources 46:23
so-called 44:23
speak 60:5,14 63:9
speakers 47:22
speaks 57:11
special 32:15
specialist 21:21
specialists 27:1,18
39:23 41:1,12,19
41:25 42:1
specialized 26:4
specifically 22:2
28:6
specifics 9:8 59:5
speculate 55:4,8
spill-over 56:20
spoke 47:24 50:23
60:17
sponsored 35:3
68:7
sponsorship 68:10
sport 35:6,13

sports 37:20 68:10
68:10
stand 53:8
standard 33:21
57:8
Stanford 1:5,6 7:3
7:13,14,24,24,25
8:6,11,23 9:5,15
10:1,10 11:4,5,9
11:23 12:19 13:6
13:11,16,21 14:10
16:1,7,17,21 17:5
18:19 19:20 22:21
23:9 25:9,15,24
26:6,24 27:2,12
27:18,19 28:6
29:20 30:11 33:18
33:18 34:8 35:4,6
35:23,25 36:4
37:1,5,6 38:1,7,8
38:17 40:2,9
41:24 42:18 43:4
43:15 44:11 45:19
48:5 49:3,7,25
50:3 51:7,16,20
52:17,23,23 53:13
53:15,19,19 54:7
54:21,25 55:23,25
56:8 57:13 58:2,8
59:3,18 61:23
62:3,19,23 63:5
63:19 64:1,14
65:16,24 66:11,21
68:7 69:3,5,5,9,10
70:17,19 71:6,8
Stanford's 37:9
53:2 54:5 55:5,15
67:7 68:14
start 30:1
starts 24:10
state 67:12 72:4,7
statement 22:15
25:4
States 1:1 13:1,2
14:4 17:10 18:1,4
19:2 21:8,13,16
22:8 24:1 32:4,24

37:18 57:5
state-of-the-art
24:2
stature 54:10,13,20
status 18:12,24
19:4 32:15 34:17
68:18 69:13
stepchild 33:4
STEPHEN 3:12
sticking 51:3
stirring 66:14,14
stone's 33:1
story 45:13
Strategic 45:25
strayed 40:12
stream 41:14
street 3:14,20 24:8
73:2
stretch 43:25
strike 15:21 36:10
57:24
study 17:9 23:3
Suarez 11:16,21
16:11 41:17 42:9
50:1 64:15 65:17
sub 21:12
subscribed 71:20
73:22
subsequently 33:14
substantial 30:21
success 34:13 64:17
65:5
successful 34:2,6
34:10 36:12,15
successfully 38:16
sued 7:13
suggested 43:15
Suite 3:4,8,20 73:2
sums 10:5
sure 15:6 20:1
25:18 26:12 27:10
31:13 40:12 44:1
58:20,23
surprise 42:4
sworn 6:2 73:22
SYNDER 3:7

**T**

T 72:3,3
table 22:5
tactics 66:12
take 15:5 20:13
29:6 43:24 47:15
52:2 56:10 61:9
69:17
taken 2:1,7 34:18
44:2 47:17
Tales 53:3
talk 13:3 21:2
talking 13:4 30:14
51:4,4,5
target 57:9
tax 17:12,21 18:14
19:21 21:20,22,25
22:6,7 23:3,18
24:2 30:20 31:24
31:24 32:5,17
38:13 39:8 51:6
68:17 69:12
taxable 22:15
taxation 31:16
taxes 21:17
teach 70:12
team 41:5,9
teams 22:20
television 68:12
tell 11:18 19:18
20:3 21:14 33:16
35:5 41:22 43:1
44:21 46:12 59:2
tend 23:22
Tennessee 2:6 6:16
72:4,7,13,17
tense 28:12
term 28:8
terms 2:8 8:14 9:11
10:4 17:10 34:20
46:11,17 67:24
testified 6:3 49:2
51:7 53:22 55:14
56:12,16 66:19
68:16,23
testimony 14:21

20:9 29:1 44:8
52:9 60:1,2,3,12
61:3 64:8
Texas 1:1 3:8,14,21
8:1
thank 6:13,19 7:6
47:10,11
Theft 72:18
thick 24:25
thing 44:6
things 10:25 17:1
24:8 31:19
think 6:14 9:18
10:5 15:8 25:24
32:22 36:2 46:16
66:2 70:12
thinking 68:24
think-tank 34:1
third 4:9 23:14
30:10 33:1 59:10
thought 35:8 48:6
three 58:24
throw 33:1
tie 21:18 62:9,12
tied 23:2
ties 21:17
time 6:21 8:4,18,24
10:13 14:8 16:22
19:10 20:13,18
21:22,24 24:24
25:2 26:9 29:6
34:4,21 44:3
47:12,18 48:7
51:14,16,17 54:21
59:10,20 60:17,22
62:2 65:9 66:7
67:24 68:3,8
69:20
times 23:7 24:20
28:12 53:17
today 7:8 34:15
60:1,3,12,15
told 12:6 16:21
70:9
Tomlinson 14:19
tool 35:11
top 26:8

topics 50:18
totality 30:19
tourism 24:10,16
    36:22
tournament 36:9
    36:11,24 37:9,25
    68:7
Tournaments 35:3
track 40:13
trade 21:8,13 39:8
trading 13:2 17:11
transactions 28:7
    28:11
transcript 72:8,16
transfer 72:17
transparent 59:21
TRANSPERFECT
    73:1
travel 46:18
traveling 9:24 62:3
    62:18
treatment 30:20
    31:20 32:5
tried 27:25
tries 52:2
trip 62:22
true 26:16 69:11
    72:8
truth 59:22
try 15:19 60:5
trying 36:1
turn 15:15 21:4
    28:1 37:2 41:25
    47:25 58:14
TV 35:2 37:6 68:6
two 33:13 34:8 57:5
    67:15
two-minute 47:15
two-prong 56:24
type 8:22 11:1
types 45:23

U

ultimate 38:16 40:5
    58:3,4 69:2
ultimately 18:11
    19:19

unaddressed 23:24
unauthorized
    72:17
understand 8:25
    10:8 22:19 25:22
    28:2,8 39:21 40:3
    42:16 45:8
understanding
    8:21 9:4 10:20
    11:6 12:7 13:18
    21:21 27:17 39:2
    42:19 49:6,11,22
    49:24 50:2,17
    55:15 69:1
Understood 48:23
undertaken 20:19
    21:15
United 1:1 13:1,1
    14:4 17:10 18:1,4
    19:2 21:8,13,16
    22:8 24:1 32:4,23
    37:18 57:5
University 70:19
    71:9
use 38:14
utilized 40:14

V

v 73:4
vaguely 17:16 70:6
Valerie 1:23 3:24
    72:6,20
valuable 38:8
value 37:25 63:6
    64:3
variable 46:24
various 41:1
venture 20:23 22:1
vetted 11:13
VI 39:8 64:17
view 38:8
vintage 66:21
violation 72:17
Virgin 18:4,13,23
    21:16 31:21 32:6
visibility 56:5
Vision 37:19

vitae 16:24 30:14
VS 1:9

W

W 53:4
wait 52:3 55:18
waive 53:10
waived 2:10,14
want 27:7 31:25
    47:20 60:8 67:9
wanted 46:18 66:13
    66:13
warranted 17:6
Washington 26:2
    39:13 62:23 67:3
wasn't 45:9 50:7
    69:2
way 10:9 12:16
    13:3,15 15:21
    17:18 19:18 25:8
    31:3 34:2 53:7,20
    59:4 60:23 71:5
    72:11
Wayne 26:20
weekly 50:5
welcome 7:9
welfare 18:9
went 20:20 26:24
    28:5 34:19,24
weren't 40:14
    66:20
We'll 19:16
we've 14:25 43:23
    52:12
whatsoever 43:2
whereabouts 62:5
white 19:11 20:13
    20:15 21:24 31:5
    31:7 56:17 58:11
willing 59:23
win 57:7
Winer 66:25 67:6
wins 57:6
Winstead 3:13,13
wish 22:8 32:12
wished 33:19
witness 2:14 3:17

6:2 14:12,22
    19:24 20:10 21:20
    26:8 27:4 28:10
    29:2 31:19 34:12
    36:14 38:4,11
    40:5 41:3 42:3
    43:7 44:14,25
    45:4,13 46:16
    47:6,13,14 49:11
    49:19 50:7,14
    52:9 53:13 54:7
    54:17 56:2 59:10
    59:17 60:9 61:4
    61:12 63:8,14,24
    64:5,9 65:11 66:9
    68:2,21 69:5,15
    70:5 73:5
words 27:20
work 8:22 11:1
    19:7,9 25:10 26:5
    27:1,12 31:13
    32:16 35:19 37:24
    38:6 56:7 57:7
    63:21 65:8 72:16
workable 24:2
worked 30:4 31:15
    39:6,22 64:25
    66:11 67:14
workhorse 56:3
working 8:4 20:20
    21:23 22:20 24:9
    25:23 40:2
world 66:2
worldwide 12:25
writes 52:25
written 15:24 16:6
    70:24
wrote 12:10
W-I-N-E-R 66:25

X

X 4:1

Y

Yeah 33:7,7 42:11
    47:24 56:14 62:11
    62:11 67:19 70:6

70:11
year 8:14 65:15
years 7:20 17:17
    20:23 21:1 24:15
    48:6,22 56:14
    58:24
Yep 45:14
Yolanda 11:15
    16:11 50:1 64:15
    65:13,16,20,20,22
York 3:5,5 73:2,2
young 6:11

Z

zone 18:6

$

$265,000 65:14

#

#456 72:6
#903 73:2

1

1 4:7 14:21 15:1,3
    16:14,14
10 7:20 15:5 48:6
10:30 2:4
10017 73:2
10169 3:5
1020 3:8
11:32 44:3
11:37 44:3
11:41 47:18
11:46 47:18
12 7:20 29:13 48:6
12:20 69:20
12:26 69:20
12:28 71:16
12770 1:24 73:5
14 4:7,15
16 4:15
17th 10:21
18th 52:14 60:19
19 4:16
1950 3:20
1989 24:17

**1992** 10:16

---
**2**

**2** 4:8 29:1,5,8 30:1
  33:8 58:15 67:9
  67:18
**20** 4:9 73:23
**20/20** 35:3,7,24
  68:6
**2004** 8:15 48:7,11
**2005** 48:14
**2006** 48:17 52:14
  69:24
**2007** 48:19 64:15
**2008** 48:24 62:2,19
  64:18
**2009** 10:19,22,23
  48:25 60:20 62:24
**2010** 29:13
**2014** 1:18 2:2 71:21
  73:4
**2016** 72:20
**21** 4:16
**210-630-4200** 3:9
**212** 73:3
**212-374-5370** 3:5
**214-651-1121** 3:21
**214-745-5709** 3:15
**216** 73:2
**230** 3:4
**24** 1:18 73:4
**24th** 2:2
**25** 4:17
**26** 4:17
**27** 4:18,18
**27th** 53:5
**2728** 3:14
**28** 4:8,19
**2828** 3:20

---
**3**

**3** 4:9 20:4,9,12,15
  21:5 37:3 56:10
  56:11
**3:10-cv-527** 1:9
**30** 72:20
**300** 3:8

**31** 4:19
**34** 4:20
**36** 4:20
**38** 4:21,21,22
**39** 4:22
**39-14-104** 72:18

---
**4**

**4** 4:10 39:4 52:6,9
  52:13 67:12,17
**40** 4:23,23
**400-8845** 73:3
**41** 4:24
**43** 4:24,25
**44** 5:2,3
**45** 5:3
**45th** 73:2
**456** 72:20
**46** 5:4
**47** 4:4 5:4
**49** 5:5,5

---
**5**

**5** 4:11 21:5 61:3,7
**50** 5:6,6
**500** 3:13
**51** 5:7,7
**52** 4:10
**53** 5:8
**54** 5:8,9
**55** 5:9,10,10,11
**59** 5:11,12

---
**6**

**6** 4:4,12 64:6,8
**61** 4:11
**62** 5:12,13,13
**63** 5:14,14
**64** 4:12 5:15
**65** 5:15
**66** 5:16 6:10
**6696** 2:5
**67** 5:16
**68** 5:17
**69** 5:17,18,18

---
**7**

**7th** 64:15
**70** 5:19
**75201** 3:14,21
**78705** 3:8

---
**8**

**850** 3:4

---
**9**

**90** 33:7
**90s** 10:15
**92** 10:16