Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, IN HIS CAPACITY AS)
COURT-APPOINTED RECEIVER FOR THE  )
STANFORD INTERNATIONAL BANK, LTD., )
ET AL., AND THE OFFICIAL STANFORD  )
INVESTORS COMMITTEE,               )
          Plaintiffs,         )Case No. 3:10-CV-0527-N-BG
                       )
v.                                 )
                       )
BEN BARNES and BEN BARNES GROUP,   )
L.P.,                              )
          Defendants.         )

*******************************

ORAL VIDEOTAPED DEPOSITION OF

BENNY FRANK BARNES

*******************************

ORAL DEPOSITION OF BENNY FRANK BARNES, produced as

a witness at the instance of the Plaintiff, Official Stanford

Investors Committee, and duly sworn, was taken in the

above-styled and numbered cause on the 28th day of October,

2014, from 10:02 a.m. to 1:50 p.m. before LINDI S. ROBERTS,

Certified Shorthand Reporter in and for the State of Texas,

reported by machine shorthand, at the offices of Winstead, PC,

401 Congress Avenue, Suite 2100, Austin, Texas   78701,

pursuant to the Federal Rules of Civil Procedure.

Exhibit B-2

APP. 091

Page 2

1                              APPEARANCES

2

    FOR THE PLAINTIFF, OFFICIAL STANFORD INVESTORS COMMITTEE:
3        Mr. Jesse R. Castillo
         CASTILLO SNYDER, PC
4        300 Convent Street, Suite 1020
         San Antonio, Texas
5        Telephone: (210) 630-4200 - Fax: (210) 630-4210

6        - and -

7   FOR THE PLAINTIFF, OFFICIAL STANFORD INVESTORS COMMITTEE:
         Mr. Joshua E. Abraham
8        BUTZEL, LONG, PC
         230 Park Avenue, Suite 850
9        New York, New York 10169
         Telephone: (212) 818-1110 - Fax: (212) 818-0494

10

11  FOR THE DEFENDANTS:
         Mr. Jay J. Madrid
12       WINSTEAD, PC
         500 Winstead Building
13       2728 N. Harwood Street
         Dallas, Texas  75201
14       Telephone: (214) 745-5709 - Fax: (214) 745-5390

15

    ALSO PRESENT:  Nancy Martin, Videographer
16                 Kent Caperton

17

18

19

20

21

22

23

24

25

APP. 092

Page 3

1                          INDEX

2                                                PAGE

3    BENNY FRANK BARNES

4    Examination by Mr. Castillo ......................6

5

6                          EXHIBITS

7    EXHIBIT              DESCRIPTION               PAGE

8    1          List showing Learjet usage          34

9    2          List of Venezuela Bank              35
                Reference Letters and List of
10               Pending list

11   3          Letter from Ben Barnes to            35
                Dr. Tino Alcides Diaz, dated
12              September 30, 2004

13   5          Email chain between Yolanda          82
                Suarez and Carlos Loumiet
14

     9          Email chain between Susan            97
15              Martin and Julie Hodge, et al;
                dated June 23, 2005
16

     10         Email chain between Susan            41
17              Martin and Julie Hodge, dated
                June 23, 2005
18

     11         Invoice from Ben Barnes Group,       41
19              L.P. to Stanford Financial for
                $1 million; dated 6/2/2005
20

     12         Email chain Julie Hodge,            100
21              Aymeric Marinoia, et al

22   13         Email chain between Susan           100
                Martin and Julie Hodge; dated
23              June 23, 2005

24

25

APP. 093

Page 4

1                          EXHIBITS (cont.)

| 2 | EXHIBIT | DESCRIPTION | PAGE |
|---|---------|-------------|------|
| 3<br>4 | 15 | Agenda: Tuesday, June 28th<br>through Thursday, June 30th,<br>2005 | 102 |
| 5<br>6 | 21 | Email chain between James<br>Miller and Yolanda Suarez, et<br>al; dated August 18, 2005 | 84 |
| 7 | 24 | "America's Third Border," dated<br>9/26/2005 | 105 |
| 8.<br>9 | 50 | Document entitled "Action<br>Plan," Bates No. 651, 652 and<br>653 | 52 |
| 10<br>11 | 51 | Travel Itinerary (Washington,<br>D.C.; Oklahoma City; Austin)<br>November 3-12, 2003 | 39 |
| 12<br>13<br>14 | 75 | Memorandum from Larry Campagna<br>and Jaremi Chilton to Jim Davis<br>and Yolanda Suarez, dated<br>1/8/2008 | 118 |
| 15<br>16 | 76 | Email chain between Allen<br>Stanford, Yolanda Suarez, et<br>al; dated January 15-16, 2008 | 119 |
| 17<br>18 | 83 | Email chain between Yolanda<br>Suarez and Susan Martin; dated<br>May 6, 2008 | 113 |
| 19<br>20 | 101 | Internet Article from<br>Chron.com, "Barnes again moves<br>into spotlight" | 119 |
| 21<br>22 | 103 | Email from Allen Stanford to<br>Yolanda Suarez; dated December<br>7, 2007 | 119 |

23

24

25

APP. 094

Page 5

1                          EXHIBITS (cont.)

2    EXHIBIT              DESCRIPTION                    PAGE

3    110           "America's Third Border,"            109
                   dated November 2005
4
     111           Documents reflecting                  78
5                  transactions between Ben Barnes
                   Group, L.P. and Stanford
6                  Financial

7    116           Ben Barnes Group, L.P.               115
                   Transaction List from January
8                  2008 through March 2009

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APP. 095

Page 6

1             THE VIDEOGRAPHER:  This is the videotaped

2   deposition of Ben Barnes; In the Matter of Ralph S. Janvey, et

3   al versus Ben Barnes and Ben Barnes Group, L.P.; Civil Action

4   No. 3:10-CV-0527-N-BG; for the U.S. District Court, Northern

5   District of Texas, Dallas Division; held in the Offices of

6   Winstead, P.C. at 401 Congress Avenue, Suite 2100, Austin,

7   Texas.

8             This is the beginning of Tape One.  Today's date

9   is October 28, 2014.  We are on the record at approximately

10  10:02 a.m.

11                    BENNY FRANK BARNES,

12  having been first duly sworn, testified as follows:

13                    EXAMINATION

14      Q.   (BY MR. CASTILLO) Sir, would you state your full

15  name.

16      A.   Benny Frank Barnes.

17      Q.   And Mr. Barnes, when were you born?

18      A.   April 17th, 1938.

19      Q.   Where?

20      A.   Gorman, Texas.

21      Q.   Okay.  And have you ever had your deposition taken

22  before?

23      A.   Yes, sir, I have.

24      Q.   On how many occasions?

25      A.   On several occasions.  A lot -- a lot of times when I

1    was in office and when I was in private practice.

2        Q.    Enough times that you're familiar with the process?

3        A.    Yes.

4        Q.    Okay.  And you shake your head like painfully so.

5        A.    The shorter the better.  I was the defendant in about

6    a dozen redistricting suits when I was in office.  And I gave

7    my deposition when the legislature was not in session.  I

8    almost gave my deposition all summer long for -- in two years.

9        Q.    All right.

10       A.    So I got a -- I got a Ph.D. in redistricting.

11       Q.    So, Doctor Barnes, you're an expert in depositions as

12   well?

13       A.    Not depositions, but redistricting depositions.

14       Q.    All right.  And so we'll follow the same process

15   where I'll ask you questions and if you understand them,

16   you'll answer them; and I'll wait until you finish your answer

17   before I start my next question.

18             Sometimes I talk a little slower than I think

19   and so you may think that I'm finished with my question, but

20   I'm not.  So we'll -- I think we'll work through this process,

21   sir.

22       A.    I suffer from that same disease.

23       Q.    Thank you, sir.  Where did you get your undergraduate

24   education?

25       A.    The University of Texas and at TCU and at John

APP. 097

Page 8

1    Tarleton.

2       Q.    And what year did you graduate from the University of

3    Texas?

4       A.    I went into the law school on a three-year plan.  I

5    went into law school in 1960 after -- after completing 90

6    hours at the university and business school.

7       Q.    Okay.  Did you get your -- a BA degree?

8       A.    No, I never got a BA degree.

9       Q.    All right.  So your degree at the University of Texas

10   is a Doctor of Law or JD?

11      A.    No, I -- I didn't complete the -- my law school

12   commitments to get a degree.  I have enough -- I had enough

13   hours, but -- to take the bar, but I didn't ever even take the

14   bar either.

15      Q.    All right.  So technically you didn't get a degree

16   from the University of Texas?

17      A.    That's right.

18      Q.    All right.  Or any other college?

19      A.    Several honorary degrees.

20      Q.    All right.  And what year did you finish your last

21   year at the University of Texas?

22      A.    1966.

23      Q.    Other than attending classes at the law school, did

24   you have what we would equate to a major in your undergraduate

25   studies?

APP. 098

Page 9

1   A.   General business.

2   Q.   All right.  And did you start working right after you

3   finished your classes at the University of Texas law school?

4   A.   I was elected to the legislature in 1960 when I was a

5   freshman in law school.

6   Q.   All right.  And I guess you were 21 years old,

7   approximately, when you were first elected?

8   A.   22 when I was sworn in.

9   Q.   Okay.  And what district was that?

10  A.   District 64.

11  Q.   And how long did you serve in that capacity?

12  A.   Eight years.

13  Q.   Were you working besides being a legislator?

14  A.   I was associated with a construction company in

15  Brownwood sometime during the mid 1960s.  I don't remember

16  exactly when.

17  Q.   And what was your role with the construction company?

18  A.   I was to look around all -- the State of Texas for

19  sites to develop shopping centers and apartments.

20  Q.   Do you remember the name of the construction company?

21  A.   Yes.

22  Q.   What was it?

23  A.   The Herman Bennett Company.

24  Q.   All right.  And after working for the construction

25  company -- or how long did you work for the construction

APP. 099

Page 10

1    company?

2       A.    Well, I worked for it part time for a few years and

3    then I -- in 1973 I became an owner -- a part owner of the

4    construction company and worked in the construction business

5    from 1963 until 1988 -- '87 or '88.

6       Q.    Any other employment during that period of time other

7    than working for the construction company?

8       A.    We did other things -- other construction.  But, yes,

9    no other -- other than just with that company and other

10   companies related to that company.

11      Q.    All right.  But, I mean, your -- your place of

12   employment, your ownership was with that company?

13      A.    Yes.

14      Q.    All right.  And at the same time you were still in

15   the legislature?

16      A.    I was in the legislature from 1960 to 1969.

17      Q.    Then what happened?

18      A.    I was elected Lieutenant Governor in 1968 and I

19   served as Lieutenant Governor from 1969 until 1973.

20      Q.    You were elected for two terms?

21      A.    Yes.

22      Q.    And you served as Lieutenant Governor for Governor

23   Connally?

24      A.    No, for -- Governor Smith was -- was governor.  But

25   in Texas, as you well -- so well know, and much more familiar

Page 11

1    with Texas government than I am (sic), but the governor and

2    the lieutenant governor don't run together in Texas.  You --

3    it's a separate office, a separate campaign.

4        Q.    Right.  They're different -- different terms, aren't

5    they?

6        A.    Yes.

7        Q.    Okay.  And why did you decide not to run for a third

8    term as lieutenant governor?

9        A.    I ran for governor in 1972.

10       Q.    Okay.  And who did you run against?

11       A.    Dolph Briscoe, Frances Farenthold, and two other

12   minor candidates whose names I don't even remember.

13       Q.    Okay.  And you ran on the democratic side?

14       A.    Yes, I did.

15       Q.    Okay.  Were you working doing something else besides

16   being the lieutenant governor full time, during that period of

17   time that you were the lieutenant governor?

18       A.    I'm still affiliated with the Herman Bennett Company.

19   But I was mostly working full time as lieutenant governor.

20       Q.    All right.  Up until this point when you served as

21   lieutenant governor up through '73, were you doing any other

22   type of separate consulting work or a role as an adviser to

23   anybody else other than the company that you had a interest

24   in?

25       A.    No, I did not.  I held several national and

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 12

1    international posts during that time that -- that took up a

2    lot of my time when I was outside of the office of lieutenant

3    governor.

4        Q.    Okay.  And what type of national post did you hold

5    during that period of time?

6        A.    I was President of the Southern Legislative

7    Conference; and then I was President of the National

8    Legislative Conference; and then I was Chairman of the Council

9    of State Governments; and then I served as a Special

10   Ambassador to NATO; and I served as a Special Ambassador to

11   the United Nation; and I served as a Special Representative

12   to -- of the United States to a conference in hun -- on hunger

13   in Rome.

14       Q.    Okay.  During your role as a member of a council or

15   ambassador to some of these -- the NATO or United Nations or

16   council for hunger, did you have any role in looking at

17   offshore banking?

18       A.    No.

19       Q.    Have you ever been in any role where you've had a

20   role in looking at the oversight of offshore banking?

21       A.    In the year -- in the period of the 2000s, yes, I

22   looked at -- I looked at the statutes pertaining to some of

23   the laws concerning offshore banking.

24       Q.    Okay.  And was that at the time when you already had

25   formed Ben Barnes Group?

Page 13

1    A.   Yes.

2    Q.   All right.  Other than through your entity, Ben

3  Barnes Group, did you have any role as an ambassador or as a

4  council member where you had some responsibility to look at

5  the oversight of offshore banking?

6    A.   No.

7    Q.   Okay.  And we'll get to the details of your looking

8  at the statute concerning offshore banking --

9    A.   Yeah.

10   Q.   -- after the -- in the 2000s.

11   A.   Yeah.

12   Q.   All right.  After your unsuccessful run for governor,

13  what did you do?

14   A.   I became president of the Herman Bennett Company.

15   Q.   The same construction company that we're --

16   A.   Yes.

17   Q.   -- you were talking about earlier?

18   A.   That's right.

19   Q.   Was it still based in Brownwood?

20   A.   Yes.

21   Q.   Did it have operations anywhere other than in the --

22  or offices other than in the Brownwood area?

23   A.   Other than construction offices on job sites where we

24  were doing construction jobs, no.

25   Q.   Okay.  And did it continue to do the same type of

Case No.  3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 14

1    developments that you described earlier:  Shopping centers?

2        A.   Yes.

3        Q.   Was it mainly commercial?

4        A.   It was mainly commercial, but we had some -- about

5    50 percent of our work was our own work and 50 percent was bid

6    work, where we built schools and hospitals.

7        Q.   Okay.  And how long did you stay in that position as

8    the president of Herman Construction Company (sic)?

9        A.   From 1973 until 1985 or '86.

10       Q.   Then what happened?

11       A.   We formed a -- the Barnes-Connally Development

12   Company and formed Ben Tex Construction Company.

13       Q.   And the Barnes-Connally Construction Company --

14       A.   That was -- that was a development company.

15       Q.   Was it to develop specific pieces of property or

16   generally a development company --

17       A.   To -- to continue the same type of business that I

18   had done with the Herman Bennett Company.

19       Q.   Okay.  What caused you to leave the Herman

20   Construction Company (sic)?

21       A.   Herman Bennett was getting older and -- and we had

22   development to be done in Austin, a very large tract of land

23   that later became the Barton Creek Country Club, and so I

24   moved to Austin really to develop that country club.

25       Q.   Okay.  What type of development, other than Barton

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 15

1    Creek Country Club, did the Barnes-Connally Development

2    Company do?

3        A.    We did condominiums on Padre Island; condominiums in

4    Ruidoso, New Mexico; shopping centers in various and sundry

5    cities in Texas.  We did apartment houses in several cities in

6    Texas.  We did office buildings in Houston and in Austin.  We

7    did other commercial developments that I don't recall at this

8    time.  But there are probably some other things other than

9    apartments and office buildings and shopping centers.

10       Q.    And what was your area of expertise that you

11   contributed to the Barnes-Connally Construction Company?

12       A.    Well, by osmosis and being in the business from '73

13   until I got out of the business, I learned by mistake and by

14   experience some expertise about developing shopping centers

15   and apartments and single-family developments.

16            And I had already had some training perhaps to

17   know how to talk to public officials, county judges, county

18   commissioners, city council, mayors, planning and zoning

19   commissioners.  All of the part of local governments that

20   political subdivisions have over development in Texas and in

21   other states.  And so I spent a good bit of my time visiting

22   with county commissioners and mayors and city council people.

23       Q.    Okay.  And that's what I kind of envisioned, that

24   that would be your role.  If you needed a waiver of an

25   ordinance or something, that you would be the person that

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 16

1    would make the contact with the public officials to see if you

2    could get that done.

3                    MR. MADRID:  Objection, form.

4        Q.   (BY MR. CASTILLO) Would that be kind of accurate?

5        A.   Yes, that would be accurate.

6        Q.   Okay.  And the same thing with the city?  If the city

7    had some favorable zoning issues or unfavorable zoning issues,

8    you would be the type of person that could talk to city

9    officials about --

10       A.   Well, attempt to talk to city officials.

11       Q.   Attempt to talk to city official.  Okay.  And at that

12   point were you ever registered as a lobbyist for any city or

13   county?

14       A.   No, not to my knowledge.

15       Q.   Okay.  Have you ever become registered to be a

16   lobbyist for any city -- at any city?

17       A.   I don't recall.

18       Q.   How about for any county?

19                   MR. MADRID:  Well, let me ask a clarification.

20                   MR. CASTILLO:  Yes, sir.

21                   MR. MADRID:  Jesse, when you say "you," are you

22   referring to Mr. Barnes, individually, or the entity that he

23   is representing?

24                   MR. CASTILLO:  Right now, him individually.

25   Yes, sir.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 17

1              MR. MADRID:  Okay.

2       A.   No, not individually.

3       Q.   Okay.  At some point did you ever become registered

4    -- you, individually -- as a lobbyist for the United States

5    Congress?

6       A.   No, not to my knowledge.  And I was -- any

7    registration that I did in any lobbying was -- that was the

8    firm, not me as an individual.

9              It was always the -- it was -- at one time it

10   was called Entrecorp and then -- and then the name was changed

11   to -- well, it was Entrecorp and then Barnes-Connally and then

12   the Herman Bennett Company -- or Herman Bennett Company and

13   then Barnes-Connally and then later the Ben Barnes Group, but

14   it was -- it was always a company.

15      Q.   It was always the entity that was registered --

16      A.   Yes.

17      Q.   -- as the lobbyist?

18      A.   That's right.

19      Q.   Okay.  And that registration as a lobbyist would have

20   been limited to the United States Congress or to Washington,

21   D.C.?

22      A.   Well, you -- different states have different laws and

23   we always complied with the law in the state in which we were

24   operating.  And then there's -- there are federal laws, of

25   course, that we complied with.

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Page 18

1     Q.    Okay.  Okay.  And we'll get to, I guess, some of the

2     details of that lobbying effort under U.S. federal law in a

3     little bit.

4           A.    Okay.

5           Q.    Tell me a little bit about the evolution of the

6     company so that it became from Entrecorp to finally the Ben

7     Barnes Group.

8           A.    I think probably we named it Entrecorp when we got

9     started in the late '80s.  And then I think -- and I don't --

10    I'm not certain of this, but I think maybe my partners -- the

11    other people in my company came to the conclusion that it was

12    probably better for us to be named the Ben Barnes Group than

13    it was Entrecorp, as far as getting our -- knowledge of our

14    firm out in the marketplace.

15          Q.    Okay.  And I know you're probably modest.  But why

16    would they want to change it to the Ben Barnes Group and have

17    your name on it?

18          A.    Well, I think they had very good judgment.  No.

19          Q.    Is the answer obvious?

20                (Laughter)

21          A.    No, I -- they made the decision, I didn't.

22          Q.    Okay.

23          A.    Yeah.

24          Q.    And they made the decision to capitalize on your

25    name?

APP. 108

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 19

1    A.    Well, I don't know whether it capitalized on my name

2    or not, but they -- they decided that it was best to be named

3    the Ben Barnes Group.

4    Q.    All right.  And then Ben Barnes Group, is that a

5    limited partnership?

6    A.    Yes.

7    Q.    And who are the -- do you know who the general

8    partner is of Ben Barnes Group, L.P.?

9    A.    I am.

10   Q.    And do you know who the limited partners are?

11   A.    No, I don't know exactly how that's all set up.  I'll

12   have to get that for you.

13   Q.    How many limited partners do you think you have?

14   A.    Well, I don't know that I have limited partners.  I

15   have partners, but I don't know whether they're limited

16   partners as far as the way the whole corporation is

17   structured.  I don't -- I'm not certain of that.

18   Q.    Okay.  And how many partners do you think you have?

19   A.    One, two, three, four.

20   Q.    And I know you're looking at Mr. Caperton -- or

21   Senator Caperton.  Was he -- is he one of the partners?

22   A.    He certainly is.

23   Q.    And who are the other three --

24   A.    His feelings would be hurt if I didn't look at him

25   first.

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Case No.  3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 20

1                    MR. MADRID:  Let me lodge just a form --

2       objection to form.

3                    Okay.  Go ahead.

4       A.   He --

5       Q.   Who are some of the other partners?

6       A.   He's the most important partner.

7                    SENATOR CAPERTON:  Here, yeah.

8       A.   Wyeth Wiedeman, Scott Moorhead and Patsy Thomasson

9       and certainly Mr. Caperton.

10      Q.   And do you continue operating as Ben Barnes Group,

11      L.P.?

12      A.   Yes.

13      Q.   All right.  And you're one of the part -- well,

14      you're the general partner of the limited partnership,

15      correct?

16      A.   Yes.

17      Q.   All right.  And so the jury can understand:  Where

18      does Ben Barnes Group, L.P. have offices?

19      A.   We have offices in Austin and in Washington.

20      Q.   And how long have you had -- Ben Barnes Group, L.P.

21      had an office in Washington?

22      A.   Oh, I don't recall.  Probably 20-plus years.  I don't

23      know.

24      Q.   If someone were to ask you at a cocktail party:

25      "What does Ben Barnes Group do?" what would your answer be?

Page 21

1    A.    I'd try to change the subject.  No, we -- I would say

2    that we are a consulting firm; a firm that has the ability to

3    represent various and sundry people that have government

4    problems, business problems that need to understand better the

5    regulatory process in state government, local government and

6    the federal government.

7        Q.    Does the Ben Barnes Group have literature that

8    describes the company?

9        A.    We have a website.

10       Q.    All right.  Beyond -- do you have something like a

11   brochure or a pamphlet or something that you can --

12       A.    No.  No, we don't have a brochure.

13       Q.    So the information on the website for Ben Barnes

14   Group kind of reflects the purpose of the firm and --

15       A.    Yes.

16       Q.    -- what it's able to deliver --

17       A.    Yes.

18       Q.    -- to its potential clients?

19       A.    Yes.  Many thousand hits a day -- I wish.

20       Q.    And that ability to represent various and sundry

21   clients or people that may need to understand the regulatory

22   process better, does that include every state in the -- in the

23   union?

24       A.    We certainly have the potential to find

25   representation in all the states.  We could go find somebody

Page 22

1   in Maine or Alaska that would probably understand what the

2   specific political terrain was in that state.

3        Q.   Okay.  How about within its own assets?  Within Ben

4   Barnes Group, is it tailored to a particular state or is it to

5   the federal system or what?

6        A.   I'd say it's tailored to the federal government and

7   also to the -- of course, we live in Texas and it's -- it has

8   a great deal of business from Texas.

9        Q.   Okay.  Other than the partners that you've named, how

10  big of a staff does Ben Barnes Group have, for instance, in

11  Austin?

12       A.   Three, four, five -- five other full-time employees.

13  And probably we -- various and sundry interns work at our firm

14  from time to time and that varies from two or three interns at

15  a time.

16       Q.   Yes, sir.  And how about in the Washington, D.C.

17  office?

18       A.   We have two full time and -- and also a lot of

19  interns that go through our offices there.

20       Q.   And if someone were to engage your services, how do

21  you sell your service or how do you get paid for your

22  services?

23       A.   We get paid by monthly fees and success fees.

24       Q.   Is there something in -- within the firm that sets

25  forth how much you would charge a particular client or is that

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 23

1    on a case-by-case basis?

2        A.    Case-by-case basis.

3        Q.    And do each of the partners have the ability to make

4    that decision of how much a particular client is going to be

5    billed on a monthly basis for the services?

6        A.    By and large they do.

7        Q.    And do each of those partners have the ability to

8    enter into an agreement with a potential client to represent

9    them on a success fee?

10       A.    It depends on the client, but probably not on -- it

11   depends on the client.

12       Q.    Okay.  And if a partner brought a client and said,

13   "Mr. Barnes, we're interested in representing this particular

14   client on a success fee," who would ultimately make that

15   decision?

16       A.    Well, there's several of us would.  No contracts are

17   written or agreed to unless they go across Mr. Caperton's

18   desk.

19       Q.    All right.  Is he reviewing for legal?

20       A.    For legal and -- but it's for discussion purposes for

21   what the scope and purpose of the contract is.

22       Q.    I'm kind of more interested in the business side of

23   it.

24       A.    Yes.

25       Q.    Who is -- who is or who are the people who would make

Page 24

1    the decision that it makes business sense?

2        A.    We -- several of us.  I'm very proud of the fact that

3    we don't have a high rate of turnover in my firm.  Wyeth

4    Wiedeman has been with me now almost 25 years.  He was working

5    in a clothing store a few blocks from here when I hired him.

6    He was still at the University of Texas.  He's been there 25

7    years.

8              Kent Caperton I've known for 35 years and he's

9    been with my firm now probably a decade.  I don't know

10   exactly.  It probably seems like three days for him and a

11   century for me.  But -- but anyway, he's been there for long

12   periods of time.

13             The -- Patsy Thomasson left the Clinton

14   administration and almost went to work immediately for us.

15             Scott Moorhead, our chief -- now chief operating

16   officer, is a young man that's been with our firm now probably

17   eight years.

18             But all of us enjoy an informal working

19   relationship and we all have input into -- into clients and

20   what the value of what they're asking us to do.  And it's a

21   general discussion.  There's not any one person that makes an

22   absolute decision.

23       Q.    Okay.  Okay.  And I guess I equate the success fee

24   kind of like a lawyer representing a client on a contingency

25   fee, where you get paid if you're successful.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 25

1    A.   Well, I'm sure you're aware of the federal statute

2   that you cannot receive a success -- a contingency fee for

3   anything that involves a federal appropriation whatsoever.  So

4   you can't have success fees with a lot our clients because of

5   the federal law.

6    Q.   If it involves a federal appropriation for whatever

7   it is you're trying having to have success --

8    A.   Yes.  Sure.

9    Q.   -- on?

10    A.   Yes.

11    Q.   Okay.  And the monthly fees -- is there, for

12   instance, a schedule that we know that Mr. Caperton might be

13   billing $500 an hour; so if it's going to take a certain

14   number of hours for him a month, that's what we're going to

15   set that monthly fee for?

16    A.   Well, we're not blessed like law firms like -- that

17   you represent, sir, that we can charge these big hourly fees.

18   And so we have to figure out what kind of -- what the -- kind

19   of the hours we're going to put in up front and estimate what

20   we're going to do.

21        I've always longed to be able to go charge

22   $1,000, $2,000 an hour like law firms do, but I've not been

23   able to do that.

24    Q.   Okay.  So you're able to -- what you are telling the

25   jury is that you try to anticipate the number of hours it's

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Page 26

1    going to take your particular staff members for a project

2    and -- and set your monthly fee accordingly?

3        A.    That's true.

4        Q.    All right.  Is there some type of mathematical

5    calculation or form --

6        A.    No.

7        Q.    -- that you fill out?

8        A.    No, there's not.

9        Q.    Is it something that you just develop because of your

10   experience?

11       A.    Because of our experience and -- and, again, the

12   informality of our firm is such that we're all talking to one

13   another hourly, daily, weekly.  It's not hard to find out what

14   someone else thinks some client ought to be charged or what we

15   ought to be doing.

16       Q.    Okay.

17       A.    And, also, we don't work on a client -- we all work

18   on them, but, you know, it's -- if it's Senator Caperton's

19   responsibility for the client, he's going to have jurisdiction

20   over that client and what he has to -- he'll have a lot more

21   to say about what's going to be charged because he's going to

22   know.

23       Q.    He's going to want to be comfortable with the monthly

24   fee and he's going to make sure it generates some profit?

25       A.    That's right.

APP. 116

Page 27

1      Q.    At the end of the year do people get evaluated as

2    partners on what they were able to bill and collect for that

3    year?

4      A.    We have a -- we have a bonus program, but we also --

5    it's at different times of the year.  Again, this firm does

6    not have a policy in writing on what's going to happen.  It's

7    what we all decide.

8      Q.    You mentioned earlier -- and I want to follow up to

9    that.  Do you have a contract that Ben Barnes Group has

10   developed in order to communicate to the client what's going

11   to be charged and what work you're going to give in exchange

12   for that?

13     A.    We do.

14     Q.    And when was that developed?

15     A.    Four or five years -- five or six years ago, seven

16   years ago.

17     Q.    All right.  So 2007, maybe?  '07-ish?

18            MR. MADRID:  Objection, form.

19            Go ahead.

20     A.    I don't -- I don't really know.  Senator Caperton

21   wanted to prove he -- that he was worth a lot of money and he

22   came in and said, "We ought to be developing this form.  And I

23   can -- with my legal expertise and background, I can develop

24   it and do a hell of a job, so let me develop this form."

25     Q.    Okay.  But he joined you 35 years ago.

Page 28

 1       A.    No, he was friends 35 years ago.

 2                   SENATOR CAPERTON:   Ten years ago.

 3       Q.    (BY MR. CASTILLO) Ten years ago?

 4       A.    Yeah.

 5       Q.    All right.   So if he -- so if Mr. -- Senator

 6   Caperton --

 7       A.    Yes.

 8       Q.    -- is the one that developed that contract or the

 9   form?

10       A.    Yes.

11       Q.    Okay.   And in that form do you describe what you're

12   going to do for that client?

13       A.    Not specifically 1, 2, 3, but -- but general.   And

14   when you're complying with the federal law you have to put

15   down in broad terms the extent and purposes for what you've

16   been hired.

17       Q.    And do you have to separate in that engagement how

18   much of that time is going to be spent for lobbying efforts

19   for the federal government?

20       A.    You don't do it up front.   What you do it is as

21   you -- as you represent the client, you decide basically at

22   the end of each month or -- or a certain period, how much time

23   you spent on actual lobbying and how much time you spent on --

24   we call it business representation or representation on

25   problems other than lobby.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 29

1      Q.    And why do you have to do that?

2      A.    Because of the United States tax laws.  If I'm

3    representing this law firm on a business matter, they can

4    deduct it -- what I'm charged.  If it's on lobbying, they can

5    only deduct 50 percent of it.

6      Q.    And does Ben Barnes Group have to report the amount

7    that it has collected for lobbying efforts?

8      A.    Yes, I think -- I think that's probably accurate,

9    yeah.

10     Q.    Okay.  And do you know if that report is done

11   annually or monthly?

12     A.    It's done quarterly, I believe.

13           SENATOR CAPERTON:  Quarterly.

14     Q.    (BY MR. CASTILLO) So it's neither.  It's quarterly?

15     A.    Yes, it's -- and it's -- and it's all a matter of

16   public record.  It's easy for you -- it's there.  And so

17   whatever is there, is there.

18     Q.    Okay.  Do you coordinate with the client to make sure

19   that the number they're reporting as lobbying is consistent

20   with what you're reporting as lobbying?

21     A.    I really don't know.  But our financing -- our

22   financial department probably does that in many cases with the

23   bigger clients.  I don't really know.

24     Q.    You obviously know that we're here because of

25   Mr. Allen Stanford.

Page 30

1        A.     Yes, sir.

2        Q.     All right.  When did you first meet Mr. Stanford?

3        A.     I don't know a specific year or -- that I met

4    Mr. Stanford.

5        Q.     Did you have -- do you remember when you first had

6    any business dealings with Mr. Stanford?

7        A.     Yes.

8        Q.     When was that?

9        A.     It was -- well, again, I don't remember the specific

10   year and time, but it's sometime in the early 2000s.

11       Q.     And what was -- what was the circumstances under

12   which you had a business dealing with Mr. Stanford in the

13   early 2000s?

14       A.     Mr. Stanford was recommended to me by Larry Temple

15   and that's the first time I had really heard of Allen

16   Stanford.

17       Q.     And Larry Temple is who?

18       A.     Larry Temple is a friend of mine -- a lifetime

19   friend.  He practices law here.  He is a financial institution

20   lawyer.  He had a very distinguished career.

21              He's been -- he was a special assistant to John

22   Connally and then chief of staff to John Connally when he was

23   governor.  Then he was special counsel for President Johnson

24   in his last two years in the White House.

25              He returned to Texas and became -- set up a

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 31

1    financial institution law practice and he was chairman of the

2    coordinating board, chairman on the Committee of 125 (sic),

3    had -- vice chairman of the Committee on 125 (sic) to evaluate

4    the future of the University of Texas.  He's been -- he's

5    president of the Lyndon B. Johnson Library and Foundation.

6              He's a -- I've known Larry since he went to work

7    for John Connally when I was 23 and he was 25 or 26.  It's

8    been a lifetime friendship.

9         Q.   All right.  And sometime in the early 2000s --

10        A.   Yeah.

11        Q.   -- is your memory of when Mr. Temple --

12        A.   Yeah.

13        Q.   -- recommended him?

14        A.   Yes.  It may have been 2000.  It may have been 2001.

15   I'm not -- I'm not exactly -- I don't -- I don't remember

16   when.

17        Q.   And when did you first meet Mr. Stanford after that

18   recommendation by Larry Temple?

19        A.   His -- a lawyer that worked for him, Lawanda --

20   Lawanda Suarez -- Yolanda Suarez, came to see me and then

21   sometime after that I met Mr. Stanford.  I don't know whether

22   he came to Austin to see me or whether I saw him when I was in

23   Houston.  I don't remember the first meeting.

24        Q.   All right.  And do you remember what the subject

25   matter was of the first meeting?

Page 32

1      A.     It's that they were wanting to be more active in

2  Washington.  And Larry had told him that he thought that we

3  knew our way around in Washington and they ought to talk to

4  us.

5               And I'm -- there may have been a specific

6  conversation about some -- a specific piece of legislation or

7  something specific, but I don't remember at that time.

8      Q.     Okay.  Do you remember when you were first -- when

9  the Ben Barnes Group was first hired to actually do some work

10  for Mr. Stanford?

11      A.     No.  The record should -- should show when we first

12  got paid.  I'm sorry.  I don't remember when.

13      Q.     So the first time that you did something for

14  Mr. Stanford would have been around the same timeframe that

15  you would have gotten paid?

16      A.     Yes.

17      Q.     Okay.  Because if you -- you weren't doing him any

18  favors?

19      A.     I was very active in the United fund in Austin, not

20  in the United fund in Austin (sic) -- or in Houston or

21  Washington.

22      Q.     Okay.  And I get the undertone meaning of that, that

23  you weren't doing anything for free?

24      A.     Yeah.  Right.

25      Q.     All right.  Prior to meeting with Yolanda Suarez and

Page 33

1   some discussion about wanting to know their -- wanting to be

2   more active in Washington, did you know anything about

3   Mr. Stanford?

4        A.   Not until I heard from Larry Temple.

5        Q.   Did you know anything about his background?

6        A.   Not until I was told later.

7        Q.   Okay.  But up until the time that you were having

8   this meeting with Yolanda Suarez, did you know anything about

9   Mr. Stanford?

10       A.   No.

11       Q.   Know anything about the nature of his business?

12       A.   No.  I was told about the nature of his business

13  after I was -- but I didn't know anything about his business.

14  And quite frankly, I don't remember ever hearing -- having

15  heard the name Allen Stanford or the Stanford Corporation.

16       Q.   Okay.  And you weren't aware that Mr. Stanford had a

17  bank in Montserrat -- the Island of Montserrat?

18       A.   No.

19       Q.   Okay.  Or the reasons he had to leave Montserrat?

20       A.   No, I didn't know any of that.  I knew that his

21  father lived in Mexia and my old assistant football coach went

22  to Mexia as head coach in Mexia.

23       Q.   Okay.

24       A.   And so I called my football coach and -- one time, or

25  he called me, and I said, "Do you know the Stanford family

Page 34

1   down there?"

2               He said, "Yeah, they're a real good family."  He

3   said, "Mr. Stanford" -- being Allen Stanford's dad -- "is a

4   good guy and supports the football team."

5        Q.   Okay.

6        A.   So that was a --

7        Q.   So he and Anna Nicole Smith were both from Mexia?

8        A.   I had forgotten about that.  I'd have gone to Mexia

9   if I had known Anna Nicole was there -- from there.

10       Q.   Yeah, the two famous people from Mexia.

11              I wanted to show you some documents.  And this

12  is really just to try to see if we can trigger some thoughts

13  or -- let me show you Plaintiff's Exhibit No. 1.

14              (Exhibit 1 was previously marked)

15              MR. MADRID:  Do you have extra copies?  If so,

16  great.  If you don't --

17              SENATOR CAPERTON:  It's not necessary, if you

18  don't.  Don't worry about it.

19              MR. MADRID:  If you don't, that's fine.

20              MR. CASTILLO:  I'm sure we do.

21       Q.   (BY MR. CASTILLO) And the reason I ask you this, sir,

22  is this is in a Stanford document and it's concerning airplane

23  usage.  And it appears that on September the 3rd, 2002 that

24  they attribute 3.2 hours of a Learjet to you.  Do you have any

25  recollection of any trip in September of 2002?

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 35

1      A.   No, I have no recollection of that, but -- I don't

2   know about this trip specifically.  I know about -- I do

3   remember that Lawan -- Yolanda -- I'll get it right -- Yolanda

4   and I, in our first conversations, said that if they wanted me

5   to do some things before we got a contract negotiated, that

6   they might be willing to give me a lift on their -- on an

7   airplane or two while we were trying to do that.

8            That was -- I think that was -- she was using

9   that to try to -- when we were talking about fees and

10  everything, that that was another form of compensation that I

11  might receive.  I don't know whether -- I don't know whether I

12  had my deal worked out or not.  But I just see this -- me

13  flying on their airplane and that might have been it.

14     Q.   Okay.  But I'm -- I'll try to help with some more

15  time issues.  Let me show you Plaintiff's Exhibit Nos. 2

16  and 3.

17            (Exhibits 2 and 3 were previously marked)

18            MR. CASTILLO:  Here you go, Mr. Madrid.

19     Q.   (BY MR. CASTILLO) And I guess the one that I want you

20  to look at first is Exhibit No. 3.

21     A.   Number -- that one numbered 3?

22     Q.   Yes, sir.

23     A.   Okay.

24     Q.   And it appears from Plaintiff's Exhibit No. 3 -- is

25  that your signature, sir?

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Page 36

1      A.    No, that's sure -- that was -- somebody signed that

2      from my -- in my office.  That's not my signature.

3          Q.    All right.  And Ben Barnes Group, that's your

4      business, correct?

5      A.    Yes.

6          Q.    And up on the top it has some type of fax transmittal

7      from the Ben Barnes Group.  You see that?

8      A.    Yes.

9          Q.    All right.  Do you know why you were asked to write

10     this letter?

11         A.    Well, if you -- I'm sure that they were trying to get

12     letters written from anybody that they thought would be

13     helpful with the banking authorities in Venezuela that would

14     say that the Stanford Group was good people.

15         Q.    Okay.  And do you know if you were asked to write

16     such a letter?

17         A.    I don't remember.

18         Q.    Do you know if the Ben Barnes Group was asked to

19     write such a letter?

20         A.    I don't remember.

21         Q.    Okay.  Do you know what the Ben Barnes Group did to

22     familiarize itself with Mr. Stanford prior to September 30,

23     2004?

24         A.    No.  By -- but by that time we had an opportunity to

25     see the Stanford operation, to see the assets, to see what was

Page 37

1    happening and go to Houston and see the offices there and meet

2    Yolanda and -- and probably Jim Davis, other people that

3    the -- at the Stanford Corporation.

4              They were very legitimate people in -- to the

5    observation that we gave them.  They were -- it was -- it was

6    a -- a substantial company.

7        Q.   Okay.  So -- so there should be some records of that

8    type of activity:  To get comfortable with their operation and

9    their assets that you just described prior to September 30,

10   2004?

11             MR. MADRID:  Objection, form.

12       A.   We are not someone that does exten -- now, with the

13   internet, it's a little different.  But you don't -- like law

14   firms, I -- we don't go do investigations of clients that we

15   -- that we represent and like hire Crowell & Associates and

16   pay them several thousand dollars to go dwell into people's

17   backgrounds and past.

18             The fact that Larry Temple recommended to me to

19   Larry (sic) -- to Allen Stanford was a very good housekeeping

20   seal of approval to me.  Because Larry Temple had been

21   representing him and that was a very strong, strong message to

22   me that he wasn't going to be recommending anybody to me that

23   he had any doubts or reservations about.

24       Q.   All right.  So you relied on Mr. Temple or did you do

25   something in addition to that to familiarize yourself with the

Page 38

1    Stanford Group?

2         A.    Just by osmosis I started look -- seeing assets of

3    the Stanford Group and learning more about it.

4         Q.    Well, we'll get into that in a little bit.  If you

5    look at Plaintiff's Exhibit No. 3, it says, "I have known

6    Mr. Stanford for more than 25 years on both a personal and

7    professional level."  Is that true?

8         A.    No.

9         Q.    And you go on to say that, "He's a highly successful

10   individual and known to be a man of strong character and

11   integrity."  Did you know him well enough to make that

12   statement?

13        A.    This is a letter of recommendation.  I don't know who

14   dictated it.  But whether rightly or wrongly, my office in

15   both public and private have written letters of recommendation

16   for kids wanting to get in the University of Texas or other

17   colleges and universities; people wanting to get in the Naval

18   Academy; people wanting to be accepted to some accounting firm

19   or some legal firm or somebody that wants a letter of

20   recommendation.  And I'd say this is a typical letter of

21   recommendation that -- that I've written in the past.

22        Q.    Would you -- would you write that letter again?

23        A.    No.

24        Q.    Okay.  For instance, if somebody wanted to go into

25   the National Guard as opposed to Vietnam, you might write a

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 39

1    letter of recommendation there, as well.  Right, sir?

2         A.    I wouldn't again.

3         Q.    Not again.  Okay.

4               Because it looks like -- if you'll look at

5    Plaintiff's Exhibit No. 2.  And it looks like "Venezuela Bank

6    Reference Letters," an internal Stanford document, they were

7    looking for letters of recommendation from a number of people

8    and you're at the top of the list.

9               MR. MADRID:  Is that a question?

10        Q.    (BY MR. CASTILLO) Right, sir?

11              MR. MADRID:  Objection.

12        A.    It looks like they may be in alphabetical -- no.  No,

13   they're not in alphabetical order.  But that's what -- it's at

14   the top of this piece of paper.

15        Q.    Yes, sir.  Do you -- did you have any discussions

16   with any of the other people that are listed in Nos. 1 through

17   15, about Mr. Stanford before, your office sent Plaintiff's

18   Exhibit 3?

19        A.    I don't -- I don't remember, but I don't think so.

20        Q.    Okay.  Let me show you Plaintiff's Exhibit No. 51.

21              (Exhibit 51 was previously marked)

22        Q.    (BY MR. CASTILLO) This appears to be a document that

23   was submitted, with a little Bates No. 1022, in response to

24   some discovery requests that I think the Baker Botts firm

25   sent.  Do you recognize this, Plaintiff's Exhibit 51?

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 40

1      A.    I don't recognize it.  It looks like it was very

2   similar to my itineraries that were prepared by my office.

3      Q.    Okay.  And, again, I'm trying to get some time

4   perspective of when you were having these initial

5   conversations with Mr. Stanford.

6      A.    Yeah.

7      Q.    And if you look at the second page it looks like on

8   Monday, November the 10th, Mr. Stanford's plane was scheduled

9   to take you and John Sharp to Oklahoma City.

10     A.    Okay.

11     Q.    Do you know what you were doing at that time?

12     A.    No, I don't.

13     Q.    At that -- by that time had you been engaged already?

14     A.    I don't know that, either.

15     Q.    Do you know why you were going to Oklahoma City with

16  John Sharp?

17     A.    I have an idea that that name is incorrect.  That's

18  probably Jim Sharp, not John Sharp.  That's No. 1.

19            No. 2, that was the Temples that were on the

20  plane, too.  And that might have been something that Temple

21  had gotten the plane for.  I don't -- I don't know that.

22            But I -- it's in regard to a committee on the

23  Commission on 125 that I -- no, that was a conference call.  I

24  don't know -- I don't remember what this trip was for.

25     Q.    And the Temples -- where it says "the Temples," that

Page 41

1    was --

2         A.    Larry Temple.

3         Q.    -- Larry Temple, the person that introduced you to

4    Stanford, correct?

5         A.    Yes.

6         Q.    And then the Melanie there, that's your --

7         A.    Wife.

8         Q.    -- third wife, right?

9         A.    Yes.

10        Q.    Okay.  And Jim Sharp -- who is Jim Sharp?

11        A.    He's a partner of mine in Washington.

12        Q.    And his expertise is in what?

13        A.    Jim was an Assistant U.S. Attorney in Washington.  He

14   was -- as a matter of fact, he was senior prosecutor in the

15   D.C. office of the U.S. Attorney in the late '60s and early

16   '70s.  He left the U.S. Attorneys Office and established a law

17   firm in the '70s, where he practiced law for -- until now.

18        Q.    Let me show you a couple of other -- Plaintiff's

19   Exhibit No. 10 and No. 11.

20               (Exhibits 10 and 11 were previously marked)

21        Q.    (BY MR. CASTILLO) And first I'll direct your attention

22   to Plaintiff's Exhibit No. 11.

23        A.    Okay.  Okay.

24        Q.    I know you indicated that you wish you had the

25   ability to send out an invoice, but here's one.  What is

Page 42

1    Plaintiff's Exhibit No. 11?

2        A.    It's an invoice from our group to -- to Allen

3    Stanford.

4        Q.    For how much?

5        A.    For a million dollars.

6        Q.    And what was the million dollars supposed to be for?

7        A.    Oh, I've got an idea.    I don't know specifically, but

8    this is probably for maybe a year's work or a year and a

9    half's work.    I'm not -- I don't -- I don't know how long a

10   period it would -- that it covered.

11       Q.    Now, it says "Retainer for Governmental Affairs."    Do

12   you see that on Plaintiff's Exhibit 11?

13       A.    Yeah.

14       Q.    Do you know whether you had -- whether the Ben Barnes

15   Group had been paid anything prior to June 23rd, 2005?

16       A.    I don't know.

17       Q.    Do you know if there was a written agreement between

18   Ben Barnes Group and Stanford Financial?

19       A.    No, I don't.    I don't believe so.

20       Q.    Do you remember anything about your discussion with

21   Mr. Stanford concerning what you were being retained for?

22       A.    It was an ongoing discussion of trying to get paid by

23   Mr. Stanford.    It was a -- like a lot of clients, they were

24   not as rapid -- I remember they were not a rapid pay.

25                   There was an ongoing discussion about -- about

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 43

1    what we were -- what we were going to be paid, what it was --

2    I don't remember all the details.  But a discussion about

3    whether it was going to -- how much a month it was going to

4    be, what it was going to be for, different things.  But this

5    was -- this was not -- this was not in advance.  This was for

6    work performed.

7        Q.   All right.  So there should have been work done prior

8    to June 23rd, 2005?

9        A.   Yes.

10       Q.   And so this million dollar invoice to Stanford

11   Financial was for work that predated June 23rd, 2005?

12       A.   Yes.

13       Q.   Do you remember when Ben Barnes Group first entered

14   into an agreement to start doing work in exchange for a fee

15   with Mr. Stanford, prior to June 23rd, 2005?

16       A.   No, I don't -- I don't recall those dates.  But

17   you've -- you've given me Plaintiff's Exhibit 3 where that I

18   -- I wrote that letter -- or that the firm wrote a letter --

19   the Ben Barnes Group wrote a letter, that someone signed for

20   me, that that's in 2004; this itinerary is in 2003.  So

21   this -- this million dollars could be for two years.  I don't

22   really know.  But it was for some period of time.

23       Q.   Who would know what Ben Barnes Group did in exchange

24   for the million dollars that was paid June 23rd, 2005?

25       A.   It would be a combination of the -- of the -- of the

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 44

1    partners in my firm.

2         Q.    Okay. Who would I have to talk to, Mr. Barnes, to

3    find out: What did Ben Barnes Group, L.P. do for Stanford

4    Financial to get paid a million dollars on June 23rd, 2005?

5                   MR. MADRID: Objection, form.

6                   Go ahead.

7         A.    We'd all have to sit down and go back and try to

8    remember and recollect all that -- what we did in 2003 and

9    2004.

10        Q.    Would there be some record of something that was

11   produced? Generated?

12        A.    No, not necessarily.

13        Q.    Okay. So tell the jury what, if anything, Ben Barnes

14   Group did, prior to June 23rd, 2005, in exchange for a million

15   dollars.

16                  MR. MADRID: Objection, form.

17        A.    We did a lot of things for the Stanford Corporation.

18   And I don't have -- while I don't have the dates, there were

19   many valuable services rendered by the Ben Barnes Group to the

20   Stanford Corporation from the -- from the initial stages of

21   our representation up until the end of our representation.

22        Q.    Who would know that?

23        A.    Well, as I testified to earlier, a combination of

24   different partners that worked on it.

25        Q.    Can you tell the jury what value you imparted to

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 45

1    Stanford Financial Group in exchange for the million dollars

2    on June 23rd, 2005?

3        A.   I don't know exactly when we were talking about

4    changes in the U.S. Virgin tax laws.  I don't know exactly --

5    I don't have in my mind -- in my memory the timetable of what

6    was going on.  Was it specifically 2003?  2004?  2005?  2006?

7    I don't know.  Perhaps we can go back and recollect that and

8    put it together, but I don't have it in my memory.

9        Q.   And that hasn't been done up until today when --

10       A.   No.

11       Q.   -- you presented here for your deposition?

12       A.   That's right.

13       Q.   What would you have to do to -- to go back and

14   reconstruct that?

15       A.   Well, it would be a combination of people's memory.

16   We don't have a lot of things in writing that we do.  A lot of

17   our things are not filing briefs and going to a district court

18   and -- and leaving a paper trail and keeping up with your

19   phone calls and your emails and charging for them like that.

20   That's not what the -- that's not what representing people in

21   Washington is.  There's not necessarily a paper trail on

22   everything you do.

23            When you take Yolanda Suarez in and introduce

24   her to a member of the -- of the Banking Committee or the

25   Commerce Committee or take her to a meeting of the Black

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 46

1    Caucus, when you want the Black Caucus to -- to make certain

2    it's high on their priority that you're going to -- that

3    they're going to strongly support the U.S. Virgin Islands tax

4    law changes, those things -- there's just not a paper trail.

5        Q.   So you have to rely on somebody's memory of that?

6        A.   Yes.   That's right.

7        Q.   Are you the type of person that keeps a calendar?

8        A.   Yes.

9        Q.   Do you have a written calendar?

10       A.   It's catch-and-catch-can.

11       Q.   Yes, sir.

12       A.   A lot of the times we do.

13       Q.   Okay.

14       A.   Yeah.   Sure.

15       Q.   And did you do that in 2004 or 2005?

16       A.   I'd have to check with my secretary and look and see

17   what she has.

18       Q.   And your secretary was Ms. Martin?

19       A.   Not in 2003, 2000 -- I don't think so.   She's been

20   there -- now, I think Susan's been there nine or ten years.

21   Well, she may -- she may have been.   I can find out who was my

22   secretary at that time.

23       Q.   Okay.   Because if you look at Plaintiff's Exhibit

24   No. 10, it looks like Susan Martin is sending a lot of the

25   information concerning wiring instructions.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 47

1      A.   Okay.  That's -- and what year was that?

2      Q.   2005.

3      A.   Okay.  Yes, I'd say that Susan has been with me at

4    least nine or ten years.

5                MR. CASTILLO:  Okay.  I've got a note that I

6    have to change a tape.  So why don't we take a five-minute

7    break --

8                THE WITNESS:  Okay.  That will be great.

9                MR. CASTILLO:  -- and then we'll come back.

10               THE WITNESS:  Thank you.

11               THE VIDEOGRAPHER:  This marks the end of Tape

12   One.  We're off the record at approximately 10:57 a.m.

13               (Recess)

14               THE VIDEOGRAPHER:  This is the beginning of Tape

15   Two.  We're back on the record at approximately 11:11 a.m.

16      Q.   (BY MR. CASTILLO) Mr. Barnes, is there anything about

17   the first hour of your testimony that you need to correct or

18   amplify or say, "Well, what I told you wasn't necessarily true

19   and I need to correct it"?

20      A.   No.  I'm just embarrassed that I don't have a better

21   memory, but it's age and wear and tear.

22      Q.   I was asking a little bit about your practice of

23   keeping a calendar.  Do you know whether your secretary also

24   keeps a computerized version of your calendar?

25      A.   I have no idea at that time whether she does --

Page 48

 1    whether she did or not.

 2        Q.   Now do you?

 3        A.   Yes.

 4        Q.   Okay.  And do you use something like an Outlook,

 5    where you can check your calendar from your cell phone?

 6        A.   I think this would be a good time for me to make a

 7    confession.  Okay?

 8        Q.   Okay.

 9        A.   I --

10             MR. MADRID:  Are you sure you want to do this

11    with -- go ahead.

12        A.   I have probably been the butt of more jokes from my

13    children, my grandchildren, from my partners -- in the age of

14    information -- than anyone.  And I did not use a Blackberry.

15    I did not use a computer.  I don't have a computer today.  I

16    have an iPad.

17             I did not do text messages.  I didn't read text

18    messages, email messages.  I started probably a couple of

19    years ago doing text messages.  And when I -- and I sent the

20    same text to about a hundred people, that had made a lot of

21    fun of me, where that they would receive the first text from

22    me --

23        Q.   Uh-huh.  Uh-huh.

24        A.   -- to prove that I -- that I had the intelligence to

25    do that.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 49

1           But if -- if someone wanted to enter a Texan or

2    a citizen of this country in a dinosaur contest, as far as the

3    information age, I would probably be a very good candidate.

4    It's highly likely that I would win.

5           But I -- I did not receive emails.  My secretary

6    would read emails.  And I'm -- I'm very sorry I receive emails

7    today, because she still reads them.  But because of the

8    political season we're in, last Friday I got 382 emails and

9    probably 380 of them were asking for money from people -- many

10   people that I had never heard of.

11     Q.   Uh-huh.

12     A.   So I -- we keep a calendar now and I can check the

13   calendar, but that is a new event in my life.

14     Q.   All right.  And in the 2005 era you -- would you rely

15   on your secretary printing out an itinerary so you would know

16   what you're doing this week or next week?

17     A.   We had printed itineraries, like the one that you

18   submitted to me as one of the exhibits, part of the time.  A

19   lot of the time was -- my calendar was picking up the

20   telephone and talking to my secretary and saying, "Where do I

21   go next?"

22     Q.   Okay.

23     A.   Okay.

24     Q.   And that would have been the practice in 2005 through

25   at least early 2009?

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Page 50

1     A.     Probably so.  I mean, yeah.  2009, yeah, that would

2    have been the practice.

3     Q.     And so you didn't -- you didn't email.  If you

4    emailed, your secretary would send out your email?

5     A.     Yes, or receive email.  I don't even know that she

6    emailed.  Maybe she did.  But when I would receive an email,

7    she would read it.  And it was really a low percentage that I

8    would ever read that email.  She would tell me that, "You got

9    an email that said so-and-so and so-and-so."  But I --

10    Q.     Was that a conscience decision you made or is it just

11   because you weren't familiar with the technology, like I

12   wasn't?

13    A.     I'd say that it was based on ignorance --

14    Q.     Okay.

15    A.     -- of the technology.

16    Q.     All right.  And so you didn't have your own laptop

17   that you carried around in 2005, up until the time you got

18   your iPad now?

19    A.     No, I didn't.

20    Q.     All right.

21    A.     I could have carried it for looks.

22    Q.     Made it seem like you --

23    A.     Yeah.

24    Q.     Okay.

25    A.     But --

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 51

1    Q.    And I take it the nature of your business is that you

2    don't have to -- you don't record your hours that you've spent

3    on a particular client doing some work today --

4    A.    No, I don't.

5    Q.    -- versus work that you might be doing under a

6    monthly fee for someone else?

7    A.    Our firm -- when we are talking to clients in the

8    initial stages, we talk to them about that we don't bill by

9    the hour. And probably half of our clients we don't bill

10   expenses and that's a -- probably a deficiency in our firm

11   because we should bill expenses. In some instances, we do,

12   but not very many. And as a result, you don't earn nearly as

13   much money as you think you're earning when you're not billing

14   expenses.

15   Q.    Okay. Like, for instance, what type of expenses?

16   A.    Hotels, airlines, Senator Caperton's scotch.  Things

17   that cost a lot of money.

18   Q.    You are losing money, then.

19   A.    Yes.

20   Q.    Okay. What about, you know, when a client comes to

21   you and asks you to help him in the political arena and

22   understand maybe the regulatory process, who puts the concept

23   of what the team is going to be to help this client -- who

24   puts that together?

25   A.    It's in an oral discussion at firm meetings or firm

Page 52

1    conversations, very informal.  But it's been Senator

2    Caperton's responsibility in the past few years to be the

3    wordsman that puts down, for regulatory purposes and for our

4    client's purposes, what the broad scope of our work is going

5    to be.

6         Q.    And then who puts together the team?  Who makes the

7    decision to who's going to staff it?

8         A.    I think we all ultimately do.  It's not a -- it's a

9    very, very informal relationship.  It's -- it's more of a --

10   it's in many instances -- and I guess it would be correct that

11   members of families don't always get along.  But I think it's

12   more -- as much of a family as it is a firm.  And I think we

13   have amazingly good communications and amazingly good

14   relationships.

15        Q.    Okay.  Let me show you what we've now marked as

16   Plaintiff's Exhibit No. 50, sir.

17                  (Exhibit 50 was previously marked)

18        Q.    (BY MR. CASTILLO) And I want to direct your attention

19   to the second page.

20        A.    Okay.

21        Q.    And this is kind of what I'm asking:  Who decides

22   what the structure of this campaign team is going to be, as

23   shown on Plaintiff's Exhibit No. 50, when you get an

24   assignment?

25        A.    My answer would remain basically the same.  There's

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 53

1    another party that's been added to this, Mitch Delk, that's

2    hired outside of our firm.  But this was a beginning of -- of

3    a team of -- internal team and external team that was going to

4    work on some Stanford matters.

5        Q.   And it has you as the manager --

6        A.   Well --

7        Q.   -- of the team?

8        A.   That's what it says on Page 2.  I don't -- I'd never

9    argue that I was the most important person in the room, but --

10   it created quite an argument for me to say that all the time.

11   But maybe out of deference to age and my name on the firm,

12   it -- that it would be manager.  But I would like to think

13   that -- that my name should be there.

14       Q.   And who would have had the contact with the principal

15   and the client, Allen Stanford, of all of the people listed on

16   Page 2 of Plaintiff's Exhibit 50?

17       A.   The client?  It all depends on who -- the client was

18   Stanford Financial.  Probably the most contact would have been

19   with Lawanda Suarez (sic).  That was her area of

20   responsibility.

21            So I don't know which one of these people talked

22   to Yolanda the most.  I mean, I don't know.  She would -- she

23   came to Washington a lot of times and met with people.  I

24   don't know who had the most contact with the -- with her and

25   the other people that represented Stanford internally and

Page 54

1    externally and other law firms.  It's -- I just don't remember

2    to be able to tell you anymore of a specific answer to your

3    question.

4        Q.    And probably it was a poor question.  But really what

5    I'm asking for is:  You have a client that's Stanford

6    Financial, correct?

7        A.    Yes.

8        Q.    And there is a person who is the head of Stanford

9    Financial?

10       A.    Yes.

11       Q.    And you understood that to be Allen Stanford?

12       A.    Yes.

13       Q.    And I guess what -- on a high-level communication

14   between Ben Barnes Group and Stanford Financial, who would

15   have -- who had that communication?  Not on the details and

16   the workings of the team, but on a big picture.

17       A.    Allen was involved in the big, big picture.  But

18   communication with him on the day-to-day activities that was

19   performed in Washington by the Ben Barnes Group and by other

20   groups of people that were hired was -- that communication was

21   not with Allen.

22       Q.    And from the Ben Barnes Group, who would have had the

23   communication with Allen Stanford?

24       A.    Oh, whoever Allen got on the phone.  Allen -- I'm

25   sure I received the most phone calls.  But Allen is the kind

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 55

1   of guy that would call if he got -- he -- he -- patience was
2   not his best virtue.

3          If he wanted to find an answer and he couldn't
4   find somebody, he'd call -- he'd call anybody that he could
5   find.  He'd talk to the cleaning lady if he was trying to find
6   out something and he didn't -- he wasn't getting the answer.

7   Q.   And from the Ben Barnes Group, if you wanted an
8   answer from a big picture, who would call Allen Stanford?

9   A.   Well, we would try to and I would try to
10  communication through Yolanda and through Jim Davis and
11  through his other lawyers.

12         Allen Stanford was not a detail person when it
13  came to certainly writing federal legislation and the language
14  that -- how it should be construed and written in final
15  statute form.  That would not be a good use of my time or his
16  time, either one, for me to try to talk to him about it.

17  Q.   Did you feel like the communications you had with
18  Allen Stanford were more on a big picture level?

19  A.   Yes, it would -- it would be much more at a big
20  picture level and much less frequently than one would suppose
21  with Allen.  He had a thousand irons in the fire.

22         And I don't know very much about cricket.  I
23  never even played cricket.  I don't know whether you ever
24  played cricket or not.  I didn't.  But I had maybe an hour
25  conversation one time on the phone, with Allen telling me how

Page 56

1    dumb I was because I didn't understand about cricket. And he

2    told me about cricket for one hour and I couldn't get off the

3    phone. I put the phone down because I really had already

4    learned as much about cricket as I wanted to know, but he

5    wanted to tell you.

6              So you could get off involved in a lot of

7    conversations that were for your educational purposes, that

8    were not going to be of any real practical help to me talking

9    to the Senators and House members in Washington that I knew a

10   great deal more about cricket.

11             But it was a -- it was a -- a -- not phone calls

12   that I dreaded; but phone calls that with Allen, if he was in

13   an expansive mood, it was not really worth the investment of

14   my time. I wanted to listen to my client and to -- and to do

15   what needed to be done for the client, but it was not -- it

16   was not the best use of my time to have long, extended

17   conversations with Allen.

18        Q.   Okay. And one example is that cricket conversation?

19        A.   Yes.

20        Q.   All right. I don't want you to think that I'm

21   chasing this trail needlessly. But now that you brought this

22   cricket issue up, didn't Ben Barnes Group spend a significant

23   amount of time assisting Allen Stanford in setting up the

24   Cricket Twenty20 matches?

25        A.   Yes, as is outlined in the paper that Senator

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 57

1    Caperton prepared for the trustee (sic) that, to the best of

2    his ability -- and he talked to me about it before he prepared

3    it -- outlining the things that we had done for Stanford.

4        Q.    The receiver?

5        A.    The receiver.  I didn't mean the trustee.  The

6    receiver.  I'll stand corrected.  I'm sorry.

7                MR. MADRID:  That's all right.

8        A.    We talked about that there were -- the work we did on

9    trying to allow Cuba to come to the cricket tournament in

10   Antigua.  Cuba had been allowed to go -- to play -- a Cuban

11   baseball team to go participate in the United States and had

12   been exempt from the embargo act of Cuba in the 1980s.

13               And Mr. Stanford couldn't understand why -- that

14   if they would exempt a baseball team, why they wouldn't exempt

15   a cricket team; and that we should be able to get Mr. Castro

16   on the phone, along with President Bush, and get that taken

17   care of right away.

18               That was the kind of broad general instructions

19   we had that -- that we couldn't necessarily fulfill his -- his

20   work program he had outlined.  But we worked very hard on

21   trying to get the exemption and were unsuccessful.

22       Q.    Okay.  And the question that I -- that you just

23   answered was:  Didn't the Ben Barnes Group spend a significant

24   amount of time trying to accomplish the client's objectives to

25   get the government to approve Cuba to participate in the

APP. 147

Page 58

1    Cricket Twenty20 Tournament?

2        A.    We did.  Patsy Thomasson, a partner in Washington,

3    had worked at the State Department for eight years.  She knew

4    the people at the State Department.  She spent a great deal of

5    time -- I'm -- maybe a hundred hours.  I don't know.  But

6    many, many, many phone calls and many -- and some personal

7    meetings trying to get this done.  And there was some degree

8    of optimism at the very beginning, but they just were not

9    going to yield on -- on Cuba.

10       Q.    Once you heard the request from Mr. Stanford for the

11   Ben Barnes Group to assist him in this cricket tournament, did

12   y'all have a discussion of how much you were going to charge

13   Allen Stanford or the Stanford Financial Group for that

14   effort?

15       A.    No.

16       Q.    Was that billed separately from any of the tax work

17   you were doing before?

18       A.    None of the -- none of the work was billed -- with

19   Mr. Stanford, based on my best of my memory, was not billed on

20   a specific project.  It was all just general billings by our

21   group and other group people that were a part of the Stanford

22   team in Washington that -- it was billed on just the overall

23   representation of Stanford.

24       Q.    All right.  So you can't attribute how much of

25   whatever you did collect was paid towards the tax work versus

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 59

1    the cricket tournament versus any other work?

2        A.    No, versus any other work.  And then there was a lot

3    of other work that's outlined on the -- on the memorandum that

4    Senator Caperton submitted.

5        Q.    And so the answer is, "Correct."  You can't attribute

6    dollars collected per project?

7                  MR. MADRID:  Objection, form.

8                  Go ahead.

9        A.    That's correct.

10       Q.    Okay.  Was the Ben Barnes Group successful in getting

11   Cuba exempt?

12       A.    No, we were not.

13       Q.    Okay.  Was there any discussion with Mr. Stanford

14   about what the benefit would be of having this Twenty20

15   Tournament with a Cuban cricket team attending?

16       A.    He thought that it would increase the bureauship

17   tremendously in the Caribbean if, for the first time in 50

18   years, that Cuba was participating against the other islands

19   in the Caribbean in the game of cricket and other cricket

20   teams that he would bring from other places around the world

21   to play Cuba.

22                  And then the T.V. audience that it would

23   build -- he was very interested in putting together a T.V.

24   audience that was larger than the Super Bowl's T.V. audience.

25       Q.    And how would that benefit Mr. Stanford?

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Page 60

1        A.    It would --

2                   MR. MADRID:  Objection, form.

3        A.    I assume it would give Stanford Financial the -- a

4    lot of recognition around the world.

5        Q.    To attract more investors?

6                   MR. MADRID:  Objection, form.

7        A.    Well, to investors.  And he had other projects that

8    were going on at that time.

9        Q.    Have you ever made a determination of what value you

10   gave Stanford Financial in connection with the attempts to get

11   Cuba exempt and a participant in the cricket tournament?

12                  MR. MADRID:  Objection, form.

13       A.    There was another very valuable thing we contributed

14   to Mr. Stanford on the cricket tournament.  I knew Lynn

15   DeLuca, who was head of ESPN, and arranged for -- our firm

16   arranged for Mr. Stanford to meet Lynn DeLuca.

17                  Lynn DeLuca agreed to part -- to be a partial

18   sponsor of the games; and then that caused Sky Sports Network

19   to come in and want a contract in addition, where ESPN could

20   not have an exclusive.  That went to England, India, many

21   parts of the -- of western and eastern Europe and other

22   continents.

23                  So that was -- that was a great value as far as

24   getting T.V. coverage to the -- and ESPN paid several million

25   dollars for that contract, as did Sky.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 61

1    Q.   To whom?

2    A.   To Stanford Financial.  And it may have gone to the

3    tournament itself.  I'm not certain about how to answer that

4    definitive.  But it's a -- the money went in the pot.

5    Q.   Did it go to Stanford Financial or did it go to the

6    Twenty20 Tournament to give to prize money?

7    A.   I don't have any idea.

8    Q.   Who would know that?

9    A.   Someone with Stanford.

10   Q.   No one within the Ben Barnes Group would know whether

11   or not Stanford Financial received any of the money?

12   A.   No.

13   Q.   I've heard you described as the quarterback of the

14   team that was helping Mr. Stanford change the tax laws.  Did

15   you consider yourself the quarterback?

16            MR. MADRID:  Objection, form.

17            Go ahead.

18   A.   I played defensive tackle and -- and -- and offensive

19   tackle on De Leon High football team.  I don't think that I've

20   ever been referred to as a quarterback on anything.  But I'd

21   like to as -- when I was Speaker of the House and Lieutenant

22   Governor, I would consider it greatly a compliment if someone

23   said I was a quarterback or a running back for the State of

24   Texas.

25            I don't know that anybody referred to me as a

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Page 62

1    quarterback, but I like -- I'd like to think that, but it was

2    a team effort.  And if I was designated the quarterback,

3    again, that's probably based on age and experience, not on the

4    ability to block and tackle.

5         Q.   All right.  Well, then, would you consider yourself,

6    if not the quarterback, the manager of the team?

7         A.   I would consider myself an important person on the

8    team.

9         Q.   And would you describe for the jury what Ben Barnes

10   Group was hired to do in connection with the tax legislation.

11        A.   Well, the tax -- changing the tax legislation in the

12   Caribbean was a very, very important thing for -- not only for

13   Stanford, but for the whole economy in the U.S. Virgin Islands

14   and really the economy in the -- in the Caribbean.

15             The U.S. Virgin Islands were very poor.  The

16   United States had to appropriate a lot of money annually to

17   the U.S. Virgin Islands for them to really exist.  And getting

18   industry there and creating jobs and having jobs to pay taxes

19   was really part of their survival.  And the U.S. Congress

20   Caribbean Caucus, that was their main goal:  To be able to

21   bring private industry and create jobs and the economic

22   development in the U.S. Virgin Islands.

23             And so -- and there was a saying that:  So goes

24   the Virgin Islands, really goes the rest of the Caribbean.  It

25   was important for us to have -- and the Caribbean was looked

APP. 152

Page 63

1    upon as our third coastline.  It was very important for

2    defense purposes and economic development purposes.  So it was

3    -- it was important legislation.  It was important to -- it

4    was important what the United States' attitude was about the

5    U.S. Virgin Islands to a lot of people.

6         Q.   Important to who?

7         A.   To the people of the Virgin Islands.  To a lot of the

8    people in Congress who had very strong feelings that we should

9    be doing a great deal more in the Caribbean than what we were

10   doing.

11             China was loaning money -- the Chinese loaned

12   the money to build a hospital in Antigua.  The Russians and

13   Chinese had put medical schools in Cuba, were turning out

14   doctors and nurses.  And many of the Caribbean islands, the

15   whole medical staffs would be educated in Cuba.  It was very

16   -- other people were very interested -- other countries were

17   very, very interested in developing friendships and developing

18   a major presence in the Caribbean and so it was important to

19   us.

20             We don't -- we really didn't need the Chinese or

21   the Russians providing the doctors and the nurses for all of

22   the Caribbean and turn those countries into -- from allies of

23   our country and strong sporters of the United States into

24   people that had a primary allegiance to some other country

25   other than the United States.

APP. 153

Page 64

1    Q.    Were any of the islands in the Caribbean clients of
2    the Ben Barnes Group?

3    A.    No.

4    Q.    Were any companies that had offices in the Caribbean
5    clients of the Ben Barnes Group, other than Mr. Stanford?

6    A.    It was a conflict for us to take any other clients in
7    the U.S. Virgin Islands because Allen Stanford wanted tougher
8    rules on investing in the Caribbean than a lot of other
9    countries did.

10         He did not want -- there was -- under the
11   previous legislation that had passed, the interpretation of
12   the laws were such that an automobile dealer from Detroit was
13   running his sales through the Virgin Islands and being -- and
14   attempting to be taxed at the U.S. Virgin tax rate rather than
15   the United States.

16         And so there were a lot of people that tried to
17   take advantage of the U.S. Virgin Islands tax laws that were
18   not really putting any money into the U.S. Virgin Islands and
19   creating any jobs.

20         Stanford Financial's position was that they
21   wanted the level of investment to be high and the number of
22   jobs to be created to be high, where there could not be --
23   where there could not be companies invest in the Virgin
24   Islands that were doing it purely for just tax purposes.

25   Q.    Let me try my question again.  Were there any other

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 65

1    entities that were clients --

2        A.    No.

3        Q.    -- of Ben Barnes Group?  Okay.

4              MR. MADRID:  Let him finish his question,

5    please.

6              THE WITNESS:  But he already asked it one time.

7    I didn't want him to have to ask it again.  I didn't want him

8    tired.

9              Okay.  Go ahead.

10       Q.    (BY MR. CASTILLO) Were there any other U.S. companies

11   that were the clients of Ben Barnes Group that were interested

12   in changing the tax laws in the United States Virgin Islands,

13   other than Allen Stanford?

14       A.    I don't know.  I don't think so, but there could have

15   been.  I don't know.

16       Q.    Were there any other clients that paid the Ben Barnes

17   Group for its efforts to change the tax laws concerning the

18   U.S. Virgin Islands, other than Stanford Financial?

19       A.    No.

20       Q.    And what were the two elements of the tax laws that

21   were going to be changed?

22       A.    One was the amount of time you had to spend in the

23   Virgin Islands.

24       Q.    Is that the residency requirement?

25       A.    Yes, the residency requirement.

Page 66

1    Q.   And then what's the other?

2    A.   And the other would be the sourcing.

3    Q.   Had there been any efforts, by any of the public

4    officials in the U.S. Virgin Islands, to try to convince the

5    United States to change that tax law?

6    A.   Yes.

7    Q.   By whom?

8    A.   By the Governor of the U.S. Virgin Islands and by the

9    elected officials of the Virgin Islands and by the U.S. Virgin

10   Islands Chamber of Commerce.

11   Q.   And when was that?  Did it predate your involvement

12   with Mr. Stanford?

13   A.   Yes.

14   Q.   Was it concurrent with your involvement with

15   Mr. Stanford's efforts to change the tax law?

16   A.   That constituency in the U.S. Virgin Islands that I

17   just spoke of were -- were continually trying to work every

18   year to get tax laws that would encourage more investment in

19   the U.S. Virgin Islands.

20   Q.   And why had they been unsuccessful?

21   A.   There was -- because of some of the people that had

22   tried to take advantage of the tax laws, there was a group in

23   Washington that were very much opposed to any changes in the

24   law and very much opposed to anybody that was a United States

25   citizen having to do any business in the Virgin Islands; and

APP. 156

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 67

1    then there were some people that were strong for it.

2              But the U.S. -- there was a caucus of the

3    Caribbean Caucus and the Black Caucus and the Hispanic Caucus.

4    There were a lot of people that were very interested in -- in

5    helping our neighbors to the south.  So there was a political

6    disagreement and a tug-of-war that was taking place in

7    Washington.

8        Q.   You're talking about the other -- the first and

9    second border being Canada and Mexico?

10       A.   Yes.

11       Q.   Okay.  And so the third border would be the

12   Caribbean --

13       A.   That's right.

14       Q.   -- right?  Was there any concern in the United States

15   government that the attempts to change the tax law in the

16   United States Virgin Islands would allow companies to avoid

17   regulation that they otherwise would have in the United

18   States?

19       A.   I think there was a division at Treasury about what

20   was the correct statutes and what was incorrect and how -- how

21   you could open the door and allow more investment into the

22   Virgin Islands for economic development and how you could keep

23   that door shut to people that were trying to use the Virgin

24   Islands for -- for tax avoidance.

25       Q.   What about other regulatory schemes in the United

Page 68

1    States?  If you were in the United States Virgin Islands that

2    you could avoid, for instance, the SEC requirements?

3         A.    No, I never had any discussion about that.

4         Q.    Or any oversight by banking commissions?

5         A.    No, I didn't have any discussion about that.

6         Q.    Were you aware that there was any opposition to

7    changing the tax laws in the Virgin Islands and the Caribbean

8    because of that?  That you would -- that companies would try

9    to avoid other regulatory schemes in the United States?

10        A.    I don't remember.  But I -- I know of no in-depth

11   discussions about regulatory agencies and what financial

12   institutions or public companies in the Virgin Islands could

13   be exempt from as far as U.S. -- other statutes.

14        Q.    Okay.  Now, did you ever visit Mr. Stanford's

15   operations in the Caribbean?

16        A.    Yes.

17        Q.    Which islands?

18        A.    Antigua and the U.S. Virgin Islands.

19        Q.    When we say "U.S. Virgin Islands," so the jury will

20   understand and doesn't have the luxury of going there, are

21   there many islands within the United States Virgin Islands or

22   is it just one island?

23        A.    I believe there's -- there's several, but I'm -- I

24   really don't know.  I think there are a couple, for sure.

25        Q.    How about St. Croix?

APP. 158

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 69

1      A.    Yeah, St. Croix.

2      Q.    Is that part of the U.S. Virgin Islands?

3      A.    Yes.

4      Q.    Antigua, is that a --

5      A.    No.

6      Q.    Okay.  Antigua is under what --

7      A.    Great Britain.

8      Q.    -- country?  Okay.  So did you visit the operations

9   of Mr. Stanford in Antigua?

10     A.    Yes, I did.

11     Q.    Okay.  And why did you go?

12     A.    I went down there to meet with him to see the

13  operations.  And, also, he had a huge project island off the

14  coast of Antigua that he was going to develop or had -- and

15  started to develop, that he was going to sell to wealthy

16  people around the world.  That was going to be a rather unique

17  island:  The amenities that were going to be offered, the golf

18  course that was going to be built there.  He hired Jack

19  Nicklaus to develop the golf course.

20            But he wanted us to see the -- the island and

21  also to -- he knew that I had developed Barton Creek in a very

22  difficult regulatory area in Austin, Texas to develop golf

23  courses.

24            And there was opposition to -- in Antigua from

25  some local people about that kind of development.  And he

Page 70

1    wanted me to look at it and wanted my counsel and advice about

2    how to deal with and what you tell people, when you're

3    developing a development like that, to give them assurances

4    that you're going to do it in a -- in a correct way and in an

5    environmentally sensitive way.

6        Q.   Okay.  What was your advice concerning -- or your

7    involvement with giving Mr. Stanford advice on the project to

8    sell this development to wealthy people?  Was that in

9    connection with the total amount of money that you were

10   getting paid?

11       A.   Yes.

12       Q.   Did you separate out how much work you did on that?

13       A.   No.

14       Q.   You can't attribute how much you charged for that?

15       A.   No.

16       Q.   How much you got paid?

17       A.   No.

18       Q.   And what value you contributed to Mr. Stanford?

19       A.   No.

20       Q.   Did that project ever get off the ground?

21       A.   No.

22       Q.   Was it a private project or was it for Stanford

23   Financial?

24       A.   It was for Stanford Financial, I believe.  I don't --

25   I don't ever discuss -- I don't remember a discussion talking

APP. 160

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 71

1    about what entity it was going to go into.

2        Q.    That development on the island for that project to

3    build this wealthy complex, was that part of the scheme to

4    move that operation to the U.S. Virgin Islands?

5              MR. MADRID:   Objection, form.

6        A.    Would you mind asking the question again.

7        Q.    Yeah, it was a poor question.  I mean, that project

8    was going to be on the island of Antigua, right?

9        A.    Yes.

10       Q.    And could that ever qualify under the sourcing

11   requirement if you changed the tax law in the U.S. Virgin

12   Islands?

13       A.    It could qualify under a proposal that we were

14   discussing with the United States Government and the United

15   States Congress:  That if you were a citizen of the U.S.

16   Virgin Islands and you had development projects or other

17   income from non U.S. islands or from non U.S. entities, then

18   that income would be taxed at the Virg -- at the U.S. Virgin

19   Islands tax rate as opposed to the United States tax rate.

20       Q.    So you were going to change the tax law so all you

21   had to meet was a residency requirement?

22             MR. MADRID:   Objection, form.

23       A.    You had to meet the residency and you had to not be a

24   United States citizen.  You had to give up your citizenship

25   and be -- and be a citizen of the U.S. Virgin Islands.

Page 72

1      Q.    So if you were a citizen of the United States Virgin

2   Islands, you would meet the residency requirement?

3      A.    That's right.

4      Q.    And you didn't have to worry about the sourcing

5   requirement?

6      A.    No, you -- yes, you still had to worry --

7      Q.    As long as it wasn't U.S.?

8      A.    No.

9      Q.    Okay.  Tell me again.

10     A.    That was a change that we were proposing in the law:

11  That if you were a citizen of the U.S. Virgin Islands and your

12  income is earned in other Caribbean Islands or in other places

13  of the world, that that income would be subject to the U.S.

14  Virgin Islands tax laws and not to the United States tax laws.

15            If you earned the income in England, the income

16  would be subject to the tax laws of England but not of the

17  double tax -- not of the United States.

18     Q.    As long as you met the residency requirement and the

19  income --

20     A.    As long as you met the -- yes.

21     Q.    -- wasn't in the United States?

22     A.    Yes.

23     Q.    Okay.  And we'll probably get some of the details in

24  a little bit.

25     A.    Pardon?

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 73

1    Q.   Any other projects that you remember helping

2    Mr. Stanford with, other than the tax law changes; this

3    project; and the Twenty20 cricket tournament?

4    A.   There was Caribbean Airline.

5    Q.   All right.  Tell me about that.

6    A.   Well, the airline service was not as good in the

7    Caribbean.  And he bought an airline and had very little

8    experience or no experience in the airline business.  And it's

9    hard to be in the airline business if you're -- the only man I

10   ever know that was really totally successful in the airline

11   business was Herb Kelleher.

12               C.R. Smith had started American Airline and was

13   never -- not ever totally successful in the airline business

14   and neither was Delta.  Most of the major airlines in the

15   United States have gone broke one time or the other, so

16   Mr. Stanford was not a unique person.

17               I went in the airline business from Brownwood to

18   DFW and consistently lost money.  I served on the Board of

19   Texas International and then later served on the Board of

20   Continental, later represented American Airlines.

21               It's a very difficult business, but he had a

22   very difficult task.  And the airline was losing money very

23   badly and I assisted him in being able to stop the bleeding

24   and being able to improve his intraline connections and his

25   reservation system.

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Page 74

1       Q.    Who owned the airlines that he bought?

2       A.    I'm sure Stanford Financial.  I don't know.

3       Q.    Do you know?

4       A.    No, I don't.

5       Q.    Do you know if Mr. Stanford owned it, individually?

6       A.    I don't not.

7       Q.    Do you know if he owned it under a separate company

8   other than Stanford Financial?

9       A.    No.

10      Q.    Do you know how many entities were within the name

11  Stanford Financial as you use it?

12      A.    No, I have no idea.

13      Q.    Did you ever look at what the holdings of Stanford

14  Financial were?  In other words, companies?

15      A.    No.

16      Q.    The operation that you went to see in Antigua -- how

17  many times did you go there to Antigua?

18      A.    Probably three, four.  I don't know for sure.

19      Q.    And that's to look at -- what facility were you

20  looking at?  Not the project, but the facility.

21      A.    Well, I went to see the Stanford Financial Bank and

22  office buildings and the airport he was developing.

23            And I went down one time to hear his

24  presentation on the one island project and to actually attend

25  sales meetings and meetings where he was explaining to the

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 75

1    citizens -- the difficult citizens.  "Difficult" in the sense

2    that they were not supportive of the one island plan.  I sat

3    in the back of the room and listened to his presentation and

4    gave him a critique on what I would have said and what I would

5    not have said.

6        Q.    Did you see -- what did you see when you were looking

7    at the bank facility?

8        A.    I saw a beautiful bank building that would have been

9    an asset to -- the building would have been an asset to

10   Congress Avenue, like this bank building.  I mean, it was --

11   not in 2014 terms, but in 2000 -- early 2000 terms it was a

12   very -- very well-constructed, very magnificent building.

13            Very well-groomed, very intelligent,

14   enthusiastic people working in the bank.

15       Q.    Operating as a normal bank?

16       A.    Yes.

17       Q.    Nothing that would give you a red flag that it was

18   something other than a bank?

19       A.    None whatsoever.

20       Q.    Nothing in your -- ever in your discussions with

21   Mr. Stanford, up until the time you were first paid, that gave

22   you a red flag of the nature of Mr. Stanford's business?

23       A.    Not at all.

24       Q.    The fact that he had grown from being in bankruptcy

25   in the mid-'80s to now owning a bank, did that ever give you a

Page 76

1    red flag?

2        A.   No.

3        Q.   Were you ever aware that he had filed bankruptcy?

4        A.   Not that I remember. But Texas went bankrupt in the

5    '80s, all my friends, a lot of my banks. First National Bank

6    of Dallas, Republic National Bank of Dallas. I think -- other

7    than the Frost Bank in San Antonio, maybe 70 or 80 banks went

8    broke. Even -- low and behold, even some law firms went broke

9    because there wasn't anybody to represent, like Barnes and

10   Connally and First National Republic. So it was a -- it was a

11   difficult time in Texas in the '80s.

12       Q.   So that wouldn't have caused you any concern that he

13   had gone into bankruptcy in the '80s?

14       A.   I didn't -- I didn't know. That was -- to my

15   knowledge, that was never called to my attention. But I -- it

16   would not have caused a red flag to go off if -- about

17   Mr. Stanford, as it would anymore than Red McCombs or Trammell

18   Crow or anybody else that was people that I knew that had been

19   in the development business in Texas.

20       Q.   Okay. I guess if Red McCombs went into bankruptcy

21   that would be a concern for everybody.

22       A.   Well, it would be now.

23            MR. MADRID: Objection, form.

24       A.   It might not have been in the '80s.

25       Q.   Well, did you ever do any damage control concerning

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 77

1    potential stories that were to come out about Mr. Stanford in

2    Bloomberg?

3         A.   I don't remember.

4         Q.   Do you remember ever having any discussion about

5    trying to kill a story that Bloomberg was going to publish

6    concerning Stanford's claim that he was tied to the founders

7    of Stanford University?

8         A.   I don't remember trying to kill a story.  I remember

9    the discussion.  I mean, I could have been in a meeting where

10   they were talking about trying to -- I don't remember.

11        Q.   Do you know if your firm did any investigation to

12   determine whether or not there was a link between Allen

13   Stanford and the founders of Stanford University?

14        A.   I remember discussions we had, but I don't remember

15   the particulars.

16        Q.   Okay.  Anybody -- do you know how much your firm was

17   paid to try to assist Mr. Stanford in that issue?

18        A.   No, I don't.

19        Q.   And do you have any idea what value was imparted to

20   Mr. Stanford if you were paid for that?

21        A.   No, I don't.  I remember the Governor of California

22   at that time telling me that he thought Mr. Stanford was

23   related and that he was very happy that Mr. Stanford was

24   contributing money to refurbish the house.  Governor Davis

25   told me how much he appreciated Mr. Stanford.

Page 78

1      Q.    Okay.  Well, I guess the question was:  Have you made

2   a determination of what value you imparted to Stanford in

3   connection with that effort for the Bloomberg article?

4      A.    No.

5      Q.    Who would know that?

6      A.    I don't -- some members of my firm might know it, but

7   I don't know.

8                    (Exhibit 111 was previously marked)

9      Q.    (BY MR. CASTILLO) Let me show you what we've marked as

10  Plaintiff's Exhibit No. 111, sir.  And I'll represent to you

11  that this is some documents that were produced by your firm,

12  through your lawyers.  And they were asked to send a recap of

13  all the monies paid by Stanford Financial to your firm.

14                    It appears on Plaintiff's Exhibit No. 111 that

15  it's a recap of all of the deposits that Stanford Financial

16  made to your firm.  Do you see that?

17     A.    Yes.

18     Q.    And it appears that the first one is on June 30,

19  2005.  And I know that --

20     A.    Yes, sir.

21     Q.    -- coordinates with Plaintiff's Exhibit No. 11,

22  doesn't it?

23     A.    Yes.

24     Q.    All right.  So you were paid the million dollars that

25  you invoiced on June 23rd, 2005, correct?

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 79

1      A.    Yes, sir.

2      Q.    All right.  And from your testimony earlier, that was

3   for work that had been done up until June of 2005?

4      A.    Yes.

5      Q.    All right.  Now, was there any discussion with

6   Mr. Stanford about what you were going to charge going forward

7   after June 2005 through the end of that year?

8      A.    I don't remember.

9      Q.    Now, when you -- you were going to represent Stanford

10  Financial on a going-forward basis after June of 2005.  Do you

11  know whether you were doing it on a monthly fee, a success fee

12  or what?

13     A.    It was on a monthly fee.

14     Q.    Okay.  And do you know what the monthly fee was?

15     A.    No, I really don't.  And I can't really tell from

16  these -- these billings.  Because sometime there other people

17  were added to the team and money was paid for other outside

18  firms in addition to our firm.

19     Q.    All right.  And if we look at Plaintiff's Exhibit

20  No. 50, when you're talking about the team --

21     A.    Yes.

22     Q.    -- was there any discussion between you and

23  Mr. Stanford about who was going to cover the expenses of the

24  other members of the team?

25     A.    I don't recall specifically.  It was probably with

Page 80

1    Yolanda Suarez.

2        Q.   What do you remember of any discussion with

3    Ms. Suarez about how the team members were going to get

4    compensated?

5        A.   I remember some discussions, but I don't remember

6    specific discussions about who was going to be paid what.

7        Q.   Well, what was your understanding of the concept of

8    payment?  Were you going to get paid a fixed sum and then

9    you're paying the expenses of the team members?  Or were you

10   going to bill the team members separately?

11       A.   I don't remember how the billing was going to go, but

12   I -- but the -- they wanted to pay the Ben Barnes Group and us

13   to pay the individual contractors.

14       Q.   Okay.  And so the individual contractors that were on

15   the team initially -- if you look at Plaintiff's Exhibit

16   No. 50, which would be paid separately?

17       A.   They all would be paid separately.

18       Q.   All the lobbyists?

19       A.   Yes, and law firms.

20       Q.   The Counselor, Ambassador Romero?

21       A.   I don't remember.

22       Q.   Hunton & Williams and Jim Richard -- or Jim and/or

23   Richard?

24       A.   I think that, again, some of these people may have

25   already been representing Stanford in various and sundry

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 81

1    capacities.  So as far as the legal team and Ambassador

2    Romero, I don't remember that.  But I -- it seems -- something

3    in my mind thinks that they -- that they had already been

4    working.

5         Q.   The lobbyists that are listed:  It's Mitch Delk,

6    correct?

7         A.   That's right.

8         Q.   Who's the Kent?

9         A.   Senator Caperton.

10        Q.   Okay.  So we know we have to include his scotch bill

11   under -- under that portion, correct?

12        A.   That's right.  And as a matter of fact, don't ever

13   put --

14             SENATOR CAPERTON:  You're giving me a bad name.

15        A.   Don't ever put Mitch ahead of Kent.  Kent needs to go

16   up at the top up there.  You change that and we'll so note it

17   in the exhibit.

18        Q.   Yeah.

19        A.   It's all serious --

20        Q.   There was an error there.

21        A.   All serious goal (phonetic).

22        Q.   There's an error on the team member listing --

23        A.   That's right.

24        Q.   -- on the depth chart.

25        A.   Yeah.

Page 82

1        Q.    And then the Scott?

2        A.    That would be Scott Reed.

3              MR. CASTILLO:    Okay.  It's 12:00.  Why don't we

4    take another five-minute break and --

5              THE VIDEOGRAPHER:    Off the record at 12:02.

6              (Lunch recess)

7              THE VIDEOGRAPHER:    This is the beginning of Tape

8    Three.  We're back on the record at approximately 12:38 p.m.

9              (Exhibit 5 was previously marked)

10       Q.    (BY MR. CASTILLO) Mr. Barnes, I'm trying to put some

11   perspective about when you first got hired.  And I know you

12   don't have a specific recollection, but let me show you

13   Plaintiff's Exhibit No. 5.

14       A.    Okay.

15       Q.    Okay.  And this is a Stanford document.  But it seems

16   to me that -- by looking at Plaintiff's Exhibit No. 5, that in

17   April of 2005 is when you were -- you were being discussed

18   internally between Ms. Suarez and Carlos Loumiet, with Hunton

19   & Williams, about potentially being retained.  Does that ring

20   a bell?

21       A.    Well, I think what this is a reference to is on the

22   -- is on the U.S. Virgin Islands project.  That's what -- this

23   is not -- this is not Stanford, in general.  This is the U.S.

24   Virgin Islands, I believe.

25       Q.    All right.  And so do you have -- does this refresh

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 83

1    your memory that maybe it was in early -- in April 2005 when

2    you were being retained for the U.S. Virgin Islands tax issue?

3        A.    Well, I was already retained.  But I think -- I think

4    what this is is I went down and talked about the U.S. Virgin

5    Islands and the political -- what was possible and what I

6    considered not to be possible.  And that was a result -- and

7    this is -- this internal document is a result of this lawyer I

8    spoke to.

9        Q.    Okay.  But were there -- were there separate issues

10   for Stanford in connection with the U.S. Virgin Islands or was

11   it just trying to change the tax laws?

12       A.    Well, it was -- it was just an ongoing representation

13   of Stanford.  I mean, this was the -- and they wanted to gear

14   up and add people to the team and to really do an amphibious

15   landing on trying to -- on trying to change the tax laws.  And

16   that's what this was in regard to.  This was not the beginning

17   of our life with Stanford.  This was a continuation, but it

18   was a bigger assignment.

19       Q.    All right.  So when did the life of this putting a

20   team together to do the amphibious landing on the U.S. Virgin

21   Islands start?

22       A.    I don't know.  I'm not trying to not remember.  The

23   only thing I've really got to go by is to go back and look at

24   the dates of some of these memorandums to refresh my memory.

25   That's --

Page 84

1      Q.   But Plaintiff's Exhibit No. 5 doesn't help you in

2   refreshing your memory?

3      A.   Not in the timeframe of what we're doing, no.

4      Q.   Now, was there a particular pressing deadline about

5   when you had to introduce that legislation vis-a-vis when

6   Congress was in session?

7      A.   I'm sorry.  Say it again.

8      Q.   Was there a deadline of when you wanted to get these

9   tax changes implemented?

10     A.   I don't know that.  But there could have easily been

11  a session deadline when a tax bill was going to move or when a

12  caption was going to move -- when we thought a caption was

13  going to move out of the Senate or out of the House that we

14  could put our language on.

15                   (Exhibit 21 was previously marked)

16     Q.   (BY MR. CASTILLO) Let me show you Plaintiff's Exhibit

17  No. 21.

18     A.   Okay.

19     Q.   And the reason I'm showing you Plaintiff's Exhibit

20  No. 21 is to see if it helps you with:  When were you trying

21  to get that tax legislation to be considered?

22     A.   Well, based on this memorandum, it seems that we were

23  shooting toward the fall session and Congress maybe moving a

24  tax bill in the fall of 2005.

25     Q.   All right.  And so something had to be done between

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 85

1    April of 2005 and the fall of 2005 to get this tax bill being

2    considered.

3        A.    That's true.

4        Q.    Tell the jury how you were going to go about doing

5    that.

6        A.    Well, we were going to assemble a team that could

7    talk to the Senate Finance Committee, the Majority and

8    Minority Members, Senator Baucus and Senator Hatch and other

9    members of the Senate; and we were going to assemble a team

10   that could talk to the House Ways and Means Committee Chairman

11   and the Ranking Member and solicit their help on -- on getting

12   the legislation introduced by the right people and -- or

13   whether we were going to try to just put it as an amendment to

14   the tax bill that was going to be authored by the Chairman and

15   Ranking Member.

16              So that's -- it was a -- kind of a standard

17   operating procedure on trying to go pass a tax bill that you

18   focus on the Ways and Means Committee in the House and the

19   Senate Finance Committee in the Senate.

20       Q.    Okay.  Do you do any study on who your client is

21   before you attempt to make these contacts and the

22   introductions?

23       A.    Can you elaborate on what "study" means?

24       Q.    Find out who your client is and what they do and any

25   skeletons in the closet.

Page 86

1      A.    We had already been representing Stanford Financial.

2    I had already been down to the -- to the islands and seen the

3    bank, seen the facilities; been in the Houston offices; had

4    seen Mr. Stanford go into very, very high-powered,

5    high-priced, very legitimate law firms and seeking their

6    representation for his firm and -- and big -- and large law

7    firms agreeing to represent Mr. Stanford.  The recommendation

8    by Larry Temple, as I testified to earlier.

9            It was standard operating procedure the way that

10   you observed and learned about a client.  I did not feel the

11   necessity to really go beyond that.  It wasn't -- it wasn't in

12   my mind that there was -- that I had a -- a problem with a

13   client.  There had not been any warning lights go off that

14   certainly had come to my attention.

15      Q.   All right.  So what I hear you saying is that from

16   your observations of Mr. Stanford and his operations, you felt

17   comfortable taking him on as a client?

18      A.   Yes.

19      Q.   And you felt comfortable enough to introduce him or

20   introduce his name to Senators and Legislators --

21      A.   Yes.

22      Q.   -- in the House of Representatives, correct?

23      A.   Yes.

24      Q.   Did you --

25      A.   But --

APP. 176

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 87

1     Q.   Go ahead.

2     A.   This legislation had a much broader application than

3     Stanford that we were trying to do.

4     Q.   And the broader implication (sic) was for who?

5     A.   Other companies and -- that would be interested in

6     locating in the Virgin Islands, other companies doing business

7     in the Caribbean.  And -- and this was a number one goal of

8     the government of the U.S. Virgin Islands.

9     Q.   All right.  So what I hear you saying is that the

10    effort would have been paid for by Mr. Stanford, but the

11    benefit would enure to any other company who could take

12    advantage of the tax changes -- tax law change --

13    A.   Yes.

14    Q.   -- correct?

15              MR. MADRID:  Objection, form.

16    Q.   (BY MR. CASTILLO) And the other beneficiary of the

17    effort would be the U.S. Virgin Islands?

18    A.   Yes.

19    Q.   How did the U.S. Virgin Islands win?

20    A.   They would be the huge winners because people would

21    come down to the U.S. Virgin Islands.  They would have to --

22    from what we were proposing, they would have to become

23    citizens of the Virgin Islands.  And they would have to invest

24    up to X million dollars and have to employ X thousand

25    employees or X hundred employees to be able to qualify under

Page 88

1    the legislation that we were proposing.

2              Mr. Stanford went to the Virgin Islands and made

3    a sizeable investment in real estate and built a building that

4    complied with the square footage that you would need to have

5    under the old statute and employed the number of people that

6    needed to be hired under the old statute.

7       Q.   Did he, in fact, do that in the U.S. Virgin Islands?

8       A.   Yes, he did.

9       Q.   Where?

10      A.   In St. Croix.

11      Q.   All right.  And was that already in place?

12      A.   No.  He -- he bought the -- the property in St. Croix

13   after all this got started, I believe.  Yes.

14      Q.   But before the -- well, the tax law never was

15   changed.

16      A.   No, but -- but during this period of time.

17      Q.   So did he buy it on the come, hoping that you're

18   going to be successful in getting the tax law changed?

19              MR. MADRID:  Objection, form.

20      A.   I don't know that for sure, but I assume that.

21      Q.   So he bought it regardless of whether the tax law

22   changed?

23              MR. MADRID:  Objection, form.

24      A.   Yes, he did.

25      Q.   Okay.  And the people that were employed by the

APP. 178

Page 89

1   bank -- or his operation that you say was in St. Croix were

2   employed whether the tax law changed or not, correct?

3        A.   Well, there would be many, many more that would be

4   working there if the tax law had been changed.

5        Q.   Because other companies would come in?

6        A.   Well, other companies.  But he would have moved more

7   of his operation to the --

8        Q.   From where to where?

9        A.   From Antigua and maybe Houston to the U.S. Virgin

10  Islands.

11       Q.   All right.  So the people of the United States Virgin

12  Islands would benefit from having more jobs, correct?

13       A.   Yes.

14       Q.   More tax base, correct?

15       A.   Yes.

16       Q.   Possibly more tourism, because it would open more

17  companies --

18       A.   That's right.

19       Q.   -- and more people would come, correct?

20       A.   More airlines, yes.

21       Q.   Okay.  The government of the U.S. Virgin Islands

22  would benefit, wouldn't it?

23       A.   Yes.

24       Q.   Because they would have an increased tax base,

25  correct?

Page 90

1        A.    Yes.

2        Q.    Did anybody in the U.S. Virgin Islands government pay

3    any of the fee for this effort?

4                    MR. MADRID:   Objection, form.

5        A.    Not to -- not to my firm.   Not to our firm, but to --

6    there were other people that were hired, who represented the

7    U.S. Virgin Islands, that they were paying large fees to.

8        Q.    Okay.   Did anybody in the United States Virgin

9    Islands government pay any fee to the Barnes Group?

10       A.    No.

11       Q.    All right.   So the only person that paid the Ben

12   Barnes Group would have been Allen Stanford?

13       A.    That's correct.

14       Q.    All right.   Any other U.S. company join in the effort

15   to pay your fee to get the tax law changed for their benefit?

16                   MR. MADRID:   Objection, form.

17       A.    No.

18       Q.    Were there any other specific companies that were

19   identified as being supportive of your tax initiative?

20       A.    That were my clients?

21       Q.    Yes, sir.

22       A.    No.

23       Q.    How about any of them that heard about your efforts

24   and said, "We'll join in"?

25       A.    I don't remember.   There was probably some people we

APP. 180

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 91

1    represented that would have benefited by it, if -- if the law

2    had been change, but I don't -- I don't recall.

3        Q.   Okay.  All right.  So we were talking a little bit

4    about whether you were doing any investigation.  And I think

5    you've described for the jury why you felt comfortable with

6    Stanford, correct?

7        A.   Yes.

8        Q.   Anything else that gave you that comfort?

9        A.   No.  I had been around the company, as a client

10   relationship, that I had -- I had seen -- I had seen no signs

11   of -- that any red lights ought to be going off.

12       Q.   Okay.  "Anything else that you did to give you the

13   comfort?" was the question.

14       A.   I think probably the fact that Tom Delay and Pete

15   Sessions and a group of Republican legislators that he -- that

16   John Cornyn had been to Antigua, our United States Senator,

17   and spent the weekend with Mr. Stanford.

18            That -- I just saw things happening.  Tom Delay

19   was ready to work as hard as he could on this legislation.  I

20   assumed that people who had political careers were probably

21   doing a little bit more due diligence than law firms were

22   doing and that firms like ours were doing, so that gave me

23   some degree of comfort.

24       Q.   Anything else other than you judged him by the

25   company he kept?

Page 92

1              MR. MADRID:  Objection, form.

2         A.   No.

3         Q.   That's what you were doing, right?  I mean, he was --

4         A.   Yeah.  Sure.

5         Q.   -- with Tom Delay and --

6         A.   Sure.

7         Q.   -- he was hobnobbing with important people.

8         A.   Yeah.

9              MR. MADRID:  Objection, form.

10        Q.   (BY MR. CASTILLO) And so that gave you some comfort in

11   who he was?

12        A.   Yes.

13        Q.   Anything else that you did to get some comfort on

14   Allen Stanford as a client?

15        A.   Not that I remember.

16        Q.   All right.  So what's the next step?  You know who

17   your client is and you know what he's trying to accomplish.

18   How do you go about getting a tax bill introduced?

19        A.   We assembled a team of people that -- who I

20   considered to be very experienced people in the legislative

21   process in Washington.

22              John Rafaelli had been General Counsel to the

23   Senate Finance Committee.  Senator Benson was Chairman, had a

24   lot of experience and knew how the Finance Committee worked.

25   Another one of the members we hired had worked on the Finance

Page 93

1      Committee when Senator Baucus was there.  Senator -- Scott

2      Reed was a very good friend of Senator Hatch.  Senator McCain

3      had been Chief of Staff to Senator Dole when he was Majority

4      Leader.  There was a -- the law firm that represented the U.S.

5      Virgin Islands was a good law firm.  They had good people on

6      their team.  I think we assemble a pretty capable team.

7          Q.   All right.  So you assemble a team and then you

8      assign -- or somebody assigns projects or part of the

9      responsibility --

10         A.   And we all meet --

11         Q.   -- and move ahead?

12         A.   We all meet around a table like this and say, "I'll

13     take them" and "I'll take this one," "You take this one."  I

14     mean, it was a -- it was a community effort and community

15     decision-making on who was going to do what.

16         Q.   At some point you have to convince either the Senate

17     Finance Committee or the Chairman of the House Ways and Means

18     Committee of "Why should we do this," don't you?

19              MR. MADRID:  Objection, form.

20         A.   Sure.

21         Q.   Okay.  And is there ever a question about:  What's

22     the economic impact of this change?

23         A.   There was a white paper that was prepared by a firm

24     that we hired.  There was other firms hired by the U.S. Virgin

25     Islands.  I think probably the OMB, the budget-making arm of

Page 94

1    the United States Government, did a study on economic impact.

2                    There were a lot of studies on the economic

3    impact on changing the law in the U.S. Virgin Islands.  And it

4    had been worked on a lot longer than I had been working on it.

5         Q.    Was there an economic impact analysis done while you

6    were the manager of the team?

7         A.    Well, our firm was the manager of the team.  I -- I

8    think the white paper that we prepared had some economic

9    impact.  I think the Virgin Islands probably had a new

10   economic impact prepared.  I -- and maybe OMB.  I don't know.

11   I mean, there was -- there was -- there was a lot of current

12   numbers that we were -- that we were given and we were working

13   with.

14                    You're dealing with -- with bureaucrats and

15   technocrats.  People that got paid to -- to look very

16   carefully at legislation and its economic impact on whoever

17   were the beneficiaries of the legislation.  So that was all

18   being done.

19        Q.    Okay.  And was there an economic analysis done for

20   the beneficiaries of the legislation?

21                    MR. MADRID:  Objection, form.

22        A.    Yes, I assume there was.

23        Q.    Was there one done for what the economic impact would

24   be on the United States Virgin Islands?

25        A.    I'm sure there was.

1     Q.    Was there an economic analysis done of what the

2     impact would be on the United States?

3     A.    I'm sure there was.

4     Q.    And part of that would be kind of a loss of a tax

5     base, correct?

6              MR. MADRID:  Objection, form.

7     A.    Yes, there would be some lost revenue.  It was --

8     they were -- I remember discussions about how that it would

9     cut down the amount of money that was being appropriated

10    directly to the U.S. Virgin Islands from the United States

11    Treasury.

12              I think that we had discussions about that there

13    was a good possibility that we might be able to make it

14    economic neutral.  In other words, there would be no loss to

15    the Treasury, nor any gain.  That's -- I think that's what our

16    ambitions were.

17    Q.    Okay.  Because you appropriate less, but you --

18    A.    Generate more taxes.

19    Q.    -- generate more taxes.  Okay.  Was there ever an

20    economic analysis of the impact on Stanford Financial?

21    A.    I don't know that.  I didn't -- we didn't do that.

22    Q.    Do you know if anybody did it?

23    A.    Oh, I'm sure that they did.  I'm sure that Jim Davis

24    and Yolanda -- I'm sure that they had a -- it would have been

25    -- and I don't remember the discussion of any numbers.  But it

Page 96

1   would have had a big impact on the -- on the Stanford company

2   and its shareholders.  It would have had a huge economic

3   benefit to Stanford.

4       Q.   Okay.  Have you ever seen that?

5       A.   No.

6       Q.   Did you ever look at it?

7            MR. MADRID:  Objection, form.

8       A.   I may have seen numbers.  I don't remember.

9       Q.   Do you remember having any discussion with anyone

10   about the economic impact on Stanford?

11      A.   Oh, I'm sure I did.  I don't recall that.  I'm sure

12   that was part of the -- we had discussions about that.

13      Q.   With who?  Who did you have a discussion with?

14      A.   Well, probably Yolanda and maybe -- I don't know.

15   Different Stanford people that were moving back and forward to

16   Washington that were working on this and with the -- but I

17   don't recall the specific individual, no.

18      Q.   Do you recall any numbers being tossed around?

19      A.   No.

20      Q.   Do you recall any discussion on the economic impact

21   on the investors in Stanford?

22      A.   No.  But when I say shareholder, I would say

23   investors and that would be the beneficiaries, also.

24      Q.   Any discussion about specific benefit to any

25   shareholder?

Page 97

1    A.    No.

2        Q.    And you knew that Mr. Stanford was the hundred

3    percent shareholder of Stanford Financial, didn't you?

4                MR. MADRID:  Objection, form.

5        A.    Probably so.

6        Q.    Were you ever asking Stanford Financial for some

7    information about Stanford so you could share with the members

8    of the legislature, so they could be familiar with who

9    Stanford is?

10        A.    Well, we had the website.  We had the Stanford

11    statements.  We had the -- we had written material that was

12    provided by Stanford Financial that was available to us all.

13        Q.    Okay.  And that's what you were providing to members

14    of the legislature?

15        A.    Yeah, if -- those that asked for it.  It was not --

16    you didn't go see the members of Congress on the behalf of

17    Stanford.  You went to see -- they knew who your client was,

18    but you didn't have a discussion about Stanford.  You had a

19    discussion about the U.S. Virgin Islands and what impact it

20    would have on the investors there.

21        Q.    But you actually did mailouts, though, of the

22    Stanford Eagle, didn't you?

23        A.    No, I don't know we did mailouts.  I don't know.  I

24    don't know that.  We may have.  I don't know, to be honest.

25                (Exhibit 9 was previously marked)

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 98

1    Q.   (BY MR. CASTILLO) Let me show you Exhibit No. 9, sir.

2    A.   Okay.

3    Q.   And we had talked earlier about Susan Martin.   That

4    was your secretary, correct?

5    A.   Yes.

6    Q.   And it appears that she was asking for brochures

7    about Stanford.

8    A.   Yes.

9    Q.   And that somehow Julie Hodge was telling her that

10   they're going to provide the Eagle -- Stanford Eagle magazine

11   for her.

12   A.   Uh-huh.

13   Q.   Do you know whether or not those were being sent out

14   to members of the legislature?

15   A.   I --

16        MR. MADRID:  Objection, form.

17   A.   I don't have any idea.  This -- that's what this

18   says.  It's not unusual at all.  It's standard practice for

19   staffs to request information about companies that you

20   represent when you're going to go see the staffs.  They always

21   want --

22        MR. MADRID:  I think I heard your question being

23   the -- provided to the legislature?

24        MR. CASTILLO:  No.  Yeah, after --

25        MR. MADRID:  That's what you asked.

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 99

1           MR. CASTILLO:  Right.

2           MR. MADRID:  Because this -- this says the Cohen

3    Group.  I just want to make sure that this is the right

4    exhibit that you're --

5           MR. CASTILLO:  Yeah.  Well, no, at first it was

6    that Ms. Martin was asking for brochures --

7           MR. MADRID:  Right.

8           MR. CASTILLO:  -- from Julie Hodge.  And then

9    the next question was:  Did you ever send that to the

10   legislature?  I mean, it's not going to be any secret.

11          MR. MADRID:  I may have -- I may have misheard

12   you.

13          MR. CASTILLO:  And I might have misspoken.  I'm

14   just trying to get done within --

15          THE WITNESS:  Don't slow him down.

16          MR. CASTILLO:  Hurry me up.  Hurry me up.

17          THE WITNESS:  I mean, let's not -- look --

18          MR. CASTILLO:  Whether it was sent or it wasn't

19   sent --

20          THE WITNESS:  The Cohen -- the Cohen Group is --

21   is not the member.  I don't have any idea --

22          MR. CASTILLO:  We'll get to that later --

23          THE WITNESS:  Okay.  All right.  Go ahead.

24          MR. CASTILLO:  -- where the mailout was mailed.

25   I mean, there's no secret to that.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 100

1                    THE WITNESS:  Counselor, I apologize.

2                    MR. MADRID:  Forget the last few minutes.

3       Q.  (BY MR. CASTILLO) And I'm sorry to have to show you

4    some of these documents, because I'm trying to get some

5    timeframe and --

6       A.   I understand.

7       Q.   -- and I know it's been nine years ago.

8       A.   Yeah.

9                    (Exhibits 12 and 13 were previously marked)

10      Q.  (BY MR. CASTILLO) Let me show you Plaintiff's Exhibits

11   12 and 13.

12      A.   Okay.

13      Q.   Let me just substitute these for mine.  They're the

14   ones with the little yellow stickies.

15      A.   Okay.  Here you go.

16      Q.   Thank you, sir.

17      A.   I'm sorry.

18                    MR. MADRID:  Oh, this is the same thing, right?

19                    MR. CASTILLO:  Yes, sir.  Yes, sir.  It's

20   Exhibits 12 and 13 -- Plaintiff's Exhibits 12 and 13.

21      Q.  (BY MR. CASTILLO) Because I've looked for all -- at

22   all of the records of both your production and Stanford's

23   production to see when I could place Mr. Barnes in the Island

24   of Antigua.  And this is the first document where I see that

25   you're traveling to Antigua.

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 101

1     A.   Okay.

2     Q.   If you would have traveled before, would there be

3   some record of it?

4     A.   I don't know.

5     Q.   If you paid for your airfare you would have had

6   expenses?

7     A.   Remember that one of the bad things about our

8   representation of Stanford is that we didn't get expenses.

9   And, therefore, a lot of the money we paid were -- went to

10   expenses.

11     Q.   Yes, sir.  But internally you would have had to buy

12   an airplane ticket.

13     A.   Oh, yes.

14     Q.   Okay.  That's what I mean.  So we would be able to

15   see if you had been to Antigua before June 20 -- June of 2005,

16   right?

17              MR. MADRID:  If you know.

18     A.   I don't know.  I mean, yes, but -- have we produced

19   the records?  Do you have a ticket?  I don't know.

20     Q.   We don't.  This is the first --

21     A.   Okay.

22     Q.   -- indication I have other than that 2002 3.5 hours

23   of aircraft time on the Learjet.

24     A.   Okay.

25     Q.   I have nothing else that shows when you went to

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 102

1    Antigua other than this Plaintiff's Exhibit No. 12 and 13.

2       A.   Okay.

3       Q.   All right.  So it appears that -- from looking at

4    Plaintiff's Exhibit 12 and 13, that you were going and you

5    were going to pick up Jim Davis in Memphis and you were flying

6    together.

7       A.   Yes.

8       Q.   Do you see that?

9       A.   Yeah.

10      Q.   Do you recall that meeting?

11      A.   Very vaguely.  But, I mean, I recall the meeting down

12   there.  I don't really -- I don't really recall going by

13   Memphis, but I'm sure I did.  I just don't remember that part.

14      Q.   And then do you remember talking to Mr. Davis about

15   the operation?

16      A.   We're talking about one where -- we were talking

17   about the -- the tax laws of the U.S. Virgin Islands, I'm

18   sure.

19      Q.   Okay.  Because that's kind of the project you were

20   involved in?

21      A.   Yeah.

22      Q.   We started seeing that April of 2005.  You're trying

23   to get it done by the fall of 2005, correct?

24      A.   Yes, sir.

25      Q.   All right.

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 103

1            (Exhibit 15 was previously marked)

2        Q.   (BY MR. CASTILLO) Maybe this will help, Exhibit

3   No. 15.  And this appears to be the agenda for the June 2005

4   meeting.

5        A.   Okay.

6        Q.   Does this refresh your memory at all of whether this

7   was the very first visit that you've been -- that you went to

8   the Stanford property in Antigua in June of 2005?

9        A.   It really doesn't.  I know -- obviously, seeing this

10  makes me remember part of this trip right here.  But I don't

11  -- I don't remember whether this was my first trip or not.

12       Q.   Okay.  And this trip, was it in connection with the

13  tax initiative?

14       A.   Yes.

15       Q.   All right.  And by June 29th and 30th you had already

16  paid -- you had already earned and been paid a million

17  dollars, correct?

18       A.   Yes.

19       Q.   Did you ever change the agreement with Mr. Stanford

20  from a flat fee to an incentive payment?

21       A.   No.  Not to my memory, no.

22       Q.   Never -- you never had any discussions with Yolanda

23  Suarez about that?

24       A.   We may have had a discussion about this.  You know,

25  as I testified to you earlier, Mr. Stanford is kind of slow

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Page 104

1    pay.  It was -- I'm sure -- I don't -- I don't really know

2    whether I had a conversation or not about it.  But, you know,

3    he was not above about -- fussing about fees.

4         Q.   Okay.  My question was:  Do you remember having any

5    discussion with Yolanda Suarez about an incentive fee?

6         A.   No.  No, I don't.  I may have, but I don't know.

7         Q.   And I know you characterize Mr. Stanford as slow pay.

8    But we can look at Exhibit 111, the date of the invoices and

9    the day that you got -- the day you received payment, couldn't

10   we?

11        A.   Well, that's -- yes, you can look at that.  But it's

12   -- that -- those million dollars had been earned probably for

13   a long -- I mean, that was probably part of being earned for a

14   year, two years.  I mean, it hadn't been anything paid.  So,

15   you know --

16        Q.   The June 2005 million dollars, you had already earned

17   that before you even --

18        A.   Yes.

19        Q.   -- did any of this work going forward on the tax

20   incentive, right?

21        A.   On the tax incentive, yes.

22        Q.   And we should be able to see some work there to be

23   able to determine whether you gave any value to Stanford in

24   exchange for that.

25                   MR. MADRID:  Objection, form.

Page 105

1     Q.   (BY MR. CASTILLO) Right?

2          A.   I know there was value.  I don't know whether you've

3     got anything that shows that.  But it's -- it's going back to

4     the -- it goes back to the memorandum that Mr. Caperton

5     prepared and gave y'all some time ago, outlining the scope of

6     our work.

7          Q.   You talked about a white paper.

8                    (Off-the-record discussion)

9                    (Exhibit 24 was previously marked)

10         Q.   (BY MR. CASTILLO) First let me show you Exhibit

11    No. 24.  Is Plaintiff's Exhibit No. 24 what you call a white

12    paper?

13         A.   Yes, it is.

14         Q.   And this is a culmination of all of the efforts that

15    you're making to be able to introduce this rationale for the

16    change in the tax law, correct?

17         A.   Yes.

18         Q.   And who is this shared with?

19         A.   It's shared probably with all interested parties in

20    the legislation.  Probably shared with members of Congress --

21    I mean their staff.  Primarily their staffs.

22         Q.   And who distributes it to them?

23         A.   The various and sundry people that were working on

24    this:  The law firm for -- for U.S. Virgin Islands, the

25    Stanford's law firm, our team that had been assembled by our

Page 106

1    firm.

2        Q.    Okay.  And who actually writes the language of the

3    proposed statute?

4                MR. MADRID:  Objection, form.

5        A.    The staff of the Ways and Means and Finance

6    Committee.

7        Q.    Any input from your group?

8        A.    Yes.

9        Q.    Do you give them a draft?

10       A.    In some cases they will accept a draft.  In other

11   cases they won't.  They want you to talk while they're

12   drafting.

13       Q.    Do you remember what happened in this case?

14       A.    No, I don't.

15       Q.    Then once you introduce it to the Senate and the

16   House, what efforts do you make to see if they're on board and

17   they will support it?

18       A.    You work the committee and the committee staff people

19   and then you attempt to count votes.  When you get an author

20   and someone that's willing to -- to bring it up in committee,

21   get it on the calendar to be considered, then you start trying

22   to count votes.

23       Q.    My only familiarity with that whole process is what

24   I've seen on House of Cards.  Have you seen that episode of

25   House of Cards?

Page 107

1          MR. MADRID:  Objection, form.

2     A.   No, I -- I've haven't.  I've not seen House of Cards.

3     Q.   You haven't?  Okay.  Well, it seems to me that what

4  you're doing is you're -- you're contacting people behind the

5  scenes to see if they're supportive of your measure, correct?

6     A.   If that's what -- I'm sure if it's -- if it's on

7  House of Cards, it's correct.

8     Q.   It's got to be.  No, I'm asking you --

9     A.   Because they wouldn't put anything --

10    Q.   -- from your experience.  Isn't that what happens?

11    A.   Do you contact people behind the scenes?  Well, yeah,

12 you do.  Talking to a member of the legislature is a private

13 adventure.  Normally, you want -- you want to talk to the

14 legislator or his single staff person and you want to do it in

15 the privacy of their offices.

16    Q.   And you want to do it in person, as opposed to --

17    A.   Yes.

18    Q.   -- email?

19    A.   Yes.  Right.

20    Q.   Who are the people that your -- your group was

21 contacting?  Was Charlie Rangel one?

22    A.   Charlie Rangel, yes, sir.

23    Q.   "Rangel".  I'm sorry.

24    A.   Yes.  Sorry.

25    Q.   From the State of New York?

Page 108

1     A.    New York. Harlem, New York City.

2     Q.    And what was his interest in the U.S. Virgin Islands?

3     A.    He had a big interest in it a long time before I

4  was -- had any interest in it. He was -- I think he was a --

5  had been a long-time member of the Black Caucus, a long-time

6  member of the Caribbean Caucus. He had been to the Caribbean

7  many times and has -- and at one time was Chairman of the

8  Caribbean Caucus.

9     Q.    Okay. Was --

10    A.    Maybe at that time.

11    Q.    Was he on board with the --

12    A.    Yes, he was.

13    Q.    -- proposed changes?

14    A.    Uh-huh.

15    Q.    And do you have to do anything so that you can

16 convince him to be on board or was he on right away?

17    A.    I think he was on board with the improving economic

18 development in the Caribbean and for this legislation or

19 similar legislation a long time before I ever got interested

20 in this.

21    Q.    Did -- did he ask for campaign contributions for any

22 other members that were running? House of Representatives or

23 Senators?

24          MR. MADRID: Objection, form.

25    A.    I don't know. I've met very few -- with great due

Page 109

1    respect to elected officials, I've met very few elected

2    officials that didn't ask for campaign contributions.

3        Q.   Did you, in turn, ask Mr. Stanford to contribute to

4    candidates of Mr. Rangel's choice?

5                    MR. MADRID:  Objection, form.

6        A.   As with all of our clients, I ask them to make

7    contributions to political candidates and to Members of the

8    House and Senate.  It's part of our doing business in

9    Washington that we have to give money to people when they run

10   for office.  It's a never-ending process of raising money for

11   people that -- Members of the House have to run every two

12   years.  They have to raise money continually.

13                    (Exhibit 110 was previously marked)

14       Q.   (BY MR. CASTILLO) Now if you look at Plaintiff's

15   Exhibit No. 24, this white paper, there was another version

16   that was later in the fall, Plaintiff's Exhibit 110.

17       A.   Uh-huh.  Do you want me to read this?

18       Q.   No, sir.  Just note the cover page.  It's the same.

19   It's a white paper, probably a different version, right?

20                    MR. MADRID:  Well, look it through so you can

21   answer that question, please.

22       A.   (Witness complies.)  There's some -- it takes some

23   time to go through words.  It looks like there's some

24   difference in places -- placement of paragraphs and maybe a

25   difference in content.

APP. 199

Page 110

1      Q.    Right.

2      A.    I'd be happy to take the time, if you want me to.

3      Q.    I think anybody on the jury can compare them and make

4   the determination that they're different.

5      A.    Okay.  Thank you.

6      Q.    They're different versions, at least.

7      A.    Okay.

8      Q.    Has anybody ever asked you to look at this white

9   paper to see what benefit this tax law change would have for

10  Stanford Financial?

11     A.    I don't recall anyone asking me to look at it.  I

12  looked at it.

13     Q.    But not with that in mind?

14     A.    No.

15     Q.    Okay.  And that's true as of today?

16     A.    Yes.

17     Q.    You couldn't -- you'd have to read it to tell me if

18  there was some --

19     A.    I'd have to read it.  Yes, I would have to.

20     Q.    Okay.  And I guess anybody that could read it could

21  make that determination?

22     A.    Well, it may take me longer than most people, but I

23  could probably do it.

24     Q.    All right.  What happened to that proposed change?

25     A.    It -- they didn't move a tax bill that fall, if I

APP. 200

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 111

1    recall right. And then we set about to try to get Treasury,

2    through their regulatory and rulemaking authority, to broaden

3    the regulations regarding USVI with anticipation of being able

4    to go back into Congress in 2006 or 2007 and make the changes.

5        Q.    Were there efforts done in 2006?

6        A.    I'm sure there was.

7        Q.    By the Ben Barnes Group?

8        A.    I'm sure there was. I don't recall. I'd have to go

9    back and find out. But we continued -- we continued to

10   represent Stanford during that time, so I'm sure we were

11   working on it.

12       Q.    On the tax issue?

13       A.    Yes.

14       Q.    Okay. And so if you look at -- going back to

15   Plaintiff's 111. So we're going to try to put the work that

16   you did from June 2005 through the end of this white paper,

17   November 2005, to see if you got paid for that work.

18       A.    Yes.

19       Q.    Look at Plaintiff's Exhibit 111.

20       A.    (Witness complies.) Okay. I have it now, sir.

21       Q.    Did you bill Stanford Financial for the work that you

22   did from June 2005 through December 2005?

23       A.    Yes.

24       Q.    And that -- you got paid $500,000 on December 2005,

25   correct?

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 112

1      A.    Yes.

2      Q.    Would that have brought you whole up until that

3   point?

4      A.    I assume so.  I'd have to -- it would be more.

5      Q.    Well, that's why we asked you for all of the invoices

6   and all of your payments.  And this appears to be the

7   compilation.  Any other invoices that you thought were still

8   outstanding as of December 2005?

9      A.    I'd have to talk to my bookkeeper and find out.  But

10  this seems about -- that would be $50,000 a month.  That would

11  be about -- yeah, I assume that's correct.

12     Q.    All right.  So let's look at what the arrangement

13  was.  Because if you look at some of the invoices -- for

14  instance, let's look at the Invoice No. 844.

15                MR. MADRID:  Do you see a page number?

16                MR. CASTILLO:  I don't see a Bates number.

17                MR. MADRID:  There's a number at the bottom.  Is

18  it -- botton right-hand corner.

19                MR. CASTILLO:  Right in the center: 1059 --

20  10591.

21                MR. MADRID:  Thank you.

22                MR. CASTILLO:  Right here, sir.  These little

23  numbers: 10591.

24                MR. MADRID:  10591.

25     A.    Okay.

Page 113

1    Q.   Is it -- if you'll look at the Invoice 844 on

2    Plaintiff's Exhibit 111, it's a retainer for the month of

3    October:  $265,000.

4        A.   Okay.

5        Q.   How much of that was for Ben Barnes Group as opposed

6    to some of the people that were doing some work for you?

7        A.   I'd have to go back and look at the breakdown of what

8    everyone was getting.  I can't recall that off the top of my

9    head.

10       Q.   Okay.

11       A.   There were a lot of different firms getting paid out

12   of that.

13                (Exhibit 83 was previously marked)

14       Q.   (BY MR. CASTILLO) Let me show you Plaintiff's Exhibit

15   No. 83.  Maybe this will help you.

16       A.   Okay.

17       Q.   Because it appears that out of the $265,000, $55,000

18   was going to people outside of Ben Barnes Group.

19       A.   Well, in this particular month that's what this says.

20   That's just this one month, though.

21       Q.   So this doesn't help you with how much you were

22   paying Scott Reed, Jim Sharp?

23       A.   Well, I'd have to -- I'd have to know -- look at --

24   look at this whole payment period globally to try to see who

25   got paid what.  And it seems to me like that Mitch Delk was

APP. 203

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 114

1    getting paid more than this $25,000.  I think he was -- I just

2    remember vaguely that I thought he was getting paid $50,000 at

3    some time.  I mean, I -- but I don't know.  I don't know.

4              This -- this doesn't help me any.  It helps me

5    on this particular month.  This obviously happened that month.

6    I don't understand why Jim Sharp and -- or I really don't

7    understand why Scott Reed was --

8              MR. MADRID:  You've answered -- you've answered

9    his question.

10             THE WITNESS:  Okay.  Thank you.  Sorry.

11       Q.   (BY MR. CASTILLO) So you don't know how much was to

12   Ben Barnes Group versus how much was to the others of the

13   $265,000 per month?

14       A.   Well, I know about this month right here, based on

15   this piece of paper.

16       Q.   Well, go back to Plaintiff's Exhibit 111.  Have that

17   in front of you.

18       A.   (Witness complies.)  Okay.

19       Q.   For instance, in February of '06 you got a $500,000

20   retainer.  Can you tell us how much Ben Barnes Group got

21   versus any other people that were doing work?

22       A.   No, I can't.  I let -- I do it -- we'd have to go

23   look at the records.  And -- I'd just have to see the paper.

24       Q.   Okay.  So we should be able to see either a payment

25   out or a separate invoice from those subs that you included in

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 115

1    the $265,00?

2         A.    Yeah, I don't know whether we got separate invoices.

3    I don't know whether we got invoices -- we may or may not

4    have -- or whether we just paid them.  I don't -- I don't

5    know.  That's my bookkeeping department.

6              MR. CASTILLO:  Okay.  Why don't we take about

7    five minutes.  I'm going to probably -- I'm going to regroup

8    and probably be done in 30 minutes.

9              THE WITNESS:  Okay.

10             THE VIDEOGRAPHER:  Off the record at

11   approximately 1:24 p.m.

12             (Recess)

13             (Exhibit 116 was previously marked)

14             THE VIDEOGRAPHER:  This is the beginning of Tape

15   Four.  We're back on the record at approximately 1:37 p.m.

16        Q.    (BY MR. CASTILLO) Mr. Barnes, just a couple of more

17   areas that I want to talk to you about.

18             I'm showing you Plaintiff's Exhibit No. 116.

19   And this was provided to us in discovery.  And this appears to

20   be a listing of all of the invoices and payments received by

21   the Ben Barnes Group in 2008 through 2009.

22             And you see where in 2008 there was a lot of

23   $55,000 entries?

24        A.    Uh-huh.

25        Q.    Do you know if that was payment for the other team

Page 116

1    members besides the Ben Barnes Group?

2        A.    I don't know.

3        Q.    And you see the last payment that's listed on

4    Plaintiff's Exhibit 116 in the amount of $110,000?  This was

5    right before the SEC filed the lawsuit against some of the

6    Stanford folks.  Are you aware of that?

7        A.    I'm not aware of the date they filed it, but I'll

8    take your word for it.

9        Q.    Okay.  In fact, you were the person that revealed

10   that Mr. Stanford actually had been served with a copy of the

11   lawsuit, weren't you?

12       A.    Revealed to whom?

13       Q.    To the public.

14       A.    I don't know.  If you say so.  I don't know.  It's --

15   I don't know.

16       Q.    Okay.  Were you in contact with Mr. Stanford during

17   the last four months before the SEC took over?

18       A.    Mr. Stanford came to my office in the last few days

19   of the -- before the SEC -- or when the SEC was taking over.

20       Q.    Okay.  And you were trying to arrange legal

21   representation for him?

22             MR. MADRID:  Objection, form.

23       A.    Yes.

24       Q.    Okay.  In fact, you had lawyers send engagement

25   letters so that you could present to Mr. Stanford?

APP. 206

Page 117

1      A.    Probably so.

2      Q.    Any of that $110,000 payment that you got -- that the

3   Ben Barnes Group got paid on February 11, 2009, what was that

4   for?

5      A.    Well, I'm sure it -- it looks to me like he was

6   several months behind and that was a -- that was a catching up

7   on some of the months that he was behind.

8      Q.    We could actually look at your last invoice to figure

9   out what the last work you did, right?

10     A.    Well, the invoice could have been for past due

11  services.  The last invoice is -- is January 2009, $55,000.

12  It got -- and it got paid, yeah.

13     Q.    And you were also doing work for these -- in

14  connection with the Synergies -- Synergies -- Energy Service

15  Project?

16     A.    Yes, but that -- that money went to them.  That --

17  that didn't go to me.

18     Q.    Okay.

19     A.    It got paid through me, but that's all.

20     Q.    And was that -- what was Stanford doing in connection

21  with that?

22     A.    That was a wind energy project that he was trying to

23  do in the Caribbean and Antigua or U.S. Virgin Islands.  I

24  mean, they're in the wind business.  I had -- I had really

25  very little to do with that.  I don't really know what all

Page 118

1    they were doing.

2        Q.    On the United States Virgin Islands tax project,

3    whose idea was that?

4        A.    Oh, I have no idea.

5        Q.    Was it a Stanford idea?

6        A.    For him to hire -- for Stanford to hire us, I'm sure

7    that was his idea.  But the changes in the U.S. tax law in the

8    U.S. Virgin Islands, I'm sure that was not his idea.  That

9    was -- that was an idea that had been going on for -- for

10   maybe 15 or 20 years.

11       Q.    But your efforts were being paid by Allen Stanford?

12       A.    That's true.

13             (Exhibit 75 was previously marked)

14       Q.    (BY MR. CASTILLO) Let me show you Plaintiff's

15   Exhibit 75.  Have you ever seen this before?

16             MR. MADRID:  Take your time to read it, please.

17             THE WITNESS:  Okay.

18       Q.    (BY MR. CASTILLO) You note in the Footnote No. 1 --

19   this is an attorney/client memo from the Chamberlain, Hrdlicka

20   firm to Mr. Davis.  And at Footnote No. 1 it says, "As noted

21   by Mr. Barnes, the amendment will be introduced as being for

22   the benefit of the Virgin Islands."

23       A.    Okay.

24       Q.    Do you know where they got that from?

25       A.    Probably --

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 119

1              MR. MADRID:   If you know.   If you know.

2     A.    I really don't know.

3     Q.    So do you deny that you never noted that?

4              MR. MADRID:   Objection, form.

5     A.    Working on the U.S. Virgin Islands tax changes, the

6     legislation was always being introduced as being for the

7     benefit of the Virgin Islands.

8     Q.    Okay.  Never for the benefit of Stanford Financial?

9     A.    That's right.

10    Q.    Okay.  It wasn't a Stanford idea?

11    A.    No.

12              (Exhibit 101 was previously marked)

13    Q.    (BY MR. CASTILLO) In fact, let me show you Plaintiff's

14    Exhibit No. 101.  This is after the SEC takes over Stanford.

15    And apparently you're in the spotlight again and you're being

16    quoted by the Austin Chronicle -- or the Houston Chronicle.

17    A.    Okay.

18    Q.    Do you see the second page where it says "Tax work"

19    on the right-hand column, second paragraph?

20    A.    Yeah.

21    Q.    Do you agree with that statement?

22    A.    Yes, I do.

23    Q.    Okay.

24    A.    I agree with Bob Lanier's statement, too.

25    Q.    Well, it's probably unanimous.

Page 120

1              (Exhibit 76 and 103 were previously marked)

2      Q.   (BY MR. CASTILLO) And let me show you 76, 103 and 83.

3   It's going to be the last area.

4              MR. CASTILLO:   You're short one, right?  Did I

5   give them to you?

6              MR. MADRID:   I have two.  I'll look -- I'll look

7   at his.

8              Just hand it when you finish.  I just want to

9   see them.

10             MR. CASTILLO:   Here you go.

11             MR. MADRID:   Oh, thanks.

12     Q.   (BY MR. CASTILLO) It appears that in January of 2008

13  there's some discussion between Yolanda Suarez and

14  Mr. Stanford concerning your fee.

15     A.   Uh-huh.

16     Q.   Did Mr. Stanford ever complain to you about your fee?

17     A.   I don't remember if he did.

18     Q.   Did he ever think that you -- he wasn't getting his

19  money's worth?

20     A.   He probably thought that about -- every day about

21  everybody he did business with.

22     Q.   Did he tell you that he wasn't getting his money's

23  worth?

24     A.   No, I don't remember that he did.

25     Q.   Did he ever tell you that he never thought that you

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 121

1    were going to have any success with the proposed tax changes?

2        A.   No.

3        Q.   The residency requirement, you'll never be able to

4    meet it?

5        A.   Well, he was -- moved to the Virgin Islands, bought a

6    house, landed the plane there every other day to try to make

7    sure he met the residency requirements.  I don't think he

8    would have been going to all that effort and everything if

9    thought that it was not possible to do it.

10       Q.   So he would spend -- get there at ten minutes before

11   midnight and spend ten minutes after midnight and get two

12   days' credit, wouldn't he?

13       A.   That's what you said.

14       Q.   Isn't that what Mr. Delk said?

15       A.   I wouldn't be surprised.

16       Q.   All right.  And so some discussion about negotiating

17   a success fee -- you have no recollection about having a

18   discussion with Yolanda Suarez about a success fee?

19       A.   I may have had a discussion with her.  I don't

20   remember any real serious discussion where we sat down and

21   said, "We're going do this for this."  It could have happened.

22   I don't know.  I mean, I just don't remember it.

23       Q.   And why would you be hesitant in doing it as a

24   success fee --

25                   MR. MADRID:  Objection, form.

APP. 211

Page 122

1      Q.    -- as opposed to a retainer or flat payment?

2                  MR. MADRID:  Objection, form.

3      A.    The -- you can't -- the payroll of firms come due and

4   expenses come due and things.  You can have a very

5   unsuccessful and a lot of cold winters if you do things just

6   based on success fees and contingent fees unless you're a very

7   high-powered trial lawyer, like some represented in this room,

8   that have gotten big contingency fees.  I've never been able

9   to do that.  So that's -- that's the reason I've had to get

10  paid by the month.

11     Q.    Who puts gas in the Volkswagen in the interim?

12     A.    Yeah.

13     Q.    Right?

14     A.    That's right.

15     Q.    Okay.  So you never had a discussion about having a

16  success fee?

17     A.    Not -- not really a serious discussion.

18     Q.    And the reasons that you just articulated to the jury

19  on why you wouldn't enter --

20     A.    Yes.

21     Q.    -- into a success fee in this case --

22     A.    Yes.

23     Q.    -- is because -- was it a long shot?

24                 MR. MADRID:  Objection, form.

25     A.    Anytime you're talking about the tax code, it's

APP. 212

Page 123

1    difficult.  With the constituency of the U.S. Virgin Islands

2    and with the United States spending so much money on the U.S.

3    Virgin Islands, this proposal had better odds than most

4    because there was a -- there was a constituency other than a

5    few businesses.  It was the people of the Virgin Islands and

6    the government of the Virgin Islands --

7         Q.   Okay.

8         A.   -- that were dependents of the United States

9    government.

10        Q.   Did you ever know what the net worth of Stanford

11   Financial was?

12        A.   Not really.

13        Q.   Any idea?

14        A.   Not right now.  I'm sure I looked at his statements,

15   but I never did do a financial analysis of Stanford.  And I --

16   we've discussed the reasons that I thought there was strength

17   and vitality and substance there.

18        Q.   Okay.  And I'm sorry to belabor, but I'm just asking:

19   Did you ever find out what the net worth of Stanford Financial

20   was?

21        A.   No.

22        Q.   Did you ever compare the financial -- the net worth

23   of Stanford Financial before you received the million dollar

24   payment and after you received the million dollar payment to

25   see if it changed?

APP. 213

Case No.  3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 124

1    A.    No, nor did I do that on other companies that paid me

2    large consulting fees.

3    Q.    I mean, I just need to get a --

4          MR. CASTILLO:  I'm going to object to the

5    responsiveness of the answer.

6    Q.    (BY MR. CASTILLO) I just need an answer.  Did you ever

7    compare the net worth of Stanford Financial before you got

8    paid a million dollars and after you got paid a million

9    dollars?

10   A.    No, I did not.

11   Q.    All right.  I --

12         MR. MADRID:  You've answered.

13         THE WITNESS:  Okay.

14   Q.    (BY MR. CASTILLO) And did you ever compare the net

15   worth of Stanford Financial in December 2005, when you got

16   paid $500,000, versus the net worth of Stanford Financial

17   after you got the $500,000?

18   A.    No, I did not.

19   Q.    Don't know whether it increased or decreased, do you?

20         MR. MADRID:  Objection, form.

21   A.    No.

22   Q.    Would the same be true of every other payment that

23   you received?  You wouldn't know the financial net worth of

24   Stanford Financial before or after?

25   A.    It would be true on Stanford Financial and all other

.Page 125

1    clients that I'm paid by.

2                MR. CASTILLO:  Thank you, sir.  Those are all

3    the questions that I have today.  We'll reserve the rest of

4    them until the time of trial.

5                MR. MADRID:  Thank you.  I have about two hours.

6    I'll reserve.

7                THE VIDEOGRAPHER:  This marks the end of the

8    deposition.

9                MR. MADRID:  We'll reserve our questions to the

10   time of trial.

11               THE VIDEOGRAPHER:  The time is 1:50.

12               (Proceedings concluded at 1:50 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Case No. 3:10-cv-0527-N-BG
Oral Videotaped Deposition of Benny Frank Barnes

Page 126

1                    CHANGES AND SIGNATURE

2               DEPOSITION OF BENNY FRANK BARNES

3    PAGE LINE   CHANGE                    REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13       I, BENNY FRANK BARNES, have read the foregoing deposition

14   and hereby affix my signature that same is true and correct,

15   except as noted above.

16

17                         _____
                           BENNY FRANK BARNES

18   THE STATE OF _____)
     COUNTY OF _____)
19
         Before me, _____, on this day
20   personally appeared BENNY FRANK BARNES, and proved to me,
     through identification card or other document, to be the
21   person whose name is subscribed to the foregoing instrument
     and acknowledged to me that he/she executed the same for the
22   purpose and consideration therein expressed.
         Given under my hand and seal of office on this _____ day
23   of _____, 2014.

24                         _____
                           NOTARY PUBLIC IN AND FOR
25                         THE STATE OF _____

Lindi S. Roberts & Associates
(830)228-4634/(830)609-0266

APP. 216

Page 127

1          F E D E R A L   C E R T I F I C A T E

2     STATE OF TEXAS  )

3     COUNTY OF COMAL )

4          I, LINDI S. ROBERTS, Certified Shorthand Reporter, in and

5     for the State of Texas, do hereby certify that this deposition

6     transcript is a true record of the testimony given by the

7     witness named herein, after said witness was duly sworn or

8     affirmed by me.

9          I further certify that I am neither attorney nor counsel

10    for, related to, nor employed by any of the parties to the

11    action in which this testimony was taken.  Further, I am not a

12    relative or employee of any attorney of record in this cause,

13    nor do I have a financial interest in the action.

14         I further certify that the total cost for the preparation

15    of this Reporter's Record is $_____ and was/will be

16    paid by attorney for the Plaintiff, the Official Stanford

17    Investors Committee.

18         WITNESS MY OFFICIAL HAND on this, the _____ day of

19    _____, 2014.

20

21
                          _____
22                        LINDI S. ROBERTS, CSR
                          Texas CSR 2410
                          Lindi S. Roberts & Associates
23                        Firm Registration No. 558
                          P.O. Box 311905
24                        New Braunfels, Texas  78131-1905
                          Expiration:  12/31/15
25

APP. 217