# America's Third Border

## *Protecting National Security*
## *By Promoting Private Investment in the Caribbean*



Prepared for the Stanford Washington Research Group
September 26, 2005



**Exhibit B-3**

# America's Third Border
### *Protecting National Security by Promoting Private Investment in the Caribbean*

<u>Executive Summary</u>

Because of the Caribbean region's geographic proximity to the United States, its political and economic stability is essential for our national security. The area could serve as a launching pad for alien smuggling, drug trafficking, and terrorist activity. In the aftermath of the September 11, 2001 attacks, the United States has taken measures to strengthen our "first border" with Canada and "second border" with Mexico. Less attention has been focused on the region President Bush has called America's "third border" with the nations of the Caribbean.

Most Caribbean countries, historically, have shared our democratic values and had strong ties to the United States. Collectively, the 24 nations benefiting from the Caribbean Basin Initiative -- a U.S. program of trade preferences designed to promote investment and economic development in the Caribbean and Central America -- were America's 8th largest export destination and 12th largest source of imports in 2004. The United States has been a significant source of private foreign investment in the region and also provides a limited amount of direct government aid.

Caribbean Basin countries have performed reasonably well based on a number of economic measures, though some have fared much better than others. Moreover, a myriad of challenges threatens the region's future prosperity, including diminished productivity growth, soaring public debt, extensive poverty, youth unemployment, increasing crime and drug trade, and exposure to hurricanes and other natural disasters. Already there is evidence that performance is slowing down.

Unfriendly governments are seeking to exploit these vulnerabilities. Venezuela's President Hugo Chávez buys influence with subsidized oil sales and, in collaboration with Cuban leader Fidel Castro, promotes a "Bolivarian Alternative" to U.S. regional trade initiatives. China is significantly increasing its presence in the region, targeting nations that do not recognize Taiwan.

As the United States attempts to foster robust democracies around the world, we also should take action to strengthen our allies in our backyard. While providing direct aid could be prohibitive, strong precedents exist for providing incentives to generate greater U.S. private investment in the region. In particular, the tax incentives provided for investments in the U.S. Virgin Islands by USVI companies have resulted in significant investment in the territory. Extending similar incentives to investments by USVI companies in other Caribbean nations would bolster economic growth and democracy in the region -- and reduce security risks to the United States -- in the years ahead.

[APG]

The law enforcement capabilities of Caribbean nations are strained by sophisticated threats to their security. Crime and violence have increased across the region, and drug trafficking is a significant concern. President Bush designated the Bahamas, Dominican Republic, Haiti, and Jamaica as major drug producing or transit countries in September 2004.[4]

Even before the terrorist attacks on the United States, the Administration announced a "Third Border Initiative," highlighting the threat that illegal drug trafficking, migrant smuggling, and financial crime pose to U.S. and regional security interests. Part of the funding was targeted for law enforcement cooperation, such as anti-money laundering, professional development of police and prosecutors, and anti-corruption training and assistance throughout the Caribbean.[5]

The nearby Panama Canal links the Atlantic and Pacific oceans. The Canal is considered a major "choke point" for oil tankers and other commercial vessels, where traffic converges and could be halted. The ability to cross it safely is a critical link in global trading, especially for the United States, which is the dominant country of origin for products transiting the Panama Canal, and the largest destination as well.[6]

In Our National Interest

A Caribbean region that remains economically strong and improves law enforcement will support multiple U.S. policy objectives. In addition to helping to combat potential terrorist threats, it will support our policies to "promote a more secure, stable region, generate expanded markets for U.S. goods and services, ensure safe and secure destinations for U.S. tourists and investments, ensure respect for the rule of law, retard the transmission of HIV/AIDS, and strengthen respect for democratic values."[7]

---

[4] "Caribbean Region: Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.

[5] The White House, Fact Sheet: Caribbean Third Border Initiative, April 21, 2001, www.whitehouse.gov/news/releases/2001/04/20010423-5.html.

[6] World Oil Transit Chokepoints, Energy Information Administration, April 2004, www.eia.doe.gov/emeu/cabs/choke.html.

[7] Fiscal Year 2006 Budget Request for the Eastern Caribbean countries of Antigua and Barbuda, Barbados, Dominica, Grenada, St. Kitts and Nevis, St. Lucia, and St. Vincent and the Grenadines, www.fas.org/asmp/profiles/aid/fy2006/CBJWHemisphere.pdf.

[APG]

products, such as apparel and electrical and non-electrical machinery.[11] Aided by CBI preferences, U.S. imports from 15 independent Caribbean nations (excluding Cuba) totaled more than $12 billion in 2004.[12]

The CBI has proven to have important benefits for the United States as well as the beneficiary countries. U.S. exports to the Caribbean totaled more than $10 billion in 2004, concentrated in four countries.[13] Counting all 24 CBI beneficiaries, including Central American countries, U.S. exports totaled $24.5 billion, making them collectively America's eighth largest export market – a little smaller than South Korea.[14]

U.S. engagement with the Caribbean region through the CBI offers an important opportunity to foster the region's active participation in the Free Trade Area of the Americas (FTAA).[15] U.S. policy aims eventually to construct a network of reciprocal free trade relations among all 34 democracies in the Western Hemisphere. The most generous CBI benefits will expire in September 2008 for countries that have not established reciprocal trade agreements with the United States.[16] Though they may have varying interests, all Caribbean nations with the exception of Cuba are participating in FTAA negotiations.[17] In addition, last year the Dominican Republic signed the Central American Free Trade Agreement (CAFTA) with the United States, Costa Rica, El Salvador, Guatemala, Honduras, and Nicaragua.

As the United States has entered into other trade agreements, such as with Andean and African nations, the value of CBI trade preferences has eroded. The loss of trade preferences for key crops such as bananas and sugar has also contributed to decreased economic growth throughout the eastern Caribbean region.[18] Relative benefits to CBI countries are expected to erode further as investors and businesses relocate to Central America to take advantage of CAFTA.

---

[11] Fifth Report to Congress on the Operation of the Caribbean Basin Economic Recovery Act, Office of the United States Trade Representative, December 31, 2003, www.ustr.gov/assets/Trade_Development/Preference_Programs/CBI/asset_upload_file160_7711.pdf.
[12] "Caribbean Region: Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.
[13] The Dominican Republic, Trinidad and Tobago, Jamaica, and the Bahamas accounted for 80 percent of U.S. exports to Caribbean nations. "Caribbean Region: Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.
[14] U.S. International Trade Commission, Interactive Tariff and Trade DataWeb, July 2005, http://dataweb.usitc.gov.
[15] The 34 democratically elected leaders in the Western Hemisphere committed to the FTAA in December 1994 at the first Summit of the Americas. In 2003, Ministers agreed on a new framework for the FTAA that calls for the creation of a "common set of rights and obligations" applicable to all countries and allows countries to pursue additional commitments through agreements under the umbrella of the FTAA. Free Trade Area of the Americas, Office of NAFTA and Inter-American Affairs, www.mac.doc.gov/ftaa2005/index.html.
[16] Caribbean Basin Initiative, Office of the United States Trade Representative, www.ustr.gov/Trade_Development/Preference_Programs/CBI/Section_Index.html.
[17] "Caribbean Region: Issues in U.S. Relations," Congressional Research Service Report for Congress, May 25, 2005, www.fas.org/sgp/crs/row/RL32160.pdf.
[18] U.S. Agency for International Development, Fiscal Year 2006 Budget Summary, Complete U.S. AID/Caribbean Regional Program, www.usaid.gov/policy/budget/cbj2006/lac/pdf/crp_complete05.pdf.

[APG]

> *"The Caribbean is at a development crossroads. Decades of reliance*
> *on traditional markets, and on trade preferences, have given way to a*
> *new reality, where traditional agriculture plays a much smaller role*
> *in most economies, and where a much harsher and more competitive*
> *international wind blows. In such an environment,*
> *business as usual will no longer suffice."*
>
> "A Time To Choose"
> 2005 World Bank Report

### 3. Caribbean economies have performed reasonably well, but slower growth and other challenges threaten their future performance.

Caribbean Basin countries have performed reasonably well on a number of economic measures, though some have fared much better than others. The region was hard hit in the wake of the September 11 attacks because of its dependence on tourism. It has since rebounded, but a myriad of challenges threatens the region's future prosperity. Already there is evidence that economic performance is slowing down.

#### Caribbean Economies Have Performed Reasonably Well

Overall, macroeconomic performance in the region has been comparable or better than the rest of the emerging market world.[22] As has been the case in many emerging economies, inflation has fallen from previous high levels. Inflation averaged 16 percent from 1990 to 1997; it fell to 6.5 percent from 1998 to 2003.[23]

Nevertheless, the standard of living in these nations is not high. In 2002, nearly 36 percent of the population in Latin America and the Caribbean lived below the poverty line -- the same portion as a decade before.[24] The extent of poverty varies significantly, from 12 percent of the population in Antigua & Barbuda to 80 percent in Haiti (see Appendix 1). This compares to a 12 percent poverty rate in the United States in 2004.[25] The Caribbean region's out-migration rate of college-educated people is among the

---

[22] The Caribbean economies have recently been analyzed extensively. See "A Time to Choose: Caribbean Development in the 21st Century, World Bank, April 26, 2005,
http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff
524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf, and "Stabilization, Debt, and Fiscal Policy in the Caribbean," Ratna Sahay, International Monetary Fund, February 2005,
www.imf.org/external/pubs/ft/wp/2005/wp0526.pdf.
[23] "Stabilization, Debt, and Fiscal Policy in the Caribbean," Ratna Sahay, International Monetary Fund, February 2005, www.imf.org/external/pubs/ft/wp/2005/wp0526.pdf.
[24] Danny M. Leipziger, "The Unfinished Poverty Agenda: Why Latin America and the Caribbean Lag Behind," *Finance and Development*, International Monetary Fund, March 2001,
http://www.imf.org/external/pubs/ft/fandd/2001/03/.
[25] "The World Factbook," Central Intelligence Agency, 2005,
www.cia.gov/cia/publications/factbook/geos/us.html.

[APG]

poor and stayed poor. Haiti's per capita GDP of less than $2 a day is below the generally accepted definition of poverty around the world.

Economic Growth Is Slowing

Economic growth is essential to alleviate poverty and address issues such as out-migration. While the region's past growth has been reasonable, it is slowing. For example, tourism, a key driver of past performance, has declined as the Caribbean faces increasing competition from new markets in Cuba and Central America. More broadly, per capita GDP growth in the region slowed from a peak of 3.9 percent per year in the 1970s to 1.9 percent in the 1990s. The World Bank projects that growth in per capita GDP will average 2 percent per year from 2001 to 2010.[29]

The most important element in the slowing of economic growth has been the slowing of productivity growth. Labor productivity (output per worker) has been mediocre, growing at about 1 percent per year. Total factor productivity, a measure of output relative to all inputs (not just labor) grew by about 2 percent per year in the 1980s and then became essentially flat in the 1990s according to World Bank estimates.[30] The difference between no productivity growth and 2 percent growth adds up. At a 2 percent growth rate, productivity doubles every generation, with ensuing benefits for living standards. For living standards to keep rising in the region, productivity growth will have to increase.

Both labor productivity and total factor productivity matter. That the former is growing slowly suggests slow growth in per capita income; that the latter stopped growing suggests that the region has chosen relatively unproductive capital investments. For per capita income to grow at the 2 percent rate predicted by the World Bank, both measures will have to improve.

Soaring Government Deficits Limit Policy Options

Deficits in the region as a percent of GDP have doubled, from an average of 3 percent (1990 to 1997) to 6 percent (1998 to 2003), and government debt has climbed rapidly. Total public debt reached a regional average of 96 percent of GDP by 2003, up from 67 percent in 1997. As the recent World Bank report explains: "Fourteen Caribbean countries are among the 30 most indebted countries in the world, and this exacts a toll on sustainable growth and worsens expectations about macro instability."[31] Soaring deficits constrain the governments' ability to take a more active role in the economy.

---

[29] "A Time to Choose: Caribbean Development in the 21st Century," World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf.
[30] "A Time to Choose: Caribbean Development in the 21st Century," World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf.
[31] "A Time to Choose: Caribbean Development in the 21st Century," World Bank, April 26, 2005, http://wbln0018.worldbank.org/LAC/lacinfoclient.nsf/8d6661f6799ea8a48525673900537f95/fe9533fb44ff524185256ff0004d98b3/$FILE/Time%20to%20choose_report.pdf.

[APG]

> *"Some of these initiatives, such as Petrocaribe, expand on the policies of previous*
> *Venezuelan governments. But now their aim is to cement an anti-American block.*
> *This goal has also led Venezuela to seek close ties with countries such as Iran and China.*
> *With Mr Castro, Mr Chávez claims to be building an alternative (called ALBA) to the*
> *Free Trade Area of the Americas..."*
>
> *The Economist*
> July 28, 2005

4. **Unfriendly nations are attempting to exploit economic stress to gain influence in the region.**

The United States benefits when the countries in the Caribbean Basin prosper. In addition to our economic interests, thriving Caribbean countries would be better able to withstand pressure from America's strategic rivals. Both Venezuela and China, for example, are attempting to use their economic clout to pursue their strategic interests in the Caribbean.

Venezuela and Cuba Promote Alternatives to U.S. Trade Pacts

Venezuela's President Hugo Chávez, in collaboration with Cuban leader Fidel Castro, is promoting a "Bolivarian Alternative" to the FTAA. Of the active member states in CARICOM,[33] only Barbados and Trinidad and Tobago declined to participate in the alternative.[34] Venezuela and Cuba's collaboration is also demonstrated by the 49 trade and development agreements they have signed this year.[35]

Chávez' PetroCaribe is a program of concessionary oil sales to Caribbean nations that is viewed as an attempt to buy influence over a block of votes in international bodies.[36] Thirteen nations have signed on.[37] At a recent meeting of the Organization of American States (OAS), U.S. officials reportedly were unable to persuade members to commit the organization to intervene in a member nation's affairs if democracy there faced a serious threat. They apparently viewed Venezuela as the target of the action.[38]

---

[33] CARICOM's member states are: Antigua and Barbuda, the Bahamas (member of the Community but not the Common Market), Barbados, Belize, Dominica, Grenada, Guyana, Haiti, Jamaica, Montserrat, St. Kitts and Nevis, Saint Lucia, St. Vincent and the Grenadines, Suriname, and Trinidad and Tobago. "CARICOM Member States,"
www.jis.gov.jm/special_sections/CARICOMNew/CaricomMemberStates.html.
[34] Carol J. Williams, "Chavez Extends an Oil-Rich Hand to Neighbors," *Los Angeles Times*, September 13, 2005.
[35] "Venezuelan-Cuban Accords," *Florida Sun-Sentinel*, September 11, 2005. www.sun-sentinel.com/news/local/cuba/sfl-acubabox11sep11,1,7099994.story?ctrack=1&cset=true.
[36] "Using Oil Sales to Spread Revolution," *The Economist*, July 28, 2005,
http://www.economist.com/world/la/displayStory.cfm?story_id=4232330.
[37] Carol J. Williams, "Chavez Extends an Oil-Rich Hand to Neighbors," *Los Angeles Times*, September 13, 2005.
[38] Chris Kraul and Paul Richter, "Frustrated U.S. Finds Few Willing to Join Anti-Chavez Coalition," *Los Angeles Times*, September 17, 2005.

[APG]

While these efforts do not constitute an immediate threat, they pose long-term concerns that the United States should address now. The best way to thwart efforts to undermine democracy and U.S. interests in the Caribbean region is to create jobs and help strengthen local economies though private-sector investment.

[APG]

administered by the USVI's Economic Development Commission (EDC), qualified investments are eligible for substantial reductions in taxes. In 2003, approximately 95 USVI companies employing nearly 9,000 people received tax benefits from the EDC. These companies represented a range of sectors including hotels and tourist attractions, manufacturing, transportation, and export service businesses.[46]

USVI Investment Incentives Provide a Model

The tax incentives applicable to USVI investments provide a model for encouraging private investment, creating jobs, and preserving democracy throughout the region. The program imposes requirements and conditions on beneficiaries to ensure that public policy objectives are achieved.[47]

These requirements include:
- A minimum level of capital investment
- Employment of a minimum number of individuals
- Training for management and employees
- Health and retirement plans for employees
- A preference for the purchase of local goods and services

Congress modified the program to ensure that it promotes legitimate economic development in the USVI as part of the Jobs Creation Act of 2004. In response to perceived abuses, Congress tightened requirements relating to who is considered a USVI resident and restricted the type of income that qualifies for benefits. For this type of program to be successful and sustainable, it must achieve its public policy goals and operate without abuses.

Benefits of the USVI Approach

One benefit of using tax incentives instead of direct government aid is that they encourage investment while maintaining the efficiency of market-based solutions. The government is not well equipped to "pick winners." With tax incentives, private investors bring capital to the region and decide how to deploy that capital, control costs, and manage their projects.

In addition, tax incentives are more effective, dollar for dollar, than direct outlays because they provide leverage. A small amount of tax benefit can lead to a significant improvement in return on a project, relative to other projects, causing a switch to the tax-favored investments and generating an inflow of investment that is larger that the original tax expenditure.

---

[46] General Information, United States Virgin Islands Economic Development Authority, www.usvieda.org/EDC/GeneralInfo/general.info.asp.
[47] The USVI government's comments on the Treasury Department's proposed regulations to implement the American Jobs Creation Act of 2004, July 2005 and Marjorie Roberts, "Budget Extends Tax Benefit Periods for Business," *Tax Notes International*, September 6, 2004. Ms. Roberts was former tax counsel to the U.S. Treasury Department.

[APG]

## Conclusion

As the United States attempts to foster democracy around the world, we also should take action to strengthen our allies in our backyard. Caribbean Basin nations are predominantly democracies with strong ties to the United States. However, these strategically important countries are vulnerable to a wide range of economic and social problems, inroads by unfriendly nations, and natural disasters.

The economies of the Caribbean countries have performed reasonably well, but they still have high levels of poverty. Economic growth, the key to improving living standards, is slowing. Investment, whether public or private, is critical to improve productivity and provide the needed economic boost.

Trade preferences have become less effective for promoting economic development as they have become more widespread. The high debt burdens of these countries preclude major increases in their own public investment, and there are limits to the amount of direct aid the United States is likely to provide. Even if sufficient aid were feasible, productivity problems are better solved by private investment.

There are strong precedents for the U.S. government to provide incentives to generate greater private investment in the region. In particular, the tax incentives for investing in the U.S. Virgin Islands have resulted in increased investment and employment in the territory. Extending similar incentives to investments by USVI companies in other nations along America's Third Border would bolster economic growth and democracy in the region -- and reduce security risks to the United States -- in the years ahead.

[APG]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Guyana | Republic within the Commonwealth | 765,283 | 1,030 | 35 | GSP CBERA CBTPA | 122,667,332 | 135,619,981 |
| Haiti | Elected government | 8,121,622 | 517 | 80 | GSP CBERA CBTPA | 370,666,305 | 663,000,588 |
| Honduras | Democratic constitutional republic | 6,975,204 | 1,086 | 53 | GSP CBERA CBTPA* CAFTA | 3,641,067,296 | 3,076,512,302 |
| Jamaica | Constitutional parliamentary democracy | 2,731,832 | 3,542 | 20 | GSP CBERA CBTPA | 320,304,040 | 1,431,596,126 |
| Montserrat | Overseas territory of the UK | 9,341 | NA | NA | GSP CBERA | 458,994 | 6,055,587 |
| Netherlands Antilles | Autonomous country within the Netherlands; Dutch government responsible for defense and foreign affairs | 219,958 | 16,237 | NA | CBERA | 443,858,386 | 872,640,316 |
| Nicaragua | Republic | 5,465,100 | 871 | 50 | CBERA CBTPA* CAFTA | 990,471,296 | 591,704,850 |
| Panama | Constitutional democracy | 3,039,150 | 4,513 | 37 | GSP CBERA CBTPA | 316,141,696 | 1,820,009,015 |
| St. Kitts & Nevis | Constitutional monarchy with Westminster-style parliament | 38,958 | 10,258 | 31 | GSP CBERA | 41,700,755 | 60,417,268 |
| St. Lucia | Westminster-style parliamentary democracy | 166,312 | 4,658 | 19 | GSP CBERA CBTPA | 14,347,007 | 103,303,535 |
| St. Vincent & Grenadines | Parliamentary democracy; independent sovereign state within the Commonwealth | 117,534 | 4,015 | 33 | GSP CBERA | 4,130,207 | 45,396,474 |
| Suriname | Constitutional Democracy | 438,144 | 2,403 | 70 | GSP | 140,804,365 | 178,561,051 |
| Trinidad & Tobago | Parliamentary democracy | 1,088,644 | 10,881 | 21 | GSP CBERA CBTPA | 5,854,311,208 | 1,207,193,573 |
| Turks & Caicos | Overseas territory of the UK | 20,556 | NA | NA | GSP | 7,275,360 | 137,239,402 |

*The Caribbean Basin Initiative (CBI) includes the Caribbean Basin Economic Recovery Act of 1983 (CBERA); the Caribbean Basin Economic Recovery Expansion Act of 1990 (CBERA Expansion Act), which made CBERA duty-free benefits permanent and added new benefits; and the U.S.-Caribbean Basin Trade Partnership Act of 2000 (CBTPA), which provides NAFTA-parity treatment to certain goods from eligible countries.  NAFTA-parity benefits under CBTPA are scheduled to expire on September 30, 2008, or the date, if sooner, on which the Central American Free Trade Agreement (CAFTA), Free Trade Area of the Americas (FTAA), or other free trade agreement enters into force between the United States and a CBTPA beneficiary country.  All these countries and territories were listed in CBERA as eligible for designation as beneficiary countries.  However, Anguilla, Cayman Islands, Suriname, and Turks & Caicos never requested beneficiary status and therefore are not CBI beneficiaries.  U.S. Department of Commerce,

[APG]

F734-E02204837

# Overview

- Because of the Caribbean region's proximity to the United States, its political and economic stability are essential for our national security.

- The United States has a history of trade, aid, and private investment in the region.

- Caribbean economies have performed reasonably well, but slower growth, poverty, and other challenges threaten their future performance.

- Unfriendly nations are attempting to exploit economic stress to gain influence in the region.

- Traditional approaches of trade preferences and aid will not be sufficient to address slower economic growth.

- Expanding existing incentives for investment in the Caribbean would promote U.S. economic and national security interests.

# The U.S. Has a History of Trade, Aid, and Private Investment in the Caribbean Region

- U.S. trade preference programs have provided duty-free access to the U.S. market for a broad array of products from the region.

  – The Caribbean Basin Initiative is a U.S. program designed to promote economic development in the region.

  – Collectively, the 24 nations benefiting from this initiative were America's 8th largest export destination and 12th largest source of imports in 2004.

- The United States also provides a limited and variable amount of direct government aid to the region.

- The United States has been a significant source of private foreign investment to the region.

# Unfriendly Nations Are Exploiting Economic Stress to Gain Influence in the Region

- Venezuela is buying influence with Caribbean nations using subsidized oil sales.

- Venezuela and Cuba are promoting alternatives to U.S. trade pacts.

- China is increasing its presence in the region, using trade and investment to isolate Taiwan.

- Economic growth and jobs are the best way to thwart efforts to undermine democracy and U.S. interests in the Caribbean.

# Expanding Incentives for Investment in the Region Would Promote U.S. Interests

- There are strong precedents for the United States to provide incentives to generate greater private investment in the region.

- Tax incentives for investments in the U.S. Virgin Islands have resulted in increased economic activity and employment in the territory.

- Extending these incentives to investments made by USVI companies throughout the region would bolster economic growth and democracy.

- Stronger Caribbean nations would serve U.S. security interests.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS | § | |
| CAPACITY AS COURT-APPOINTED | § | |
| RECEIVER FOR THE STANFORD | § | |
| INTERNATIONAL BANK, LTD., et al | § | Civil Action No. |
| | § | 3:10-cv-527-N |
| v. | § | |
| | § | |
| BEN BARNES AND BEN BARNES | § | |
| GROUP, L.P, | § | |

### EXPERT REPORT OF JAMES C. LANGDON, JR., ESQ.

I.    **Scope and Terms of Engagement.**

By letter dated October 10, 2014, a copy of which is attached as Exhibit "A", the undersigned was retained as an expert witness on behalf of the Ben Barnes Group, L.P. ("BBG") and Ben Barnes, Individually, named as Defendants in the above styled and numbered case (the "Lawsuit"). The matters on which I was asked to opine are spelled out in Exhibit A, and I have performed the work necessary to permit me to arrive at the opinions set forth in this report.

II.    **Background.**

For many years I have practiced broadly within the oil and gas field both in a regulatory capacity in Washington DC, but also, especially over the last few decades in the international space, involving Russia, Central Asia, China, South America, and Europe. Over the years, I have also spent considerable time advising clients on matters that might generally be labeled as Washington DC based Government Relations. Perhaps this is an acquired expertise or perhaps it is a function of simple longevity here in Washington.

I have served at various times beginning in the early to mid-1980's as a member of the Washington office Management Committee and then in the early 1990's I served as a member of the firm's central Management Committee and continued that role until being elected by the entire partnership as one of three, Senior Executive Partner of the firm and served in that role for some eight or more years beginning in the early 2000's. During all of these years, I served as a partner in the Washington DC office, which for many of these years beginning in the 1980s was the largest office of Akin Gump. Additionally, my firm's Washington office has long been a prominent provider of Government Relations counseling to clients whose needs include the broad array of services that fit within that category. I have long been involved in counseling in the Government Relations area and work along side many other lawyers both in my firm and in other firms who engage in these activities on a daily basis. Many of these lawyers, and others

including certain non-lawyers, practice as registered lobbyists before state and federal government bodies, particularly the Congress of the United States

I am familiar with Ben Barnes and the BBG, having known Mr. Barnes personally for many years. I am familiar with his and his firm's reputation, particularly as it relates to prominent individuals who practice in Government Relations and lobbying fields. Mr. Barnes and his firm enjoy a fine reputation and have for many years. Like other successful practitioners in lobbying and Government Relations work, the Ben Barnes Group has fostered strong relationships that provide access to a wide range of decision makers, including legislators, which is of value to clients.

## III.    Activity Undertaken and Tasks Performed.

In connection with the work I was asked to undertake in the Lawsuit, I have reviewed the information and conducted the tasks outlined on Exhibit "B" attached hereto. In addition to the foregoing, I have met with counsel for BBG and Mr. Barnes, have reviewed in general the law as it relates to the Texas Uniform Fraudulent Transfer Act ("TUFTA") and the requirements of proof related thereto. In particular, it is my understanding that, for a violation of the TUFTA to be established, the party with the burden of proof must demonstrate (1) that a "transfer" occurred from a debtor; (2) that the transferee was acting in objective good faith in his/its dealings with the transferor; (3) that the transfer was made with the transferor's intent to defraud the transferor's creditors; (4) that what was received in exchange for the consideration transferred was reasonably equivalent in value to the actual payments received. As I understand this particular statute, when applied to the instant situation involving Mr. Barnes and BBG, the claim is that in dealing with the Stanford Financial Group and individuals representing that entity and its affiliates ("Stanford"), BBG and Ben Barnes did not act in good faith, provided little or no value to Stanford or its creditors, and the services rendered were not reasonably equivalent to the payments made.

In that regard, I have assumed the following as facts that I am told can or will be proven in this case:

1.    BBG was engaged by Stanford to provide Government Relations consulting and, to a much lesser extent, lobbying, services to SFG and affiliates;

2.    BBG rendered such services beginning some time in 2003 and continuing to mid-February 2009;

3.    The arrangement involving scope of work to be performed and payment for such services between BBG and SFG was informal, consisting of verbal agreements coupled with periodic invoices issued by BBG to SFG;

4.    All payments received by BBG from SFG for services rendered were paid by SFG or an affiliate company;

5.     The services provided by BBG are summarized in two multi-page letters from Kent Caperton, Esq. (on behalf of BBG) to Kevin Sadler, Esq., counsel for the Stanford Receiver dated September 10, 2009 and November 13, 2009, respectively;

6.     BBG retained certain contractors on behalf of SFG, among them being the following:  Robert Mitchell Delk; Cheaspeake Enterprises, Inc., Cauthen Forbes & Williams LLC, Synergics Energy Services, LLC ("Contractors");

7.     Each of the Contractors was retained and performed services for SFG with the express approval of SFG representatives;

8.     With only minor exceptions, the Contractors billed BBG on a monthly basis with BBG serving as a conduit or clearing house for the Contractors;

9.     As BBG received invoices from the Contractors, the invoices would typically be held for payment pending receipt of payment for those services from SFG;

10.    On some occasions, including in late 2008 early 2009, BBG advanced funds regardless of whether payment therefore had already been received from SFG;

11.    At least at the end of the rendition of services for SFG, BBG advanced monies to the Contractors without receiving any reimbursement from SFG;

12.    BBG did not bill or collect for out-of-pocket expenses incurred on behalf of SFG, such out-of-pocket expenses totaling between $450,000 and $500,000;

13.    During the entirety of 2008 and through February 2009, BBG received no payments for services it rendered or expenses it incurred on behalf of SFG, but any such payments that were received were on behalf of the Contractors;

14.    BBG's fees charged to SFG for services rendered were either at or below market for BBG's peer groups in rendering similar services;

15.    The services rendered by BBG to SFG either created value or had the potential for creating value for SFG, which would ultimately have benefited creditors of SFG;

16.    On one or two occasions, services rendered by BBG actually assisted SFG in creation of revenue on its behalf; and

17.    For the entire period of time during which BBG rendered services for SFG, it was paid the total sum of $3,709,512.00 (which included out-of-pocket expenses) with the remaining payments from SFG being for the benefit of the Contractors.

## IV. Opinions and Conclusions

Based upon the foregoing, I express the following Opinions:

1. BBG rendered a high level of professional Government Relations services to Stanford. These services were rendered as I understand from mid-2003 through January, 2009, which by Washington standards is a significant time frame to represent a client in regard to Government Relations matters. This length of service would tell me that the client found significant value in these services and if I recall correctly Jim Davis, a senior Stanford executive testified to this point directly in his deposition;

2. These services were rendered to Stanford by BBG and its employees, as well as by a small consortium of other Washington practitioners selected by BBG and recommended to the client for specialized work with the full range of government relations sought by Stanford;

3. The services that were rendered by BBG for Stanford were of the type customarily rendered by entities or individuals engaged in the rendition of consulting services in the Governmental Relations area, and in dealings with government agencies, as well as lobbyists similarly situated to BBG and Mr. Barnes;

4. The services rendered by BBG resulting in some $3+ million in fees to BBG over approximately 6 years, as well as the professional services which were subcontracted by BBG, as seen by a competitive provider of such services, look to have been of very high quality and competence. The creation of such "ad hoc" group of advisors to address the individualized needs of a client is one important indicator of the professional competence of an organization such as BBG in terms of the value of services delivered;

5. The services rendered by BBG, if I have done the math correctly over some 6 years in the context of total fees paid, would indicate a monthly retainer of approximately $45,000 to $50,000 which very unusually also included expenses, would seem to be a very reasonable level of expenditure for this level of professional service and therefore reasonably equivalent to the amounts paid for these services. The starting point for Government Relations work across many individual areas of interest, for a substantial company without a Washington office, would be the minimum amount that it would cost a company to open such an office in Washington. A $50,000 per month retainer to BBG would be far under the monthly cost of opening such an office, with staff, rent, and a well-respected Washington lobbyist. Secondly, the longevity of this relationship also suggests management was well satisfied with the value received for services rendered, and finally the quality of others which BBG brought into this relationship also speaks to both to the quality and ultimate values of the services rendered; and

6. BBG also served as the quarterback for adding skilled specialists from other firms into the "ad hoc" group BBG created for the purpose of representing the interests of Stanford. While often seen as only an administrative function, the work of managing the team is far more complex than most might imagine, First, the client is going to hold BBG responsible for the work product of all those that are recommended and ultimately hired by the client. Explaining exactly what each does and why such a person or firm is needed becomes the responsibility of

BBG. Communicating for example why research (or polling) might be necessary, and why poll results are important in political outcomes, becomes a BBG responsibility to the client. Time consumed managing a larger "ad hoc" team can be much more extensive than managing your own team both administratively and substantively.

Dated: 1/16/15

Respectfully submitted,

James C. Langdon, Jr.